UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:
BRANDON HEITMANN

Chapter 7
Case No. 24−41956−mar
Hon. Mark Randon

Debtor(s)

_____/

MOHAMED SAAD,

     Plaintiff,

v

BRANDON HEITMANN

     Defendant.

Adv. Pro. No. 24-04375-mar

_____/

## **DEFENDANT'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

## **INTRODUCTION**

This case arises out of a dispute concerning the construction of a luxury swimming pool initiated by the plaintiff, Mohammad Saad ("Saad"), at his residence 921 Crescent Drive, Dearborn, Michigan (the "Project"). The defendant, Brandon Heitmann ("Heitmann"), was the principal of Exigent Landscaping, LLC ("Exigent"), the contracting entity responsible for the Project. Plaintiff claims damages under several provisions of the United States Bankruptcy Code, including defalcation of trust (§523(a)(4)), fraud (§523(a)(2)), and claims for willful and malicious injury (§523(a)(6)) against Heitmann personally.

1

Plaintiff's claims must be dismissed. First, the Plaintiff's allegations of defalcation of trust, conversion, and fraud,[1] all arise from the Michigan Building Contract Fund Act ("MBCFA") and fail as a matter of law. Specifically, these claims fail under the MBCFA because: (1) Plaintiff has not provided evidence that subcontractors who allegedly did not receive payment from Exigent were "engaged" at the time payments were made form Plaintiff to Exigent; (2) Plaintiff was actually behind on progress payments to Exigent; and (3) Plaintiff has not demonstrated that he suffered damages, such as paying subcontractors twice for the same work. Under the MBCFA, there is no breach of trust unless the contractor fails to pay a subcontractor or supplier who is "engaged," at the time payment is made. This is a vital requirement of the MBCFA that allows general contractors to disburse funds to themselves for overhead and profit throughout the project after each progress payment, rather than waiting until final payment to do so. Plaintiff's interpretation of the statute would disrupt this business model, essentially hampering the cash flow of contractors in Michigan.

Plaintiff's claims damages based on fraud and willful malicious injury are predicated on the assertion that Heitmann was not a licensed residential builder as required by Michigan law and that he misrepresented his licensure status to the plaintiff. However, even assuming Plaintiff's allegations are true, Plaintiff has failed to establish a claim of non-dischargeability because: (1) Heitmann obtained the required residential builder's license during the Project, correcting any prior deficiencies; (2) plaintiff has failed to establish a causal nexus between any his damages— which arise from alleged construction defects—and the absence of licensure on the part of Heitmann; and (3) Plaintiff has failed to establish his criticism of Exigent's construction were actually "defects." Furthermore, the purported "hybrid" expert opinions relied upon by the plaintiff

---

[1] Plaintiff's claim for fraud under 11 USC § 523(a)(4) has two factual bases, one of which is violation of the MBCFA.

are inadmissible, as they are not based on scientific or statutory principles. Instead, they are essentially critiques from a salesperson who, ironically, is not a licensed residential builder himself.

In sum, because Plaintiff cannot establish a cause of action under the MBCFA and cannot substantiate the damages for his fraud claims with admissible evidence, Plaintiff's case should be dismissed in its entirety.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. FRCP 56, *Waller v. Thames*, 852 F.2d 569 (6th Cir. 1988) The plaintiff must present affirmative evidence sufficient to create a genuine issue of material fact regarding damages. *See*, *White v. Wyndham Vacation Ownership, In*c., 617 F.3d 472 (6th Cir. 2010). A mere scintilla of evidence is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff. *Anderson v Liberty Lobby*, Inc, 477 US 242, 252; 106 S Ct 2505; 91 L Ed 2d 202, 214 (1986). Moreover, the evidence presented by a plaintiff must be more than "merely colorable" and if it is "not significantly probative, summary judgment may be granted…" *White v Wyndham Vacation Ownership*, Inc, *supra* 617 F 3 d at 476. Consistent with this, a plaintiff cannot rely upon mere conclusory assertions, but must show that there is **competent**,[2] admissible evidence of specific facts. *Waller, supra*, 852 F2d 569.

## STATEMENT OF MATERIAL FACTS

*General Background*

As stated previously, the Project was contracted for between Plaintiff and Exigent, Heitmann's former company. The Project consisted of the Scope of Work set for in the Contract,

---

[2] Empasis added.

as amended by Change Order 1 (**Exhibit 6a**, *the Contract*).[3] This included a shotcrete swimming pool and spa, with a lazy river; grotto and slide; bridge; frameless glass fence, and "finishing touches." (**Exhibit 6a** at pages 1-3). Plaintiff approved plans for the pool and grotto provided by Exigent. (**Exhibit 6b, 6c**, *Approval Email and Plans*). The Contract was executed on or around June 27, 2022. (**Exhibit 6** at page 3). Change Order #1 was executed on or about August 5, 2022. (*Id.*) Change Order #1 modified the contract to provide for a quicker progress payment schedule due to the inclusion of "jumping jets" free of charge. *Id.* Work began on the Project on or around September 2022. Exigent was terminated after its Chapter 11 Bankruptcy sometime in the fall of 2023.

Plaintiff filed this action [Dkt. 1] alleging non-dischargeability under 11 USC § 523(a)(2); 11 USC § 523(a)(4) and a state law claim for "statutory conversion." Plaintiff filed its First Amended Complaint ([Dkt. 34] and (**Exhibit 6d**, *First Amended Complaint*)) on April 15, 2025, to add a count under 11 USC § 523(a)(6).

*Relevant Background for the MBCFA*

Plaintiff's allegations related to the MBCFA relate to three specific payments made to two separate contractors: (1) Messina Concrete; and (2) Dolphin Waterslides. [Dkt. 34 at ¶ 27]; (**Exhibit 6e**, *Plaintiff's Interrogatory Responses* at Interrogatory #5).

1. Messina Concrete Payment

It is undisputed Messina Concrete was responsible delivering the concrete or "shotcrete" which formed the shell of the pool, lazy river, and spa for the Project. It is also undisputed that

---

[3] During Plaintiff's deposition, he testified there may have been another change order. None has been produced, and Plaintiff has not provided a copy of this alleged second change order. Accordingly, this "conclusory allegation" does not rise to the level needed to support Plaintiff's response to this motion. The transcript for Plaintiff's deposition was not available at the time of filing and will be provided as a supplemental exhibit once received.

4

Messina delivered this concrete on December 12-13, 2022. Plaintiff has provided no evidence to show that Messina was "engaged" by Exigent prior to these dates or that previous amounts paid by Plaintiff were intended to be applied to the concrete for the pool. Put another way, Plaintiff has failed to provide evidence showing Exigent had already engaged Messina to provide materials prior to their delivery and was short on payment, despite having already received payment from Plaintiff. Indeed, the documentary evidence which is available, and which is not disputed by Plaintiff, shows that Plaintiff was significantly behind in his progress payments as of Messina's delivery date and that, as a compromise to keep the Project moving forward, Exigent agreed to allow Plaintiff to direct pay Messina. Specifically, the unrebutted documentary evidence shows as follows:

1. As of the date of Messina's delivery, Plaintiff was supposed to have paid Defendant a total of $300,000. (**Exhibit 6a**, at Change Order 1)

2. As of the date of Messina's delivery, Plaintiff had only paid Exigent $150,000. (**Exhibit 6f**, *Exigent Payment Tracker*). Accordingly, as of the date of Messina's delivery, Plaintiff was $**150,000.00** delinquent in progress payments.

3. Heitmann had previously asked Plaintiff to make the required progress payments according to the contract and change order. (**Exhibit 6g**, *Heitmann Communication regarding Payment*).

4. In addition to the $150,000 owed, Plaintiff was required to pay Exigent another $70,000.00 after the shotcrete shell was formed. (**Exhibit 6a** at Change Order 1).

5. On Messina's date of delivery, Exigent requested Plaintiff pay Messina directly for the concrete. Heitmann indicated to Plaintiff that he thought Messina would accept payment after delivery [thus payment from the next progress payment would be acceptable], but that Messina wanted payment on delivery. (**Exhibit 6h,** *December 12 Text Thread*).

6. Plaintiff did not object to the requirement for direct payment. (**Exhibit 6h**)

7. Plaintiff, consistent with this arrangement, made direct payment to Messina on the day of delivery. (**Exhibit 6i**, *Invoices*).

8. Plaintiff was credited for his direct payment, and made another payment on December 30, 2022. (**Exhibit 6f).**

9. As of December 31, 2022, which was after the concrete had been poured, Plaintiff was still **$93,651.20** delinquent in progress payments.

2. Dolphin Waterslides Payment

It is undisputed Plaintiff paid Dolphin Waterslides $11,437.76 on August 1, 2023. However, once again, Plaintiff failed to provide any evidence to show that Exigent was actually engaged with Dolphin or that Plaintiff had already paid for the waterslide. Moreover, once again, the documentary evidence shows that payment was made to Dolphin upon the ordering of the waterslide and that Plaintiff was behind in progress payments. Specifically, the Documentary evidence shows:

1. An invoice for the waterslide was generated on August 1, 2023 (**Exhibit 6j**, *Dolphin Waterslide Invoices* at pg. 3).

2. Pursuant to this invoice payment was not due for 90 days, on October 3, 2023. *Id.*

3. Plaintiff made direct payment to Dolphin Waterslides on the same day the invoice was generated August 1, 2023. *Id.*

4. As of the date of the payment to Dolphin Waterslides, Plaintiff was still **$44,796.74** delinquent in progress payments. (**Exhibit 6f**)[4]

*Relevant Background for Fraud and Allegations of Construction Defects*

Plaintiff's remaining claims arise from allegations of fraud, seeking damages for the allegedly necessary repairs due to construction defects.

---

[4] Progress payment 5 would have been due under the Contract.

To support liability, Plaintiff generally asserts that Heitmann misrepresented his licensure status on the contract by placing a fraudulent license number upon the same. Heitmann disputes that this license number was ever intended to deceive, but does not dispute that, at the time of entering into the contract, he did not hold a valid residential builder's license.

However, even assuming this is true, there are several key facts relevant to this allegation: First, Plaintiff never verified Heitmann's license number via the Michigan Secretary of State's website. Second, Plaintiff was informed by Heitmann that a different individual was responsible for obtaining construction permits—someone other than Heitmann. Moreover, at the time Plaintiff learned this information, no work was actively being performed on the project (see **Exhibit 6k**).

However, these facts notwithstanding, Plaintiff has failed to provide any evidence establishing the veracity of the damages claimed or provide any a causal connection between Heightman's licensing status, and Plaintiff's damages.

The only evidence provided by Plaintiff to support his damages is an email from Justin Booth, a salesperson of the replacement pool contractor. This email outlines all of Plaintiff's claims of defective construction and was relied upon by plaintiff in formulating his calculation of damages. (**Exhibit 6l**, *Booth Email*) However, this email, and Mr. Booth's testimony are unreliable and inadmissible because Mr. Booth is not an expert (Plaintiff has been barred from naming experts, *See* Dkt. 77) and cannot be a fact-hybrid expert because he has no residential builder's license and no expertise in structural, mechanical, or electrical engineering. (**Exhibit 6m**, *Booth Transcript* at pp. 15-22).

Below is a summary of each opinion Mr. Booth provided and the reason he lacks the qualification or factual basis to make the opinion stated.

| Alleged Defect | Lack of Qualification or Factual Basis |
|---|---|
| The Grotto was installed with inadequate footings. | Mr. Booth has no structural engineering degree and cannot critique the engineered structural calculations provided by Exigent's engineer. (**Exhibit 6m**, pp. 15-22; 65-72) |
| Exigent failed to include a shallow area in the pool, posing safety hazards. | Mr. Booth admits the applicable code defines any area under five feet in depth as a "shallow area" and that 75% of the pool comprises of shallow area as defined by the code. Mr. Booth is not a residential builder (**Exhibit 6m**, pp. 15-22; 72-73; **Exhibit 6c; Exhibit 6n**, *International Swimming Pool and Spa Code* at p. 2-11) |
| The "Lazy River" cannot function at its designed / constructed width. | Mr. Booth does not provide any code requirement as to the required width of a lazy river. Moreover, Mr. Booth cannot provide any form of objective metric which would support this claim. (**Exhibit 6m** at pp. 27-29, 44) |
| The "Lazy River" pump system is inadequate. | Mr. Booth has no experience in mechanical engineering, cannot identify an objective measurement of the current required to make the lazy river feature operate correctly, and his opinion relies entirely upon third parties who are not named as witnesses. (**Exhibit 6m**, pp. 57-62). |

| Alleged Defect | Lack of Qualification or Factual Basis |
|---|---|
| The stairs as installed are too small. | Mr. Booth admits the surface area of the stairs is more than double the code requirements and has failed to provide any evidence to the contrary. (**Exhibit 6m** pp. 74-78; **Exhibit 6c; Exhibit 6n** at p.86; §809.5.1). |
| Spa spillover would not function as designed or installed. | Mr. Booth cannot provide scientific data or objective analysis to support this allegation. (**Exhibit 6m** at pp 42-44) |
| Tan ledge feature not functioning properly | Mr. Booth cannot provide scientific data or objective analysis to support this allegation. (**Exhibit 6m**, at pp. 27-29) |
| Improperly installed conduits | Mr. Booth cannot specify the allegedly violated code provision, nor show with particularity where the code was exceeded. (**Exhibit 6m**, 47-50) |
| Undersized plumbing risking efficiency | Mr. Booth lacks mechanical engineering expertise. Further Mr. Booth provides no evidence showing what the proper sized pipes should be as compared to what was installed. (**Exhibit 6m**, pp. 57-65). |

| Alleged Defect | Lack of Qualification or Factual Basis |
|---|---|
| Pool lights not installed according to safety standards | Code does not require spa area lights. This is merely a subjective opinion-based assessment. (**Exhibit 6m**, at pp. 55, **Exhibit 6n** at p. 3-43) |
| Failed to obtain required city inspections | Cannot identify applicable codes requiring inspections for these features. (**Exhibit 6m** pp.47-51) |

Finally, even disregarding Mr. Booth's lack of qualifications and factual basis for his opinions, Plaintiff has completely failed to provide any other evidence of his claims. By way of example: ( 1) Plaintiff claims the grotto roof is cracked, but has not provided a picture of the crack; (2) Plaintiff has not provided as-built measurements; (3) Plaintiff alleges the grotto has shifted / settled, but has not provided any photographs showing the settlement; (4) Plaintiff has not provided the actual contract for the work to be performed by the replacement contractor (Mr. Booth testified the only contract provided by Plaintiff was not the final contract (**Exhibit 6m** at pp.80-81). Simply put, Plaintiff has not provided anything that it can show a trier of fact at trial to substantiate its claim.

Accordingly, because Plaintiff has failed to meet his burden, Heitmann now brings this motion for summary judgment.

## <u>ANALYSIS</u>

I. **Plaintiff has failed to establish two key elements under the MBCFA: (1) that contractors were "engaged" at the time of payment; and (2) damages. Moreover, if this Court were to adopt Plaintiff's interpretation of the MBCFA, it would fundamentally disrupt the ability for contractors to function in Michigan.**

Plaintiff's Count II alleges that the entirety of funds paid to Exigent were "trust funds" under the MBCFA and that Heitmann misappropriated those funds by paying his own company before paying subcontractors, suppliers, and materialmen on the Project [Dkt. 34; **Exhibit 4** at ¶73-77] and that this violation of the MBCFA is a defalcation of trust pursuant to 11 USC §523(a)(4). Plaintiff completely misunderstands the MBCFA.

To support a claim a claim for defalcation of trust under 11 USC §523(a)(4), a plaintiff must show: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss. *Patel v Shamrock Floorcovering Servs*, (In re Patel), 565 F3d 963, 968 (6th Cir., 2009).

A fiduciary relationship can be established by demonstrating a trust. A trust is established by showing (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary. *Id.* The 6th Circuit has held that the MBCFA "MBTFA makes the general contractor a trustee of project funds and imposes on him the duty to pay the beneficiaries--the subcontractors--before himself and his employees and before paying any other expenses." *Id.* at 169.

With all due respect to the Sixth Circuit, this is an incomplete statement of Michigan law, and it appears this incomplete recitation has been relied upon by Plaintiff to Heitmann's detriment. There is no disputed funds paid by the owner to the contractor that are held in trust for the benefit of the person making payment, contractors, laborers, subcontractors, and materialmen. In fact, this is the plain language of the first section of the MBCFA, MCL § 570.151. However, the second portion of the statement by the Sixth Circuit that the MBCFA imposes a duty "to pay the beneficiaries--the subcontractors--before himself and his employees and before paying any other expenses." is not accurate.

MCL 570.152, states as follows:

> Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part therefor, of any payment made to him, for any other purpose than to first pay laborers, subcontractors and materialmen, **engaged by him to perform labor or furnish material for the specific improvement**, shall be guilty of a felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court.

(emphasis added). As can be seen here, the Sixth Circuit's recitation misses a key element—that laborers, subcontractors, or materialmen must have been engaged by the contractor to provide services. In other words, the MBCFA does not require a contractor to withhold payment to himself until the project's completion out of concern about withholding funds from a yet-to-be-retained subcontractor. Instead, it merely specifies the sequence in which funds should be disbursed once payment is received. This additional element, that downstream subcontractors and suppliers have been engaged, has been confirmed by Michigan courts. Specifically, in *Livonia Bldg Materials Co v Harrison Constr Co*, 276 Mich App 514, 519; 742 NW2d 140 (2007), the Court set forth the five elements to establish a claim under the MBCFA as follows:

> "To establish a claim under the MBTFA, a plaintiff must show: (1) that the defendant is a contractor or subcontractor engaged in the building construction industry, (2) that the defendant was paid for labor or materials provided on a construction project, (3) that the defendant retained or used those funds, or any part of those funds, (4) that the funds were retained for any purpose other than to first pay laborers, subcontractors, and materialmen, and (5) that the laborers, subcontractors and materialmen were engaged by the defendant to perform labor or furnish material for the specific construction project.…" *Id.*

12

Finally, this interpretation of the statute aligns with the fundamental principles governing the Michigan building industry. Contractors cannot be expected to delay payments for their own overhead or profit until project completion, especially in projects extending over two or three years. Such an approach would effectively render the contractor as a de facto bank, which is inconsistent with standard construction practices. Typically, contractors receive progress payments from owners, enabling them to pay subcontractors and suppliers incrementally, thereby maintaining functional cash flow within the industry. Interpreting the MBCFA in Plaintiff's favor would impose an impractical cash flow crisis on the construction industry—an outcome clearly contrary to the drafters' intent.

Applying the above to this case, Plaintiff's claim must fail because he cannot establish: (1) that the subcontractors or suppliers in question were "engaged" at the time money was paid to and; (2) even assuming there was a breach of trust (there wasn't) Plaintiff cannot establish the "resulting loss" required by 11 USC §523(a)(4).

With respect to the first point, the unrefuted evidence clearly demonstrates that the payments made to the subcontractors—specifically, to Concrete and Dolphin Water Slides—were directly made by the plaintiff on the same day they were engaged to perform services and not prior to.

Regarding Messina, the evidence establishes Plaintiff was $150,000.00 behind in progress payments as of the date Messina provided concrete. (**Exhibits 6e; 6f; 6g**) Further, Plaintiff could not have previously paid for the concrete as a seperate progress payment but, was to be provided for after delivery of the concrete to cover its costs. (**Exhibit 6a**) Finally Plaintiff and Defendant discussed the direct payment to Messina the same day the materials were delivered and Plaintiff

13

did not object. (**Exhibits 6h; 6i**). Clearly, Messina was not owed money or "engaged" to perform services prior to Plaintiff's direct payment.

Turning to Dolphin Water Slides, the evidence shows that the plaintiff was significantly delinquent on overall progress payments—exceeding $40,000—and that a payment correlating with the slide's order was made on the same day, as evidenced by the invoice. (**Exhibits 6f; 6j**). Therefore, as Plaintiff has failed to establish that the subcontractors were engaged by Heitmann prior to the payments becoming due, Plaintiff has not satisfied one of the key elements under the MBCFA. Consequently, Plaintiff cannot establish that Heitman violated the trust established under the MBCFA.

Finally, even assuming, arguendo, that Plaintiff's interpretation of the MBCFA prevails, Plaintiff has failed to demonstrate any resulting loss under the MBCFA and therefore failed to establish a claim under 11 USC §523(a)(4). Contrary to Plaintiff's assertions, Plaintiff's damages are not "all funds" paid to Exigent, rather it would be funds which were paid twice for the same work. Indeed, the MBCFA does not require contractors to account for every penny spent years after project completion; rather, it establishes a prioritized disbursement scheme designed to protect material suppliers and owners from duplicative payments. Here, Plaintiff cannot establish that the funds previously paid to Exigent were intended to cover the same work twice.

In sum, because Plaintiff cannot establish Messina and Dolphin were "engaged" by Exigent prior to payment and cannot prove a duplication of payments under the Michigan Building Contract Fund Act, Count II should be dismissed. Additionally, Plaintiff's count for statutory conversion, (Count III), which arises solely out of Heitmann's alleged misappropriation of trust funds (Dkt. 34; **Exhibit 6d** at ¶ 78-83) should be dismissed.

**II. Plaintiff's remaining Counts, Counts I and IV, should be dismissed because Heitmann became licensed during the course of the project and because Plaintiff has failed to provide any admissible evidence of damages due to purported fraud.**

*a. Under Michigan Law, if party becomes licensed during the course of a project, it cures any alleged wrong arising from an initial lack of licensure.*

There is no dispute that Heitmann obtained his residential builder's license during the course of the project and this Court can take judicial notice of the same. Accordingly, any ills resulting from a lack of licensure were cured when Heitmann obtained his license. As stated by the Michigan Court of Appeals:

> The clear and unambiguous language of the statute imposes no requirement that a residential builder be licensed at the time the contract is signed in order to bring or maintain an action in a court of this state for the collection of compensation for the performance of the contract and, therefore, one may not legitimately append this requirement to the statute. In other words, because the statute does not require a residential builder to allege and prove that the builder was licensed at the time the contract was signed, neither may the courts.

*Edgewood Dev*, Inc *v Landskroener*, 262 Mich App 162, 167; 684 NW2d 387 (2004). It follows that, if the Michigan legislature saw fit to allow a residential builder to bring a claim on a contract so long as it became licensed during the course of the project, failure to have the license at the outset of the contract is not tantamount to fraud. Therefore, Plaintiff's claims relating to fraud, Counts I and IV, should be dismissed.

*b. Even assuming all of Plaintiff's allegations regarding fraud and lack of licensure are true, plaintiff has failed to establish damages.*

Both a claim under 11 USC § 523(a)(2)(A) and 11 USC § 523(a)(6) require a plaintiff to establish damages directly and proximately caused by a defendant's acts. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert),* 141 F.3d 277, 280-81 (6th Cir. 1998) ((discussing 523(a)(2)(A)); *CMEA Title Agency, Inc. v. Little* (In re Little), 335 B.R. 376 (Bankr. ND. Ohio,

15

2005 (discussing § 523(a)(6)). In this case, Plaintiff's failure to provide a credible expert or any documentary evidence of the alleged conditions is fatal to Plaintiff's claim.

It is well established that a defendant, if moving for summary judgment, can meet their burden by showing that the plaintiff lacks sufficient evidence to prove causation. The defendant need not disprove causation but must demonstrate the absence of evidence from which a rational trier of fact could find for the plaintiff *See*, *eg*, *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797 (6th Cir. 2000). Moreover, in order to survive a motion for alleging a lack of proofs, a mere scintilla of evidence presented by Plaintiff is insufficient; rather there must be evidence on which a jury could reasonably find for the plaintiff. *Anderson supra,* 477 US at 252. Moreover, the evidence presented by a plaintiff must be more than "merely colorable" and if it is "not significantly probative, summary judgment may be granted…" *White, supra* 617 F3 d at 476. Consistent with this, a plaintiff cannot rely upon mere conclusory assertions, but must show that there is **<u>competent</u>**,[5] admissible evidence of specific facts. *Waller, supra*, 852 F2d 569. Finally, when damages involve specialized knowledge, expert testimony is necessary to establish a causal relationship between the alleged act and damages. *See e.g., Devnshire v Johnston Group First Advisors*, 338 F Supp 2d 823, 826 (ND Ohio, 2004).

Plaintiffs damages for Counts I and IV all arise from alleged construction defects. However, Plaintiff has failed to establish a casual nexus between the lack of licensure and the alleged defects. That is, there is no testimony in the record which would establish that a licensed builder would not make the same alleged mistakes that Heitmann and Exigent allegedly did. For this reason alone, Plaintiff's claims should be dismissed.

---

[5] Empasis added.

Yet, even if this Court were to assume *arguendo* that there was some sort of causal nexus between Heitmann's initial lack of licensure and the purported defects, Plaintiff has failed to establish there was actual, defective construction.

First, as a threshold matter, Plaintiff has failed to document the alleged defective condition of the work. There are no photographs, measurements, or any other documentary evidence of the alleged defective conditions. In fact, Plaintiff has not even produced the contract between him and the replacement contractor, which would detail the scope of work set forth as a result of the alleged defects. Therefore, there is no way to determine precisely what work was done to remediate the alleged defects. No trier of fact could reasonably find for Plaintiff based on these mere, lay and conclusory allegations of defective construction without further evidence. Therefore, Plaintiff's Counts I and IV should be dismissed.

Next, even if this Court were to get past the fact no causal nexus has been established and if this Court were to get past the fact there is no actual documentation of the defective conditions, Plaintiff has not provided any expert testimony related to the defective construction. Plaintiff was previously stricken from this Court from presenting an expert at trial [Dkt. 77]. As an attempted work around for their failure to provide the requisite reports under FRCP 26, Plaintiff appears to be attempting to utilize Justin Booth of Coastal pools as an alleged "hybrid" fact witness. However, this blatant gamesmanship meant to deprive Heitmann of information must be rejected for one simple reason: Mr. Booth is not an expert in anything but sales.

During Mr. Booth's deposition, he testified: (1) he has no mechanical, electrical, or engineering degrees; (2) he is not a licensed residential builder; and (3) that he relied on sources not in the record when formulating opinions (i.e., his opinions did not come from his own firsthand observations). (**Exhibit 6m**, *Booth Transcript* at pp. 15-22). This is a far cry from the treating

physician, who happens to be uniquely qualified to speak to the observations which he or she viewed firsthand.

Finally, even if this Court were to get past the fact that Plaintiff has not established the requisite causal nexus; Plaintiff lacks any documentary evidence; and does not have a credible expert to testify to alleged failures of engineering and construction, the individual defects presented do not have a factual basis established by competent evidence. A summary chart of the alleged defects is presented in the Statement of Material Facts section of this brief, but each will be explained in further detail below here.

i.     Grotto Footing and Structural Integrity

Plaintiff alleges that the grotto installed by Exigent was defective, particularly concerning its footings, which purportedly led to cracking and shifting. This claim has several fundamental issues. First, Exigent submitted structural load calculations with the plans, indicating the footings were appropriately sized for the weight of the grotto (**Exhibit 6c**). Plaintiff has not provided any critique as to the adequacy of these calculations, nor provided evidence that the structure was loaded contrary to the calculations in the structural plans. Second, and perhaps even more fundamentally, Plaintiff has not provided any evidence, aside from his own conclusory opinions, to show the grotto is actually cracked or settling—no photographs, measurements, elevations— nothing. No trier of fact can find for Plaintiff on this evidence. Finally, to the extent Plaintiff were to rely on Mr. Booth it cannot because Mr. Booth lacks the structural engineering expertise to testify about these engineering defects. (**Exhibit 6m**, *Booth Transcript* at pp. 15-22; 65-72). Accordingly, because Plaintiff has failed to provide any evidence regarding the grotto, Heitmann's motion should be granted.

## ii.   Shallow Area in Pool Design

Plaintiff claims that Exigent failed to include a shallow area in the pool design. This contention is demonstrably incorrect. According to the International Pool and Spa Code, a shallow area includes any portion of the pool under five feet deep. (**Exhibit 6n**, *International Swimming Pool and Spa Code* at p. 2-11). The plans show nearly 75% of the pool meets this criterion. (**Exhibit 6c**) Neither the plaintiff nor Mr. Booth has provided evidence proving the field conditions differ from Exigent's design (**Exhibit 6m**, pp. 15-22; 72-73). This claim should be dismissed.

## iii.   Lazy River Design and Functionality

Plaintiff argues the lazy river cannot function as designed due to its width. This claim lacks merit. First, there are no regulatory width requirements for lazy rivers, necessarily making Plaintiff's opinion on the matter purely subjective.[6] Furthermore, Plaintiff apparently arrived at this assessment by assessment using a "standard" inner tube of unspecified diameter (**Exhibit 6m** at pp. 27-29, 44). This is clearly unscientific and not an acceptable means of proof before this Court. Finally, due to the subjective nature of this opinion, it is clear there can be no causal nexus between any alleged deficiency and a lack of licensure at the time the parties contracted. Defendant should be granted

## iv.   Lazy River Pump System Adequacy

Plaintiff alleges that the Lazy River pump system is insufficient to generate an adequate current. However, there is no standard requirement for the water current in a lazy river or supporting calculations to substantiate claims of system inadequacy. The entire argument rests on

---

[6] Heitmann maintains that the width of the lazy river at its narrowest (5 feet) is sufficient, but this is immaterial of the purposes of this motion.

third-party contractor opinions not included in the record. (**Exhibit 6m**, pp. 57-62). As a hybrid fact-expert witness, Mr. Booth cannot rely on the opinions of others, but must rely on his own expertise, which he does not have. Accordingly, any claims relating to this alleged defect must be dismissed.

v.      Stair Dimensions

Plaintiff vaguely asserts that the stairs in the pool are too small. This allegation is completely without merit.  First, the International Pool and Spa Code requires the tread of a stair to be at least 240 square inches in area (**Exhibit 6m** pp. 74-78; **Exhibit 6c; Exhibit 6n** at p.86; §809.5.1). The plans in this case detail a tread surface area exceeding 570 square inches, more than twice the required surface area. Further, Plaintiff has failed to identify the actual surface area of the as-built stairs. No reasonable trier of fact can find the stairs are too small when: (1) the as-planned dimensions are more than double the area required by code; and (2) the Plaintiff cannot produce the dimensions of the as-built stairs. Damages related to this claim must be dismissed.

vi.     Spa Spillway Design

Plaintiff claims the spa spillway design is not at the proper height, resulting in improper circulation of pool water. First, once again Plaintiff does not provide the actual dimensions of the as-built spillway.  It is obvious a trier of fact cannot determine whether the height was adequate if there is no evidence of the existing height itself. Moreover, even assuming an estimate of the as-built height was provided, there is no objective evidence demonstrating that this will affect circulation. No calculations showing the turnover rate (i.e., the rate at which water is circulated in the pool) have been provided by Plaintiff or by Mr. Booth. (**Exhibit 6m** pp. 74-78; **Exhibit 6c; Exhibit 6n** at p.86; §809.5.1). This claim should be dismissed.

vii.    <u>Tanning Ledge Depth</u>

The "tanning ledge" allegations relate to the splash pad at the center of the island in the pool, which was planned at 1 foot in depth (**Exhibit 6c**). Plaintiff alleges this area is too deep to be safe. However, this allegation is without merit for several reasons: (1) there is no code requirement for the depth of a splash pad; (2) plaintiff has failed to provide other evidence that the 1 foot as-planned depth was objectively unsafe (**Exhibit 6m**, at pp. 27-29) and Plaintiff has failed to provide any evidence of the actual depth of the splash pad. Accordingly, damages related to this alleged defect must be denied.

viii.    <u>Electrical Conduit Installation</u>

Plaintiff claims improper installation of electrical conduits due to excessive right angles in the conduit run. Plaintiff has not provided any evidence to support this claim. First, Mr. Booth, who testified to this matter, lacks qualifications because he is not a residential builder, electrician or electrical engineer. Moreover, Mr. Booth cannot cite the portion of the applicable code that the existing conduit allegedly violates. Finally, Plaintiff cannot point out with any specificity where the allegedly unlawful conduit runs were located. (**Exhibit 6m**, 47-50). This claim should be dismissed.

ix.    <u>Plumbing System Efficiency</u>

Plaintiff's expert Mr. Booth alleges the circulation system used inadequately sized plumbing. There is no objective evidence to support this opinion. Mr. Booth nor Plaintiff have provided calculations which would show the existing piping was not capable of supporting a proper turnover rate (the rate at which water is circulated in the pool), nor could they even identify,

with certainty, the diameter of the plumbing used. (**Exhibit 6m**, pp. 57-65). Damages related to this claim must be dismissed.

x.      Pool Lighting Safety Standard Compliance

Plaintiff alleges safety risks due to inadequate lighting in the grotto and spa. However, according to the International Pool and Spa Code, lighting is not mandated for spas (**Exhibit 6m**, at pp. 55, **Exhibit 6n** at p. 3-43). Accordingly, any allegations that a lack of lighting presented a safety concern is purely subjective. This claim must be dismissed.

xi.      Underground Inspections Requirement

Lastly, Plaintiff alleges that Exigent (and by extension Heitmann) should have complete an underground inspection of the electrical and plumbing. However, Plaintiff has not provided any evidence that such an inspection is required—likely because one was not required. Underground inspections are not required when only low voltage electrical wiring is run and when the plumbing run is for circulation only (i.e., not connected to city sewer or electrical). Further, as stated in the sections regarding wiring and plumbing above, Plaintiff has not provided any evidence that the existing underground electrical and plumbing would not have passed said inspection and thus has no damages from this alleged failure. (**Exhibit 6m** pp.47-51). Therefore, damages related to this allegation must be denied.

As can be seen from all of the above, Plaintiff has utterly failed to document any of its damages or evidence of causation as it relates to the purported construction defects—which are Plaintiff's sole damages for Counts I and IV. Therefore, Counts I and IV should be dismissed in their entirety.

## **CONCLUSION**

WHEREFORE, Brandon Heitmann respectfully requests this Court enter the Order attached as Exhibit 1, dismiss the entirety of Plaintiff's First Amended Complaint and grant such further relief as this Court deems just.

Dated: 08/04/2025

Tyler P. Phillips (P78280)
Apex Law
Attorneys for Debtor /Defendant