UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

                                        Chapter 7
BRANDON HEITMANN,                       Case No. 24-41956-MAR
                                        Hon. Mark A. Randon

          Debtor.
_____/
MOHAMED SAAD,

     Plaintiff,

v.                                      Adv. Pro. No. 24-04375-mar

BRANDON HEITMANN,

     Defendant.

_____/

**BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, Mohamed Saad, by and through his attorneys, OSIPOV

BIGELMAN, P.C., and for his Brief in Support of Plaintiff's Motion for Summary Judgment, states

as follows:

## I.      Background

**A. Brand Heitmann.**

Brandon Heitmann is currently 31 years old.[1] Heitmann Deposition at 10:7-8.  Eight years

ago, when Heitmann was 23, he formed Exigent Landscaping, LLC ("Exigent") and was the sole

owner of Exigent. Prior to forming Exigent, Heitmann dropped out of Oakland University +

Macomb Community College, and his work experience was limited to Jets Pizza, Sorrento's Pizza,

---

[1] Brandon Heitmann's deposition transcript from July 22, 2025, is attached hereto as **Exhibit A**.  It will be referenced
as "Heitmann Deposition at ___:___."

and a landscaping company. He had no experience building swimming pools. He did not go to trade school, nor did he possess a residential builder's license. Heitmann Deposition at 7:4-13 and 9:9-13. As such, at the time Heitmann contracted with Mr. Saad he did not possess the requisite skill, experience, or licensing required by the State of Michigan to perform the scope of work that he contracted to do.

**B. Mr. Saad.**

Mr. Saad owns real property located in 921 Crescent Drive Dearborn, Michigan ("Property"). Unfortunately, in spring of 2022, Mr. Saad's path crossed with Heitmann and his company Exigent.

**C. Contract.**

On June 27, 2022, Mr. Saad entered into a contract, drafted by Exigent and signed by Heitmann in his capacity as Manager of Exigent, to build a swimming pool, spa, lazy river, grotto, water slide, bridges, and a glass fence ("Swimming Pool") on the Property for $554,545.00 ("Contract"). **Exhibit B**. Heitmann testified the generally his profit margin is as high as 30%[2]. Heitmann 2004 Examination at 19:24-20:1. Heitmann admitted that he signed the Contract in his capacity as manager of Exigent, and that a residential builders license was required to do the work contemplated in the scope of work contained in the Contract. ECF No. 82. Heitmann also admitted that a residential builder's license is required for a contractor to obtain a building permit in its name and that he did not have a residential builder's license when the parties entered into the Contract. ECF No. 82; see also Heitmann Deposition at 11:7-9.

---

[2] For illustration purposes, if the job cost was $554,545.00, a 30% profit margin would be $166,363.50.

Michigan law requires contractors to include their residential builder's license information as a part of their contracts. M.C.L. § 339.2404a. The bottom of every page of the Contract purported to be a residential builder's license number, wherein it stated "License #: 802082183".

## License #: 802082183
## Phone: (586) 383-8308

The purported license number is not a license number of any kind. Heitmann acknowledged that this was not a residential builder's license number:

> 10   Q.   Do you see at the bottom of the page, it has
> 11        "License No. 802082183"?  Do you see that?
> **12   A.   Yes.**
> 13   Q.   That's not a residential builder's license, is it?
> **14   A.   Correct.**

Heitmann Deposition at 11:10-14 also ECF No. 82. The Contract also stated at page 4 that the start date was contingent upon being issued a building permit.

The parties executed a document titled CO1 ("Change Order #1") on August 5, 2022. **Exhibit B**. Heitmann signed the document in his capacity as manager of Exigent. ECF No. 82. Heitmann also acknowledged that he did not have a residential builder's license on August 5, 2022. ECF No. 82; see also Heitmann Deposition at 20:7-10. This phony license number was listed on the bottom of every page of Change Order #1.

As Heitmann lacked a residential builder's license, he had no ability to legally obtain a building permit. The City of Dearborn also requires residential builders to have a license to operate within the city limits. To get around these requirements Heitmann used a third-party's, Henry

(Hank) Bell of Construction Contractors, builder's license to obtain building permits and a license to operate in Dearborn. The Contract and the Change Order #1 make no mention of Hank Bell of Construction Contractors, or using any third party's residential builder's license, which was acknowledged by Heitmann. Heitmann Deposition at 15:25-16:5.

On September 7, 2022, Mr. Saad could not locate the building permits with the city and when he asked Heitman about it, Heitmann made further false representations to Mr. Saad claiming that (1) Hank Bell was his uncle, (2) that he is going to be helping with the permit process, and (3) that "he looked at the plans and everything looks good."



Hank Bell testified at his deposition[3] that he was not related to Heitmann at all:

> 3   Q.   How do you know Brandon Heitmann?
> **4   A.   Brandon Heitmann is -- my brother's wife's sister's**
> **5      husband is a Heitmann, Mike Heitmann.   His brother is**
> **6      Ron Heitmann, and that is Brandon's dad.   I -- so I**
> **7      came across Brandon at some of my brother's family**
> **8      outings throughout the years.**

Bell Deposition at 9:3-8.

> 14   Q.   So you're not exactly related to him?
> **15   A.   I'm sorry?**
> 16   Q.   You're not exactly related to him?
> **17   A.   I'm not related to him at all.**

Bell Deposition at 9:14-17.

He also testified that he never visited the Property, never met Mr. Saad, never reviewed any drawings for the Property, and never authorized Heitmann to use his residential builder's license. Bell Deposition at 12:5-14 and 38:2-6. Heitmann also confirmed at his deposition that he is not related to Hank Bell. Heitmann Deposition at 9:19-22.

### August 31, 2022, Swimming Pool Permit Application

On August 31, 2022, a Swimming Pool Permit Application ("1st Fraudulent Application") was submitted to the City of Dearborn for the Property. **Exhibit D.** The 1st Fraudulent Application was purportedly submitted under the name of Construction Contractors, using the residential builder's license of Hank Bell, and purportedly signed by Hank Bell. Hank Bell testified that he had never seen this application before, that he did not sign the 1st Fraudulent Application, and that his signature was forged. Bell Deposition Transcript at 17:23-18:4. On the second page of the 1st Fraudulent Application, it states that the applicant is Amanda Pisarski (Heitmann's wife). It also lists an email address for the applicant as bheitmann12@yahoo.com. When questioned about the

---

[3] Hank Bell Deposition Transcript is attached as **Exhibit C.**

1st Fraudulent Application at her deposition Pisarski refused to answer, citing her 5th Amendment

privilege against self-incrimination.[4]

> 3   Q.   All right.  Do you see the document titled "Swimming
> 4        Pool Permit Application"?
> **5   A.   Yes.**
> 6   Q.   The right-hand corner is dated 8-31-22.  Do you see
> 7        that?
> **8   A.   Yes.**
> 9   Q.   Whose handwriting is on this document?
> 10            MR. PHILLIPS:  Amanda, I'm going to advise
> 11       you to invoke your Fifth Amendment right.
> **12            THE WITNESS:  I will invoke my Fifth**
> **13       Amendment right.**

Pisarski Deposition at 15:3-13.

> 15   Q.   For record purposes, this is marked as Exhibit C.  Do
> 16       you see the second page?  It says your name on here.
> 17            MARKED BY THE REPORTER:
> 18            DEPOSITION EXHIBIT C
> 19            9:53 a.m.
> **20   A.   Yeah.**
> 21   Q.   Did you write that?
> 22            MR. PHILLIPS:  I advise --
> **23            THE WITNESS:  I invoke my Fifth Amendment**
> **24       right.**

Pisarski Deposition at 15:15-24.

> 7   Q.   Did you ever sign Hank Bell's name on any applications
> 8        or permits?
> **9   A.   I will invoke my Fifth Amendment right.**
> 10   Q.   Were you an employee or an agent of Construction
> 11       Contractors?
> **12   A.   I will invoke my Fifth Amendment right.**

Pisarski Deposition at 16:7-12.

As such, there is no reasonable dispute that Heitmann caused the 1st Fraudulent

Application to be submitted to the City of Dearborn for the Property.

---

[4] Amanda Pisarski's Deposition Transcript is attached as **Exhibit E**.

**September 29, 2022, Revised Document Application**

On September 29, 2022, Heitmann caused a Revised Document Application ("2nd Fraudulent Application") to be filed with the City of Dearborn again listing the contractor's name as Construction Contractors (Hank Bell's company), naming himself as an authorized agent of Construction Contractors, and listing his own email address as the contact information; exigentlandscaping@yahoo.com. **Exhibit F.** Heitmann acknowledged he was not an authorized agent of Construction Contractors and that the email on the 2nd Fraudulent Application was an email he used:

```
 7  Q.   Were you ever an authorized agent of Construction
 8       Contractors?
 9           MR. PHILLIPS:  Same objection.
10           THE WITNESS:  No.
11  BY MR. BIGELMAN:
12  Q.   Page 2, line 17, "Company, Construction Contractors,"
13       do you see that?
14  A.   Yes.
15  Q.   Line 23, "Authorized representative, Brandon
16       Heitmann," do you see that?
17  A.   Yes.
18  Q.   Paragraph 22, "Company e-mail,
19       exigentlandscaping@yahoo.com."  Was that an e-mail
20       that you used at the time?
21  A.   Yes.
```

Heitmann Deposition at 21:7-21.

As such, there is no reasonable dispute that Heitmann caused the 2nd Fraudulent Application to be submitted to the City of Dearborn for the Property.

**October 24, 2022, Revised Documents Application**

On October 24, 2022, Heitmann caused a Revised Documents Application ("3rd Fraudulent Application") to be filed with the City of Dearborn again listing the contractor's name as Construction Contractors (Hank Bell's company), naming Exigent's employee Madison Braunz as

an authorized agent of Construction Contractors, and listing his own email address as the contact information; exigentlandscaping@yahoo.com. **Exhibit G.**

Hank Bell testified that he did not know Madison Braunz, she was not an authorized agent of his company Construction Contractors, and she had no authority to sign on behalf of his company. Bell Deposition at 27:3-17. Heitmann admitted that Madison Braunz was a former employee of Exigent, and worked for Exigent on October 24, 2022.[5]

Heitmann acknowledged that despite Construction Contractors being listed on the 3rd Fraudulent Application, the contract information listed his email address and his wife's phone number instead of Construction Contractors. He also acknowledged that he did not have a residential builder's license when the 3rd Fraudulent Application was submitted.

> 25   Q.   On the second page, paragraph 17, "Company name:
> **Page 23**
> 1        Construction Contractors."  Paragraph 22, again, your
> 2        e-mail is exigentlandscaping@yahoo.com.  That's your
> 3        e-mail; correct?
> **4   A.   Yes.**
> 5   Q.   Paragraph 20, "Company phone number: 586-489-6680."
> 6        That's your phone number?
> **7   A.   No.**
> 8   Q.   Whose phone number's that?
> **9   A.   Amanda's.**
> 10   Q.   Paragraph 23, "Authorized representative: Madison
> 11       Braunz"; correct?
> **12   A.   Correct.**
> 13   Q.   She's a former employee of Exigent Landscaping;
> 14       correct?
> **15   A.   Correct.**
> 16   Q.   Is this her writing on this page we're looking at,
> 17       page 2 of Exhibit E?
> **18   A.   I'm not sure.**
> 19   Q.   And as of October 24, 2022, you personally did not
> 20       have a residential builder's license; correct?
> **21   A.   Correct.**

---

[5] See ECF No. 82.

Heitmann at 22:25-23:21.

## Mr. Saad Terminates Heitmann

Unsurprisingly, Heitmann and Exigent were unable to complete the project. As an initial matter, on the day the Contract was signed, Exigent was in breach of the contract as Heitmann and Exigent had no ability to complete the scope of work.

On or about August 29, 2023, Mr. Saad terminated Exigent, as it had become clear they were incompetent and had no ability to complete the project in a proper and timely manner. Not only was Heitmann unqualified, but he was also not permitted to work on the project as he was not licensed through the City of Dearborn or the State of Michigan.[6] As such, Heitmann was the proximate cause of all damages incurred by Mr. Saad.

When Heitman was terminated, the grotto had not been completed, a ten-thousand-pound limestone rock above the unfinished grotto was cracked, the bridges had not been built, the water slides had not been built, and the spa, lazy river, swimming pool, and glass fence had not been completed. Not only was the work not completed, what was completed was done so in a shoddy and haphazard manner that had to be replaced or redone. Heitmann failed to build the tanning shelf to the correct depth for its intended use. Heitmann failed to plan or build the lazy river to a proper width for its intended use. Heitmann installed coping poorly in an unworkmanlike manner throughout the pool, requiring complete replacement. Heitmann installed the spillways at improper heights to function as intended. Heitmann installed electrical conduits improperly and haphazardly, using improper fittings, connections, and materials. Heitmann failed to have the

---

[6] Heitmann will claim that halfway through the project he obtained a residential builder's license, however, that is of no consequence, as he defrauded Mr. Saad to induce him into signing the Contract and Change Order #1, and he fraudulently deceived the City of Dearborn to obtain building permits. Despite obtaining a residential builder's license, Heitmann and Exigent never obtained a license to do business in the City of Dearborn. Heitmann at 80:20-25. As such, he did not have a license to work in the City of Dearborn.

plumbing and electrical work inspected and approved, requiring it to be dug up. Heitmann installed undersized plumbing for the lazy river, which had to be replaced. Perhaps most egregiously, Heitmann failed to use a proper sized footing for the ledge rock grotto, and the 10,000-pound stone at the roof of the grotto cracked – causing a potentially life-threatening safety issue. **Exhibit Q**.

Heitmann and Exigent left the Property in disrepair after defrauding $395,203.26 from Mr. Saad. Heitmann acknowledged that he left the Property in the condition as depicted below:



Heitmann Deposition at 55:23-25. Heitmann claimed that Mr. Saad expressed that he was fired in part due to a crack in the 10,000-pound limestone rock that was above the grotto. Heitmann Deposition at 54:24-6 and 56:12-15. While the cracked rock in the roof of the grotto certainly contributed to Heitmann's termination from the project, it was merely the latest, most egregious, and most dangerous of Heitmann's repeated failures. Throughout the project, Heitmann and Exigent had, as discussed above, shown themselves to be fully unqualified to perform the work as

contracted.  Heitmann and Exigent failed to properly construct a "Swimming Pool" necessitating the work to be redone by a reputable contractor at an additional cost to Mr. Saad.

Mr. Saad hired Coastal Pools ("Coastal") to complete the project.  **Exhibit Q**. Coastal had to repair or replace a large amount of the work that Heitmann had done poorly or improperly.  The tanning shelf had to be redone.  The lazy river needed to be widened.  The tile and coping needed to be repaired and replaced.  The spillways needed to be replaced and installed at their proper heights.  The underground electrical and plumbing needed to be dug up, removed, and replaced. Missing lighting needed to be installed.  Exigent's pumps were undersized and had to be replaced. The pool stairs needed to be widened to allow for safe use.  The limestone grotto had to be removed, new footings had to be installed, and the stone replaced.

Ultimately, Mr. Saad had to pay Coastal $380,073.58[7] to repair Exigent's mistakes and finish the job that Exigent had contracted to complete.  When added to the amounts already paid ($350,000 to Exigent and $37,786.56 directly to Exigent's contractors), Mr. Saad paid $767,860.14 to complete a job that Exigent had contracted to complete for $554,454.00 – resulting in excess costs of **$213,406.14[8]**.

Below is a photograph of the completed pool that cost Mr. Saad $767,860.14 to complete due to being defrauded by Heitmann and having to replace his shoddy workmanship.

---

[7] This amount differs from the $484,982.73 referenced in the Complaint (see First Amended Complaint (ECF No. 34), paragraph 35.  The amount stated in the Complaint inadvertently referred to a quote Coastal had provided to Mr. Saad. The amount set forth herein, $380,073.58, refers to the actual amounts Mr. Saad paid to Coastal to remediate, replace, and finish Exigent's work (see contract and change orders attached hereto as Exhibit Q).
[8] This does not account for the $247,729.97 that Heitmann received and cannot account for.



### Payments by Mr. Saad

The payments made by Mr. Saad are not in dispute. Mr. Saad paid a total of $387,786.56

to Exigent and its contractors prior to their termination, $350,000.00 of which was paid directly to

Exigent.

| 7/1/2022 | $ | 50,000.00 | Exigent |
|---|---|---|---|
| 8/18/2022 | $ | 100,000.00 | Exigent |
| 12/12/2022 | $ | 16,782.45 | Messina Concrete (paid directly) |
| 12/13/2022 | $ | 9,566.35 | Messina Concrete (paid directly) |
| 12/29/2022 | $ | 100,000.00 | Exigent |
| 5/4/2023 | $ | 100,000.00 | Exigent |
| 8/1/2023 | $ | 11,437.76 | Dolphin Waterslides (paid directly) |
| **TOTAL** | $ | **387,786.56** | |

Heitmann Deposition at 24:7-27:3. It should be noted that $250,000 of the $350,000 was paid prior

to Heitmann obtaining a residential builder's license. Heitmann Deposition 26:2-5.

**Heitmann Cannot Account for Funds Received**

Heitmann was asked to account for the money he or Exigent received from Mr. Saad.

**Exhibit H.** His response is below.

**<u>INTERROGATORY NO. 2:</u>** Identify the disposition of all money you or your company received from the Plaintiff.

**ANSWER: Plaintiff objects to this interrogatory, as it is vague and overbroad. The question essentially asks Heitmann to perform a complete accounting from recollection alone.**

**Subject to this objection, Heitmann has produced receipts in his possession at Bates 369-383; 470; 473; 477; 496-509 as well as employee time records at Bates 522. Subject to this objection, Heitmann is aware of monies paid to Henry Rodriguez; J.P. Pools Ferguson Plumbing, Grace Transport, Home Depot, Upper Canada Stone, SCP Pool Corp; Classic Pools and Rock Bottom Stone. Exigent also paid a sales commission of 2.5% of project cost to Avery Petri. The business records pertaining to these payments; however, are with Exigent and Heitmann no longer has access to them. By way of further answer, Heitmann's personal knowledge is limited as the parties primarily responsible for purchasing materials and tracking project costs were Exigent's project managers, Kody Grandchamp and Cory Maxwell along with Exigent's CFO, Dan Othlof.**

At Heitmann's deposition, he was questioned about the purported use of the $350,000 he received from Mr. Saad and was only able to account for $102,270.03. Heitmann 31:17-52:7.

| <u>Name</u> | <u>Amount Claimed</u> | <u>Bates #</u> | <u>Notes</u> |
|---|---|---|---|
| CRC | $902.12 | 369 | "Ship to" portion of invoice missing |
| CRC | $2,189.32 | 371 | |
| CRC | $1,362.52 | 375 | |
| CRC | $79.50 | 379 | |
| CRC | $902.12 | 381 | "Ship to" portion of invoice missing |

| | | | |
|---|---|---|---|
| CRC | $902.12 | 383 | "Ship to" portion of invoice missing |
| Nacy | $11,750.00 | 470 | Heitmann testified this was an estimate, not a receipt, and only a portion was paid, less than half. |
| Boomer Constr. | $6,351.35 | 496 | |
| Home Depot | $1,032.10 | 497 | |
| JP Pools | $6,832.50 | 499 | |
| A&G Constr. | $10,703.75 | 500 | |
| JP Pools | $7,012.90 | 501 | |
| Fergeson | $1,448.44 | 502 | |
| Home Depot | $431.39 | 506 | |
| Messina | $16,782.45 | 507 | Heitmann thinks the actual number may be $26,837.61 but has no evidence.   Heitmann Deposition at 46:10-18. |
| Labor | $19,798.82 | 522 | |
| 2.5% commission | $13,788.63 | | |
| TOTAL | $102,270.03 | | |

Accordingly, Heitmann is unable to account for $247,729.97 of the $350,000 that Mr. Saad paid to Exigent. He claims it went into overhead and fuel but has no evidence to support this claim. Heitmann Deposition at 53:15-54:3.

### Mr. Saad is not the only Person Heitmann has Defrauded

This is not an isolated incident. This was Heitmann's and Exigent's routine practice[9] of conducting business, that was used to defraud many other people. These actions have resulted in many lawsuits, actions being taken by the State of Michigan Attorney General against him, and criminal prosecutions for fraud.  Heitmann Deposition at 58:9-60:9.

### Hebeka Formal Complaint

Heitmann has used the same scam to defraud many other people. He defrauded Mr. and Mrs. Hebeka with the same contract with the phony license number, wherein he held himself out

---

[9] FRE 406.

to be a licensed contractor, used the same third party's residential builder's license to fraudulently obtain a building permit, and then failed to complete the project. **Exhibit I.**

His fraudulent actions against Hebeka resulted in a license complaint by the Attorney General for the State of Michigan ("Formal Complaint"). **Exhibit J.** The material facts in the Formal Complaint are identical to the facts in this case, to wit:

> 16. Respondent Heitmann is the qualifying officer for Exigent Landscaping and is responsible for its compliance with the Occupational Code.
>
> 17. On September 30, 2021, before they were licensed by the Department, Respondents entered into a construction contract with the owners (Homeowners) of a home on Chaucer Court in Macomb, Michigan.
>
> 18. Under Article 24 of the Code, Respondents were required to be licensed by the Department as residential builders or maintenance and alteration contractors to perform the work in their contract with the Homeowners.
>
> 19. The contract with the Homeowners included a "license number" of 802082183 that does not correspond to residential builder or maintenance and alteration contractor license numbers issued by the Department, was signed on behalf of Exigent by an unlicensed salesperson and does not contain information regarding a qualifying officer.
>
> 20. To obtain a building permit for the construction, Respondents, or someone on their behalf, submitted a permit application to Macomb County which stated that another company, which was duly licensed as a residential builder under the Occupational Code, was the contractor for the Homeowners' project
>
> 21. The application, which was dated October 6, 2021, included the other company's name, license number, and expiration date in the spots for "contractor/applicant name," "builder's license number," and "expiration date." However, the contact email address was for someone at "exigentdesignbuild.com" and the contact phone number was the same number Respondents used on their contract with the Homeowners.

22. Despite what was stated on the permit application, the other company was not the contractor for the project. Neither it nor its qualified officer performed construction on the project, and they did not have a contract with the Homeowners.

23. The building permit was issued to the other company, Construction Contractors, LLC, on October 28, 2021.

24. Despite not being licensed as required by the Code, Respondents received payments from the Homeowners and performed the construction on the Chaucer Court home.

Heitmann acknowledged that the material facts are the same. Heitmann Deposition at 63:2-70:23.

Heitmann stipulated to a Consent Order to resolve the Formal Complaint which resulted in the suspension of his residential builders' license where he acknowledged violating multiple provisions of the occupational code. **Exhibit K**.

A. MCL 339.601(1): A person shall not engage in or attempt to engage in the practice of an occupation regulated under this act or use a title designated in this act unless the person possesses a license or registration issued by the department for the occupation.

B. MCL 339.604(d): Demonstrates a lack of good moral character.

C. MCL 339.604(h): Violates any other provision of this act or a rule promulgated under this act for which a penalty is not otherwise prescribed.

D. MCL 339.2411(j): Aiding or abetting an unlicensed person to evade this article, or knowingly combining or conspiring with, or acting as agent, partner, or associate for an unlicensed person, allowing one's license to be used by an unlicensed person, or acting as or being an ostensible licensed residential builder or licensed residential maintenance and alteration contractor for an undisclosed person who does or shall control or direct, or who may have the right to control or direct, directly or indirectly, the operations of a licensee.

E. MCL 339.2411(m): Workmanship not meeting the standards of the Michigan residential code as promulgated under the Stille-DeRossett-Hale single state construction code act,1972 PA 230, MCL 125.1501 to 125.1531.

Heitmann violated the same statutes in his dealing with Mr. Saad as evidenced herein.

### 2nd Formal Complaint

There was a second license complaint for which Heitmann refused to provide a copy of the Formal Complaint in discovery but provided the Consent Order, wherein he stipulated that he once again violated MCL 339.601(1), MCL 339.604(d) and (l), MCL 339.2411(j), and MCL 339.2404a which states:

> A licensee shall, as part of the contract, provide information relating to his or her individual license and to any license issued to that person as a qualifying officer of another entity.

Once again, he defrauded a customer by falsely representing he had a residential builder's license, fraudulently used a third-party's license to obtain a permit, and then failed to properly complete the work. **Exhibit L.**

## Boyd

He also defrauded Mr. and Mrs. Boyd in the same manner as he defrauded Mr. Saad, by being an unlicensed contractor, using a contract with a phony license number at the bottom of every page, using a third-party (Hank Bell and Construction Contractors) to obtain a building permit, and failing to properly construct a swimming pool. See ¶16-21 of Complaint which is attached as **Exhibit M** and see Exigent contract which is attached thereto.

## Carter

He also defrauded Mr. Carter in the same manner as he defrauded Mr. Saad, by being an unlicensed contractor, using a contract with a phony license number at the bottom of every page, using a third-party (Hank Bell and Construction Contractors) to obtain a building permit, and failing to properly construct a swimming pool. See ¶7-14 of Complaint which is attached as **Exhibit N** and see Exigent contract which is attached thereto.

## Mehra

He also defrauded Mr. and Mrs. Mehra in the same manner as he defrauded Mr. Saad, by being an unlicensed contractor, using a contract with a phony license number at the bottom of every page, using a third-party (Hank Bell and Construction Contractors) to obtain a building permit, and failing to properly construct a swimming pool. See ¶14-30 of Complaint which is attached as **Exhibit O** and see Exigent contract which is attached thereto.

## II. Standard of Review

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c), made applicable to bankruptcy proceedings by Bankruptcy Rule 7056, provides that a court shall render summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The party moving the Court for summary judgment bears the burden of showing that "there is no genuine issue as to any material fact and that [the moving party] is entitled to judgment as a matter of law." Jones v. Union County, 296 F.3d 417, 423 (6th Cir. 2002). *See generally* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets that burden, the nonmoving party "must identify specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997) (emphasis added). In determining the existence or nonexistence of a material fact, a court will view the evidence in a light most favorable to the nonmoving party. Tennessee Dep't of Mental Health & Mental Retardation v. Paul B., 88 F.3d 1466, 1472 (6th Cir. 1996).

## B.  11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides: (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt– . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.] 11 U.S.C. § 523(a)(2)(A).

"This section is phrased in the disjunctive, meaning that false pretenses, false representation and actual fraud are three separate grounds for nondischargeability [under § 523(a)(2)(A)]." Becton, Dickinson & Co. v. Sterling (In re Sterling), 479 B.R. 444, 449 (Bankr. E.D. Mich. 2012)(citations omitted); see also Tweedie v. Hermoyian (In re Hermoyian), 466 B.R. 348, 363 (Bankr. E.D. Mich. 2012).

### False representation

The elements of a § 523(a)(2)(A) claim based on a false representation are: "(1) the debtor obtained money [property, services, or an extension, renewal, or refinancing of credit] through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." Willens v. Bones (In re Bones), 395 B.R. 407, 430 (Bankr. E.D. Mich. 2008)(quoting Rembert v. AT&T Universal Card Servs., Inc., 141 F.3d 277, 280-81 (6th Cir. 1998)). "A 'failure to disclose can amount to misrepresentation. A condition to invocation of the doctrine, however, is that there be a duty to make disclosure.'" Id. at 429 (quoting Rowe v. Steinberg (In re Steinberg), 270 B.R. 831, 835 (Bankr. E.D. Mich. 2001)).

## False pretenses

The phrase "false pretenses" has been defined this way: "A 'false pretense' involves an implied misrepresentation or conduct intended to create or foster a false impression. A false pretense has been defined to include a 'mute charade,' where the debtor's conduct is designed to convey an impression without oral representation." Schafer v. Rapp (In re Rapp), 375 B.R. 421, 433 (Bankr.S.D.Ohio 2007) (quotation marks and citation omitted). It has also been described as "usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction...." Evans v. Dunston (In re Dunston), 117 B.R. 632, 641 (Bankr.D.Colo.1990), aff'd in part and rev'd in part on other grounds, 146 B.R. 269 (D.Colo.1992). The failure to disclose a material fact can form the basis of either a material misrepresentation or false pretense. See Semaan v. Allied Supermarkets, Inc., 951 F.2d 718, 728 (6th Cir.1991) ("That such deception takes the form of an intentional nondisclosure of a material fact or an implied representation makes no difference."). A debtor's silence may also "create a false impression which would be actionable under § 523(a)(2)(A)...." Brann v. Oxford (In re Oxford), 440 B.R. 772, 777 (Bankr.W.D.Ky.2010) (citation omitted). Hermoyian, 466 B.R. at 377. As is the case with a claim under § 523(a)(2)(A) based on a false representation, a creditor making a false pretenses claim under § 523(a)(2)(A) must also establish materiality; intent; justifiable reliance; and causation. See Hermoyian, 466 B.R. at 379 (relying in part on Brann v. Oxford (In re Oxford), 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010)).

## Actual fraud

"Actual fraud is broader than misrepresentation." Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). [A]ctual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and

cheat another." . . . "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud." . . . [A]ctual fraud as used 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code. Vitanovich, 259 B.R. at 877.

**C.    11 USC §523(a)(4)**

Section 523(a)(4) states that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4).

"This section essentially contains two different exceptions—one for fraud or defalcation while acting in a fiduciary capacity and another for embezzlement or larceny while acting in any capacity." Kriescher v. Gibson (In re Gibson), 521 B.R. 645, 655 (Bankr. W.D. Wis. 2014)(citing Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1760 (2013)).

The term "fiduciary capacity" in § 523(a)(4) has a special, narrow meaning: A debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss. Bd. of Trustees v. Bucci (In re Bucci), 493 F.3d 635, 642 (6th Cir.2007).

The creditor must demonstrate: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel), 565 F.3d 963, 968 (6th Cir. 2009) (emphasis added) (citation omitted); see also Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 391 (6th Cir. 2005).

Federal law defines "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud. Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th Cir. 1996). "[E]mbezzlement, for purposes of 11 U.S.C. § 523 . . . requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud." Gibson, 521 B.R. at 655 (internal quotation marks omitted)(quoting Bank Calumet v. Whiters (In re Whiters), 337 B.R. 326, 332 (Bankr. N.D. Ind. 2006) (citing Driggs v. Black (In re Black), 787 F.2d 503, 507 (10th Cir.1986))).

## D. 11 USC §523(a)(6)

Section 523(a)(6) states that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). In order to establish nondischargeability under § 523(a)(6), a creditor must show an injury to person or property by the debtor that is both "willful" and "malicious." "[T]o find a 'willful' injury under § 523(a)(6), [the court] must determine either that (I) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." Monsanto Co. v. Trantham (In re Trantham ), 304 B.R. 298, 307 (6th Cir. BAP 2004)

(citing <u>Markowitz v. Campbell (In re Markowitz )</u>, 190 F.3d 455, 464 (6th Cir.1999)). "Under §

523(a)(6), "'[m]alicious' means in conscious disregard of one's duties or without just cause or

excuse; it does not require ill-will or specific intent.'" Id. at 308 (quoting <u>Wheeler v. Laudani</u>, 783

F.2d 610, 615 (6th Cir.1986)).

### E. Statutory Conversion MCL 600.2919a

MCL 600.2919a provides, in pertinent part, (1) A person damaged as a result of either or

both of the following may recover 3 times the amount of actual damages sustained, plus costs and

reasonable attorney fees: (a) Another person's stealing or <u>embezzling property</u> or converting

property to the other person's own use.

Section 600.2919a(1)(a) awards treble damages not just for conversion, but also for

"stealing or embezzling property," and Michigan courts have recognized that stealing and

embezzling are separate statutory grounds for treble damages. See Aroma Wines, 871 N.W. 2d at

141 n.18 (noting that the statute provides for treble damages for "stealing" and "embezzling," not

just for conversion); <u>Shiffman v. Auto Source Wholesale, LLC</u>, No. 339291, 2018 WL 3863471,

at *2-3 (Mich. Ct. App. Aug. 14, 2018) (finding the defendant liable for treble damages under §

600.2919a(1)(a) for "stealing" $250,000 from the plaintiff)[10]

### III.  Application of Law to Facts

### A. Count 1- Section 523(a)(2)

There is no reasonable dispute that Heitmann, through Exigent, obtained $350,000 from

Mr. Saad through false pretenses. Heitmann obtained this money through false pretenses (1) by

---

[10] The Michigan Court of Appeals in <u>Shiffman</u> defined "stealing" as "the criminal taking of personal property either by larceny, embezzlement, or false pretenses." <u>Id</u>. at *3 (citations omitted). Michigan courts have defined "embezzlement" as "'the application to the party's own use of property which came into his hands, under trust, by reason of his employment in a particular capacity; and the misapplication of it from the purpose for which he received it.'" <u>People v. Bergman</u>, 224 N.W. 375, 376 (Mich. 1929) (citations omitted).

representing he was capable to properly complete the scope of work in the Contract and Change Order #1, (2) by presenting a Contract and Change Order #1 to Mr. Saad with a phony license number, (3) by lying to Mr. Saad that Hank Bell was his uncle and that he had "reviewed the plans and everything looks great", and (4) by fraudulently obtaining a building permit from the City of Dearborn by forging Hank Bell's signature and using his residential builder's license.

There is no reasonable dispute that Heitmann, through Exigent, obtained $350,000 from Mr. Saad through false representations. Based on the actions articulated herein, Heitmann, through Exigent, obtained $350,000 from Mr. Saad through material representations that he knew were false when he made them, that Heitmann intended to deceive Mr. Saad, that Mr. Saad justifiably relied on the false representations, and his reliance was the proximate cause of loss.

There is no reasonable dispute that Heitmann, through Exigent, obtained $350,000 from Mr. Saad through actual fraud. Based on the actions articulated herein, Heitmann, through Exigent, obtained $350,000 from Mr. Saad through actual fraud as he intentionally deceived Mr. Saad to separate Mr. Saad from $350,000.

Additionally, M.C.L. § 570.153 provides,

> **Building contract fund; evidence of fraudulent detention or use.**
> The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud.

As noted above, since Heitmann appropriated $247,729.97 of the $350,000 entrusted to him this is evidence of intent to defraud.

Heitmann cannot account for $247,729.97 and it cost Mr. Saad an additional $380,073.58, for total damages of $627,803.55.

*****

Mr. Saad is entitled to a non-dischargeable judgment as a matter of law in the amount of $627,803.55 as there exist no genuine issues of material fact that would preclude this Court from granting Mr. Saad's Motion for Summary Judgment.

**B. Count 2- Section 523(a)(4) and Count 3- MCL § 600.2919a.**

**(1) Breach of Fiduciary Duty**

There is no dispute that the $350,000 that Mr. Saad paid to Exigent were funds that were covered under the Michigan Building Contract Fund Act, MCL §570.151 et. seq. (the "MBCFA"). Heitmann and Exigent are also "contractors" subject to the MBCFA. Heitmann was the CEO of the Exigent, was the only person with check writing authority for the company bank account, commingled funds from all projects into the same company bank account, and specifically deposited Mr. Saad's funds in the same bank account with the commingled funds. Heitmann 2004 Examination[11] at 10:20-21, 13:12-15, 18:17-25, and 25:2-5.

Upon receiving funds for a construction project, the contractor (or subcontractor) becomes a trustee for the project. <u>Weathervane Window, Inc. v. White Lake Constr. Co</u>., 192 Mich. App. 316, 325, 480 N.W.2d 337, 341 (1991).

Corporate officers are contractors under the MBCFA. Under the MBCFA, officers, members, owners and even employees of a business in the construction industry may be held individually liable for misappropriating funds received by the business for any other purpose other than first paying subcontractors, suppliers and laborers. MCL 570.151 et seq.; <u>BC Tile & Marble Co. v. Multi Bldg. Co.</u>, 288 Mich. App. 576, 586-587 (2010). "There is no requirement that contract

---

[11] Heitmann's 2004 Examination Transcript is attached hereto as **Exhibit P**.

payments be made directly to the officer of a corporate contractor in order to hold the officer individually responsible under the MBCFA." BC Tile at 586-587.

The MBTFA is a penal statute, but our Supreme Court recognizes a civil cause of action for its violation. DiPonio Constr Co, Inc v Rosati Masonry Co, Inc, 246 Mich. App. 43, 48; 631 N.W.2d 59 (2001), citing BF Farnell Co v Monahan, 377 Mich. 552, 555; 141 N.W.2d 58 (1966). The MBTFA applies to funds paid to contractors and subcontractors for products and services provided to them under their construction contracts. DiPonio, *supra* at 47. Officers of a corporation may be held individually liable when they personally cause their corporation to   act unlawfully. People v Brown, 239 Mich. App. 735, 739-740; 610 N.W.2d 234 (2000). "'[A] corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation.'" *Id*., quoting Attorney General v Ankersen, 148 Mich. App. 524, 557; 385 N.W.2d 658 (1986). If a defendant personally misappropriates funds after they are received by the corporation, he or she can be held personally responsible under the MBTFA. Brown, *supra* at 743-744. "A ***reasonable inference of appropriation arises*** from the payment of construction funds to a contractor and the subsequent failure of the contractor to pay laborers, subcontractors, materialmen, or others entitled to payment." People v Whipple, 202 Mich. App. 428, 435; 509 N.W.2d 837 (1993), Livonia Bldg. Materials Co. v. Harrison Constr. Co., 276 Mich. App. 514, 519, 742 N.W.2d 140, 143-44 (2007). (emphasis added).

Heitmann breached his fiduciary duty to Mr. Saad, as imposed by the MBCFA.  Heitmann wrongfully defalcated and misappropriated trust funds for his own use and benefit. Heitmann's failure to account for the disposition of trust funds establishes defalcation.

**(2)    Embezzlement.**

As set forth above, Mr. Saad entrusted $350,000 to Heitmann through Exigent, and Heitmann cannot account for $247,729.97. Therefore, an inference arises that these funds were appropriated by Heitmann, and as such, Heitmann embezzled these funds.

**(3) Treble Damages under MCL 600.2919a(1)(a).**

MCL 600.2919a(1)(a) awards treble damages not just for conversion, but also for "stealing or embezzling property," and Michigan courts have recognized that stealing and embezzling are separate statutory grounds for treble damages. See <u>Aroma Wines</u>, 871 N.W. 2d at 141 n.18 (noting that the statute provides for treble damages for "stealing" and "embezzling," not just for conversion); <u>Shiffman v. Auto Source Wholesale, LLC</u>, No. 339291, 2018 WL 3863471, at *2-3 (Mich. Ct. App. Aug. 14, 2018)

*****

As noted above Heitmann cannot account for the $350,000 that Exigent received from Mr. Saad. Heitmann was only able to account for $102,270.03, and therefore $247,729.97 is unaccounted for. As an officer and director of Exigent who personally participated in its day-to-day operations, and who personally misappropriated Mr. Saad's funds, Heitmann is personally liable for violations of the MBCFA, as well as for conversion. See <u>BC Tile & Marble Co. v. Multi Bldg. Co</u>., 288 Mich. App. 576, 586-89 (2010).

*****

As Heitmann obtained $247,729.97 through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and violated MCL § 600.2919a, Mr. Saad is entitled to treble damages in the amount of $743,189.91.

Mr. Saad is entitled to a non-dischargeable judgment in the amount $743,189.91 of as a matter of law, as there exist no genuine issues of material fact that would preclude this Court from granting Mr. Saad's Motion for Summary Judgment.

*****

Mr. Saad is entitled to a non-dischargeable judgment as a matter of law in the amount of **$627,803.55** as there exist no genuine issues of material fact that would preclude this Court from granting Mr. Saad's Motion for Summary Judgment.

## C. Count 4- Section 523(a)(6).

There is no reasonable dispute that Heitmann's actions as described herein were both willful and malicious. The State of Michigan has laws and rules in place to protect homeowners from unqualified and unlicensed residential builders.[12] As such, Heitmann's actions were willful because he knew that his actions were illegal under Michigan law requiring a residential builder's license to do the work he contracted on behalf of Exigent, and that he would be unable to obtain a building permit absent the fraud he committed on Mr. Saad and the City of Dearborn to obtain the building permit and a license to operate in the City of Dearborn. It was substantially certain that his attempt to complete the scope of work in Contract properly was foreseeable as he was unqualified (by the standards set by the State of Michigan and the City of Dearborn) to contract with Mr. Saad and to accept money to build a Swimming Pool. Heitmann's actions were also malicious as he disregarded his duties and obligations under the occupational code for residential builders.

Heitmann cannot account for $247,729.97 and it cost Mr. Saad an additional $380,073.58, for total damages of $627,803.55.

---

[12] MCL 339.601(1), MCL 339.604(d), MCL 339.604(h), MCL 339.2411(j), and MCL 339.2411(m).

## Conclusion

Mr. Saad is entitled to non-dischargeable judgments against Heitmann for the reasons stated herein in the form set forth in the proposed judgment.

Dated: August 4, 2025                           Respectfully Submitted,

                                                **OSIPOV BIGELMAN, P.C.**

                                                /s/      Jeffrey H. Bigelman
                                                JEFFREY H. BIGELMAN (P61755)
                                                ANTHONY J. MILLER (P71505)
                                                Attorneys for Plaintiff
                                                20700 Civic Center Drive, Ste. 420
                                                Southfield, MI 48076
                                                 (248) 663-1800
                                                jhb@osbig.com / am@osbig.com