UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

BRANDON HEITMANN,

      Debtor.

_____/

Chapter 7
Case No. 24-41956-MAR
Hon. Mark A. Randon

MOHAMED SAAD,

    Plaintiff,

v.

BRANDON HEITMANN,

    Defendant.

_____/

Adv. Pro. No. 24-04375-mar

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, Mohamed Saad, by and through his attorneys OSIPOV
BIGELMAN, P.C., and for his response to Defendant's Motion for Summary Judgment, requests
that the Motion be denied for the reasons set forth in the Plaintiff's Brief attached hereto.

DATED: August 25, 2025        Respectfully Submitted,

**OSIPOV BIGELMAN, P.C.**

/s/ Anthony J. Miller
JEFFREY H. BIGELMAN (P61755)
ANTHONY J. MILLER (P71505)
Attorneys for Plaintiff
20700 Civic Center Drive, Ste. 420
Southfield, MI 48076
(248) 663-1800
am@osbig.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

BRANDON HEITMANN,

       Debtor.

_____/

MOHAMED SAAD,

    Plaintiff,

v.

BRANDON HEITMANN,

    Defendant.

_____/

Chapter 7
Case No. 24-41956-MAR
Hon. Mark A. Randon

Adv. Pro. No. 24-04375-mar

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      NOW COMES, Plaintiff, by and through his attorneys, OSIPOV BIGELMAN, P.C., and

responds as follows:

**INTRODUCTION**

      Defendant's motion attempts to recast this action as nothing more than a contract dispute

with a dissatisfied homeowner. The undisputed record shows otherwise. Defendant deliberately

schemed to misrepresent his licensure status, inducing Plaintiff into paying him more than

$350,000.00. He then misappropriated funds without accounting for them. Defendant's fraudulent

conduct (in violation of the Michigan Builders Trust Fund Act ("MBCFA")) caused Plaintiff

substantial damages. Such damages are nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4),

and (a)(6).

Defendant's arguments that (1) subsequent licensure cures prior misrepresentations, (2) the MBCFA does not apply because subcontractors were not yet engaged, and (3) Plaintiff cannot prove damages without an expert, fail as a matter of law. Defendant's request for summary judgment must therefore be denied.

## SUMMARY OF FACTS

The facts of this case are set forth in Plaintiff's First Amended Complaint (ECF No. 34) and Plaintiff's Motion for Summary Judgment (ECF No. 89). The following undisputed facts are relevant to the present motion:

1. Defendant induced Plaintiff to enter into a written construction agreement for installation of a pool and related improvements. The cost to complete the work was $554,545.00.

2. The work contemplated by the contract required a valid Michigan builder's license.

3. At the time, Defendant did not have a valid Michigan builder's license.

4. Nevertheless, every page of the Defendant's contract (and the subsequent change order) listed "License #: 802082183." This number was not actually a Michigan builder's license number (or a license number of any kind).

5. Defendant falsely represented that he was authorized to operate under the license of Hank Bell.

6. Bell testified his signature on the licensing documents was forged and that he never authorized Defendant to use his license.

7. Plaintiff paid Defendant a total of **$350,000.00 and paid an additional $37,786.56 directly to Defendant's subcontractors.**

8. Of the $350,000.00 received, Defendant can only account for 29.2% – $102,270.03.

9. **Defendant cannot account for the remaining 70.8% of the funds received - $247,729.97.**

10. Defendant later obtained his own license, but only after Plaintiff had been fraudulently induced to enter the contract and made substantial payments.

## Background

### *Brandon Heitmann*

When Defendant Brandon Heitmann was 23, he formed Exigent Landscaping, LLC ("Exigent") and was the sole owner of Exigent. Prior to forming Exigent, Heitmann dropped out of Oakland University and Macomb Community College. His work experience was limited to Jets Pizza, Sorrento's Pizza, and a landscaping company. He had no experience building swimming pools. He did not go to trade school, nor did he possess a residential builder's license. Heitmann Deposition at 7:4-13 and 9:9-13.[1] At the time Heitmann contracted with Plaintiff, he did not possess the requisite training, skill, experience, or licensing required by the State of Michigan to perform the scope of work that he contracted to do.

### *Plaintiff Mohamed Saad*

Plaintiff owns real property located at 921 Crescent Drive Dearborn, Michigan ("Property"). Unfortunately, in spring of 2022, Plaintiff crossed paths with Heitmann and his company, Exigent Landscaping, LLC ("Exigent").

### *Contract*

On June 27, 2022, Plaintiff entered into a contract, drafted by Exigent and signed by Heitmann in his capacity as manager of Exigent, to build a swimming pool, spa, lazy river, grotto,

---

[1] Brandon Heitmann's deposition transcript from July 22, 2025, is attached hereto as **Exhibit A**. It will be referenced as "Heitmann Deposition at ___:___".

water slide, bridges, and a glass fence ("Swimming Pool") on the Property for $554,545.00 ("Contract"). **Exhibit B**. Heitmann testified the generally his profit margin is as high as 30%. Heitmann 2004 Examination at 19:24-20:1. **Exhibit C**. Heitmann admitted that he signed the Contract in his capacity as manager of Exigent, and that a residential builders license was required to do the work contemplated in the scope of work contained in the Contract. ECF No. 82. Heitmann also admitted that a residential builder's license is required for a contractor to obtain a building permit in its name and that he did not have a residential builder's license when the parties entered into the Contract. ECF No. 82; see also Heitmann Deposition at 11:7-9.

Michigan law requires contractors to include their residential builder's license information as a part of their contracts. M.C.L. § 339.2404a. The bottom of every page of the Contract purported to be a residential builder's license number, wherein it stated "License #: 802082183."

The purported license number is not a license number of any kind. Heitmann acknowledged that this was not a residential builder's license number:

10· ·Q.· ·Do you see at the bottom of the page, it has
11· · · · "License No. 802082183"?· Do you see that?
**12· ·A.· ·Yes.**
13· ·Q.· ·That's not a residential builder's license, is it?
**14· ·A.· ·Correct.**

Heitmann Deposition at 11:10-14 also ECF No. 82. The Contract also stated at page 4 that the start date was contingent upon being issued a building permit.

The parties executed a document titled CO1 ("Change Order #1") on August 5, 2022. See **Exhibit B**. Heitmann signed the document in his capacity as manager of Exigent. ECF No. 82. Heitmann also acknowledged that he did not have a residential builder's license on August 5, 2022. ECF No. 82; see also Heitmann Deposition at 20:7-10. This phony license number was listed on the bottom of every page of Change Order #1.

As Heitmann lacked a residential builder's license, he had no ability to legally obtain a building permit. The City of Dearborn also requires residential builders to have a license to operate within the city limits. To get around these requirements Heitmann used a third-party's, Henry (Hank) Bell of Construction Contractors, builder's license to obtain building permits and a license to operate in Dearborn. Heitmann acknowledges that the Contract and Change Order #1 make no mention of Hank Bell, Construction Contractors, or using any third party's residential builder's license. Heitmann Deposition at 15:25-16:5.

On September 7, 2022, Plaintiff could not locate the building permits with the city. He asked Heitman about it. Heitmann made further false representations to Plaintiff, claiming that (1) Hank Bell was his uncle, (2) that he is going to be helping with the permit process, and (3) that "he [Hank Bell] looked at the plans and everything looks good."



12:52    5G

< 11      **M**      ▢

Mohammad ›

My uncle

Hank bell
Construction contractors

Sorry

That's ok lol

He is going to be helping with the
permit process has been building for
40 years.

He looked at the plans everything
looks good!

Sep 8, 2022 at 11:53 AM

Got an update

224379 that's the permit number
It's in plan review

👍

Perfect thank you working on it

Sep 15, 2022 at 9:54 AM

Give me a shout when ya can

iMessage

Hank Bell testified in his deposition[2] that he is not related to Heitmann at all:

> 3· ·Q.· ·How do you know Brandon Heitmann?
> ·4· ·A.· **Brandon Heitmann is -- my brother's wife's sister's**
> ·5· · · **husband is a Heitmann, Mike Heitmann.· His brother is**
> ·6· · · **Ron Heitmann, and that is Brandon's dad.· I -- so I**
> ·7· · · **came across Brandon at some of my brother's family**
> ·8· · · **outings throughout the years.**

Bell Deposition at 9:3-8.

> 14· ·Q.· ·So you're not exactly related to him?
> **15· ·A.· ·I'm sorry?**
> 16· ·Q.· ·You're not exactly related to him?
> **17· ·A.· ·I'm not related to him at all.**

Bell Deposition at 9:14-17.

Mr. Bell also testified that he never visited the Property, never met Plaintiff, never reviewed any drawings for the Property, and never authorized Heitmann to use his residential builder's license. Bell Deposition at 12:5-14 and 38:2-6. Heitmann also confirmed at his deposition that, despite his misrepresentations to Plaintiff, he is not related to Hank Bell. Heitmann Deposition at 9:19-22.

### *August 31, 2022, Swimming Pool Permit Application*

On August 31, 2022, a Swimming Pool Permit Application ("1st Fraudulent Application") was submitted to the City of Dearborn for the Property. **Exhibit E**. The 1st Fraudulent Application was purportedly submitted under the name of Construction Contractors, using the residential builder's license of Hank Bell, and was purportedly signed by Hank Bell. During his deposition, Hank Bell testified that he had never seen the 1st Fraudulent Application before, that he did not sign it, and that his signature was forged. Bell Deposition Transcript at 17:23-18:4. On the second

---

[2] Hank Bell's Deposition Transcript is attached as **Exhibit D.**

page, the 1st Fraudulent Application states that the applicant is Amanda Pisarski (Heitmann's wife). It also lists an email address for the applicant as bheitmann12@yahoo.com. When questioned about the 1st Fraudulent Application at her deposition,[3] Pisarski refused to answer, citing her 5th Amendment privilege against self-incrimination.

> 3· ·Q.· ·All right.· Do you see the document titled "Swimming
> ·4· · · · Pool Permit Application"?
> **·5· ·A.· ·Yes.**
> ·6· ·Q.· ·The right-hand corner is dated 8-31-22.· Do you see
> ·7· · · · that?
> **·8· ·A.· ·Yes.**
> ·9· ·Q.· ·Whose handwriting is on this document?
> 10· · · · · · · · · ·MR. PHILLIPS:· Amanda, I'm going to advise
> 11· · · · you to invoke your Fifth Amendment right.
> **12· · · · · · · · · ·THE WITNESS:· I will invoke my Fifth**
> **13· · · · Amendment right.**

Pisarski Deposition at 15:3-13.

> 15· ·Q.· ·For record purposes, this is marked as Exhibit C.· Do
> 16· · · · you see the second page?· It says your name on here.
> 17· · · · · · · · · ·MARKED BY THE REPORTER:
> 18· · · · · · · · · ·DEPOSITION EXHIBIT C
> 19· · · · · · · · · ·9:53 a.m.
> **20· · A.· ·Yeah.**
> 21· · · ·Q.· ·Did you write that?
> 22· · · · · · · · · ·MR. PHILLIPS:· I advise --
> **23· · · · · · · · · ·THE WITNESS:· I invoke my Fifth Amendment**
> **24· · · · · · · · right.**

Pisarski Deposition at 15:15-24.

> 7· ·Q.· ·Did you ever sign Hank Bell's name on any applications
> ·8· · · · or permits?
> **·9· ·A.· ·I will invoke my Fifth Amendment right.**
> 10· ·Q.· ·Were you an employee or an agent of Construction
> 11· · · · Contractors?
> **12· ·A.· ·I will invoke my Fifth Amendment right.**

Pisarski Deposition at 16:7-12.

---

[3] Amanda Pisarksi's Deposition Transcript is attached as **Exhibit F.**

As such, there is no reasonable dispute that Heitmann caused the 1st Fraudulent Application to be submitted to the City of Dearborn for the Property.

### *September 29, 2022, Revised Document Application*

On September 29, 2022, Heitmann caused a Revised Document Application ("2nd Fraudulent Application") to be filed with the City of Dearborn, again listing the contractor's name as Construction Contractors (Hank Bell's company), naming himself as an authorized agent of Construction Contractors, and listing his own email address as the contact information; exigentlandscaping@yahoo.com. **Exhibit G**. Heitmann acknowledged he was not an authorized agent of Construction Contractors and that the email on the 2nd Fraudulent Application was an email he used:

```
 7· ·Q.· ·Were you ever an authorized agent of Construction
·8· · · · Contractors?
·9· · · · · · · · ·MR. PHILLIPS:· Same objection.
10· · · · · · · · ·THE WITNESS:· No.
11· ·BY MR. BIGELMAN:
12· ·Q.· ·Page 2, line 17, "Company, Construction Contractors,"
13· · · · do you see that?
14· ·A.· ·Yes.
15· ·Q.· ·Line 23, "Authorized representative, Brandon
16· · · · Heitmann," do you see that?
17· ·A.· ·Yes.
18· ·Q.· ·Paragraph 22, "Company e-mail,
19· · · · exigentlandscaping@yahoo.com."· Was that an e-mail
20· · · · that you used at the time?
21· ·A.· ·Yes.
```

Heitmann Deposition at 21:7-21.

As such, there is no reasonable dispute that Heitmann caused the 2nd Fraudulent Application to be submitted to the City of Dearborn for the Property.

### *October 24, 2022, Revised Documents Application*

On October 24, 2022, Heitmann caused a Revised Documents Application ("3rd Fraudulent Application") to be filed with the City of Dearborn again listing the contractor's name as Construction Contractors (Hank Bell's company), naming Exigent's employee Madison Braunz as an authorized agent of Construction Contractors, and listing his own email address as the contact information; exigentlandscaping@yahoo.com. **Exhibit H**.

Hank Bell testified that he did not know Madison Braunz, she was not an authorized agent of his company, Construction Contractors, and she had no authority to sign on behalf of his company. Bell Deposition at 27:3-17. Heitmann admitted that Madison Braunz was a former employee of Exigent, and that she worked for Exigent on October 24, 2022. See ECF No. 82.

Heitmann acknowledged that, despite Construction Contractors being listed on the 3rd Fraudulent Application, the contract information listed his email address and his wife's phone number, instead of Construction Contractors. He also acknowledged that he did not have a residential builder's license when the 3rd Fraudulent Application was submitted.

25· ·Q.· ·On the second page, paragraph 17, "Company name:
**Page 23**
·1· · · · Construction Contractors."· Paragraph 22, again, your
·2· · · · e-mail is exigentlandscaping@yahoo.com.· That's your
·3· · · · e-mail; correct?
**·4· ·A.· ·Yes.**
·5· ·Q.· ·Paragraph 20, "Company phone number: 586-489-6680."
·6· · · · That's your phone number?
**·7· ·A.· ·No.**
·8· ·Q.· ·Whose phone number's that?
**·9· ·A.· ·Amanda's.**
10· ·Q.· ·Paragraph 23, "Authorized representative: Madison
11· · · · Braunz"; correct?
**12· ·A.· ·Correct.**
13· ·Q.· ·She's a former employee of Exigent Landscaping;
14· · · · correct?
**15· ·A.· ·Correct.**
16· ·Q.· ·Is this her writing on this page we're looking at,
17· · · · page 2 of Exhibit E?
**18· ·A.· ·I'm not sure.**

19· ·Q.· ·And as of October 24, 2022, you personally did not
20· · · · have a residential builder's license; correct?
**21· ·A.· ·Correct.**

Heitmann Deposition at 22:25-23:21.

### *Plaintiff Terminates Heitmann*

Unsurprisingly, Heitmann and Exigent were unable to complete the project.  As an initial

matter, on the day the Contract was signed, Exigent was in breach of the contract as Heitmann and

Exigent had no ability to complete the scope of work.

On or about August 29, 2023, Plaintiff terminated Exigent, as it had become clear they

were incompetent and had no ability to complete the project in a proper and timely manner. Not

only was Heitmann unqualified, but he was also not permitted to work on the project as he was not

licensed through the City of Dearborn or the State of Michigan.[4]  As such, Heitmann's fraudulent

conduct was the proximate cause of all damages incurred by Plaintiff.

When Plaintiff terminated Heitmann, the grotto had not been completed, a ten-thousand-

pound limestone rock above the unfinished grotto was cracked, the bridges had not been built, the

water slides had not been built, and the spa, lazy river, swimming pool, and glass fence had not

been completed. Not only was the work not completed, what was completed was done so in a

shoddy and haphazard manner that had to be replaced or redone.  Heitmann failed to build the

tanning shelf to the correct depth for its intended use.  Heitmann failed to plan or build the lazy

---

[4] Heitmann claims that, halfway through the project, he obtained a residential builder's license.
He argues that this subsequent licensure somehow absolves him of his fraudulent conduct.  As
discussed more fully below, the fact that he later obtained a license does not change that: (a) he
defrauded Plaintiff to induce him into signing the Contract and Change Order #1, and (b) he
fraudulently deceived the City of Dearborn to obtain building permits. Despite obtaining a
residential builder's license, Heitmann and Exigent never obtained a license to do business in the
City of Dearborn. Heitmann at 80:20-25. As such, he did not have a license to work in the City of
Dearborn.

river to a proper width for its intended use. Heitmann installed coping poorly in an unworkmanlike manner throughout the pool, requiring complete replacement. Heitmann installed the spillways at improper heights to function as intended. Heitmann installed electrical conduits improperly and haphazardly, using improper fittings, connections, and materials. Heitmann failed to have the plumbing and electrical work inspected and approved, requiring it to be dug up. Heitmann installed undersized plumbing for the lazy river, which had to be replaced. Perhaps most egregiously, Heitmann failed to use a proper sized footing for the ledge rock grotto, and the 10,000-pound stone at the roof of the grotto cracked – causing a potentially life-threatening safety issue. **Exhibit I**.

Heitmann and Exigent left the Property in disrepair, after defrauding $395,203.26 from Plaintiff. Heitmann claimed that Plaintiff expressed that he was fired in part due to a crack in the 10,000-pound limestone rock that was above the grotto. Heitmann Deposition at 54:24-6 and 56:12-15. While the cracked rock in the roof of the grotto certainly contributed to Heitmann's termination from the project, it was merely the latest, most egregious, and most dangerous of Heitmann's repeated failures. Throughout the project, Heitmann and Exigent had, as discussed above, shown themselves to be fully unqualified to perform the work as contracted. Heitmann and Exigent failed to properly construct a "Swimming Pool," necessitating the work to be redone by a reputable contractor at an additional cost to Plaintiff.

Plaintiff hired Coastal Pools ("Coastal") to complete the project. **Exhibit J**. Coastal had to repair or replace a large amount of the work that Heitmann had done poorly or improperly. The tanning shelf had to be redone. The lazy river needed to be widened. The tile and coping needed to be repaired and replaced. The spillways needed to be replaced and installed at their proper heights. The underground electrical and plumbing needed to be dug up, removed, and replaced.

Missing lighting needed to be installed. Exigent's pumps were undersized and had to be replaced. The pool stairs needed to be widened to allow for safe use. The limestone grotto had to be removed, new footings had to be installed, and the stone replaced.

Ultimately, Plaintiff had to pay Coastal $380,073.58 to repair Exigent's mistakes and finish the job that Exigent had contracted to complete. When added to the amounts already paid ($350,000 to Exigent and $37,786.56 directly to Exigent's contractors), Plaintiff paid $767,860.14 to complete a job that Exigent had contracted to complete for $554,454.00 – resulting in excess costs of $213,406.14.

### *Payments by Plaintiff*

The payments made by Plaintiff are not in dispute. Plaintiff paid a total of $387,786.56 to Exigent and its contractors prior to their termination, $350,000.00 of which was paid directly to Exigent.

| 7/1/2022 | $ | 50,000.00 | Exigent |
|---|---|---|---|
| 8/18/2022 | $ | 100,000.00 | Exigent |
| 12/12/2022 | $ | 16,782.45 | Messina Concrete (paid directly) |
| 12/13/2022 | $ | 9,566.35 | Messina Concrete (paid directly) |
| 12/29/2022 | $ | 100,000.00 | Exigent |
| 5/4/2023 | $ | 100,000.00 | Exigent |
| 8/1/2023 | $ | 11,437.76 | Dolphin Waterslides (paid directly) |
| **TOTAL** | **$** | **387,786.56** | |

Heitmann Deposition at 24:7-27:3. $250,000.00 of the $350,000.00 was paid prior to Heitmann obtaining a residential builder's license. Heitmann Deposition 26:2-5.

### *Heitmann Cannot Account for Funds Received*

Heitmann was asked to account for the money he or Exigent received from Plaintiff. **Exhibit K**.

**INTERROGATORY NO. 2:** Identify the disposition of all money you or your company received from the Plaintiff.

**ANSWER: Plaintiff objects to this interrogatory, as it is vague and overbroad. The question essentially asks Heitmann to perform a complete accounting from recollection alone.**

**Subject to this objection, Heitmann has produced receipts in his possession at Bates 369-383; 470; 473; 477; 496-509 as well as employee time records at Bates 522. Subject to this objection, Heitmann is aware of monies paid to Henry Rodriguez; J.P. Pools Ferguson Plumbing, Grace Transport, Home Depot, Upper Canada Stone, SCP Pool Corp; Classic Pools and Rock Bottom Stone. Exigent also paid a sales commission of 2.5% of project cost to Avery Petri. The business records pertaining to these payments; however, are with Exigent and Heitmann no longer has access to them. By way of further answer, Heitmann's personal knowledge is limited as the parties primarily responsible for purchasing materials and tracking project costs were Exigent's project managers, Kody Grandchamp and Cory Maxwell along with Exigent's CFO, Dan Othlof.**

At Heitmann's deposition, he was questioned about the purported use of the $350,000 he received from Plaintiff and was only able to account for $102,270.03. Heitmann 31:17-52:7.

| Name | Amount Claimed | Bates # | Notes |
|------|----------------|---------|-------|
| CRC | $902.12 | 369 | "Ship to" portion of invoice missing |
| CRC | $2,189.32 | 371 | |
| CRC | $1,362.52 | 375 | |
| CRC | $79.50 | 379 | |
| CRC | $902.12 | 381 | "Ship to" portion of invoice missing |
| CRC | $902.12 | 383 | "Ship to" portion of invoice missing |

| | | | |
|---|---|---|---|
| Nacy | $11,750.00 | 470 | Heitmann testified this was an estimate, not a receipt, and only a portion was paid, less than half. |
| Boomer Constr. | $6,351.35 | 496 | |
| Home Depot | $1,032.10 | 497 | |
| JP Pools | $6,832.50 | 499 | |
| A&G Constr. | $10,703.75 | 500 | |
| JP Pools | $7,012.90 | 501 | |
| Fergeson | $1,448.44 | 502 | |
| Home Depot | $431.39 | 506 | |
| Messina | $16,782.45 | 507 | Heitmann thinks the actual number may be $26,837.61 but has no evidence. Heitmann Deposition at 46:10-18. |
| Labor | $19,798.82 | 522 | |
| 2.5% commission | $13,788.63 | | |
| TOTAL | $102,270.03 | | |

Accordingly, Heitmann is unable to account for **$247,729.97** of the $350,000.00 that Plaintiff paid to Exigent. The unaccounted funds constitute 70.8% of the funds paid to Exigent, and 44.7% of the total contract price (despite Heitmann's previous testimony that Exigent's profit margin on pool builds was "Anywhere from 0 to 30 percent"). Heitmann 2004 Examination at 19:24-20:1. Heitmann claims the unaccounted funds went into overhead and fuel, but he has no evidence to support this claim. Heitmann Deposition at 53:15-54:3.

### *Plaintiff is not the only Person Heitmann has Defrauded*

This is not an isolated incident. This was Heitmann's and Exigent's routine practice[5] of conducting business, used to defraud many other people. These actions have resulted in many lawsuits, actions being taken by the State of Michigan Attorney General, and criminal prosecutions for fraud. Heitmann Deposition at 58:9-60:9.

### *Hebeka Formal Complaint*

---

[5] FRE 406.

Heitmann used the same scam to defraud Mr. and Mrs. Hebeka, using the same contract

with the phony license number, wherein he held himself out to be a licensed contractor, using the

same third party's residential builder's license to fraudulently obtain a building permit, and then

failing to complete the project. **Exhibit L.**

His fraudulent actions against Hebeka resulted in a license complaint by the Attorney

General for the State of Michigan ("Formal Complaint"). **Exhibit M.** The material facts in the

Formal Complaint are identical to the facts in this case, to wit:

16.     Respondent Heitmann is the qualifying officer for Exigent Landscaping and is responsible for its compliance with the Occupational Code.

17.     On September 30, 2021, before they were licensed by the Department, Respondents entered into a construction contract with the owners (Homeowners) of a home on Chaucer Court in Macomb, Michigan.

18.     Under Article 24 of the Code, Respondents were required to be licensed by the Department as residential builders or maintenance and alteration contractors to perform the work in their contract with the Homeowners.

19.     The contract with the Homeowners included a "license number" of 802082183 that does not correspond to residential builder or maintenance and alteration contractor license numbers issued by the Department, was signed on behalf of Exigent by an unlicensed salesperson and does not contain information regarding a qualifying officer.

20.     To obtain a building permit for the construction, Respondents, or someone on their behalf, submitted a permit application to Macomb County which stated that another company, which was duly licensed as a residential builder under the Occupational Code, was the contractor for the Homeowners' project

21.     The application, which was dated October 6, 2021, included the other company's name, license number, and expiration date in the spots for "contractor/applicant name," "builder's license number," and "expiration date." However, the contact email address was for someone at "exigentdesignbuild.com" and the contact phone number was the same number Respondents used on their contract with the Homeowners.

22.     Despite what was stated on the permit application, the other company was not the contractor for the project. Neither it nor its qualified officer performed construction on the project, and they did not have a contract with the Homeowners.

23.    The building permit was issued to the other company, Construction Contractors, LLC, on October 28, 2021.

24.    Despite not being licensed as required by the Code, Respondents received payments from the Homeowners and performed the construction on the Chaucer Court home.

Heitmann acknowledged that the material facts are the same. Heitmann Deposition at 63:2-70:23. Heitmann stipulated to a Consent Order to resolve the Formal Complaint.  This resulted in the suspension of his residential builder's license where Heitmann's acknowledgment that he violated multiple provisions of the occupational code. **Exhibit N**.

A.    MCL 339.601(1): A person shall not engage in or attempt to engage in the practice of an occupation regulated under this act or use a title designated in this act unless the person possesses a license or registration issued by the department for the occupation.

B.    MCL 339.604(d): Demonstrates a lack of good moral character.

C.    MCL 339.604(h): Violates any other provision of this act or a rule promulgated under this act for which a penalty is not otherwise prescribed.

D.    MCL 339.2411(j): Aiding or abetting an unlicensed person to evade this article, or knowingly combining or conspiring with, or acting as agent, partner, or associate for an unlicensed person, allowing one's license to be used by an unlicensed person, or acting as or being an ostensible licensed residential builder or licensed residential maintenance and alteration contractor for an undisclosed person who does or shall control or direct, or who may have the right to control or direct, directly or indirectly, the operations of a licensee.

E.    MCL 339.2411(m): Workmanship not meeting the standards of the Michigan residential code as promulgated under the Stille-DeRossett-Hale single state construction code act,1972 PA 230, MCL 125.1501 to 125.1531.

Heitmann violated the same statutes in his dealing with Plaintiff as evidenced herein.

## 2nd Formal Complaint

Another customer made a formal license complaint against Heitmann.  Heitmann refused to provide a copy of the Formal Complaint in discovery, but provided the Consent Order, wherein he stipulated that he once again violated MCL 339.601(1), MCL 339.604(d) and (l), MCL 339.2411(j), and MCL 339.2404a which states:

A licensee shall, as part of the contract, provide information relating to his or her individual license and to any license issued to that person as a qualifying officer of another entity.

Once again, he defrauded a customer by falsely representing he had a residential builder's license, fraudulently used a third-party's license to obtain a permit, and then failed to properly complete the work. **Exhibit O**.

### *Boyd*

Heitmann defrauded Mr. and Mrs. Boyd in the same manner as he defrauded Plaintiff, by being an unlicensed contractor, using a contract with a phony license number at the bottom of every page, using a third-party (Hank Bell and Construction Contractors) to obtain a building permit, and failing to properly construct a swimming pool. See ¶16-21 of Complaint which is attached as **Exhibit P** and see Exigent contract which is attached thereto.

### *Carter*

Heitmann defrauded Mr. Carter in the same manner as he defrauded Plaintiff, by being an unlicensed contractor, using a contract with a phony license number at the bottom of every page, using a third-party (Hank Bell and Construction Contractors) to obtain a building permit, and failing to properly construct a swimming pool. See ¶7-14 of Complaint which is attached as **Exhibit Q** and see Exigent contract which is attached thereto.

### *Mehra*

Heitmann defrauded Dr. and Mrs. Mehra in the same manner as he defrauded Plaintiff, by being an unlicensed contractor, using a contract with a phony license number at the bottom of every page, using a third-party (Hank Bell and Construction Contractors) to obtain a building permit, and failing to properly construct a swimming pool. See ¶14-30 of Complaint which is attached as **Exhibit R** and see Exigent contract which is attached thereto.

### **STANDARD OF REVIEW**

The standards governing a motion for summary judgment are as follows:

Fed.R.Civ.P. 56(a), applicable to bankruptcy adversary proceedings under Fed. R. Bankr. P. 7056, provides that a motion for summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149-50 (6th Cir.1995), the court elaborated:

> The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to 'put up or shut up' on a critical issue.

> If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a . . . verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.

> . . .

> Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson* [*v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)], *Celotex* [*Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)] and *Matsushita* [*Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)], trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted.

*Id.* (internal quotation marks and citations omitted). In determining whether the moving party has met its burden, a court must "believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant." *Ingram v. City of Columbus*, 185 F.3d 579, 586 (6th Cir.1999) (relying on *Russo v. City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir.1992)).

*McCallu-m v. Pixley (In re Pixley)*, 456 B.R. 770, 774-75 (Bankr. E.D. Mich. 2011).

## ARGUMENT

### I. Defendant's Misrepresentations Constitute Fraud under § 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) excludes from discharge claims incurred by "false pretenses, a false representation, or actual fraud." "In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998) (internal footnote omitted).

All four elements are met:

- **Knowingly false representations:** Defendant knowingly included a fictitious license number on every page of the contract. See **Exhibit B**, ECF No. 82, Heitmann Deposition at 20:7-10. Defendant then lied to Plaintiff about his relationship with Hank Bell, Hank Bell's involvement in the permitting process and his authority to use Hank Bell's license to obtain permits.[6] See Bell Deposition at 9:14-17, 9:19-22, 12:5-14, and 38:2-22.

---

[6] Assisting an unlicensed person in the unlicensed practice of a covered occupation is a violation of Michigan law. *See* M.C.L.A §§ 339.604(j) and 339.1118. Consequences are serious, and can include loss of the license, fines, and, in some cases, criminal prosecution. Defendant's allegation that Hank Bell, a licensed Michigan builder since 1980, would have authorized him to use his license to obtain permits strains credulity.

- **Intent to deceive:** Michigan law requires contractors to include their residential builder's license information as a part of their contracts. M.C.L. § 339.2404a. There can be no conceivable reason for Defendant to have included a fake license number – specifically identified as a "License #," on every page of the contract, other than to deceive Plaintiff into believing that he was a duly licensed builder. See **Exhibit B**.

- **Reliance:** Plaintiff justifiably relied on the contract's license representations in entering the agreement and making payments. See Heitmann Deposition at 24:7-27:3.

- **Damages:** Plaintiff paid Defendant $350,000.00 (with **$247,729.97** unaccounted for) and paid $37,786.56 to Defendant's subcontractors. See Heitmann Deposition at 24:7-27:3. Defendant's work was defective (see **Exhibits I and J**), resulting in an additional $380,073.58 paid to remedy and complete the project (see **Exhibit J**). As a result of Defendant's fraud, Plaintiff paid $767,860.14 to complete a job that Defendant had contracted to complete for $554,454.00.

Defendant's assertion that his "subsequent licensure" cures his prior misrepresentations is legally untenable. Defendant cites *Edgewood Dev. Inc. v. Landskoener*, 262 Mich. App. 162, 167 (2004) to support the proposition that, because Defendant *later* obtained a builder's license, his earlier fraud is somehow wiped clean. But that is not what the *Edgewood* court held. In *Edgewood*, the court evaluated MCL § 339.2412(1) and found that, if a builder was unlicensed at the time the contract was signed, but became licensed during the project, such builder may bring a claim for payment for its work. In *Edgewood*, there were no allegations of affirmative fraud - that the contractor *intentionally deceived* its customer into believing that it had a license. In the present case, Heitmann took affirmative steps to deceive Plaintiff into believing that Heitmann was, in fact, a licensed builder.

Section 523(a)(2)(A) makes claims non-dischargeable based upon how they were "obtained." The fraud necessary to make a debt nondischargeable must exist at the inception of the debt. *In re Vissers*, 21 B.R. 638, 640 (Bankr. E.D. Wis. 1982). Accordingly, Defendant's fraud is judged at the time of inducement, not by later developments. Heitmann lied to Plaintiff – misrepresenting his qualifications get Plaintiff to sign on the dotted line. His subsequent licensure does not alter the fact that he fraudulently induced Plaintiff to remit payments under the contract.

## II. Defendant's Misuse of Funds Violates the MBCFA and Constitutes Defalcation under § 523(a)(4)

The MBCFA imposes a fiduciary duty on contractors to hold construction payments in trust for laborers, subcontractors, and material suppliers. M.C.L. § 570.151 *et. seq.* Misappropriation of those funds constitutes defalcation while acting in a fiduciary capacity. *In re Johnson*, 691 F.2d 249, 255–56 (6th Cir. 1982).

"A ***reasonable inference of appropriation arises*** from the payment of construction funds to a contractor and the subsequent failure of the contractor to pay laborers, subcontractors, materialmen, or others entitled to payment." *People v Whipple*, 202 Mich. App. 428, 435; 509 N.W.2d 837 (1993), *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 276 Mich. App. 514, 519, 742 N.W.2d 140, 143-44 (2007) (emphasis added). Defendant's failure to segregate and properly apply trust funds is precisely the conduct the MBCFA and § 523(a)(4) prohibit.

Defendant's argument runs contrary to the Sixth Circuit's determination of violations of the MBCFA. Defendant asks this Court to overrule *Patel v. Shamrock Floorcovering Servcs.*, 565 F.3d 963 (6th Cir. 2009), which held that general contractors have a duty to pay subcontractors before paying themselves. *Id.* at 970. Defendant asks this Court to modify the Sixth Circuit's holding to its exact opposite – that general contractors actually *can* pay themselves before subcontractors, as long as certain subcontractors were not "engaged" at the time the general

contractor pays itself. In addition to being directly contrary to the Sixth Circuit's holding, Defendant's reading of the statute would "put the fox in charge of the henhouse," giving general contractors the ability to delay "engaging" subcontractors until after they had collected – and misappropriated – a customer's funds.

Moreover, even if Defendant's reading of the law was accurate, here, his actions still violate the MBCFA. By Defendant's own admission, his profit margins on a project were anywhere from 0 to 30 percent. Heitmann 2004 Examination at 19:24-20:1. Even assuming Plaintiff's project was at the high end of that range, Defendant's profit on the job would be 30% of $554,545.00 (see **Exhibit B**) – or $166,363.50. Yet already, even before Plaintiff paid in full, Defendant is unable to account for $247,729.97 of Plaintiff's funds. Heitmann 31:17-52:7. Even if Heitmann had already paid himself *all* of his anticipated profit on the job – there would *still* be $81,366.47 missing. This shortfall is presumptive evidence of defalcation. *Whipple*, 202 Mich. App. 428 at 435.

### III. Plaintiff Has Demonstrated Damages Without Need for an Expert.

Defendant contends Plaintiff cannot prove damages absent expert testimony. This is incorrect. Defendant seeks to distract the Court from the issues – attempting to turn this *fraud* case into a construction defect case. But here, Defendant's fraud induced Plaintiff to sign the Contract. Defendant and Exigent failed to perform as required by the Contract (see **Exhibit I**). Defendant's failures caused Plaintiff to incur costs beyond the scope and extent of the Contract. These damages are readily calculable and plainly shown by documentary evidence.

- Payments made: **$350,000.00 to Defendant, $37,786.56 directly to Defendant's subcontractors (Heitmann Deposition at 24:7-27:3), and $380,073.58 to finish the job**

**properly (see Exhibit J). This led to Plaintiff paying $213,406.14[7] more than the original contract price.**

This disparity is evidence of Plaintiff's damages, independent of expert testimony. A lay finder of fact may compare sums paid to the benefit received without expert assistance. The Sixth Circuit has held, even in cases of complex professional malpractice, "[w]hen the alleged negligence is straightforward, expert testimony is not required." *EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 632 (6th Cir. 2019). Here, where the causal nexus is plain, and the damages are readily calculable, expert testimony is not required.

## CONCLUSION

Defendant induced Plaintiff into a construction contract by fraudulently misrepresenting his licensure. He forged permitting documents and lied about it to Plaintiff. He misappropriated substantial funds in violation of the MBCFA. His actions were fraudulent, willful, malicious, and gave rise to significant damages.

WHEREFORE, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied.

DATED: August 25, 2025     Respectfully Submitted,

            **OSIPOV BIGELMAN, P.C.**

            /s/ Anthony J. Miller
            JEFFREY H. BIGELMAN (P61755)
            ANTHONY J. MILLER (P71505)
            Attorneys for Plaintiff
            20700 Civic Center Drive, Ste. 420
            Southfield, MI 48076
            (248) 663-1800
            am@osbig.com

---

[7] This does not account for the $247,729.97 that Heitmann received and cannot account for.

# EXHIBIT A

1                UNITED STATES BANKRUPTCY COURT

2                EASTERN DISTRICT OF MICHIGAN

3                     SOUTHERN DIVISION

4

5    In re:                      Chapter 13

6    BRANDON HEITMANN,           Case No. 24-41956-mar

7         Debtor.                Hon. Mark A. Randon

8    _____/

9    MOHAMED SAAD,

10        Plaintiff,             Adv. Pro. No. 24-04375-mar

11   vs.                         Hon. Mark A. Randon

12   BRANDON HEITMANN,

13        Defendant.

14   _____/

15

16

17           The Video Deposition of BRANDON HEITMANN,

18           Taken via Hanson Remote,

19           Commencing at 10:24 a.m.,

20           Tuesday, July 22, 2025,

21           Before Susannah Gorman, CSR-9271, RPR.

22

23

24

25

```
1   APPEARANCES:

2

3   JEFFREY H. BIGELMAN, ESQ. (P61755)

4   Osipov Bigelman, P.C.

5   20700 Civic Center Drive, Suite 420

6   Southfield, Michigan 48076-4140

7   (248)663-1800

8   jhb@osbig.com

9        Appearing on behalf of the Plaintiff.

10

11  TYLER PATRICK PHILLIPS, ESQ. (P78280)

12  Kotz Sangster Wysocki P.C.

13  400 Renaissance Center, Suite 3400

14  Detroit, Michigan 48243-1618

15  (313)259-8782

16  tphillips@kotzsangster.com

17       Appearing on behalf of the Defendant.

18

19  ALSO PRESENT:

20  Neal Rogers, Legal Videographer

21  Brandon Heitmann, Defendant

22

23

24

25
```

```
1                 TABLE OF CONTENTS
2
3   BRANDON HEITMANN                     PAGE
4
5
6   Examination                           6
7   By Mr. Bigelman
8   Examination                          81
9   By Mr. Phillips
10
11
12                 EXHIBITS
13
14  EXHIBIT                              PAGE
15  (Exhibits attached to transcript.)
16
17  DEPOSITION EXHIBIT A                  10
    10:36 a.m.
18  Contract
    DEPOSITION EXHIBIT C                  16
19  10:49 a.m.
    Swimming Pool Permit Application
20  DEPOSITION EXHIBIT D                  20
    10:57 a.m.
21  Revised Document Application
    DEPOSITION EXHIBIT E                  22
22  11:01 a.m.
    Revised Documents Application
23  DEPOSITION EXHIBIT F                  24
    11:04 a.m.
24  Defendant's Response to Plaintiff
    Interrogatories
25  DEPOSITION EXHIBIT G                  24
    11:04 a.m.
```

```
1   Table of payments
    DEPOSITION EXHIBIT H                  32
2   11:22 a.m.
    Invoice from CRC Contractors Rental
3   DEPOSITION EXHIBIT I                  35
    11:27 a.m.
4   Summary page
    DEPOSITION EXHIBIT CC                 55
5   12:09 p.m.
    Photo of the pool site
6   DEPOSITION EXHIBIT K                  60
    12:36 p.m.
7   Residential builder's license look-up
    website
8   DEPOSITION EXHIBIT L                  64
    12:43 p.m.
9   Formal complaint
    DEPOSITION EXHIBIT M                  73
10  1:03 p.m.
    Consent order
11  DEPOSITION EXHIBIT T                  74
    1:04 p.m.
12  Boyd complaint
    DEPOSITION EXHIBIT U                  75
13  1:06 p.m.
    Hebeka complaint
14  DEPOSITION EXHIBIT V                  77
    1:07 p.m.
15  Carter complaint
    DEPOSITION EXHIBIT W                  78
16  1:09 p.m.
    Responses to Plaintiff's Requests for
17  Admission, Third Set of Interrogatories
    DEPOSITION EXHIBIT Y                  80
18  1:14 p.m.
    License to do business in the city of
19  Dearborn for Construction Contractors
20
21
22
23
24
25
```

```
1   Remote deposition
2   Tuesday, July 22, 2025
3   About 10:24 a.m.
4        THE VIDEOGRAPHER:  We are on the record.
5   This is the video-recorded deposition of Brandon
6   Heitmann being taken remotely via Zoom.  Today is
7   July 22, 2025, and the time is 10:24 a.m.  Would the
8   attorneys please identify themselves and the court
9   reporter please swear in the witness.
10       MR. BIGELMAN:  Jeffrey Bigelman on behalf
11  of Plaintiff.
12       MR. PHILLIPS:  Tyler Phillips, P78280, on
13  behalf of Defendant.
14       BRANDON HEITMANN
15  was thereupon called as a witness herein and, after
16  having first been duly sworn to testify to the truth,
17  the whole truth, and nothing but the truth, was
18  examined and testified as follows:
19       MR. BIGELMAN:  As an initial matter,
20  Amanda's gonna need to leave the room because she's
21  not a party to this case.
22       MR. PHILLIPS:  That's fair, Amanda.
23       Yep, that's fine, Jeff.
24       You want to go in my office?
25       Jeff, can we just pause for one second?
```

Page 6

1  I'm going to show her to my office.
2         MR. BIGELMAN:  Yeah, no problem.
3         THE VIDEOGRAPHER:  We are going off the
4  record at 10:25 a.m.
5         (Off the record at 10:25 a.m.)
6         (Back on the record at 10:27 a.m.)
7         THE VIDEOGRAPHER:  We are back on the
8  record at 10:27 a.m.
9         MR. BIGELMAN:  The witness has already been
10  sworn.
11         Mr. Heitmann, I presume you have given
12  depositions before?
13         **THE WITNESS:  Yes.**
14         MR. BIGELMAN:  So you understand the
15  process; correct?
16         **THE WITNESS:  Yes.**
17         MR. BIGELMAN:  You were here when I
18  explained the process to your wife; correct?
19         **THE WITNESS:  Yes.**
20         MR. BIGELMAN:  Okay.
21                EXAMINATION
22  BY MR. BIGELMAN:
23  Q.  What's your educational background?
24  **A.  Can you elaborate on that?**
25  Q.  Did you graduate high school?

Page 7

1  **A.  Yes.**
2  Q.  From what school?
3  **A.  Lutheran High School North.**
4  Q.  Did you go to college?
5  **A.  Yes.**
6  Q.  Where did you go?
7  **A.  I went to -- excuse me.  Went to Oakland; took some**
8     **classes there and took come classes at Macomb.**
9  Q.  Did you obtain a degree from either Oakland University
10     or Macomb Community College?
11  **A.  No.**
12  Q.  Did you go to trade school?
13  **A.  No.**
14  Q.  Have you had any professional licenses?
15  **A.  Builder's license.**
16  Q.  Your license is currently suspended; correct?
17  **A.  I believe so.**
18  Q.  Do you know how long it's suspended for?
19  **A.  I don't recall.**
20  Q.  You are the sole owner of Exigent Landscaping, LLC;
21     correct?
22  **A.  Yes.**
23  Q.  When did you form that company?
24  **A.  I can't recall exactly when.**
25  Q.  Did you start that company with your own money, or did

Page 8

1  someone give you money, or how did you start that
2  company?
3  **A.  Can you elaborate a little bit on that?**
4  Q.  Before I go any further, is there anything that would
5     impair your memory as we sit here today, any health
6     conditions, any drug use, whether it's prescription or
7     street drugs or alcohol?  Is there anything that would
8     impair your memory as we sit here today?  Can you
9     answer, please.
10  **A.  Can you elaborate on what the funding would be for?**
11  Q.  You need to answer the question I just asked.
12         MR. PHILLIPS:  Jeff, he did.  I don't know
13  why you're not picking it up.  He said, "No."
14         But go ahead and speak loudly into the
15  microphone, Brandon.
16         Can you repeat the prior question, just so
17  we have a clear record for you, Jeff.
18         MR. BIGELMAN:  Susannah, are you able to
19  hear his answers?
20         (The court reporter indicates she cannot
21  hear the witness's answers either.)
22         MR. BIGELMAN:  Let's try to speak loudly so
23  we can make a clear record.
24         **THE WITNESS:  Okay.**
25

Page 9

1  BY MR. BIGELMAN:
2  Q.  So there's no impairments of memory; is that correct?
3  **A.  Correct.**
4  Q.  Okay.  When you started Exigent Landscaping, where did
5     the money come from to start the company?
6  **A.  Self-funded.**
7  Q.  How much money did you use to start the company?
8  **A.  I don't recall the exact amount.**
9  Q.  Prior to starting the company, did you gain experience
10     somewhere building pools?
11  **A.  No.**
12  Q.  Where did you work before forming Exigent Landscaping?
13  **A.  I worked at Jet's Pizza, Sorrento's Pizza, and for my**
14     **cousin's landscaping company.**
15  Q.  What was the name of your cousin's landscaping
16     company?
17  **A.  Not sure what it was called at the time, but now it is**
18     **called Height Control Lawn & Landscape, I believe.**
19  Q.  Who is Hank Bell to you?  Is he related to you?
20  **A.  Not exactly.**
21  Q.  So he's not related to you; correct?
22  **A.  Correct.**
23  Q.  How would you describe your relationship with him?
24  **A.  We were working together to build pools, and he was --**
25  Q.  You worked for him; is that correct?

1     MR. PHILLIPS:  I don't think he finished
2  his answer.
3     Go ahead.  Finish your answer, Brandon.
4     **THE WITNESS:  And he was like a mentor, I**
5  **would say.**
6  BY MR. BIGELMAN:
7  Q.  How old are you?
8  **A.  Thirty-one.**
9  Q.  When did you work for him?
10 **A.  Sorry, when did I work for who?**
11 Q.  For Hank Bell.
12 **A.  I never worked for Hank Bell besides, like, small**
13 **landscaping stuff for his personal home.**
14 Q.  Brandon, what I have put on the screen has been marked
15 as Exhibit A.  Can you see that document?
16    MARKED BY THE REPORTER:
17    DEPOSITION EXHIBIT A
18       10:36 a.m.
19 **A.  Yes.**
20 Q.  The top left corner has the Exigent Landscaping logo.
21    Do you see that?
22 **A.  Yes.**
23 Q.  The top middle says "Estimate."  Do you see that?
24 **A.  Yes.**
25 Q.  It's dated June 27, '22.  Do you see that?

1  **A.  Yes.**
2  Q.  And it says, "Dear OJ and Mohamed, 921 Crescent Drive,
3  Dearborn"; correct?
4  **A.  Yes.**
5  Q.  This was a proposal to build a swimming pool; correct?
6  **A.  Correct.**
7  Q.  You didn't have the builder's license at this time;
8  correct?
9  **A.  Correct.**
10 Q.  Do you see at the bottom of the page, it has
11    "License No. 802082183"?  Do you see that?
12 **A.  Yes.**
13 Q.  That's not a residential builder's license, is it?
14 **A.  Correct.**
15 Q.  And, in fact, that same license number is on every
16    page; correct?
17 **A.  Correct.**
18 Q.  I'm going to -- see these numbers at the bottom?
19    These are called Bates numbers.  These are how lawyers
20    mark documents.  Okay?
21 **A.  Yes.**
22 Q.  So this was marked by an attorney as "BH27."  Do you
23    see that?
24 **A.  Yes.**
25 Q.  Okay.  And this document was signed by Mohamed Saad,

1  Avery Petri, and you on June 27, 2022, by Docusign;
2  correct?
3  **A.  Yes.**
4  Q.  Were you with Mohamed Saad before this contract was
5  executed?
6  **A.  No.**
7  Q.  Did you go out and visit 921 Crescent Drive, Dearborn,
8  before this contract was executed?
9  **A.  I don't think so.**
10 Q.  Who is Avery Petri?
11 **A.  Can you repeat that, please.**
12 Q.  Right here on the screen, Avery Petri, who is that?
13 **A.  That was our sales -- one of our sales reps.**
14 Q.  She worked for you?  Or is it a "he"?
15 **A.  "He."  He worked for Exigent.**
16 Q.  Okay.
17    MR. PHILLIPS:  Jeff, I don't mean to
18 interrupt, but just as a formality, I don't think we
19 ever got the roll call of who is in the room.  Is it
20 the same as Ms. Heitmann?
21    MR. BIGELMAN:  Can you say again, Tyler.
22    MR. PHILLIPS:  Yeah.  I apologize for
23 interrupting, but as a formality, I don't think we got
24 the roll call of who was in every room.  Is it the
25 same as Ms. Heitmann?  So I can presume Mr. Saad's not

1  with us today?
2     MR. BIGELMAN:  That's correct.
3     MR. PHILLIPS:  Okay.  That satisfies me in
4  terms of who is in the room.  Thank you.  Continue.
5  Sorry about that, Jeff.
6     MR. BIGELMAN:  No problem.  You're looking
7  at my home office.
8  BY MR. BIGELMAN:
9  Q.  Did Avery Petri work on commission for you or salary
10    or some type of hybrid?
11 **A.  I believe it was a hybrid.**
12 Q.  Do you recall what it was?
13 **A.  Not the exact amount.**
14 Q.  As part of Exhibit A, there's a document attached to
15    it.  Do you see where I have highlighted "CO1"?  Does
16    that mean "Change Order 1"?
17 **A.  Yes.**
18 Q.  This is dated August 5, 2022; correct?
19 **A.  Yes.**
20 Q.  And as of August 5, 2022, you did not have a
21    residential builder's license; correct?
22    **THE WITNESS:  Thanks, Phil.**
23 BY MR. BIGELMAN:
24 Q.  Do you think I'm correct, or you think you did?
25 **A.  I don't think I had a builder's license at that time.**

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1 Q. Prior to August 5, 2022, and June 27, 2022, did you
2    ever advise Mr. Saad that you did not have a
3    residential builder's license?
4 **A. Yes.**
5 Q. When would that have been?
6 **A. I texted him and told him I was gonna be working with**
7    **Hank and he was gonna be assisting me with the permit**
8    **process and Hank's been in construction for 40 years**
9    **and we were gonna be working together on it.**
10 Q. Has that text been produced?
11 **A. I believe so. I believe so. I don't know if I can**
12    **ask Tyler or not but. . .**
13       MR. PHILLIPS: We produced everything,
14    Jeff.
15 BY MR. BIGELMAN:
16 Q. You testified that you had not spoken to Mr. Saad
17    prior to the execution of the contract on June 27,
18    '22; correct?
19 **A. Can you repeat that, please.**
20 Q. Yeah. When was the supposed text saying that you were
21    gonna use Hank Bell's license?
22 **A. I don't recall the exact date, but it was before the**
23    **permits were pulled. If I can recall correctly,**
24    **Mohamed had some contacts in the City, and he was**
25    **trying to expedite the process of the approval of the**

1    **permits, and I told him the name the permits were**
2    **under and sent him a brief description of who I was**
3    **working with on that.**
4 Q. Okay. But you would not have pulled permits before
5    you signed the contract on June 27, '22; correct?
6 **A. Correct.**
7 Q. And you didn't pull permits prior to August 5, 2022;
8    did you?
9 **A. I don't -- August 5, 2022. I don't recall exactly**
10    **when we pulled the permits. I would have to look at a**
11    **document.**
12 Q. There was never -- as of June 27, '22, and August 5,
13    2022, there was no residential builder's license
14    attached to Exigent Landscaping, LLC; correct?
15 **A. I'm sorry. Can I give you a new answer to my -- can I**
16    **rephrase my last answer?**
17 Q. Just answer the present question, please.
18 **A. Okay. Can you ask it again, please.**
19       MR. BIGELMAN: Susannah, can you reread it.
20       (The court reporter read back the previous
21    question at 10:45 a.m.)
22       **THE WITNESS: That's correct. We viewed**
23    **Hank as our qualified officer.**
24 BY MR. BIGELMAN:
25 Q. His company is Construction Contractors; right?

1 **A. Correct.**
2 Q. They're not mentioned anywhere in the June 27, '22,
3    document or the change order on August 5, 2022;
4    correct?
5 **A. Correct.**
6 Q. If we look here on page 4 of Exhibit A, it says,
7    "Estimated start date, August," slash,
8    "September 2022, contingent on weather, certain
9    material availability, and building permit issuance";
10    correct?
11 **A. Correct.**
12 Q. Showing you on the screen what's been marked as
13    Exhibit C. Can you still see that?
14       MARKED BY THE REPORTER:
15       DEPOSITION EXHIBIT C
16       10:49 a.m.
17       MR. PHILLIPS: You just closed it, Jeff.
18       MR. BIGELMAN: Okay. Let's try it again.
19 BY MR. BIGELMAN:
20 Q. Do you see it now?
21 **A. Yes.**
22 Q. Okay. This says "Swimming Pool Permit Application."
23    Do you see that?
24 **A. Yes.**
25 Q. This is dated August 31, 2022; right?

1 **A. Yes.**
2 Q. So that's after June 27, '22, which was the date you
3    signed the contract, and also after Change Order 1 of
4    August 5, 2022; correct?
5 **A. If we're referring to the document in front of us,**
6    **yes. Off memory, I thought Change Order 2 was signed**
7    **after we had the permits and started work.**
8 Q. I'm talking about Change Order 1, which is dated
9    August 5, 2022.
10 **A. August 5th. . . Okay. Yeah, according to this**
11    **document.**
12 Q. Let's go back to Exhibit A. June 27, 2022; right?
13 **A. Yep.**
14 Q. Change Order 1, August 5, 2022; correct?
15 **A. Correct.**
16 Q. Exhibit C, "Swimming Pool Permit Application,"
17    August 31, 2022; correct?
18 **A. Correct.**
19 Q. I did not hear your answer.
20 **A. Correct.**
21 Q. This is your handwriting?
22 **A. No.**
23 Q. First you said, "Correct." Then you say, "No."
24       MR. PHILLIPS: He's answering "Correct" to
25    the prior question, Jeff, which wasn't regarding

1 handwriting.
2 BY MR. BIGELMAN:
3 Q. Is this your handwriting on this, document, which is
4 marked as Exhibit C?
5 **A. No.**
6 Q. Talk into the microphone. I cannot hear you.
7 **A. No.**
8 Q. Did you sign Hank Bell's name on this document?
9 **A. No.**
10 Q. Do you know who did?
11 **A. No.**
12 Q. Do you believe that Hank Bell signed this signature
13 here that purports to be his?
14 **A. I'm not sure. I don't recall.**
15 Q. Would you agree that on the first page of Exhibit C,
16 there's no mention of Brandon Heitmann or Exigent
17 Landscaping, LLC?
18 **A. In the first page? Correct.**
19 Q. Correct. On the second page, the only mention of you
20 is an e-mail address, "bheitmann12@yahoo.com";
21 correct?
22 **A. Correct.**
23 Q. And your wife's name, Amanda Pisarski; correct?
24 **A. Correct.**
25 Q. Is that the e-mail you used at the time,

1 bheitmann12@yahoo.com?
2 **A. It was one of them, yes.**
3 Q. What about this address, 55949 Lancewood Drive, Shelby
4 Township? What is that?
5 **A. That's Amanda's home address -- parents' address.**
6 Q. Is that where she lived as of August 25th, '22?
7 **A. No.**
8 Q. You two lived somewhere else at the time?
9 **A. I believe so, yes. Or yes, we did.**
10 Q. Does this look like your wife's handwriting?
11 **A. I'm not sure.**
12 Q. Do you recognize the notary signature?
13 **A. Yes. I see it.**
14 Q. Right. Who is the notary? Do you know?
15 **A. Who is the notary? Can you rephrase that.**
16 Q. You know what a notary is; correct?
17 **A. Correct.**
18 Q. Did you have a notary working at your office or
19 someone who had a notary --
20 **A. No.**
21 Q. No?
22 **A. No.**
23 Q. Where would you get documents notarized when you
24 needed them notarized?
25 **A. FedEx or a bank.**

1 Q. Do you see at the bottom of this document, "Plan fee,
2 $15. Processing fee, $42"?
3 **A. Yes.**
4 Q. Did Exigent pay that money, or did Construction
5 Contractors or Hank Bell? Do you know who paid that?
6 **A. I don't recall.**
7 Q. And as of August 25, 2022, you did not have a
8 residential builder's license; correct?
9 **A. Correct.**
10 Q. Showing you what's been marked as Exhibit D. Do you
11 see it on your screen?
12     MARKED BY THE REPORTER:
13     DEPOSITION EXHIBIT D
14     10:57 a.m.
15 **A. Yes.**
16 Q. This is titled "Revised Document Application";
17 correct?
18 **A. Yes.**
19 Q. And this is dated September 29, '22; correct?
20 **A. Yes.**
21 Q. This is for 921 Crescent Drive; correct?
22 **A. Yes.**
23 Q. Is this your handwriting on the first page of
24 Exhibit D?
25 **A. No.**

1 Q. Were you ever an authorized agent of Construction
2 Contractors?
3     MR. PHILLIPS: Foundation. Form.
4     If you know, go ahead.
5 **THE WITNESS: Can you reask that, please.**
6 BY MR. BIGELMAN:
7 Q. Were you ever an authorized agent of Construction
8 Contractors?
9     MR. PHILLIPS: Same objection.
10 **THE WITNESS: No.**
11 BY MR. BIGELMAN:
12 Q. Page 2, line 17, "Company, Construction Contractors,"
13 do you see that?
14 **A. Yes.**
15 Q. Line 23, "Authorized representative, Brandon
16 Heitmann," do you see that?
17 **A. Yes.**
18 Q. Paragraph 22, "Company e-mail,
19 exigentlandscaping@yahoo.com." Was that an e-mail
20 that you used at the time?
21 **A. Yes.**
22 Q. I didn't hear your answer.
23 **A. Yes.**
24     MR. PHILLIPS: Did you get that, Jeff?
25     MR. BIGELMAN: I did.

1    MR. PHILLIPS: Okay.
2
3  BY MR. BIGELMAN:
4  Q. Showing you what's been marked Exhibit E. This
5    document's entitled "Revised Documents Application."
6    Revision date, 10-24-22. Do you see that?
7        MARKED BY THE REPORTER:
8        DEPOSITION EXHIBIT E
9        11:01 a.m.
10 **A. Yes.**
11 Q. Do you recognize -- strike that.
12       Paragraph 1, "Permit site address: 921
13    Crescent Drive, city of Dearborn"; correct?
14 **A. Yes.**
15 Q. Paragraph 7, "This revision is for a grotto that is
16    attached to the pool. We have already submitted the
17    plans for the pool itself." That's what it says;
18    correct?
19 **A. Yes.**
20 Q. Is this your handwriting on the front, on this first
21    page here?
22 **A. No.**
23 Q. Do you know whose handwriting it is?
24 **A. No.**
25 Q. On the second page, paragraph 17, "Company name:

1    Construction Contractors." Paragraph 22, again, your
2    e-mail is exigentlandscaping@yahoo.com. That's your
3    e-mail; correct?
4  **A. Yes.**
5  Q. Paragraph 20, "Company phone number: 586-489-6680."
6    That's your phone number?
7  **A. No.**
8  Q. Whose phone number's that?
9  **A. Amanda's.**
10 Q. Paragraph 23, "Authorized representative: Madison
11    Braunz"; correct?
12 **A. Correct.**
13 Q. She's a former employee of Exigent Landscaping;
14    correct?
15 **A. Correct.**
16 Q. Is this her writing on this page we're looking at,
17    page 2 of Exhibit E?
18 **A. I'm not sure.**
19 Q. And as of October 24, 2022, you personally did not
20    have a residential builder's license; correct?
21 **A. Correct.**
22 Q. Okay. I'm going to ask some questions, and I'm going
23    to toggle back between Exhibits F and G. Okay?
24 **A. Okay.**
25

1        MARKED BY THE REPORTER:
2        DEPOSITION EXHIBIT F
3        11:04 a.m.
4        MARKED BY THE REPORTER:
5        DEPOSITION EXHIBIT G
6        11:04 a.m.
7  Q. This is Exhibit F, "Defendant's Response to Plaintiff
8    Interrogatories." Interrogatory 1, we asked you to
9    "Identify the amount that you or your company received
10   from the Plaintiff"; right?
11 **A. Correct.**
12 Q. Okay. And you first say that you received $50,000 on
13   July 1; correct?
14 **A. Correct.**
15 Q. So I made this chart here. Can you see the chart?
16 **A. Correct. Yeah, I can.**
17 Q. So the chart reflects the July 1 payment that we just
18   spoke about; correct?
19 **A. Correct.**
20 Q. Then you state in your interrogatory answer that you
21   received $100,000 on August 18, 2022; correct?
22 **A. Correct.**
23 Q. That's reflected here; correct?
24 **A. Correct.**
25 Q. And I also broke it out separately, the second table,

1    the first two payments; correct? Do you see that?
2  **A. Correct.**
3  Q. Then you state, "$26,348 direct payment made to
4    subcontractor for progress payment on December 14,
5    2022"; correct?
6  **A. Correct.**
7  Q. And if we go back to Exhibit G, that's our table here;
8    correct?
9  **A. Correct.**
10 Q. It's also reflected in this table at the bottom,
11    payments to third parties; right?
12 **A. Correct.**
13 Q. Who was that contractor?
14 **A. That was Messina's Concrete.**
15 Q. I'm going back to your interrogatory response. You
16    received a hundred thousand dollars on December 30,
17    2022; correct?
18 **A. Yes.**
19 Q. That's reflected in Exhibit G in the table; correct?
20 **A. Yes.**
21 Q. That's also reflected in the table of the payments to
22    Exigent; correct?
23 **A. Yes.**
24 Q. December 30, 2022, you did not have your builder's
25    license; correct?

1  A.  Correct.

2  Q.  So you had received $250,000 from Mr. Saad, or the

3      company had, before you received your residential

4      builder's license; correct?

5  A.  Correct.

6  Q.  If you go to the second page, continuation of your

7      answer to Interrogatory 1, it states that "Direct

8      payments were made to stone company in the amount of

9      $5,506.72 on April 23rd"; correct?

10  A.  Yes.

11  Q.  Going back to Exhibit G, I accounted for that payment;

12      correct?

13  A.  Yes.

14  Q.  And I also accounted for it in the third table for

15      payments to third parties; correct?

16  A.  Yes.

17  Q.  Going back to your interrogatory response, Exigent

18      received a hundred thousand dollars on May 4, 2023;

19      correct?

20  A.  Yes.

21  Q.  And going back to Exhibit G, I accounted for that in

22      both the first table and in the second table; correct?

23  A.  Yes.

24  Q.  This table shows a total of $350,000 paid directly to

25      Exigent; right?

1  A.  Yes.

2  Q.  And that's accurate; right?

3  A.  Yes.

4  Q.  And then if we go back to the interrogatory response,

5      it says, "Credited Plaintiff for direct payments to

6      the water slide supplier in the amounts of $5,718.87

7      and $7,620.87 on August 1, 2023, and August 15, 2023";

8      correct?

9  A.  Yes.

10  Q.  I accounted for both of those payments in the first

11      table of Exhibit G and in the third table; correct?

12  A.  Yes.

13  Q.  Would you agree that Exhibit G is an accurate summary

14      of your interrogatory that we just looked at?

15  A.  Yes.

16  Q.  Do you know why Mohamed Saad would have paid the stone

17      company directly?

18  A.  Yeah.  He was behind on payments, and he offered to

19      pay suppliers directly.  He claimed he was waiting on

20      money from the bank.

21  Q.  So you're claiming he was behind on payments?

22  A.  Correct.  He was.

23  Q.  Is there any e-mails or text messages to that effect?

24  A.  Yes, text messages, mainly, if I recall correctly.

25      Phone conversations.

1  Q.  And were you communicating directly with him or was

2      one of your employees?

3  A.  When it came to money, yes, I was -- I was -- I was

4      communicating directly with him.

5  Q.  How often were you at the jobsite at 921 Crescent?

6  A.  What time period are you referring to?

7  Q.  Well, from the start of the job until Exigent was

8      terminated.

9  A.  In the beginning, I was not on the jobsite too much.

10      I had a project manager managing the project that

11      was -- towards the end of the project, I became a

12      little bit more involved, but my project manager

13      managed the project, and my operations manager.

14  Q.  In total, how many times would you say you visited 921

15      Crescent Drive?

16  A.  Probably 15 times, maybe 20.

17  Q.  Who is the project manager on the job?

18  A.  What time period?

19  Q.  Was there more than one?

20  A.  Yes.

21  Q.  Who were the project managers on the job?

22  A.  I believe, originally, if my memory is correct, Archie

23      was the first project manager on the job.

24  Q.  What's Archie's last name?

25  A.  Mercado.

1  Q.  Why was he replaced?

2  A.  I believe -- we believed he was stealing from the

3      company.

4  Q.  You fired him?

5  A.  Yes.

6  Q.  Did you have issues with his workmanship also?

7  A.  No.

8  Q.  And who was the second project manager?

9  A.  Kody -- well, excuse me.  Kody was his -- was the

10      operations manager, and Archie reported to him, but

11      the other project manager was Cory Maxwell.

12  Q.  Did Cory Maxwell see it through until you were

13      terminated?

14  A.  If I remember correctly, yes.  If -- yes.  Yeah.

15  Q.  Was Cory Maxwell fired at some point, or did he stay

16      with Exigent until it went bankrupt?

17  A.  He stayed with Exigent throughout the bankruptcy, but

18      he was later fired.

19  Q.  Why was he fired?

20  A.  Honestly, just attitude, anger, I would say.  He was

21      kind of a loose cannon, I would say, sometimes.

22  Q.  Did you have workmanship issues?

23  A.  No.

24  Q.  What was Kody's last name?

25  A.  Grandchamp.

Page 30

1  Q.  How do you spell that?
2  A.  G-r-a-n-d-c-h-a-m-p.
3  Q.  And did he work with Exigent until it went bankrupt,
4      or was his employment terminated earlier?
5  A.  He was terminated earlier.
6  Q.  For what reason?
7  A.  He actually quit.
8  Q.  Did he quit during the -- the project at 921 Crescent?
9  A.  Yeah.  He quit, if I remember correctly, in the
10     winter.
11 Q.  Winter of which year?
12 A.  I believe '23.
13 Q.  Do you know why he quit?
14 A.  I think so.
15 Q.  Well, tell me.
16 A.  I believe he quit -- he just -- I don't know.  He
17     couldn't handle the pressure.  He was making mistakes,
18     and I was putting the pressure on him, and I don't
19     think he could handle it.  He didn't believe in the
20     vision maybe.  I don't know.
21 Q.  (Technical difficulties) Saad job either quit or were
22     fired during the job; correct?
23 A.  I'm sorry, can you ask that again, please.
24 Q.  Yeah.  Two of the three people in charge of the Saad
25     job were fired or quit during the pendency of the job?

Page 31

1  A.  Correct.  Three of the three.
2  Q.  Three of the three.  Cory also; right?
3  A.  Correct.
4  Q.  Three of them quit?
5  A.  Correct.
6  Q.  No, I'm asking you.
7  A.  Oh, sorry.  To clarify, two of them were fired.  One
8      of them quit.
9  Q.  So who -- who managed the job after these three guys
10     were gone?
11 A.  Well, one of them was managing the job at all times.
12     Cory was the latest, and I believe we were terminated
13     when Cory was still with us.
14 Q.  Who was higher?  A project manager or operations
15     manager?
16 A.  Operations manager.
17 Q.  We're going back to Exhibit -- Exhibit F should still
18     be on your screen.  Now we're gonna look at
19     Interrogatory 2.  This is where I ask you to identify
20     the disposition of all the money you or your company
21     received from the Plaintiff.  Do you see that?
22 A.  Yes.
23 Q.  And then in response, you point us to Bates Nos. 369
24     to 383, 470, 473, 477, 496 to 509, as well as employee
25     time records at Bates 22; correct?

Page 32

1          MR. PHILLIPS:  (Indiscernible) just for
2      clarifying the record.
3          (The court reporter interjects.)
4          He said "22."  I believe that's Bates 522,
5      just so we have a clean record.
6          MR. BIGELMAN:  Correct, Bates 522.
7          THE WITNESS:  Respectfully, I don't know
8      what the Bates portion of this is, "Bates 369-3."  I
9      don't know what any of that is.  I think my attorney
10     put that in there.
11 BY MR. BIGELMAN:
12 Q.  Okay.  Well, I'm about to show you so we can go
13     through it.
14 A.  Okay.  Okay.
15 Q.  What I have put on your screen is Exhibit H.  These
16     are the Bates numbers that we were referring to, and
17     we can look in the bottom right-hand corner.  See
18     where it says "Heitmann 369"?
19         MARKED BY THE REPORTER:
20         DEPOSITION EXHIBIT H
21         11:22 a.m.
22 A.  Yes.
23 Q.  Okay.  So scrolling up, this is an invoice from CRC
24     Contractors Rental; correct?
25 A.  Yes.

Page 33

1  Q.  For $902.12; correct?
2  A.  Yes.  Yeah, I do remember this.
3  Q.  What is this for?
4  A.  Looks like a rental for a trailer.
5  Q.  Okay.  This is dated April 21, 2023; correct?
6  A.  Yes.
7  Q.  And how do we know this is specific to the 921
8      Crescent job?
9  A.  I would be going off whoever the project manager would
10     be at that time.  My assumption is that was used for
11     transporting equipment and/or materials to the job.
12 Q.  But looking at this document, you're not certain;
13     correct?
14 A.  Not certain about what?
15 Q.  You're not certain which job this was for.
16 A.  I would say yes, I'm certain that it was for the Saad
17     project.
18 Q.  Do you see that "Ship to" here?  Nothing there --
19     there's either nothing there, or something was whited
20     out.  Do you see that?
21 A.  Yes, I see it.
22 Q.  So I made a summary page also for this, "CRC $902.12,
23     Bates No. 369."  Do you see that?
24 A.  Yes.
25 Q.  Yet that's accurate from -- based on what we just



Page 34

1 looked at; correct?
2 A. Yes. Where is the number on this? 369, where is that
3 number?
4 MR. PHILLIPS: Right here.
5 Can we go back to the invoice, please,
6 Jeff?
7 MR. BIGELMAN: Sure.
8 THE WITNESS: Okay. Yeah.
9 MR. BIGELMAN: Okay.
10 THE WITNESS: Yes.
11 MR. BIGELMAN: I just wanted to make an
12 accurate summary. That's all we're trying to do here.
13 BY MR. BIGELMAN:
14 Q. The next one we're gonna look at is 371. Okay?
15 A. Yes.
16 Q. Now, here, unlike the prior document we provided,
17 Bates 369 -- here it says, "Ship to Exigent
18 Landscaping, 921 Crescent Drive." Do you see that?
19 A. Yes.
20 Q. And this was for -- this was for April 25, 2023, in
21 the amount of $2,189.32; correct?
22 A. Yes.
23 Q. And if we go to the summary page, it's reflected
24 there; correct?
25 A. Yes.

Page 35

1 Q. Now we're looking at Bates No. 373. Okay?
2 A. Yes.
3 Q. And, again, here there are documents dated April 25,
4 2023. Again, here, the "Ship to Exigent Landscaping,
5 921 Crescent Drive." Do you see that?
6 A. Yes.
7 Q. Dated April 25, 2023?
8 A. Yes.
9 Q. Amount approved, $2,189.32. Actually, that's the same
10 one. Let's go to the next one. All right. We're
11 looking at Bates 375. Do you see that?
12 A. Yes.
13 Q. And this is dated April 27, 2023, and at the top,
14 "Ship to Exigent Landscaping, 921 Crescent Drive." Do
15 you see that?
16 A. Yes.
17 Q. Total amount, 1,362.52; correct?
18 A. Yes.
19 Q. And it's reflected on Exhibit I -- correct? -- the
20 summary page?
21 MARKED BY THE REPORTER:
22 DEPOSITION EXHIBIT I
23 11:27 a.m.
24 A. Yes.
25 Q. Looking at Bates No. 377 -- actually, that's the same

Page 36

1 one. Again, Bates 379, it's dated April 26, 2023;
2 correct?
3 A. Yes.
4 Q. And "Ship to Exigent Landscaping, 921 Crescent Drive,
5 Dearborn"; correct?
6 A. Yes.
7 Q. This is $79.50; correct?
8 A. Yes.
9 Q. And here on the summary page, we have the amount
10 correct, the name correct -- CRC -- the amount, 79.50,
11 Bates No. 379; correct?
12 A. Yes.
13 Q. Now we're looking at Bates No. 381. Do you see that?
14 A. Yes.
15 Q. And this is dated May 3, 2023, and here, like the
16 first one we looked at, the "Ship to," there's nothing
17 there. It was either whited out, or it's missing. Do
18 you see that?
19 A. Yes.
20 Q. This is for $902.12; correct?
21 A. Yes.
22 Q. And it's on the summary page; correct?
23 A. Yes.
24 Q. Here, Bates No. 383, this is dated May 8, 2023.
25 Again, there's nothing in the "Ship to" portion;

Page 37

1 correct?
2 A. Correct.
3 Q. And this is the same dollar amount as before, $902.11
4 [sic]; correct?
5 A. Correct.
6 Q. And we reflected that in the summary page; correct?
7 A. Correct.
8 Q. I'll make this bigger. This is a small one. 470, do
9 you see that?
10 A. Yes.
11 Q. This is from Nacy, N-a-c-y. Do you see that?
12 A. Yes.
13 Q. This is for $23,500; correct?
14 A. That's what it says on the estimate, correct.
15 Q. What is this?
16 A. I'm sorry?
17 Q. Do you see the black signature and then the date in
18 black that's handwritten?
19 A. Yes.
20 Q. Do you see that? Do you know whose signature that is?
21 Whose is it?
22 A. Mine. Mine.
23 Q. Okay. This is for the job at 922 -- 921 Crescent; is
24 that right?
25 A. Yeah.



1  Q.  If we look at the summary page, we have "Nacy 23,500,
2     Bates No. 470"; correct?
3  A.  Yes.  So that was an estimate there.
4  Q.  Was this actually paid, or was this just an estimate?
5  A.  It was an estimate.  We paid him a portion of a down
6     payment on that.
7  Q.  How much of the 23,500 did you pay?
8  A.  I don't recall the exact amount.
9  Q.  Was it, like, half down or less?  More?
10 A.  I think half or less, going off memory.
11 Q.  Okay.  So in our summary page, we're just reflecting
12    what the invoices say.  We're not -- I'm not
13    questioning right or wrong.  I'm just making a
14    summary.  Okay?
15 A.  Okay.
16 Q.  So the summary reflects what Bates 470 says; correct?
17 A.  Correct.
18 Q.  Bates 477, this is Upper Canada Stone company; right?
19 A.  Yes.
20 Q.  It says "Purchase order date, November 11, '21";
21    right?
22 A.  Yes.  On the sheet in front of me, yes.
23 Q.  This says, "Ship to Exigent job 66 West Millington
24    Road, Fostoria, Michigan"; right?
25 A.  Yes.

1  Q.  So this is not for the job at 921 Crescent Drive;
2     correct?
3  A.  It should have been.  I don't know if my CFO made an
4     error or the stone company made an error.  Based on
5     memory, there was a partial ship to that address.  A
6     few boulders came off.  The majority of the load went
7     to Moe's -- Saad's.  It was a split load.
8  Q.  Did you do a job -- did Exigent do a job at 66 West
9     Millington Road, Fostoria, Michigan?
10 A.  Yes.
11 Q.  And what is UCG -- I don't even how to say that word.
12    I'll spell it.  G-u-i --
13 A.  Guillotine.
14 Q.  How do you say it?
15 A.  Guillotine.
16 Q.  Guillotine.  What is that?
17 A.  Limestone.
18 Q.  Okay.  Forty-three and a half tons of limestone?
19 A.  Correct.
20 Q.  And you think part of it went to 921 Crescent Drive?
21 A.  Most of it.
22 Q.  "Purchase Order date, November 11, '21."  Do you see
23    that?
24 A.  Correct.
25 Q.  Do you see "Date shipped, November 19, '21"?

1  A.  Correct.
2  Q.  That would have predated the contract with my client
3     Mr. Saad; correct?
4  A.  Correct.
5  Q.  We listed that here on the summary page; correct?
6  A.  Correct.
7  Q.  Next one is Bates No. 496, 10-26-22.  It's from Boomer
8     Construction Materials, shipped to 921 Crescent Drive;
9     right?
10 A.  Yes.
11 Q.  And deposit of $6,351.35.  Do you see that?
12 A.  Yes.
13 Q.  Was that paid?
14 A.  I believe so.
15 Q.  Okay.  And what was this for?
16 A.  Rebar.
17 Q.  Going to the concrete?
18 A.  Yeah, for the pool.
19 Q.  And if we go back to the summary page, we listed that
20    here; correct?
21 A.  Yes.
22 Q.  I'm looking at Bates No. 497.  This is a Home Depot
23    invoice dated -- I don't see a date, but I do see "Job
24    description, 921 Crescent."  Correct?
25 A.  Correct.

1  Q.  Here we go.  Here's the date, October 27, 2022;
2     correct?
3  A.  Correct.
4  Q.  This is for $973.68; correct?
5  A.  Correct.
6  Q.  And if we go to the summary page, we listed that there
7     properly; correct?
8  A.  Correct.
9  Q.  If we look at Bates No. 499, this is a document with
10    Exigent Landscaping's letterhead; correct?
11 A.  Correct.
12 Q.  It says "Receipt," and it's dated October 24, 2022;
13    correct?
14 A.  Correct.
15 Q.  So tell me what we're looking at here.
16 A.  So that was a receipt, it appears, that we paid this
17    guy for work on that property, and it appears that
18    we -- some -- or whoever put this thing together
19    didn't calculate correctly 'cause the rest of it
20    should have been paid.  Looks like this is half of it
21    here.
22 Q.  Okay.  But here it shows that you paid half; you paid
23    6,832.50; right?
24 A.  Correct.
25 Q.  Okay.  And below that, it shows a remaining balance of

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    the same amount; correct?
**2  A.  Correct.**
3    Q.  Whose signature is that from Exigent?
**4  A.  Not sure.**
5    Q.  Okay.
**6  A.  Assuming my CFO, Dan.**
7    Q.  What's Dan's last name?
**8  A.  Othlof.**
9    Q.  How do you spell that?
**10 A.  O-t-h-l-o-f.**
11   Q.  Okay.  Going to the summary page.  We listed that
12      accurately; correct?
**13 A.  Yes.**
14   Q.  Here we're looking at Bates No. 500.  This is -- it's
15      an invoice from A&G Construction billed to Kody
16      Grandchamp of Exigent Design of November 4, 2022;
17      correct?
**18 A.  Yep.**
19   Q.  In the amount of $10,703.75; correct?
**20 A.  Yes.**
21   Q.  And can you tell me, by looking at this invoice, what
22      this was for?
**23 A.  Looks like excavation of the pool, lazy river.**
24   Q.  So they dug the hole; correct?
**25 A.  Yes, one of them.**

Page 43

1    Q.  And then what?  They deliver some type of stone; is
2       that right?
**3  A.  Yes.**
4    Q.  What was the stone for?
**5  A.  The base, the floor.**
6    Q.  Okay.  And was this paid?
**7  A.  Yes.**
8    Q.  And if we go back to the summary, it's listed properly
9       there, "A&G Construction, $10,703.75," Bates No. 500;
10      correct?
**11 A.  Yes.**
12   Q.  And Bates No. 501, this appears to be the other half
13      for JP Pools, of 6,832, and then some other items;
14      correct?
**15 A.  Yes.**
16   Q.  Here -- we have it on here.  This is not correct.
17      This says "180.40," which it should say "7,012.90";
18      correct?
**19 A.  That's correct.**
20   Q.  So this needs to be fixed.  That's Exhibit I.  So
21      Exhibit I, JP Pools, Bates 501, 7,012.90 instead of
22      $180.40; correct?
**23 A.  Yes.**
24   Q.  I'm looking at Bates No. 502.  This is from Fergeson,
25      dated November 14, 2022, which just says "Counter

1    pickup"; correct?
**2  A.  Yes.**
3    Q.  Total amount, 1,448.44.  Do you see that?
**4  A.  Yes.**
5    Q.  And can you tell me by looking at this document what
6       was purchased?
7           MR. PHILLIPS:  Can you zoom in, Jeff,
8       please.  Thank you.
**9      THE WITNESS:  Looks like a bunch of glue**
**10     for plywood.**
11   BY MR. BIGELMAN:
12   Q.  Glue?
**13 A.  Yeah, plumbing glue.**
14   Q.  This document -- I can make it a little bit smaller.
15      Is that -- just looking at it, that would tie it to
16      921 Crescent?
**17 A.  Yes.  It looks like project managers or operation**
**18     managers would be responsible for putting the job name**
**19     on there, and it looks like they did that, and my CFO**
**20     put that towards his project.**
21   Q.  Okay.  And if we look at the summary, we have
22      "Fergeson, $1,448.44," Bates No. 502; correct?
**23 A.  Yes.**
24   Q.  I have another Home Depot receipt, which is dated
25      December 15, '22.  "Job description, 921 Crescent";

Page 45

1    correct?
**2  A.  Yes.**
3    Q.  $406.97; correct?
**4  A.  Yes.**
5    Q.  And if we go back to the summary page, it's accurately
6       reflected there; correct?
**7  A.  Yes.**
8    Q.  So if we look at Bates No. 507, this is a document
9       from Messina, Inc., Concrete; correct?
**10 A.  Correct.**
11   Q.  Grand total is $16,782.45; correct?
**12 A.  What you got highlighted there, yes.**
13   Q.  And the -- the credit card receipt shows payments of
14      2,850.87; correct?
**15 A.  Yes.**
16   Q.  And that's also reflected right here or highlighted
17      where it says "Total."  Same amount; correct?
**18 A.  Looks like it, yes.**
19   Q.  So help me out here.  What was paid?  Was it the
20      2,850.87 or 16,782.45?
21           MR. PHILLIPS:  Jeff, can you zoom out so we
22      can see the entirety of the document, please.  Thank
23      you.
**24     THE WITNESS:  Honestly, I believe the total**
**25     amount paid was the 26 figure.  It might have been**

Page 46

1  in -- he might have been paying per truck.  He might
2  have been paying -- I think he shot some shotcrete --
3  going off memory, I think we shot some shotcrete one
4  day and then came back and shot some more shotcrete
5  the next day.  Maybe that's why they charged it in
6  payments, but my mind's telling me that 26 number is
7  what was paid by Moe.
8       MR. BIGELMAN:  Okay.
9  BY MR. BIGELMAN:
10 Q.  So looking at the summary sheet, the summary sheet
11     reflects the 16,782.45; correct?
12 A.  Correct.
13 Q.  And you think that maybe should be changed to
14     26,837.61; is that correct?
15 A.  Correct.
16 Q.  Is there any other documentation that would
17     substantiate this figure?
18 A.  No, not that we would have or I would have.
19 Q.  Next one I'm looking at, Bates 508.
20 A.  Okay.
21 Q.  This is San Marino Iron company dated March 16, 2023,
22     for 921 Crescent Drive; correct?
23 A.  Correct.
24 Q.  It shows budget numbers: first, structural aluminum
25     bridge for a total of 24,000; second, structural

Page 47

1  aluminum grotto for a total of 44,000; correct?
2  A.  Correct.
3  Q.  Was -- looks like it's the second page.  There's a
4     second page here.  It shows a total of 68,000.
5     There's no signatures on the page.  Was this amount
6     ever paid to San Marino, the total amount or a lesser
7     amount or none, if you know?
8  A.  None.  That's just an estimate, it looks like.  We
9     never engaged them on that project.
10 Q.  Okay.  Going to the summary page, I have "San Marino
11     Iron company of 68,000," Bates No. 508.  That should
12     be removed; correct?
13 A.  Correct.
14 Q.  Then for labor, if you remember, employee time records
15     at Bates 522, and if you go to Bates 522, it says
16     "Native document placeholder," and that refers us to
17     a -- to an Excel spreadsheet that was provided.  We
18     saved this in PDF.  So the top of it says, "Time clock
19     export, exported on Tuesday, November 19, 2024."  Did
20     you have some way for your employees to check in,
21     check out?  Is that what we're looking at?
22 A.  Yes.
23 Q.  Okay.
24 A.  For -- to clarify, for laborers and foremen,
25     specifically.  Salary employees didn't.

Page 48

1  Q.  This is for hourly workers; is that right?
2  A.  Correct.
3  Q.  And if we look at the first one, you broke it down by
4     worker, Jesus Soria; correct?
5  A.  Yep.
6  Q.  And I summed up the amounts here to $2,117.51.  Do you
7     see that?
8  A.  Yes.
9  Q.  That's consistent with the summary page here; correct?
10 A.  Yes.
11 Q.  Next employee, Thomas Galindo, $1,142.60; correct?
12 A.  Yes.
13 Q.  And looking at the summary page, that information is
14     accurate; correct?
15 A.  Yes.
16 Q.  Next employee, Aldo Barajas Tello, T-e-l-l-o,
17     $7,033.95; correct?
18 A.  Yes.
19 Q.  And -- correct?
20 A.  I didn't hear you there.
21 Q.  Aldo Barajas Tello, $7,033.95, is reflected accurately
22     on the summary page; correct?
23 A.  Yes.
24 Q.  Next employee, Sergio Esquivel, E-s-q-u-i-v-e-l,
25     $5,309.56; correct?

Page 49

1  A.  Yes.
2  Q.  And that's properly reflected on the summary page;
3     correct?
4  A.  Yes.
5  Q.  (Technical difficulties) -- costs, zero.  Do you see
6     that?
7       THE COURT REPORTER:  I think your question
8     may have cut out.
9       MR. BIGELMAN:  Oh, I'm sorry.
10 BY MR. BIGELMAN:
11 Q.  It says "Name, Edward Guest."  Is that a real name or
12     just a placeholder?
13 A.  Honestly, no idea, but I don't have an -- never had an
14     employee named Edward Guest.
15 Q.  Okay.  And in any event, it says "Builder cost, zero";
16     correct?
17 A.  Yes.
18 Q.  Next one, Arturo Ramos?
19 A.  Yes.
20 Q.  $1,704.40; correct?
21 A.  Yes.
22 Q.  That's accurately reflected on the summary page;
23     correct?
24 A.  Yes.
25       MR. PHILLIPS:  Jeff, can you give me one

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Page 50

1    second?  Someone popped into my Teams meeting.  It's
2    showing up on my computer.  I just got to close it.
3    All right.  We're good.
4 BY MR. BIGELMAN:
5    Q.   Next one, Joe Edmonds, and "Builder cost, zero";
6    correct?
7 **A.   "Builder cost, zero," where?**
8    Q.   Right here.
9 **A.   Can't see.**
10    Q.   See it?
11 **A.   Yeah.  Based on that document, it looks like it should**
12 **not be zero, but, yeah.**
13    Q.   Misael Pineda, M-i-s-a-e-l.  Last name, P-i-n-e-d-a.
14    "Total, 643.20."  Do you see that?
15 **A.   Yes.**
16    Q.   That's accurately reflected on the summary; correct?
17 **A.   Yes.**
18    Q.   Eddy Hernandez, "$1,016.76"; correct?
19 **A.   Yes.**
20    Q.   That -- again, that's accurately reflected on the
21    summary page; correct?
22 **A.   Yes.**
23    Q.   Next one, I believe, Noe, N-o-e, Ortega, O-r-t-e-g-a,
24    "$830.84"; correct?
25 **A.   Yes.**

Page 51

1    Q.   That's accurately reflected on the summary page,
2    correct?
3 **A.   Yes.**
4    Q.   Okay.  So one more question.  Based on your
5    interrogatory response, Exigent also paid a sales
6    commission of two and a half percent of the project
7    cost to Avery Petri.  Is that an accurate statement?
8 **A.   Yes.**
9    Q.   So that would have been, what, two and a half percent
10    of what number?
11 **A.   I believe it was a full, total deal of 556- or**
12 **whatever it was.**
13    Q.   By my math, that's 13,900.  Does that sound right?
14        MR. PHILLIPS:  Can the witness check on his
15    calculator?
16 BY MR. BIGELMAN:
17    Q.   In the summary, I have it at 13,788.63.
18 **A.   We might have split the cost of the commission, 'cause**
19 **I assisted on the deal or something like that, if the**
20 **number doesn't line up.**
21    Q.   All right.  So this summary is pretty accurate.  We
22    have to fix JP Pools, Bates No. 501.  It should go
23    from 180.40 to $7,012.90; correct?
24 **A.   JP Pools?**
25    Q.   Yep.

Page 52

1 **A.   Yes.**
2    Q.   Then Messina, the invoice said 16,782.45, but there
3    was a handwritten notation for 26,837.61; correct?
4 **A.   Yes.**
5    Q.   So we need to adjust that.  And San Marino for 68,000,
6    that needs to be removed; correct?
7 **A.   Correct.**
8    Q.   Okay.  So it brings me to my question.  My client paid
9    you directly -- when I say "you," I mean Exigent
10    Landscaping -- $350,000, and we're not even accounting
11    for -- you're not able to account for even half of
12    that money.
13        MR. PHILLIPS:  Foundation.
14 BY MR. BIGELMAN:
15    Q.   So my question is where did the rest of the money go?
16        MR. PHILLIPS:  Foundation.  Form.
17 BY MR. BIGELMAN:
18    Q.   Go ahead and answer.
19        MR. PHILLIPS:  You can answer.
20        He's just thinking.
21 **THE WITNESS:  I don't know where this was**
22 **orchestrated from, but there's missing -- missing**
23 **stuff on here.**
24 BY MR. BIGELMAN:
25    Q.   This is your discovery response.  We just looked at

Page 53

1    every one of those documents.
2        MR. PHILLIPS:  What's the question?
3 BY MR. BIGELMAN:
4    Q.   The question is Exigent Landscaping received $350,000,
5    and it can only account for maybe half of the money it
6    received, so where did the rest of the money go?
7        MR. PHILLIPS:  Again, same objection,
8    foundation.  You haven't established what it can and
9    can't account for.  You're giving him an incomplete
10    recitation of his interrogatory response.  You haven't
11    laid a proper foundation.
12 BY MR. BIGELMAN:
13    Q.   Go ahead and answer.
14 **A.   I don't understand the question.**
15    Q.   You received -- when I say "you," Exigent Landscaping
16    received $350,000 from my client.  The total summary,
17    before we make adjustments, amounts to 183,000 and
18    change before we back out the $68,000 that San Marino
19    Iron never received and make, you know, minor
20    adjustments, you know, elsewhere.  You're at about
21    $130,000 of the $350,000 that you received.  Where did
22    the rest of the money go?
23 **A.   A vast majority of it went into overhead, fuel.**
24 **There's a lot of receipts that we weren't able to get**
25 **from suppliers.  Keep in mind, this happened over**



1   three years ago and over a year and a half after my
2   corporation filed bankruptcy, and this is just what I
3   have on a personal level based on what my team logged.
4   Q.  When you say "overhead," what do you mean by
5   "overhead"?
6   A.  Equipment that was used on the project, fuel used to
7   go to and from the project, and fuel used for the
8   equipment on the project, fuel used by --
9   Q.  When --
10      MR. PHILLIPS:  He's still answering the
11  question.
12      THE WITNESS:  -- fuel used by project
13  managers, operations managers, videographer, runners,
14  drivers, employees sometimes, and that's going off
15  memory.
16  BY MR. BIGELMAN:
17  Q.  When you say "overhead," would that include office
18  rent, utilities, salaries, stuff like that?
19  A.  Correct.
20  Q.  Why did my client fire you?
21      MR. PHILLIPS:  Calls for speculation.  He
22  can't read Mr. Saad's mind.
23  BY MR. BIGELMAN:
24  Q.  Did my client ever -- my client Mr. Saad -- did he
25  ever express to you why he fired you?

1   A.  Yeah.  I believe he said there was a crack in the
2   limestone, which he was unwilling for me to look at,
3   correct, or even show me proof of.
4   Q.  This would have been the limestone in the grotto;
5   correct?
6   A.  So he claimed, yes.
7   Q.  How big would that piece of limestone have been?
8   A.  Based off memory --
9       MR. PHILLIPS:  Which piece are you speaking
10  of, Jeff?
11  BY MR. BIGELMAN:
12  Q.  I'm going to show you guys Exhibit CC.
13      MR. PHILLIPS:  You got a line of
14  questioning, but I could use a restroom break when you
15  get an opportunity.
16      MR. BIGELMAN:  Let's just finish this, and
17  then we'll take a break.
18      MR. PHILLIPS:  Fair enough.
19      MARKED BY THE REPORTER:
20      DEPOSITION EXHIBIT CC
21      12:09 p.m.
22  BY MR. BIGELMAN:
23  Q.  Is this an accurate depiction of how you left
24  Mr. Saad's house -- his pool, rather?
25  A.  Yeah, I believe so.

1   Q.  And when we talk about the -- how did you describe it,
2   the piece that was cracked?  What's the term you used?
3   A.  Mr. Saad was very vague, and he just said there was a
4   crack in his limestone piece, and he felt
5   uncomfortable.
6   Q.  Well, he was referring to this big piece here;
7   correct?
8   A.  I have no idea.  He didn't describe that.
9   Q.  Is this limestone that I'm pointing at here, that
10  covers the grotto?
11  A.  Yes.
12  Q.  How much does this -- how much would this piece have
13  weighed?
14  A.  I don't recall the exact pounds.  10,000 plus off
15  memory.  My engineer has it.
16  Q.  Okay.
17      MR. BIGELMAN:  All right.  Do you guys want
18  to take a break here for about 15, 20 minutes?
19      MR. PHILLIPS:  Yeah.  Jeff, I don't know --
20  well, let me -- we're off the record?
21      THE VIDEOGRAPHER:  We are going off the
22  record at 12:10 p.m.
23      (Off the record at 12:10 p.m.)
24      (Back on the record at 12:24 p.m.)
25      THE VIDEOGRAPHER:  We are back on the

1   record at 12:24 p.m.
2   BY MR. BIGELMAN:
3   Q.  Mr. Heitmann, have you ever been criminally charged
4   with anything?
5   A.  Charged?  Yes.
6   Q.  What have you been charged with?
7   A.  I believe it was fraud.
8   Q.  In connection with what?
9   A.  In my opinion, contractual dispute.
10  Q.  Who made the complaint?
11  A.  Made the complaint. . .  I signed a
12  non-confidentiality agreement on that.  I don't think
13  I need to disclose that.
14      MR. PHILLIPS:  Hold on, Jeff.  Just give me
15  one second with the client.  Go off the record.  Yeah,
16  give me one second to talk to him.
17      THE VIDEOGRAPHER:  I'm sorry.  Did you say
18  you wanted to go off?
19      We are going off the record at 12:26 p.m.
20      (Off the record at 12:26 p.m.)
21      (Back on the record at 12:26 p.m.)
22      THE VIDEOGRAPHER:  We are back on the
23  record at 12:26 p.m.
24      MR. PHILLIPS:  Jeff, just for the record,
25  without waiving privilege, I was just speaking to my

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1    client and discussing that civil things may be subject
2    to a confidentiality agreement.  Any public criminal
3    proceedings would not be, and so that I advised him to
4    answer questions with respect to public criminal
5    proceedings, but with respect to any civil proceedings
6    against those particular plaintiffs, we do have a
7    confidentiality agreement.
8  BY MR. BIGELMAN:
9  Q.  Okay.  So in regard to criminal charges brought by the
10     State of Michigan or one of its municipalities, what
11     was the basis of the charge?
12 **A.  Fraud.**
13 Q.  Right.  Fraud in connection with what?
14 **A.  In my opinion a -- a civil dispute -- I mean -- I'm**
15 **   sorry -- a contractual dispute.**
16 Q.  What were the allegations of fraud?
17 **A.  I think they were alleging that I took a deposit and**
18 **   wasn't gonna build a pool.**
19 Q.  Were there any allegations of you contracting to build
20     a pool without a residential builder's license?
21 **A.  I believe so.**
22 Q.  And what was the main complaint?  What was the
23     customer's name?
24 **A.  Joseph and Angela Hebeka.**
25 Q.  Did you get convicted of these charges?

1  **A.  If I remember correctly, the fraud charges, no, and**
2  **   building without a license, no contest or something.**
3  Q.  What court was this in?
4  **A.  Court. . .  I think Shelby Township or Macomb.  I'm**
5  **   not sure.**
6        MR. BIGELMAN:  Is that right, Tyler?
7        MR. PHILLIPS:  It was -- I don't know if it
8     was in district or circuit.  I think it might have
9     been -- it was in Macomb County or Shelby, one of the
10     two, the district court there.  I didn't handle the
11     criminal, so I can't really tell you.
12 BY MR. BIGELMAN:
13 Q.  Did you receive jail time, probation, a fine?  What
14     happened?  What was the punishment?
15 **A.  Eight months' nonreporting probation, if I remember**
16 **   correctly.**
17 Q.  Give me one second, please.  Do you recall what year
18     the case was?
19 **A.  I think 2024.**
20 Q.  What we're looking at here, this is out of Shelby
21     Township 41A District Court, case ID 23-23-1450-FYFY.
22     False pretenses, $50,000 or more but less than a
23     hundred thousand?
24 **A.  Yes.**
25 Q.  Okay.  And a plea of nolo contendere; is that right?

1  **A.  Not sure what that means, but sounds about right.**
2  Q.  Nolo contendere is consistent with no contest.
3  **A.  Okay.  Yes.**
4  Q.  There's another one, 23-23-1332-FYFY, same charge,
5     false pretenses.  Plea, nolo contendere.  Somehow you
6     got it reduced to disorderly person.  Is that
7     accurate?
8  **A.  Yes.**
9  Q.  Any other charges aside from what we just spoke about?
10 **A.  Just small stuff when I was, like, 18.**
11 Q.  Okay.  Anything else involving fraud?
12 **A.  No.**
13 Q.  This screen is going to be marked as Exhibit K.  This
14     is a residential builder's license look-up website.
15     Is that your builder's license there, 242300197?
16        MARKED BY THE REPORTER:
17        DEPOSITION EXHIBIT K
18        12:36 p.m.
19 **A.  I don't know it off memory, but based on the document**
20 **   you're showing me, it looks correct.**
21 Q.  Okay.  It's got your name here; right?
22 **A.  Yes.**
23 Q.  License issued March 28, 2023; correct?
24 **A.  Yes.**
25 Q.  It's currently suspended; correct?

1  **A.  Correct.**
2  Q.  License complaint is against the company.  Your
3     attorney provided this to me yesterday.  Are you
4     familiar with this formal complaint?
5  **A.  Yeah.**
6  Q.  Paragraph 19, formal complaint, states that -- this is
7     the allegation.  It goes, "Contract with the
8     homeowners included a license number of 802082183 that
9     does not correspond to a residential builder or
10     maintenance and alteration contractor license number
11     issued by the department.  Was signed on behalf of
12     Exigent by an unlicensed salesperson and does not
13     contain information regarding a qualified officer."
14     Did I read that allegation properly?
15 **A.  Yes.**
16 Q.  Allegation 20, "To obtain a building permit for the
17     construction, Respondents or someone on their behalf
18     submitted a permit application to Macomb County, which
19     stated that another company, which was duly licensed
20     as a residential builder under the occupational code,
21     was the contractor for homeowners' project."  Did I
22     read that properly?
23 **A.  Yes.**
24 Q.  Allegation 21, "The application, which was dated
25     October 6, 2021, included the other company's name,

Page 62

1  license number, and expiration date in the spots for
2  contractor," slash, "applicant name, builder's license
3  number, and expiration date; however, the contract
4  e-mail address was for someone at
5  exigentdesignbuild.com and the contact phone number
6  was the same number Respondents used on their contract
7  with homeowners."  Did I read that properly?
8  A.  Yes.
9  Q.  Paragraph 22, "Despite what was stated on the permit
10    application, the other company was not the contractor
11    for the project.  Neither it nor its qualified officer
12    performed construction on the project, and they did
13    not have a contract with the homeowners."  Did I read
14    that properly?
15 A.  Yes.
16 Q.  Paragraph 23, "The building permit was issued to the
17    other company, Construction Contractors, LLC, on
18    October 28, 2021"; correct?
19 A.  Yes.
20 Q.  Paragraph 24, "Despite not being licensed, as required
21    by the code, Respondents received payment from the
22    homeowners and performed the construction on the
23    Chaucer Court home."  Did I read that properly?
24 A.  Yes.
25 Q.  Who is the owner of the Chaucer Court home?

Page 63

1  A.  Daniel Carter.
2  Q.  Would you agree that this fact pattern is very similar
3    to the fact pattern in our case here with Mr. Saad?
4  A.  Can you ask the question again, please.
5  Q.  Would you agree that this fact pattern is very similar,
6    paragraphs 19 through 24, is very similar to the fact
7    pattern with Mr. Saad?
8  A.  Similar.
9  Q.  Similar, right.  Paragraph 19, "He had a contract with
10    a said license number, 802082183, which did not
11    correspond to a residential builder or a maintenance
12    and alteration contractor license number"; correct?
13 A.  Correct.
14 Q.  Yet you got somebody else to apply for a building
15    permit; correct?
16       MR. PHILLIPS:  Are you asking the document,
17    or are you asking him to admit the allegation?
18       MR. BIGELMAN:  I'm talking about in our
19    case with Mr. Saad.
20       MR. PHILLIPS:  I don't understand your
21    question.  Can you rephrase.
22       MR. BIGELMAN:  Sure.
23 BY MR. BIGELMAN:
24 Q.  Just as in with this formal complaint, Exhibit L, the
25    allegation in 19, same thing happened with Mr. Saad.

Page 64

1  You had a contract with said License No. 802082183,
2    and it didn't correspond to any license; correct?
3       MARKED BY THE REPORTER:
4       DEPOSITION EXHIBIT L
5       12:43 p.m.
6       MR. PHILLIPS:  Form.
7       THE WITNESS:  I disagree.
8  BY MR. BIGELMAN:
9  Q.  Why do you disagree?
10 A.  Because the contract wasn't with just Mohamed.  It was
11    with OJ, who was a licensed residential builder and my
12    main point of contact through most of the project.  I
13    agree with 19, the license number, it was -- it was on
14    the same contract but -- yeah.
15 Q.  Correct.  The license number wasn't the license number
16    at all; correct?
17 A.  It was a business license.
18 Q.  No.  There is no such thing as a business license.
19       MR. PHILLIPS:  Are you asking a question,
20    or are you making an affirmative statement to the
21    witness?
22       MR. BIGELMAN:  Okay.  Let's go down --
23    let's go down your rabbit hole.
24 BY MR. BIGELMAN:
25 Q.  What business license did Exigent have that you put on

Page 65

1  your contracts, purporting it to be a license number?
2    What business license?
3  A.  The business of Exigent that was registered with LARA.
4  Q.  What business license?  What business license did LARA
5    give you?
6  A.  I believe it was that one --
7  Q.  What --
8  A.  -- that was listed --
9  Q.  A license to do what?
10 A.  Do business.
11 Q.  Just as with the formal complaint, Exigent couldn't
12    get a building permit in its own name, so you used a
13    third party; correct?
14       MR. PHILLIPS:  Form.
15 BY MR. BIGELMAN:
16 Q.  Answer the question.
17       MR. PHILLIPS:  If you understand it.
18       THE WITNESS:  According to the document in
19    front of me, yes.
20 BY MR. BIGELMAN:
21 Q.  Paragraph 21, here the allegation was -- basically
22    everything on the application -- contractor, applicant
23    name, builder's license number, expiration date -- was
24    for a third party, but the contact e-mail was for
25    exigentdesignbuild.com, and if you recall, we looked

Page 66

1  at the e-mail on all of those applications, and it
2  always went back to brandonheitmann12@yahoo or
3  exigentdesignbuild; correct?
4      MR. PHILLIPS: Compound.
5      Go on if you understand.
6      **THE WITNESS: What was the question?**
7      MR. BIGELMAN: (Technical difficulties),
8  please.
9      MR. PHILLIPS: He asked you what the
10  question was. Oh, you're asking the court reporter.
11  Sorry, Jeff.
12      (The court reporter read back the previous
13  question at 12:47 a.m.)
14      MR. PHILLIPS: Same objection.
15      Go ahead, if you know.
16      **THE WITNESS: I'm going off of 21. I mean,**
17  **yeah, you're reading what is in front of me on 21. My**
18  **attorney handled most of this, and I don't remember**
19  **even looking through this. Well, I remember briefly,**
20  **but it was, like, three years ago, four years ago.**
21      MR. BIGELMAN: No problem. We will refresh
22  your memory. If you want to stretch it out, we'll
23  stretch it out. We can play that game.
24      MR. PHILLIPS: Jeff, can you please keep
25  your comments to questions rather than badgering my

Page 67

1  client.
2  BY MR. BIGELMAN:
3  Q. Okay. Let's look here, Exhibit C, "Swimming Pool
4    Permit Application," dated August 31, '22. Do you see
5    that?
6  A. Yes.
7  Q. Contractor information, Construction Contractors,
8    signature purportedly by Hank Bell -- he disputes he
9    ever signed it -- his license number. Then we go to
10    the next page, e-mail address,
11    "bheitmann12@yahoo.com." Do you see that?
12  A. Yes.
13  Q. Okay. Whose phone number is 586-383-8308?
14  A. Exigent. Exigent's old number.
15  Q. Mm-hmm. Let's go look at Exhibit D. It says "Revised
16    documents application, dated September 29, '22";
17    correct?
18  A. Yes. No, I'm familiar with the --
19      (Interruption.)
20  Q. Line 17, "Construction Contractors"?
21  A. Yes.
22  Q. Paragraph 22, e-mail address,
23    "exigentlandscaping@yahoo.com"; right?
24  A. Yes.
25  Q. Let's go look at Exhibit E. This says "Revised

Page 68

1  document application, October 24, 2022"; correct?
2  A. Yes.
3  Q. Once again, paragraph 17, contractor name,
4    "Construction Contractors"; right?
5  A. Yes.
6  Q. Company e-mail, exigentlandscaping@yahoo.com; correct?
7  A. Yes.
8  Q. Phone number, paragraph 20, "586-489-6680." Whose
9    number is that?
10  A. Amanda's.
11  Q. And we were talking about paragraph 21 before, and
12    just like in the case in the formal complaint, third
13    parties, contractor name, license number, but the
14    contact e-mail address for your company, contact phone
15    number for your company; correct?
16      MR. PHILLIPS: Form.
17  BY MR. BIGELMAN:
18  Q. Answer the question.
19      MR. PHILLIPS: If you know.
20      **THE WITNESS: What is the question?**
21      MR. BIGELMAN: Could you please repeat it.
22      (The court reporter read back the previous
23  question at 12:51 p.m.)
24      MR. PHILLIPS: Form. If you know.
25      **THE WITNESS: I don't understand the**

Page 69

1  **question. Is it a question or a statement?**
2  BY MR. BIGELMAN:
3  Q. If you don't answer the question, we're gonna continue
4    this exam without a date, or we're going to go in
5    front of a judge and --
6      MR. PHILLIPS: He says he doesn't
7  understand your question, Jeff. Ask a better question
8  that he understands. The witness said he didn't
9  understand your question, so ask a better question.
10  Your question doesn't make any sense. So you can go
11  in front of the judge all you want, but until you ask
12  a better question that the witness understands -- he's
13  not refusing to understand. He's saying he doesn't
14  understand it, so ask a better question.
15      MR. BIGELMAN: You're gonna make a real
16  poor witness. I can tell you that.
17      MR. PHILLIPS: Thanks for your opinion.
18  Limit your comments to questions. Quit badgering my
19  client. Quit (indiscernible) --
20      (Simultaneous speakers.)
21      MR. BIGELMAN: Calm down. Calm down. Calm
22  down, and stop interfering with my exam.
23      MR. PHILLIPS: Ask a better question.
24      MR. BIGELMAN: Shush.
25      MR. PHILLIPS: It's enough from you, too.

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

BY MR. BIGELMAN:

Q. Back to paragraph 21. We just looked at Exhibits C, D, and E. Do you recall, or do you want to look at them again?

A. I do recall that.

Q. On Exhibits C, D, and E, you had a third-party contractor applying for a permit, and you had your contact e-mail and your phone number; correct?

A. Correct.

Q. And Mr. Saad's case, 921 Crescent, Construction Contractors was not -- was not the contractor on the project. Exigent Landscaping was; correct?

A. Correct.

Q. And Mr. Saad's job, at 921 Crescent, a building permit was issued to Construction Contractors and not Exigent Landscaping; correct?

A. Correct.

Q. And despite not being licensed, Exigent Landscaping received payments from Mr. Saad; correct?

        MR. PHILLIPS: Foundation and form -- sorry, I wasn't finished. Foundation and form.
        Go ahead.

        THE WITNESS: Correct.

BY MR. BIGELMAN:

Q. That formal complaint we were looking at had

Complaint Nos. 2300623 and 2200622. Do you see that?

A. Yes.

Q. And you entered into a consent order and stipulation resolving that complaint, the same complaint numbers; correct?

A. Yes.

Q. And this states, first sentence, paragraph 2, "The parties have stipulated that the board may enter this consent order"; correct? Do you see that?

A. Yes.

Q. "Therefore, the board finds that the allegations of fact contained in the formal complaint are true and Respondents have violated" -- we'll start with the first one -- "Section 6011 of the occupational code." 6011 of the occupational code, "Person shall not engage in or attempt to engage in the practice of an occupation regulated under this act or use a title designated in this act unless the person possesses a license or registration used by the department for their occupation"; correct?

A. Yes.

Q. That's what you agreed to; correct?

A. Yes.

Q. Then you also agreed to having violated 604(d). 604(d), "lack of good moral character"; correct?

A. According to the document, yes.

Q. That's what you stipulated to; right?

A. According to the document in front of me. I don't remember this that much. It was a long time ago.

Q. You also stipulated to 604(h), violated any other provision of the act or rule, and (l), not to respond to citation as required by Section 555. What else do we have? 2411 (2)(e), 2(j), 2(m), "A willful violation of the building laws of the State or the subdivision of the State"; correct?

A. Yes.

Q. 2411 (2)(j), "Aiding or abetting an unlicensed person to evade this article or knowingly combining or conspiring with or acting as an agent, partner, or associate of an unlicensed person, allowing one's license to be used by an unlicensed person, or acting as or being an obstensible licensed or residential builder or licensed contractor, licensed residential maintenance or alteration contractor for an undisclosed person who does not or shall control, direct" -- "may have the right to control or direct, directly or indirectly, the operations of licensee"; correct?

A. Correct.

Q. "Workmanship not meeting the standards of the Michigan

residential code"; correct?

A. I don't know. Was that on there? Okay.

Q. We also have 2404(a), "Licensee shall, as part of the contract, provide information relating to his or her individual license and to any license issued to that person as a qualifying officer of another entity"; correct?

A. Yes.

Q. Michigan Administrative Code, Rule 338.1551 (5), "All construction, renovations, alterations, or repairs must comply with Michigan construction code"; correct?

A. Yes.

Q. Then you had another license complaint -- two more -- Complaint No. 2300616 and 2300759, which was also resolved by consent order and stipulation; correct?

A. Yes.

Q. And here, again, it's almost exactly the same. "The board finds that the allegations of fact contained in the formal complaint are true and the Respondents have violated Section 604(1), 2411(2)(e), 2411(2)(j), 2404(a), and 604(h) of the occupational code"; correct?

        MARKED BY THE REPORTER:
        DEPOSITION EXHIBIT M
        1:03 p.m.

1  A.  Yes.

2  Q.  As a result of these complaints, your residential

3     builder's license has been suspended; correct?

4  A.  Yes.

5  Q.  Do you recall being sued by Alex and Rebecca Boyd?

6  A.  Yes.

7  Q.  Paragraph 16, they allege that your contract with

8     them, you had "License No. 802082183." Do you see

9     that?

10       MARKED BY THE REPORTER:

11       DEPOSITION EXHIBIT T

12       1:04 p.m.

13       MR. PHILLIPS:  No.  The document's not on

14    the screen, Jeff.

15       MR. BIGELMAN:  Oh, I'm sorry.

16 BY MR. BIGELMAN:

17 Q.  Do you see it now?

18 A.  Yes.

19 Q.  Sixteen; correct?

20 A.  Yes.

21 Q.  And they allege that Exigent was never a licensed

22    residential builder during their relationship with the

23    Boyds; correct?

24 A.  Yes.

25 Q.  And in paragraph 18, that they paid a substantial

1     portion of their respective contract price to Exigent;

2     correct?

3  A.  Yes.

4  Q.  In paragraph 19, they allege that "After execution of

5     the contract with the Boyds, the Defendants knowingly

6     and falsely represented the Macomb Township officials,

7     that the Plaintiff executed documents with Defendant

8     Construction Contractors, LLC, and Henry Girard Bell."

9     That's what they allege; correct?

10 A.  Yes.

11 Q.  Paragraph 20, this was also for the construction of an

12    in-ground swimming pool; correct?

13 A.  Yes.

14 Q.  Paragraph 21, allege that Exigent "failed to timely or

15    properly construct the swimming pool, necessitating

16    the removal of their respective pools"; correct?

17 A.  Yes.

18 Q.  And you were also sued by Joseph and Angela Hebeka;

19    correct?

20       MARKED BY THE REPORTER:

21       DEPOSITION EXHIBIT U

22       1:06 p.m.

23 A.  Yes.

24 Q.  You can see that on the screen it's marked as

25    Exhibit U.  For the record, the Boyd exhibit was

1     Exhibit T.  Here they allege, at paragraph 13, that

2     the contract listed a license number of 802082183,

3     which is not a license number at all.  That's what

4     they allege; correct?

5  A.  Yes.

6  Q.  And then they allege, at paragraph 14, "Michigan law

7     requires an individual or entity to be licensed as a

8     residential builder when engaging in swimming pool

9     installation or alteration"; correct?

10 A.  Yes.

11 Q.  Then they claim, paragraph 15, that "Exigent

12    fraudulently held itself out as a licensed

13    contractor"; correct?

14 A.  Yes.

15 Q.  Paragraph 16, that you fraudulently held yourself out

16    as a licensed contractor; correct?

17 A.  Yes.

18       MR. PHILLIPS:  You're asking if that's what

19    they allege?

20       MR. BIGELMAN:  That's correct.

21 BY MR. BIGELMAN:

22 Q.  Exhibit V, this is a complaint by Daniel Cater.  Is

23    that how you say it?

24       MARKED BY THE REPORTER:

25       DEPOSITION EXHIBIT V

1       1:07 p.m.

2  A.  That's a typo.  It's meant to be "Carter."

3  Q.  Okay.  Daniel Carter alleges, at paragraph 9, that

4     your contract with him, stated at the bottom of each

5     page, that License No. 802082183 inferred that Exigent

6     was a licensed residential builder.  That's his

7     allegation; correct?

8  A.  Correct.

9  Q.  Paragraph 10, he alleges that neither you or Exigent

10    was a licensed residential builder during their --

11    during the relationship with him; correct?

12 A.  Yes.

13 Q.  Paragraph 11, he alleges that during the permit

14    process, that you knowingly and falsely represented to

15    Macomb Township Building Officials that "Plaintiff

16    contracted with licensed residential builders

17    Construction Contractors and Henry Girard Bell";

18    correct?

19 A.  Yes.

20 Q.  Paragraph 12, he alleges, "Based on said false

21    representations, Macomb Township Building Officials

22    approved permits for the construction of an in-ground

23    swimming pool at Plaintiff's residence"; correct?

24 A.  Yes.

25 Q.  Paragraph 13, he alleges that "Plaintiff paid a

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1  substantial portion of the contract price to Exigent
2  Landscaping, LLC"; correct?
3  A.  Yes.
4  Q.  Then he alleges, at 14, that you "failed to properly
5    construct the swimming pool, necessitating the removal
6    of the pool and otherwise causing substantial monetary
7    damages to be suffered by the Plaintiff"; correct?
8  A.  Yes, allegedly.  That's what he's alleging.
9        MARKED BY THE REPORTER:
10       DEPOSITION EXHIBIT W
11       1:09 p.m.
12  Q.  This is Exhibit W.  These are your Responses to
13    Plaintiff's Requests for Admission, Third Set of
14    Interrogatories.  I'm going to draw your attention to
15    Interrogatory 4, where I ask --
16       MR. PHILLIPS:  Put it on the screen,
17    please.
18       MR. BIGELMAN:  Excuse me?
19       MR. PHILLIPS:  Put them on the screen,
20    please.  Thank you.
21       MR. BIGELMAN:  I'm sorry.
22  BY MR. BIGELMAN:
23  Q.  Interrogatory 4, "Identify all projects since
24    January 11, '21, where you have used a residential
25    builder's license to obtain a permit that was not your

Page 79

1  own," and you took the Fifth Amendment in response to
2    that.  Is that still your response to that question?
3       MR. PHILLIPS:  I'm going to advise you to
4    continue that.
5       THE WITNESS:  Yes.
6       MR. BIGELMAN:  Okay.
7  BY MR. BIGELMAN:
8  Q.  Your wife testified earlier that when she first
9    started her company, Resilient Outdoor Living, that
10    that operated under your residential builder's
11    license.  Is that correct?
12  A.  No.  We never actually operated.  We never did
13    anything that required a permit or a license.
14  Q.  Did you associate your license with Resilient Outdoor
15    Living, whether you did work or not?
16  A.  I believe I did for a short period of time.
17  Q.  How many different individuals have sued you or
18    Exigent in the past five years?
19  A.  How many individual -- can you repeat that one more
20    time, please.
21  Q.  How many individuals have sued you or Exigent in the
22    last five years?
23  A.  I believe four.
24  Q.  Well, we know three.
25       MR. PHILLIPS:  Jeff, I think it was five.

1  I'm just gonna cut to the chase on this.
2       MR. BIGELMAN:  Okay.
3       MR. PHILLIPS:  I think it was five.
4       THE WITNESS:  Sounds about right.
5  BY MR. BIGELMAN:
6  Q.  We know it was three.  We just looked at those
7    complaints, not counting my client, so that would be
8    four, and then I have another client, Mehra,
9    M-e-h-r-a, so that would be five.  Are there any
10    others?
11  A.  No, not that I can remember.
12  Q.  Showing you what's being marked as Exhibit Y.  This is
13    a license to do business in the city of Dearborn that
14    Construction Contractors obtained.  Do you see that?
15    Can you see that, Mr. Heitmann?
16       MARKED BY THE REPORTER:
17       DEPOSITION EXHIBIT Y
18       1:14 p.m.
19  A.  Yes.
20  Q.  My question to you is did Exigent Landscaping ever
21    obtain a license to do business in the city of
22    Dearborn while it was working on Mr. Saad's property
23    at 921 Crescent?
24  A.  Not that I can recall.  At some point, when I got
25    licensed, I applied, but I don't know if it was before

Page 81

1  or after I was terminated.  I can't remember.
2  Q.  Did anyone ever issue a license for Exigent to do
3    business there?
4  A.  Can you repeat that, please.
5  Q.  Did the City of Dearborn ever issue a license for
6    Exigent Landscaping to do business in its town?
7  A.  I don't remember.  I don't recall.
8       MR. BIGELMAN:  I don't have any more
9    questions, subject to redirect if you're gonna have
10    some questions.
11       MR. PHILLIPS:  In ten minutes I'll find out
12    if I do.
13       Can we go off the record.
14       THE VIDEOGRAPHER:  We are going off the
15    record at 1:16 p.m.
16       (Off the record at 1:16 p.m.)
17       (Back on the record at 1:21 p.m.)
18       THE VIDEOGRAPHER:  We are back on the
19    record at 1:21 p.m.
20       EXAMINATION
21  BY MR. PHILLIPS:
22  Q.  Brandon, just a couple quick questions.  You have
23    referred to Hank Bell as your uncle in the past.  Why
24    have you done that?
25  A.  I viewed him as my uncle.  I've known him for ten or



Page 82

1   fifteen years. He's technically my cousin's cousin or
2   something like that. He's been in the family for a
3   while, and I look to him as, like, a mentor. He was
4   helping me throughout the permit process and was
5   helping me with my license and stuff.
6 Q.  Did Hank Bell or Construction Contractors review the
7      permit drawings before they were submitted on this
8      project?
9 A.  Yes. They were e-mailed to him.
10 Q.  And Hank Bell and Construction Contractors, did they
11     authorize you to use their signature?
12 A.  Yes.
13 Q.  Okay. So when you said you were an authorized agent
14     previously, what did you mean by that?
15 A.  I think I -- we had a -- we were working together to
16     build projects. I wasn't officially a partner at his
17     firm, but we were working together to build projects.
18     I had his approval to work with him.
19 Q.  And, lastly --
20        MR. PHILLIPS: Jeff, if you could pop up
21     Exhibit H. I believe that's the invoices for the
22     trailer, the first one.
23        MR. BIGELMAN: Do you know which Bates
24     number?
25        MR. PHILLIPS: It was the very first page.

Page 83

1      I think it's probably 529, if I had to guess, but it's
2      the very first page, one of the ones with the blank
3      "Ship to."
4        MR. BIGELMAN: 369?
5        MR. PHILLIPS: Yeah, that will work. Okay.
6 BY MR. PHILLIPS:
7 Q.  Brandon, do you have any reason why you believe the
8      "Ship to" address might have been blank on these
9      invoices, some of these invoices from CRC?
10 A.  Yeah. I think usually what -- we pick up the trailer
11     from the place -- rental place.
12 Q.  So they wouldn't be delivering to the jobsite. You
13     would be picking it up at the rental company?
14 A.  Correct.
15        MR. PHILLIPS: Nothing further.
16        MR. BIGELMAN: No redirect. Mr. Heitmann,
17     thank you for your time.
18        Mr. Phillips, thank you for your time.
19        And, especially, Susannah, thank you for
20     your time.
21        THE VIDEOGRAPHER: This concludes today's
22     testimony. We are off the record at 1:24 p.m.
23        (Off the video record at 1:24 p.m.)
24        MR. BIGELMAN: We're going to be ordering
25     the transcript, please.

Page 84

1        MR. PHILLIPS: Yes. Can I do a four-page
2 mini, please.
3        (The deposition was concluded at 1:25 p.m.)

Page 85

1                CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3                    ) SS
4   COUNTY OF OAKLAND )
5
6        I, Susanne Ellen Gorman, a Notary Public in
7   and for the above county and state, do hereby certify
8   that the above deposition was taken before me via
9   virtual technology; that the witness was by me first
10  duly sworn to testify to the truth and nothing but the
11  truth; that the foregoing questions asked and answers
12  made by the witness were duly recorded by me
13  stenographically and reduced to computer
14  transcription; that this is a true, full, and correct
15  transcript of my stenographic notes so taken; and that
16  I am not related to, nor of counsel to either party,
17  nor interested in the event of this cause.
18
19
20
21  Susanne Ellen Gorman, CSR-9271, RPR
22  Notary Public,
23  Oakland County, Michigan.
24
25  My commission expires: September 14, 2029

## $

**$1,016.76** 50:18

**$1,142.60** 48:11

**$1,448.44** 44:22

**$1,704.40** 49:20

**$10,703.75** 42:19 43:9

**$100,000** 24:21

**$130,000** 53:21

**$15** 20:2

**$16,782.45** 45:11

**$180.40** 43:22

**$2,117.51** 48:6

**$2,189.32** 34:21 35:9

**$23,500** 37:13

**$250,000** 26:2

**$26,348** 25:3

**$350,000** 26:24 52:10 53:4,16,21

**$406.97** 45:3

**$42** 20:2

**$5,309.56** 48:25

**$5,506.72** 26:9

**$5,718.87** 27:6

**$50,000** 24:12 59:22

**$6,351.35** 40:11

**$68,000** 53:18

**$7,012.90** 51:23

**$7,033.95** 48:17,21

**$7,620.87** 27:7

**$79.50** 36:7

**$830.84** 50:24

**$902.11** 37:3

**$902.12** 33:1,22 36:20

**$973.68** 41:4

## (

**(2)(e)** 72:8

**(2)(j)** 72:12

**(5)** 73:9

**(l)** 72:6

## 1

**1** 13:16 17:3,8,14 22:12 24:8,13,
17 26:7 27:7

**1,362.52** 35:17

**1,448.44** 44:3

**10** 77:9

**10,000** 56:14

**10-24-22** 22:6

**10-26-22** 40:7

**10:24** 5:3,7

**10:25** 6:4,5

**10:27** 6:6,8

**10:36** 10:18

**10:45** 15:21

**10:49** 16:16

**10:57** 20:14

**11** 38:20 39:22 77:13 78:24

**11:01** 22:9

**11:04** 24:3,6

**11:22** 32:21

**11:27** 35:23

**12** 77:20

**12:09** 55:21

**12:10** 56:22,23

**12:24** 56:24 57:1

**12:26** 57:19,20,21,23

**12:36** 60:18

**12:43** 64:5

**12:47** 66:13

**12:51** 68:23

**13** 76:1 77:25

**13,788.63** 51:17

**13,900** 51:13

**14** 25:4 43:25 76:6 78:4

**15** 27:7 28:16 44:25 56:18 76:11

**16** 46:21 74:7 76:15

**16,782.45** 45:20 46:11 52:2

**17** 21:12 22:25 67:20 68:3

**18** 24:21 60:10 74:25

**180.40** 43:17 51:23

**183,000** 53:17

**19** 39:25 47:19 61:6 63:6,9,25
64:13 75:4

**1:03** 73:25

**1:04** 74:12

**1:06** 75:22

**1:07** 77:1

**1:09** 78:11

**1:14** 80:18

**1:16** 81:15,16

**1:21** 81:17,19

**1:24** 83:22,23

**1:25** 84:3

## 2

**2** 17:6 21:12 23:17 31:19 71:7

**2(j)** 72:8

**2(m)** 72:8

**2,850.87** 45:14,20

**20** 23:5 28:16 56:18 61:16 68:8
75:11

**2021** 61:25 62:18

**2022** 12:1 13:18,20 14:1 15:7,9,
13 16:3,8,25 17:4,9,12,14,17
20:7 23:19 24:21 25:5,17,24
41:1,12 42:16 43:25 68:1

**2023** 26:18 27:7 33:5 34:20 35:4,
7,13 36:1,15,24 46:21 60:23

**2024** 47:19 59:19

**2025** 5:2,7

**21** 33:5 38:20 39:22,25 61:24
65:21 66:16,17 68:11 70:2 75:14
78:24

**22** 5:2,7 10:25 14:18 15:5,12 16:2
17:2 19:6 20:19 21:18 23:1
31:25 32:4 44:25 62:9 67:4,16,
22

**2200622** 71:1

**23** 21:15 23:10 30:12 62:16

**23,500** 38:1,7

**23-23-1332-FYFY** 60:4

**23-23-1450-FYFY** 59:21

**2300616** 73:14

**2300623** 71:1

**2300759** 73:14

**23rd** 26:9

**24** 23:19 41:12 62:20 63:6 68:1

**24,000** 46:25

**2404(a)** 73:3,21

**2411** 72:8,12

**2411(2)(e)** 73:20

**2411(2)(j)** 73:20

**242300197** 60:15

**25** 20:7 34:20 35:3,7

**25th** 19:6

**26** 36:1 45:25 46:6

**26,837.61** 46:14 52:3

**27** 10:25 12:1 14:1,17 15:5,12
16:2 17:2,12 35:13 41:1

**28** 60:23 62:18

**29** 20:19 67:16

---

**3**

**3** 36:15

**30** 25:16,24

**31** 16:25 17:17 67:4

**338.1551** 73:9

**369** 31:23 32:18 33:23 34:2,17
83:4

**369-3** 32:8

**371** 34:14

**373** 35:1

**375** 35:11

**377** 35:25

**379** 36:1,11

**381** 36:13

**383** 31:24 36:24

---

**4**

**4** 16:6 26:18 42:16 78:15,23

**40** 14:8

**41A** 59:21

**44,000** 47:1

**470** 31:24 37:8 38:2,16

**473** 31:24

**477** 31:24 38:18

**496** 31:24 40:7

**497** 40:22

**499** 41:9

---

**5**

**5** 13:18,20 14:1 15:7,9,12 16:3
17:4,9,14

**500** 42:14 43:9

**501** 43:12,21 51:22

**502** 43:24 44:22

**507** 45:8

**508** 46:19 47:11

**509** 31:24

**522** 32:4,6 47:15

**529** 83:1

**555** 72:7

**556-** 51:11

**55949** 19:3

**586-383-8308** 67:13

**586-489-6680** 23:5 68:8

**5th** 17:10

---

**6**

**6** 61:25

**6,832** 43:13

**6,832.50** 41:23

**6011** 71:14,15

**604(1)** 73:20

**604(d)** 71:24,25

**604(h)** 72:5 73:21

**643.20** 50:14

**66** 38:23 39:8

**68,000** 47:4,11 52:5

---

**7**

**7** 22:15

**7,012.90** 43:17,21

**79.50** 36:10

---

**8**

**8** 36:24

**802082183** 11:11 61:8 63:10 64:1

74:8 76:2 77:5

---

**9**

**9** 77:3

**921** 11:2 12:7 20:21 22:12 28:5,
14 30:8 33:7 34:18 35:5,14 36:4
37:23 39:1,20 40:8,24 44:16,25
46:22 70:10,14 80:23

**922** 37:23

---

**A**

**A&g** 42:15 43:9

**a.m.** 5:3,7 6:4,5,6,8 10:18 15:21
16:16 20:14 22:9 24:3,6 32:21
35:23 66:13

**abetting** 72:12

**account** 52:11 53:5,9

**accounted** 26:11,14,21 27:10

**accounting** 52:10

**accurate** 27:2,13 33:25 34:12
48:14 51:7,21 55:23 60:7

**accurately** 42:12 45:5 48:21
49:22 50:16,20 51:1

**act** 71:17,18 72:6

**acting** 72:14,16

**address** 18:20 19:3,5 22:12 39:5
62:4 67:10,22 68:14 83:8

**adjust** 52:5

**adjustments** 53:17,20

**Administrative** 73:9

**Admission** 78:13

**admit** 63:17

**advise** 14:2 79:3

**advised** 58:3

**affirmative** 64:20

**agent** 21:1,7 72:14 82:13

**agree** 18:15 27:13 63:2,5 64:13

**agreed** 71:22,24

**agreement** 57:12 58:2,7

**ahead** 8:14 10:3 21:4 52:18
53:13 66:15 70:22

**Aiding** 72:12

**alcohol** 8:7

**Aldo** 48:16,21

**Alex** 74:5

**allegation** 61:7,14,16,24 63:17,
25 65:21 77:7

**allegations** 58:16,19 71:11 73:18

**allege** 74:7,21 75:4,9,14 76:1,4,6,
19

**allegedly** 78:8

**alleges** 77:3,9,13,20,25 78:4

**alleging** 58:17 78:8

**allowing** 72:15

**alteration** 61:10 63:12 72:19 76:9

**alterations** 73:10

**aluminum** 46:24 47:1

**Amanda** 5:22 18:23

**Amanda's** 5:20 19:5 23:9 68:10

**Amendment** 79:1

**amount** 9:8 13:13 24:9 26:8
34:21 35:9,17 36:9,10 37:3 38:8
42:1,19 44:3 45:17,25 47:5,6,7

**amounts** 27:6 48:6 53:17

**and/or** 33:11

**Angela** 58:24 75:18

**anger** 29:20

**answering** 17:24 54:10

**answers** 8:19,21

**apologize** 12:22

**appears** 41:16,17 43:12

**applicant** 62:2 65:22

**application** 16:22 17:16 20:16
22:5 61:18,24 62:10 65:22 67:4,
16 68:1

**applications** 66:1

**applied** 80:25

**apply** 63:14

**applying** 70:7

**approval** 14:25 82:18

**approved** 35:9 77:22

**April** 26:9 33:5 34:20 35:3,7,13
36:1

**Archie** 28:22 29:10

**Archie's** 28:24

**article** 72:13

**Arturo** 49:18

**assisted** 51:19

**assisting** 14:7

**associate** 72:15 79:14

**Assuming** 42:6

**assumption** 33:10

**attached** 13:14 15:14 22:16

**attempt** 71:16

**attention** 78:14

**attitude** 29:20

**attorney** 11:22 32:9 61:3 66:18

**attorneys** 5:8

**August** 13:18,20 14:1 15:7,9,12
16:3,7,25 17:4,9,10,14,17 19:6
20:7 24:21 27:7 67:4

**authorize** 82:11

**authorized** 21:1,7,15 23:10 82:13

**availability** 16:9

**Avery** 12:1,10,12 13:9 51:7

---

**B**

**back** 6:6,7 15:20 17:12 23:23

25:7,15 26:11,17,21 27:4 31:17
34:5 40:19 43:8 45:5 46:4 53:18
56:24,25 57:21,22 66:2,12 68:22
70:2 81:17,18

**background** 6:23

**badgering** 66:25 69:18

**balance** 41:25

**bank** 19:25 27:20

**bankrupt** 29:16 30:3

**bankruptcy** 29:17 54:2

**Barajas** 48:16,21

**base** 43:5

**based** 33:25 39:4 50:11 51:4
54:3 55:8 60:19 77:20

**basically** 65:21

**basis** 58:11

**Bates** 11:19 31:23,25 32:4,6,8,16
33:23 34:17 35:1,11,25 36:1,11,
13,24 38:2,16,18 40:7,22 41:9
42:14 43:9,12,21,24 44:22 45:8
46:19 47:11,15 51:22 82:23

**beginning** 28:9

**behalf** 5:10,13 61:11,17

**believed** 29:2

**Bell** 9:19 10:11,12 18:12 20:5
67:8 75:8 77:17 81:23 82:6,10

**Bell's** 14:21 18:8

**BH27** 11:22

**bheitmann12@yahoo.com**
18:20 19:1

**bheitmann12@yahoo.com.**
67:11

**big** 55:7 56:6

**Bigelman** 5:10,19 6:2,9,14,17,20,
22 8:18,22 9:1 10:6 12:21 13:2,
6,8,23 14:15 15:19,24 16:18,19
18:2 21:6,11,25 22:3 32:6,11
34:7,9,11,13 44:11 46:8,9 49:9,
10 50:4 51:16 52:14,17,24 53:3,
12 54:16,23 55:11,16,22 56:17

57:2 58:8 59:6,12 63:18,22,23
64:8,22,24 65:15,20 66:7,21
67:2 68:17,21 69:2,15,21,24
70:1,24 74:15,16 76:20,21
78:18,21,22 79:6,7 80:2,5 81:8
82:23 83:4,16,24

**bigger** 37:8

**billed** 42:15

**bit** 8:3 28:12 44:14

**black** 37:17,18

**blank** 83:2,8

**board** 71:8,11 73:18

**Boomer** 40:7

**bottom** 11:10,18 20:1 25:10
32:17 77:4

**boulders** 39:6

**Boyd** 74:5 75:25

**Boyds** 74:23 75:5

**Brandon** 5:5,14 8:15 10:3,14
18:16 21:15 81:22 83:7

**brandonheitmann12@yahoo**
66:2

**Braunz** 23:11

**break** 55:14,17 56:18

**bridge** 46:25

**briefly** 66:19

**brings** 52:8

**broke** 24:25 48:3

**brought** 58:9

**budget** 46:24

**build** 9:24 11:5 58:18,19 82:16,
17

**builder** 49:15 50:5,7 61:9,20
63:11 64:11 72:18 74:22 76:8
77:6,10

**builder's** 7:15 11:7,13 13:21,25
14:3 15:13 20:8 23:20 25:24
26:4 58:20 60:14,15 62:2 65:23
74:3 78:25 79:10

**builders** 77:16

**building** 9:10 16:9 59:2 61:16
62:16 63:14 65:12 70:14 72:9
77:15,21

**bunch** 44:9

**business** 64:17,18,25 65:2,3,4,
10 80:13,21 81:3,6

---

**C**

---

**calculate** 41:19

**calculator** 51:15

**call** 12:19,24

**called** 5:15 9:17,18 11:19

**Calls** 54:21

**Calm** 69:21

**Canada** 38:18

**cannon** 29:21

**card** 45:13

**Carter** 63:1 77:2,3

**case** 5:21 59:18,21 63:3,19 68:12
70:10

**Cater** 76:22

**causing** 78:6

**CFO** 39:3 42:6 44:19

**change** 13:16 16:3 17:3,6,8,14
53:18

**changed** 46:13

**character** 71:25

**charge** 30:24 58:11 60:4

**charged** 46:5 57:3,5,6

**charges** 58:9,25 59:1 60:9

**chart** 24:15,17

**chase** 80:1

**Chaucer** 62:23,25

**check** 47:20,21 51:14

**circuit** 59:8

citation 72:7

city 14:24 22:13 80:13,21 81:5

civil 58:1,5,14

claim 76:11

claimed 27:19 55:6

claiming 27:21

clarify 31:7 47:24

clarifying 32:2

classes 7:8

clean 32:5

clear 8:17,23

client 40:2 52:8 53:16 54:20,24 57:15 58:1 67:1 69:19 80:7,8

clock 47:18

close 50:2

closed 16:17

CO1 13:15

code 61:20 62:21 71:14,15 73:1, 9,11,21

college 7:4,10

combining 72:13

comments 66:25 69:18

commission 13:9 51:6,18

communicating 28:1,4

Community 7:10

company 7:23,25 8:2 9:5,7,9,14, 16 15:25 21:12,18 22:25 23:5 24:9 26:3,8 27:17 29:3 31:20 38:18 39:4 46:21 47:11 61:2,19 62:10,17 68:6,14,15 79:9 83:13

company's 61:25

complaint 57:10,11 58:22 61:2,4, 6 63:24 65:11 68:12 70:25 71:1, 4,12 73:13,14,19 76:22

complaints 74:2 80:7

comply 73:11

Compound 66:4

computer 50:2

concluded 84:3

concludes 83:21

concrete 25:14 40:17 45:9

conditions 8:6

confidentiality 58:2,7

connection 57:8 58:13

consent 71:3,9 73:15

consistent 48:9 60:2

conspiring 72:14

construct 75:15 78:5

construction 14:8 15:25 20:4 21:1,7,12 23:1 40:8 42:15 43:9 61:17 62:12,17,22 67:7,20 68:4 70:10,15 73:10,11 75:8,11 77:17,22 80:14 82:6,10

contact 62:5 64:12 65:24 68:14 70:8

contacts 14:24

contained 71:12 73:18

contendere 59:25 60:2,5

contest 59:2 60:2

contingent 16:8

continuation 26:6

continue 13:4 69:3 79:4

contract 12:4,8 14:17 15:5 17:3 40:2 61:7 62:3,6,13 63:9 64:1, 10,14 73:4 74:7 75:1,5 76:2 77:4 78:1

contracted 77:16

contracting 58:19

contractor 25:13 61:10,21 62:2, 10 63:12 65:22 67:7 68:3,13 70:7,11 72:18,19 76:13,16

Contractors 15:25 20:5 21:2,8, 12 23:1 32:24 62:17 67:7,20 68:4 70:11,15 75:8 77:17 80:14

contracts 65:1

contractual 57:9 58:15

control 9:18 72:20,21

conversations 27:25

convicted 58:25

corner 10:20 32:17

corporation 54:2

correct 6:15,18 7:16,21 9:2,3,21, 22,25 11:3,5,6,8,9,14,16,17 12:2 13:2,18,21,24 14:18 15:5,6,14, 22 16:1,4,5,10,11 17:4,14,15,17, 18,20,23,24 18:18,19,21,22,23, 24 19:16,17 20:8,9,17,19,21 22:13,18 23:3,11,12,14,15,20,21 24:11,13,14,16,18,19,21,22,23, 24 25:1,2,5,6,8,9,12,17,19,22,25 26:1,4,5,9,12,15,19,22 27:8,11, 22 28:22 30:22 31:1,3,5,25 32:6, 24 33:1,5,13 34:1,21,24 35:17, 19 36:2,5,7,10,11,20,22 37:1,2, 4,5,6,7,13,14 38:2,16,17 39:2, 19,24 40:1,3,4,5,6,20,24,25 41:2,3,4,5,7,8,10,11,13,14,24 42:1,2,12,17,19,24 43:10,14,16, 18,19,22 44:1,22 45:1,3,6,9,10, 11,14,17 46:11,12,14,15,22,23 47:1,2,12,13 48:2,4,9,11,14,17, 19,22,25 49:3,16,20,23 50:6,16, 18,21,24 51:2,23 52:3,6,7 54:19 55:3,5 56:7 60:20,23,25 61:1 62:18 63:12,13,15 64:2,15,16 65:13 66:3 67:17 68:1,6,15 70:8, 9,12,13,16,17,19,23 71:5,9,20, 22,25 72:10,23,24 73:1,7,11,15, 22 74:3,19,23 75:2,9,12,16,19 76:4,9,13,16,20 77:7,8,11,18,23 78:2,7 79:11 83:14

correctly 14:23 27:24 29:14 30:9 41:19 59:1,16

correspond 61:9 63:11 64:2

Cory 29:11,12,15 31:2,12,13

cost 49:15 50:5,7 51:7,18

costs 49:5

Counter 43:25

counting 80:7

County 59:9 61:18

couple 81:22

court 5:8 8:20 15:20 32:3 49:7
59:3,4,10,21 62:23,25 66:10,12
68:22

cousin 82:1

cousin's 9:14,15 82:1

covers 56:10

crack 55:1 56:4

cracked 56:2

CRC 32:23 33:22 36:10 83:9

credit 45:13

Credited 27:5

Crescent 11:2 12:7 20:21 22:13
28:5,15 30:8 33:8 34:18 35:5,14
36:4 37:23 39:1,20 40:8,24
44:16,25 46:22 70:10,14 80:23

criminal 58:2,4,9 59:11

criminally 57:3

customer's 58:23

cut 49:8 80:1

---

**D**

damages 78:7

Dan 42:6

Dan's 42:7

Daniel 63:1 76:22 77:3

date 14:22 16:7 17:2 22:6 37:17
38:20 39:22,25 40:23 41:1 62:1,
3 65:23 69:4

dated 10:25 13:18 16:25 17:8
20:19 33:5 35:3,7,13 36:1,15,24
40:23 41:12 43:25 44:24 46:21
61:24 67:4,16

day 46:4,5

---

deal 51:11,19

Dear 11:2

Dearborn 11:3 12:7 22:13 36:5
80:13,22 81:5

December 25:4,16,24 44:25

Defendant 5:13 75:7

Defendant's 24:7

Defendants 75:5

degree 7:9

deliver 43:1

delivering 83:12

department 61:11 71:19

depiction 55:23

deposit 40:11 58:17

deposition 5:1,5 10:17 16:15
20:13 22:8 24:2,5 32:20 35:22
55:20 60:17 64:4 73:24 74:11
75:21 76:25 78:10 80:17 84:3

depositions 6:12

Depot 40:22 44:24

describe 9:23 56:1,8

description 15:2 40:24 44:25

Design 42:16

designated 71:18

difficulties 30:21 49:5 66:7

direct 25:3 26:7 27:5 72:21

directly 26:24 27:17,19 28:1,4
52:9 72:22

disagree 64:7,9

disclose 57:13

discovery 52:25

discussing 58:1

disorderly 60:6

disposition 31:20

dispute 57:9 58:14,15

disputes 67:8

---

district 59:8,10,21

document 10:15 11:25 13:14
15:11 16:3 17:5,11 18:3,8 20:1,
16 33:12 34:16 41:9 44:5,14
45:8,22 47:16 50:11 60:19 63:16
65:18 68:1 72:1,3

document's 22:5 74:13

documentation 46:16

documents 11:20 19:23 22:5
35:3 53:1 67:16 75:7

Docusign 12:1

dollar 37:3

dollars 25:16 26:18

draw 78:14

drawings 82:7

Drive 11:2 12:7 19:3 20:21 22:13
28:15 34:18 35:5,14 36:4 39:1,
20 40:8 46:22

drivers 54:14

drug 8:6

drugs 8:7

dug 42:24

duly 5:16 61:19

---

**E**

e-mail 18:20,25 21:18,19 23:2,3
62:4 65:24 66:1 67:10,22 68:6,
14 70:8

e-mailed 82:9

e-mails 27:23

E-S-Q-U-I-V-E-L 48:24

earlier 30:4,5 79:8

Eddy 50:18

Edmonds 50:5

educational 6:23

Edward 49:11,14

effect 27:23

elaborate  6:24 8:3,10

employee  23:13 31:24 47:14 48:11,16,24 49:14

employees  28:2 47:20,25 54:14

employment  30:4

end  28:11

engage  71:16

engaged  47:9

engaging  76:8

engineer  56:15

enter  71:8

entered  71:3

entirety  45:22

entitled  22:5

entity  73:6 76:7

equipment  33:11 54:6,8

error  39:4

Esquivel  48:24

established  53:8

estimate  10:23 37:14 38:3,4,5 47:8

Estimated  16:7

evade  72:13

event  49:15

exact  9:8 13:13 14:22 38:8 56:14

exam  69:4,22

EXAMINATION  6:21 81:20

examined  5:18

excavation  42:23

Excel  47:17

excuse  7:7 29:9 78:18

executed  12:5,8 75:7

execution  14:17 75:4

exhibit  10:15,17 13:14 16:6,13, 15 17:12,16 18:4,15 20:10,13,24 22:4,8 23:17 24:2,5,7 25:7,19 26:11,21 27:11,13 31:17 32:15, 20 35:19,22 43:20,21 55:12,20 60:13,17 63:24 64:4 67:3,15,25 73:24 74:11 75:21,25 76:1,22,25 78:10,12 80:12,17 82:21

Exhibits  23:23 70:2,6

Exigent  7:20 9:4,12 10:20 12:15 15:14 18:16 20:4 23:13 25:22 26:17,25 28:7 29:16,17 30:3 34:17 35:4,14 36:4 38:23 39:8 41:10 42:3,16 51:5 52:9 53:4,15 61:12 64:25 65:3,11 67:14 70:12,15,18 74:21 75:1,14 76:11 77:5,9 78:1 79:18,21 80:20 81:2, 6

Exigent's  67:14

exigentdesignbuild  66:3

exigentdesignbuild.com  62:5 65:25

exigentlandscaping@yahoo.com  67:23 68:6

exigentlandscaping@yahoo.com.  21:19 23:2

expedite  14:25

experience  9:9

expiration  62:1,3 65:23

explained  6:18

export  47:19

exported  47:19

express  54:25

## F

fact  11:15 63:2,3,5,6 71:12 73:18

failed  75:14 78:4

fair  5:22 55:18

false  59:22 60:5 77:20

falsely  75:6 77:14

familiar  61:4 67:18

family  82:2

Fedex  19:25

fee  20:1,2

felt  56:4

Fergeson  43:24 44:22

fifteen  82:1

figure  45:25 46:17

filed  54:2

find  81:11

finds  71:11 73:18

fine  5:23 59:13

finish  10:3 55:16

finished  10:1 70:21

fire  54:20

fired  29:4,15,18,19 30:22,25 31:7 54:25

firm  82:17

fix  51:22

fixed  43:20

floor  43:5

foremen  47:24

form  7:23 21:3 52:16 64:6 65:14 68:16,24 70:20,21

formal  61:4,6 63:24 65:11 68:12 70:25 71:12 73:19

formality  12:18,23

forming  9:12

Forty-three  39:18

Fostoria  38:24 39:9

foundation  21:3 52:13,16 53:8, 11 70:20,21

four-page  84:1

fraud  57:7 58:12,13,16 59:1 60:11

fraudulently  76:12,15

front  17:5 22:20 38:22 65:19

66:17 69:5,11 72:3

**fuel** 53:23 54:6,7,8,12

**full** 51:11

**funding** 8:10

**G**

**G-R-A-N-D-C-H-A-M-P** 30:2

**G-U-I** 39:12

**gain** 9:9

**Galindo** 48:11

**game** 66:23

**Girard** 75:8 77:17

**give** 8:1 15:15 49:25 57:14,16
59:17 65:5

**giving** 53:9

**glue** 44:9,12,13

**good** 50:3 71:25

**graduate** 6:25

**Grand** 45:11

**Grandchamp** 29:25 42:16

**grotto** 22:15 47:1 55:4 56:10

**guess** 83:1

**Guest** 49:11,14

**Guillotine** 39:13,15,16

**guy** 41:17

**guys** 31:9 55:12 56:17

**H**

**half** 38:9,10 39:18 41:20,22
43:12 51:6,9 52:11 53:5 54:1

**handle** 30:17,19 59:10

**handled** 66:18

**handwriting** 17:21 18:1,3 19:10
20:23 22:20,23

**handwritten** 37:18 52:3

**Hank** 9:19 10:11,12 14:7,21
15:23 18:8,12 20:5 67:8 81:23
82:6,10

**Hank's** 14:8

**happened** 53:25 59:14 63:25

**health** 8:5

**hear** 8:19,21 17:19 18:6 21:22
48:20

**Hebeka** 58:24 75:18

**Height** 9:18

**Heitmann** 5:6,14 6:11 12:20,25
18:16 21:16 32:18 57:3 80:15
83:16

**held** 76:12,15

**helping** 82:4,5

**Henry** 75:8 77:17

**Hernandez** 50:18

**high** 6:25 7:3

**higher** 31:14

**highlighted** 13:15 45:12,16

**Hold** 57:14

**hole** 42:24 64:23

**home** 10:13 13:7 19:5 40:22
44:24 62:23,25

**homeowners** 61:8 62:7,13,22

**homeowners'** 61:21

**Honestly** 29:20 45:24 49:13

**hourly** 48:1

**house** 55:24

**hundred** 25:16 26:18 59:23

**hybrid** 13:10,11

**I**

**ID** 59:21

**idea** 49:13 56:8

**identify** 5:8 24:9 31:19 78:23

**impair** 8:5,8

**impairments** 9:2

**in-ground** 75:12 77:22

**include** 54:17

**included** 61:8,25

**incomplete** 53:9

**indirectly** 72:22

**indiscernible** 32:1 69:19

**individual** 73:5 76:7 79:19

**individuals** 79:17,21

**inferred** 77:5

**information** 48:13 61:13 67:7
73:4

**initial** 5:19

**installation** 76:9

**interfering** 69:22

**interjects** 32:3

**Interrogatories** 24:8 78:14

**interrogatory** 24:8,20 25:15
26:7,17 27:4,14 31:19 51:5
53:10 78:15,23

**interrupt** 12:18

**interrupting** 12:23

**Interruption** 67:19

**invoice** 32:23 34:5 40:23 42:15,
21 52:2

**invoices** 38:12 82:21 83:9

**involved** 28:12

**involving** 60:11

**Iron** 46:21 47:11 53:19

**issuance** 16:9

**issue** 81:2,5

**issued** 60:23 61:11 62:16 70:15
73:5

**issues** 29:6,22

**items** 43:13

**J**

jail 59:13

January 78:24

Jeff 5:23,25 8:12,17 12:17 13:5
14:14 16:17 17:25 21:24 34:6
44:7 45:21 49:25 55:10 56:19
57:14,24 66:11,24 69:7 74:14
79:25 82:20

Jeffrey 5:10

Jesus 48:4

Jet's 9:13

job 28:7,17,21,23 30:21,22,25
31:9,11 33:8,11,15 37:23 38:23
39:1,8 40:23 44:18,25 70:14

jobsite 28:5,9 83:12

Joe 50:5

Joseph 58:24 75:18

JP 43:13,21 51:22,24

judge 69:5,11

July 5:2,7 24:13,17

June 10:25 12:1 14:1,17 15:5,12
16:2 17:2,12

**K**

kind 29:21

knowingly 72:13 75:5 77:14

Kody 29:9 42:15

Kody's 29:24

**L**

labor 47:14

laborers 47:24

lack 71:25

laid 53:11

Lancewood 19:3

Landscape 9:18

landscaping 7:20 9:4,12,14,15
10:13,20 15:14 18:17 23:13
34:18 35:4,14 36:4 52:10 53:4,
15 70:12,16,18 78:2 80:20 81:6

Landscaping's 41:10

LARA 65:3,4

lastly 82:19

latest 31:12

law 76:6

Lawn 9:18

laws 72:9

lawyers 11:19

lazy 42:23

leave 5:20

left 10:20 55:23

lesser 47:6

letterhead 41:10

level 54:3

license 7:15,16 11:7,11,13,15
13:21,25 14:3,21 15:13 20:8
23:20 25:25 26:4 58:20 59:2
60:14,15,23 61:2,8,10 62:1,2
63:10,12 64:1,2,13,15,17,18,25
65:1,2,4,9,23 67:9 68:13 71:19
72:16 73:5,13 74:3,8 76:2,3 77:5
78:25 79:11,13,14 80:13,21
81:2,5 82:5

licensed 61:19 62:20 64:11
70:18 72:17,18 74:21 76:7,12,16
77:6,10,16 80:25

licensee 72:22 73:3

licenses 7:14

limestone 39:17,18 55:2,4,7
56:4,9

Limit 69:18

listed 40:5,19 41:6 42:11 43:8
65:8 76:2

lived 19:6,8

Living 79:9,15

LLC 7:20 15:14 18:17 62:17 75:8
78:2

load 39:6,7

logged 54:3

logo 10:20

long 7:18 72:4

look-up 60:14

looked 27:14 34:1 36:16 52:25
65:25 70:2 80:6

loose 29:21

lot 53:24

loudly 8:14,22

Lutheran 7:3

**M**

M-E-H-R-A 80:9

M-I-S-A-E-L 50:13

Macomb 7:8,10 59:4,9 61:18
75:6 77:15,21

made 24:15 25:3 26:8 33:22
39:3,4 57:10,11

Madison 23:10

main 58:22 64:12

maintenance 61:10 63:11 72:19

majority 39:6 53:23

make 8:23 34:11 37:8 44:14
53:17,19 69:10,15

making 30:17 38:13 64:20

managed 28:13 31:9

manager 28:10,12,13,17,23 29:8,
10,11 31:14,15,16 33:9

managers 28:21 44:17,18 54:13

managing 28:10 31:11

March 46:21 60:23

Marino 46:21 47:6,10 52:5 53:18

mark 11:20

marked 10:14,16 11:22 16:12,14 18:4 20:10,12 22:4,7 24:1,4 32:19 35:21 55:19 60:13,16 64:3 73:23 74:10 75:20,24 76:24 78:9 80:12,16

material 16:9

materials 33:11 40:8

math 51:13

matter 5:19

Maxwell 29:11,12,15

means 60:1

meant 77:2

meeting 50:1 72:25

Mehra 80:8

memory 8:5,8 9:2 17:6 28:22 38:10 39:5 46:3 54:15 55:8 56:15 60:19 66:22

mention 18:16,19

mentioned 16:2

mentor 10:4 82:3

Mercado 28:25

messages 27:23,24

Messina 45:9 52:2

Messina's 25:14

Michigan 38:24 39:9 58:10 72:25 73:9,11 76:6

microphone 8:15 18:6

middle 10:23

Millington 38:23 39:9

mind 53:25 54:22

mind's 46:6

Mine 37:22

mini 84:2

minor 53:19

minutes 56:18 81:11

Misael 50:13

missing 36:17 52:22

mistakes 30:17

Mm-hmm 67:15

Moe 46:7

Moe's 39:7

Mohamed 11:2,25 12:4 14:24 27:16 64:10

monetary 78:6

money 7:25 8:1 9:5,7 20:4 27:20 28:3 31:20 52:12,15 53:5,6,22

months' 59:15

moral 71:25

municipalities 58:10

## N

N-A-C-Y 37:11

N-O-E 50:23

Nacy 37:11 38:1

named 49:14

Native 47:16

necessitating 75:15 78:5

needed 19:24

Noe 50:23

nolo 59:25 60:2,5

non-confidentiality 57:12

nonreporting 59:15

North 7:3

Nos 31:23 71:1

notarized 19:23,24

notary 19:12,14,15,16,18,19

notation 52:3

November 38:20 39:22,25 42:16 43:25 47:19

number 11:15 23:5,6 34:2,3 46:6

51:10,20 61:8,10 62:1,3,5,6 63:10,12 64:13,15 65:1,23 67:9, 13,14 68:8,9,13,15 70:8 76:2,3 82:24

number's 23:8

numbers 11:18,19 32:16 46:24 71:4

## O

O-R-T-E-G-A 50:23

O-T-H-L-O-F 42:10

Oakland 7:7,9

objection 21:9 53:7 66:14

obstensible 72:17

obtain 7:9 61:16 78:25 80:21

obtained 80:14

occupation 71:17,20

occupational 61:20 71:14,15 73:21

October 23:19 41:1,12 61:25 62:18 68:1

offered 27:18

office 5:24 6:1 13:7 19:18 54:17

officer 15:23 61:13 62:11 73:6

officially 82:16

officials 75:6 77:15,21

OJ 11:2 64:11

one's 72:15

operated 79:10,12

operation 44:17

operations 28:13 29:10 31:14,16 54:13 72:22

opinion 57:9 58:14 69:17

opportunity 55:15

orchestrated 52:22

order 13:16 16:3 17:3,6,8,14 38:20 39:22 71:3,9 73:15

ordering 83:24

originally 28:22

Ortega 50:23

Othlof 42:8

Outdoor 79:9,14

overhead 53:23 54:4,5,17

owner 7:20 62:25

P

P-I-N-E-D-A 50:13

p.m. 55:21 56:22,23,24 57:1,19,
20,21,23 60:18 64:5 68:23 73:25
74:12 75:22 77:1 78:11 80:18
81:15,16,17,19 83:22,23 84:3

P78280 5:12

paid 20:5 26:24 27:16 38:4,5
40:13 41:16,20,22 43:6 45:19,25
46:7 47:6 51:5 52:8 74:25 77:25

paragraph 21:18 22:12,15,25
23:1,5,10 61:6 62:9,16,20 63:9
65:21 67:22 68:3,8,11 70:2 71:7
74:7,25 75:4,11,14 76:1,6,11,15
77:3,9,13,20,25

paragraphs 63:6

parents' 19:5

part 13:14 39:20 73:3

partial 39:5

parties 25:11 26:15 68:13 71:8

partner 72:14 82:16

party 5:21 65:13,24

past 79:18 81:23

pattern 63:2,3,5,7

pause 5:25

pay 20:4 27:19 38:7

paying 46:1,2

payment 24:17 25:3,4 26:11 38:6
62:21

payments 25:1,11,21 26:8,15
27:5,10,18,21 45:13 46:6 70:19

PDF 47:18

pendency 30:25

people 30:24

percent 51:6,9

performed 62:12,22

period 28:6,18 79:16

permit 14:7 16:9,22 17:16 22:12
61:16,18 62:9,16 63:15 65:12
67:4 70:7,14 77:13 78:25 79:13
82:4,7

permits 14:23 15:1,4,7,10 17:7
77:22

person 60:6 71:15,18 72:12,15,
16,20 73:6

personal 10:13 54:3

personally 23:19

Petri 12:1,10,12 13:9 51:7

Phil 13:22

Phillips 5:12,22 8:12 10:1 12:17,
22 13:3 14:13 16:17 17:24 21:3,
9,24 22:1 32:1 34:4 44:7 45:21
49:25 51:14 52:13,16,19 53:2,7
54:10,21 55:9,13,18 56:19
57:14,24 59:7 63:16,20 64:6,19
65:14,17 66:4,9,14,24 68:16,19,
24 69:6,17,23,25 70:20 74:13
76:18 78:16,19 79:3,25 80:3
81:11,21 82:20,25 83:5,6,15,18
84:1

phone 23:5,6,8 27:25 62:5 67:13
68:8,14 70:8

pick 83:10

picking 8:13 83:13

pickup 44:1

piece 55:7,9 56:2,4,6,12

Pineda 50:13

Pisarski 18:23

Pizza 9:13

place 83:11

placeholder 47:16 49:12

Plaintiff 5:11 24:7,10 27:5 31:21
75:7 77:15,25 78:7

Plaintiff's 77:23 78:13

plaintiffs 58:6

Plan 20:1

plans 22:17

play 66:23

plea 59:25 60:5

plumbing 44:13

plywood 44:10

point 29:15 31:23 64:12 80:24

pointing 56:9

pool 11:5 16:22 17:16 22:16,17
40:18 42:23 55:24 58:18,20 67:3
75:12,15 76:8 77:23 78:5,6

pools 9:10,24 43:13,21 51:22,24
75:16

poor 69:16

pop 82:20

popped 50:1

portion 32:8 36:25 38:5 75:1
78:1

possesses 71:18

pounds 56:14

practice 71:16

predated 40:2

prescription 8:6

present 15:17

pressure 30:17,18

presume 6:11 12:25

pretenses 59:22 60:5

pretty 51:21

previous 15:20 66:12 68:22

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

previously 82:14

price 75:1 78:1

prior 8:16 9:9 14:1,17 15:7 17:25 34:16

privilege 57:25

probation 59:13,15

problem 6:2 13:6 66:21

proceedings 58:3,5

process 6:15,18 14:8,25 77:14 82:4

Processing 20:2

produced 14:10,13

professional 7:14

progress 25:4

project 28:10,11,12,13,17,21,23 29:8,11 30:8 31:14 33:9,17 44:17,20 47:9 51:6 54:6,7,8,12 61:21 62:11,12 64:12 70:12 82:8

projects 78:23 82:16,17

proof 55:3

proper 53:11

properly 41:7 43:8 49:2 61:14,22 62:7,14,23 75:15 78:4

property 41:17 80:22

proposal 11:5

provide 73:4

provided 34:16 47:17 61:3

provision 72:6

public 58:2,4

pull 15:7

pulled 14:23 15:4,10

punishment 59:14

Purchase 38:20 39:22

purchased 44:6

purportedly 67:8

purporting 65:1

purports 18:13

put 10:14 32:10,15 41:18 44:20 64:25 78:16,19

putting 30:18 44:18

---

**Q**

qualified 15:23 61:13 62:11

qualifying 73:6

question 8:11,16 15:17,21 17:25 49:7 51:4 52:8,15 53:2,4,14 54:11 63:4,21 64:19 65:16 66:6, 10,13 68:18,20,23 69:1,3,7,9,10, 12,14,23 79:2 80:20

questioning 38:13 55:14

questions 23:22 58:4 66:25 69:18 81:9,10,22

quick 81:22

quit 30:7,8,9,13,16,21,25 31:4,8 69:18,19

---

**R**

rabbit 64:23

Ramos 49:18

read 15:20 54:22 61:14,22 62:7, 13,23 66:12 68:22

reading 66:17

real 49:11 69:15

reask 21:5

reason 30:6 83:7

Rebar 40:16

Rebecca 74:5

recall 7:19,24 9:8 13:12 14:22,23 15:9 18:14 20:6 27:24 38:8 56:14 59:17 65:25 70:3,5 74:5 80:24 81:7

receipt 41:12,16 44:24 45:13

receipts 53:24

receive 59:13

received 24:9,12,21 25:16 26:2, 3,18 31:21 53:4,6,15,16,19,21 62:21 70:19

recitation 53:10

recognize 19:12 22:11

record 5:4 6:4,5,6,8 8:17,23 32:2, 5 56:20,22,23,24 57:1,15,19,20, 21,23,24 75:25 81:13,15,16,17, 19 83:22,23

records 31:25 47:14

redirect 81:9 83:16

reduced 60:6

referred 81:23

referring 17:5 28:6 32:16 56:6

refers 47:16

reflected 24:23 25:10,19,21 34:23 35:19 37:6 45:6,16 48:21 49:2,22 50:16,20 51:1

reflecting 38:11

reflects 24:17 38:16 46:11

refresh 66:21

refusing 69:13

regard 58:9

registered 65:3

registration 71:19

regulated 71:17

related 9:19,21

relating 73:4

relationship 9:23 74:22 77:11

remaining 41:25

remember 29:14 30:9 33:2 47:14 59:1,15 66:18,19 72:4 80:11 81:1,7

Remote 5:1

remotely 5:6

removal 75:16 78:5

removed 47:12 52:6

renovations 73:10

rent 54:18

rental 32:24 33:4 83:11,13

repairs 73:10

repeat 8:16 12:11 14:19 68:21
79:19 81:4

rephrase 15:16 19:15 63:21

replaced 29:1

reported 29:10

reporter 5:9 8:20 10:16 15:20
16:14 20:12 22:7 24:1,4 32:3,19
35:21 49:7 55:19 60:16 64:3
66:10,12 68:22 73:23 74:10
75:20 76:24 78:9 80:16

representations 77:21

representative 21:15 23:10

represented 75:6 77:14

reps 12:13

Requests 78:13

required 62:20 72:7 79:13

requires 76:7

reread 15:19

residence 77:23

residential 11:13 13:21 14:3
15:13 20:8 23:20 26:3 58:20
60:14 61:9,20 63:11 64:11
72:17,18 73:1 74:2,22 76:8 77:6,
10,16 78:24 79:10

Resilient 79:9,14

resolved 73:15

resolving 71:4

respect 58:4,5

Respectfully 32:7

respective 75:1,16

respond 72:6

Respondents 61:17 62:6,21

71:13 73:19

response 24:7 25:15 26:17 27:4
31:23 51:5 52:25 53:10 79:1,2

Responses 78:12

responsible 44:18

rest 41:19 52:15 53:6,22

restroom 55:14

result 74:2

review 82:6

Revised 20:16 22:5 67:15,25

revision 22:6,15

right-hand 32:17

river 42:23

Road 38:24 39:9

roll 12:19,24

room 5:20 12:19,24 13:4

rule 72:6 73:9

runners 54:13

---

**S**

Saad 11:25 12:4 14:2,16 26:2
27:16 30:21,24 33:16 40:3 54:24
56:3 63:3,7,19,25 70:19

Saad's 12:25 39:7 54:22 55:24
70:10,14 80:22

salaries 54:18

salary 13:9 47:25

sales 12:13 51:5

salesperson 61:12

San 46:21 47:6,10 52:5 53:18

satisfies 13:3

saved 47:18

school 6:25 7:2,3,12

screen 10:14 12:12 16:12 20:11
31:18 32:15 60:13 74:14 75:24
78:16,19

scrolling 32:23

Section 71:14 72:7 73:20

Self-funded 9:6

sense 69:10

sentence 71:7

separately 24:25

September 16:8 20:19 67:16

Sergio 48:24

Set 78:13

sheet 38:22 46:10

Shelby 19:3 59:4,9,20

ship 33:18 34:17 35:4,14 36:4,
16,25 38:23 39:5 83:3,8

shipped 39:25 40:8

short 79:16

shot 46:2,3,4

shotcrete 46:2,3,4

show 6:1 32:12 55:3,12

showing 16:12 20:10 22:4 50:2
60:20 80:12

shows 26:24 41:22,25 45:13
46:24 47:4

Shush 69:24

sic 37:4

sign 18:8

signature 18:12 19:12 37:17,20
42:3 67:8 82:11

signatures 47:5

signed 11:25 15:5 17:3,6 18:12
57:11 61:11 67:9

similar 63:2,6,8,9

simultaneous 69:20

sit 8:5,8

site 22:12

Sixteen 74:19

slash 16:7 62:2

slide 27:6

small 10:12 37:8 60:10

smaller 44:14

sole 7:20

Soria 48:4

Sorrento's 9:13

sound 51:13

sounds 60:1 80:4

speak 8:14,22

speakers 69:20

speaking 55:9 57:25

specific 33:7

specifically 47:25

speculation 54:21

spell 30:1 39:12 42:9

split 39:7 51:18

spoke 24:18 60:9

spoken 14:16

spots 62:1

spreadsheet 47:17

standards 72:25

start 7:25 8:1 9:5,7 16:7 28:7
 71:13

started 9:4 17:7 79:9

starting 9:9

state 24:20 25:3 58:10 72:9,10

stated 61:19 62:9 77:4

statement 51:7 64:20 69:1

states 26:7 61:6 71:7

stay 29:15

stayed 29:17

stealing 29:2

stipulated 71:8 72:2,5

stipulation 71:3 73:15

stone 26:8 27:16 38:18 39:4
 43:1,4

stop 69:22

street 8:7

stretch 66:22,23

strike 22:11

structural 46:24,25

stuff 10:13 52:23 54:18 60:10
 82:5

subcontractor 25:4

subdivision 72:10

subject 58:1 81:9

submitted 22:16 61:18 82:7

substantial 74:25 78:1,6

substantiate 46:17

sued 74:5 75:18 79:17,21

suffered 78:7

summary 27:13 33:22 34:12,23
 35:20 36:9,22 37:6 38:1,11,14,
 16 40:5,19 41:6 42:11 43:8
 44:21 45:5 46:10 47:10 48:9,13,
 22 49:2,22 50:16,21 51:1,17,21
 53:16

summed 48:6

supplier 27:6

suppliers 27:19 53:25

supposed 14:20

Susannah 8:18 15:19 83:19

suspended 7:16,18 60:25 74:3

swear 5:9

swimming 11:5 16:22 17:16 67:3
 75:12,15 76:8 77:23 78:5

sworn 5:16 6:10

---

**T**

---

T-E-L-L-O 48:16

table 24:25 25:7,10,19,21 26:14,
 22,24 27:11

talk 18:6 56:1 57:16

talking 17:8 63:18 68:11

team 54:3

Teams 50:1

technical 30:21 49:5 66:7

technically 82:1

telling 46:6

Tello 48:16,21

ten 81:11,25

term 56:2

terminated 28:8 29:13 30:4,5
 31:12 81:1

terms 13:4

testified 5:18 14:16 79:8

testify 5:16

testimony 83:22

text 14:10,20 27:23,24

texted 14:6

thing 41:18 63:25 64:18

things 58:1

thinking 52:20

third-party 70:6

Thirty-one 10:8

Thomas 48:11

thought 17:6

thousand 25:16 26:18 59:23

tie 44:15

time 5:7 9:17 11:7 13:25 18:25
 19:8 21:20 28:6,18 31:25 33:10
 47:14,18 59:13 72:4 79:16,20
 83:17,18,20

timely 75:14

times 28:14,16 31:11

title 71:17

titled 20:16

today 5:6 8:5,8 13:1

today's 83:21

toggle 23:23

told 14:6 15:1

tons 39:18

top 10:20,23 35:13 47:18

total 26:24 28:14 35:17 44:3
45:11,17,24 46:25 47:1,4,6
50:14 51:11 53:16

town 81:6

Township 19:4 59:4,21 75:6
77:15,21

trade 7:12

trailer 33:4 82:22 83:10

transcript 83:25

transporting 33:11

truck 46:1

true 71:12 73:19

truth 5:16,17

Tuesday 5:2 47:19

Tyler 5:12 12:21 14:12 59:6

type 13:10 43:1

typo 77:2

**U**

UCG 39:11

uncle 81:23,25

uncomfortable 56:5

understand 6:14 53:14 63:20
65:17 66:5 68:25 69:7,9,13,14

understands 69:8,12

undisclosed 72:20

University 7:9

unlicensed 61:12 72:12,15,16

unlike 34:16

unwilling 55:2

Upper 38:18

utilities 54:18

**V**

vague 56:3

vast 53:23

video 83:23

video-recorded 5:5

viewed 15:22 81:25

violated 71:13,24 72:5 73:20

violation 72:9

vision 30:20

visit 12:7

visited 28:14

**W**

waiting 27:19

waiving 57:25

wanted 34:11 57:18

water 27:6

weather 16:8

website 60:14

weighed 56:13

West 38:23 39:8

whited 33:19 36:17

wife 6:18 79:8

wife's 18:23 19:10

willful 72:8

winter 30:10,11

witness's 8:21

word 39:11

work 9:12 10:9,10 13:9 17:7 30:3

41:17 79:15 82:18 83:5

worked 9:13,25 10:12 12:14,15

worker 48:4

workers 48:1

working 9:24 14:6,9 15:3 19:18
80:22 82:15,17

workmanship 29:6,22 72:25

writing 23:16

wrong 38:13

**Y**

year 30:11 54:1 59:17

years 14:8 54:1 66:20 79:18,22
82:1

yesterday 61:3

**Z**

zoom 5:6 44:7 45:21

# EXHIBIT B



**Exigent Design & Build**
51517 Van Dyke Ave
Shelby Twp MI, 48038

Estimate

Date: 6-27-2022

Dear OJ & Mohammed
921 Crescent Drive
Dearborn MI, 48126
Mohammed - (313) 402-4417
Osama Abdullah 'OJ' - (313) 231-4056

Thank you for the opportunity to submit the following quotation. We would love to get this project on our schedule. Listed below is a complete breakdown of the scope of work.

**Scope of Work**

## <u>Shotcrete Swimming Pool & Spa (LAZY RIVER) - $309,445</u>

- Shotcrete Swimming Pool rebar Approx. 1,100 Sq. foot shell, 3'-7' deep - $121,000
  - Island Sun Shelf 110 Sq. Ft. - $11,000
    - (2) Bubblers with lights - $4,000
    - (3) Laminars - $9,000
  - Tile on waterline ($10 Allowance)
  - Smooth Plaster Finish
  - **Pebble Tech**
  - Rebar
  - Installation, dig hole, remove all dirt
  - Pool Plumbing: $27,000
    - Pool plumbing
    - Pressure test all plumbing before gunite
- Brussels Fullnose Coping - 220 Linear  ft x $75 (Includes Tile)  = $16,500
- Permits and engineering/plans for city for pool
- Deliver water to fill pool - $4,000

**Electrical - $9,500**
- Run electrical and wire in all pool equipment, pass all inspections, pull permits
- Trench conduit for electrician 18 " deep trenched
- Trench as line 18"for boiler
- Licensed plumber come in run gas line pass depth test/air test

**Pool Equipment/Accessories - $63,050**
> *May need additional electrical this will be formed as a change order*
- Clean and clear cartridge filter= $2,000
- (7)  7 HP Superflo VS pump= $32,500
- (6) LED ColorBright lights = $19,000
- Heater 400k BTU - $4,200
- Salt Chlorine system - $2,500
- Intellibrite controller for lights= $850
- Robot Vacuum - $2,000

License #: 802082183
Phone: (586) 383-8308



**Spa + Equipment/ Accessories - $38,395**
- Raised 8' x 8' Spa (Built under grotto)
- 2.7 HP Pump
- 150k BTU Heater
- Spa Air Blower
- (3) LED Lights
- 2.25 HP Pump for jets
- (10) Jets

## Gorotto & Slide - $149,500
- 3,600 Cubic Ft of grotto poured out of shotcrete - $110,000
  - Includes landing at top
  - Includes building wall out of Natural Limestone
- 40 Linear Feet of Railing - $4,200
- Custom Built 90 degree arching slide - $20,000
  - Approx 10 Ft tall (starts at landing)
  - Plumbing for slide
- 48" Spillway - $750
- 36" Spillway - $550
- Plumbing for spillways - $3,000
- Electrical for lights and spillways - $8,000

## Bridge - $28,500
- Approx. 4 Ft Wide x 7 Ft Long x 3 Ft High - $13,600
  - Pavers included to match pool decking
  - Formed from shotcrete with proper engineering
  - Includes Rebar and Forms
  - Plumbing for spillways
  - Electrical for lights (LED) - $2,500
- (2) 3 Ft tall shotcrete railings for walls for each side of bridge - $7,700
  - Includes Stack stone on both railings (Inside and Outside)
- Steps on each side of bridge
  - Formed from pavers
    - 55 Phase Ft / 35 Linear ft
- (2) 36" spillways on each side of bridge - $3,100
  - Includes Plumbing

License #: 802082183
Phone: (586) 383-8308



## FRAMELESS Glass Fence - $65,100
- Approx. 155  linear ft of fence
- Includes 42" footings and fence anchored to Coping
- Includes (2) Gates



## Finishing Touches - $2,000
- Disposal Fee
- NO SOD / NO SPRINKLERS INCLUDED
  - *HOMEOWNER WILL CONTRACT OUT HIMSELF*

➔ **Total Investment - $554,545**

➔ **Design Refunded - $551,545**

**\*Client will be refunded down payment if pool is not approved by city\***



**Homeowner's Initials Acknowledging Total Investment+Progress Payment Schedule**

PROGRESS PAYMENTS -
- Down Payment to book spot in line- $50,000
- Progress payment: 2-4 weeks before work is started on site - $150,000
- Progress payment: ShotCrete Shell is Formed - $70,000
- Progress payment: Grotto wall is semi / Completed - $70,000
- Progress payment: Island and Firepit is Semi / Completed - $50,000
- Progress payment: Bridge and Paver work is completed - $50,000
- Progress payment: Plants and finishing touches completed - $50,000
- Progress payment: Frameless fence is completed - $35,000
- Final payment upon approval of final building inspection - $6,545 *+ any additional add-ons added on after initial contract*

License #: 802082183

Phone: (586) 383-8308

*Note that if for any progress payment the homeowner chooses to pay with a credit card, there will be an additional 3% convenience fee added to the amount.**

**The 3% fee is an additional fee and does not count towards the rest of the progress payments.

***Estimates are only good for 7 days.


Estimated Start Date: ~ ==August/September 2022==

- *Contingent on: Weather, Certain Material Availability, and <u>Building Permit Issuance</u>*


**<u>Terms & Conditions of this quote, as well as any change order thereafter-</u>**

These terms & conditions protect Exigent Landscaping, LLC as well as the homeowner if any issues should arise.

Please review carefully.

**<u>General Contract Terms:</u>**
1. Exigent's employees stand behind all their work, if any problems with install come up, contact us.
2. Add-ons/extras must be paid upon completion or immediately.
3. Both parties are entitled to a filled out copy of the agreement, signed by the homeowner and contractor.
4. By signing, the homeowner agrees to everything stated in the contract.
5. If there is a change order, a revision will be sent through email.
6. Before work is started on property, Exigent will call Miss Dig to mark utilities. Please do not disturb these markings as they are important to us to know where these utilities are at time of project. If any sprinkler lines are damaged by Exigent we will fix it and the homeowner will not incur cost. We are not liable for any other damaged utility lines, including but not limited, to cable, gas, water, etc.
7. If an item is not stated in this contract, it is NOT included. Nothing in designs are included if they are not listed on here, ex. Outdoor furniture, coping on steps, etc. Designs only provide homeowners with a vision, they are never 100% exact.
8. All prices in any contract provided by Exigent are only good for 7 days from the date listed in the top right corner of the front page of quotes. After 7 days, prices may rise due to changes in gas prices, material prices rising, etc.
9. Return check fee= $40
10. Progress payments are non negotiable. If a progress payment is delayed it may incur a delay on the project.
11. For any interior work, Exigent asks the homeowner to please remove all valuables from the room and cover any furniture with plastic/tarps as dust/debris may collect during work.
12. If an item/service listed in this contract can no longer be performed/purchased by Exigent once job is started for whatever reason, Exigent is no longer liable to perform/purchase item/service and the homeowner will be notified and fully refunded for that item/service. Ex. if the type of paver(s) gets discontinued, etc.
13. Exigent is not responsible for pets that get loose. Exigent is also not responsible if they hit an invisible fence line. This must be marked out by the homeowner before Exigent initiates work.
14. Exigent will clean up job sites at the end of day as best as possible, however, homeowner's property/surrounding area(s) will not be cleaned up 100% until Exigent is completely finished with the job.
15. If another contractor/company is ever present during the course of Exigent's working period, Exigent can not be held liable for any damage that occurs to the homeowner's property.
16. If a permit/architect plan payment is not listed above, but becomes needed at any point during the project, a charge will incur a minimum of $150 to a maximum of $3,000 depending on size of project.
17. In pool quotes, water is not included in the quote unless otherwise stated. We will fill the pool with the homeowner's hose if water delivery is not stated. Covers are also not included unless stated otherwise in the pool section of the quote.
18. Any progress payment/final payment is non-negotiable.
19. Exigent is not responsible for soil bearing capacity. We strongly encourage homeowners to hire a geo technical engineer before Exigent starts work.
20. If city/HOA/engineer/etc. ever requires extra work/material needed to be done to scope of work that is not listed in the contract above, Exigent is not responsible for the extra fees.

License #: 802082183
Phone: (586) 383-8308

21. We are not responsible for existing patio or cement drainage not installed by Exigent.
22. Exigent is not responsible for the homeowner's water bills.
23. If there is a high water table on a homeowner's property, Exigent is not responsible for pumping fees.
24. If final payment, including payment of all change orders, is not received on the day of completion, payment is subject to late fees. If payment is not received after 30 days, Exigent is subject to place a lien on the homeowner's property. If at any point during the project a progress payment is not paid, Exigent reserves the right to commence work until payment is received.
25. We are not responsible for HOA approval. We are not responsible for any HOA fees or deposits.
26. Up to 40% of the down payment may not be refundable due to costs already incurred on Exigent's part depending when contact/project is terminated by the homeowner.
27. Agreeing to a price or add-on via text message or email omits the need for a signature for that particular item/change order.
28. I will allow Exigent Landscaping to use pictures of my property for marketing purposes indefinitely. The pictures will only be taken on the property while work is being done to show the progress of the job and the only pictures taken after work is completed will be taken when Exigent/Brandon has permission to enter the property.
29. For any electrical work: Exigent assumes there is easy access to the panel in the home. If interior work must be done in order to access the panel, additional costs may occur.
30. We do not remove large trees. Please ensure if we will be installing a patio/pool/etc. where a tree is currently present, it is removed (roots and all) before our arrival. If roots remain we may charge a fee to remove/haul away.
31. For landscape beds, edging is not included unless specifically stated in the proposal. In lieu of edging, Exigent will provide machined, "natural" deep divot edge bed perimeter.
32. Homeowners may not interfere with laborers/foremen while working on your project. Our employees are trained professionals who execute landscape construction projects regularly and they have set targets they are trying to reach, any interference can cause them to not hit deadlines and they may not hit their targets/earn their incentive. If any problems arise please call the project manager. If laborers/foremen are interfered with, costs may incur for delays.
33. Once a contract is signed, the homeowner agrees to make no changes to the contract that will lower the contract signing price by 20% or more. We reserve spots on our schedule according to size of job at signing, when lowered, this allows for extra spaces in our schedule we did not account for.
34. Signing the contract allows for Exigent to reserve space for your project on our schedule. Down payment allows us to order materials and to start the permitting/engineering process.
35. If a homeowner changes design after engineering plans are complete and/or after the permit process is started/finished, a change order may ensue for the cost of changing the plans and/or permits.
36. Homeowner agrees to pay for supply chain product price increases (that exceed 15% from time of bidding) which occur between contract signature and completion of project.
37. Unknown conditions are not Exigent's responsibility.
38. All claims and disputes arising under or relating to this Contract are to be settled by binding arbitration in the state of Michigan or another location mutually agreeable to the parties. An award of arbitration may be confirmed in a court of competent jurisdiction.
39. Once plans are submitted to the township, the client has the right to make changes to the original plan. If the changes require township/city approval as well, clients will be charged $750 per change.
40. Design changes after a contract is signed may result in charges to the client of $500 per design change.

**Materials:**

1. Materials cannot be changed once purchased by Exigent. Location of patio, ledgerock, limestone, etc. cannot be changed once base has begun to be dug by Exigent. If the homeowner no longer wants material that was already purchased, the homeowner is responsible for the return fee or must pay the full amount if the return is not allowed by the supplier.

License #: 802082183
Phone: (586) 383-8308

2. If more material is needed for any scope of work, sqft or cost per item will be re-measured and multiplied by amount charged.
3. Any leftover materials/tools are property of Exigent. In many cases we have to purchase full pallets of brick, or an even tonnage of limestone from our supplier, but the homeowner is only paying for what is listed on quote/invoice.
4. All concrete types (white, stamped, and aggregate) are mixed on site before being poured by our concrete company. Color will almost never be exact as color promised, however 90% of time concrete will be very similar. Exigent is not responsible if color is not exact. Patio/walkway/etc. will be installed as is. If color is not to homeowner's standards, Exigent is not responsible to rip out the patio/walkway/etc. or pay for new concrete load.
5. Plant sizes and/or species may have to be substituted upon availability.
6. If a homeowner purchases any material, we are not responsible for the trash/debris associated with that material. As well as if the homeowner has other contractor(s) on site, we are not responsible for their trash/debris.

**Warranties:**

1. Exigent is not responsible for any weeds after install. Weedblock/landscape fabric is not a guarantee.
2. It is the homeowner's responsibility to maintain all aspects of landscaping after install. A professional company should be hired afterwards to maintain all living items such as trees, shrubs, etc. as well as any maintenance needed/desired for hardscape.
3. Exigent is not responsible for damage to existing concrete driveways/sidewalks/walkways on homeowner's property. Exigent's machines are made to not crack cement, however, if the cement does crack that means the base was never installed properly and Exigent cannot be held responsible.
4. After installation of landscaping/hardscaping/etc. some settling may be experienced - which may or may not be the result of services Exigent provided. Exigent will make every effort to minimize the chance of settling, but Exigent is not responsible should settling occur.
5. Exigent warranties white concrete/exposed aggregate/stamped concrete for 1 month after install.
6. Exigent provides a 3-year limited warranty on brick paver labor. If a brick paver itself cracks or is damaged, all manufacturers have a lifetime warranty and Exigent will just charge a $95 service fee for labor to come out to replace it. The warranty covers settling and paver shifting. Warranty does not cover self-inflicted damage, salt damage, or caused by natural disaster(s). Warranty does not include polymeric sand between pavers, this is a product that requires maintenance and cannot fall under our warranty.
7. Some paver blocks may tend to chip. Exigent is not responsible for any chips in the block. Unfortunately, we have no control over the pallet choice at our supplier. However, we will do our best to hide chips in blocks.
8. Exigent does not manufacture its brick pavers, therefore, if paver(s) produce effloforesence Exigent will not be held liable and they will not compensate homeowners for new pavers nor will they re-install new ones without charging for additional labor and materials. However, Exigent will help homeowners coordinate with Pavers' Manufacturer to see what the Manufacturer can do for the homeowner.
9. Exigent provides a 1 year warranty on all composite decks. The warranty covers only issues with labor that arise, this warranty does not cover physical damage to deck, damage to wood, or damage caused by natural disasters or self-inflicted damage.
10. In-lite lights come with a 3-year limited warranty. Exigent warranties their labor in installing them for 1 year. Warranty doesn't cover physical damage, self-inflicted damage, damage caused by natural disasters, or water damage.
11. Exigent provides a 1 year limited warranty on auto covers. Warranty does not cover physical or self inflicted damage. Auto covers are not considered a winter cover.
12. Exigent offers a 3 year warranty on pool plumbing. Winterization will be required every year in order to uphold warranty and it is extra and not included in the proposal.
13. There are no warranties on plants/shrubs/trees/flowers.
14. There is no warranty on re-planted/transplanted plants/shrubs/trees/flowers.
15. There are no warranties on sod/seed and straw.
16. Exigent is not responsible for any rotting wood after install.

License #: 802082183
Phone: (586) 383-8308

17. 4 year warranty (ALL pool equipment)
18. 5 year plumbing warranty
19. 10-15 year warranty on plaster (depending on plaster chosen)
20. Lifetime warranty on pool shell
21. 5 year warranty on paver LABOR
22. Lifetime warranty on pavers itself
23. 1 year warranty on autocover
24. 5 year warranty on autocover MOTOR
25. Exigent is not liable for any damage caused to any scope of work due to natural disasters.
26. Warranties on all products bought from suppliers, other than pavers and paver block, such as outdoor fridges, outdoor/indoor fireplaces, outdoor sinks, etc. all follow original manufacturers' warranties. Exigent does not provide any extra warranty on these products. We cannot warranty products only labor.
27. Any and all invoices not paid in full will result in no warranty on work completed by Exigent.

License #: 802082183

Phone: (586) 383-8308

000027

Page 8

**Homeowner's Signature (as well as initial on investment amount):**

Name _____ Date: 6/27/2022

Mohamed Saad

Signature _____

**Exigent's Salesman's Signature:**

Name _____ Date: 6/27/2022

Avery Petri

Signature _____

**(586) 785 - 8555**
**Avery@exigentdesignbuild.com**

**Exigent's Manager Signature:**

Name _____ Date: 6/27/2022

Brandon Heitmann

Signature _____

License #: 802082183
Phone: (586) 383-8308

000028

**Exigent Design & Build**
51517 Van Dyke Ave
Shelby Twp MI, 48038

CO1

Date: 8-05-2022

Dear OJ & Mohammed
921 Crescent Drive
Dearborn MI, 48126
Mohammed - (313) 402-4417
Osama Abdullah 'OJ' - (313) 231-4056

Thank you for the opportunity to submit the following quotation. We would love to get this project on our schedule. Listed below is a complete breakdown of the scope of work.

**Scope of Work**

**Larger, Quicker Progress Payments for Free Jumping Jets- $0**

- Restructuring progress payments so jumping jets can be added into project at no cost
- *Normally a $6,000 add on*
- New progress payment schedule:

**Homeowner's Initials Acknowledging New Progress Payment Schedule**

NEW PROGRESS PAYMENTS SCHEDULE -
- <mark>Down Payment to book spot in line- $50,000 ALREADY PAID</mark>
- Progress payment: In 2 weeks (week of 8/22) - $100,000
- Progress payment: Early to mid October - $150,000
- Progress payment: Shotcrete Shell is formed - $70,000
- Progress payment: Island and Firepit is Semi / Completed - $50,000
- Progress payment: Bridge and Paver work is completed - $50,000
- Progress payment: Plants and finishing touches completed - $50,000
- Progress payment: Frameless fence is completed - $25,000
- Final payment upon approval of final building inspection - $6,545 + *any additional add-ons added on after initial contract*

*Note that if for any progress payment the homeowner chooses to pay with a credit card, there will be an additional 3% convenience fee added to the amount.**
**The 3% fee is an additional fee and does not count towards the rest of the progress payments.

**Terms & Conditions of this quote, as well as any change order thereafter-**

These terms & conditions protect Exigent Landscaping, LLC as well as the homeowner if any issues should arise.

Please review carefully.

License #: 802082183
Phone: (586) 383-8308

**General Contract Terms:**

1. Exigent's employees stand behind all their work, if any problems with install come up, contact us.
2. Add-ons/extras must be paid upon completion or immediately.
3. Both parties are entitled to a filled out copy of the agreement, signed by the homeowner and contractor.
4. By signing, the homeowner agrees to everything stated in the contract.
5. If there is a change order, a revision will be sent through email.
6. Before work is started on property, Exigent will call Miss Dig to mark utilities. Please do not disturb these markings as they are important to us to know where these utilities are at time of project. If any sprinkler lines are damaged by Exigent we will fix it and the homeowner will not incur cost. We are not liable for any other damaged utility lines, including but not limited, to cable, gas, water, etc.
7. If an item is not stated in this contract, it is NOT included. Nothing in designs are included if they are not listed on here, ex. Outdoor furniture, coping on steps, etc. Designs only provide homeowners with a vision, they are never 100% exact.
8. All prices in any contract provided by Exigent are only good for 7 days from the date listed in the top right corner of the front page of quotes. After 7 days, prices may rise due to changes in gas prices, material prices rising, etc.
9. Return check fee= $40
10. Progress payments are non negotiable. If a progress payment is delayed it may incur a delay on the project.
11. For any interior work, Exigent asks the homeowner to please remove all valuables from the room and cover any furniture with plastic/tarps as dust/debris may collect during work.
12. If an item/service listed in this contract can no longer be performed/purchased by Exigent once job is started for whatever reason, Exigent is no longer liable to perform/purchase item/service and the homeowner will be notified and fully refunded for that item/service. Ex. if the type of paver(s) gets discontinued, etc.
13. Exigent is not responsible for pets that get loose. Exigent is also not responsible if they hit an invisible fence line. This must be marked out by the homeowner before Exigent initiates work.
14. Exigent will clean up job sites at the end of day as best as possible, however, homeowner's property/surrounding area(s) will not be cleaned up 100% until Exigent is completely finished with the job.
15. If another contractor/company is ever present during the course of Exigent's working period, Exigent can not be held liable for any damage that occurs to the homeowner's property.
16. If a permit/architect plan payment is not listed above, but becomes needed at any point during the project, a charge will incur a minimum of $150 to a maximum of $3,000 depending on size of project.
17. In pool quotes, water is not included in the quote unless otherwise stated. We will fill the pool with the homeowner's hose if water delivery is not stated. Covers are also not included unless stated otherwise in the pool section of the quote.
18. Any progress payment/final payment is non-negotiable.
19. Exigent is not responsible for soil bearing capacity. We strongly encourage homeowners to hire a geo technical engineer before Exigent starts work.
20. If city/HOA/engineer/etc. ever requires extra work/material needed to be done to scope of work that is not listed in the contract above, Exigent is not responsible for the extra fees.
21. We are not responsible for existing patio or cement drainage not installed by Exigent.
22. Exigent is not responsible for the homeowner's water bills.
23. If there is a high water table on a homeowner's property, Exigent is not responsible for pumping fees.
24. If final payment, including payment of all change orders, is not received on the day of completion, payment is subject to late fees. If payment is not received after 30 days, Exigent is subject to place a lien on the homeowner's property. If at any point during the project a progress payment is not paid, Exigent reserves the right to commence work until payment is received.
25. We are not responsible for HOA approval. We are not responsible for any HOA fees or deposits.
26. Up to 40% of the down payment may not be refundable due to costs already incurred on Exigent's part depending when contact/project is terminated by the homeowner.
27. Agreeing to a price or add-on via text message or email omits the need for a signature for that particular item/change order.

License #: 802082183
Phone: (586) 383-8308

28. I will allow Exigent Landscaping to use pictures of my property for marketing purposes indefinitely. The pictures will only be taken on the property while work is being done to show the progress of the job and the only pictures taken after work is completed will be taken when Exigent/Brandon has permission to enter the property.
29. For any electrical work: Exigent assumes there is easy access to the panel in the home. If interior work must be done in order to access the panel, additional costs may occur.
30. We do not remove large trees. Please ensure if we will be installing a patio/pool/etc. where a tree is currently present, it is removed (roots and all) before our arrival. If roots remain we may charge a fee to remove/haul away.
31. For landscape beds, edging is not included unless specifically stated in the proposal. In lieu of edging, Exigent will provide machined, "natural" deep divot edge bed perimeter.
32. Homeowners may not interfere with laborers/foremen while working on your project. Our employees are trained professionals who execute landscape construction projects regularly and they have set targets they are trying to reach, any interference can cause them to not hit deadlines and they may not hit their targets/earn their incentive. If any problems arise please call the project manager. If laborers/foremen are interfered with, costs may incur for delays.
33. Once a contract is signed, the homeowner agrees to make no changes to the contract that will lower the contract signing price by 20% or more. We reserve spots on our schedule according to size of job at signing, when lowered, this allows for extra spaces in our schedule we did not account for.
34. Signing the contract allows for Exigent to reserve space for your project on our schedule. Down payment allows us to order materials and to start the permitting/engineering process.
35. If a homeowner changes design after engineering plans are complete and/or after the permit process is started/finished, a change order may ensue for the cost of changing the plans and/or permits.
36. Homeowner agrees to pay for supply chain product price increases (that exceed 15% from time of bidding) which occur between contract signature and completion of project.
37. Unknown conditions are not Exigent's responsibility.
38. All claims and disputes arising under or relating to this Contract are to be settled by binding arbitration in the state of Michigan or another location mutually agreeable to the parties. An award of arbitration may be confirmed in a court of competent jurisdiction.
39. Once plans are submitted to the township, the client has the right to make changes to the original plan. If the changes require township/city approval as well, clients will be charged $750 per change.
40. Design changes after a contract is signed may result in charges to the client of $500 per design change.

**Materials:**

1. Materials cannot be changed once purchased by Exigent. Location of patio, ledgerock, limestone, etc. cannot be changed once base has begun to be dug by Exigent. If the homeowner no longer wants material that was already purchased, the homeowner is responsible for the return fee or must pay the full amount if the return is not allowed by the supplier.
2. If more material is needed for any scope of work, sqft or cost per item will be re-measured and multiplied by amount charged.
3. Any leftover materials/tools are property of Exigent. In many cases we have to purchase full pallets of brick, or an even tonnage of limestone from our supplier, but the homeowner is only paying for what is listed on quote/invoice.
4. All concrete types (white, stamped, and aggregate) are mixed on site before being poured by our concrete company. Color will almost never be exact as color promised, however 90% of time concrete will be very similar. Exigent is not responsible if color is not exact. Patio/walkway/etc. will be installed as is. If color is not to homeowner's standards, Exigent is not responsible to rip out the patio/walkway/etc. or pay for new concrete load.
5. Plant sizes and/or species may have to be substituted upon availability.

License #: 802082183

Phone: (586) 383-8308

6.  If a homeowner purchases any material, we are not responsible for the trash/debris associated with that material. As well as if the homeowner has other contractor(s) on site, we are not responsible for their trash/debris.

**Warranties:**

1.  Exigent is not responsible for any weeds after install. Weedblock/landscape fabric is not a guarantee.
2.  It is the homeowner's responsibility to maintain all aspects of landscaping after install. A professional company should be hired afterwards to maintain all living items such as trees, shrubs, etc. as well as any maintenance needed/desired for hardscape.
3.  Exigent is not responsible for damage to existing concrete driveways/sidewalks/walkways on homeowner's property. Exigent's machines are made to not crack cement, however, if the cement does crack that means the base was never installed properly and Exigent cannot be held responsible.
4.  After installation of landscaping/hardscaping/etc. some settling may be experienced - which may or may not be the result of services Exigent provided. Exigent will make every effort to minimize the chance of settling, but Exigent is not responsible should settling occur.
5.  Exigent warranties white concrete/exposed aggregate/stamped concrete for 1 month after install.
6.  Exigent provides a 3-year limited warranty on brick paver labor. If a brick paver itself cracks or is damaged, all manufacturers have a lifetime warranty and Exigent will just charge a $95 service fee for labor to come out to replace it. The warranty covers settling and paver shifting. Warranty does not cover self-inflicted damage, salt damage, or caused by natural disaster(s). Warranty does not include polymeric sand between pavers, this is a product that requires maintenance and cannot fall under our warranty.
7.  Some paver blocks may tend to chip. Exigent is not responsible for any chips in the block. Unfortunately, we have no control over the pallet choice at our supplier. However, we will do our best to hide chips in blocks.
8.  Exigent does not manufacture its brick pavers, therefore, if paver(s) produce efflofloresence Exigent will not be held liable and they will not compensate homeowners for new pavers nor will they re-install new ones without charging for additional labor and materials. However, Exigent will help homeowners coordinate with Pavers' Manufacturer to see what the Manufacturer can do for the homeowner.
9.  Exigent provides a 1 year warranty on all composite decks. The warranty covers only issues with labor that arise, this warranty does not cover physical damage to deck, damage to wood, or damage caused by natural disasters or self-inflicted damage.
10. In-lite lights come with a 3-year limited warranty. Exigent warranties their labor in installing them for 1 year. Warranty doesn't cover physical damage, self-inflicted damage, damage caused by natural disasters, or water damage.
11. Exigent provides a 1 year limited warranty on auto covers. Warranty does not cover physical or self inflicted damage. Auto covers are not considered a winter cover.
12. Exigent offers a 3 year warranty on pool plumbing. Winterization will be required every year in order to uphold warranty and it is extra and not included in the proposal.
13. There are no warranties on plants/shrubs/trees/flowers.
14. There is no warranty on re-planted/transplanted plants/shrubs/trees/flowers.
15. There are no warranties on sod/seed and straw.
16. Exigent is not responsible for any rotting wood after install.
17. 4 year warranty (ALL pool equipment)
18. 5 year plumbing warranty
19. 10-15 year warranty on plaster (depending on plaster chosen)
20. Lifetime warranty on pool shell
21. 5 year warranty on paver LABOR
22. Lifetime warranty on pavers itself
23. 1 year warranty on autocover
24. 5 year warranty on autocover MOTOR
25. Exigent is not liable for any damage caused to any scope of work due to natural disasters.

License #: 802082183
Phone: (586) 383-8308

000032

Page 5

26. Warranties on all products bought from suppliers, other than pavers and paver block, such as outdoor fridges, outdoor/indoor fireplaces, outdoor sinks, etc. all follow original manufacturers' warranties. Exigent does not provide any extra warranty on these products. We cannot warranty products only labor.

27. Any and all invoices not paid in full will result in no warranty on work completed by Exigent.

**Homeowner's Signature (as well as initial on investment amount):**

Name _MOHAMED SAAD_____ Date: 8/5/2022

Signature _____
C54A6F7EG64E467...

**Exigent's Salesman's Signature:**

Name _Brandon Heitmann_____ Date: 8/5/2022

Signature _____
EA032F4BB5F343B...

License #: 802082183
Phone: (586) 383-8308

# EXHIBIT C

1          UNITED STATES BANKRUPTCY COURT

2          EASTERN DISTRICT OF MICHIGAN

3            SOUTHERN DIVISION

4

5  In re:

6

7  BRANDON HEITMANN,

8       Debtor.

9                Chapter 13

10              Case No. 24-41956-MAR

11              Hon. Mark A. Randon

12  _____/

13

14  PAGE 1 - 197

15

16     The Examination of BRANDON HEITMANN,

17     Taken at 20700 Civic Center Drive, Suite 420,

18     Southfield, Michigan,

19     Commencing at 1:43 p.m.,

20     Tuesday, September 3, 2024,

21     Before Tammie M. Snyder, CSR-6657.

22

23

24

25



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Page 2**

```
1  APPEARANCES:
2
3  MR. ANTHONY J. MILLER  P71505
4  Osipov Bigelman, P.C.
5  20700 Civic Center Drive
6  Suite 420
7  Southfield, Michigan  48076
8  (248)663-1800
9       Appearing on behalf of creditor Mohamed Saad.
10
11 MR. JOHN F. HARRINGTON  P40443
12 Law Offices of John F. Harrington
13 30500 Van Dyke Avenue
14 Suite 200
15 Warren, Michigan  48093
16 (586)751-3610
17 attysharrington@comcast.net
18      Appearing on behalf of creditors Alex and Rebecca
19      Boyd and Daniel Carter.
20
21
22
23
24
25
```

**Page 3**

```
1  APPEARANCES CONTINUED:
2
3  MR. TYLER P. PHILLIPS  P78280
4  Kotz, Sangster & Wysocki, P.C.
5  400 Renaissance Center
6  Suite 3400
7  Detroit, Michigan  48243
8  (313)259-8782
9  tphillips@kotzsangster.com
10      Appearing on behalf of Mrs. Heitmann.
11
12 MR. ROBERT N. BASSEL  P48420
13 P.O. Box T
14 Clinton, Michigan  49236
15 (248)277-1234
16 bbassel@gmail.com
17      Appearing on behalf of debtor Brandon Heitmann.
18
19 Also present:
20      - Alex Boyd
21      - Rebecca Boyd
22      - Amanda Pisarski
23
24
25
```

**Page 4**

```
1                    TABLE OF CONTENTS
2  Witness                                          Page
3  BRANDON HEITMANN
4  EXAMINATION BY MR. MILLER:                          7
5  EXAMINATION BY MR. HARRINGTON:                    103
6  RE-EXAMINATION BY MR. MILLER:                     193
7
8
9               INDEX TO EXHIBITS
10        (Exhibits attached to transcript)
11
12 Exhibits                                         Page
13 HEITMANN EXHIBIT 1                                 27
14 HEITMANN EXHIBIT 2                                 49
15 HEITMANN EXHIBIT 3                                 94
16 HEITMANN EXHIBITS 4 and 5                         111
17 HEITMANN EXHIBIT 6                                124
18 HEITMANN EXHIBIT 7                                143
19 HEITMANN EXHIBIT 8                                146
20
21
22
23
24
25
```

```
              Hanson/Renaissance Court Reporters
          Detroit   (313) 567-8100   Mt. Clemens
                   www.hansonreporting.com
```

**Page 5**

```
1  Southfield, Michigan
2  Tuesday, September 3, 2024,
3  About 1:43 p.m.
4         BRANDON HEITMANN,
5  having first been duly sworn, was examined and
6  testified on his oath as follows:
7         MR. MILLER:  Sir, can you please state and
8  spell your name for the record.
9         THE WITNESS:  Brandon Heitmann.
10        MR. BASSEL:  Can you spell your name, please.
11        THE WITNESS:  B-r-a-n-d-o-n, Heitmann,
12 H-e-i-t-m-a-n-n.
13        MR. MILLER:  Thank you.  And I'd like to
14 start by just kind of going around the table here, we
15 have a bit of a full house today, and placing
16 appearances on the record.  My name is Anthony Miller
17 and I am the attorney for creditor Mohamed Saad, that's
18 S-a-a-d, in the case of Brandon L. Heitmann, Chapter 13
19 bankruptcy case pending in the Eastern District of
20 Michigan, Case Number 24-41956.
21        Mr. Harrington, do you want to put your
22 appearance on the record?
23        MR. HARRINGTON:  Yes, thank you.  My name's
24 John Harrington, I represent creditors Alex and Rebecca
25 Boyd, who are to my immediate left, as well as creditor
```

1 Daniel Carter.
2         MR. PHILLIPS: Tyler Phillips, P78280,
3 representing Mrs. Heitmann.
4         MR. BASSEL: And Robert Bassel representing
5 Brandon Heitmann.
6         MR. MILLER: Thank you. Mr. Heitmann, is
7 there any reason that you would not be able to testify
8 truthfully today?
9         THE WITNESS: No.
10        MR. MILLER: Are you currently taking any
11 medications or other drugs or substances that might
12 impact your ability to testify truthfully today?
13        THE WITNESS: No.
14        MR. MILLER: Have you had your deposition
15 taken before?
16        THE WITNESS: No.
17        MR. MILLER: Okay. I'll explain the way this
18 will work then. This is a question and answer session.
19 I'm going to begin, I expect Mr. Harrington will follow
20 me. I'm going to have questions for you and ask you to
21 give answers to those questions. As the court reporter
22 swore you in, I'm going to expect and anticipate that
23 any questions that you answer and the answers that you
24 give me will be truthful, accurate and complete answers
25 to those question. Does that make sense?

1         THE WITNESS: Yes.
2         MR. MILLER: If you don't understand a
3 question that I've asked you, please ask me to rephrase
4 it or repeat it, I'll be happy to do so. Because if
5 you do give me an answer, I'm going to assume that you
6 did understand the question that I've asked and that
7 the answer you've given me is truthful. Fair?
8         THE WITNESS: Okay.
9 EXAMINATION BY MR. MILLER:
10 Q.  Okay. What's your current address?
11 A.  **60749 Forest Creek Drive, Washington, Michigan 48094.**
12 Q.  Is that the address that appears on your bankruptcy
13    schedules and petition?
14 A.  Yes.
15 Q.  Who owns that home?
16 A.  The bank.
17 Q.  What do you mean by that?
18 A.  Well, I guess I -- we -- I have a mortgage on the home.
19 Q.  Whose name is on the deed to that home?
20 A.  I believe myself.
21 Q.  Is anyone else?
22 A.  I believe it's just me.
23 Q.  Your wife's not on the deed?
24 A.  No.
25 Q.  What is that home worth, in your opinion?

1 A.  I'm not sure.
2 Q.  Have you had any recent appraisals or brokers evaluate
3    the home?
4 A.  No.
5 Q.  You said you have a mortgage on the property; is that
6    correct?
7 A.  Yes.
8 Q.  Which bank holds the mortgage?
9 A.  I'm thinking. I can't remember the name.
10 Q.  Do you know how much you owe on that mortgage?
11 A.  I don't recall the exact figure. A lot.
12 Q.  Over 700,000?
13 A.  I believe so.
14 Q.  You think the house is worth more than 700,000?
15 A.  I'm not sure.
16 Q.  Possibly?
17 A.  Possibly.
18 Q.  Okay. Is the mortgage current?
19 A.  No.
20 Q.  When's the last time a payment was made on that
21    mortgage?
22 A.  I don't recall. Probably a year, if I were to guess,
23    or longer.
24        MR. BASSEL: For the record, Mr. Miller, I
25    think it's Associated Bank through Trott & Trott that

1 requested release relief for the stay, and we had a
2 stipulation. I haven't seen that actually filed yet,
3 but my gut is I will be filing it fairly soon.
4         MR. MILLER: You're going to stipulate the
5 stay relief?
6         MR. BASSEL: Correct.
7         THE WITNESS: Yeah, that's correct.
8 BY MR. MILLER:
9 Q.  How much is the monthly mortgage payment?
10 A.  From what I recall, around 5,400.
11 Q.  When you were making the mortgage payments -- I guess
12    when the mortgage payments were being paid, who was
13    making those payments?
14 A.  I was.
15 Q.  From your personal bank account?
16 A.  Yes.
17 Q.  Did anyone else ever make a mortgage payment on this
18    property other than you -- other than you from your
19    personal bank account?
20 A.  No.
21 Q.  Okay. Are you familiar with a company called Exigent
22    Landscaping, LLC?
23 A.  Yes.
24 Q.  Who were the owners of that company prior to its
25    bankruptcy filing?

1  A.  No.
2  Q.  Any other owners?
3  A.  No.
4  Q.  Or I should say members.  You're a member of that
5      company; is that right?
6  A.  That's correct.
7  Q.  Were there ever any other members of that company?
8  A.  Describe members.
9  Q.  Did the -- well, I'll ask you a question to follow-up
10     on then.  Did -- and I'll call it Exigent, I'm
11     referring to Exigent Landscaping, LLC.
12         Did Exigent have an operating agreement?
13 A.  No.
14 Q.  So if I say and I tell you that a limited liability
15     company, rather than shareholders like an S-Corp is
16     owned by its members.  So the members are, in effect,
17     the owners of the LLC.  If I explain that to you that
18     way, were there ever any other members of Exigent?
19 A.  No.
20 Q.  Who operated Exigent?
21 A.  I was the CEO.
22 Q.  What was your role with Exigent on a day-to-day basis?
23 A.  I did the sales and marketing.
24 Q.  When you say -- let's take those one at a time.  When
25     you say sales, does that mean that you would personally

1      visit potential customers and pitch them any products
2      or services that Exigent might be offering?
3  A.  Yes.
4  Q.  Okay.  What kind of products or services would those
5      be?
6  A.  Landscaping work, swimming pools, bricks paving,
7      fencing, sod, sprinklers.
8  Q.  Full service landscaping, fair to say, plus pools?
9  A.  Yes.
10 Q.  When you talk about swimming pools, were you removing
11     existing pools and replacing them with new structures,
12     were you digging new swimming pools or a little bit of
13     both?
14 A.  I'd say a little bit of both.
15 Q.  Were you doing maintenance, as well?
16 A.  What time period are you -- yes.
17 Q.  Did Exigent have any other individuals that would have
18     met with potential customers or existing customers to
19     sell them products and services?
20 A.  Yes.
21 Q.  Who would that have been?
22 A.  I had several salespeople.  Kody.  Actually, I mean
23     everybody would have a fair position to be able to sell
24     inside the company.  Avery and Jake were sales reps.
25 Q.  What's Kody's last name?

1  A.  Grandchamp.
2  Q.  What's Avery's last name?
3  A.  Petri.
4  Q.  P-e-t-r-y?
5  A.  P-e-t-r-i, I believe.
6  Q.  And what's Jake's last name?
7  A.  Gross.
8  Q.  G-r-o-s-s?
9  A.  That's correct.
10 Q.  You mentioned marketing responsibilities, what were
11     your marketing responsibilities for Exigent?
12 A.  Promoting.
13 Q.  In what way?
14 A.  Attracting, getting attention and attracting clients'
15     interest.
16 Q.  How would you do that?
17 A.  Social media, Google, word of mouth.  That's it, that I
18     can recall.
19 Q.  Okay.  You had access to Exigent's bank account?
20 A.  Yes.
21 Q.  Did anyone else?
22 A.  What time period are you referring to?
23 Q.  2022.
24         MR. BASSEL:  When you say access, can you
25     clarify just so he understands the question.

1 BY MR. MILLER:
2  Q.  Did anyone -- during the year of 2022 did anyone
3      besides yourself have an online login that could look
4      at the bank account, the bank statements online?
5  A.  Yes.
6  Q.  Who?
7  A.  Dan Olthof.
8  Q.  Can you spell that last name?
9  A.  A-T-H-L-O-F.
10 Q.  Anyone else?
11 A.  Shara Gunther, Amanda.  That's it.
12 Q.  Did any of these individuals or anyone else during that
13     same time period have authority to write checks on
14     behalf of the company?
15 A.  I don't think so.
16 Q.  Did any of these three individuals, Dan, Shara or
17     Amanda have authority to write checks?
18 A.  I'm not sure.  I think Amanda might have, but not
19     positive.
20 Q.  Do you know if Amanda ever did write checks on behalf
21     of Exigent?
22 A.  I don't believe so.  I believe I signed all of them.
23 Q.  Who managed the day-to-day financial affairs of
24     Exigent?
25 A.  Can you describe the day-to-day financial affairs,

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1     please.
2  Q.   Did you look at the bank account every day?
3  A.   Yes.
4  Q.   Did you have an idea of how much money was coming in?
5  A.   A general idea, yes.
6  Q.   Did you have an idea of how much money was going out?
7  A.   A general idea, yes.
8  Q.   Did you have a business manager?
9  A.   I had a financial -- financial, what is it called,
10      finance guy.
11 Q.   Who was that?
12 A.   Dan Olthof, and I had a bookkeeper, Shara.
13 Q.   When you say finance guy, was he a CPA?
14 A.   No.
15 Q.   What role did Dan play?
16 A.   He did profit and losses and kept track of expenses.
17 Q.   The bookkeeper didn't do that?
18 A.   His was -- no, the bookkeeper did, as well.
19 Q.   Why did you have two people doing that?
20 A.   Shara was more for end of the year, end of the month,
21      and she was a CPA for taxes. And Dan was more of an
22      internal finance guy for our own -- for our own like
23      keeping track of expenses.
24 Q.   Who decided when after meeting with the client and assessing
25      the client's needs how much to charge that client?

Page 15

1  A.   Me.
2  Q.   How would you make that determination?
3  A.   Based on knowledge from being in the trade.
4  Q.   Can you be more specific as to the nuts and bolts as to
5      how you would make that determination?
6  A.   Keeping an idea of what other jobs took as far as
7      materials and labor.
8  Q.   Would you create a spreadsheet that says okay, the
9      materials are going to cost this much on this job,
10     labor's going to cost this much, I need a 15 percent
11     profit margin, how would you come up with those
12     numbers?
13 A.   Sometimes, but sometimes not, just based on what we
14     thought the job would cost and what we anticipated to
15     make on the product.
16 Q.   When you say we, that's really you making that
17     decision, right?
18 A.   Yeah.
19 Q.   How were you paid by Exigent?
20 A.   What time period are you referring to?
21 Q.   2022.
22 A.   From what I recall, I was paying myself a draw as a
23     W-2.
24 Q.   Those are different things. Were you a W-2 employee or
25     were you taking draws?

Page 16

1  A.   W-2 employee.
2  Q.   What was your salary or were you hourly?
3  A.   I don't recall the exact figure.
4  Q.   More than 100,000?
5  A.   I don't think so. I would also receive sales
6      commissions for projects sold on about 2 percent.
7  Q.   Did the other salespeople also receive commissions?
8  A.   Yes.
9  Q.   I want to come back to the commissions in a moment.
10      But was there any other way you were
11     compensated by Exigent in 2022 other than the W-2
12     income and these 2 percent commissions?
13 A.   There may have been some draws, but I don't remember
14     specifics. For the most part, it would be the
15     commission and the gross of what I was paid on W-2.
16 Q.   Would you track any draws that you took?
17 A.   Me, myself.
18 Q.   Yeah?
19 A.   No.
20 Q.   Would anyone?
21 A.   Shara.
22 Q.   How would she know how to do that?
23 A.   We provided her bank statements, and yeah, I think she
24     did it mostly off bank statements.
25 Q.   What form would those draws take, a check to you

Page 17

1      personally or something else?
2  A.   Yeah, check.
3  Q.   Made out to you personally?
4  A.   Correct.
5  Q.   Did Exigent ever pay your personal expenses as a form
6      of a draw?
7  A.   Can you describe personal expenses.
8  Q.   Any obligation of yours that Exigent wouldn't be
9      responsible for legally?
10 A.   Not that I can recall.
11 Q.   Did you ever buy groceries out of the business bank
12     account?
13 A.   I don't think so.
14 Q.   Did you ever make a car payment out of the business
15     bank account?
16 A.   What specific?
17 Q.   For your personal vehicle.
18 A.   For personal vehicle, no.
19 Q.   Did you ever make a mortgage payment out of the
20     business bank account?
21 A.   No.
22 Q.   Okay. I want to talk about the commissions, the 2
23     percent commissions you discussed. Were Exigent's
24     contracts typically set up with a down payment and then
25     several progress payments as work progressed?

1 A.   Yes.

2 Q.   Okay.  When were you paid your 2 percent commission,

3      was it when the project was completed or did you get 2

4      percent of each of those down payment installments, et

5      cetera?

6 A.   **Usually salespeople were paid when they sold the**

7      **project.**

8 Q.   Okay.  That includes yourself?

9 A.   **Yes.**

10 Q.   So if you, for instance, sold a $500,000 project and

11      that called for a $50,000 down payment and then several

12      progress payments to be made over the next six to nine

13      months, on the date that project was sold, presumably

14      the down payment was made, is that when you would take

15      your 2 percent or pay the 2 percent to the salesperson?

16 A.   **Yes.**

17 Q.   Okay.  How were the individual projects managed, was

18      there a separate accounting done for each project or

19      was it all done out of one central bank account?

20 A.   **It was done out of one central bank account.  And at a**

21      **certain period we had a payroll account, as well, for**

22      **paying employees, that was a separate account.**

23 Q.   Okay.  But you didn't segregate money from client A's

24      payments, client B's payments, client C's payments?

25 A.   **No.**

1 Q.   Okay.  Was there a person responsible for determining

2      whether a particular project was over budget?

3 A.   **Yes.**

4 Q.   Who's that?

5 A.   **Dan and/or project manager.**

6 Q.   Who was the project manager?

7 A.   **It depends on what project.  What project are you**

8      **referring to?**

9 Q.   You had several project managers?

10 A.   **Yes.**

11 Q.   Okay.  Was there a project manager assigned to each

12      contract?

13 A.   **Yes.**

14 Q.   How many project managers did you have at the height?

15 A.   **Four.**

16 Q.   Typically how many projects would each of these

17      managers be overseeing?

18 A.   **Five.**

19 Q.   Were you a project manager?

20 A.   **No.**

21 Q.   Did it ever happen that a project was over budget and a

22      project manager reported that to you?

23 A.   **No.**

24 Q.   What was your typical profit margin on a swimming pool

25      install?

1 A.   **Anywhere from 0 to 30 percent.**

2 Q.   And no projects ever went over budget?

3          You told me no project manager had reported

4      that to you.  Did any projects go over budget?

5 A.   **Yes.**

6 Q.   Why didn't the project managers tell you?

7 A.   **Because when we noticed, it was too late, project was**

8      **done or there was external things out of our control.**

9 Q.   Like what?

10 A.   **Inflation, material price increase, supply chain**

11      **shortages.**

12 Q.   What caused Exigent to come into financial

13      difficulties?

14 A.   **Inflation, material cost rising, and Mr. Harrington's**

15      **client over there creating a website that went viral in**

16      **regards to our company.**

17 Q.   Did your contracts with your customers contain a

18      provision that shifted the risk of inflation and

19      material cost to the clients to the customers?

20 A.   **Yes.**

21 Q.   Then why would inflation --

22 A.   **What -- I'm sorry.  What specific time period are you**

23      **referring to?**

24 Q.   2022.

25 A.   **I believe so, yes, but --**

1 Q.   When did Exigent start experiencing financial

2      difficulties?

3 A.   **2023.**

4 Q.   Okay.  Was that clause still in the contracts in 2023?

5 A.   **Yes.**

6 Q.   And why was inflation a problem for Exigent and not

7      allocated instead to the customers, why weren't those

8      costs passed on?

9          MR. BASSEL:  I'm going to object to the form

10      of the question.  That assumes that the customers

11      actually paid.  If they didn't pay, then that wouldn't

12      be something that was actually something that Exigent

13      could have dealt with.

14 BY MR. MILLER:

15 Q.   Did you attempt to charge your clients more when

16      material cost went up, come back to them and say I need

17      more money because material cost went up and here's the

18      receipts, did you do that?

19 A.   **At what time period are you referring to?**

20 Q.   2023.

21 A.   **Yes.**

22 Q.   And some clients refused to pay?

23 A.   **That's correct.**

24 Q.   If a client then refused to pay, what happened?

25 A.   **Well, they breached the contract.**

1 Q. What would you do in response to that?

2 A. Not finish their job unless a payment was made or a

3 decision was reached.

4 Q. Do you have a residential builder's license?

5 A. Me personally?

6 Q. Yes.

7 A. Yes.

8 Q. When did you first obtain a residential builder's

9 license?

10 A. Me personally?

11 Q. Yes.

12 A. I think March.

13 Q. Of what year?

14 A. 2023.

15 Q. You did not have a license prior to March 2023?

16 MR. BASSEL: When you say you, do you mean

17 Exigent or do you mean Brandon?

18 MR. MILLER: I mean Brandon.

19 THE WITNESS: We were working with Hank and

20 we viewed him as our qualifying officer for Exigent.

21 BY MR. MILLER:

22 Q. Okay. Lot to unpack there. What Hank?

23 A. Who we were working with to build pools and was working

24 as our qualified officer for the company.

25 Q. What's Hank's last name?

1 A. Bell.

2 Q. Was Hank a W-2 employee of Exigent?

3 A. No.

4 Q. Subcontractor?

5 A. No.

6 Q. What was he vis-a-vis Exigent?

7 A. We viewed him as our qualifying officer of Exigent.

8 Q. What's a qualifying officer, what's that mean? That's

9 not a term I'm unfamiliar with.

10 A. I don't really -- I think that's an attorney question.

11 Q. You said that term twice now. What does it mean to

12 you?

13 A. I viewed Hank as a representative in our company that

14 worked with us through the permit process and worked

15 with us building pools.

16 Q. What did Hank do?

17 A. Basically, what I just stated. He was a representative

18 of our company. He worked through the permit process

19 with us when we were building pools together.

20 Q. Did he meet with clients?

21 A. No.

22 Q. Did he review contracts?

23 A. No.

24 Q. Did he pull permits?

25 A. Yes.

1 Q. Did he do anything for Exigent other than pull permits?

2 MR. BASSEL: I think he already testified as

3 to what he thought his role was with respect to

4 Exigent.

5 MR. MILLER: He told me what he thought his

6 role was.

7 BY MR. MILLER:

8 Q. I want to know if he did anything else except pull

9 permits? It's a different question.

10 A. Yeah. We worked together on building pools, talking

11 about pools, talking about projects, working through

12 the permit process together.

13 Q. When you say building pools, you were in the ground

14 with shovels, the two of you?

15 A. No.

16 Q. What does it mean, building pools then?

17 A. Going through the paperwork.

18 Q. What kind of paperwork?

19 A. Drawings, site plans, if we ran into any issues, would

20 have conversations.

21 Q. Who would develop those drawings or site plans?

22 A. Our engineer. Depends on the project. But for the

23 most part, our engineer.

24 Q. Did Hank have input on those drawings?

25 A. If needed.

1 Q. Would he review every drawing?

2 A. No.

3 Q. Who would?

4 A. Me or a project manager.

5 Q. Mr. Bell have a residential builder's license prior to

6 March 2023?

7 A. Yes.

8 Q. Was he paid by Exigent?

9 A. No.

10 Q. Did any employee of Exigent, other than yourself while

11 working at the company have a residential builder's

12 license?

13 A. No.

14 Q. Were you charged with a crime for operating without a

15 business license?

16 A. I'm not sure. My attorney handled that. I don't know

17 exactly what I pled to.

18 Q. I didn't ask what you pled to, I asked if you were

19 charged?

20 MR. BASSEL: If you know. If you know you

21 can answer the question. But if you don't know, you

22 don't know.

23 THE WITNESS: Can I read it, please.

24 MR. HARRINGTON: Just for the record, you're

25 reviewing the transcript?

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1      MR. BASSEL: Correct.
2           THE WITNESS: I don't know the answer to
3      that.
4 BY MR. MILLER:
5  Q.   Were you charged with a crime for fraudulent use of a
6      building contract fund?
7  A.   **I don't know the answer to that.**
8  Q.   Were you criminally charged in connection with your
9      work for Exigent?
10 A.   **I'm not sure. My attorney handled that.**
11 Q.   You don't know if -- were you criminally charged in
12     2023?
13 A.   **Charged?**
14 Q.   For anything.
15 A.   **From my understanding, the charges were dismissed.**
16 Q.   Were you criminally charged in 2023, is that a yes?
17          MR. BASSEL: I think he answered it to the
18     extent that he knows.
19          MR. MILLER: No, he didn't.
20 BY MR. MILLER:
21 Q.   It's a very simple yes or no question.
22 A.   **I believe so.**
23 Q.   What was the result of that prosecution?
24 A.   **I'm not sure. My attorney handled that.**
25 Q.   Was there a plea deal?

1  A.   **I'm not sure what it was.**
2  Q.   I'm not asking you for the contents of it, but was
3      there a plea deal?
4  A.   **I believe so.**
5  Q.   Was that resolved in 2023?
6  A.   **Actually, can you describe what a plea deal is, please.**
7  Q.   A negotiated resolution with the prosecutor.
8  A.   **I'm not sure. My attorney handled that.**
9           MR. MILLER: Mark this, please.
10          HEITMANN EXHIBIT 1
11          WAS MARKED BY THE REPORTER
12          FOR IDENTIFICATION.
13 BY MR. MILLER:
14 Q.   Mr. Heitmann, the court reporter just handed you what's
15     been marked as Exhibit 1 to this examination. Take a
16     look at it. Are you familiar with this document?
17 A.   **Yes.**
18 Q.   Have you seen it before?
19 A.   **Yes.**
20 Q.   Can you tell me what it is?
21 A.   **This is our first contract with Mohamad Saad.**
22 Q.   Between Mohamed Saad and Exigent Landscaping, LLC?
23 A.   **Correct.**
24 Q.   Can you tell me in your own words what the purpose of
25     this contract is?

1  A.   **Purpose of the contract, to identify the work scope of**
2      **what we're doing and progress payments and create**
3      **dollar amount.**
4  Q.   So Exigent was going to build a swimming pool and spa,
5      I think it's called a lazy river on here, and Mr. Saad
6      agreed to pay for that work, correct?
7  A.   **That's correct.**
8  Q.   Who prepared this contract?
9  A.   **I believe -- I don't recall. I would imagine my**
10     **finance guy Dan did, Dan Olthof, with my review.**
11 Q.   You would have reviewed it?
12 A.   **Yes.**
13 Q.   Okay. If I can have you look at the last page, keep
14     going, very last page.
15          MR. BASSEL: Signature lines.
16 BY MR. MILLER:
17 Q.   Looking at the signature page. You see at the top it
18     was signed by Mr. Saad electronically?
19 A.   **Correct.**
20 Q.   Below that it says Exigent salesman's signature, Avery
21     Petri?
22 A.   **Correct.**
23 Q.   That means she would have sold the job to Mr. Saad?
24 A.   **He. That's correct.**
25 Q.   Or he, I'm sorry. And at the bottom it has the

1      Exigent's manager's signature and it has your
2      electronic signature; is that correct?
3  A.   **That's correct.**
4  Q.   And you reviewed this before signing on off on it?
5  A.   **That's correct.**
6  Q.   Are you familiar with the terms of this contract?
7  A.   **Terms, can you clarify that.**
8  Q.   What it says. If you need to read it, I can have you
9      read it.
10 A.   **What are you referring to, like the material, like what**
11     **page specifically?**
12 Q.   All of it, the payment terms and responsibilities of
13     the parties.
14 A.   **Yes. Some of the terms and conditions, not so much as,**
15     **that was kind of something me and my lawyer worked out.**
16     **But everything else, yes.**
17 Q.   Is this a fairly standard form that you would use with
18     many clients or customers?
19 A.   **Pretty standard form.**
20 Q.   Yes?
21 A.   **Like a pretty standard contract?**
22 Q.   Yes.
23          MR. BASSEL: When you say standard, you mean
24     like other contracts that he used with other clients or
25     standard within the industry?

1 BY MR. MILLER:
2 Q. I'll be more specific. If you turn to page 4, you see
3    where it says terms and conditions of this quote as
4    well as any change order thereafter, do you see that?
5 A. Uh-huh.
6 Q. And then underneath that there are general contract
7    terms?
8 A. Uh-huh.
9 Q. Do you know if any of these terms would have been
10    specific to Mr. Saad's contract or is this a form that
11    Exigent would use with all of its pool customers?
12 A. I'm not sure. I would have to review it.
13 Q. Go ahead.
14        MR. BASSEL: When you say review it, do you
15    mean review all the contracts or review this contract?
16        THE WITNESS: Probably all of them to see if
17    there's a difference.
18 BY MR. MILLER:
19 Q. Would these terms frequently be modified for different
20    customers?
21 A. You're referring to just below general contract terms?
22 Q. Right.
23 A. Sometimes. If a client or a client's attorneys that
24    reviewed the contract wanted different wordage, we
25    might make an adjustment.

1 Q. Okay. Who would be the person to approve or reject any
2    changes, would that have been you?
3 A. Yes.
4 Q. Are there any other contracts between Exigent and
5    Mohamed Saad or is this the only one?
6 A. Yes. There is a change order one that Mr. Saad agreed
7    upon and signed that I don't see included in this.
8 Q. Not with you necessarily today, but in your records
9    somewhere do you have a copy of that change order?
10 A. Yes.
11 Q. What was the scope of that change order?
12 A. If I remember correctly, it was free bubblers or
13    jumping jets, one of the two, and a different progress
14    payment structure. There may be a couple other things,
15    but I'd like to refer to that document for the rest.
16 Q. Do you know whether the total cost of the project was
17    altered by that change order?
18 A. I don't believe so.
19 Q. Okay. If you look at the first page of the contract --
20    first three pages describes the scope of work and
21    things that were to be installed at Mr. Saad's
22    residence; is that accurate?
23 A. Correct.
24 Q. Several of these items have prices associated with
25    them, do you see that? In fact, all of them do.

1 A. Correct.
2 Q. Who would have been the person to determine those
3    prices?
4 A. Me, working along side my finance guy Dan Olthof. Some
5    of which we'd be using a subcontractor that provided us
6    an estimate.
7 Q. So you would consult with your subcontractors to
8    determine how much a particular piece of work would --
9    how much that would cost, and incorporate that into
10    this contract?
11 A. On specific items, yes.
12 Q. Okay. Did you sub out all of its labor?
13 A. No.
14 Q. What did you do in-house?
15 A. In regards to -- it depended on the job, but we did a
16    lot of landscaping work in-house. We did a lot of the
17    fencing in-house. We did a lot of the -- a lot of the
18    work in-house.
19 Q. Did you have crews, were they like W-2 or 1099?
20 A. W-2, yes. We had crews.
21 Q. So your costs then were more readily ascertainable on
22    the in-house work versus the subcontractor work or did
23    it not make a difference.
24 A. What do you mean by that exactly? I'm sorry, I don't
25    understand that question.

1 Q. Were you getting quotes from subcontractors when you
2    were putting these bids together?
3 A. On some aspects of the project, yes.
4 Q. And others you were what, having conversations with
5    them and saying hey, I'm going to need this done can
6    you give me a ballpark estimate, is that what would
7    happened?
8 A. That's correct, or they would just shoot a price over
9    the phone and we worked together a lot, and so
10    whatever they -- you know, we worked together a lot, so
11    a verbal was adequate.
12 Q. So you didn't have written quotes --
13 A. No.
14 Q. -- from the subs before putting your bid together?
15 A. No.
16 Q. Turn to the third page. At the bottom there's a
17    schedule of progress payments. Do you see that?
18 A. Yes.
19 Q. I think you might have told me this already. But a
20    progress payment structure like this was typical of a
21    pool that Exigent would have sold?
22 A. I mean, every project was different in regards to the
23    progress payment structure.
24 Q. Fair enough. And I'm not saying was each job
25    structured exactly like this. But was the idea of

1    progress payments a common practice with Exigent?
2 **A.   Correct.**
3 Q.   Okay.  Did Mr. Saad make a down payment to Exigent?
4 **A.   Yes.**
5 Q.   $50,000?
6 **A.   I believe so.**
7 Q.   On July 1, 2022?
8 **A.   I don't recall the exact date.  However, should have**
9 **been within the week of signing or around that**
10 **ballpark.**
11 Q.   The contract has a date on the top of June 27, 2022.
12    So it would make sense then that the first down payment
13    would have come July 1, 2022?
14 **A.   Around that time, yeah, somewhere around there.**
15 Q.   Did Mr. Saad make progress payments?
16 **A.   He did.  Towards the end of the project we had some**
17 **issues with collecting down -- collecting progress**
18 **payments.**
19 Q.   He pay Exigent $100,000 in August of 2022?
20 **A.   I don't recall the exact date, but it sounds like he --**
21 **I do remember him paying 100,000.**
22 Q.   Did he pay another 100,000 in December of '22?
23 **A.   Same thing.  I don't recall the exact date, but I do**
24 **recall an additional 100,000 that was paid.**
25 Q.   Did he pay another 100,000 in May '23?

1 **A.   I'm not sure.**
2 Q.   What did Exigent do with the money Mr. Saad paid?
3 **A.   We used it for materials and labor.**
4 Q.   Was it deposited into Exigent's general fund?
5 **A.   Yes.**
6 Q.   Did Exigent have any other customers besides Mr. Saad
7    in June through December of '22?
8 **A.   Yes.**
9 Q.   Were those customers also making payments?
10 **A.   Yes.**
11 Q.   How did you ensure that the money that Mr. Saad paid
12    was allocated to his own project, or did you?
13 **A.   I mean, we purchased materials and labor for that**
14 **project specifically.  We wouldn't have used -- we did**
15 **not use the funds for anything besides that.**
16 Q.   How do you know that?
17 **A.   To the best of my ability, that's what I believe.**
18 Q.   What systems were in place to ensure that that was the
19    case, if there were any?
20 **A.   We didn't have a specific systems in regards to that.**
21          MR. BASSEL:  When you say systems, what do
22    you mean by systems in place and who was it that was --
23    I object to the form of the question.  I'm not sure
24    what you mean by the systems.
25 BY MR. MILLER:

1 Q.   What procedures did Exigent have, did Exigent employ to
2    ensure that a customer's, and Mr. Saad's in particular,
3    payments were a paid to their project?
4 **A.   I would be the one to utilize those funds and make sure**
5 **that those funds would be used for that project.  Or**
6 **the project manager, if he was purchasing the**
7 **materials, I would make certain that it was for that**
8 **project.  Same goes with labor.**
9 Q.   How were you able to tell if a job was profitable?
10 **A.   Daniel Olthof would be the guy to do that.  And he did**
11 **project profit and losses and he would keep track of**
12 **expenses.**
13 Q.   He did profit and losses for each individual project?
14 **A.   At a specific time period.**
15 Q.   Would he have done one for Mr. Saad's project?
16 **A.   Not a profit and loss, no.  I believe he left before**
17 **Mr. Saad's project or in the middle of**
18 **Mr. Saad's project.**
19 Q.   Was there any similar accounting being done after Dan
20    left?
21 **A.   Can you describe accounting, please.**
22 Q.   The project profit and loss or something similar to
23    profit and loss?
24 **A.   Yes, and it was turned over to the Chapter 11 trustee.**
25 Q.   Who would have done that, who would have prepared that

1    project profit and loss, if not Dan?
2 **A.   Who would have prepared it?**
3 Q.   Yes.
4 **A.   I'm not sure.  I'm not sure who did his.**
5 Q.   It was prepared, though?
6 **A.   Project profit and loss?**
7 Q.   Yes.
8 **A.   I'm not sure.**
9 Q.   If it was prepared, it would be in the hands of the
10    Chapter 7 trustee for Exigent?
11 **A.   Yes.  I don't believe it was a project and -- profit**
12 **and loss, excuse me.  It was more so a quick analysis**
13 **to show Mr. Saad we had enough funds to finish his**
14 **project.**
15 Q.   What do you mean by quick analysis?
16 **A.   Basically, an analysis at a certain period of time**
17 **inside the project where we presented Mr. Saad his**
18 **expenses that were left to finish his job and the**
19 **revenue that he owned -- he owed to Exigent to show him**
20 **that we were able to finish his project.**
21 Q.   This was something presented in writing?
22 **A.   Yeah.**
23 Q.   Would the Chapter 7 trustee for Exigent have possession
24    of that in writing?
25 **A.   I believe so, yeah.**

1 Q.   Okay.  I'll be interested to see that.
2         MR. PHILLIPS:  Tony, when you get a chance,
3 I'm floating over here.
4         MR. MILLER:  We can take --
5         MR. PHILLIPS:  Whenever.  I don't want to
6 interrupt your line of questioning.  But whenever you
7 got a good spot.
8         MR. MILLER:  Okay.  We can take a break.
9 Let's go off the record.
10        (A short recess was taken.)
11 BY MR. MILLER:
12 Q.   Mr. Heitmann, I'm returning your attention to Exhibit
13      1.  At the bottom of that front page, and I believe on
14      every page thereafter at the bottom there's a license
15      number.  Do you see that?
16 A.   Yes.
17 Q.   Are you familiar with that license number?
18 A.   Yes.
19 Q.   Whose license number is that?
20 A.   Business license for Exigent.
21 Q.   What do you mean business license?
22 A.   Business license registration with LARA, with Exigent.
23 Q.   Is that a builder's license number?
24 A.   No.
25 Q.   Did you ever represent to any customers that that was a

Page 39

1 builder's license number?
2 A.   No.
3 Q.   Do you think a reasonable customer looking at a
4      contract with someone in your line of work would assume
5      that that is a residential builder's license number?
6         MR. BASSEL:  Objection as to speculation.
7         MR. MILLER:  That's fine.  I'll withdraw.
8 BY MR. MILLER:
9 Q.   On Mr. Saad's project who was responsible for ensuring
10      that subcontractors were paid?
11 A.   Before or after a subcontractor performed work?
12 Q.   Would you pay subcontractors before they performed
13      work?
14 A.   No.  So after a subcontractor performed work, it would
15      be myself or Cory Maxwell.
16 Q.   Who's Cory Maxwell?
17 A.   The project manager on Mr. Saad's project.
18 Q.   Mr. Maxwell have authority to issue payments from
19      Exigent's bank account?
20 A.   No.
21 Q.   So how would he be responsible?
22 A.   Just the delivering of the check.
23 Q.   You would sign the check?
24 A.   Correct.
25 Q.   And hand it to Mr. Maxwell, and he'd drive it over to

Page 40

1      the subcontractor?
2 A.   Yes.  Or the subcontractor would come to the office.
3 Q.   Did Exigent pay all of its subcontractors that did work
4      on Mr. Saad's project?
5 A.   I believe so, except of one, the architect, with a
6      small fee that was owed to him, but that was going to
7      be paid out of the next draw that Mr. Saad owed.
8 Q.   Who was the architect?
9 A.   Gateway Engineering.
10 Q.   What was that small fee?
11 A.   I don't recall the exact amount.
12 Q.   $100 or $10,000, or somewhere in between there?
13 A.   I believe somewhere in between there.
14 Q.   Closer to 10,000 or closer to 100?
15        MR. BASSEL:  If you know.
16        THE WITNESS:  I don't recall the exact fee.
17 I believe it was on the document that we provided
18 Mr. Saad.
19 BY MR. MILLER:
20 Q.   Was it the architect's complete bill or was this a
21      final payment or partial payment?
22 A.   I believe it was a revision due to an increase in work
23      scope.
24 Q.   Was that fee more than $5,000?
25 A.   I don't recall the number.

Page 41

1 Q.   But they were never paid?
2 A.   The -- I believe they were paid partially, but not
3      fully, if I understand correctly.
4 Q.   Okay.  What about Dolphin Water Slides, were they a
5      subcontractor on the Saad project?
6 A.   No.
7 Q.   No?
8 A.   Sorry.  I would say vendor.
9 Q.   What's the difference between a vendor and a
10      subcontractor in your mind?
11 A.   Subcontractor would be somebody that performs work on a
12      job.
13 Q.   And a vendor would provide materials?
14 A.   Yes.
15 Q.   Okay.  Did Dolphin Water Slides provide materials on
16      the Saad project?
17 A.   Yes.
18 Q.   Did Exigent pay for those materials?
19 A.   Essentially, yes.
20 Q.   What does that mean?
21 A.   The homeowner elected to pay directly for that slide
22      and have it subtracted from progress payments due to
23      Exigent on his agreement.
24 Q.   Did Dolphin Water Slide request payment from Exigent?
25 A.   No.

1 Q.   Never on this project?
2 A.   No.  The homeowner elected to work with the vendor
3      directly and we allowed so.  He wanted to put it on a
4      credit card.
5 Q.   What about Messina Concrete, were they a subcontractor
6      or vendor on this job?
7 A.   Vendor, yes.
8 Q.   Did Exigent pay all amounts owed to Messina Concrete?
9 A.   The same position as the slide.  The homeowner elected
10     to use a credit card to pay for the concrete and
11     subtract from the next draw owed to Exigent.
12 Q.  Was that because Exigent was unable to pay itself the
13     amounts owed to Messina Concrete?
14 A.  No.  That's because there was a progress payment due to
15     Exigent and the homeowner wanted to use a credit card,
16     from what I recall.
17 Q.  In fact, wasn't Messina Concrete holding materials from
18     the job because Exigent had not paid the amounts owed
19     as required?
20 A.  No.
21 Q.  That's not true?
22 A.  Not true.
23 Q.  Did Exigent complete the Saad project?
24 A.  No.
25 Q.  Why not?

Page 43

1 A.   Because the homeowner breached the contract.
2 Q.   How so?
3 A.   He kicked us off the job.
4 Q.   Why?
5         MR. BASSEL:  Objection as to asking him for
6      speculation as to what was in the mind of a third
7      party.
8 BY MR. MILLER:
9 Q.   In your understanding.
10 A.  I don't know.  I'm not Saad.
11 Q.  Did you personally inspect the work that was done at
12     Mr. Saad's residence for this project?
13 A.  What work specifically?
14 Q.  Any of it.
15 A.  Yes.
16 Q.  What did you inspect?
17 A.  I had a project manager on-site inspecting the work
18     almost daily or by daily as work progressed, and I
19     would also inspect the work through certain portions of
20     the project.
21 Q.  You personally visited?
22 A.  Yes.
23 Q.  When?
24 A.  I don't recall the exact dates.  Throughout multiple
25     stage points I would visit the project as work

1      progressed.
2 Q.   Did you visit during certain checkpoints, when a
3      certain part of the project was complete you were going
4      to go there and inspect it and make sure it was done
5      properly, or was it more when you're your rounds you're
6      going to find time to stop by this customer's house?
7 A.   I would say more so when I was -- I would say in
8      between both, when I made my rounds or if there was a
9      big milestone where I felt I needed to see in person.
10 Q.  Did Mr. Saad ever communicate to you that the work that
11     was done by Exigent was unsatisfactory?
12 A.  Before he breached the contract, no.
13 Q.  Did Mr. Saad communicate to you that the work done by
14     Exigent was unsatisfactory?
15 A.  Before he --
16 Q.  Ever.
17 A.  Throughout the project, yes, and we addressed issues.
18 Q.  How did you address issues?
19 A.  Fix it.
20 Q.  What specific issues were addressed?
21 A.  I believe there was one point Mr. Saad wanted to move
22     the swimming pool back after we already started digging
23     and after we confirmed the location of the lazy river
24     on the site plan and on-site with the homeowner, and we
25     did that, we moved it back.

Page 45

1 Q.   Anything else?
2 A.   Me specifically, no.  He was in contact with my project
3      manager for the most part.
4 Q.   What other items did your project manager address or
5      fix?
6 A.   Not too much.  Mostly just hey, the guys are coming on
7      this date or we'll be back tomorrow type thing, I
8      remember.
9 Q.   When's the last time you visited Mr. Saad's home to
10     inspect the project?
11 A.  I don't recall the exact date.  But last year, I
12     believe right before he had us stop work over there.
13 Q.  Immediately before he had you stop work, you said?
14 A.  I'd say within a couple weeks.
15 Q.  You didn't go back again after to discuss with him or
16     try to see what could be done to salvage the deal?
17 A.  I offered to, but Mr. Saad wouldn't allow me to go back
18     on the property.
19 Q.  The last time that you did go to the property, did you
20     inspect the work that had been done?
21 A.  Yes.
22 Q.  And did you believe it had been done satisfactorily?
23 A.  Yes.
24 Q.  But you didn't have a residential builder's license at
25     that time, did you?

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1  A.  I did.

2  Q.  That would have been after May '23?

3  A.  I believe it was March '23.

4  Q.  Okay.

5  A.  When I had my license for it, yes.

6  Q.  Did Exigent use any of the funds that Saad paid for any

7      purpose other than paying labor and materials

8      associated with this project?

9  A.  Overhead specific to that project.

10 Q.  For instance --

11        MR. BASSEL:  Actually, I'm not sure if you

12     were answering his question.  His question was were any

13     monies paid -- actually, if you could restate the

14     question.  I'm not sure if he was answering --

15        MR. MILLER:  Can you read that question back,

16     please.  It's a pretty straightforward question.

17        THE WITNESS:  I can read it.

18            I'm not sure.  To my understanding, the funds

19        were used for that project.

20 BY MR. MILLER:

21 Q.  How do you know, or do you know?

22 A.  I don't know.

23 Q.  Was the 2 percent commission paid to the salesperson?

24 A.  I believe so.

25        MR. BASSEL:  Object to the form of the

1      question.  You're assuming that the 2 percent came from

2      the down payment as opposed from some other source.  I

3      don't think you laid a foundation for that or he

4      testified that that's where it came from.

5        MR. MILLER:  That's fine.

6        THE WITNESS:  And I don't know if it was 2

7      percent, because it wasn't me that sold the project, it

8      was another salesperson, and I don't recall what his

9      exact sales commission was.

10 BY MR. MILLER:

11 Q.  Did different salespeople have different commissions?

12 A.  Yes.

13 Q.  Were they set by contract?

14 A.  I don't think so.

15 Q.  How were they set?

16 A.  Verbally.

17 Q.  Did they change over time?

18 A.  Sometimes.

19 Q.  Did Mr. -- I was going to say Mr. Avery, but that's not

20     right.

21        Mr. Petri, did his commission change over

22     time?

23 A.  Yes.

24 Q.  How much was it on this project?

25 A.  I don't recall.

---

1  Q.  He was paid a commission for this project?

2  A.  I believe so.

3  Q.  Was that commission paid out of the down payment that

4      Mr. Saad made?

5  A.  I believe so.

6  Q.  I'm going to shift gears to your Chapter 13 case that's

7      currently pending and the schedules and documents you

8      filed along with that.

9            Have you filed all state and federal tax

10     returns required to be filed by today's date?

11 A.  I believe so.

12 Q.  Are you familiar with the statements and schedules

13     filed on your behalf in your Chapter 13 bankruptcy?

14 A.  Yes.

15 Q.  Did you review those statements and schedules before

16     you signed them?

17 A.  Yes.

18 Q.  And you found the information as amended, I know you

19     filed an amendment, to be completely truthful, accurate

20     and complete to the best of your knowledge?

21 A.  Yes.

22 Q.  Are there any errors, changes or omissions you'd like

23     to bring to my attention today?

24 A.  No.

25        MR. MILLER:  I'll have to you mark this,

1      please.

2            HEITMANN EXHIBIT 2

3            WAS MARKED BY THE REPORTER

4            FOR IDENTIFICATION.

5  BY MR. MILLER:

6  Q.  Mr. Heitmann, you've just been handed what's identified

7      as Exhibit 2 -- been marked, rather, as Exhibit 2 for

8      this examination.  Do you recognize that document?

9      It's lengthy, you can flip through it.

10 A.  It looks familiar, yes.

11 Q.  If I represented to you that this is the document filed

12     at Docket Number 20, filed on March 15, 2024 in your

13     Chapter 13 bankruptcy case, does that refresh your

14     recollection at all as to the nature and identification

15     of this document?

16 A.  Yes.

17 Q.  And in your own words can you tell me what this

18     document is?

19 A.  Under my understanding, it's a petition and schedules

20     for the bankruptcy.  I'm not entirely sure.  Bob

21     handled most of -- well, guided me through this.

22 Q.  Okay.

23 A.  We worked on it together.

24 Q.  You're close.  It's not the petition, but it does have

25     the schedules that you filed in your bankruptcy case or

1  Bob filed on your behalf.
2      Now, you just testified that the information
3  contained in these schedules is truthful, accurate and
4  complete, and you did sign these under oath.  Are you
5  aware of that?
6  **A.   Yes.**
7      MR. BASSEL:  I think you've amended them,
8  also, I think you had also stated.
9      MR. MILLER:  I did see an amended Schedule I
10  and J.  Were there other amendments I'm missing?  I
11  think that was the only one.
12     MR. BASSEL:  I can't remember the docket.  I
13  can't remember the docket.
14     MR. MILLER:  Fair enough.  And we'll get to
15  the amended schedules in a little bit.
16  BY MR. MILLER:
17  Q.   If you can turn to, and you can see the page numbers on
18  the bottom right, page 3 of 71.  There's a court stamp
19  on the bottom, that runs across the bottom, and those
20  are the pages I'll be referring to.
21  **A.   I'm sorry?**
22  Q.   It says page 3 of 71 down at the bottom.
23  **A.   Yeah, okay.**
24  Q.   Top of that page or near the top it says Schedule A, B:
25  Property.  You see that?

1  **A.   Yes.**
2  Q.   And on this schedule you listed all of your assets?
3  **A.   I believe we had an updated -- updated amendment.**
4  Q.   To the schedule of assets?
5  **A.   Yeah, I believe so.**
6  Q.   I don't recall seeing that.
7  **A.   Well, I guess --**
8  Q.   Do you know if there was an amended Schedule A, B?
9      MS. BASSEL:  I don't think there was an A, B.
10  I think it was probably I, J.  I was just checking to
11  see if there were any other.  But go on your with your
12  question.
13  BY MR. MILLER:
14  Q.   Take a look through them, please, and let me know if
15  there are any amendments you believe need to be made.
16     MR. BASSEL:  Actually --
17  **THE WITNESS:  Okay.  It goes all the way over**
18  **here.  Okay.  Yeah, I believe this is accurate.**
19  BY MR. MILLER:
20  Q.   Okay.
21     MR. BASSEL:  I think as we had also
22  stipulated, that Saad would have the ability to file a
23  proof of claim.  I'm not sure that Saad had been
24  listed, but I know that we had stipulated to allow them
25  to file the proof of claim.

1  BY MR. MILLER:
2  Q.   Okay.  I'm going to have you turn to page 10 of 71.
3  Let me know when you're there.
4  **A.   Yes.**
5  Q.   There's a number of paragraphs that run along the
6  left-hand side and there's paragraph 53 asks, do you
7  have other property of any kind you did not already
8  list.  And you responded, claims for affirmative relief
9  and offset in the various lawsuits filed and potential
10  tort claims against third parties.  And you gave that
11  asset an unknown value.
12     Can you explain to me what claims for
13  affirmative relief and offset in the various lawsuits
14  filed and potential tort claims against third parties
15  you believe you hold?
16  **A.   Possible counterclaims.**
17  Q.   Against whom?
18  **A.   Clients that breached their contract.**
19  Q.   Who?
20  **A.   Not certain at this time.**
21  Q.   What would the nature of those counterclaims be?
22  **A.   Not exactly sure at this time.**
23     MR. BASSEL:  He just testified to that.
24  BY MR. MILLER:
25  Q.   Would those be Exigent's claims or your claims?

1  **A.   I'm not exactly sure at this time.**
2  Q.   Are you working with anyone to determine what those
3  claims would be?
4  **A.   Not currently at this time.**
5  Q.   Do you intend to?
6  **A.   Not sure yet.**
7  Q.   Would you intend to do that during the life of a
8  confirmed Chapter 13 plan?
9  **A.   Not exactly sure yet.**
10  Q.   Would you contribute the proceeds of any claims to your
11  Chapter 13 plan?
12     MR. BASSEL:  I think you're asking for a
13  legal question.  I can probably answer it, but I think
14  you're asking him a legal question.  I'm not sure he
15  would have a basis to know the answer to it.
16  **THE WITNESS:  That's correct.**
17  BY MR. MILLER:
18  Q.   Do you intend to pay the proceeds from those claims to
19  your Chapter 13 trustee?
20  **A.   I'm not sure.  I'd defer to my attorney for that**
21  **question.**
22  Q.   I'm going to have you turn to page 16 of 71.  It says
23  at the top Schedule E, F, creditors who have unsecured
24  claims.  Do you see that?
25  **A.   Yes.**



Page 54

1 Q.   And this is a list of the priority and unsecured debts
2      that you owe to third parties.  And I know your
3      attorney already mentioned that Mr. Saad may not be
4      included on here, but you have agreed to permit him
5      time to file proof of claim.  But I'm going to ask you
6      some questions about the ones that are listed on here.
7      First being the Internal Revenue Service on the first
8      page.  Do you see that?
9 A.   Yes.
10 Q.  You listed that claim with an unknown amount.  Do you
11     see that?
12 A.  Yes.
13 Q.  Do you now know what that amount is?
14 A.  I believe so, but I don't recall the exact amount.
15 Q.  Okay.  You know the Internal Revenue Service filed a
16     proof of claim in the case asserting they are owed more
17     than $150,000.  Do you know that?
18        MR. BASSEL:  I think they originally filed
19     one for over 500,000, and Linda already indicated that
20     she was going to be amending hers.
21        MR. MILLER:  They amended it a couple of
22     times I think.
23 BY MR. MILLER:
24 Q.  You filed an amended 2021 tax return?
25 A.  I believe so.

Page 55

1 Q.   And that supposedly was going to reduce the liability
2      that you owed to the IRS down from that 155 or one
3      hundred and whatever it was that they claimed you owed?
4 A.   Uh-huh.
5 Q.   Yes?
6 A.   I believe so.
7 Q.   Has that '21 tax return been accepted by the IRS?
8 A.   I'm not sure.
9 Q.   When did you file it?
10 A.  Bob might know, if I can refer to him.
11        MR. BASSEL:  If you want, I can tell you the
12     status of it.
13        MR. MILLER:  Please.
14        MR. BASSEL:  It might be helpful.  So what
15     happened is we -- Linda Maret for IRS has been
16     assisting in being able to try to expedite that as much
17     as possible.  The amended 2021s were for something like
18     22 grand for off -- one second.
19        MR. MILLER:  We can't have other
20     communications --
21        MR. PHILLIPS:  He's asking for water.
22        MR. MILLER:  Just wait until he's done
23     speaking, and then we'll take a break if we need to.
24        THE WITNESS:  Okay.
25        MR. BASSEL:  The total amount I think for

Page 56

1      2021 was -- so for 2022 and 2023 monies were owed, 2
2      grand to Mr. Heitmann.  Ms. Maret had indicated that
3      they were going to offset the 2022 and the 2023 from
4      the amount owed on the 2021s.  My memory, and I can
5      look at it for the exact e-mail from her was about
6      $22,000 originally owed.  And then if you take the
7      credits, it's down to either $4,788, or something
8      similar.  So that $500,000 is now, should be around
9      $4,788.
10        MR. MILLER:  Okay.
11        MR. BASSEL:  But I can -- I'm glad to share
12     with Mr. Harrington and Mr. Miller a copy of the e-mail
13     correspondence with Mr. Dickinson and also Ms. Maret.
14 BY MR. MILLER:
15 Q.  Okay.  Did you hear the response your counsel just
16     gave?
17 A.  Yes.
18 Q.  Do you disagree with anything he said?
19 A.  No.
20 Q.  Do you adopt his response as your own?
21 A.  I mean, based on memory, yes.
22        MR. PHILLIPS:  Brandon, do you need water.
23        THE WITNESS:  Yes.
24        MR. MILLER:  I need some, too.  So we can go
25     off the record for a moment.

Page 57

1        (A short recess was taken.)
2 BY MR. BASSEL:
3 Q.   Turn the page to page 17.  At the top there's a listing
4      from the State of Michigan.  Do you see that?
5 A.   Yes.
6 Q.   It's listed with a $0 figure.  Why is that?
7 A.   To my understanding, when we filed this we weren't
8      exactly certain what the number was.
9 Q.   Do you owe any money to the State of Michigan?
10 A.  I believe so.
11 Q.  How much?
12 A.  I don't recall the exact number.
13 Q.  Is that something you could provide?
14        MR. BASSEL:  Yes.
15 BY MR. MILLER:
16 Q.  Turn to page 20 -- I'm sorry, page 18.  At the top
17     there's AG Gas Service also scheduled with a zero
18     value.  Do you owe AG Gas Service any money?
19 A.  Personally, no.
20 Q.  Does Exigent owe AG Gas Service money?
21 A.  Yes.
22 Q.  Do you have any personal liability or responsibility in
23     the event Exigent doesn't pay?
24 A.  No, not to my understanding.
25 Q.  The next one is Alex Boyd and Rebecca Boyd also with a



Page 58

1   zero, and it's marked as disputed. I'm going to pass
2   over them for now because I know Mr. Harrington will
3   have questions about that, but I will want to know how
4   much is owed to them.
5        The one below that is Amanda Pisarski.
6   That's your wife who's here today?
7 A.  Yes.
8 Q.  And it lists her with an unknown amount. And then the
9   notation at the bottom specifies that this was for
10  loans. Do you see that?
11 A.  Yes.
12 Q.  How much do you owe to Amanda?
13 A.  I don't recall the amount.
14 Q.  Did Amanda loan you personally money?
15 A.  I don't recall.
16 Q.  Turn to the next page. You see American Express listed
17  at $450,000, you see that?
18 A.  Yes.
19 Q.  That claim is marked as contingent and disputed. Do
20  you see that, those boxes are checked?
21 A.  Yes.
22 Q.  Due you dispute that you owe American Express that
23  amount?
24 A.  Not exactly sure.
25        MR. BASSEL: Object to the form of the

Page 59

1   question. It's calling for a legal conclusion.
2        MR. MILLER: No, it's not.
3 BY MR. MILLER:
4 Q.  Do you owe American Express $450,000 or not?
5 A.  I'm not sure.
6 Q.  Why not?
7 A.  I'm not sure.
8 Q.  Do you have a credit card with American Express?
9 A.  Exigent had a credit card with American Express, to my
10  understanding.
11 Q.  Are you personally responsible on that credit card?
12 A.  I'm not sure.
13 Q.  Does that credit card have a balance of approximately
14  $450,000?
15 A.  I believe so.
16 Q.  Do you disagree with those charges or that balance?
17        MR. BASSEL: I think his disagreement was
18  whether he had a personal obligation to it.
19        THE WITNESS: That's correct.
20        MR. MILLER: Well, he can testify to that.
21        THE WITNESS: I believe that I'm not certain
22  that that's a personal debt.
23 BY MR. MILLER:
24 Q.  Do you know why it's marked as contingent?
25 A.  I do not.

Page 60

1 Q.  Before you filed bankruptcy, but after Exigent filed
2   bankruptcy did American Express take any step to try to
3   collect from you on that $450,000 obligation?
4 A.  Can you say that one more time, please.
5 Q.  After Exigent filed bankruptcy, but before you
6   personally filed bankruptcy did American Express take
7   any action to collect that $450,000 from you
8   personally, did they send you any demand letters or do
9   anything else?
10 A.  No.
11 Q.  The next one down on the list American Leak Detection
12  scheduled with a $0 value. Why is that?
13 A.  Not sure of the amount that I owed them and if I
14  personally -- and I don't believe I personally owed
15  them money.
16 Q.  Is that a subcontractor of Exigent?
17 A.  Yes.
18 Q.  Were they paid for all work that they did on behalf of
19  Exigent's customers?
20 A.  I can't recall.
21 Q.  Would that be the same thing for Aqua Haul, the next
22  one on the list, were they also a vendor or
23  subcontractor of Exigent?
24 A.  Yes.
25 Q.  Was Aqua Haul paid all amounts owed to it for work they

Page 61

1   did on behalf of Exigent's customers?
2 A.  I believe there was an outstanding balance Exigent owed
3   for a service they rendered.
4 Q.  Okay. The next page, Arlington Masonry Supply, is this
5   a vendor of Exigent?
6 A.  Yes.
7 Q.  Was Arlington Masonry Supply paid in full for all
8   services or products it provided on behalf of Exigent's
9   customers?
10 A.  No.
11 Q.  How much is outstanding?
12 A.  I don't recall the exact amount.
13 Q.  The next one Auto Owners Insurance, is this related to
14  Exigent or is this you personally?
15 A.  Related to Exigent.
16 Q.  Is there an outstanding bill for insurance premiums?
17 A.  I believe so.
18 Q.  Are you personally responsible for that?
19 A.  I don't believe so.
20 Q.  Barajas, B-a-r-a-j-a-s, Enterprise, is that a
21  subcontractor of Exigent?
22 A.  Yes.
23 Q.  Are they paid in full for all services and work that
24  they did on behalf of Exigent's customers?
25 A.  I don't think so.

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

1  Q.   Next one is Blue Cross Blue Shield.  Is this a personal
2       obligation or is this another obligation related to
3       Exigent?
4  A.   **Exigent.  A lot of these on the -- on here are.**
5  Q.   Yeah, and we're going to go through all of them.
6            Why is Blue Cross Blue Shield owed money by
7       Exigent?
8  A.   **I'm not sure.**
9  Q.   Was it for employee health insurance?
10 A.   **I believe so.**
11 Q.   There's an unpaid bill?
12 A.   **Not exactly sure.  I believe so.**
13 Q.   Did Exigent pay or was it current with its unemployment
14      insurance taxes, the 941s -- I guess let's start with
15      unemployment.  Is it up-to-date with its unemployment
16      insurance taxes?
17 A.   **Yes.  To my understanding, yes.**
18 Q.   Is it up-to-date on its 941s?
19 A.   **The 941s, payroll tax?**
20 Q.   Yes.
21 A.   **Yes.**
22 Q.   Okay.
23 A.   **To my understanding, yes.**
24 Q.   Campo Disposal, is that a subcontractor or vendor or
25      Exigent?

1  A.   **Vendor.**
2  Q.   Was it paid in full for all work it did or supplies,
3       materials it provided on behalf of Exigent's customers?
4  A.   **I believe there is an outstanding bill.**
5  Q.   And the next one, Caterpillar Financial Services, this
6       one has an amount listed, $7,000?
7  A.   **Yes.**
8  Q.   Do you see that?
9  A.   **Yes.**
10 Q.   Why do you owe Caterpillar Financial Services $7,000?
11 A.   **I believe that was an equipment loan with Exigent.**
12 Q.   Do they have a lien or security interest against a
13      piece of equipment?
14 A.   **I'm not sure.**
15 Q.   Did you personally guarantee any obligations to
16      Caterpillar Financial Services?
17 A.   **I'm not exactly sure on that.**
18 Q.   Next page is Citi Bank listed with unknown.  Is that a
19      personal loan?
20 A.   **I don't recall what that one's for.**
21 Q.   Do you know how much you owe Citi Bank?
22 A.   **No.**
23 Q.   I'm going to jump down to Classic Pools.  Is this a
24      supplier or vendor of Exigent?
25 A.   **Yes.**

1  Q.   Was Classic Pools paid in full for all work or services
2       or goods, supplies, materials it provided on behalf of
3       Exigent's customers?
4  A.   **No.**
5  Q.   This one in particular is also marked as contingent,
6       unliquidated and disputed while several of the other
7       ones were not.  Do you know why that is?
8  A.   **No.**
9  Q.   Is there any particular dispute with Classic Pools or
10      claims you may have against Classic Pools?
11 A.   **Just a disputed amount.**
12 Q.   But you don't claim that they owe you any money?
13 A.   **Correct.**
14 Q.   Next page, Congil Truck Lines, same questions.  Is this
15      a contractor or vendor for Exigent?
16 A.   **Vendor.**
17 Q.   Were they paid in full?
18 A.   **I don't think so.**
19 Q.   Connelly Crane Rental Corp, is this related to Exigent?
20 A.   **Yes.**
21 Q.   What did they do for Exigent?
22 A.   **I believe a crane rental.**
23 Q.   And they weren't paid?
24 A.   **I don't think so.**
25 Q.   The next one's a little different, the Connexus Credit

1       Union.  You have an amount listed there of $151,852,
2       it's marked as disputed, and the type of claim
3       specified is a home improvement loan (unlikely
4       secured).  Why do you owe Connexus Credit Union, albeit
5       disputably, 151,852?
6  A.   **It was a personal loan.**
7  Q.   Why is it disputed?
8  A.   **I'm not sure.**
9            MR. MILLER:  Is that the secured status
10      that's disputed, Bob?
11           MR. BASSEL:  Yeah.  I mean, there's a real
12      issue as to whether it's proper -- that they have a
13      proper lien as to the real estate.  But regardless,
14      he's not able to keep the real estate, so I think it
15      ends up being a non-issue.
16           MR. MILLER:  The underline debt is not
17      disputed, though; is that correct?
18           MR. BASSEL:  I don't believe he had an issue
19      with the debt.  He certainly has an issue with whether
20      it was secured or not.
21 BY MR. MILLER:
22 Q.   Mr. Heitmann, did you hear your counsel's response?
23 A.   **Yes.**
24 Q.   Do you agree with it?
25 A.   **Yes.**

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1 Q.   Do you adopt it as your own statement?

2          **THE WITNESS: Can I reread that one more**

3 **time?**

4          MR. MILLER: Certainly.

5          **THE WITNESS: Correct.**

6 BY MR. MILLER:

7 Q.   Yes, you do?

8 **A.   Yes.**

9 Q.   The next page, at the top there's Dana Caran,

10    C-a-r-a-n, is this a homeowner or was this a supplier

11    or vendor of Exigent?

12 **A.   Homeowner.**

13 Q.   Was this somebody Exigent contracted with to do some

14    work at their home?

15 **A.   Correct.**

16 Q.   Was that work completed?

17 **A.   Yes.**

18 Q.   Does Exigent owe any money to Dana Caran?

19 **A.   I think Exigent might have.**

20 Q.   For what reason?

21 **A.   Warranty work.**

22 Q.   The next one, Mr. Carter, is also Mr. Harrington's

23    client, so I'll skip that one for the moment, let him

24    ask his own questions.

25          I'm going to turn to the next page.  ERC

1    Specialist, this one says it was for financial services

2    and has a $0 value.  What financial services did ERC

3    Specialist provide?

4 **A.   I believe -- I believe they applied -- they did an**

5 **employee retention credit.**

6 Q.   They did some tax work for Exigent?

7 **A.   Employee retention credit, not sure exactly what that**

8 **is, if that's classified under tax work or not.  But it**

9 **was for employee retention credit.**

10 Q.   During COVID?

11 **A.   I believe so, yeah.**

12 Q.   Okay.  And they were not paid for their work?

13 **A.   I don't think so.**

14 Q.   Are you personally responsible for that payment?

15 **A.   No, I don't think so.**

16 Q.   The next line, Everest Business Funding.  It's listed

17    with $200,000.  It says business loan and it's marked

18    as contingent, unliquidated and disputed.  Do you see

19    that?

20 **A.   Yes.**

21 Q.   Why is that marked as contingent, unliquidated and

22    disputed?

23 **A.   Not exactly sure.  That was kind of where my attorneys**

24 **guide me, got me to go with that.**

25 Q.   Did you personally guarantee that Everest loan?

1 **A.   I can't recall.**

2 Q.   The next line down you list Exigent landscaping, LLC in

3    an unknown amount.  Do you owe money to Exigent?

4 **A.   No.**

5 Q.   Top of the next page, Fantastic Pools, LLC.  Is that a

6    subcontractor of Exigent?

7 **A.   Yes.**

8 Q.   Were they paid for all the work they did on behalf of

9    Exigent or its customers?

10 **A.   I don't think so.**

11 Q.   Skip down to First Foundation Bank.  It's listed $0

12    amount and it says business loan.  Was this a business

13    loan for Exigent?

14 **A.   Yes.**

15 Q.   Did you personally guarantee it?

16 **A.   I'm not sure.**

17 Q.   How much is outstanding on that loan?

18 **A.   I'm not sure.**

19 Q.   What was the original loan amount?

20 **A.   I don't recall.  Should be on Exigent's schedules.**

21 Q.   You caused Exigent to file bankruptcy; is that right?

22          MR. BASSEL:  You mean did he sign the

23    petition?

24 BY MR. MILLER:

25 Q.   Yes.  You signed the petition for Exigent?

1 **A.   Yes.**

2 Q.   And you worked with Exigent's counsel to complete its

3    bankruptcy schedules?

4 **A.   Yes.**

5 Q.   Did any other person aside from you yourself and

6    Exigent's counsel assist in creating those schedules?

7 **A.   Employees of Exigent assisted with accumulating debts**

8 **and outstandings.**

9 Q.   Did you review all of the information on Exigent's

10    schedules?

11 **A.   Yes.**

12 Q.   Before they were filed?

13 **A.   Yes.**

14 Q.   Did you review all of the amendments to those schedules

15    that were subsequently made?

16 **A.   Yes.**

17 Q.   As it stands here today, to the best of your knowledge

18    are those schedules accurate as amended?

19 **A.   Yes.**

20 Q.   Back to this schedule.  Fleet Masters Equipment, on the

21    top of page 27.  Is that a vendor of Exigent?

22 **A.   Yes.**

23 Q.   Were they paid in full for all work they did on behalf

24    of Exigent or its customer?

25 **A.   I don't think so.**

1 Q.  Skipping down to Funbox Financing in an unknown amount.
2      What is that?
3 A.  **Financing for Exigent.**
4 Q.  Did you personally guarantee it?
5 A.  **I'm not certain. I'm not sure.**
6 Q.  What was the loan amount?
7 A.  **I don't recall.**
8 Q.  When was that borrowed?
9 A.  **I don't recall.**
10 Q.  How much are they owed now?
11 A.  **It should be on Exigent's schedules.**
12 Q.  Who's Gateway Engineering?
13 A.  **Exigent's engineer, former engineer.**
14 Q.  Is this the one we talked about that's still owed money
15      on the Saad project?
16 A.  **I believe so.**
17 Q.  Are they owed money on any other projects?
18 A.  **I'm not sure.**
19 Q.  Skipping down. What's Grace Transport?
20 A.  **Transportation company.**
21 Q.  Why do you owe Grace Transport money?
22 A.  **For transportation services, trucking.**
23 Q.  Related to Exigent?
24 A.  **Yes.**
25 Q.  Were they paid for all the work they did on behalf of

1      Exigent or its customer?
2 A.  **I believe Exigent owes them money.**
3 Q.  On the middle of the next page. Hecktor Orozco, is
4      that a homeowner or is that a contractor?
5 A.  **Contractor.**
6 Q.  Were they paid in full for all work they did on behalf
7      of Exigent or its customer?
8 A.  **I think Exigent owes them money.**
9 Q.  $450,000 balance, is that related to Exigent?
10 A.  **Yes.**
11 Q.  Did you personally guarantee that loan?
12 A.  **Not sure.**
13 Q.  Did you take any of that money personally?
14 A.  **I'm not sure. No.**
15 Q.  Those are two different answers.
16 A.  **No. It was for Exigent.**
17 Q.  The next page. Ivan Salem, is that a homeowner or
18      contractor?
19 A.  **Homeowner.**
20 Q.  Do you or Exigent owe Ivan Salem any money?
21 A.  **No.**
22 Q.  J&H Transportation Company, was that a supplier for
23      Exigent?
24 A.  **Yes.**
25 Q.  Was J&H Transportation Company paid in full for all

1      work they did on behalf of Exigent or its customer?
2 A.  **I believe Exigent owed them a balance.**
3 Q.  Which is how much?
4 A.  **I don't recall.**
5 Q.  Jay's Septic Service, was that personal or related to
6      Exigent?
7 A.  **Related to Exigent.**
8 Q.  Were they paid in full for work they did on behalf of
9      Exigent's customers?
10 A.  **I don't think so.**
11 Q.  Jeff English, it says it's for rent. Is that related
12      to a personal expense or is that rent for Exigent?
13 A.  **Exigent.**
14 Q.  Did you personally guarantee that lease?
15 A.  **I'm not sure.**
16 Q.  How were the lease terms, how much was the rent?
17 A.  **I don't recall exactly. To my knowledge, I think**
18      **around 2,500.**
19 Q.  Per month?
20 A.  **Yeah.**
21 Q.  Joe and Angela Hebeka, are they homeowners?
22 A.  **Yes.**
23 Q.  Was their project completed?
24 A.  **They breached the contract with Exigent.**
25 Q.  Was their project completed?

1 A.  **No, because they breached the contract with Exigent.**
2 Q.  Joe Regalado, was that a homeowner?
3 A.  **Yes.**
4 Q.  Was this project completed?
5 A.  **No, because he breached the contract with Exigent.**
6 Q.  John Benincasa, is he a homeowner contracted with
7      Exigent?
8 A.  **Yes.**
9 Q.  Was his project completed?
10 A.  **No, because he breached the contract with Exigent.**
11 Q.  The next line. Kabbage has a loan for $50,000. Do you
12      see that?
13 A.  **Yes.**
14 Q.  Is that money borrowed by Exigent?
15 A.  **Yes.**
16 Q.  Did you personally guarantee that loan?
17 A.  **Not sure.**
18 Q.  Did you take any of that money personally?
19 A.  **No.**
20 Q.  Kelsey Acho, is that a homeowner that contracted with
21      Exigent?
22 A.  **Yes.**
23 Q.  Is Kelsey Acho's project completed?
24 A.  **No, because she breached her contract with Exigent.**
25 Q.  Kirk, Huth, Lange & Badalamenti, they do legal work for

1    Exigent or you personally?

2  **A.   I believe Exigent.**

3  Q.   And were not paid?

4  **A.   I believe they had a balance with Exigent.**

5  Q.   Kristen Toma, is that a homeowner?

6  **A.   Yes.**

7  Q.   Was her project completed?

8  **A.   Yes.**

9  Q.   Why is she still on the schedules?

10  **A.   Possible warranty claims.**

11  Q.   Lafayette -- sorry, go ahead.

12  **A.   Yeah, she was with Exigent.**

13  Q.   Okay.  Lafayette Federal Credit Union, it's listed

14    $53,200, but it's listed as disputed.  Was this another

15    personal loan similar to the credit union one we

16    discussed before?

17  **A.   Yes.**

18  Q.   So is there a dispute regarding the amounts of that

19    debt or is it merely whether or not it attaches to the

20    real estate as a security interest?

21  **A.   I --**

22  Q.   Let me to ask you a simpler question.  Do you dispute

23    that you owe $53,200 to Lafayette Federal Credit Union?

24  **A.   No.**

25  Q.   Okay.  Lee Cameron, is that a homeowner that contracted

1    with Exigent?

2  **A.   Yes.**

3  Q.   Was that project completed?

4  **A.   Yes.**

5  Q.   Was this also for warranty work?

6  **A.   Yes.**

7  Q.   Malek Shamaya, is that a homeowner?

8  **A.   Yes.**

9  Q.   Contracted with Exigent, yes?

10  **A.   Yes.**

11  Q.   Was Malek Shamaya's project completed?

12  **A.   No.  He breached the contract with Exigent.**

13  Q.   Marc Piper, is that a homeowner that contracted with

14    Exigent?

15  **A.   Yes.**

16  Q.   Was that project completed?

17  **A.   Yes.**

18  Q.   Listed here for warranty work purposes?

19  **A.   Yes.  Possible warranty work completed, yeah.**

20  Q.   Marco, no last name, is listed for excavator services.

21    What's that?

22  **A.   Subcontractor, Exigent, owes money.**

23  Q.   Was not paid in full for all the work it did on behalf

24    of Exigent for its clients?

25  **A.   Correct.**

1  Q.   The top of the next page.  Matt Decoster, is that

2    another homeowner that contracted with Exigent?

3  **A.   Yes.**

4  Q.   Was that project completed?

5  **A.   Yes.**

6  Q.   Matt Martin, is that another homeowner?

7  **A.   Yes.**

8  Q.   Was that project completed?

9  **A.   No.  That client breached the contract with Exigent.**

10  Q.   Megan Madaus, was that another homeowner that

11    contracted with Exigent?

12  **A.   Yes.**

13  Q.   Was that project completed?

14  **A.   Yes.**

15  Q.   Nancy A-f-r, is that a homeowner?

16  **A.   Yes.**

17  Q.   Was Nancy's project completed?

18  **A.   No, she breached the contract with Exigent.**

19  Q.   Nick Pinozzi, is that a homeowner that contracted with

20    Exigent?

21  **A.   Yes.**

22  Q.   Was that project completed?

23  **A.   Yes.**

24  Q.   Oakland Fuels Services, is that related to Exigent?

25  **A.   Yes.**

1  Q.   Was it paid in full for its work or services it

2    provided on behalf of Exigent or its customers?

3  **A.   I believe there's a balance owed by Exigent.**

4  Q.   Peterson Brothers Company, was that another contractor

5    for Exigent?

6  **A.   Yes.**

7  Q.   Was it paid in full?

8  **A.   I believe they were owed a balance from Exigent.**

9  Q.   Quench Water, what's that?

10  **A.   Water, water dispenser thing inside the office.**

11  Q.   There's an outstanding balance there?

12  **A.   Yes.  That's an Exigent debt.**

13  Q.   Ratnesh Mehra, M-e-h-r-a, was that a homeowner?

14  **A.   Yes.**

15  Q.   Was that project completed?

16  **A.   Yes.**

17  Q.   Rock Bottom is a supplier?

18  **A.   Yes.**

19  Q.   Were they paid in full for the work that -- the product

20    they supplied on behalf of Exigent or its customer?

21  **A.   I believe Exigent owed them a balance, it's on filing.**

22  Q.   Who's Ron Heitmann?

23  **A.   My father.**

24  Q.   You owe him money?

25  **A.   I believe so.**

Page 78

1  Q.  How much?
2  A.  I'm not sure.
3  Q.  More than $10,000?
4  A.  I'm not sure of the amount right now.
5  Q.  Do you know if it's more or less than $10,000?
6          MR. BASSEL:  I think he answered the
7  question.
8          MR. MILLER:  He said he's not sure of the
9  amount.  I just want to know if it's more or less than
10  10,000.
11         MR. BASSEL:  I apologize.
12         THE WITNESS:  I'm not sure what the amount
13  is.
14  BY MR. MILLER:
15  Q.  Is there a promissory note?
16  A.  I'm not sure.
17  Q.  When's the last time your father loaned you any money?
18  A.  I don't recall him loaning me money.
19  Q.  Then why is he on your schedule listed with loans?
20  A.  Yeah, I don't know the exact amount that I owe him.
21  Q.  You just said you don't recall him loaning you money.
22  You do or you don't?
23  A.  I do recall him loaning me money, but I'm not certain
24  on the amount that I owe him at this time.
25  Q.  When was the last time he loaned you money?

Page 79

1  A.  I don't recall.
2  Q.  Are you tracking in any way how much he's been loaning
3  you?
4  A.  No.
5  Q.  Is it one loan or is it several small loans or not so
6  small loans?
7  A.  I don't remember.
8  Q.  Would he remember?
9          MR. BASSEL:  Objection as to asking a
10  question as to what is in someone else's mind.  I don't
11  think there's a basis for him to know that.
12         MR. MILLER:  I'll ask him.
13  BY MR. MILLER:
14  Q.  Is Ryan Kelly a homeowner that contracted with Exigent?
15  A.  Yes.
16  Q.  Was that project completed?
17  A.  Yes.
18  Q.  Safeco Insurance, was that personal or related to
19  Exigent?
20  A.  I don't remember.  I believe personal, but not
21  positive.
22  Q.  How much do you owe to Safeco?
23  A.  I don't know if I owe them money.
24  Q.  Bottom of page 41.  Simna Kumar, is that a homeowner
25  that contracted with Exigent?

Page 80

1  A.  Yes.
2  Q.  Was that project completed?
3  A.  Yes.
4  Q.  Site One Landscape Supply, was this a supplier for
5  Exigent?  I'm looking at the top of page 42.
6  A.  Yes.
7  Q.  Were they paid in full for the work they performed on
8  behalf of Exigent or its clients?
9  A.  No.
10  Q.  Stafford Landscaping was a subcontractor for Exigent?
11  A.  Yes.
12  Q.  They were not paid in full for the work they did on
13  behalf of Exigent or its clients?
14  A.  Correct.
15  Q.  The Hills of Lone Pine Association, is that your
16  homeowners association for your residence?
17  A.  No.
18  Q.  What is that?
19  A.  That was a contract we had with Exigent.
20  Q.  Okay.  Was it performed and completed?
21  A.  Yes.
22  Q.  The middle of page 43.  U.S. Small Business
23  association -- Administration, rather.  $500,000 that
24  was loaned on account of Exigent?
25  A.  Yes.

Page 81

1  Q.  Did you personally guarantee that loan?
2  A.  I'm not sure.
3  Q.  Was any of it repaid?
4  A.  I'm not sure.
5  Q.  Did you take any of the money personally?
6  A.  No.
7  Q.  Was that $500,000 deposited into Exigent's bank
8  account?
9  A.  Yes.
10  Q.  So presumably if we look at Exigent's bank statements
11  after, we could see where that money went?
12  A.  I believe so.
13  Q.  Would the Chapter 7 trustee for Exigent be in
14  possession of all those bank statements?
15  A.  Yes.
16  Q.  Unique Funding, is that a loan related to Exigent?
17  A.  Yes.
18  Q.  $85,000?
19  A.  Yes.
20  Q.  When was that borrowed?
21  A.  I don't recall.
22  Q.  Did you personally guarantee it?
23  A.  I don't know.
24  Q.  Did you use the money personally?
25  A.  No.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1  Q.   Top of the next page.  Upstart Loan applications, is
2       that an Exigent business loan?
3  A.   **I believe so.**
4  Q.   How much?
5  A.   **I don't remember the amount.**
6  Q.   Did you personally guarantee it?
7  A.   **I'm not sure.**
8  Q.   Did you use the money for any personal expenses?
9  A.   **No.**
10 Q.   US Bank, was that a personal loan or was that related
11      to Exigent?
12 A.   **I believe that's related to Exigent.**
13 Q.   When did you borrow that or did Exigent borrow that?
14 A.   **I don't remember exactly when.**
15 Q.   How much?
16 A.   **I don't remember the amount.**
17 Q.   Did you use the money for any personal expenses?
18 A.   **Not that I can recall.**
19 Q.   Valley Transport, Inc., was that a contractor for
20      Exigent?
21 A.   **Yes.**
22 Q.   Was it paid in full for the work it performed on behalf
23      of Exigent or its customer?
24 A.   **No.  They had -- we had Exigent had that with them.**
25 Q.   Western Equipment Finance, Inc., in the middle of page

1       45, listed as $77,273.91 as a business loan to Exigent
2       to finance equipment.  Have they been paid?
3  A.   **That was -- that was Exigent debt.**
4  Q.   That's still outstanding?
5  A.   **I believe that was for an equipment loan, and they got**
6       **the equipment from my understanding.**
7  Q.   They repossessed the equipment?
8  A.   **Yeah.**
9  Q.   When did that happen?
10 A.   **I don't recall.**
11 Q.   And this is --
12 A.   **2023.**
13 Q.   This is a deficiency balance then, the 77,000 is still
14      owed to them after they repossessed the equipment?
15 A.   **I don't know exactly where that 77 is from.**
16 Q.   Did you personally guarantee that?
17 A.   **I'm not sure.**
18 Q.   Do you know why that loan or that debt is marked as
19      contingent?
20 A.   **No.**
21 Q.   Wiegands Farm, the next one down, plant vendor, is that
22      a vendor for Exigent?
23 A.   **Yes.**
24 Q.   Were they paid in full for all of the material they
25      supplied on behalf of Exigent and its clients?

1  A.   **I believe there was a balance owed from Exigent.**
2  Q.   Next page.  Wings Financial Credit Union, it says a
3       loan with an unknown amount.  Was that a personal loan?
4  A.   **That's correct.**
5  Q.   How much?
6  A.   **I don't remember the exact amount.**
7  Q.   When did you borrow it?
8  A.   **2022 or 2023.**
9  Q.   You don't remember how much it was?
10 A.   **No.**
11 Q.   What did you do with the money?
12 A.   **Don't recall.**
13 Q.   Wright Engineering, is that a contractor for Exigent?
14 A.   **Yes.**
15 Q.   They're listed as disputed, why is that?  Do you have a
16      dispute with Wright Engineering?
17 A.   **I'm not sure why that's there.**
18 Q.   Were they paid in full for any work they performed on
19      behalf of Exigent or its customer?
20 A.   **I believe there's a balance with Exigent.**
21 Q.   I'm going to have you turn a little farther down, first
22      to page 50.
23 A.   **Okay.**
24 Q.   This is Schedule H, lists your codebtors.  Do you see
25      that?

1  A.   **Yes.**
2  Q.   And when I say codebtor, the way we colloquial use that
3       term in bankruptcy is that somebody else that is
4       also obligated on a debt that you scheduled in the
5       schedules we just went through.
6  A.   **Okay.**
7  Q.   Exigent Landscaping is understandably listed several
8       times throughout the next several pages here.  I want
9       to turn towards the back of this schedule to page 58 of
10      71.  The last three entries there are all Hank Bell.
11      Do you see that?
12 A.   **Yes.**
13 Q.   It says that he is also a codebtor as it concerns Lee
14      Cameron, Matt Decoster and Simna Kumar.  Why is that?
15 A.   **I was advised by my attorney to have them on the**
16      **schedules for Exigent.**
17 Q.   Can you say that again, I didn't understand what you
18      meant.
19 A.   **I was advised to have him on the schedules for Exigent**
20      **by my attorney.**
21 Q.   For Exigent, what do you mean for Exigent?
22 A.   **Oh, a lot of these that are listed on my schedules are**
23      **carryover from Exigent's Chapter 13 -- Chapter 11 plan.**
24 Q.   I don't understand that.  Is Hank Bell also obligated
25      to Lee Cameron, Matt Decoster and Simna Kumar?

1  A.  I'm not sure.
2  Q.  I'm not either.
3       I'm going to have you turn to page 64.  I'll
4  be looking at the bottom of 64 and top of 65.  Are you
5  there?
6  A.  **Top of page 64?**
7  Q.  I'll be looking at the bottom of 64 and top of 65.
8  A.  **Okay.**
9  Q.  Particularly question Number 4 that asks:  Did you have
10     any income from employment or operating a business
11     during this year or the previous two calendar years.
12         Do you see that?
13 A.  **Yes.**
14 Q.  And your response was that in 2024 year-to-date, as in
15     the date you filed this bankruptcy case, you had made
16     $1,538.47, that in all of 2023 you made $25,969.13, and
17     in all of 2022 you made $82,000 -- 82,692.44.  Are
18     those numbers correct?
19 A.  **I don't see the other figures you're referring to.  I**
20     **see the 1,538.47.**
21 Q.  It would be at the top of the next page, page 65.
22         MR. BASSEL:  I think you're mixed up.
23         **THE WITNESS:  I mixed them all up.**
24         MR. BASSEL:  No worries.
25         **THE WITNESS:  Yeah, those are the figures me**

1  and my bookkeeper came up with, that's correct.
2  BY MR. MILLER:
3  Q.  And that includes all of your W-2 income?
4  A.  **I believe so.**
5  Q.  That includes all of your draws?
6  A.  **I believe so.**
7  Q.  That includes all of your commissions?
8  A.  **I believe so.**
9  Q.  Is there any other source of income that you had in
10     2022, 2023, 2024 before you filed this case from any
11     source?
12 A.  **Yes.**
13 Q.  What was that?
14 A.  **Consulting.**
15 Q.  What kind of consulting?
16 A.  **Business consulting.**
17 Q.  Were you doing that on your own or through an
18     organization?
19 A.  **It was an arm of Exigent.**
20 Q.  This was separate compensation from your W-2 draws and
21     commissions?
22         MR. BASSEL:  Actually, I'm confused.  Was it
23     Exigent that was receiving consulting money or was it
24     you receiving consulting money?
25         **THE WITNESS:  Exigent account was receiving**

1  the consulting money.
2  BY MR. MILLER:
3  Q.  Okay.  Did you, Brandon Heitmann, have any other income
4  from any other source that's not reflected in these
5  figures on the bottom of page 64 and top of page 65 we
6  just discussed?
7  A.  **That's correct.**
8  Q.  Was Exigent using the consulting income -- what was
9  Exigent using the consulting income for?
10 A.  **It was an arm of Exigent.**
11 Q.  Was that money then being routed to you personally?
12 A.  **No.  It was routed to the Exigent account.**
13 Q.  And what did Exigent do with the money?
14 A.  **Used it.**
15 Q.  For what?
16 A.  **It depends on what money you're referring to.**
17 Q.  The consulting money.
18 A.  **It depends on what -- what service for the consulting.**
19     **If it was for -- if it was for an event, it was used**
20     **for an event to pay for event stuff for the consulting**
21     **event that was held.**
22 Q.  When was Exigent doing consulting work, during what
23     time periods?
24 A.  **To my understanding, 2020 to 2023.**
25 Q.  Were you the one doing the consulting?

1  A.  **Yes.**
2  Q.  How much revenue did Exigent generate 2020 through 2023
3  from consulting?
4  A.  **I don't recall the exact number.**
5  Q.  Was it comparable to its landscape revenue?
6  A.  **No.**
7  Q.  Less?
8  A.  **Yes.**
9  Q.  Substantially less?
10 A.  **Yes.**
11 Q.  During 2022, 2023 and up until this case was filed in
12     2024 was there any other source of household income, if
13     not attributed to you directly?
14 A.  **Can you specify what that might be.**
15 Q.  Did your wife have an income?
16 A.  **Yes, through Exigent.**
17 Q.  In 2022?
18 A.  **Yes.**
19 Q.  How much was she paid in 2022?
20 A.  **I don't recall the exact amount.**
21 Q.  Comparable to yours?
22 A.  **Comparable to which year?**
23 Q.  2022.
24 A.  **I would say she was paid a fair wage, comparable, close**
25     **to that figure.**

Page 90

1  Q.  What about --
2  A.  If I were to guess.
3  Q.  What about 2023?
4       MR. BASSEL:  Actually, he's asking if you
5  know.  He's not asking you to guess.  No disrespect.
6       THE WITNESS:  I don't know the exact number
7  she was making, no.
8  BY MR. MILLER:
9  Q.  And I'm not disputing that you're saying that she
10      wasn't paid fairly.  I just wanted to get an idea for
11      how much was coming into the household at the time.
12  A.  I got you.
13  Q.  In 2022 then you listed you made about 82,000.  Would
14      it be fair to assume that she also made about 82,000?
15  A.  If I can remember, I think she was making less than
16      that figure.
17  Q.  Okay.  What about 23, you said you made 25,969.  What
18      would she have brought in in 2023, close to that
19      figure?
20  A.  I think slightly more than that figure.
21  Q.  Okay.  You bought your house in 2022; is that right?
22  A.  2022, I believe so.
23  Q.  How much did you put down?
24  A.  I don't remember the exact number.
25  Q.  What was the purchase price?

Page 91

1  A.  I don't remember the exact figure.
2  Q.  Did you fill out a loan application?
3  A.  I believe so.
4  Q.  Would that loan application match the income you're
5      reporting on your statement of financial affairs?
6  A.  I'm not sure.
7  Q.  How much is the mortgage you were approved for?
8  A.  I don't recall the exact amount.
9  Q.  More than 700,000?
10  A.  I believe around there.
11  Q.  Did you accurately state your income on the loan
12      application?
13  A.  Yes.
14  Q.  When did you buy the Audi RS7, Fifth Third Bank's proof
15      of claim suggests that it was purchased in November of
16      2022.  Does that sound right?
17  A.  Sounds right.
18  Q.  You financed that vehicle with Fifth Third Bank?
19  A.  I believe so.
20  Q.  You borrowed $78,000?
21  A.  I don't think so.  I traded in another vehicle for
22      that.
23  Q.  Your schedules say that you currently owe 72,500 to
24      Fifth Third Bank on account of the Audi.  You borrowed
25      north of 70, would that be fair to say?

Page 92

1  A.  I'm not sure.  I traded in a vehicle for that vehicle.
2      So I --
3  Q.  Is there any reason the balance reported on your
4      schedules would be more than the amount you borrowed
5      when you purchased the vehicle?
6       MR. BASSEL:  I think he testified he didn't
7  know what the number was.  I'm not sure how he would be
8  able to answer that question.
9       MR. MILLER:  This is a different question.
10      THE WITNESS:  I can't remember the exact
11      details of it.  I traded in another vehicle for that
12      vehicle.
13  BY MR. MILLER:
14  Q.  What vehicle did you trade in?
15  A.  It was a Urus, I believe 2021, Lamborghini Urus.
16  Q.  Did you fill out a loan application when you got the
17      Audi?
18  A.  I can't remember.
19  Q.  If you did, would your income reported on the loan
20      application line up with the income you're reporting in
21      this case?
22  A.  I believe so.
23       MR. BASSEL:  Obviously if you can't take a
24  break now, that's fine.  But I've got a lot of
25  caffeine, if we can maybe take a five-minute break,

Page 93

1  that would be good, unless you're close to the end.
2       MR. MILLER:  I'm close to wrapping up.
3       MR. BASSEL:  Okay.  I'll hold.
4       MR. MILLER:  If you can give me 15 minutes?
5       MR. BASSEL:  For you, always.
6       MR. MILLER:  Appreciate that.  And for that,
7  I'll ask a question about Bob.
8  BY MR. MILLER:
9  Q.  If you can turn to page 68.  Question 16 asks:  Within
10      one year before you filed for bankruptcy did you or
11      anyone else acting on your behalf pay or transfer any
12      property to anyone you consulted about seeking
13      bankruptcy or preparing the bankruptcy petition.
14       You listed a $15,000 retainer paid to
15      Mr. Bassel in three installments, January and February
16      2023.  I assume that means '24, but maybe it's '23.
17       MR. BASSEL:  Bad typing probably on the
18      drafts person.
19       MR. MILLER:  Should that be 2024?
20       MR. BASSEL:  Yes.
21       MR. MILLER:  Okay.
22       MR. BASSEL:  Actually, yeah, it should be.
23  BY MR. MILLER:
24  Q.  Who made those installment payments totaling $15,000?
25  A.  I believe a family member did.

Page 94

1  Q.  Who?
2  A.  **I believe Ron.**
3  Q.  Your father?
4  A.  **Yeah.**
5  Q.  All 15,000?
6  A.  **I believe so.**
7  Q.  Okay.  Are you expected to repay Ron that 15,000?
8  A.  **I'm not sure.**
9  Q.  I'm going to move on to my last exhibit.  I don't have
10    much here.
11           HEITMANN EXHIBIT 3
12           WAS MARKED BY THE REPORTER
13           FOR IDENTIFICATION.
14  BY MR. MILLER:
15  Q.  You've been handed what's been marked as Exhibit 3 to
16    this examination.  Do you recognize that document?
17  A.  **What page is that?**
18  Q.  Just looking at the document as a whole.  Flip through
19    it, do you recognize this document, Exhibit 3?
20         MR. BASSEL:  There's a date on the bottom
21    right there.
22         **THE WITNESS:  Is this the amended or the old?**
23         MR. BASSEL:  If I were to answer -- well,
24    that is the most recent filed.
25         MR. MILLER:  Okay.

Page 95

1         **THE WITNESS:  Okay.  Yeah, I'm familiar with**
2    **this.**
3  BY MR. MILLER:
4  Q.  For the record, this is the cover sheet for amendments,
5    and then the amended Schedules I and J that Mr. Bassel
6    filed on your behalf in your bankruptcy case.  You're
7    familiar with these documents?
8  A.  **Yes.**
9  Q.  And familiar with the information contained on them?
10  A.  **Yes.**
11  Q.  Are they accurate and complete?
12  A.  **To my understanding, yes.**
13  Q.  Okay.  On page 3 item 1 states that both you and your
14    wife are employed by Resilient Outdoor Living as
15    contractors, is that correct, it's correct that it
16    states that?
17  A.  **What page, I'm sorry?**
18  Q.  Page 3.  Again, going on the court stamped page numbers
19    at the bottom.
20  A.  **Yes.**
21  Q.  Who owns Resilient Outdoor Living?
22  A.  **Amanda.**
23  Q.  How are you paid?
24  A.  **W-2.**
25  Q.  You get a check every week, every two weeks, every

Page 96

1    month, what?
2  A.  **Just about every week.**
3  Q.  Are you hourly or salary?
4  A.  **Salary.**
5  Q.  You have taxes and insurance withheld?
6  A.  **Taxes, yes.**
7  Q.  What's your salary?
8  A.  **I believe it's on here, if I remember correctly.**
9         **THE WITNESS:  Right.  Is that this number**
10    **right here?**
11         MR. BASSEL:  Actually, he's asking if you
12    know.  You may not.  If you know, you know.  If you
13    don't, you don't.
14         **THE WITNESS:  I don't recall the amount.  Not**
15    **much, I know that.**
16  BY MR. MILLER:
17  Q.  What type of work does Resilient Outdoor Living do?
18  A.  **Landscaping work.**
19  Q.  What kind of work do you do for Resilient Outdoor
20    Living?
21  A.  **Project management.**
22  Q.  Is it a similar line of work as Exigent?
23  A.  **I wouldn't say that.**
24  Q.  What's different?
25  A.  **I'm not the owner.**

Page 97

1  Q.  Fine.  Does it do the same kind of work, though?
2  A.  **Landscaping work.**
3         MR. BASSEL:  Was your question does he do the
4    same work or does Resilient do the same work?
5  BY MR. MILLER:
6  Q.  Does Resilient do the same work as Exigent?
7  A.  **Similar.**
8  Q.  How many employees does Resilient have?
9  A.  **Six.**
10  Q.  Including you and your wife?
11  A.  **Yes.**
12  Q.  Were any of those employees, aside from you and your
13    wife, also employees of Exigent?
14  A.  **You'd have to ask the business owner that.**
15  Q.  Do you know who the other employees of Resilient are?
16  A.  **Yeah.  I've worked with them in the past.**
17  Q.  Do you know who the employees of Exigent were?
18  A.  **Yeah.  They worked for Exigent.**
19  Q.  These people that are now working for Resilient.
20    Previously worked for Exigent?
21  A.  **Correct.**
22  Q.  Okay.  Are you paid through a payroll company?
23  A.  **I believe so.**
24  Q.  Okay.  Turn to page 5.  Question 2 asked if you have
25    any dependents.  Do you see that?

1 A.  Yes.

2 Q.  You list your wife as a dependant.  You see that?

3 A.  Yes.

4 Q.  As a business owner, I don't know if she qualifies as a
5      dependant.  But why did you list her as a dependant?

6 A.  Because I was advised by my attorney to do so.

7 Q.  You list no housing expenses.  Is that accurate?

8 A.  Where are you referring to?

9 Q.  Question 4, rental or homeownership expenses of your
10     residence.  You list zero.

11 A.  I believe this is -- this is the amended plan and --

12         MR. BASSEL:  Actually, that's -- well, your

13     question -- his question to you was you listed zero for

14     line item --

15         MR. MILLER:  4.

16         MR. BASSEL:  Number 4.

17 BY MR. MILLER:

18 Q.  Zero rental or homeownership expense right now.  Is
19     that an accurate statement?

20 A.  I believe so, yeah.

21 Q.  Is that because you're not currently paying the
22     mortgage?

23 A.  Correct.

24 Q.  I believe your counsel indicated earlier that you're on
25     the verge of stipulating with the mortgage lender for

1      relief from stay.  Presumably they'll be foreclosing or
2      you'll be surrounding the residence following that.

3          What do you plan to do following foreclosure
4      or surrender of the property?

5 A.  I have no idea yet.

6 Q.  If you turn to the next page, page 6, Number 12.
7      Transportation:  Include gas, maintenance, bus or train
8      fare, but not car payments.  You listed zero.  You
9      don't have any transportation expenses?

10         MR. BASSEL:  What line item, 12?

11         MR. MILLER:  Right.

12         MR. BASSEL:  Okay.

13         THE WITNESS:  No.

14 BY MR. MILLER:

15 Q.  You don't put gas in the car?

16 A.  No.  Resilient pays for my gas.  I use a company
17     vehicle.

18 Q.  What company vehicle are you using?

19 A.  GMC.  I believe it's a GMC 2500.

20 Q.  It's titled to Resilient?

21 A.  It's titled to -- no, it's titled to Brandon.  I
22     believe it's titled to Brandon, and Amanda cosigned it.

23 Q.  Why do you say it's a company vehicle?

24 A.  Because we use it every day for work for the company.

25 Q.  Is it also your personal vehicle?

1 A.  You could say so.

2 Q.  Would you say so?

3 A.  Could say so.

4 Q.  Would you say so?

5          MR. BASSEL:  Actually, I apologize.  So your
6      question to Mr. Heitmann was do you also -- I assume do
7      you also use the vehicle for nonbusiness purposes?

8          THE WITNESS:  Occasionally.  But mostly it's
9      a business vehicle.

10 BY MR. MILLER:

11 Q.  Do you have a personal vehicle in addition to this
12     vehicle --

13 A.  No, I'm sorry.  I'm sorry.  That vehicle is used for
14     the business.  The pickup truck is used for the
15     business.

16 Q.  Do you have a personal vehicle in addition to that
17     business vehicle?

18 A.  Just the Audi, which has been sitting in my garage for
19     the past year that I haven't driven.

20 Q.  Anything else?

21 A.  Nope.

22 Q.  So you have a vehicle you use just for business and
23     that's it?

24 A.  That's correct.

25 Q.  How do you get to the grocery store?

1 A.  Amanda drives.

2 Q.  What does she drive?

3 A.  Her car.

4 Q.  Which is what?

5 A.  You have to ask her that.

6 Q.  You don't know what she drives?

7 A.  She drives a Mercedes.

8 Q.  What year?

9 A.  I believe a 2020.

10 Q.  What model?

11 A.  Don't know the model.

12 Q.  Someone put gas in it?

13 A.  She does.

14 Q.  Why isn't that expense reflected on your schedules?

15 A.  Not certain.

16 Q.  You currently paying $250 a month for your wife's
17     credit card payments?

18 A.  No.

19 Q.  Why is that on your schedules in answer to question 21,
20     $50 for American Express and $200 for wife's other
21     credit card payments?

22 A.  I believe that's on there because that's hers.

23         MR. BASSEL:  I'm not sure if he understands
24     that these are household expenses.  I think the
25     question was is that a household expense that's being

1    paid.
2  BY MR. MILLER:
3  Q.   I'll back up.  Do you understand that these Schedules I
4       and J reflect your combined household monthly income
5       and expenses?
6  A.   Correct.
7  Q.   Yes, you understand that?
8  A.   At the time we filed this, that's correct, yeah.
9  Q.   Okay.  So there's a fuel expense associated with your
10      wife's car, or should be, right?
11 A.   (No response.)
12 Q.   I'll move on.  Number 21, if you look at wife's
13      vehicle.  What does this mean, wife pays 40 percent
14      vehicle, payment based on use?
15 A.   I believe what that means is she pays 40 percent of the
16      vehicle that she is driving based on the use.
17 Q.   Who pays the other 60 percent?
18 A.   The company -- her company.
19 Q.   So this 651 -- 651.64 that's listed there would be 40
20      percent of the total car payment?
21 A.   I believe so.
22 Q.   And that would be for the Mercedes?
23 A.   I believe so.
24          MR. MILLER:  Okay.  I'm done for now.
25          MR. BASSEL:  Restroom.

1          (A short recess was taken.)
2          MR. HARRINGTON:  Mr. Heitmann, my name is
3  John Harrington, I'm an attorney.  I think you probably
4  had some interaction with me before at the prior
5  hearings.  I represent Alex and Rebecca Boyd and Daniel
6  Carter.  Just like Mr. Miller, I'm going to ask you a
7  series of questions, and like you've been doing, you
8  know, you're doing a good job, give verbal responses.
9  A couple times you said uh-huh and things like that,
10 but you kind of corrected yourself.  But please give us
11 a verbal response if you completely understood the
12 question and things of that nature.
13         THE WITNESS:  Okay.
14         MR. HARRINGTON:  And like I said, Mr. Miller
15 asked you a lot of questions I would have asked, so
16 I'll just follow-up on some of these issues.
17 EXAMINATION BY MR. HARRINGTON:
18 Q.   You're aware of an administrative complaint that was
19      issued against you by the Michigan attorney general?
20 A.   Yes.
21 Q.   And that concerns your residential builder's license?
22 A.   I believe so.
23 Q.   What is the status of that administrative complaint?
24 A.   I'm not sure.  My attorneys handle -- my attorney
25      handled that.

1  Q.   Okay.  Who is your attorney on that?
2  A.   I believe Tyler Phillips.
3  Q.   So it's your wife's attorney today, or he represents
4       your wife in this matter.
5            Your wife's a creditor?
6  A.   That's correct.
7  Q.   Okay.  Besides Mr. Phillips, anybody else represent you
8       on the administrative complaint?
9  A.   No.
10 Q.   Okay.
11          MR. PHILLIPS:  John, just so you know, one of
12 my associates Yousef Farraj was involved in the matter.
13          MR. HARRINGTON:  Okay.
14          THE WITNESS:  Yes.
15 BY MR. HARRINGTON:
16 Q.   In other words, at the 341 hearing back in June we
17      asked, and you were going to supply some documents
18      related to that.  We never did get them before today.
19          Did you -- do you have any -- are you in
20      possession of any documents related to the
21      administrative complaint?
22 A.   I don't have any documents.  My attorney might.
23 Q.   Okay.  Do you know -- I understand -- well, you
24      understand what the nature of the administrative
25      complaint was about, what the attorney general is

1  seeking to accomplish in that complaint?
2  A.   Briefly.
3  Q.   What is your understanding?
4  A.   That there was a complaint about the possible licensing
5       issue that they're alleging.
6  Q.   Okay.  And in particular, was it that you were
7       performing residential construction work and you did
8       not have a license at that time?
9  A.   I believe that's what the complaints about.
10 Q.   Okay.
11          MR. BASSEL:  Actually, I think he's asking if
12 you know.  And I'm not trying to parse words.  He's
13 asking what you know, and I'm not sure if you're
14 answering his question or not.
15          MR. HARRINGTON:  It sounded like to me like
16 he answered it and that he understood it.
17          THE WITNESS:  Yeah.
18 BY MR. HARRINGTON:
19 Q.   Are you aware of -- are you aware of any -- let me turn
20      this off for a second.
21          Are you aware of another complaint that's
22      been brought against Exigent Landscaping?
23 A.   No.
24 Q.   You're not.  I mean the administrative complaint,
25      you're not aware of that?

1 A.   No.
2 Q.   Do you know if Mr. Phillip is representing some
3    affiliated business of yours in the administrative
4    arena?
5 A.   **I'm sorry, can you repeat that.**
6 Q.   I'll try to rephrase it.
7         Are you aware if Mr. Phillips or anybody else
8    representing you or any affiliated business of yours
9    such as Exigent in the administrative proceeding?
10 A.   **I can't remember if Exigent was on that complaint or**
11   **not in regards to the attorney general.  My attorney**
12   **has been handling that matter.**
13 Q.   Mr. Phillips?
14 A.   **That's correct.**
15 Q.   And his office?
16 A.   **That's correct.**
17 Q.   What about Henry Bell or his business, Construction
18   Contractors, are you aware of there being any
19   administrative action brought against him?
20 A.   **No.**
21 Q.   Has he consulted you at all about those administrative
22   actions, assuming there is one?
23 A.   **No.**
24 Q.   When is the last time you spoke to Henry Bell?
25 A.   **I don't recall.  I think around 2023.**

1 Q.   Do you recall when in 2023?
2 A.   **Beginning, middle, spring of 2023.**
3 Q.   So over a year ago?
4 A.   **About spring, summertime of 2023, I would say.**
5 Q.   Okay.
6 A.   **From what I remember.**
7 Q.   And did you talk about these proceedings, I mean the
8    lawsuits brought against you and against Exigent and
9    against him personally --
10 A.   **No.**
11 Q.   -- and his business?
12        Is he any relation to you, Mr. Bell, that is?
13 A.   **Can you describe relation.**
14 Q.   Is he some sort of family relationship to you, foamily
15   relationship?
16 A.   **I looked at Hank as a mentor and friend.**
17 Q.   Okay.  How old is Mr. Bell, approximately, do you know?
18 A.   **50, 60, if I were to guess.  I don't know his exact**
19   **age.**
20 Q.   Maybe even older, 70?
21 A.   **Possibly.**
22 Q.   Okay.  How is it you became a friend or mentor of
23   somebody who's almost twice your age, or more than
24   twice your age?
25 A.   **I was great friends with his son.**

1 Q.   His son was your age, approximately?
2 A.   **Yes.**
3 Q.   Okay.  But he's not an uncle or cousin or Godparent or
4    anything like that to you?
5 A.   **No.**
6 Q.   All right.  What's the name of his son who's a -- that
7    you were good friends with?
8 A.   **Cale.**
9 Q.   Cale Bell?
10 A.   **That's correct.**
11 Q.   Going back to the administrative complaint that's been
12   brought against you, are you aware of there being a
13   proposed consent or stipulation regarding that
14   complaint?
15 A.   **No.**
16 Q.   Are you aware that there was a hearing or meeting
17   scheduled with LARA for a week ago from today on that
18   issue?
19 A.   **No.**
20 Q.   So as you sit here today, you're not aware of any -- of
21   the current status of the administrative complaint
22   brought against you by the attorney general?
23 A.   **That's correct.**
24 Q.   And is your residential builder's license still valid
25   as of today?

1 A.   **Yes.**
2 Q.   Do you use your residential builder's license at all in
3    your role with Resilient Outdoor Living?
4 A.   **Not currently.**
5 Q.   You talked a bit about Exigent with Mr. Miller's
6    questions.
7         You had entered into a contract with some of
8    customers, and as we talked about with one of them with
9    Mr. Saad where you signed the agreement and the
10   salesperson also signed the agreement.  How long had
11   Exigent had that practice or procedure where both the
12   sales person and as you as the "owner" would sign the
13   contract with the customer?
14 A.   **I don't remember the exact time period.  Maybe between**
15   **2022 and 2023, if I were to guess.**
16 Q.   At some point in time it wasn't both signatures, it was
17   just a signature of either yourself or the salesperson
18   on the contracts with the customers; is that correct?
19 A.   **I don't remember.**
20 Q.   Okay.  Well, let's go back to administrative complaint
21   issue.  Hypothetically if the State of Michigan were
22   successful in revoking or somehow canceling your
23   residential builder's license, do you think that would
24   have an impact on your ability to follow through on the
25   Chapter 13 plan?

1  A.   No.
2  Q.   Why is that?
3  A.   Because I think I can stay busy with work with or
4        without my license.
5  Q.   Okay.  And Mr. Miller may have asked you this question,
6        and if he did I apologize for asking it again.  But is
7        there anybody affiliated with Resilient Outdoor Living
8        that has a residential builder's license that you're
9        aware of?
10            MR. PHILLIPS:  Objection.  Other than
11       Mr. Heitmann?
12 BY MR. HARRINGTON:
13 Q.   Yes.  I'm sorry, yes.
14 A.   Other than me at this time, no.
15 Q.   Okay.  And Resilient Outdoor Living doesn't have a
16       residential builder's license either, correct?
17 A.   I'm the qualified officer for that company.
18 Q.   Does it have a license in its own name as the business?
19 A.   Yes.
20 Q.   When did it obtain that license?
21 A.   I don't recall the exact day.  I don't remember.  A
22       couple months ago, month ago, somewhere around there.
23 Q.   The business has only been in existence since the
24       beginning of 2024?
25 A.   That's correct.

1  Q.   And the license was obtained with you as a qualifying
2        officer or licensee, correct?
3  A.   Correct.
4             MR. HARRINGTON:  Let's mark this.
5             HEITMANN EXHIBITS 4 and 5
6             WERE MARKED BY THE REPORTER
7             FOR IDENTIFICATION.
8             (A short recess was taken.)
9  BY MR. HARRINGTON:
10 Q.   Sir, I'm showing you what we marked as Exhibit 4, and
11       let us know if you recognize that?
12 A.   Yes.
13 Q.   Okay.  And you do recognize it.  Can you please tell us
14       what it is?
15 A.   This is a contract between Exigent and Dan Carter.
16 Q.   All right.  And that's for installation of an in-ground
17       pool in his home in Macomb Township?
18 A.   Yes.  Swimming pool, concrete, and some other work,
19       that's correct.
20 Q.   Turn to the last page.  Is there a signature line on
21       the last page?
22 A.   Yes.
23 Q.   Okay.  And it contains your signature on behalf of
24       Exigent?
25 A.   That's correct.

1  Q.   All right.  And this is a contract that Exigent had
2        prepared and submitted to its customer, correct,
3        similar to the contract we have with Mr. Saad that we
4        looked at earlier?
5  A.   Yes.  I would say similar.  Little different because of
6        the time period as far as the general contract terms
7        and whatnot.
8  Q.   Okay.  I'm going to show you what we marked as Exhibit
9        5.
10            MR. HARRINGTON:  Just so everyone knows,
11       that's the void contract.
12 BY MR. HARRINGTON:
13 Q.   Do you recognize -- after your attorney looks at it,
14       can you tell me if you recognize that and if you can us
15       what it is?
16 A.   Yes.
17 Q.   What is it?
18 A.   A contract between Exigent and Alex Boyd.
19 Q.   Okay.  Who signed that agreement on behalf of Exigent?
20 A.   Kody Grandchamp.
21 Q.   You mentioned him earlier.  He was one of the salesmen
22       for Exigent?
23 A.   Salesman and project manager, and at one point
24       operations manager for Exigent.
25 Q.   Okay.  He had authority to sign that contract on behalf

1        of Exigent?
2  A.   That's correct.
3  Q.   Is he one of the individuals who now works for
4        Resilient Outdoor Living?
5  A.   No.
6  Q.   And other than perhaps a few minor particulars, the two
7        contracts between the Boyds and Carters are very
8        similar in many respects, correct?
9  A.   Correct.
10 Q.   In fact, the pool is the same, an Imagine Pool?
11 A.   Yes, that's correct.
12 Q.   And in fact, I think they're both the same price,
13       $130,000; is that correct?
14 A.   It looks like there's different prices on here.
15 Q.   Okay.
16 A.   But similar, close.
17 Q.   All right.  And in terms of Kody Grandchamp, you were
18       his supervisor or boss, for lack of a better word?
19 A.   I was the -- yeah, I was the owner of the company and
20       he worked under me.
21 Q.   Okay.  And I know Mr. Miller asked you questions about
22       it.  But both contracts have at the bottom a license
23       number, correct?
24 A.   Correct.
25 Q.   And that's on every page of the agreements, correct?



1 A.   Correct.
2 Q.   And you told us earlier that that was the business
3      license?
4 A.   Correct.
5 Q.   Why would Exigent have its business license on these
6      contracts?
7 A.   To show that the business was registered with LARA.
8 Q.   Registered as what, as a limited liability company or
9      something else?
10 A.   As a valid business.
11 Q.   Okay.  But you can't tell us what kind of a business, a
12     corporation, an LLC, anything like that?
13 A.   I believe it was an LLC at this time.
14 Q.   Okay.  Is it -- are you, because you're a licensed
15     residential builder I assume you know this, are you
16     aware whether a contract between a business such as
17     Exigent and a consumer customer must have a residential
18     builder's license on it when it deals with residential
19     work?
20 A.   No.
21 Q.   It does not have to be on there?
22 A.   No.
23        MR. BASSEL:  Your question was are you aware?
24        MR. HARRINGTON:  Yeah.
25        MR. BASSEL:  Okay.

1        THE WITNESS:  And I'm -- no.  I was under the
2      understanding, you know, we were working with Hank and
3      he was our -- we're viewing him as our qualified
4      officer.
5 BY MR. HARRINGTON:
6 Q.   Okay.  My question was are you aware -- first, let's
7      back up a second.
8        At the time -- I think you told us before,
9      you became a licensed residential builder in your
10     personal capacity in about March 2023, correct?
11 A.   I believe so.
12 Q.   And you entered into these contracts, or Exigent
13     entered into these contracts prior to the date you
14     became a licensed residential builder contractor in
15     your personal capacity, correct?
16        COURT REPORTER:  I'm sorry, can you repeat
17     that question.
18        THE WITNESS:  Yeah.
19 BY MR. HARRINGTON:
20 Q.   I'm sorry.  Those contracts on behalf of Exigent
21     Landscaping were entered into with both the Boyds and
22     Mr. Carter prior to you having obtained your --
23     personally obtained your residential builder's license,
24     correct?
25 A.   Personally?

1 Q.   Yes.
2 A.   Yes.
3 Q.   All right.  At no time whatsoever did Exigent
4      Landscaping ever have a residential builder's license,
5      correct?
6 A.   At the time we were under the understanding we were
7      working with Hank and we were viewing him as our
8      qualified officer.
9 Q.   Okay.  But as it stands here today, you can answer this
10     question, at any time did Exigent Landscaping ever have
11     a residential builder's license?
12 A.   No.
13 Q.   And going back to the license at the bottom.  I think
14     my question earlier was are you aware of whether or not
15     on any agreement between an entity that's doing
16     residential construction work in the State of Michigan
17     has to have on the contract his residential builder's
18     license number?
19 A.   No.
20 Q.   You're not aware of that or your understanding is
21     that's not required?
22 A.   I'm not aware of that.
23 Q.   Okay.  Well, let me to ask you why, and you kind of
24     answered it before, but I don't know if I got an answer
25     to the question.  Why did -- was it necessary, do you

1      believe, to put the builder's license showing that it's
2      an LLC on the bottom of every page of that contract?
3 A.   I watched a YouTube video from another contractor in
4      California, and he suggested putting that documentation
5      showing that your business is registered with the
6      state.
7 Q.   Okay.  Do you understand why that YouTube person said
8      that?
9 A.   No.
10 Q.   At any time was it to suggest, as kind of what
11     Mr. Miller asked you, to suggest to a homeowner that
12     Exigent Landscaping did, in fact, have a residential
13     builder's license?
14 A.   No.
15 Q.   But as it sits here today, you don't know why, for
16     example, in California maybe it may be required, but in
17     Michigan you're not aware of there being any
18     requirement to having a licensed number on a contract
19     suggesting that you are -- your business is, in fact, a
20     valid limited liability company?
21 A.   Let me reread that one.  Can you repeat that, I'm
22     sorry, I don't understand the question.
23 Q.   Sure.  Maybe I'll try to rephrase it.
24        Are you aware -- well, when I asked you why
25     was it put on the licenses, the license number was put

1  on the contract on every page, you said we watched a
2  YouTube video from somebody in California that
3  suggested that be done. Do you know why that perhaps
4  was suggested or why that's a good thing?
5 A.  No.
6 Q.  Do you ever remember being asked by either Mr. Carter
7  or the Boyds as to whether or not Exigent was a
8  licensed residential builder?
9 A.  No.
10 Q.  Now, each one of those contracts has a picture on the
11  first page, correct? I understand the original may
12  have been in color, but the copy we have is in black
13  and white. Can you tell us what's in that picture on
14  each exhibit?
15 A.  It looks like an example of a swimming pool from
16  Imagine, from their website.
17 Q.  Okay. That's what I was going to ask. It's an Imagine
18  Pool?
19 A.  Correct.
20 Q.  And that's the type of pool that was contracted to be
21  installed at both the Boyds' residence, as well as the
22  Carter residence?
23 A.  That was the vendor for the swimming pools, correct.
24 Q.  Okay. And was Exigent the licensed or authorized
25  dealer of Imagine Pools?

1 A.  I believe so, yes.
2 Q.  Okay. And what was necessary to become -- well, let me
3  back up.
4      Who was actually an authorized dealer, was it
5  you personally or was it Exigent?
6 A.  Exigent.
7 Q.  Did you have to undergo some sort of, for lack of a
8  better word, vetting before you became, or Exigent
9  became a licensed or authorized dealer of Imagine
10  Pools?
11 A.  I believe so. I don't remember what, though, yeah.
12 Q.  Okay. Do you know where Imagine Pools is
13  headquartered?
14 A.  Yes.
15 Q.  Where?
16 A.  Knoxville, Tennessee.
17 Q.  Did you have to go to Knoxville, Tennessee in order to
18  become an authorized dealer?
19 A.  No.
20 Q.  Had you ever been to Knoxville, Tennessee to visit the
21  Imagine Pools facility?
22 A.  Yes. We went there for training.
23 Q.  Okay. Did you need to fill out an application or
24  anything of that nature to become a dealer of Imagine
25  Pools?

1 A.  I can't remember.
2 Q.  Did you recall ever entering into or Exigent ever
3  entering into a contract with Imagine Pools?
4 A.  I believe so. There was some kind of -- I believe
5  there was some kind of vendor agreement.
6 Q.  Do you remember when that was signed?
7 A.  No.
8 Q.  And would you have signed it on behalf of Exigent?
9 A.  I believe so.
10 Q.  Presumably that was before you -- these contracts were
11  entered into and I believe they're dated in 2021; is
12  that correct?
13 A.  I'm sorry, can you say that one more time.
14 Q.  I presume that this -- you believe there was an
15  agreement entered into between Exigent and Imagine
16  Pools, and I asked you when, you didn't recall. But.
17      My follow-up question is I imagine it was
18  sometime prior to these contracts being signed in 2021,
19  is that a safe assumption?
20 A.  Yeah. Based on memory, we had some kind of
21  prerequisites to be able to be a dealer for these
22  pools. I don't remember the exact facts of it, but I
23  remember we were registered to be able to buy them.
24 Q.  Okay. And when I say Imagine Pools, I also understand
25  they're known by as Explore Industries, perhaps doing

1  business as Imagine Pools, and I think at some point in
2  time in the recent past the ownership changed. So any
3  of the questions I just asked you about Imagine Pools,
4  if I were to ask you about Explore Industries instead
5  of saying the words Imagine Pools, would that change
6  your answer at all?
7 A.  No. I believe those two are the same entity.
8 Q.  Okay. Do you know, did Imagine Pools, and when I say
9  that, I mean Explore industries or Imagine Pools, did
10  they ever inquire from you or Exigent, if either one of
11  you were a licensed residential builder in the State of
12  Michigan prior to making you, authorizing you to sell
13  the pools.
14 A.  No. We purchased the pools from SCP.
15 Q.  From who?
16 A.  SCP Poolcorp.
17 Q.  But in order to sell them to customers in Michigan you
18  needed to be an authorized dealer from Imagine Pools,
19  correct?
20 A.  I believe so.
21 Q.  I'm sorry, you said the name SEP?
22 A.  SCP Poolcorp.
23 Q.  Are they in Michigan or are they in another state?
24 A.  Yes.
25 Q.  So SCP Poolcorp is a wholesaler, for lack of a better

Page 122

1  phrase, a wholesaler of Imagine Pools in Michigan?
2  **A.  Correct.**
3  Q.  And you -- Exigent wouldn't be able to buy Imagine
4  Pools from SCP Poolcorp unless they were authorized to
5  do so by Imagine Pools; is that correct?
6  **A.  I believe so.**
7  Q.  Now, as Mr. Miller asked you several questions, it was
8  necessary to obtain -- was it necessary to obtain
9  building permits to put in in-ground swimming pools?
10  **A.  Yes.**
11  Q.  Okay.  And as he talked about already, representations
12  were made to various government entities that to obtain
13  the builder's license -- excuse me, the builder permit,
14  that the contractor was Hank Bell or Construction
15  Contractors; is that correct?
16  **A.  (No response.)**
17  Q.  Would you like me to rephrase that?
18  **A.  Yes, please.**
19  Q.  Let's take, for example, the Boyds, I'll try to
20  rephrase it differently.
21      Was it necessary to obtain any building
22  permits to install or construct the in-ground swimming
23  pool on behalf of the Boyds, and if so, from whom?
24  **A.  Yes, it was necessary.**
25  Q.  From whom?

Page 123

1  **A.  Macomb.**
2  Q.  Macomb Township or Macomb County?
3  **A.  Yes.  Macomb building.**
4  Q.  Macomb Township or Macomb County?
5  **A.  Macomb Township, I believe.**
6  Q.  Okay.  They can be confusing, I understand, I believe
7  they happen to have the same names.
8  **A.  Yeah.**
9  Q.  And who would have made those representations for the
10  building permits to the building -- to Macomb Township
11  building officials?
12  **A.  What representations specifically?**
13  Q.  In order to obtain a building permit.
14  **A.  The representation that was made was Hank and Exigent**
15  **were working together to build the pool.**
16  Q.  Okay.  Well, was it necessary for someone to actually
17  going to the township offices and fill out an
18  application, or something to that effect?
19  **A.  I believe so.**
20  Q.  Okay.  And who would have done that for the Boyds'
21  project?
22  **A.  I don't recall.**
23  Q.  But it actually required a personal visit from somebody
24  on behalf of Exigent, correct?
25  **A.  I don't recall if it was a personal visit or if it was**

Page 124

1  mailed in.
2  Q.  Okay.  Well, let me show you what we marked --
3      MR. HARRINGTON:  I'll have this marked,
4  sorry, first.
5      HEITMANN EXHIBIT 6
6      WAS MARKED BY THE REPORTER
7      FOR IDENTIFICATION.
8  BY MR. HARRINGTON:
9  Q.  Mr. Heitmann, do you recognize that document we've
10  marked as Exhibit 7, and if so, tell us what it is?
11      MR. BASSEL:  You're asking him has he ever
12  seen it before?
13      MR. HARRINGTON:  Yeah, kind of a compound
14  question.  First, if he recognizes it?  And two, if he
15  does, if he can tell us what it is?
16  **      THE WITNESS:  I recognize that this is an**
17  **application for a building permit.  I don't recall**
18  **seeing this before.**
19  BY MR. HARRINGTON:
20  Q.  Okay.  Well, do you recognize that it's a, as you just
21  indicated, it states on here it's a building permit for
22  the property owners Alex Boyd, and the contractor is
23  identified as Construction Contractors, LLC, correct?
24  **A.  Correct.**
25  Q.  And it says, on the e-mail address it says

Page 125

1  chelsea@exigentdesignbuild.com.  Do you see that in the
2  middle of the page?
3  **A.  Yes, I see it.**
4  Q.  And are you familiar with a company known as Exigent
5  Design Build?
6  **A.  Yes.**
7  Q.  What is that?
8  **A.  That's a company that I owned.**
9  Q.  Is it part of Exigent Landscaping or is it a separate
10  entity?
11  **A.  D/b/a of Exigent Landscaping, I believe.**
12  Q.  Okay.  Do you also know the name of Chelsea?
13  **A.  Yes.**
14  Q.  Who's Chelsea?
15  **A.  Former employee of Exigent.**
16  Q.  And that's her work-related e-mail address?
17  **A.  I believe so.**
18  Q.  And what were Chelsea's duties at Exigent Design and
19  build or design build?
20  **A.  She would do paperwork.  She would track the process of**
21  **permits and engineering.**
22  Q.  What's Chelsea's last name, assuming that's her first
23  name?
24  **A.  I believe Quinn.**
25  Q.  Is she one of the individuals who is now working for



1    Resilient Outdoor Living?
2  **A.  No.**
3  Q.   Do you know where she is today?
4  **A.  No.**
5  Q.   And down towards the bottom third of the document it
6      has a signature on here.  Do you see that?
7  **A.  Yes.**
8  Q.   Do you recognize that signature?
9  **A.  Yeah, it looks familiar.**
10 Q.   Can you tell us what it is, if you know?
11 **A.  That looks like Hank's signature.**
12 Q.   Hank Bell?
13 **A.  Yes.**
14 Q.   Okay.  Do you know whether or not Hank Bell actually
15     signed this application for a building permit or did
16     somebody else on his behalf?
17 **A.  I'm not sure.**
18 Q.   It states on here that the contractor is Construction
19     Contractors, LLC.  Is that Mr. Bell's company?
20 **A.  I believe so, yes.**
21 Q.   And are you aware of whether or not the Boyds entered
22     into an agreement with Construction Contractors?
23 **A.  I don't believe so.**
24 Q.   Then why is Construction Contractors' named as the
25     contractor on this document, if you know, if that

1      entity did not enter into a contract with the Boyds?
2  **A.  Because we were working with Hank.**
3  Q.   Okay.
4  **A.  To work together.**
5  Q.   Do you know who filled out this, obviously, handwritten
6      portion of this form, the party's names and entity's
7      name and addresses?
8  **A.  No.**
9  Q.   Do you know whether or not that's Hank Bell's
10     handwriting?
11         MR. BASSEL:  I think you asked and answered.
12 BY MR. HARRINGTON:
13 Q.   Okay.  That's true.  I can ask the same question a
14     little bit twisted differently.
15         You ever seen Hank Bell's handwriting?
16 **A.  Have I ever seen Hank Bell's handwriting, I believe so.**
17 Q.   Okay.  Does it look anything familiar to what's in
18     front of you now?
19 **A.  Does it look familiar?**
20 Q.   Does it look like Hank Bell's handwriting?
21         MR. BASSEL:  I would object.  You're asking
22     him to do a handwriting analysis.  I think he already
23     testified he doesn't know.
24         MR. HARRINGTON:  Okay.
25         MR. BASSEL:  First, he never seen it before,

1      I think he testified.  And second, that he wasn't able
2      to testify as to who signed it.
3          MR. HARRINGTON:  I'm trying to maybe jog his
4      memory with some idea here.
5  BY MR. HARRINGTON:
6  Q.   You don't know what -- you said you're familiar with
7      Hank Bell's handwriting.  I'm trying to maybe jog your
8      memory here.
9          Does that perhaps look like Hank Bell's
10     handwritten portion -- Hank Bell's handwriting in the
11     handwritten portion of the document?
12 **A.  I'm not sure.  I don't remember what Hank's...**
13 Q.   What about Chelsea's handwriting, are you familiar with
14     that?
15 **A.  No.**
16 Q.   It also indicates on here that the, in the middle
17     portion or section of other description, and it says
18     35 x 155 in-ground fiberglass pool.  Do you see that?
19 **A.  Yes.**
20 Q.   An it has an estimated cost of $50,000?
21 **A.  Yes.**
22 Q.   Do you know why an estimated cost has to be identified
23     in the building permit?
24 **A.  No.**
25 Q.   As it relates to a residential builder, you're not

1      aware of the reasons why you need to put the estimated
2      cost in the building permit?
3  **A.  No, I don't know the reason for it.**
4  Q.   Okay.  I'm looking down at the lower right-hand corner,
5      it talks about permit fee.  Are you familiar with the
6      permit fee being based on the project valuation?
7  **A.  Am I aware -- can you say that one more time.**
8  Q.   Are you aware of the permit fee being calculated based
9      on the amount of the project valuation?
10 **A.  No.  Now I am, though, after looking at this.**
11 Q.   Okay.  Do you know how that estimated cost of $50,000
12     came about?
13 **A.  That's the construction material cost, I would imagine.**
14         MR. BASSEL:  I think he's asking if you know.
15 BY MR. HARRINGTON:
16 Q.   And by your answer you're imagining.  So you're just
17     speculating, correct?
18 **A.  I'm sorry, there's too many --**
19         MR. BASSEL:  I think he was asking if you
20     know, and I don't think your answer was responsive as
21     to whether you know or not as to where that number came
22     from.
23 BY MR. HARRINGTON:
24 Q.   Is that safe to say --
25         MR. BASSEL:  If you know what it is, you can

1   say what it is. But if you don't know, you would just
2   say I don't know.
3         THE WITNESS: Can you repeat the question.
4   BY MR. HARRINGTON:
5   Q.   Do you know how it came -- well, I think my question
6        was do you know how that cost of $50,000 came about,
7        and I think you said that was the cost of the pool.
8        But do you know for certain?
9   A.   No. I didn't --
10  Q.   Actual contract price is $130,000, correct,
11       approximately?
12  A.   That's correct.
13  Q.   Okay. And you mentioned a couple times already, both
14       in response to my questions, as well as that of
15       Mr. Miller's, that there was a relationship between
16       Exigent and Hank Bell. Did that relationship also
17       extend to Construction Contractors?
18  A.   I'm not sure.
19  Q.   Okay. Well, I know you mentioned a couple times, but
20       maybe you can clarify. You mentioned of some
21       relationship between Exigent and Hank Bell relating to
22       his builder's license. Perhaps you can elaborate
23       again. What exactly was your understanding of that
24       relationship?
25  A.   My understanding with Hank Bell is we viewed him as our

                    Page 131

1        qualified officer and we work together to pull permits
2        and work through inspections on projects.
3   Q.   And what was the basis of your understanding that that
4        was permissible or legal?
5         MR. BASSEL: Are you asking for a legal
6        conclusion?
7         MR. HARRINGTON: Well, no. I mean, he's a
8        contractor entering into these contracts using somebody
9        else's contractor's license or residential builder's
10       license. I just wanted to ask him what made him
11       understand or believe that that was proper or
12       permissible.
13  BY MR. HARRINGTON:
14  Q.   Do you understand that, sir?
15  A.   Can you repeat the question.
16  Q.   What was the basis of your understanding that it was
17       permissible for Exigent to use another individual's
18       residential builder's license in order to apply for a
19       building permit?
20        MR. BASSEL: I would object that it calls for
21       a legal conclusion. But it's up to you as to how you
22       want to answer that, Mr. Heitmann.
23        THE WITNESS: Yeah, I would agree that it
24       would ask for a legal conclusion. It would be a good
25       question for my attorney.

1   BY MR. HARRINGTON:
2   Q.   Okay. Well, you didn't consult an attorney when you
3        entered into this relationship with Hank Bell, correct?
4   A.   I don't remember.
5   Q.   Okay. Well, what was the genesis of how this
6        relationship became about with Hank Bell?
7   A.   We decided to work together on projects.
8   Q.   Okay. And did Hank Bell receive any remuneration from
9        his relationship with Exigent?
10  A.   Did Hank Bell receive any --
11  Q.   Did he get any money?
12  A.   No.
13  Q.   Okay. And you said you decided to work together on
14       these jobs. Why -- perhaps you can give me a little
15       more detail. How did that come about that you decided
16       to work together?
17  A.   We worked together in regards to pulling the permits
18       and monitoring inspections and guidance, if needed
19       help.
20  Q.   Okay. Hank Bell had been a licensed registered
21       contractor for many years, to the best of your
22       understanding; is that correct?
23  A.   I believe so.
24  Q.   Okay. And is there any reason why you didn't just
25       apply in your own personal name or Exigent's name for a

                    Page 133

1        residential builder's license instead of using Hank
2        Bell's license?
3   A.   Yeah. At the time, because of COVID, they didn't have
4        testing.
5   Q.   Who didn't have testing?
6   A.   LARA.
7   Q.   Didn't have -- they weren't issuing licenses, is that
8        what you're saying?
9   A.   They didn't have classrooms for licensing, that's
10       correct.
11  Q.   Okay. So because they didn't have classes available,
12       that's why you decided to -- you joined forces with
13       Hank Bell?
14  A.   Correct, because they didn't have testing and classes
15       available due to COVID.
16  Q.   Okay. And what timeframe did they not have classes, as
17       you understood it?
18  A.   I don't recall the exact specific timeframe. I believe
19       it was in 2020 and 2021, somewhere around when COVID
20       happened.
21  Q.   And did they have classes virtually that you're aware
22       of, or did you even inquire about that?
23  A.   I believe not. Or actually, I don't recall.
24  Q.   Was there anything in writing between Exigent and/or
25       yourself and Hank Bell to allow use of his builder's

1    license?
2  **A.   No.**
3  Q.    Is there any text messages or e-mails memorializing
4        your understanding with Hank Bell?
5  **A.   I believe so.**
6  Q.    Okay.  Do you still have those e-mails or text
7        messages?
8  **A.   I'm not sure.**
9  Q.    And what would the text message or e-mails indicate?
10 **A.   That we were working together.**
11 Q.    Okay.  And do you recall if it was a text message or an
12       e-mail, or was it possibly both?
13 **A.   Possibly both.**
14 Q.    And whose idea was it originally?
15 **A.   Both of ours.**
16 Q.    And you indicated that you came about this idea in the
17       midst of COVID, so that's sometime in 2020 or 2021; is
18       that correct?
19 **A.   I believe so.**
20 Q.    How long has Exigent been in existence?
21 **A.   I believe Exigent's been in existence since 2017, if I**
22       **remember correctly.**
23 Q.    How long have they been installing in-ground swimming
24       pools?
25 **A.   I believe since to 2021, possibly 2020 a little bit.**

1  Q.    So the first time was in 2020?
2  **A.   I believe so.**
3  Q.    Who was the first customer to put in a swimming pool?
4  **A.   Jimmy Fox.**
5  Q.    And that was in 2020?
6  **A.   I believe so.**
7  Q.    And did you use -- was it necessary to get a building
8        permit for Mr. Fox?
9  **A.   Yes.**
10 Q.    Where Mr. Fox -- I'm sorry, was this Mr. Fox's
11       residence?
12 **A.   Yes.**
13 Q.    Where does Mr. Fox reside?
14 **A.   I don't know where he lives now.**
15 Q.    No.  Where was the job done, what city?
16 **A.   Shelby Township.**
17 Q.    And did Exigent use Hank Bell's information to obtain
18       the building permits with Shelby Township?
19 **A.   We worked with Hank Bell to complete that project**
20       **together.**
21 Q.    Okay.  Did Hank Bell do any work?
22 **A.   Can you describe work, please.**
23 Q.    You said you worked with Hank Bell.  You tell us, what
24       did Hank Bell do on Mr. Fox's job?
25 **A.   Review plans, site plans, structural plans, was there**

1        for, if needed, for issues or things that came apart
2        and guidance throughout the project.
3  Q.    And he did that without getting any compensation?
4  **A.   Correct.**
5  Q.    All right.  What about the Boyds what, if anything, did
6        Mr. Bell do?
7  **A.   I would say the same thing.  Was there, was aware of**
8        **plans, scope of work.**
9  Q.    Okay.
10 **A.   Was there if needed for help.  We discussed some of the**
11       **issues that came apart on the project and -- yeah.**
12 Q.    And same thing with Mr. Carter?
13 **A.   Yes.**
14 Q.    And I note on this application, that have Mr. Bell's
15       driver's license number.  Do you have
16       Mr. Bell's -- that information from Mr. Bell, his
17       driver's license number or actual picture of his
18       driver's license?
19 **A.   Not -- I don't think so.  I'm not sure.**
20 Q.    Okay.  But you don't know how it came about that the
21       driver's license of Mr. Bell was put on this
22       application, Exhibit 7?
23 **A.   I believe -- no, I'm not sure how that happened.**
24 Q.    Okay.  But you're not -- and just -- I may have asked
25       this, and again, I apologize if I did.

1            You're not aware if Mr. Bell actually going
2        to the building township and filled this form out?
3  **A.   I'm not sure.  I don't remember.**
4  Q.    Okay.  You're aware of the litigation that was pending
5        in Macomb County Circuit Court brought by both
6        Mr. Carter, as well as by the Boyds, two separate
7        actions that has been temporarily transferred to, maybe
8        permanently transferred to the bankruptcy court?
9  **A.   I understand.**
10 Q.    Okay.
11 **A.   Yeah, I remember.**
12 Q.    And you're aware that Hank Bell and his business
13       Construction Contractors is named as a defendant in
14       that case?
15 **A.   Yes.**
16 Q.    All right.  And you're aware that Mr. Bell and
17       Construction Contractors are denying that they had any
18       sort of relationship, whether formal or informal, with
19       you or Exigent to use his builder's license or that of
20       Construction Contractors' builder's license?
21 **A.   Yes.**
22 Q.    Okay.  So who's telling the truth, you or Mr. Bell?
23 **A.   I'm not sure.  I believe I'm telling the truth.**
24 Q.    Okay.  It's a pretty straightforward question.  I mean,
25       what is it you're not sure about?

1 A.   Or I'm telling the truth.

2 Q.   Okay.  You said a moment ago, I'm not sure.  Is there

3       some sort of level of uncertainty on your part?

4 A.   I'm not sure why Hank would say that.

5             MR. BASSEL:  I'd object to the foundation as

6       to what Hank Bell actually said.  So I'm not sure if he

7       actually knows what he said for you to respond to it.

8             MR. HARRINGTON:  All right.  We'll thank

9       Mr. Phillips for the objection there.

10            MR. PHILLIPS:  I'm happy to give it myself,

11      if you'd so let me.

12 BY MR. HARRINGTON:

13 Q.   At the same time --

14 A.   Yeah.

15 Q.   But to answer my question, you believe, your

16      representation is that you have an agreement, formal or

17      informal, with Hank Bell to use his residential

18      builder's license is correct, and the statements from

19      Hank Bell and Construction Contractors in the Macomb

20      County litigation is that that wasn't true, that's a

21      lie --

22            MR. BASSEL:  Object to the foundation as to

23      what they actually said.

24 BY MR. HARRINGTON:

25 Q.   Okay.  Well, assuming for the sake of discovery that

1       the representations were in the Macomb County

2       pleadings.  Your position is that Hank Bell is not

3       telling the truth?

4             MR. BASSEL:  I would object that you're

5       asking for speculation now, because we don't have a

6       foundation that that's what was actually said.

7             MR. HARRINGTON:  Okay.  Well, for discovery

8       purposes I can ask this question.

9 BY MR. HARRINGTON:

10 Q.   It is your position Mr. Bell is not telling the truth;

11      is that correct?

12 A.   I don't agree with -- I don't know.  I don't know

13      why -- I'm not sure what he's saying.

14 Q.   All right.  Well, you understand that there's

15      contradictory positions that have been taken?

16 A.   No.

17            MR. BASSEL:  I'll object to the form of the

18      question --

19            MR. HARRINGTON:  I haven't asked a question

20      yet.

21            MR. BASSEL:  All right.  But you're assuming

22      that there are contradictory positions.  I don't think

23      there's a foundation that they are.

24            MR. HARRINGTON:  Okay.  Well, for the sake of

25      discovery, and I can, if need be, pull out the

1       pleadings to show that.  But I mean, it's

2       well-established that Hank Bell and Construction

3       Contractors have taken the position that Exigent

4       Landscaping nor Mr. Heitmann had authority to use the

5       residential builder's license and the respective

6       residential builder's license.

7 BY MR. HARRINGTON:

8 Q.   So assuming that to be their position in the litigation

9       in the Macomb County Circuit Court.  Just to establish

10      correctly, your position is there was an understanding,

11      and Hank Bell's and Construction Contractors' position

12      is there's not such an understanding to use their

13      respective residential builder's license.  So your

14      position is correct and their position is incorrect, is

15      that safe to assume?

16 A.   I'm sorry --

17            MR. BASSEL:  Object to the form of the

18      question.

19            But if you're able to answer it, you can

20      answer it.

21            THE WITNESS:  No.  I don't understand the

22      question.  You lost me, I apologize.

23 BY MR. HARRINGTON:

24 Q.   Hank Bell, assuming for the sake of discovery that Hank

25      Bell and Construction Contractors have contended in the

1       Macomb County Circuit Court litigation, both in the

2       Boyd and Carter cases, that Exigent nor yourself had

3       permission to use their respective residential

4       builder's license.  Is it your position that their

5       representations in that litigation is incorrect?

6             MR. BASSEL:  I think you could ask

7       Mr. Heitmann what his understanding is.  I'm not sure

8       if he's able to opine as to whether someone else's

9       statement is truthful or not truthful.  But he's

10      definitely able to answer -- I think he's already

11      answered the question that you asked as to did he have

12      what was -- why is it that their position is that there

13      was no violation with respect to their performing work.

14            MR. HARRINGTON:  Okay.  I'm sorry, I didn't

15      quite understand your objection.  But the question was

16      is that correct or incorrect, their position.  I think

17      it's not cause for any, you know, lengthy discovery --

18      I'm sorry, speculative insight here.

19            But he's kind of answered the question one

20      way, saying that he's the one telling the truth.  So I

21      just wanted to come about it from a different way and

22      ask him.

23 BY MR. HARRINGTON:

24 Q.   So if you're telling the truth, so their position is

25      incorrect?

1  A.  I don't know what position Hank is taking at this time.

2  Q.  I just told you --

3      MR. PHILLIPS:  You represented it to him, you

4  didn't tell him.  You represented a position, which

5  there's been foundation objections galore on.

6      MR. HARRINGTON:  Okay.  So you're

7  objecting --

8      MR. PHILLIPS:  So you're asking him -- I am

9  objecting.  You're asking him to place a hypothetical

10  situation on something that lacks any sort of

11  foundation.  You've already said yourself you've asked

12  and answered the question, and now you're just asking

13  him to answer in a different way.  So it's asked and

14  answered.  Move on.

15      MR. MILLER:  Can we go off the record --

16      MR. HARRINGTON:  Okay.  You're not allowed to

17  object.  And so I'd ask that he be stricken from this

18  because you're not allowed to object.  You're not his

19  attorney, at least not in this proceeding.  You're

20  obviously it sounds like a conflict of interest in this

21  these proceedings.  Nonetheless, I think we still -- I

22  think the question asked is legitimate, and he can try

23  to answer it without having some sort of indirect kind

24  of prompting or coaching from yourself or Mr. Bassel.

25  So I think it's a legitimate question to ask.  And if

1  Mr. Bassel is instructing him not to answer, then I

2  guess we can take it up in front of the judge.

3  BY MR. HARRINGTON:

4  Q.  Do you understand my question, sir?

5      MR. BASSEL:  I object to the form of the

6  question because you're asking him in the form of a

7  hypothetical.  He's a lay witness, and I don't think

8  that that would be -- I think you're asking for

9  speculation, and I think he's already answered your

10  question, and I'm not sure if we're going to get any

11  further than that.  And I'm not trying to be difficult

12  because it's getting late, but I'm not sure if we're

13  going to get any further than that.

14      THE WITNESS:  I'm going to have to agree.

15  BY MR. HARRINGTON:

16  Q.  I didn't ask for your agreement.  Let me ask you

17  this here.

18      MR. HARRINGTON:  Let me have this marked as

19  an exhibit, please.

20  (An off-the-record discussion was held.)

21      HEITMANN EXHIBIT 7

22      WAS MARKED BY THE REPORTER

23      FOR IDENTIFICATION.

24      MR. HARRINGTON:  Apparently in all the

25  excitement I forget the numbers of exhibits and I said

1  7 and it was really 6, the last exhibit, so I stand

2  corrected with that.

3  BY MR. HARRINGTON:

4  Q.  Mr. Heitmann, I'm going to show you the true Exhibit

5  Number 7, and I'll have your attorneys look at that

6  first.  While you're looking at that, sir, my first

7  question is do you recognize it, and if so, tell me

8  what it is?

9  A.  All right.  Do you recognize it, yes.  An affidavit.

10  Q.  Okay.  Do you know for what purposes that affidavit was

11  created?

12  A.  I don't know.  It's something me and my attorney worked

13  together on.

14  Q.  Okay.  If I were to just kind of fill in the blanks

15  here.  You had a customer that Mr. Miller asked you

16  about name Rebecca, correct?

17  A.  That's correct.

18  Q.  And Rebecca's also filed a lawsuit against with

19  yourself and Exigent in Macomb County Circuit Court; is

20  that correct?

21  A.  I believe so.

22  Q.  And in connection with that litigation, you've prepared

23  the document in front of you entitled affidavit.  Does

24  that sound familiar?

25  A.  Correct.

1  Q.  All right.  And is that your signature on that

2  document?

3  A.  Correct.

4  Q.  And what is the date of that document?

5  A.  December 21, 2023.

6  Q.  Okay.  What is the -- I believe it's the second to last

7  paragraph on there.  I don't -- didn't make a copy, as

8  I don't know the number of that.  Can you tell us what

9  the number to the second to last paragraph is?

10  A.  Hank Bell's Construction Contractors suggested that

11  they're unaware of their information -- that their

12  license information is also false.

13  Q.  Okay.  What number is that paragraph?

14  A.  Five.

15  Q.  Okay.  And so in that affidavit you're saying that Hank

16  Bell's claims that he was unaware that his license was

17  being used is false, is that safe to say?

18  A.  Yes.

19  Q.  Okay.  Who was your attorney in that lawsuit?

20  A.  I believe Tyler Phillips.

21  Q.  Today, eight, nine months later, has anything changed

22  from your representation in that affidavit from

23  December of 2023?

24  A.  What do you mean by that?

25  Q.  Is anything different, are you changing anything from

1    your representation in the affidavit today than what
2    you affirmed back on December 21, 2023?
3 A.  No.
4 Q.  Okay.  Is there any documents that Exigent had prepared
5    in telling the salespeople how to handle a
6    particular -- you know, how to sell the job or how to
7    process a job or anything of that nature -- let me
8    rephrase the question, I get that's kind of not a good
9    question.
10       Are you aware of there being any documents
11    that Exigent had telling its project managers and/or
12    salespeople how the job should progress from start to
13    finish?
14 A.  I believe there's some, yeah.
15 Q.  Okay.  And every customer had such a document assigned
16    to it?
17 A.  Do you have a specific document that you're referring
18    to.
19 Q.  Well, let me to ask you this.  Let me get this marked
20    first.  I don't mean to be coy and hide things, let me
21    show you this document first.
22       HEITMANN EXHIBIT 8
23       WAS MARKED BY THE REPORTER
24       FOR IDENTIFICATION.
25 BY MR. HARRINGTON:

1 Q.  Sir, do you recognize that document, if you do, can you
2    tell us what it is?
3 A.  Looks like a master process outline.
4 Q.  And it's for Exigent Landscaping?
5       MR. BASSEL:  I think his question was do you
6    recognize it.
7 BY MR. HARRINGTON:
8 Q.  Yes.
9 A.  I think I've seen it before, something similar.
10 Q.  Okay.  At the top there's a handwritten name on there,
11    could you tell us what that is?
12 A.  Right here?
13 Q.  Yes.
14 A.  Dunakey.
15 Q.  Was there a customer of Exigent named Dunakey?
16 A.  Yes.
17 Q.  Okay.  And is there a similar document for every
18    customer of Exigent?
19 A.  I don't think so.
20 Q.  Okay.  At the very back, it's a multi-page document,
21    there's some information about licensing and that
22    nature, and actually a picture of a driver's license.
23    Do you see that, that page plus the last page?
24 A.  All right.
25 Q.  And that's information, in the second to last page, is

1    for Construction Contractors, correct?
2 A.  It looks like it, yes.
3 Q.  And what exactly is it as it concerns Construction
4    Contractors?
5 A.  This looks like their license info.
6 Q.  Okay.  What about the last page, what is on there?
7 A.  Looks like copy of a license.
8 Q.  And who's -- a driver's license?
9 A.  Yeah.
10 Q.  And who's the driver's license for?
11 A.  Hank.
12 Q.  Hank Bell?
13 A.  Looks like it, yes.
14 Q.  And do you know why those two documents in the last two
15    pages are attached to the Dunakey master project
16    outline -- the master process outline?
17 A.  No idea.
18 Q.  Okay.  Is it possibly because the customer wanted to
19    inquire about information about license, residential
20    builder's license, they would be shown those documents,
21    the last two pages showing the Construction
22    Contractors' residential builder's license and a
23    picture of Hank Bell?
24       MR. BASSEL:  Can you read back that question?
25       (Record repeated as requested.)

1       MR. BASSEL:  Objection.  Calling for
2    speculation.
3       MR. HARRINGTON:  No, it's not.  I believe I
4    asked -- he said he recognizes this document, I'm
5    inquiring why those documents are attached to it.  And
6    so I think it's a very legitimate question.
7       MR. BASSEL:  I think you said is it possible
8    that.  That sounds like speculation.
9 BY MR. HARRINGTON:
10 Q.  Okay.  Can you answer the question?  I mean, to be
11    honest, not to sound snarky, but if your attorney
12    doesn't understand, it's one thing.  The key is whether
13    you understand it.
14       MR. BASSEL:  I think you asked him why it's
15    there.  I think he already said he doesn't know.  Then
16    you asked him to speculate, is it because of -- and I
17    think I objected, it calls for speculation.
18       MR. HARRINGTON:  Well, I guess I wouldn't
19    call it speculation.  It was perhaps an attempt to a
20    jog his memory as to why it's attached.
21 BY MR. HARRINGTON:
22 Q.  Is that a possible reason?
23 A.  I have no idea.  If it was attached or why it would be
24    attached.
25       MR. HARRINGTON:  Okay, fair enough.  You want



1  to take a break?
2        MR. PHILLIPS:  Yes, please.
3        (A short recess was taken.)
4  BY MR. HARRINGTON:
5  Q.  Sir, as Mr. Miller just indicated, he organized the
6  documents in front of you.  So I'm going to show you
7  again what we marked as Exhibit 6, and again, I
8  mistakenly said Exhibit 7.  That's the application for
9  building permit, there's a couple questions on there.
10       You see in the top sessions where it says the
11  project address and the property owner, Alex Boyd, and
12  the address being at Cheltenham Drive?
13 A.  Yes.
14 Q.  On the third line down there it has a telephone number.
15  Do you see that, (586)785-8671.
16 A.  Yes.
17 Q.  Do you know whose phone number that is?
18 A.  No.
19 Q.  Okay.  That's supposed to be the customer's phone
20  number, though, isn't it, property owners?
21 A.  I'm not sure.
22 Q.  Okay.  And an attempt to jog your memory, do you know
23  if that's Chelsea's phone number?
24 A.  I'm not sure.
25 Q.  What about on the next section where it says

Page 151

1  contractors, and then there's also a phone number on
2  that section.  Do you see that?
3  A.  Yes.
4  Q.  And phone number is (586)383-8308, correct?
5  A.  Yes.
6  Q.  Do you recognize that number?
7  A.  Yes.
8  Q.  What is it -- or who owns that number?
9  A.  Exigent.
10 Q.  Okay.  So that's the telephone number for Exigent, but
11  not Construction Contractors, correct?
12 A.  That's correct.
13 Q.  Okay.  Is that number still valid today?
14 A.  No.
15 Q.  Resilient Outdoor Living has a different phone number?
16 A.  That's correct.
17 Q.  Let's talk about some of these exhibits again.
18  Mr. Miller asked you a lot of questions I'm going to
19  about Exhibit 2, and I'm going to just nitpick some of
20  the things that he may have touched upon or didn't
21  touch upon.
22       In the summary of assets -- I'm sorry.  On
23  page 8 of 71, if you could turn to that, please.  Do
24  you have that in front of you?
25 A.  Yes.

1  Q.  Okay.  Look at paragraph 27.  It states licenses,
2  franchises and other general intangibles, and it gives
3  some examples on there.  Do you see that?
4  A.  Yes.
5  Q.  And one of the examples is professional licenses?
6  A.  Yes.
7  Q.  Okay.  The answer checked is no, correct?
8  A.  Correct.
9  Q.  Now, at the time you completed this on March 15, 2024,
10  you did have a professional license, isn't that true?
11 A.  That's correct.
12 Q.  Okay.  And that was a residential builder's license?
13 A.  That's correct.
14 Q.  Do you know why it's checked as the answer as being no
15  if you do, in fact, have a professional builder's
16  license?
17 A.  Seems to be in error.
18 Q.  Okay.  I don't think Mr. Miller asked you this
19  question.  He went through this document very
20  thoroughly.  Were there any errors that you may have
21  noticed that weren't identified earlier besides what we
22  just talked about?
23 A.  Just the fuel.
24 Q.  What were some of those errors?
25       MR. BASSEL:  Just the errors that Mr. Miller

Page 153

1  had pointed out.
2  BY MR. HARRINGTON:
3  Q.  Anything else that he did not point out that you
4  recognize?
5  A.  No.
6  Q.  Go to the next page.  If you would, page 9, it says in
7  section 33, do you see that paragraph at the top of the
8  page?
9  A.  What page, I'm sorry?
10 Q.  Page 9 of 71, paragraph 33.
11 A.  Okay.
12 Q.  It states, Claims against third parties, whether you
13  filed a lawsuit -- whether or not you filed a lawsuit
14  or made a demand of payment.  And you've marked yes,
15  correct?
16 A.  Correct.
17 Q.  And for the description it's listed as amounts owed by
18  Exigent Landscaping, $7,695.88?
19 A.  That's correct.
20 Q.  Now, please give us some details, what exactly is that?
21 A.  That's money that Exigent owed me for payroll for I
22  believe six weeks of pay.
23 Q.  Okay.  There weren't any other -- you're not aware of
24  any other lawsuits or claims you have against third
25  parties other than against your own business, your own



1   company, correct?
2 A.   Yeah.  To clarify, it's not a lawsuit, it's -- we were
3       just kind of stating that the record that Exigent owed
4       me for five or six paychecks.
5 Q.   Okay.  But in terms of any claims, whether a lawsuit or
6       not against anybody else, you didn't list anything
7       more, so I'm assuming there aren't any more, correct?
8            MR. BASSEL:  No.  He -- objection to the form
9       of the question.  I think he also listed N53.
10 BY MR. HARRINGTON:
11 Q.   Okay.
12 A.   Yes.
13 Q.   Well, that was jumping ahead then to my next area of
14      questions.  N53, as your attorney just directed you to,
15      what are some -- this question is do you have any other
16      property of any kind you have not already listed.  And
17      this seems to be more of a catch-all type section.  So
18      perhaps you can tell us, what are the claims of
19      affirmative relief in offset in your responses filed
20      and potential tort claims against third parties.
21 A.   Are you referring to 53?
22 Q.   Correct.
23 A.   And what was the question again?
24 Q.   Well, this identifies any other property you have, and
25      I just read about what's written there.  Perhaps you

1   can tell us, what are these other claims that would be
2       considered other property?
3 A.   Potential claims that we're contemplating filing
4       against clients.
5 Q.   Okay.  In your personal capacity?
6 A.   Not sure yet.
7 Q.   Okay.  Well, give us some examples, what are some of
8       these claims that may or may not be in your personal
9       capacity listed here?
10           MR. BASSEL:  I think he answered he wasn't
11      sure yet.
12           MR. HARRINGTON:  He isn't sure whether he's
13      going to file or not.
14 BY MR. HARRINGTON:
15 Q.   But who are some of these other people, perhaps you can
16      give us some names and the nature of the claim?
17 A.   I'm not sure yet.
18 Q.   Have you been -- have you been personally injured in
19      some capacity that would rise to a tort claim?
20           MR. BASSEL:  Object to the form of the
21      question to the extent that it's asking him to make a
22      legal conclusion as to whether he has a valid claim.
23           But if you can answer the question, you can
24      answer the question.
25           THE WITNESS:  Yeah.  I think it is asking for

1   a legal conclusion.
2 BY MR. HARRINGTON:
3 Q.   Well, have you suffered -- I mean, I understand the
4       word tort is a legal term that isn't used outside of
5       law school.
6            But Nonetheless, are you familiar -- have you
7       suffered any personal injury that you're aware of that
8       may give rise to suing somebody, for example?
9 A.   I'm not sure yet.
10 Q.   How is your personal health today?
11 A.   Personal health, I'm good.
12 Q.   Have you been involved in any accidents, have you
13      suffered a bodily injury?
14 A.   No.
15 Q.   Let's turn to page 15 -- I'm sorry, I already asked you
16      about that.
17           Turn to page 18.  In the middle of the page
18      it identifies unsecured creditors, Alex Boyd and
19      Rebecca Boyd, correct?
20 A.   Correct.
21 Q.   And do you know why they're listed as unsecured
22      creditors in your Chapter 13?
23 A.   No, I don't know why.
24 Q.   You identified the value of their claim as being zero.
25      How did you come up with that amount?

1 A.   It's correct.  We feel we don't owe Alex and Rebecca
2       Boyd money.
3 Q.   Okay.  Do you know how much they're seeking against
4       you?
5 A.   No.
6 Q.   Are you aware that they've submitted proof of claim or
7       other evidence in the circuit court case of $300,000?
8 A.   I believe so.
9 Q.   Okay.  Is there any reason why you didn't put down the
10      claim as $300,000 instead of zero, because I do know
11      that you checked the box disputed?
12 A.   Because we believe we don't owe them any money.
13 Q.   Okay.  And what about the -- where it says in the
14      section on the left side of that portion where it's
15      checked at least one other debtor -- I'm sorry.  At
16      least -- who may -- at least one of the debts and/or
17      another.  You elaborate on that, who is the other one?
18 A.   I'm sorry, can you clarify that question.
19 Q.   You see on the left-hand side under the Boyds?
20 A.   Yes.
21 Q.   And there's a box checked, it says at least one of the
22      debtors and/or another.  Why is that box checked?
23 A.   That might be a question for Bob, I believe.
24 Q.   Okay.  Is there somebody else that may be you're
25      familiar that may contemporaneously be possibly

**Page 158**

1  indebted to the Boyds besides yourself personally?

2      MR. BASSEL: If you know.

3      **THE WITNESS: I believe there was other**

4  **people in the lawsuit, that's why I put that there.**

5 BY MR. HARRINGTON:

6 Q.  Okay. And then later down in the same column it says

7  this claim is subject to offset, and the box yes is

8  marked. Why is that marked yes to that question?

9 A.  **I don't know.**

10 Q.  Do the Boyds owe you any money?

11 A.  **I don't know.**

12 Q.  Have you filed any lawsuits against the Boyds that's

13  currently pending?

14 A.  **Not at this time.**

15 Q.  Are you contemplating filing a lawsuit against the

16  Boyds?

17 A.  **Not sure right now.**

18 Q.  Do you have any idea if you were, what the claim would

19  be, the nature of the claim against the Boyds?

20 A.  **No.**

21 Q.  It also says when the debt was incurred was 2022. Why

22  did you select that year?

23 A.  **I believe that was the year that was related in regards**

24  **to their project.**

25 Q.  Well, the contract was signed in 2021, as I think we

**Page 159**

1  went over before.

2 A.  **I think -- I don't know why I put 2022. I thought it**

3  **was just 2022.**

4 Q.  Okay. Well, why don't we turn to page 20 -- I'm sorry,

5  I misspoke. 24, page 24.

6 A.  **Okay.**

7 Q.  Like the Boyds, Daniel Carter was a customer of

8  Exigent, correct?

9 A.  **Correct.**

10 Q.  And why were they being -- why is Daniel Carter named

11  as a creditor in your personal bankruptcy?

12 A.  **I was advised to include that into my personal**

13  **bankruptcy. I believe they were -- because they were**

14  **trying to come after me personally, I believe.**

15 Q.  Okay. You also put down, as the amount of their claim

16  as being unknown. Why is that unknown?

17 A.  **Because we feel we don't owe Carter any money.**

18 Q.  Do you know how much Carter is seeking against you?

19 A.  **I don't recall the exact amount.**

20 Q.  Okay. But it is some form of -- some sum of money,

21  though?

22 A.  **Correct.**

23 Q.  And under the section where it says -- in the middle

24  where it says as of the date you filed this claim

25  and checked possibly all those boxes apply contingent,

**Page 160**

1  unliquidated and disputed, none is checked, correct?

2 A.  **That's correct.**

3 Q.  So the debt owed to Daniel Carter is not disputed,

4  otherwise it would have been checked, correct?

5 A.  **No. I would say that we don't agree with the amount.**

6 Q.  Okay. So it should be disputed?

7 A.  **I think that would be a good question for Bob.**

8 Q.  Okay.

9 A.  **My attorney.**

10 Q.  But you're saying you don't agree with the amount, but

11  you don't even know what the amount is, otherwise you

12  would have put it on this schedule, correct?

13 A.  **What was the question?**

14 Q.  You say you don't dispute the amount that Carter's

15  claiming, but you don't know the amount as reflected in

16  the schedule, correct?

17 A.  **I don't recall the exact amount that Carter was**

18  **requesting, and we don't feel that we owe him any**

19  **money.**

20 Q.  Okay. Is that --

21 A.  **Because Daniel Carter breached the contract with**

22  **Exigent.**

23 Q.  How did Daniel Carter breach the contract?

24 A.  **He kicked us off the job and cancelled payment on a**

25  **progress payment with Exigent and didn't allow us to**

**Page 161**

1  **finish.**

2 Q.  Okay. And how does the fact that he cancelled a

3  contract with Exigent impact you personally?

4 A.  **I don't know.**

5 Q.  Let's go back. I should have asked this earlier on the

6  Boyds. Why do you think that there's no money owed to

7  the Boyds?

8 A.  **Because they breached the contract with Exigent.**

9 Q.  And how did the Boyds breach the contract?

10 A.  **They did not allow us to finish the job.**

11 Q.  Okay. Are there -- is there any monies owed by the

12  Boyds to Exigent?

13 A.  **Is there any monies owed by the Boyds to -- I'm not**

14  **sure at this time.**

15 Q.  Okay. And I guess the same question I asked regarding

16  Daniel Carter as it relates to the Boyds. Why do you

17  think -- well, strike that.

18      You also marked, on the question is this

19  claim subject to offset, you put -- the box no is

20  checked. Why is that no?

21 A.  **To be honest, I don't know what that means.**

22 Q.  Okay. Did you ask your attorney what that means when

23  you ended up checking the box no on that?

24 A.  **I can't remember.**

25 Q.  Okay. You went through all this with, as Mr. Miller

1   asked you, you went through everything to, you know,
2   review it with your attorney before you electronically
3   signed this document, correct?
4 A.   Correct.
5 Q.   Okay. And if there was some questions you didn't know
6   about, you would have mentioned that to Mr. Bassel,
7   correct?
8 A.   I believe I forgot what that means. I think I -- we
9   discussed that, but I just -- I can't recall what it
10   means at this time.
11 Q.   Okay. Well, the fact that Daniel Carter cancelled the
12   contract with Exigent, how does that impact you
13   personally?
14        MR. BASSEL: Objection. Calls for a legal
15   conclusion.
16 BY MR. HARRINGTON:
17 Q.   To the best of your ability to answer that, can you do
18   that?
19 A.   I would agree with Bob.
20 Q.   Okay. So the answer's no, you can't answer it because
21   you're not an attorney?
22 A.   I would say that asks for a legal conclusion, and it
23   would be a good question for my attorney.
24 Q.   Okay. Maybe we'll take his deposition next.
25        Next, also on this document, going back to

Page 163

1   page 18 at the bottom what is below the Boyds, is
2   Amanda Pisarski as a creditor, unsecured creditor,
3   correct?
4 A.   What page are we on again?
5 Q.   18.
6 A.   Okay.
7 Q.   And Mr. Miller asked you questions about that, and you
8   indicated that it stated it was for a loan. Is there
9   anything in writing between yourself and your wife to
10   memorialize a loan?
11 A.   I don't think so.
12 Q.   And how long have you and Amanda been married?
13 A.   I think two years.
14 Q.   Okay. Were these loans before or after you were
15   married?
16 A.   I don't recall.
17 Q.   And do you know where Amanda obtained the monies to
18   loan you?
19 A.   No.
20 Q.   Okay. Do you and Amanda maintain separate bank
21   accounts?
22 A.   Yes.
23 Q.   Where does Amanda maintain her bank account?
24 A.   Where does she -- what?
25 Q.   What bank does she -- to the best of your knowledge,

Page 164

1   where does Amanda do her banking?
2 A.   Christian Financial.
3 Q.   Okay. And how long has Amanda been banking at
4   Christian Financial to the best --
5        MR. BASSEL: Objection as to relevance.
6 BY MR. HARRINGTON:
7 Q.   Well, it goes to the source you claim is a loan, and
8   I'm trying to figure out if this is a loan before or
9   after she opened up her own separate bank account.
10        I mean, is this a loan from commingled funds?
11 A.   Yeah, I would agree. I don't think that's relevant.
12 Q.   Yeah. I'm not asking whether you agree it's relevant
13   or not. The fact is --
14        MR. BASSEL: If you know.
15        THE WITNESS: I don't know.
16 BY MR. HARRINGTON:
17 Q.   Okay. When did -- did you and Amanda have joint
18   accounts at any banks at any particular time?
19 A.   I don't recall.
20 Q.   And you don't remember the date of your marriage,
21   sometime in 2022?
22 A.   I think I remember.
23 Q.   Wasn't that long ago.
24 A.   December. I think it was December 30th.
25 Q.   Okay. So you've been married about a year and ten

Page 165

1   months?
2 A.   Sounds about right.
3 Q.   All right. And having identified that timeframe, does
4   that jog your memory at all as to whether or not Amanda
5   loaned you those monies before or after you were
6   married?
7 A.   I believe it would be after.
8 Q.   Okay. At any -- you already answered that question,
9   excuse me.
10        Let's jump to paragraph 31 -- page 31, excuse
11   me.
12 A.   Page 31.
13 Q.   Do you have page 31 in front of you?
14 A.   Yes.
15 Q.   Right in the middle it says Joel and Angela Hebeka. I
16   understand that Mr. Miller asked you questions about
17   this, but I'm going to ask you a couple more. And as
18   we just talked about with this affidavit, the Hebekas
19   sued you in Macomb County Circuit Court, correct?
20 A.   I believe so.
21 Q.   And that lawsuit was settled, was it not?
22        MR. PHILLIPS: John, just because I was
23   counsel for that, that case is subject to a
24   confidentiality agreement. The only thing he's going
25   to -- I'm going to direct him not to answer, even

Page 166

1  though I'm not his counsel in this particular matter,
2  because I was counsel in that case, absent saying that
3  it was settled and settled amicably. There's a
4  confidentiality agreement.
5       MR. HARRINGTON: Okay. Well, maybe I can ask
6  some questions that don't get into the specifics.
7       MR. PHILLIPS: I understand. Well, you
8  can't -- he's not going to answer anything about the
9  settlement.
10      MR. HARRINGTON: Well, then it could be a
11 problem with the bankruptcy, if he paid him money right
12 before he filed bankruptcy --
13      MR. PHILLIPS: You want access to it, file a
14 motion.
15      MR. HARRINGTON: Let me ask these questions,
16 you can put in your objection. If you instruct him not
17 to answer, I guess we'll go in front of the judge.
18 BY MR. HARRINGTON:
19 Q.  The case with Hebekas came to a resolution in February
20 2024; is that correct?
21 A.  I'm not going to answer that.
22      MR. PHILLIPS: You can answer if you recall
23 I'll let you know when not to.
24      THE WITNESS: I believe so. Somewhere around
25 there.

Page 167

1  BY MR. HARRINGTON:
2  Q.  Okay. And you filed bankruptcy March 15, 2024 -- I'm
3  sorry. When did you file bankruptcy? That was in
4  February, as well, correct?
5       MR. BASSEL: Well, it was February 29, 2024.
6  BY MR. HARRINGTON:
7  Q.  That sounds about right?
8  A.  February 9, 2024?
9       MR. BASSEL: 29th.
10 BY MR. HARRINGTON:
11 Q.  Okay.
12 A.  Okay.
13 Q.  And monies were tendered to the Hebekas in settlements
14 of that lawsuit?
15      MR. PHILLIPS: Don't answer. I'm instructing
16 him not to answer. The terms of the settlement
17 agreement, including but not limited to whether or not
18 there was any monetary compensation are subject to a
19 confidentiality agreement subject to exceptions
20 for carve-outs for being legally compelled. If you
21 want it, file a motion.
22      MR. HARRINGTON: Okay. Well, I'll tell you
23 what, you're not his attorney in this case. Perhaps
24 Mr. Bassel can instruct him that --
25      MR. BASSEL: Okay.

Page 168

1       MR. HARRINGTON: -- because with all due
2  respect, you don't have a standing in this case to make
3  that objection.
4       MR. BASSEL: I appreciate that. If there's a
5  confidentiality order, which it appears there is, I
6  think you probably need to file a motion in front of
7  Judge Randon.
8       MR. HARRINGTON: Okay.
9  BY MR. HARRINGTON:
10 Q.  Are there monies due and owing as of March 15 to the
11 Hebekas by you personally?
12      MR. BASSEL: It's a standing objection on my
13 part to not answer questions regarding the terms of the
14 settlement agreement.
15      MR. HARRINGTON: Okay. So he can't even
16 answer yes or no if they're a creditor. I'm assuming
17 that they're still a creditor, otherwise they wouldn't
18 be listed here.
19      (An off-the-record discussion was held.)
20 BY MR. HARRINGTON:
21 Q.  Did you -- let's jump ahead to page 65. You see -- are
22 you on page 65, sir?
23 A.  Yes.
24 Q.  Do you see paragraph 6 under part 3?
25 A.  Right here?

Page 169

1  Q.  Yes. And you see the first question asked if the debts
2  are primarily consumer debts, and the answer is no?
3       MR. BASSEL: Do you see that?
4       THE WITNESS: Yeah, I see it.
5  BY MR. HARRINGTON:
6  Q.  Okay. And what are most of your debts for then if
7  they're not consumer debts?
8       MR. BASSEL: I would object to the form of
9  the question because it's calling for a legal
10 conclusion.
11      That being said, there's a diseconomy,
12 Mr. Heitmann, between a consumer debt and a
13 non-consumer debt, which are typically business debts,
14 if that helps to answer the question.
15      MR. HARRINGTON: Thank you.
16 BY MR. HARRINGTON:
17 Q.  Do you understand it better now?
18 A.  Yeah. What Bob said. I don't understand the question,
19 really.
20 Q.  Are most of these debts that you cited in your
21 bankruptcy schedules related to your business, your
22 former business, Exigent Landscaping, or for yourself
23 personally?
24 A.  I don't know.
25 Q.  Okay. Well, the next question under that same section

1    says: During the 90 days before you filed bankruptcy,
2    did you pay any creditor a total of $7,575 or more.
3         Do you see that line?
4 **A.  Yes.**
5 Q.  And your answer is no, correct?
6 **A.  Correct.**
7 Q.  Okay.  Is that a truthful answer?
8 **A.  To the best of my knowledge, yes.**
9 Q.  Okay.  So without, you know, subject to the objection
10   of your counsel, any claim you may have made -- any
11   monies that may have been paid to Hebekas did not total
12   more than $7,575?
13        MR. BASSEL:  I would object as to my sitting
14   or standing objection as to the terms of the settlement
15   agreement.  I think you're asking for terms of the
16   settlement agreement.
17 BY MR. HARRINGTON:
18 Q.  Okay.  Well, you've agreed that -- well, are you aware
19   of any exception to putting down truthful answers if
20   there's a confidentiality agreement?
21 **A.  I don't know.  I'm not a lawyer.**
22 Q.  Okay.  Let's go back to page 31.  Do you have that in
23   front of you?
24 **A.  Yes.**
25 Q.  Down at the bottom there's another creditor named Joe

1    Regalado, if I'm pronouncing that correctly.  Do you
2    see that?
3 **A.  Yes.**
4 Q.  And I think you mentioned in response to
5    Mr. Miller's question, Mr. Regalado was another
6    customer of Exigent regarding installation of a pool,
7    correct?
8 **A.  Yes.**
9 Q.  And did Mr. Regalado also file a lawsuit against
10   Exigent and yourself -- and/or yourself in the Macomb
11   County Circuit Court?
12 **A.  Yes.**
13 Q.  And were you named individually as a party to that
14   case?
15 **A.  I don't recall.**
16 Q.  Okay.  And are there any other monies owed to
17   Mr. Regalado?
18        MR. BASSEL:  I would object to the question.
19   It calls for questions regarding the settlement
20   agreement, which I believe there's a confidentiality
21   order regarding.
22        MR. HARRINGTON:  I don't know if there's any
23   foundation laid that there is, in fact, a settlement
24   agreement.
25        MR. BASSEL:  I don't think I have to.

1 BY MR. HARRINGTON:
2 Q.  Is there any -- what is the status of that lawsuit
3    brought by Mr. Regalado, to the best of your knowledge?
4 **A.  Yeah, on that there's a confidentiality agreement.**
5 Q.  Was there a settlement to that case?
6 **A.  I'm not sure.**
7 Q.  Okay.  But there was a confidentiality agreement
8    signed?
9 **A.  I believe so, yeah.**
10 Q.  Okay.  Generally that doesn't come about unless there's
11   a resolution or a settlement.  So do you know when that
12   came about.
13        MR. BASSEL:  I would object.  It's calling
14   for terms of the settlement agreement or the
15   confidentiality provision.
16        MR. HARRINGTON:  Well, I asked about the
17   Hebekas, Mr. Phillips, and it was okay to answer that
18   question in terms of the date, that's all.
19        MR. PHILLIPS:  It was settled amicably and
20   dismissed.  I can't give you the exact date.
21        Brandon, if you know the exact date it was
22   dismissed.
23        **THE WITNESS:  I don't recall.**
24 BY MR. HARRINGTON:
25 Q.  If the court records reflect it was February of 2024,

1    does that sound about right?
2 **A.  It should be public record.**
3 Q.  All right.  So you have no reason to dispute that.  And
4    I'm going off memory myself, but I think that's, pretty
5    much, when it was, shortly before you filed Chapter 13.
6         I note on the Hebeka's you had checked
7    contingent, unliquidated and disputed, but you didn't
8    check any of those boxes for Mr. Regalado.  Is there
9    any reason why?
10 **A.  No.**
11 Q.  And going back to paragraph -- page 65, we talked about
12   section 6.  If I ask you the same questions that I
13   asked you about Hebekas as it concerns Mr. Regalado and
14   whether any monies were paid to any creditor of more
15   than $7,575 within 90 days of filing the bankruptcy
16   petition, then your answers would be essentially the
17   same as they were for the Hebekas?
18 **A.  That's correct.**
19 Q.  Okay.  On page 33 at the top, the very top creditor is
20   Kirk, Huth, Lange & Badalamenti, P.C., do you see that?
21 **A.  Yes.**
22 Q.  And that's your former attorneys, correct?
23 **A.  I believe Exigent's.**
24 Q.  Okay.  They represented you personally, as well; isn't
25   that true?

1  A.  I can't recall.

2  Q.  Well, do you recall the arbitration proceedings,

3      whether they were your attorneys, Mr. Joe Riddle, I

4      think from the firm, and Raechel Badalamenti represent

5      you -- Chad Riddle, excuse me?

6  A.  **Yeah.  They were -- they were my -- I just can't**

7      **remember if they were representing me personally and**

8      **the business, but they were my old attorneys.**

9  Q.  Okay.  Well, I can tell you that you and your business

10     was named as defendants in that, or respondents I

11     guess, in that determined arbitration proceedings.  You

12     can concur that they represented you, as well as the

13     business; isn't that true?

14         MR. BASSEL:  If you know.

15         THE WITNESS:  I'm not sure.

16 BY MR. HARRINGTON:

17 Q.  Okay.  You also brought a lawsuit against the Boyds,

18     you and your business, in the Macomb County Circuit

19     Court back in 2022, correct?

20 A.  **That's correct.**

21 Q.  And Kirk, Huth, Lange & Badalamenti were your attorneys

22     in that lawsuit that you brought, correct?

23 A.  **Yes.**

24 Q.  And they represented you in that lawsuit wherein you

25     were named as a plaintiff individually, as well as your

Page 175

1      business; isn't that correct?

2  A.  **As I said previous, I can't recall if it was personally**

3      **in business or just the business that -- that was in**

4      **that lawsuit.**

5  Q.  Do you know how much they -- are they claiming that

6      the -- excuse me, let me rephrase that.

7          Do you know approximately how much the law

8      firm is claiming that it's owed in legal fees?

9  A.  **I don't recall.**

10 Q.  Do you have a LinkedIn page, a LinkedIn, whatever you

11     want to call it, listing?

12 A.  **Me personally?**

13 Q.  Yes.

14 A.  **Yes.**

15 Q.  And what does it indicate is your professional

16     information or your occupational information?

17 A.  **I don't know if I have anything on there.**

18 Q.  Well, if I were to tell you we looked at it this

19     morning it says director of operations, sales and

20     marketing for Resilient Outdoor Living, does that sound

21     about right?

22 A.  **That sounds correct.**

23 Q.  Okay.  And even though Amanda is the owner of that

24     business as you pointed out earlier, you, pretty much,

25     run the operations there, correct?

1          MR. BASSEL:  Objection.  When you say run the

2      operations, in what capacity.

3  BY MR. HARRINGTON:

4  Q.  Well, you are -- Amanda is -- people look to you as

5      being the boss of that business; is that true?

6  A.  **No.  Amanda is the owner of the company.**

7  Q.  Okay.  But that wasn't my question.

8          They look to you as being the boss, to the

9      best of your understanding, correct?

10 A.  **No.  Amanda is the owner of the company.**

11 Q.  Okay.  You make more money from that business than

12     Amanda does as reflected in one of these exhibits we

13     talked about, correct?

14 A.  **No.**

15         MR. BASSEL:  Objection as to the foundation

16     for that.  I'm not sure if that's correct.

17         **THE WITNESS:  Yeah, I don't believe it's**

18     **true.**

19         MR. BASSEL:  I think there's an amended

20     schedule, I'm not sure.

21 BY MR. HARRINGTON:

22 Q.  Yeah.  Schedule I, I'm looking at Exhibit 3 on page 2

23     to page 3 says what your income is and what Amanda's

24     income is at the bottom?

25 A.  **This looks like an old plan.  I believe this was**

Page 177

1      **amended.  From my recollection, Amanda --**

2          MR. BASSEL:  Actually, that is the most --

3      he's asking -- okay.  Sorry, just I -- it's getting

4      late.

5          So was your question does Amanda make more

6      money or less money than Brandon or was your question

7      do people perceive Brandon as being the head of the

8      company?

9          MR. HARRINGTON:  That was the old question.

10         MR. BASSEL:  Okay.

11 BY MR. HARRINGTON:

12 Q.  The most recent question was you make more money than

13     Amanda at Resilient Outdoor Living, correct, as

14     reflected in exhibit --

15         MR. BASSEL:  Objection as to the time period.

16     If the time period is for October 7, 2024, the document

17     speaks for itself.

18 BY MR. HARRINGTON:

19 Q.  Okay.  Was that accurate then, your income as of three

20     weeks ago was greater than Amanda's?

21 A.  **I don't know.**

22 Q.  Well, like your attorney says, the document speaks for

23     itself.

24         And who is -- do you have a boss at Resilient

25     Outdoor Living?

Page 178

1  A.   Yes.

2  Q.   And who is that?

3  A.   Amanda.

4  Q.   What's her title, if she has one?

5  A.   CEO.

6  Q.   Chief operating officer, correct?

7  A.   Is that the same as an owner?  I think so.

8  Q.   You said CEO?

9  A.   CEO, chief operating -- yeah, I think she's the

10      owner --

11            MR. PHILLIPS:  I think he meant executive

12      officer.  He said operating officer, that's where I was

13      confused.

14            MR. HARRINGTON:  Yeah, I'm sorry.  It is

15      getting late, sorry.

16 BY MR. HARRINGTON:

17 Q.   And you indicated that Resilient Outdoor Living

18      obtained its builder's license a couple months ago and

19      you still have your residential builder's license.  Has

20      Resilient Outdoor Living started doing in-ground

21      swimming pool installations?

22 A.   No.

23 Q.   Does Resilient Outdoor Living have any customers that

24      were former Exigent customers?

25 A.   I believe so.

Page 179

1  Q.   And who are they?

2  A.   I don't think that's relevant.

3            MR. PHILLIPS:  You can't say that.

4  BY MR. HARRINGTON:

5  Q.   You have to answer.  That's -- you've got to answer.

6            MR. BASSEL:  One second.

7            MR. PHILLIPS:  No, you're fine.

8            MR. BASSEL:  If you know the answer, you know

9       the answer.

10           THE WITNESS:  Yeah, there's some clients.

11 BY MR. HARRINGTON:

12 Q.   Who?

13 A.   Jeff Trapoli.

14 Q.   How do you spell his last name?  Like the restaurant?

15 A.   T-r-a-p-o-l-i.

16 Q.   Okay.  I misheard you then.

17      Where does Mr. Trapoli reside?

18 A.   I don't know where he lives.

19 Q.   Okay.

20 A.   I don't have that on me.

21 Q.   Macomb County, Oakland County?

22 A.   Oakland County.

23 Q.   And what type of job is Resilient doing for

24      Mr. Trapoli?

25 A.   What kind of job is -- pool cleaning.

Page 180

1  Q.   Okay.  Who are some other customers that were former

2       Exigent customers that are now customers of Resilient

3       Outdoor Living?

4  A.   Is that relevant?

5  Q.   Yes.

6            MR. BASSEL:  In what way?

7            MR. HARRINGTON:  Well, first off, it's

8  discovery.  Even if it wasn't relevant, it may lead to

9  relevant evidence.  And I think it's interesting to

10 know if we know who these people are, if there's some

11 sort of confidential agreement with them, not to list

12 them in the bankruptcy or anything of that nature.  So

13 I think we're --

14           MR. BASSEL:  But they're customers of --

15 okay.

16           MR. HARRINGTON:  And if they were customers

17 of Exigent, they may or may not have been people who

18 made claims against Brandon's personal capacity.

19 BY MR. HARRINGTON:

20 Q.   So --

21 A.   I think that might be an answer for the new business

22      owner.  I'm just an employee.

23 Q.   No.  But you're also the director of -- what is it.

24      The director of operation, sales and marketing, you

25      make more money than the owner.  So who --

Page 181

1  A.   I'm not making more money than her.

2  Q.   Well, that's what Exhibit 3 suggests.

3       In any event, who are some of the other

4       customers?

5  A.   (No response.)

6  Q.   You're under oath.

7  A.   Yeah, I think that would be a good question for the new

8       business.

9  Q.   So maybe it would be a good question, but I'm asking

10      you.

11           MR. PHILLIPS:  Can you repeat the pending

12      question, please.

13 BY MR. HARRINGTON:

14 Q.   I'll just repeat it.  Who are some of the customers of

15      Resilient Outdoor Living who were former customers of

16      Exigent Landscaping?

17 A.   Who are some of the customer of Resilient Outdoor

18      Living --

19           Is that something I can talk to my attorneys?

20 Q.   No.  It's not that complicated of a question.

21           MR. BASSEL:  You can answer it.  Once you've

22      answered it, you can talk to your attorney.  I don't

23      think you can talk to your attorney while there's a

24      pending question out there.  Once you've answered it,

25      you can talk to counsel.



Page 182

1      THE WITNESS:  Do we agree that that's
2    relevant?
3  BY MR. HARRINGTON:
4  Q.   Even if it wasn't irrelevant, it can still lead to
5     relevant information.  So it's a legitimate question to
6     ask in these proceedings.
7      THE WITNESS:  Do you agree with that, Bob?
8      MR. BASSEL:  Well, two things.  One is he's
9    asking you the question.  You -- we can talk, but we
10    can't talk until after you've answered the question.
11    And this is discovery as opposed to a trial.  A trial,
12    it's a different rule book than it is for discovery.
13    But you'll answer the question however you want to
14    answer the question, and then we can take a break.
15      THE WITNESS:  Where's the question again?
16      MR. HARRINGTON:  I think the record should
17    reflect a several minute delay in answering this
18    question.
19      THE WITNESS:  Andy Breton.
20  BY MR. HARRINGTON:
21  Q.   How do you spell Breton?
22  A.   B-r-e-t-o-n, I believe.
23  Q.   Do you know where Mr. Breton resides?
24  A.   Macomb.
25  Q.   Anybody else -- well, first of all, what kind of work

Page 183

1     are you doing for Mr. Breton, or Resilient Outdoor
2     Living is doing for Mr. Breton?
3  A.   Pool cleanings.
4  Q.   Anybody else?
5  A.   Kali Nandi.
6  Q.   Kelly?
7  A.   Kali Nandi.
8  Q.   What kind of work are you doing for Kali Nandi?
9  A.   Pool cleanings.
10  Q.   Where does Kali Nandi reside?
11  A.   Bloomfield.
12  Q.   Is that at 7178 Lahser Road?
13  A.   No.  That's the next one.
14  Q.   Okay.  Who's that?
15  A.   Genevere.
16  Q.   Genevere, is that a first name, last name?
17  A.   First name.
18  Q.   What's Genever's last name?
19  A.   I think Jameel.
20  Q.   What kind of work are you doing for Genevere Jameer?
21  A.   Pool cleaning.
22  Q.   When was --
23  A.   And she signed a contract with Resilient to do exterior
24     work.
25  Q.   Did Exigent put in the pool for Genevere Jameer?

Page 184

1  A.   I believe so.
2  Q.   And when was that completed?
3  A.   I don't recall.
4  Q.   Was it completed prior to Exigent filing for
5     bankruptcy?
6  A.   Yeah.
7  Q.   That's a yes?
8  A.   The pool was, yes.
9  Q.   Okay.  And you filed bankruptcy in August of 2024.
10     When did Resilient start doing work in --
11      MR. BASSEL:  Excuse me, say that one more
12     time.
13  BY MR. HARRINGTON:
14  Q.   Exigent filed bankruptcy in 2023.  I'm sorry, I
15     misspoke.
16      MR. BASSEL:  Okay.
17  BY MR. HARRINGTON:
18  Q.   When did Resilient start doing work at Jameel's
19     property?
20  A.   I don't recall exactly when.  Spring of this year.
21  Q.   Okay.  Anybody else besides those four people we just
22     mentioned?
23  A.   Yeah.  There's some others.
24  Q.   And who are the others?
25  A.   Jennifer Hernandez.

Page 185

1  Q.   Where's that property?
2  A.   Macomb.
3  Q.   What type of work did you do for Jennifer Hernandez?
4  A.   Pool cleaning.
5  Q.   Did Exigent put in the pool for Jennifer Hernandez?
6  A.   Yes.
7  Q.   When was that put in?
8  A.   Twenty- -- when was that.  Last year.
9  Q.   Okay.  What about work for the Nandis, did Exigent put
10     that pool in?
11  A.   Yes.
12  Q.   And when was that?
13  A.   '21 or 2022.
14  Q.   What about Breton, did Exigent put in their pool?
15  A.   Yes.
16  Q.   And when was that put in?
17  A.   2023.
18  Q.   And Trapoli, did you put in the pool, Exigent put in
19     the pool?
20  A.   Yeah.
21  Q.   When was that?
22  A.   2023.
23  Q.   Anybody else besides these five people you've already
24     talked about, you mentioned your -- you suggested there
25     might be more, who are some others?

1  A.   Ron Heitmann.

2  Q.   Your father?

3  A.   Yep.

4  Q.   Anybody else?

5  A.   Adam Pulson.

6  Q.   Where does Adam Pulson reside?

7  A.   Clarkston.

8  Q.   Is that a pool -- what type of work does Resilient

9       Outdoor Living do for Adam Pulson?

10  A.   Pool maintenance.

11  Q.   Did Exigent put in their pool?

12  A.   Yes.

13  Q.   When was that put in?

14  A.   2022 or 2021.

15  Q.   Okay.

16  A.   Can't remember exactly.

17  Q.   Anybody else besides those six, seven people?

18  A.   Jim Papageorgiou.

19  Q.   What type of work does Resilient Outdoor Living do for

20       this gentleman?

21  A.   Pool maintenance.

22  Q.   Where's --

23  A.   And landscaping maintenance.

24  Q.   And where is that property?

25  A.   Troy.

1  Q.   And was their pool put in by Exigent?

2  A.   Yes.

3  Q.   When was that completed?

4  A.   2023.

5  Q.   Anybody else?

6  A.   Yeah, Sam Kaji.

7  Q.   I'm sorry, Sam Kaji?

8  A.   Yeah.

9  Q.   How do you spell Kaji?

10  A.   K-a-j-i.

11  Q.   And where was that, where's that property?

12  A.   Shelby Township.

13  Q.   What type of work did Resilient Outdoor Living do for

14       Sam Kaji?

15  A.   Pool maintenance.

16  Q.   Did Exigent put in that pool?

17  A.   Yes.

18  Q.   Anybody else?

19  A.   Not that I can recall right now.

20  Q.   Any of these individuals that you've just talked about,

21       did they have a claim against Exigent that was

22       compromised in some capacity with the understanding

23       that Resilient Outdoor Living would complete the work

24       or do work at their house?

25  A.   No.

1  Q.   Has there been any projects for Exigent Landscaping

2       that were paid in cash that you recall?

3        MR. BASSEL:  Actually, I think we had said

4       was after he had finished the question we could take a

5       break.  If you want to take a break, we can take a

6       break.

7        MR. HARRINGTON:  Well, I don't know if I

8       asked that question before.  I mean, like you just

9       said, the question's out there --

10        MR. BASSEL:  No.  I know, but we --

11        MR. HARRINGTON:  You guys said it.  I don't

12       remember saying yeah, we'll take a break when this

13       question's over.

14        MR. BASSEL:  No, we'll take a break.  We had

15       said that we would take a break after that question was

16       over.  That's unfair and it will be a quick break.

17        (A short recess was taken.)

18  BY MR. HARRINGTON:

19  Q.   I think before we took a break I asked if there were

20       any Exigent customers that paid their -- paid in full

21       or paid a substantial portion of their contract in

22       cash, and if so --

23  A.   Yes.

24  Q.   Who was that?

25  A.   Ivan, off recollection, Salem.

1  Q.   Is Ivan Salem a creditor in this case?  I don't

2       remember seeing the name.

3  A.   I don't think so.

4  Q.   And so how much did Ivan Salem pay in cash?

5  A.   I believe -- I don't recall the exact amount.  I

6       believe close to 1 million.

7  Q.   Okay.  Any other customers pay in cash?

8  A.   Some, yeah.

9  Q.   Who were they?

10  A.   Not sure exactly.  You know, like I don't think I'd be

11       able to remember all the names.

12  Q.   Well --

13  A.   But we did accept some cash.

14  Q.   What happened to the $1 million in cash that Ivan Salem

15       paid?

16  A.   Went into the business and paid for material and

17       expenses.

18  Q.   Did it pay -- was it deposited it into a bank account?

19  A.   Some of it.

20  Q.   How much?

21  A.   I don't recall the exact amount.

22  Q.   Most of it, half of it, a fraction of it?

23  A.   I don't recall.

24  Q.   And when was this, when was this $1 million in cash

25       paid?

1 A.  2020 and I believe 2021.

2 Q.  Did you keep any of the cash for yourself?

3 A.  **No.**

4 Q.  You're aware of the social media postings of yourself

5      with large amounts of cash?

6 A.  **No.**

7 Q.  You're not aware of that?

8 A.  **Not aware of that.**

9 Q.  Okay.  Just one area of questioning.  Mr. Miller asked

10     you questions in Section H, at the very end on page 58

11     where Hank Bell was listed as a joint debtor on three

12     homeowners projects, Cameron, Decoster and Kumar.  Do

13     you recall those questions?

14 A.  **Which page are you referring to?**

15 Q.  58.

16 A.  **Okay.**

17 Q.  Was Construction Contractors and/or Hank Bell

18     residential builder's license used to obtain permits

19     for those three presumably homeowners, Cameron,

20     Decoster and Kumar?

21 A.  **I believe so.**

22 Q.  Okay.  And Mr. Miller may have asked you this question,

23     if he did, I apologize for repeating it.  But do you

24     know why Hank Bell was named as a codebtor on just

25     those three homeowners and not others?

1 A.  **No.**

2 Q.  Did Hank Bell sign a contract in any capacity with any

3      of those three homeowners we just talked about?

4 A.  **No.**

5 Q.  What's the status of Heitmann Academy?

6 A.  **Not active at the moment.**

7 Q.  You were referencing earlier about consulting in

8      response to Mr. Miller's questions.  Was that something

9      that consulting was under, the Heitmann Academy, or was

10     that something different?

11 A.  **I'm sorry, can you ask that one more time.**

12 Q.  Let me strike that.  I'll ask another question.

13         What is Heitmann Academy, or what was

14     Heitmann Academy?

15 A.  **Heitmann Academy was an arm of Exigent.**

16 Q.  Okay.  Is -- and what -- you said arm.  That suggests

17     some sort of legal connection between the two.  Was it

18     a d/b/a of Exigent, was it a subsidiary of Exigent or

19     what was it officially, if you know?

20 A.  **It was just another service that Exigent offered.**

21 Q.  Was it a trademark or d/b/a, or was it none of the

22     above?

23 A.  **None of the above.**

24 Q.  And what did Heitmann Academy do in particular?

25 A.  **Consulting.**

1 Q.  Consulting for what?

2 A.  **Sales and marketing.**

3 Q.  Was that the consulting you referenced in response to

4      Mr. Miller's questions a little while ago or was that

5      something different?

6 A.  **That's correct.**

7 Q.  Was it a yes or no, is it the same or something

8      different?

9 A.  **Same.**

10 Q.  How many clients did Heitmann Academy have?

11 A.  **At what time period?**

12 Q.  As of January 1 of 2024.

13 A.  **Zero.**

14 Q.  When did Heitmann Academy last have any clients or

15     customers?

16 A.  **I believe Heitmann Academy ended around the time of --**

17     **or before bankruptcy.**

18 Q.  Of Exigent?

19 A.  **Yeah.**

20 Q.  So about a year ago, little more than a year ago,

21     perhaps?

22 A.  **Yeah, I would say so.**

23 Q.  How many clients or customers did Heitmann Academy

24     have?

25 A.  **Roughly 150.**

1 Q.  And did they all pay the same fee for consulting or was

2      it something always different?

3 A.  **Different.**

4 Q.  Any of the clients or customers, those 150 people,

5      named as creditors in your Chapter 13 petition?

6 A.  **No.**

7 Q.  Are any of them owed any money or any refunds?

8 A.  **Not that I know.**

9 Q.  What about with Exigent Landscaping, are any of them

10     named as creditors in Exigent Landscaping's bankruptcy?

11 A.  **No.**

12         MR. HARRINGTON:  I have no further questions.

13         MR. MILLER:  I've got very brief follow-up.

14 RE-EXAMINATION BY MR. MILLER:

15 Q.  You mentioned in response to Mr. Harrington's questions

16     that there were two disputes with homeowners, I believe

17     Rebecca and Regalado were the names that were resolved,

18     although I understand you didn't respond to material

19     questions about those settlements due to

20     confidentiality agreements.

21         Other than those two, were there any other

22     disputes with homeowners that were resolved by you

23     and/or Exigent in the one year prior to your

24     bankruptcy?

25 A.  **Not that I can remember.**



1 Q.  You're familiar with Matthew Martin?

**2 A.  Yes.**

3 Q.  Was he a customer of Exigent?

**4 A.  Yes.**

5 Q.  Did he file a lawsuit against Exigent and you
6      personally?

**7 A.  Can't remember.  I believe so.**

8 Q.  Was that lawsuit resolved?

**9 A.  Not sure.  Might be a good question for Tyler or Bob,**
**10     if they know.  I'm not sure.**

11 Q.  Do you know if there's any confidentiality agreements
12     between yourself, Exigent and/or Matthew Martin?

**13 A.  There's not.**

14 Q.  Did you pay any money or did Exigent pay any money to
15     Matthew Martin to resolve any potential disputes?

**16 A.  No.**

17 Q.  You're aware you were sued by Citizens Bank --

**18 A.  Yes.**

19 Q.  -- in Macomb County Circuit Court?
20        Did they get a judgment against you?

**21 A.  Not sure.**

22 Q.  Was that case settled or resolved?

**23 A.  No.**

24 Q.  It was not?

**25 A.  It was not settled or resolved.**

1 Q.  Okay.  You mentioned you and Amanda were married, I
2      think you said in December 2022, correct?

**3 A.  I believe so, yeah.**

4 Q.  When were you engaged?

**5 A.  I don't recall exactly.  A year before.**

6 Q.  Did you buy her an engagement ring?

**7 A.  Yes.**

8 Q.  Did you give it to her at the time you were engaged?

**9 A.  I believe so.**

10 Q.  How much did you spend on that engagement ring?

**11 A.  I don't recall an exact number.**

12 Q.  Can you give me an estimate?

**13 A.  Say around 20,000.**

14 Q.  Who did you purchase it from?

**15 A.  I don't recall.**

16 Q.  Was it a chain store or an independent jeweler?

**17 A.  I don't recall.  My aunt assisted me with it.**

18 Q.  Assisted you with the payment for it?

**19 A.  Assisted me with finding it.**

20 Q.  Who paid for the ring?

**21 A.  I did.**

22 Q.  With your own personal funds?

**23 A.  Correct.**

24 Q.  Did you use any money from Exigent to pay for the ring?

**25 A.  No.**

1        MR. MILLER:  I don't have any other
2  questions.

3        MR. BASSEL:  Just for the record I looked on
4  WeddingWire, it looks like you guys were married
5  December 30, 2021.

6        MR. HARRINGTON:  2021.

7        MR. MILLER:  I don't have anything further.

8        MR. HARRINGTON:  Neither do I.

9        (The examination was concluded at 7:19 p.m.)

1                    CERTIFICATE OF NOTARY

2

3  STATE OF MICHIGAN  )

4                     ) SS

5  COUNTY OF MACOMB   )

6

7        I, Tammie Marie Snyder, Certified Shorthand
8  Reporter, a Notary Public in and for the above county
9  and state, do hereby certify that the above examination
10  was taken before me at the time and place hereinbefore
11  set forth; that the witness was by me first duly sworn
12  to testify to the truth, and nothing but the truth,
13  that the foregoing questions asked and answers made by
14  the witness were duly recorded by me stenographically
15  and reduced to computer transcription; that this is a
16  true, full and correct transcript of my stenographic
17  notes so taken; and that I am not related to, nor of
18  counsel to either party nor interested in the event of
19  this cause.

20

21

22                    Tammie Marie Snyder, CSR-6657

23                    Notary Public,

24                    Macomb County, Michigan

25  My Commission expires:  06-19-2026

## $

**$0** 57:6 60:12 67:2 68:11

**$1** 189:14,24

**$1,538.47** 86:16

**$10,000** 40:12 78:3,5

**$100** 40:12

**$100,000** 34:19

**$130,000** 113:13 130:10

**$15,000** 93:14,24

**$150,000** 54:17

**$151,852** 65:1

**$200** 101:20

**$200,000** 67:17

**$22,000** 56:6

**$25,969.13** 86:16

**$250** 101:16

**$300,000** 157:7,10

**$4,788** 56:7,9

**$450,000** 58:17 59:4,14 60:3,7 71:9

**$5,000** 40:24

**$50** 101:20

**$50,000** 18:11 34:5 73:11 128:20 129:11 130:6

**$500,000** 18:10 56:8 80:23 81:7

**$53,200** 74:14,23

**$7,000** 63:6,10

**$7,575** 170:2,12 173:15

**$7,695.88** 153:18

**$77,273.91** 83:1

**$78,000** 91:20

**$82,000** 86:17

**$85,000** 81:18

## 0

**0** 20:1

## 1

**1** 27:10,15 34:7,13 38:13 95:13 189:6 192:12

**1,538.47** 86:20

**10** 52:2

**10,000** 40:14 78:10

**100** 40:14

**100,000** 16:4 34:21,22,24,25

**1099** 32:19

**11** 36:24 85:23

**12** 99:6,10

**13** 5:18 48:6,13 49:13 53:8,11,19 85:23 109:25 156:22 173:5 193:5

**15** 15:10 49:12 93:4 152:9 156:15 167:2 168:10

**15,000** 94:5,7

**150** 192:25 193:4

**151,852** 65:5

**155** 55:2 128:18

**16** 53:22 93:9

**17** 57:3

**18** 57:16 156:17 163:1,5

**1:43** 5:3

## 2

**2** 16:6,12 17:22 18:2,3,15 46:23 47:1,6 49:2,7 56:1 97:24 151:19 176:22

**2,500** 72:18

**20** 49:12 57:16 159:4

**20,000** 195:13

**2017** 134:21

**2020** 88:24 89:2 101:9 133:19 134:17,25 135:1,5 190:1

**2021** 54:24 56:1 92:15 120:11,18 133:19 134:17,25 158:25 186:14 190:1 196:5,6

**2021s** 55:17 56:4

**2022** 12:23 13:2 15:21 16:11 20:24 34:7,11,13,19 56:1,3 84:8 86:17 87:10 89:11,17,19,23 90:13,21,22 91:16 109:15 158:21 159:2,3 164:21 174:19 185:13 186:14 195:2

**2023** 21:3,4,20 22:14,15 25:6 26:12,16 27:5 56:1,3 83:12 84:8 86:16 87:10 88:24 89:2,11 90:3, 18 93:16 106:25 107:1,2,4 109:15 115:10 145:5,23 146:2 184:14 185:17,22 187:4

**2024** 5:2 49:12 86:14 87:10 89:12 93:19 110:24 152:9 166:20 167:2,5,8 172:25 177:16 184:9 192:12

**21** 55:7 101:19 102:12 145:5 146:2 185:13

**22** 34:22 35:7 55:18

**23** 34:25 46:2,3 90:17 93:16

**24** 93:16 159:5

**24-41956** 5:20

**25,969** 90:17

**2500** 99:19

**27** 34:11 69:21 152:1

**29** 167:5

**29th** 167:9

## 3

**3** 5:2 50:18,22 94:11,15,19 95:13, 18 168:24 176:22,23 181:2

**30** 20:1 196:5

**30th** 164:24

**31** 165:10,12,13 170:22

**33** 153:7,10 173:19

**341** 104:16

**35** 128:18

---

**4**

**4** 30:2 86:9 98:9,15,16 111:5,10

**40** 102:13,15,19

**41** 79:24

**42** 80:5

**43** 80:22

**45** 83:1

**48094** 7:11

---

**5**

**5** 97:24 111:5 112:9

**5,400** 9:10

**50** 84:22 107:18

**500,000** 54:19

**53** 52:6 154:21

**58** 85:9 190:10,15

**586 383-8308** 151:4

**586 785-8671** 150:15

---

**6**

**6** 99:6 124:5 144:1 150:7 168:24
173:12

**60** 102:17 107:18

**60749** 7:11

**64** 86:3,4,6,7 88:5

**65** 86:4,7,21 88:5 168:21,22
173:11

**651** 102:19

**651.64** 102:19

**68** 93:9

---

**7**

**7** 37:10,23 81:13 124:10 136:22
143:21 144:1,5 150:8 177:16

**70** 91:25 107:20

**700,000** 8:12,14 91:9

**71** 50:18,22 52:2 53:22 85:10
151:23 153:10

**7178** 183:12

**72,500** 91:23

**77** 83:15

**77,000** 83:13

**7:19** 196:9

---

**8**

**8** 146:22 151:23

**82,000** 90:13,14

**82,692.44** 86:17

---

**9**

**9** 153:6,10 167:8

**90** 170:1 173:15

**941s** 62:14,18,19

---

**A**

**A's** 18:23

**A-F-R** 76:15

**A-T-H-L-O-F** 13:9

**ability** 6:12 35:17 51:22 109:24
162:17

**absent** 166:2

**Academy** 191:5,9,13,14,15,24
192:10,14,16,23

**accept** 189:13

**accepted** 55:7

---

**access** 12:19,24 166:13

**accidents** 156:12

**accomplish** 105:1

**account** 9:15,19 12:19 13:4 14:2
17:12,15,20 18:19,20,21,22
39:19 80:24 81:8 87:25 88:12
91:24 163:23 164:9 189:18

**accounting** 18:18 36:19,21

**accounts** 163:21 164:18

**accumulating** 69:7

**accurate** 6:24 31:22 48:19 50:3
51:18 69:18 95:11 98:7,19
177:19

**accurately** 91:11

**Acho** 73:20

**Acho's** 73:23

**acting** 93:11

**action** 60:7 106:19

**actions** 106:22 137:7

**active** 191:6

**actual** 130:10 136:17

**Adam** 186:5,6,9

**addition** 100:11,16

**additional** 34:24

**address** 7:10,12 44:18 45:4
124:25 125:16 150:11,12

**addressed** 44:17,20

**addresses** 127:7

**adequate** 33:11

**adjustment** 30:25

**Administration** 80:23

**administrative** 103:18,23 104:8,
21,24 105:24 106:3,9,19,21
108:11,21 109:20

**adopt** 56:20 66:1

**advised** 85:15,19 98:6 159:12

---

affairs 13:23,25 91:5

affidavit 144:9,10,23 145:15,22 146:1 165:18

affiliated 106:3,8 110:7

affirmative 52:8,13 154:19

affirmed 146:2

AG 57:17,18,20

age 107:19,23,24 108:1

agree 65:24 131:23 139:12 143:14 160:5,10 162:19 164:11, 12 182:1,7

agreed 28:6 31:6 54:4 170:18

agreement 10:12 41:23 109:9,10 112:19 116:15 120:5,15 126:22 138:16 143:16 165:24 166:4 167:17,19 168:14 170:15,16,20 171:20,24 172:4,7,14 180:11

agreements 113:25 193:20 194:11

ahead 30:13 74:11 154:13 168:21

albeit 65:4

Alex 5:24 57:25 103:5 112:18 124:22 150:11 156:18 157:1

alleging 105:5

allocated 21:7 35:12

allowed 42:3 142:16,18

altered 31:17

Amanda 13:11,17,18,20 58:5,12, 14 95:22 99:22 101:1 163:2,12, 17,20,23 164:1,3,17 165:4 175:23 176:4,6,10,12 177:1,5,13 178:3 195:1

Amanda's 176:23 177:20

amended 48:18 50:7,9,15 51:8 54:21,24 55:17 69:18 94:22 95:5 98:11 176:19 177:1

amending 54:20

amendment 48:19 51:3

amendments 50:10 51:15 69:14 95:4

American 58:16,22 59:4,8,9 60:2,6,11 101:20

amicably 166:3 172:19

amount 28:3 40:11 54:10,13,14 55:25 56:4 58:8,13,23 60:13 61:12 63:6 64:11 65:1 68:3,12, 19 70:1,6 78:4,9,12,20,24 82:5, 16 84:3,6 89:20 91:8 92:4 96:14 129:9 156:25 159:15,19 160:5, 10,11,14,15,17 189:5,21

amounts 42:8,13,18 60:25 74:18 153:17 190:5

analysis 37:12,15,16 127:22

and/or 19:5 133:24 146:11 157:16,22 171:10 190:17 193:23 194:12

Andy 182:19

Angela 72:21 165:15

answer's 162:20

answering 46:12,14 105:14 182:17

answers 6:21,23,24 71:15 170:19 173:16

Anthony 5:16

anticipate 6:22

anticipated 15:14

apologize 78:11 100:5 110:6 136:25 140:22 190:23

Apparently 143:24

appearance 5:22

appearances 5:16

appears 7:12 168:5

application 91:2,4,12 92:16,20 119:23 123:18 124:17 126:15 136:14,22 150:8

applications 82:1

applied 67:4

apply 131:18 132:25 159:25

appraisals 8:2

approve 31:1

approved 91:7

approximately 59:13 107:17 108:1 130:11 175:7

Aqua 60:21,25

arbitration 174:2,11

architect 40:5,8

architect's 40:20

area 154:13 190:9

arena 106:4

Arlington 61:4,7

arm 87:19 88:10 191:15,16

ascertainable 32:21

asks 52:6 86:9 93:9 162:22

aspects 33:3

asserting 54:16

assessing 14:24

asset 52:11

assets 51:2,4 151:22

assigned 19:11 146:15

assist 69:6

assisted 69:7 195:17,18,19

assisting 55:16

associates 104:12

association 80:15,16,23

assume 7:5 39:4 90:14 93:16 100:6 114:15 140:15

assumes 21:10

assuming 47:1 106:22 125:22 138:25 139:21 140:8,24 154:7 168:16

assumption 120:19

attached 148:15 149:5,20,23,24

**attaches** 74:19

**attempt** 21:15 149:19 150:22

**attention** 12:14 38:12 48:23

**attorney** 5:17 23:10 25:16 26:10,
24 27:8 53:20 54:3 85:15,20
98:6 103:3,19,24 104:1,3,22,25
106:11 108:22 112:13 131:25
132:2 142:19 144:12 145:19
149:11 154:14 160:9 161:22
162:2,21,23 167:23 177:22
181:22,23

**attorneys** 30:23 67:23 103:24
144:5 173:22 174:3,8,21 181:19

**attracting** 12:14

**attributed** 89:13

**Audi** 91:14,24 92:17 100:18

**August** 34:19 184:9

**aunt** 195:17

**authority** 13:13,17 39:18 112:25
140:4

**authorized** 118:24 119:4,9,18
121:18 122:4

**authorizing** 121:12

**Auto** 61:13

**Avery** 11:24 28:20 47:19

**Avery's** 12:2

**aware** 50:5 103:18 105:19,21,25
106:7,18 108:12,16,20 110:9
114:16,23 115:6 116:14,20,22
117:17,24 126:21 129:1,7,8
133:21 136:7 137:1,4,12,16
146:10 153:23 156:7 157:6
170:18 190:4,7,8 194:17

---

**B**

---

**B's** 18:24

**B-A-R-A-J-A-S** 61:20

**B-R-A-N-D-O-N** 5:11

**B-R-E-T-O-N** 182:22

**back** 16:9 21:16 44:22,25 45:7,
15,17 46:15 69:20 85:9 102:3
104:16 108:11 109:20 115:7
116:13 119:3 146:2 147:20
148:24 161:5 162:25 170:22
173:11 174:19

**Bad** 93:17

**Badalamenti** 73:25 173:20
174:4,21

**balance** 59:13,16 61:2 71:9 72:2
74:4 77:3,8,11,21 83:13 84:1,20
92:3

**ballpark** 33:6 34:10

**bank** 7:16 8:8,25 9:15,19 12:19
13:4 14:2 16:23,24 17:11,15,20
18:19,20 39:19 63:18,21 68:11
81:7,10,14 82:10 91:18,24
163:20,23,25 164:9 189:18
194:17

**Bank's** 91:14

**banking** 164:1,3

**bankruptcy** 5:19 7:12 9:25 48:13
49:13,20,25 60:1,2,5,6 68:21
69:3 85:3 86:15 93:10,13 95:6
137:8 159:11,13 166:11,12
167:2,3 169:21 170:1 173:15
180:12 184:5,9,14 192:17
193:10,24

**banks** 164:18

**Barajas** 61:20

**based** 15:3,13 56:21 102:14,16
120:20 129:6,8

**Basically** 23:17 37:16

**basis** 10:22 53:15 79:11 131:3,16

**Bassel** 5:10 6:4 8:24 9:6 12:24
21:9 22:16 24:2 25:20 26:1,17
28:15 29:23 30:14 35:21 39:6
40:15 43:5 46:11,25 50:7,12
51:9,16,21 52:23 53:12 54:18
55:11,14,25 56:11 57:2,14 58:25
59:17 65:11,18 68:22 78:6,11
79:9 86:22,24 87:22 90:4 92:6,
23 93:3,5,15,17,20,22 94:20,23
95:5 96:11 97:3 98:12,16 99:10,

12 100:5 101:23 102:25 105:11
114:23,25 124:11 127:11,21,25
129:14,19,25 131:5,20 138:5,22
139:4,17,21 140:17 141:6
142:24 143:1,5 147:5 148:24
149:1,7,14 152:25 154:8 155:10,
20 158:2 162:6,14 164:5,14
167:5,9,24,25 168:4,12 169:3,8
170:13 171:18,25 172:13 174:14
176:1,15,19 177:2,10,15 179:6,8
180:6,14 181:21 182:8 184:11,
16 188:3,10,14 196:3

**begin** 6:19

**beginning** 107:2 110:24

**behalf** 13:14,20 48:13 50:1 60:18
61:1,8,24 63:3 64:2 68:8 69:23
70:25 71:6 72:1,8 75:23 77:2,20
80:8,13 82:22 83:25 84:19 93:11
95:6 111:23 112:19,25 115:20
120:8 122:23 123:24 126:16

**Bell** 23:1 25:5 85:10,24 106:17,
24 107:12,17 108:9 122:14
126:12,14 130:16,21,25 132:3,6,
8,10,20 133:13,25 134:4 135:19,
21,23,24 136:6,16,21 137:1,12,
16,22 138:6,17,19 139:2,10
140:2,24,25 148:12,23 190:11,
17,24 191:2

**Bell's** 126:19 127:9,15,16,20
128:7,9,10 133:2 135:17 136:14,
16 140:11 145:10,16

**Benincasa** 73:6

**bid** 33:14

**bids** 33:2

**big** 44:9

**bill** 40:20 61:16 62:11 63:4

**bit** 5:15 11:12,14 50:15 109:5
127:14 134:25

**black** 118:12

**blanks** 144:14

**Bloomfield** 183:11

**Blue** 62:1,6

**Bob**  49:20 50:1 55:10 65:10 93:7 157:23 160:7 162:19 169:18 182:7 194:9

**bodily**  156:13

**bolts**  15:4

**book**  182:12

**bookkeeper**  14:12,17,18 87:1

**borrow**  82:13 84:7

**borrowed**  70:8 73:14 81:20 91:20,24 92:4

**boss**  113:18 176:5,8 177:24

**bottom**  28:25 33:16 38:13,14 50:18,19,22 58:9 77:17 79:24 86:4,7 88:5 94:20 95:19 113:22 116:13 117:2 126:5 163:1 170:25 176:24

**bought**  90:21

**box**  157:11,21,22 158:7 161:19, 23

**boxes**  58:20 159:25 173:8

**Boyd**  5:25 57:25 103:5 112:18 124:22 141:2 150:11 156:18,19 157:2

**Boyds**  113:7 115:21 118:7 122:19,23 126:21 127:1 136:5 137:6 157:19 158:1,10,12,16,19 159:7 161:6,7,9,12,13,16 163:1 174:17

**Boyds'**  118:21 123:20

**Brandon**  5:4,9,18 6:5 22:17,18 56:22 88:3 99:21,22 172:21 177:6,7

**Brandon's**  180:18

**breach**  160:23 161:9

**breached**  21:25 43:1 44:12 52:18 72:24 73:1,5,10,24 75:12 76:9, 18 160:21 161:8

**break**  38:8 55:23 92:24,25 150:1 182:14 188:5,6,12,14,15,16,19

**Breton**  182:19,21,23 183:1,2 185:14

**bricks**  11:6

**Briefly**  105:2

**bring**  48:23

**brokers**  8:2

**Brothers**  77:4

**brought**  90:18 105:22 106:19 107:8 108:12,22 137:5 172:3 174:17,22

**bubblers**  31:12

**budget**  19:2,21 20:2,4

**build**  22:23 28:4 123:15 125:5,19

**builder**  114:15 115:9,14 118:8 121:11 122:13 128:25

**builder's**  22:4,8 25:5,11 38:23 39:1,5 45:24 103:21 108:24 109:2,23 110:8,16 114:18 115:23 116:4,11,17 117:1,13 122:13 130:22 131:9,18 133:1, 25 137:19,20 138:18 140:5,6,13 141:4 148:20,22 152:12,15 178:18,19 190:18

**building**  23:15,19 24:10,13,16 26:6 122:9,21 123:3,10,11,13 124:17,21 126:15 128:23 129:2 131:19 135:7,18 137:2 150:9

**bus**  99:7

**business**  14:8 17:11,14,20 25:15 38:20,21,22 67:16,17 68:12 80:22 82:2 83:1 86:10 87:16 97:14 98:4 100:9,14,15,17,22 106:3,8,17 107:11 110:18,23 114:2,5,7,10,11,16 117:5,19 121:1 137:12 153:25 169:13,21, 22 174:8,9,13,18 175:1,3,24 176:5,11 180:21 181:8 189:16

**busy**  110:3

**buy**  17:11 91:14 120:23 122:3 195:6

---

**C**

**C's**  18:24

**C-A-R-A-N**  66:10

**caffeine**  92:25

**calculated**  129:8

**Cale**  108:8,9

**calendar**  86:11

**California**  117:4,16 118:2

**call**  10:10 149:19 175:11

**called**  9:21 14:9 18:11 28:5

**calling**  59:1 149:1 169:9 172:13

**calls**  131:20 149:17 162:14 171:19

**Cameron**  74:25 85:14,25 190:12, 19

**Campo**  62:24

**canceling**  109:22

**cancelled**  160:24 161:2 162:11

**capacity**  115:10,15 155:5,9,19 176:2 180:18 187:22 191:2

**car**  17:14 99:8,15 101:3 102:10, 20

**Caran**  66:9,18

**card**  42:4,10,15 59:8,9,11,13 101:17,21

**carryover**  85:23

**Carter**  6:1 66:22 103:6 111:15 115:22 118:6,22 136:12 137:6 141:2 159:7,10,17,18 160:3,17, 21,23 161:16 162:11

**Carter's**  160:14

**Carters**  113:7

**carve-outs**  167:20

**case**  5:18,19,20 35:19 48:6 49:13,25 54:16 86:15 87:10 89:11 92:21 95:6 137:14 157:7 165:23 166:2,19 167:23 168:2 171:14 172:5 189:1 194:22

**cases**  141:2

**cash**  188:2,22 189:4,7,13,14,24

190:2,5

catch-all 154:17

Caterpillar 63:5,10,16

caused 20:12 68:21

central 18:19,20

CEO 10:21 178:5,8,9

cetera 18:5

Chad 174:5

chain 20:10 195:16

chance 38:2

change 30:4 31:6,9,11,17 47:17, 21 121:5

changed 121:2 145:21

changing 145:25

Chapter 5:18 36:24 37:10,23 48:6,13 49:13 53:8,11,19 81:13 85:23 109:25 156:22 173:5 193:5

charge 14:25 21:15

charged 25:14,19 26:5,8,11,13, 16

charges 26:15 59:16

check 16:25 17:2 39:22,23 95:25 173:8

checked 58:20 152:7,14 157:11, 15,21,22 159:25 160:1,4 161:20 173:6

checking 51:10 161:23

checkpoints 44:2

checks 13:13,17,20

Chelsea 125:12,14

Chelsea's 125:18,22 128:13 150:23

chelsea@exigentdesignbuild. com. 125:1

Cheltenham 150:12

chief 178:6,9

Christian 164:2,4

circuit 137:5 140:9 141:1 144:19 157:7 165:19 171:11 174:18 194:19

cited 169:20

Citi 63:18,21

Citizens 194:17

city 135:15

claim 51:23,25 54:5,10,16 58:19 64:12 65:2 91:15 155:16,19,22 156:24 157:6,10 158:7,18,19 159:15,24 161:19 164:7 170:10 187:21

claimed 55:3

claiming 160:15 175:5,8

claims 52:8,10,12,14,25 53:3,10, 18,24 64:10 74:10 145:16 153:12,24 154:5,18,20 155:1,3,8 180:18

clarify 12:25 29:7 130:20 154:2 157:18

Clarkston 186:7

classes 133:11,14,16,21

Classic 63:23 64:1,9,10

classified 67:8

classrooms 133:9

clause 21:4

cleaning 179:25 183:21 185:4

cleanings 183:3,9

client 14:24,25 18:23,24 20:15 21:24 30:23 66:23 76:9

client's 14:25 30:23

clients 20:19 21:15,22 23:20 29:18,24 52:18 75:24 80:8,13 83:25 155:4 179:10 192:10,14, 23 193:4

clients' 12:14

close 49:24 89:24 90:18 93:1,2 113:16 189:6

closer 40:14

coaching 142:24

codebtor 85:2,13 190:24

codebtors 84:24

collect 60:3,7

collecting 34:17

colloquial 85:2

color 118:12

column 158:6

combined 102:4

commingled 164:10

commission 16:15 18:2 46:23 47:9,21 48:1,3

commissions 16:6,7,9,12 17:22, 23 47:11 87:7,21

common 34:1

communicate 44:10,13

communications 55:20

company 9:21,24 10:5,7,15 11:24 13:14 20:16 22:24 23:13, 18 25:11 70:20 71:22,25 77:4 97:22 99:16,18,23,24 102:18 110:17 113:19 114:8 117:20 125:4,8 126:19 154:1 176:6,10 177:8

comparable 89:5,21,22,24

compelled 167:20

compensated 16:11

compensation 87:20 136:3 167:18

complaint 103:18,23 104:8,21,25 105:1,4,21,24 106:10 108:11,14, 21 109:20

complaints 105:9

complete 6:24 40:20 42:23 44:3 48:20 50:4 69:2 95:11 135:19 187:23

completed 18:3 66:16 72:23,25 73:4,9,23 74:7 75:3,11,16,19

76:4,8,13,17,22 77:15 79:16
80:2,20 152:9 184:2,4 187:3

**completely** 48:19 103:11

**complicated** 181:20

**compound** 124:13

**compromised** 187:22

**concerns** 85:13 103:21 148:3
173:13

**concluded** 196:9

**conclusion** 59:1 131:6,21,24
155:22 156:1 162:15,22 169:10

**concrete** 42:5,8,10,13,17 111:18

**concur** 174:12

**conditions** 29:14 30:3

**confidential** 180:11

**confidentiality** 165:24 166:4
167:19 168:5 170:20 171:20
172:4,7,15 193:20 194:11

**confirmed** 44:23 53:8

**conflict** 142:20

**confused** 87:22 178:13

**confusing** 123:6

**Congil** 64:14

**connection** 26:8 144:22 191:17

**Connelly** 64:19

**Connexus** 64:25 65:4

**consent** 108:13

**considered** 155:2

**construct** 122:22

**construction** 105:7 106:17
116:16 122:14 124:23 126:18,
22,24 129:13 130:17 137:13,17,
20 138:19 140:2,11,25 145:10
148:1,3,21 151:11 190:17

**consult** 32:7 132:2

**consulted** 93:12 106:21

**consulting** 87:14,15,16,23,24

**88**:1,8,9,17,18,20,22,25 89:3
191:7,9,25 192:1,3 193:1

**consumer** 114:17 169:2,7,12

**contact** 45:2

**contained** 50:3 95:9

**contemplating** 155:3 158:15

**contemporaneously** 157:25

**contended** 140:25

**contents** 27:2

**contingent** 58:19 59:24 64:5
67:18,21 83:19 159:25 173:7

**contract** 19:12 21:25 26:6 27:21,
25 28:1,8 29:6,21 30:6,10,15,21,
24 31:19 32:10 34:11 39:4 43:1
44:12 47:13 52:18 72:24 73:1,5,
10,24 75:12 76:9,18 80:19
109:7,13 111:15 112:1,3,6,11,
18,25 114:16 116:17 117:2,18
118:1 120:3 127:1 130:10
158:25 160:21,23 161:3,8,9
162:12 183:23 188:21 191:2

**contracted** 66:13 73:6,20 74:25
75:9,13 76:2,11,19 79:14,25
118:20

**contractor** 64:15 71:4,5,18 77:4
82:19 84:13 115:14 117:3
122:14 124:22 126:18,25 131:8
132:21

**contractor's** 131:9

**contractors** 95:15 106:18 122:15
124:23 126:19,22 130:17
137:13,17 138:19 140:3,25
145:10 148:1,4 151:1,11 190:17

**Contractors'** 126:24 137:20
140:11 148:22

**contracts** 17:24 20:17 21:4 23:22
29:24 30:15 31:4 109:18 113:7,
22 114:6 115:12,13,20 118:10
120:10,18 131:8

**contradictory** 139:15,22

**contribute** 53:10

**control** 20:8

**conversations** 24:20 33:4

**copy** 31:9 56:12 118:12 145:7
148:7

**corner** 129:4

**Corp** 64:19

**corporation** 114:12

**correct** 8:6 9:6,7 10:6 12:9 17:4
21:23 26:1 27:23 28:6,7,19,22,
24 29:2,3,5 31:23 32:1 33:8 34:2
39:24 53:16 59:19 64:13 65:17
66:5,15 75:25 80:14 84:4 86:18
87:1 88:7 95:15 97:21 98:23
100:24 102:6,8 104:6 106:14,16
108:10,23 109:18 110:16,25
111:2,3,19,25 112:2 113:2,8,9,
11,13,23,24,25 114:1,4 115:10,
15,24 116:5 118:11,19,23
120:12 121:19 122:2,5,15
123:24 124:23,24 129:17
130:10,12 132:3,22 133:10,14
134:18 136:4 138:18 139:11
140:14 141:16 144:16,17,20,25
145:3 148:1 151:4,11,12,16
152:7,8,11,13 153:15,16,19
154:1,7,22 156:19,20 157:1
159:8,9,22 160:1,2,4,12,16
162:3,4,7 163:3 165:19 166:20
167:4 170:5,6 171:7 173:18,22
174:19,20,22 175:1,22,25 176:9,
13,16 177:13 178:6 192:6 195:2,
23

**corrected** 103:10 144:2

**correctly** 31:12 41:3 96:8 134:22
140:10 171:1

**correspondence** 56:13

**Cory** 39:15,16

**cosigned** 99:22

**cost** 15:9,10,14 20:14,19 21:16,
17 31:16 32:9 128:20,22 129:2,
11,13 130:6,7

**costs** 21:8 32:21

**counsel** 56:15 69:2,6 98:24
165:23 166:1,2 170:10 181:25

counsel's 65:22

counterclaims 52:16,21

County 123:2,4 137:5 138:20
139:1 140:9 141:1 144:19
165:19 171:11 174:18 179:21,22
194:19

couple 31:14 45:14 54:21 103:9
110:22 130:13,19 150:9 165:17
178:18

court 6:21 27:14 50:18 95:18
115:16 137:5,8 140:9 141:1
144:19 157:7 165:19 171:11
172:25 174:19 194:19

cousin 108:3

cover 95:4

COVID 67:10 133:3,15,19 134:17

coy 146:20

CPA 14:13,21

crane 64:19,22

create 15:8 28:2

created 144:11

creating 20:15 69:6

credit 42:4,10,15 59:8,9,11,13
64:25 65:4 67:5,7,9 74:13,15,23
84:2 101:17,21

creditor 5:17,25 104:5 159:11
163:2 168:16,17 170:2,25
173:14,19 189:1

creditors 5:24 53:23 156:18,22
193:5,10

credits 56:7

Creek 7:11

crews 32:19,20

crime 25:14 26:5

criminally 26:8,11,16

Cross 62:1,6

current 7:10 8:18 62:13 108:21

customer 39:3 69:24 71:1,7 72:1
77:20 82:23 84:19 109:13 112:2
114:17 135:3 144:15 146:15
147:15,18 148:18 159:7 171:6
181:17 194:3

customer's 36:2 44:6 150:19

customers 11:1,18 20:17,19
21:7,10 29:18 30:11,20 35:6,9
38:25 60:19 61:1,9,24 63:3 64:3
68:9 72:9 77:2 109:8,18 121:17
178:23,24 180:1,2,14,16 181:4,
14,15 188:20 189:7 192:15,23
193:4

## D

d/b/a 125:11 191:18,21

daily 43:18

Dan 13:7,16 14:12,15,21 19:5
28:10 32:4 36:19 37:1 111:15

Dana 66:9,18

Daniel 6:1 36:10 103:5 159:7,10
160:3,21,23 161:16 162:11

date 18:13 34:8,11,20,23 45:7,11
48:10 86:15 94:20 115:13 145:4
159:24 164:20 172:18,20,21

dated 120:11

dates 43:24

day 14:2 99:24 110:21

day-to-day 10:22 13:23,25

days 170:1 173:15

deal 26:25 27:3,6 45:16

dealer 118:25 119:4,9,18,24
120:21 121:18

deals 114:18

dealt 21:13

debt 59:22 65:16,19 74:19 77:12
83:3,18 85:4 158:21 160:3
169:12,13

debtor 157:15 190:11

debtors 157:22

debts 54:1 69:7 157:16 169:1,2,

6,7,13,20

December 34:22 35:7 145:5,23
146:2 164:24 195:2 196:5

decided 14:24 132:7,13,15
133:12

decision 15:17 22:3

Decoster 76:1 85:14,25 190:12,
20

deed 7:19,23

defendant 137:13

defendants 174:10

defer 53:20

deficiency 83:13

delay 182:17

delivering 39:22

demand 60:8 153:14

denying 137:17

dependant 98:2,5

depended 32:15

dependents 97:25

depends 19:7 24:22 88:16,18

deposited 35:4 81:7 189:18

deposition 6:14 162:24

describe 10:8 13:25 17:7 27:6
36:21 107:13 135:22

describes 31:20

description 128:17 153:17

design 125:5,18,19

detail 132:15

details 92:11 153:20

Detection 60:11

determination 15:2,5

determine 32:2,8 53:2

determined 174:11

determining 19:1

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

develop 24:21

Dickinson 56:13

difference 30:17 32:23 41:9

differently 122:20 127:14

difficult 143:11

difficulties 20:13 21:2

digging 11:12 44:22

direct 165:25

directed 154:14

directly 41:21 42:3 89:13

director 175:19 180:23,24

disagree 56:18 59:16

disagreement 59:17

discovery 138:25 139:7,25
140:24 141:17 180:8 182:11,12

discuss 45:15

discussed 17:23 74:16 88:6
136:10 162:9

discussion 143:20 168:19

diseconomy 169:11

dismissed 26:15 172:20,22

dispenser 77:10

Disposal 62:24

disputably 65:5

dispute 58:22 64:9 74:18,22
84:16 160:14 173:3

disputed 58:1,19 64:6,11 65:2,7,
10,17 67:18,22 74:14 84:15
157:11 160:1,3,6 173:7

disputes 193:16,22 194:15

disputing 90:9

disrespect 90:5

District 5:19

docket 49:12 50:12,13

document 27:16 31:15 40:17
49:8,11,15,18 94:16,18,19 124:9

126:5,25 128:11 144:23 145:2,4
146:15,17,21 147:1,17,20 149:4
152:19 162:3,25 177:16,22

documentation 117:4

documents 48:7 95:7 104:17,20,
22 146:4,10 148:14,20 149:5
150:6

dollar 28:3

Dolphin 41:4,15,24

drafts 93:18

draw 15:22 17:6 40:7 42:11

drawing 25:1

drawings 24:19,21,24

draws 15:25 16:13,16,25 87:5,20

drive 7:11 39:25 101:2 150:12

driven 100:19

driver's 136:15,17,18,21 147:22
148:8,10

drives 101:1,6,7

driving 102:16

drugs 6:11

due 40:22 41:22 42:14 58:22
133:15 168:1,10 193:19

duly 5:5

Dunakey 147:14,15 148:15

duties 125:18

**E**

e-mail 56:5,12 124:25 125:16
134:12

e-mails 134:3,6,9

earlier 98:24 112:4,21 114:2
116:14 152:21 161:5 175:24
191:7

Eastern 5:19

effect 10:16 123:18

elaborate 130:22 157:17

elected 41:21 42:2,9

electronic 29:2

electronically 28:18 162:2

else's 79:10 131:9 141:8

employ 36:1

employed 95:14

employee 15:24 16:1 23:2 25:10
62:9 67:5,7,9 125:15 180:22

employees 18:22 69:7 97:8,12,
13,15,17

employment 86:10

end 14:20 34:16 93:1 190:10

ended 161:23 192:16

ends 65:15

engaged 195:4,8

engagement 195:6,10

engineer 24:22,23 70:13

engineering 40:9 70:12 84:13,16
125:21

English 72:11

ensure 35:11,18 36:2

ensuring 39:9

enter 127:1

entered 109:7 115:12,13,21
120:11,15 126:21 132:3

entering 120:2,3 131:8

Enterprise 61:20

entities 122:12

entitled 144:23

entity 116:15 121:7 125:10 127:1

entity's 127:6

entries 85:10

equipment 63:11,13 69:20 82:25
83:2,5,6,7,14

ERC 66:25 67:2

error 152:17

**errors** 48:22 152:20,24,25

**essentially** 41:19 173:16

**establish** 140:9

**estate** 65:13,14 74:20

**estimate** 32:6 33:6 195:12

**estimated** 128:20,22 129:1,11

**evaluate** 8:2

**event** 57:23 88:19,20,21 181:3

**Everest** 67:16,25

**evidence** 157:7 180:9

**exact** 8:11 16:3 34:8,20,23 40:11,
16 43:24 45:11 47:9 54:14 56:5
57:12 61:12 78:20 84:6 89:4,20
90:6,24 91:1,8 92:10 107:18
109:14 110:21 120:22 133:18
159:19 160:17 172:20,21 189:5,
21 195:11

**examination** 7:9 27:15 49:8
94:16 103:17 196:9

**examined** 5:5

**examples** 152:3,5 155:7

**excavator** 75:20

**exception** 170:19

**exceptions** 167:19

**excitement** 143:25

**excuse** 37:12 122:13 165:9,10
174:5 175:6 184:11

**executive** 178:11

**exhibit** 27:10,15 38:12 49:2,7
94:9,11,15,19 111:10 112:8
118:14 124:5,10 136:22 143:19,
21 144:1,4 146:22 150:7,8
151:19 176:22 177:14 181:2

**exhibits** 111:5 143:25 151:17
176:12

**Exigent** 9:21 10:10,11,12,18,20,
22 11:2,17 12:11 13:21,24 15:19
16:11 17:5,8 20:12 21:1,6,12
22:17,20 23:2,6,7 24:1,4 25:8,10
26:9 27:22 28:4,20 30:11 31:4

32:12 33:21 34:1,3,19 35:2,6
36:1 37:10,19,23 38:20,22 40:3
41:18,23,24 42:8,11,12,15,18,23
44:11,14 46:6 57:20,23 59:9
60:1,5,16,23 61:2,5,14,15,21
62:3,4,7,13,25 63:11,24 64:15,
19,21 66:11,13,18,19 67:6 68:2,
3,6,9,13,21,25 69:7,21,24 70:3,
23 71:1,2,7,8,9,16,20,23 72:1,2,
6,7,12,13,24 73:1,5,7,10,14,21,
24 74:1,2,4,12 75:1,9,12,14,22,
24 76:2,9,11,18,20,24 77:2,3,5,
8,12,20,21 79:14,19,25 80:5,8,
10,13,19,24 81:13,16 82:2,11,
12,13,20,23,24 83:1,3,22,25
84:1,13,19,20 85:7,16,19,21
87:19,23,25 88:8,9,10,12,13,22
89:2,16 96:22 97:6,13,17,18,20
105:22 106:9,10 107:8 109:5,11
111:15,24 112:1,18,19,22,24
113:1 114:5,17 115:12,20 116:3,
10 117:12 118:7,24 119:5,6,8
120:2,8,15 121:10 122:3 123:14,
24 125:4,9,11,15,18 130:16,21
131:17 132:9 133:24 134:20
135:17 137:19 140:3 141:2
144:19 146:4,11 147:4,15,18
151:9,10 153:18,21 154:3 159:8
160:22,25 161:3,8,12 162:12
169:22 171:6,10 178:24 180:2,
17 181:16 183:25 184:4,14
185:5,9,14,18 186:11 187:1,16,
21 188:1,20 191:15,18,20
192:18 193:9,10,23 194:3,5,12,
14 195:24

**Exigent's** 12:19 17:23 29:1 35:4
39:19 52:25 60:19 61:1,8,24
63:3 64:3 68:20 69:2,6,9 70:11,
13 72:9 81:7,10 85:23 132:25
134:21 173:23

**existence** 110:23 134:20,21

**existing** 11:11,18

**expect** 6:19,22

**expected** 94:7

**expedite** 55:16

**expense** 72:12 98:18 101:14,25
102:9

**expenses** 14:16,23 17:5,7 36:12
37:18 82:8,17 98:7,9 99:9
101:24 102:5 189:17

**experiencing** 21:1

**explain** 6:17 10:17 52:12

**Explore** 120:25 121:4,9

**Express** 58:16,22 59:4,8,9 60:2,6
101:20

**extend** 130:17

**extent** 26:18 155:21

**exterior** 183:23

**external** 20:8

**F**

**facility** 119:21

**fact** 31:25 42:17 113:10,12
117:12,19 152:15 161:2 162:11
164:13 171:23

**facts** 120:22

**fair** 7:7 11:8,23 33:24 50:14
89:24 90:14 91:25 149:25

**fairly** 9:3 29:17 90:10

**false** 145:12,17

**familiar** 9:21 27:16 29:6 38:17
48:12 49:10 95:1,7,9 125:4
126:9 127:17,19 128:6,13 129:5
144:24 156:6 157:25 194:1

**family** 93:25 107:14

**Fantastic** 68:5

**fare** 99:8

**Farm** 83:21

**Farraj** 104:12

**farther** 84:21

**father** 77:23 78:17 94:3 186:2

**February** 93:15 166:19 167:4,5,8
172:25

**federal** 48:9 74:13,23

fee 40:6,10,16,24 129:5,6,8 193:1

feel 157:1 159:17 160:18

fees 175:8

felt 44:9

fencing 11:7 32:17

fiberglass 128:18

figure 8:11 16:3 57:6 89:25
90:16,19,20 91:1 164:8

figures 86:19,25 88:5

file 51:22,25 54:5 55:9 68:21
155:13 166:13 167:3,21 168:6
171:9 194:5

filed 9:2 48:8,9,10,13,19 49:11,
12,25 50:1 52:9,14 54:15,18,24
57:7 60:1,5,6 69:12 86:15 87:10
89:11 93:10 94:24 95:6 102:8
144:18 153:13 154:19 158:12
159:24 166:12 167:2 170:1
173:5 184:9,14

filing 9:3,25 77:21 155:3 158:15
173:15 184:4

fill 91:2 92:16 119:23 123:17
144:14

filled 127:5 137:2

final 40:21

finance 14:10,13,22 28:10 32:4
82:25 83:2

financed 91:18

financial 13:23,25 14:9 20:12
21:1 63:5,10,16 67:1,2 84:2 91:5
164:2,4

Financing 70:1,3

find 44:6

finding 195:19

fine 39:7 47:5 92:24 97:1 179:7

finish 22:2 37:13,18,20 146:13
161:1,10

finished 188:4

firm 174:4 175:8

five-minute 92:25

fix 44:19 45:5

Fleet 69:20

flip 49:9 94:18

floating 38:3

foamily 107:14

follow 6:19 109:24

follow-up 10:9 103:16 120:17
193:13

forces 133:12

foreclosing 99:1

foreclosure 99:3

Forest 7:11

forget 143:25

forgot 162:8

form 16:25 17:5 21:9 29:17,19
30:10 35:23 46:25 58:25 127:6
137:2 139:17 140:17 143:5,6
154:8 155:20 159:20 169:8

formal 137:18 138:16

found 48:18

foundation 47:3 68:11 138:5,22
139:6,23 142:5,11 171:23
176:15

Fox 135:4,8,10,13

Fox's 135:10,24

fraction 189:22

franchises 152:2

fraudulent 26:5

free 31:12

frequently 30:19

friend 107:16,22

friends 107:25 108:7

front 38:13 127:18 143:2 144:23
150:6 151:24 165:13 166:17
168:6 170:23

fuel 102:9 152:23

Fuels 76:24

full 5:15 11:8 61:7,23 63:2 64:1,
17 69:23 71:6,25 72:8 75:23
77:1,7,19 80:7,12 82:22 83:24
84:18 188:20

fully 41:3

Funbox 70:1

fund 26:6 35:4

Funding 67:16 81:16

funds 35:15 36:4,5 37:13 46:6,18
164:10 195:22

---

**G**

---

G-R-O-S-S 12:8

galore 142:5

garage 100:18

gas 57:17,18,20 99:7,15,16
101:12

Gateway 40:9 70:12

gave 52:10 56:16

gears 48:6

general 14:5,7 30:6,21 35:4
103:19 104:25 106:11 108:22
112:6 152:2

Generally 172:10

generate 89:2

genesis 132:5

Genever's 183:18

Genevere 183:15,16,20,25

gentleman 186:20

give 6:21,24 7:5 33:6 93:4 103:8,
10 132:14 138:10 153:20 155:7,
16 156:8 172:20 195:8,12

glad 56:11

GMC 99:19

Godparent 108:3

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**good** 38:7 93:1 103:8 108:7 118:4 131:24 146:8 156:11 160:7 162:23 181:7,9 194:9

**goods** 64:2

**Google** 12:17

**government** 122:12

**Grace** 70:19,21

**grand** 55:18 56:2

**Grandchamp** 12:1 112:20 113:17

**great** 107:25

**greater** 177:20

**groceries** 17:11

**grocery** 100:25

**gross** 12:7 16:15

**ground** 24:13

**guarantee** 63:15 67:25 68:15 70:4 71:11 72:14 73:16 81:1,22 82:6 83:16

**guess** 7:18 8:22 9:11 51:7 62:14 90:2,5 107:18 109:15 143:2 149:18 161:15 166:17 174:11

**guidance** 132:18 136:2

**guide** 67:24

**guided** 49:21

**Gunther** 13:11

**gut** 9:3

**guy** 14:10,13,22 28:10 32:4 36:10

**guys** 45:6 188:11 196:4

---

**H**

**H-E-I-T-M-A-N-N** 5:12

**half** 189:22

**hand** 39:25

**handed** 27:14 49:6 94:15

**handle** 103:24 146:5

**handled** 25:16 26:10,24 27:8 49:21 103:25

**handling** 106:12

**hands** 37:9

**handwriting** 127:10,15,16,20,22 128:7,10,13

**handwritten** 127:5 128:10,11 147:10

**Hank** 22:19,22 23:2,13,16 24:24 85:10,24 107:16 115:2 116:7 122:14 123:14 126:12,14 127:2, 9,15,16,20 128:7,9,10 130:16, 21,25 132:3,6,8,10,20 133:1,13, 25 134:4 135:17,19,21,23,24 137:12 138:4,6,17,19 139:2 140:2,11,24 142:1 145:10,15 148:11,12,23 190:11,17,24 191:2

**Hank's** 22:25 126:11 128:12

**happen** 19:21 83:9 123:7

**happened** 21:24 33:7 55:15 133:20 136:23 189:14

**happy** 7:4 138:10

**Harrington** 5:21,23,24 6:19 25:24 56:12 58:2 103:2,3,14,17 104:13,15 105:15,18 110:12 111:4,9 112:10,12 114:24 115:5, 19 124:3,8,13,19 127:12,24 128:3,5 129:15,23 130:4 131:7, 13 132:1 138:8,12,24 139:7,9, 19,24 140:7,23 141:14,23 142:6, 16 143:3,15,18,24 144:3 146:25 147:7 149:3,9,18,21,25 150:4 153:2 154:10 155:12,14 156:2 158:5 162:16 164:6,16 166:5,10, 15,18 167:1,6,10,22 168:1,8,9, 15,20 169:5,15,16 170:17 171:22 172:1,16,24 174:16 176:3,21 177:9,11,18 178:14,16 179:4,11 180:7,16,19 181:13 182:3,16,20 184:13,17 188:7,11, 18 193:12 196:6,8

**Harrington's** 20:14 66:22 193:15

**Haul** 60:21,25

**head** 177:7

**headquartered** 119:13

**health** 62:9 156:10,11

**hear** 56:15 65:22

**hearing** 104:16 108:16

**hearings** 103:5

**Hebeka** 72:21 165:15

**Hebeka's** 173:6

**Hebekas** 165:18 166:19 167:13 168:11 170:11 172:17 173:13,17

**Hecktor** 71:3

**height** 19:14

**Heitmann** 5:4,9,11,18 6:3,5,6 27:10,14 38:12 49:2,6 56:2 65:22 77:22 88:3 94:11 100:6 103:2 110:11 111:5 124:5,9 131:22 140:4 141:7 143:21 144:4 146:22 169:12 186:1 191:5,9,13,14,15,24 192:10,14, 16,23

**held** 88:21 143:20 168:19

**helpful** 55:14

**helps** 169:14

**Henry** 106:17,24

**Hernandez** 184:25 185:3,5

**hey** 33:5 45:6

**hide** 146:20

**Hills** 80:15

**hold** 52:15 93:3

**holding** 42:17

**holds** 8:8

**home** 7:15,18,19,25 8:3 45:9 65:3 66:14 111:17

**homeowner** 41:21 42:2,9,15 43:1 44:24 66:10,12 71:4,17,19 73:2, 6,20 74:5,25 75:7,13 76:2,6,10, 15,19 77:13 79:14,24 117:11

**homeowners** 72:21 80:16

homeownership 98:9,18

honest 149:11 161:21

hourly 16:2 96:3

house 5:15 8:14 44:6 90:21
187:24

household 89:12 90:11 101:24,
25 102:4

housing 98:7

hundred 55:3

Huth 73:25 173:20 174:21

hypothetical 142:9 143:7

Hypothetically 109:21

**I**

idea 14:4,5,6,7 15:6 33:25 90:10
99:5 128:4 134:14,16 148:17
149:23 158:18

identification 27:12 49:4,14
94:13 111:7 124:7 143:23
146:24

identified 49:6 124:23 128:22
152:21 156:24 165:3

identifies 154:24 156:18

identify 28:1

imagine 28:9 113:10 118:16,17,
25 119:9,12,21,24 120:3,15,17,
24 121:1,3,5,8,9,18 122:1,3,5
129:13

imagining 129:16

Immediately 45:13

impact 6:12 109:24 161:3 162:12

improvement 65:3

in-ground 111:16 122:9,22
128:18 134:23 178:20

in-house 32:14,16,17,18,22

include 99:7 159:12

included 31:7 54:4

includes 18:8 87:3,5,7

including 97:10 167:17

income 16:12 86:10 87:3,9 88:3,
8,9 89:12,15 91:4,11 92:19,20
102:4 176:23,24 177:19

incorporate 32:9

incorrect 140:14 141:5,16,25

increase 20:10 40:22

incurred 158:21

indebted 158:1

independent 195:16

indirect 142:23

individual 18:17 36:13

individual's 131:17

individually 171:13 174:25

individuals 11:17 13:12,16 113:3
125:25 187:20

industries 120:25 121:4,9

industry 29:25

inflation 20:10,14,18,21 21:6

info 148:5

informal 137:18 138:17

information 48:18 50:2 69:9 95:9
135:17 136:16 145:11,12
147:21,25 148:19 175:16 182:5

injured 155:18

injury 156:7,13

input 24:24

inquire 121:10 133:22 148:19

inquiring 149:5

inside 11:24 37:17 77:10

insight 141:18

inspect 43:11,16,19 44:4 45:10,
20

inspecting 43:17

inspections 131:2 132:18

install 19:25 122:22

installation 111:16 171:6

installations 178:21

installed 31:21 118:21

installing 134:23

installment 93:24

installments 18:4 93:15

instance 18:10 46:10

instruct 166:16 167:24

instructing 143:1 167:15

insurance 61:13,16 62:9,14,16
79:18 96:5

intangibles 152:2

intend 53:5,7,18

interaction 103:4

interest 12:15 63:12 74:20
142:20

interested 38:1

interesting 180:9

internal 14:22 54:7,15

interrupt 38:6

involved 104:12 156:12

irrelevant 182:4

IRS 55:2,7,15

issue 39:18 65:12,18,19 105:5
108:18 109:21

issued 103:19

issues 24:19 34:17 44:17,18,20
103:16 136:1,11

issuing 133:7

item 95:13 98:14 99:10

items 31:24 32:11 45:4

Ivan 71:17,20 188:25 189:1,4,14

**J**

**J&h**  71:22,25

**Jake**  11:24

**Jake's**  12:6

**Jameel**  183:19

**Jameel's**  184:18

**Jameer**  183:20,25

**January**  93:15 192:12

**Jay's**  72:5

**Jeff**  72:11 179:13

**Jennifer**  184:25 185:3,5

**jets**  31:13

**jeweler**  195:16

**Jim**  186:18

**Jimmy**  135:4

**job**  15:9,14 22:2 28:23 32:15
33:24 36:9 37:18 41:12 42:6,18
43:3 103:8 135:15,24 146:6,7,12
160:24 161:10 179:23,25

**jobs**  15:6 132:14

**Joe**  72:21 73:2 170:25 174:3

**Joel**  165:15

**jog**  128:3,7 149:20 150:22 165:4

**John**  5:24 73:6 103:3 104:11
165:22

**joined**  133:12

**joint**  164:17 190:11

**judge**  143:2 166:17 168:7

**judgment**  194:20

**July**  34:7,13

**jump**  63:23 165:10 168:21

**jumping**  31:13 154:13

**June**  34:11 35:7 104:16

**K**

**K-A-J-I**  187:10

**Kabbage**  73:11

**Kaji**  187:6,7,9,14

**Kali**  183:5,7,8,10

**keeping**  14:23 15:6

**Kelly**  79:14 183:6

**Kelsey**  73:20,23

**key**  149:12

**kicked**  43:3 160:24

**kind**  5:14 11:4 24:18 29:15 52:7
67:23 87:15 96:19 97:1 103:10
114:11 116:23 117:10 120:4,5,
20 124:13 141:19 142:23 144:14
146:8 154:3,16 179:25 182:25
183:8,20

**Kirk**  73:25 173:20 174:21

**knowledge**  15:3 48:20 69:17
72:17 163:25 170:8 172:3

**Knoxville**  119:16,17,20

**Kody**  11:22 112:20 113:17

**Kody's**  11:25

**Kristen**  74:5

**Kumar**  79:24 85:14,25 190:12,20

**L**

**labor**  15:7 32:12 35:3,13 36:8
46:7

**labor's**  15:10

**lack**  113:18 119:7 121:25

**lacks**  142:10

**Lafayette**  74:11,13,23

**Lahser**  183:12

**laid**  47:3 171:23

**Lamborghini**  92:15

**landscape**  80:4 89:5

**landscaping**  9:22 10:11 11:6,8
27:22 32:16 68:2 80:10 85:7
96:18 97:2 105:22 115:21 116:4,
10 117:12 125:9,11 140:4 147:4
153:18 169:22 181:16 186:23
188:1 193:9

**Landscaping's**  193:10

**Lange**  73:25 173:20 174:21

**LARA**  38:22 108:17 114:7 133:6

**large**  190:5

**late**  20:7 143:12 177:4 178:15

**law**  156:5 175:7

**lawsuit**  144:18 145:19 153:13
154:2,5 158:4,15 165:21 167:14
171:9 172:2 174:17,22,24 175:4
194:5,8

**lawsuits**  52:9,13 107:8 153:24
158:12

**lawyer**  29:15 170:21

**lay**  143:7

**lazy**  28:5 44:23

**lead**  180:8 182:4

**Leak**  60:11

**lease**  72:14,16

**Lee**  74:25 85:13,25

**left**  5:25 36:16,20 37:18 157:14

**left-hand**  52:6 157:19

**legal**  53:13,14 59:1 73:25 131:4,
5,21,24 155:22 156:1,4 162:14,
22 169:9 175:8 191:17

**legally**  17:9 167:20

**legitimate**  142:22,25 149:6 182:5

**lender**  98:25

**lengthy**  49:9 141:17

**letters**  60:8

**level**  138:3

**liability** 10:14 55:1 57:22 114:8 117:20

**license** 22:4,9,15 25:5,12,15 38:14,17,19,20,21,22,23 39:1,5 45:24 46:5 103:21 105:8 108:24 109:2,23 110:4,8,16,18,20 111:1 113:22 114:3,5,18 115:23 116:4, 11,13,18 117:1,13,25 122:13 130:22 131:9,10,18 133:1,2 134:1 136:15,17,18,21 137:19, 20 138:18 140:5,6,13 141:4 145:12,16 147:22 148:5,7,8,10, 19,20,22 152:10,12,16 178:18, 19 190:18

**licensed** 114:14 115:9,14 117:18 118:8,24 119:9 121:11 132:20

**licensee** 111:2

**licenses** 117:25 133:7 152:1,5

**licensing** 105:4 133:9 147:21

**lie** 138:21

**lien** 63:12 65:13

**life** 53:7

**limited** 10:14 114:8 117:20 167:17

**Linda** 54:19 55:15

**lines** 28:15 64:14

**Linkedin** 175:10

**list** 52:8 54:1 60:11,22 68:2 98:2, 5,7,10 154:6 180:11

**listed** 51:2,24 54:6,10 57:6 58:16 63:6,18 65:1 67:16 68:11 74:13, 14 75:18,20 78:19 83:1 84:15 85:7,22 90:13 93:14 98:13 99:8 102:19 153:17 154:9,16 155:9 156:21 168:18 190:11

**listing** 57:3 175:11

**lists** 58:8 84:24

**litigation** 137:4 138:20 140:8 141:1,5 144:22

**lives** 135:14 179:18

**Living** 95:14,21 96:17,20 109:3

110:7,15 113:4 126:1 151:15 175:20 177:13,25 178:17,20,23 180:3 181:15,18 183:2 186:9,19 187:13,23

**LLC** 9:22 10:11,17 27:22 68:2,5 114:12,13 117:2 124:23 126:19

**loan** 58:14 63:11,19 65:3,6 67:17,25 68:12,13,17,19 70:6 71:11 73:11,16 74:15 79:5 81:1, 16 82:1,2,10 83:1,5,18 84:3 91:2,4,11 92:16,19 163:8,10,18 164:7,8,10

**loaned** 78:17,25 80:24 165:5

**loaning** 78:18,21,23 79:2

**loans** 58:10 78:19 79:5,6 163:14

**location** 44:23

**login** 13:3

**Lone** 80:15

**long** 109:10 134:20,23 163:12 164:3,23

**longer** 8:23

**looked** 107:16 112:4 175:18 196:3

**loss** 36:16,22,23 37:1,6,12

**losses** 14:16 36:11,13

**lost** 140:22

**lot** 8:11 22:22 32:16,17 33:9,10 62:4 85:22 92:24 103:15 151:18

**lower** 129:4

---

**M**

**M-E-H-R-A** 77:13

**Macomb** 111:17 123:1,2,3,4,5,10 137:5 138:19 139:1 140:9 141:1 144:19 165:19 171:10 174:18 179:21 182:24 185:2 194:19

**Madaus** 76:10

**made** 8:20 17:3 18:12,14 22:2 44:8 48:4 51:15 69:15 86:15,16, 17 90:13,14,17 93:24 122:12

123:9,14 131:10 153:14 170:10 180:18

**mailed** 124:1

**maintain** 163:20,23

**maintenance** 11:15 99:7 186:10, 21,23 187:15

**make** 6:25 9:17 15:2,5,15 17:14, 19 30:25 32:23 34:3,12,15 36:4, 7 44:4 145:7 155:21 168:2 176:11 177:5,12 180:25

**making** 9:11,13 15:16 35:9 90:7, 15 121:12 181:1

**Malek** 75:7,11

**managed** 13:23 18:17

**management** 96:21

**manager** 14:8 19:5,6,11,19,22 20:3 25:4 36:6 39:17 43:17 45:3, 4 112:23,24

**manager's** 29:1

**managers** 19:9,14,17 20:6 146:11

**Marc** 75:13

**March** 22:12,15 25:6 46:3 49:12 115:10 152:9 167:2 168:10

**Marco** 75:20

**Maret** 55:15 56:2,13

**margin** 15:11 19:24

**mark** 27:9 48:25 111:4

**marked** 27:11,15 49:3,7 58:1,19 59:24 64:5 65:2 67:17,21 83:18 94:12,15 111:6,10 112:8 124:2, 3,6,10 143:18,22 146:19,23 150:7 153:14 158:8 161:18

**marketing** 10:23 12:10,11 175:20 180:24 192:2

**marriage** 164:20

**married** 163:12,15 164:25 165:6 195:1 196:4

**Martin** 76:6 194:1,12,15

Masonry 61:4,7

master 147:3 148:15,16

Masters 69:20

match 91:4

material 20:10,14,19 21:16,17
29:10 83:24 129:13 189:16
193:18

materials 15:7,9 35:3,13 36:7
41:13,15,18 42:17 46:7 63:3
64:2

Matt 76:1,6 85:14,25

matter 104:4,12 106:12 166:1

Matthew 194:1,12,15

Maxwell 39:15,16,18,25

means 28:23 93:16 102:15
161:21,22 162:8,10

meant 85:18 178:11

media 12:17 190:4

medications 6:11

meet 23:20

meeting 14:24 108:16

Megan 76:10

Mehra 77:13

member 10:4 93:25

members 10:4,7,8,16,18

memorialize 163:10

memorializing 134:3

memory 56:4,21 120:20 128:4,8
149:20 150:22 165:4 173:4

mentioned 12:10 54:3 112:21
130:13,19,20 162:6 171:4
184:22 185:24 193:15 195:1

mentor 107:16,22

Mercedes 101:7 102:22

message 134:9,11

messages 134:3,7

Messina 42:5,8,13,17

met 11:18

Michigan 5:1,20 7:11 57:4,9
103:19 109:21 116:16 117:17
121:12,17,23 122:1

middle 36:17 71:3 80:22 82:25
107:2 125:2 128:16 156:17
159:23 165:15

midst 134:17

milestone 44:9

Miller 5:7,13,16 6:6,10,14,17 7:2,
9 8:24 9:4,8 13:1 21:14 22:18,21
24:5,7 26:4,19,20 27:9,13 28:16
30:1,18 35:25 38:4,8,11 39:7,8
40:19 43:8 46:15,20 47:5,10
48:25 49:5 50:9,14,16 51:13,19
52:1,24 53:17 54:21,23 55:13,
19,22 56:10,12,14,24 57:15
59:2,3,20,23 65:9,16,21 66:4,6
68:24 78:8,14 79:12,13 87:2
88:2 90:8 92:9,13 93:2,4,6,8,19,
21,23 94:14,25 95:3 96:16 97:5
98:15,17 99:11,14 100:10 102:2,
24 103:6,14 110:5 113:21
117:11 122:7 142:15 144:15
150:5 151:18 152:18,25 161:25
163:7 165:16 190:9,22 193:13,
14 196:1,7

Miller's 109:5 130:15 171:5
191:8 192:4

million 189:6,14,24

mind 41:10 43:6 79:10

minor 113:6

minute 182:17

minutes 93:4

misheard 179:16

missing 50:10

misspoke 159:5 184:15

mistakenly 150:8

mixed 86:22,23

model 101:10,11

modified 30:19

Mohamad 27:21

Mohamed 5:17 27:22 31:5

moment 16:9 56:25 66:23 138:2
191:6

monetary 167:18

money 14:4,6 18:23 21:17 35:2,
11 57:9,18,20 58:14 60:15 62:6
64:12 66:18 68:3 70:14,17,21
71:2,8,13,20 73:14,18 75:22
77:24 78:17,18,21,23,25 79:23
81:5,11,24 82:8,17 84:11 87:23,
24 88:1,11,13,16,17 132:11
153:21 157:2,12 158:10 159:17,
20 160:19 161:6 166:11 176:11
177:6,12 180:25 181:1 193:7
194:14 195:24

monies 46:13 56:1 161:11,13
163:17 165:5 167:13 168:10
170:11 171:16 173:14

monitoring 132:18

month 14:20 72:19 96:1 101:16
110:22

monthly 9:9 102:4

months 18:13 110:22 145:21
165:1 178:18

morning 175:19

mortgage 7:18 8:5,8,10,18,21
9:9,11,12,17 17:19 91:7 98:22,
25

motion 166:14 167:21 168:6

mouth 12:17

move 44:21 94:9 102:12 142:14

moved 44:25

multi-page 147:20

multiple 43:24

---

**N**

N53 154:9,14

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

name's 5:23

named 126:24 137:13 147:15
159:10 170:25 171:13 174:10,25
190:24 193:5,10

names 123:7 127:6 155:16
189:11 193:17

Nancy 76:15

Nancy's 76:17

Nandi 183:5,7,8,10

Nandis 185:9

nature 49:14 52:21 103:12
104:24 119:24 146:7 147:22
155:16 158:19 180:12

necessarily 31:8

needed 24:25 44:9 121:18
132:18 136:1,10

negotiated 27:7

Nick 76:19

nitpick 151:19

non-consumer 169:13

non-issue 65:15

nonbusiness 100:7

Nonetheless 142:21 156:6

north 91:25

notation 58:9

note 78:15 136:14 173:6

noticed 20:7 152:21

November 91:15

number 5:20 38:15,17,19,23
39:1,5 40:25 49:12 52:5 57:8,12
86:9 89:4 90:6,24 92:7 96:9
98:16 99:6 102:12 113:23
116:18 117:18,25 129:21
136:15,17 144:5 145:8,9,13
150:14,17,20,23 151:1,4,6,8,10,
13,15 195:11

numbers 15:12 50:17 86:18
95:18 143:25

nuts 15:4

## O

Oakland 76:24 179:21,22

oath 5:6 50:4 181:6

object 21:9 35:23 46:25 58:25
127:21 131:20 138:5,22 139:4,
17 140:17 142:17,18 143:5
155:20 169:8 170:13 171:18
172:13

objected 149:17

objecting 142:7,9

objection 39:6 43:5 79:9 110:10
138:9 141:15 149:1 154:8
162:14 164:5 166:16 168:3,12
170:9,14 176:1,15 177:15

objections 142:5

obligated 85:4,24

obligation 17:8 59:18 60:3 62:2

obligations 63:15

obtain 22:8 110:20 122:8,12,21
123:13 135:17 190:18

obtained 111:1 115:22,23 163:17
178:18

Occasionally 100:8

occupational 175:16

October 177:16

off-the-record 143:20 168:19

offered 45:17 191:20

offering 11:2

office 40:2 77:10 106:15

officer 22:20,24 23:7,8 110:17
111:2 115:4 116:8 131:1 178:6,
12

offices 123:17

officially 191:19

officials 123:11

offset 52:9,13 56:3 154:19 158:7
161:19

older 107:20

Olthof 13:7 14:12 28:10 32:4
36:10

omissions 48:22

on-site 43:17 44:24

one's 63:20 64:25

online 13:3,4

opened 164:9

operated 10:20

operating 10:12 25:14 86:10
178:6,9,12

operation 180:24

operations 112:24 175:19,25
176:2

opine 141:8

opinion 7:25

opposed 47:2 182:11

order 30:4 31:6,9,11,17 119:17
121:17 123:13 131:18 168:5
171:21

organization 87:18

organized 150:5

original 68:19 118:11

originally 54:18 56:6 134:14

Orozco 71:3

Outdoor 95:14,21 96:17,19 109:3
110:7,15 113:4 126:1 151:15
175:20 177:13,25 178:17,20,23
180:3 181:15,17 183:1 186:9,19
187:13,23

outline 147:3 148:16

outstanding 61:2,11,16 63:4
68:17 77:11 83:4

outstandings 69:8

Overhead 46:9

overseeing 19:17

owe 8:10 54:2 57:9,18,20 58:12, 22 59:4 63:10,21 64:12 65:4 66:18 68:3 70:21 71:20 74:23 77:24 78:20,24 79:22,23 91:23 157:1,12 158:10 159:17 160:18

owed 37:19 40:6,7 42:8,11,13,18 54:16 55:2,3 56:1,4,6 58:4 60:13,14,25 61:2 62:6 70:10,14, 17 72:2 77:3,8,21 83:14 84:1 153:17,21 154:3 160:3 161:6,11, 13 171:16 175:8 193:7

owes 71:2,8 75:22

owing 168:10

owned 10:16 37:19 125:8

owner 96:25 97:14 98:4 109:12 113:19 150:11 175:23 176:6,10 178:7,10 180:22,25

owners 9:24 10:2,17 61:13 124:22 150:20

ownership 121:2

owns 7:15 95:21 151:8

**P**

P-E-T-R-I 12:5

P-E-T-R-Y 12:4

P.C. 173:20

p.m. 5:3 196:9

P78280 6:2

pages 31:20 50:20 85:8 148:15, 21

paid 9:12 15:19 16:15 18:2,6 21:11 25:8 34:24 35:2,11 36:3 39:10 40:7 41:1,2 42:18 46:6,13, 23 48:1,3 60:18,25 61:7,23 63:2 64:1,17,23 67:12 68:8 69:23 70:25 71:6,25 72:8 74:3 75:23 77:1,7,19 80:7,12 82:22 83:2,24 84:18 89:19,24 90:10 93:14 95:23 97:22 102:1 166:11 170:11 173:14 188:2,20,21 189:15,16,25 195:20

Papageorgiou 186:18

paperwork 24:17,18 125:20

paragraph 52:6 145:7,9,13 152:1 153:7,10 165:10 168:24 173:11

paragraphs 52:5

parse 105:12

part 16:14 24:23 44:3 45:3 125:9 138:3 168:13,24

partial 40:21

partially 41:2

particulars 113:6

parties 29:13 52:10,14 54:2 153:12,25 154:20

party 43:7 171:13

party's 127:6

pass 58:1

passed 21:8

past 97:16 100:19 121:2

paving 11:6

pay 17:5 18:15 21:11,22,24 28:6 34:19,22,25 39:12 40:3 41:18,21 42:8,10,12 53:18 57:23 62:13 88:20 93:11 153:22 170:2 189:4, 7,18 193:1 194:14 195:24

paychecks 154:4

paying 15:22 18:22 34:21 46:7 98:21 101:16

payment 8:20 9:9,17 17:14,19,24 18:4,11,14 22:2 29:12 31:14 33:20,23 34:3,12 40:21 41:24 42:14 47:2 48:3 67:14 102:14,20 153:14 160:24,25 195:18

payments 9:11,12,13 17:25 18:12,24 28:2 33:17 34:1,15,18 35:9 36:3 39:18 41:22 93:24 99:8 101:17,21

payroll 18:21 62:19 97:22 153:21

pays 99:16 102:13,15,17

pending 5:19 48:7 137:4 158:13

181:11,24

people 14:19 97:19 155:15 158:4 176:4 177:7 180:10,17 184:21 185:23 186:17 193:4

perceive 177:7

percent 15:10 16:6,12 17:23 18:2,4,15 20:1 46:23 47:1,7 102:13,15,17,20

performed 39:11,12,14 80:7,20 82:22 84:18

performing 105:7 141:13

performs 41:11

period 11:16 12:22 13:13 15:20 18:21 20:22 21:19 36:14 37:16 109:14 112:6 177:15,16 192:11

periods 88:23

permanently 137:8

permissible 131:4,12,17

permission 141:3

permit 23:14,18 24:12 54:4 122:13 123:13 124:17,21 126:15 128:23 129:2,5,6,8 131:19 135:8 150:9

permits 23:24 24:1,9 122:9,22 123:10 125:21 131:1 132:17 135:18 190:18

person 19:1 31:1 32:2 44:9 69:5 93:18 109:12 117:7

personal 9:15,19 17:5,7,17,18 57:22 59:18,22 62:1 63:19 65:6 72:5,12 74:15 79:18,20 82:8,10, 17 84:3 99:25 100:11,16 115:10, 15 123:23,25 132:25 155:5,8 156:7,10,11 159:11,12 180:18 195:22

personally 10:25 17:1,3 22:5,10 43:11,21 57:19 58:14 59:11 60:6,8,14 61:14,18 63:15 67:14, 25 68:15 70:4 71:11,13 72:14 73:16,18 74:1 81:1,5,22,24 82:6 83:16 88:11 107:9 115:23,25 119:5 155:18 158:1 159:14 161:3 162:13 168:11 169:23

173:24 174:7 175:2,12 194:6

**Peterson** 77:4

**petition** 7:13 49:19,24 68:23,25
93:13 173:16 193:5

**Petri** 12:3 28:21 47:21

**Phillip** 106:2

**Phillips** 6:2 38:2,5 55:21 56:22
104:2,7,11 106:7,13 110:10
138:9,10 142:3,8 145:20 150:2
165:22 166:7,13,22 167:15
172:17,19 178:11 179:3,7
181:11

**phone** 33:9 150:17,19,23 151:1,
4,15

**phrase** 122:1

**pickup** 100:14

**picture** 118:10,13 136:17 147:22
148:23

**piece** 32:8 63:13

**Pine** 80:15

**Pinozzi** 76:19

**Piper** 75:13

**Pisarski** 58:5 163:2

**pitch** 11:1

**place** 35:18,22 142:9

**placing** 5:15

**plaintiff** 174:25

**plan** 44:24 53:8,11 85:23 98:11
99:3 109:25 176:25

**plans** 24:19,21 135:25 136:8

**plant** 83:21

**play** 14:15

**plea** 26:25 27:3,6

**pleadings** 139:2 140:1

**pled** 25:17,18

**point** 44:21 109:16 112:23 121:1
153:3

**pointed** 153:1 175:24

**points** 43:25

**pool** 19:24 28:4 30:11 33:21
44:22 111:17,18 113:10 118:15,
18,20 122:23 123:15 128:18
130:7 135:3 171:6 178:21
179:25 183:3,9,21,25 184:8
185:4,5,10,14,18,19 186:8,10,
11,21 187:1,15,16

**Poolcorp** 121:16,22,25 122:4

**pools** 11:6,8,10,11,12 22:23
23:15,19 24:10,11,13,16 63:23
64:1,9,10 68:5 118:23,25
119:10,12,21,25 120:3,16,22,24
121:1,3,5,8,9,13,14,18 122:1,4,
5,9 134:24

**portion** 127:6 128:10,11,17
157:14 188:21

**portions** 43:19

**position** 11:23 42:9 139:2,10
140:3,8,10,11,14 141:4,12,16,24
142:1,4

**positions** 139:15,22

**positive** 13:19 79:21

**possession** 37:23 81:14 104:20

**possibly** 8:16,17 107:21 134:12,
13,25 148:18 157:25 159:25

**postings** 190:4

**potential** 11:1,18 52:9,14 154:20
155:3 194:15

**practice** 34:1 109:11

**premiums** 61:16

**prepared** 28:8 36:25 37:2,5,9
112:2 144:22 146:4

**preparing** 93:13

**prerequisites** 120:21

**presented** 37:17,21

**presume** 120:14

**pretty** 29:19,21 46:16 137:24
173:4 175:24

**previous** 86:11 175:2

**Previously** 97:20

**price** 20:10 33:8 90:25 113:12
130:10

**prices** 31:24 32:3 113:14

**primarily** 169:2

**prior** 9:24 22:15 25:5 103:4
115:13,22 120:18 121:12 184:4
193:23

**priority** 54:1

**problem** 21:6 166:11

**procedure** 109:11

**procedures** 36:1

**proceeding** 106:9 142:19

**proceedings** 107:7 142:21
174:2,11 182:6

**proceeds** 53:10,18

**process** 23:14,18 24:12 125:20
146:7 147:3 148:16

**product** 15:15 77:19

**products** 11:1,4,19 61:8

**professional** 152:5,10,15 175:15

**profit** 14:16 15:11 19:24 36:11,
13,16,22,23 37:1,6,11

**profitable** 36:9

**progress** 17:25 18:12 28:2 31:13
33:17,20,23 34:1,15,17 41:22
42:14 146:12 160:25

**progressed** 17:25 43:18 44:1

**project** 18:3,7,10,13,18 19:2,5,6,
7,9,11,14,19,21,22 20:3,6,7
24:22 25:4 31:16 33:3,22 34:16
35:12,14 36:3,5,6,8,11,13,15,17,
18,22 37:1,6,11,14,17,20 39:9,
17 40:4 41:5,16 42:1,23 43:12,
17,20,25 44:3,17 45:2,4,10 46:8,
9,19 47:7,24 48:1 70:15 72:23,
25 73:4,9,23 74:7 75:3,11,16
76:4,8,13,17,22 77:15 79:16
80:2 96:21 112:23 123:21 129:6,

9 135:19 136:2,11 146:11
148:15 150:11 158:24

**projects** 16:6 18:17 19:16 20:2,4
24:11 70:17 131:2 132:7 188:1
190:12

**promissory** 78:15

**Promoting** 12:12

**prompting** 142:24

**pronouncing** 171:1

**proof** 51:23,25 54:5,16 91:14
157:6

**proper** 65:12,13 131:11

**properly** 44:5

**property** 8:5 9:18 45:18,19 50:25
52:7 93:12 99:4 124:22 150:11,
20 154:16,24 155:2 184:19
185:1 186:24 187:11

**proposed** 108:13

**prosecution** 26:23

**prosecutor** 27:7

**provide** 41:13,15 57:13 67:3

**provided** 16:23 32:5 40:17 61:8
63:3 64:2 77:2

**provision** 20:18 172:15

**public** 173:2

**pull** 23:24 24:1,8 131:1 139:25

**pulling** 132:17

**Pulson** 186:5,6,9

**purchase** 90:25 195:14

**purchased** 35:13 91:15 92:5
121:14

**purchasing** 36:6

**purpose** 27:24 28:1 46:7

**purposes** 75:18 100:7 139:8
144:10

**put** 5:21 42:3 90:23 99:15 101:12
117:1,25 122:9 129:1 135:3
136:21 157:9 158:4 159:2,15

160:12 161:19 166:16 183:25
185:5,7,9,14,16,18 186:11,13
187:1,16

**putting** 33:2,14 117:4 170:19

**Q**

**qualified** 22:24 110:17 115:3
116:8 131:1

**qualifies** 98:4

**qualifying** 22:20 23:7,8 111:1

**Quench** 77:9

**question** 6:18,25 7:3,6 10:9
12:25 21:10 23:10 24:9 25:21
26:21 32:25 35:23 46:12,14,15,
16 47:1 51:12 53:13,14,21 59:1
74:22 78:7 79:10 86:9 92:8,9
93:7,9 97:3,24 98:9,13 100:6
101:19,25 103:12 105:14 110:5
114:23 115:6,17 116:10,14,25
117:22 120:17 124:14 127:13
130:3,5 131:15,25 137:24
138:15 139:8,18,19 140:18,22
141:11,15,19 142:12,22,25
143:4,6,10 144:7 146:8,9 147:5
148:24 149:6,10 152:19 154:9,
15,23 155:21,23,24 157:18,23
158:8 160:7,13 161:15,18
162:23 165:8 169:1,9,14,18,25
171:5,18 172:18 176:7 177:5,6,
9,12 181:7,9,12,20,24 182:5,9,
10,13,14,15,18 188:4,8,15
190:22 191:12 194:9

**question's** 188:9,13

**questioning** 38:6 190:9

**questions** 6:20,21,23 54:6 58:3
64:14 66:24 103:7,15 109:6
113:21 121:3 122:7 130:14
150:9 151:18 154:14 162:5
163:7 165:16 166:6,15 168:13
171:19 173:12 190:10,13 191:8
192:4 193:12,15,19 196:2

**quick** 37:12,15 188:16

**Quinn** 125:24

**quote** 30:3

**quotes** 33:1,12

**R**

**Raechel** 174:4

**ran** 24:19

**Randon** 168:7

**Ratnesh** 77:13

**RE-EXAMINATION** 193:14

**reached** 22:3

**read** 25:23 29:8,9 46:15,17
148:24 154:25

**readily** 32:21

**real** 65:11,13,14 74:20

**reason** 6:7 66:20 92:3 129:3
132:24 149:22 157:9 173:3,9

**reasonable** 39:3

**reasons** 129:1

**Rebecca** 5:24 57:25 103:5
144:16 156:19 157:1 193:17

**Rebecca's** 144:18

**recall** 8:11,22 9:10 12:18 15:22
16:3 17:10 28:9 34:8,20,23,24
40:11,16,25 42:16 43:24 45:11
47:8,25 51:6 54:14 57:12 58:13,
15 60:20 61:12 63:20 68:1,20
70:7,9 72:4,17 78:18,21,23 79:1
81:21 82:18 83:10 84:12 89:4,20
91:8 96:14 106:25 107:1 110:21
120:2,16 123:22,25 124:17
133:18,23 134:11 159:19 160:17
162:9 163:16 164:19 166:22
171:15 172:23 174:1,2 175:2,9
184:3,20 187:19 188:2 189:5,21,
23 190:13 195:5,11,15,17

**receipts** 21:18

**receive** 16:5,7 132:8,10

**receiving** 87:23,24,25

**recent** 8:2 94:24 121:2 177:12

**recess** 38:10 57:1 103:1 111:8 150:3 188:17

**recognize** 49:8 94:16,19 111:11, 13 112:13,14 124:9,16,20 126:8 144:7,9 147:1,6 151:6 153:4

**recognizes** 124:14 149:4

**recollection** 49:14 177:1 188:25

**record** 5:8,16,22 8:24 25:24 38:9 56:25 95:4 142:15 148:25 154:3 173:2 182:16 196:3

**records** 31:8 172:25

**reduce** 55:1

**refer** 31:15 55:10

**referenced** 192:3

**referencing** 191:7

**referring** 10:11 12:22 15:20 19:8 20:23 21:19 29:10 30:21 50:20 86:19 88:16 98:8 146:17 154:21 190:14

**reflect** 102:4 172:25 182:17

**reflected** 88:4 101:14 160:15 176:12 177:14

**refresh** 49:13

**refunds** 193:7

**refused** 21:22,24

**Regalado** 73:2 171:1,5,9,17 172:3 173:8,13 193:17

**registered** 114:7,8 117:5 120:23 132:20

**registration** 38:22

**reject** 31:1

**related** 61:13,15 62:2 64:19 70:23 71:9 72:5,7,11 76:24 79:18 81:16 82:10,12 104:18,20 158:23 169:21

**relates** 128:25 161:16

**relating** 130:21

**relation** 107:12,13

**relationship** 107:14,15 130:15, 16,21,24 132:3,6,9 137:18

**release** 9:1

**relevance** 164:5

**relevant** 164:11,12 179:2 180:4, 8,9 182:2,5

**relief** 9:1,5 52:8,13 99:1 154:19

**remember** 8:9 16:13 31:12 34:21 45:8 50:12,13 79:7,8,20 82:5,14, 16 84:6,9 90:15,24 91:1 92:10, 18 96:8 106:10 107:6 109:14,19 110:21 118:6 119:11 120:1,6,22, 23 128:12 132:4 134:22 137:3, 11 161:24 164:20,22 174:7 186:16 188:12 189:2,11 193:25 194:7

**removing** 11:10

**remuneration** 132:8

**rendered** 61:3

**rent** 72:11,12,16

**rental** 64:19,22 98:9,18

**repaid** 81:3

**repay** 94:7

**repeat** 7:4 106:5 115:16 117:21 130:3 131:15 181:11,14

**repeated** 148:25

**repeating** 190:23

**rephrase** 7:3 106:6 117:23 122:17,20 146:8 175:6

**replacing** 11:11

**reported** 19:22 20:3 92:3,19

**reporter** 6:21 27:11,14 49:3 94:12 111:6 115:16 124:6 143:22 146:23

**reporting** 91:5 92:20

**repossessed** 83:7,14

**represent** 5:24 38:25 103:5 104:7 174:4

**representation** 123:14 138:16

145:22 146:1

**representations** 122:11 123:9,12 139:1 141:5

**representative** 23:13,17

**represented** 49:11 142:3,4 173:24 174:12,24

**representing** 6:3,4 106:2,8 174:7

**represents** 104:3

**reps** 11:24

**request** 41:24

**requested** 9:1 148:25

**requesting** 160:18

**required** 42:19 48:10 116:21 117:16 123:23

**requirement** 117:18

**reread** 66:2 117:21

**reside** 135:13 179:17 183:10 186:6

**residence** 31:22 43:12 80:16 98:10 99:2 118:21,22 135:11

**residential** 22:4,8 25:5,11 39:5 45:24 103:21 105:7 108:24 109:2,23 110:8,16 114:15,17,18 115:9,14,23 116:4,11,16,17 117:12 118:8 121:11 128:25 131:9,18 133:1 138:17 140:5,6, 13 141:3 148:19,22 152:12 178:19 190:18

**resides** 182:23

**Resilient** 95:14,21 96:17,19 97:4, 6,8,15,19 99:16,20 109:3 110:7, 15 113:4 126:1 151:15 175:20 177:13,24 178:17,20,23 179:23 180:2 181:15,17 183:1,23 184:10,18 186:8,19 187:13,23

**resolution** 27:7 166:19 172:11

**resolve** 194:15

**resolved** 27:5 193:17,22 194:8, 22,25

**respect** 24:3 141:13 168:2

respective 140:5,13 141:3

respects 113:8

respond 138:7 193:18

responded 52:8

respondents 174:10

response 22:1 56:15,20 65:22
86:14 102:11 103:11 122:16
130:14 171:4 181:5 191:8 192:3
193:15

responses 103:8 154:19

responsibilities 12:10,11 29:12

responsibility 57:22

responsible 17:9 19:1 39:9,21
59:11 61:18 67:14

responsive 129:20

rest 31:15

restate 46:13

restaurant 179:14

Restroom 102:25

result 26:23

retainer 93:14

retention 67:5,7,9

return 54:24 55:7

returning 38:12

returns 48:10

revenue 37:19 54:7,15 89:2,5

review 23:22 25:1 28:10 30:12,
14,15 48:15 69:9,14 135:25
162:2

reviewed 28:11 29:4 30:24

reviewing 25:25

revision 40:22

revoking 109:22

Riddle 174:3,5

right-hand 129:4

ring 195:6,10,20,24

rise 155:19 156:8

rising 20:14

risk 20:18

river 28:5 44:23

Road 183:12

Robert 6:4

Rock 77:17

role 10:22 14:15 24:3,6 109:3

Ron 77:22 94:2,7 186:1

Roughly 192:25

rounds 44:5,8

routed 88:11,12

RS7 91:14

rule 182:12

run 52:5 175:25 176:1

runs 50:19

Ryan 79:14

**S**

S-A-A-D 5:18

S-CORP 10:15

Saad 5:17 27:21,22 28:5,18,23
31:5,6 34:3,15 35:2,6,11 37:13,
17 40:7,18 41:5,16 42:23 43:10
44:10,13,21 45:17 46:6 48:4
51:22,23 54:3 70:15 109:9 112:3

Saad's 30:10 31:21 36:2,15,17,
18 39:9,17 40:4 43:12 45:9

safe 120:19 129:24 140:15
145:17

Safeco 79:18,22

sake 138:25 139:24 140:24

salary 16:2 96:3,4,7

Salem 71:17,20 188:25 189:1,4,
14

sales 10:23,25 11:24 16:5 47:9
109:12 175:19 180:24 192:2

Salesman 112:23

salesman's 28:20

salesmen 112:21

salespeople 11:22 16:7 18:6
47:11 146:5,12

salesperson 18:15 46:23 47:8
109:10,17

salvage 45:16

Sam 187:6,7,14

satisfactorily 45:22

schedule 33:17 50:9,24 51:2,4,8
53:23 69:20 78:19 84:24 85:9
160:12,16 176:20,22

scheduled 57:17 60:12 85:4
108:17

schedules 7:13 48:7,12,15
49:19,25 50:3,15 68:20 69:3,6,
10,14,18 70:11 74:9 85:5,16,19,
22 91:23 92:4 95:5 101:14,19
102:3 169:21

school 156:5

scope 28:1 31:11,20 40:23 136:8

SCP 121:14,16,22,25 122:4

section 128:17 150:25 151:2
153:7 154:17 157:14 159:23
169:25 173:12 190:10

secured 65:4,9,20

security 63:12 74:20

seeking 93:12 105:1 157:3
159:18

segregate 18:23

select 158:22

sell 11:19,23 121:12,17 146:6

send 60:8

sense 6:25 34:12

SEP 121:21

separate 18:18,22 87:20 125:9
137:6 163:20 164:9

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

September 5:2

Septic 72:5

series 103:7

service 11:8 54:7,15 57:17,18,20 61:3 72:5 88:18 191:20

services 11:2,4,19 61:8,23 63:5, 10,16 64:1 67:1,2 70:22 75:20 76:24 77:1

session 6:18

sessions 150:10

set 17:24 47:13,15

settled 165:21 166:3 172:19 194:22,25

settlement 166:9 167:16 168:14 170:14,16 171:19,23 172:5,11, 14

settlements 167:13 193:19

Shamaya 75:7

Shamaya's 75:11

Shara 13:11,16 14:12,20 16:21

share 56:11

shareholders 10:15

sheet 95:4

Shelby 135:16,18 187:12

Shield 62:1,6

shift 48:6

shifted 20:18

shoot 33:8

short 38:10 57:1 103:1 111:8 150:3 188:17

shortages 20:11

shortly 173:5

shovels 24:14

show 37:13,19 112:8 114:7 124:2 140:1 144:4 146:21 150:6

showing 111:10 117:1,5 148:21

shown 148:20

side 32:4 52:6 157:14,19

sign 39:23 50:4 68:22 109:12 112:25 191:2

signature 28:15,17,20 29:1,2 109:17 111:20,23 126:6,8,11 145:1

signatures 109:16

signed 13:22 28:18 31:7 48:16 68:25 109:9,10 112:19 120:6,8, 18 126:15 128:2 158:25 162:3 172:8 183:23

signing 29:4 34:9

similar 36:19,22 56:8 74:15 96:22 97:7 112:3,5 113:8,16 147:9,17

Simna 79:24 85:14,25

simple 26:21

simpler 74:22

sir 5:7 111:10 131:14 143:4 144:6 147:1 150:5 168:22

sit 108:20

site 24:19,21 44:24 80:4 135:25

sits 117:15

sitting 100:18 170:13

situation 142:10

skip 66:23 68:11

Skipping 70:1,19

slide 41:21,24 42:9

Slides 41:4,15

slightly 90:20

small 40:6,10 79:5,6 80:22

snarky 149:11

social 12:17 190:4

sod 11:7

sold 16:6 18:6,10,13 28:23 33:21 47:7

son 107:25 108:1,6

sort 107:14 119:7 137:18 138:3 142:10,23 180:11 191:17

sound 91:16 144:24 149:11 173:1 175:20

sounded 105:15

sounds 34:20 91:17 142:20 149:8 165:2 167:7 175:22

source 47:2 87:9,11 88:4 89:12 164:7

Southfield 5:1

spa 28:4

speaking 55:23

speaks 177:17,22

Specialist 67:1,3

specific 15:4 17:16 20:22 30:2, 10 32:11 35:20 36:14 44:20 46:9 133:18 146:17

specifically 29:11 35:14 43:13 45:2 123:12

specifics 16:14 166:6

specifies 58:9

speculate 149:16

speculating 129:17

speculation 39:6 43:6 139:5 143:9 149:2,8,17,19

speculative 141:18

spell 5:8,10 13:8 179:14 182:21 187:9

spend 195:10

spoke 106:24

spot 38:7

spreadsheet 15:8

spring 107:2,4 184:20

sprinklers 11:7

Stafford 80:10

stage 43:25

stamp 50:18

stamped 95:18

stand 144:1

standard 29:17,19,21,23,25

standing 168:2,12 170:14

stands 69:17 116:9

start 5:14 21:1 62:14 146:12
 184:10,18

started 44:22 178:20

state 5:7 48:9 57:4,9 91:11
 109:21 116:16 117:6 121:11,23

stated 23:17 50:8 163:8

statement 66:1 91:5 98:19 141:9

statements 13:4 16:23,24 48:12,
 15 81:10,14 138:18

states 95:13,16 124:21 126:18
 152:1 153:12

stating 154:3

status 55:12 65:9 103:23 108:21
 172:2 191:5

stay 9:1,5 99:1 110:3

step 60:2

stipulate 9:4

stipulated 51:22,24

stipulating 98:25

stipulation 9:2 108:13

stop 44:6 45:12,13

store 100:25 195:16

straightforward 46:16 137:24

stricken 142:17

strike 161:17 191:12

structural 135:25

structure 31:14 33:20,23

structured 33:25

structures 11:11

stuff 88:20

subcontractor 23:4 32:5,22
 39:11,14 40:1,2 41:5,10,11 42:5
 60:16,23 61:21 62:24 68:6 75:22
 80:10

subcontractors 32:7 33:1 39:10,
 12 40:3

subject 158:7 161:19 165:23
 167:18,19 170:9

submitted 112:2 157:6

subs 33:14

subsequently 69:15

subsidiary 191:18

substances 6:11

substantial 188:21

Substantially 89:9

subtract 42:11

subtracted 41:22

successful 109:22

sued 165:19 194:17

suffered 156:3,7,13

suggest 117:10,11

suggested 117:4 118:3,4 145:10
 185:24

suggesting 117:19

suggests 91:15 181:2 191:16

suing 156:8

sum 159:20

summary 151:22

summertime 107:4

supervisor 113:18

supplied 77:20 83:25

supplier 63:24 66:10 71:22 77:17
 80:4

supplies 63:2 64:2

supply 20:10 61:4,7 80:4 104:17

supposed 150:19

supposedly 55:1

surrender 99:4

surrounding 99:2

swimming 11:6,10,12 19:24 28:4
 44:22 111:18 118:15,23 122:9,
 22 134:23 135:3 178:21

swore 6:22

sworn 5:5

systems 35:18,20,21,22,24

---

**T**

---

T-R-A-P-O-L-I 179:15

table 5:14

taking 6:10 15:25 142:1

talk 11:10 17:22 107:7 151:17
 181:19,22,23,25 182:9,10

talked 70:14 109:5,8 122:11
 152:22 165:18 173:11 176:13
 185:24 187:20 191:3

talking 24:10,11

talks 129:5

tax 48:9 54:24 55:7 62:19 67:6,8

taxes 14:21 62:14,16 96:5,6

telephone 150:14 151:10

telling 137:22,23 138:1 139:3,10
 141:20,24 146:5,11

temporarily 137:7

ten 164:25

tendered 167:13

Tennessee 119:16,17,20

term 23:9,11 85:3 156:4

terms 29:6,7,12,14 30:3,7,9,19,
 21 72:16 112:6 113:17 154:5
 167:16 168:13 170:14,15
 172:14,18

testified 5:6 24:2 47:4 50:2 52:23
 92:6 127:23 128:1

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

testify  6:7,12 59:20 128:2

testing  133:4,5,14

text  134:3,6,9,11

thing  34:23 45:7 60:21 77:10
118:4 136:7,12 149:12 165:24

things  15:24 20:8 31:14,21
103:9,12 136:1 146:20 151:20
182:8

thinking  8:9

thought  15:14 24:3,5 159:2

time  8:20 10:24 11:16 12:22
13:13 15:20 20:22 21:19 34:14
36:14 37:16 44:6 45:9,19,25
47:17,22 52:20,22 53:1,4 54:5
60:4 66:3 78:17,24,25 88:23
90:11 102:8 105:8 106:24
109:14,16 110:14 112:6 114:13
115:8 116:3,6,10 117:10 120:13
121:2 129:7 133:3 135:1 138:13
142:1 152:9 158:14 161:14
162:10 164:18 177:15,16 184:12
191:11 192:11,16 195:8

timeframe  133:16,18 165:3

times  54:22 85:8 103:9 130:13,
19

title  178:4

titled  99:20,21,22

today  5:15 6:8,12 31:8 48:23
58:6 69:17 104:3,18 108:17,20,
25 116:9 117:15 126:3 145:21
146:1 151:13 156:10

today's  48:10

told  20:3 24:5 33:19 114:2 115:8
142:2

Toma  74:5

tomorrow  45:7

Tony  38:2

top  28:17 34:11 50:24 53:23
57:3,16 66:9 68:5 69:21 76:1
80:5 82:1 86:4,6,7,21 88:5
147:10 150:10 153:7 173:19

tort  52:10,14 154:20 155:19
156:4

total  31:16 55:25 102:20 170:2,
11

totaling  93:24

touch  151:21

touched  151:20

township  111:17 123:2,4,5,10,17
135:16,18 137:2 187:12

track  14:16,23 16:16 36:11
125:20

tracking  79:2

trade  15:3 92:14

traded  91:21 92:1,11

trademark  191:21

train  99:7

training  119:22

transcript  25:25

transfer  93:11

transferred  137:7,8

Transport  70:19,21 82:19

transportation  70:20,22 71:22,
25 99:7,9

Trapoli  179:13,17,24 185:18

trial  182:11

Trott  8:25

Troy  186:25

truck  64:14 100:14

trucking  70:22

true  42:21,22 127:13 138:20
144:4 152:10 173:25 174:13
176:5,18

trustee  36:24 37:10,23 53:19
81:13

truth  137:22,23 138:1 139:3,10
141:20,24

truthful  6:24 7:7 48:19 50:3

141:9 170:7,19

truthfully  6:8,12

Tuesday  5:2

turn  30:2 33:16 50:17 52:2 53:22
57:3,16 58:16 66:25 84:21 85:9
86:3 93:9 97:24 99:6 105:19
111:20 151:23 156:15,17 159:4

turned  36:24

Twenty-  185:8

twisted  127:14

Tyler  6:2 104:2 145:20 194:9

type  45:7 65:2 96:17 118:20
154:17 179:23 185:3 186:8,19
187:13

typical  19:24 33:20

typically  17:24 19:16 169:13

typing  93:17

---

**U**

U.S.  80:22

uh-huh  30:5,8 55:4 103:9

unable  42:12

unaware  145:11,16

uncertainly  138:3

uncle  108:3

undergo  119:7

underline  65:16

underneath  30:6

understand  7:2,6 32:25 41:3
85:17,24 102:3,7 104:23,24
117:7,22 118:11 120:24 123:6
131:11,14 137:9 139:14 140:21
141:15 143:4 149:12,13 156:3
165:16 166:7 169:17,18 193:18

understandably  85:7

understanding  26:15 43:9 46:18
49:19 57:7,24 59:10 62:17,23
83:6 88:24 95:12 105:3 115:2

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

116:6,20 130:23,25 131:3,16
132:22 134:4 140:10,12 141:7
176:9 187:22

**understands** 12:25 101:23

**understood** 103:11 105:16
133:17

**unemployment** 62:13,15

**unfair** 188:16

**unfamiliar** 23:9

**union** 65:1,4 74:13,15,23 84:2

**Unique** 81:16

**unknown** 52:11 54:10 58:8 63:18
68:3 70:1 84:3 159:16

**unliquidated** 64:6 67:18,21
160:1 173:7

**unpack** 22:22

**unpaid** 62:11

**unsatisfactory** 44:11,14

**unsecured** 53:23 54:1 156:18,21
163:2

**up-to-date** 62:15,18

**updated** 51:3

**Upstart** 82:1

**Urus** 92:15

**utilize** 36:4

---

**V**

**valid** 108:24 114:10 117:20
151:13 155:22

**Valley** 82:19

**valuation** 129:6,9

**vehicle** 17:17,18 91:18,21 92:1,5,
11,12,14 99:17,18,23,25 100:7,
9,11,12,13,16,17,22 102:13,14,
16

**vendor** 41:8,9,13 42:2,6,7 60:22
61:5 62:24 63:1,24 64:15,16
66:11 69:21 83:21,22 118:23

120:5

**verbal** 33:11 103:8,11

**Verbally** 47:16

**verge** 98:25

**versus** 32:22

**vetting** 119:8

**video** 117:3 118:2

**viewed** 22:20 23:7,13 130:25

**viewing** 115:3 116:7

**violation** 141:13

**viral** 20:15

**virtually** 133:21

**vis-a-vis** 23:6

**visit** 11:1 43:25 44:2 119:20
123:23,25

**visited** 43:21 45:9

**void** 112:11

---

**W**

**W-2** 15:23,24 16:1,11,15 23:2
32:19,20 87:3,20 95:24

**wage** 89:24

**wait** 55:22

**wanted** 30:24 42:3,15 44:21
90:10 131:10 141:21 148:18

**warranty** 66:21 74:10 75:5,18,19

**Washington** 7:11

**watched** 117:3 118:1

**water** 41:4,15,24 55:21 56:22
77:9,10

**website** 20:15 118:16

**Weddingwire** 196:4

**week** 34:9 95:25 96:2 108:17

**weeks** 45:14 95:25 153:22
177:20

**well-established** 140:2

**Western** 82:25

**whatnot** 112:7

**whatsoever** 116:3

**When's** 8:20 45:9 78:17

**white** 118:13

**wholesaler** 121:25 122:1

**Wiegands** 83:21

**wife** 58:6 89:15 95:14 97:10,13
98:2 102:13 104:4 163:9

**wife's** 7:23 101:16,20 102:10,12
104:3,5

**Wings** 84:2

**withdraw** 39:7

**withheld** 96:5

**word** 12:17 113:18 119:8 156:4

**wordage** 30:24

**words** 27:24 49:17 104:16
105:12 121:5

**work** 6:18 11:6 17:25 26:9 28:1,6
31:20 32:8,16,18,22 39:4,11,13,
14 40:3,22 41:11 42:2 43:11,13,
17,18,19,25 44:10,13 45:12,13,
20 60:18,25 61:23 63:2 64:1
66:14,16,21 67:6,8,12 68:8
69:23 70:25 71:6 72:1,8 73:25
75:5,18,19,23 77:1,19 80:7,12
82:22 84:18 88:22 96:17,18,19,
22 97:1,2,4,6 99:24 105:7 110:3
111:18 114:19 116:16 127:4
131:1,2 132:7,13,16 135:21,22
136:8 141:13 182:25 183:8,20,
24 184:10,18 185:3,9 186:8,19
187:13,23,24

**work-related** 125:16

**worked** 23:14,18 24:10 29:15
33:9,10 49:23 69:2 97:16,18,20
113:20 132:17 135:19,23 144:12

**working** 22:19,23 24:11 25:11
32:4 53:2 97:19 115:2 116:7
123:15 125:25 127:2 134:10

**works** 113:3

**worries** 86:24

**worth** 7:25 8:14

**wrapping** 93:2

**Wright** 84:13,16

**write** 13:13,17,20

**writing** 37:21,24 133:24 163:9

**written** 33:12 154:25

---

### Y

**year** 8:22 13:2 14:20 22:13 45:11
86:11 89:22 93:10 100:19 101:8
107:3 158:22,23 164:25 184:20
185:8 192:20 193:23 195:5

**year-to-date** 86:14

**years** 86:11 132:21 163:13

**Yousef** 104:12

**Youtube** 117:3,7 118:2

# EXHIBIT D

1            UNITED STATES BANKRUPTCY COURT

2            EASTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4

5  In re:                  Chapter 13

6  BRANDON HEITMANN,       Case No. 24-41956-MAR

7     Debtor,          Hon. Mark A. Randon

8  _____/

9  MOHAMED SAAD

10    Plaintiff,        Adv. Pro. No. 24-04375-MAR

11  vs.                Hon. Mark A. Randon

12  BRANDON HEITMANN,

13    Defendant.

14  _____/

15

16

17        The Deposition of HANK BELL,

18        Taken via Hanson Remote,

19        Commencing at 12:00 p.m.,

20        Wednesday, May 7, 2025,

21        Before Susannah Gorman, CSR-9271, RPR.

22

23

24

25

**Page 2**

```
1   APPEARANCES:

2

3   JEFFREY H. BIGELMAN, ESQ. (P61755)

4   Osipov Bigelman PC

5   20700 Civic Center Drive, Suite 420

6   Southfield, Michigan 48076-4140

7   (248)663-1800

8   jhb@osbig.com

9        Appearing on behalf of the Plaintiff.

10

11  TYLER PATRICK PHILLIPS, ESQ. (P78280)

12  Kotz Sangster Wysocki PC

13  400 Renaissance Center, Suite 3400

14  Detroit, Michigan 48243-1618

15  (313) 259-8782

16  tphillips@kotzsangster.com

17       Appearing on behalf of the Defendant.

18

19  GORAN ANTOVSKI, ESQ. (P75898)

20  Michigan Justice PLLC

21  198 South Main Street, Suite 2

22  Mount Clemens, Michigan 48043-7917

23  (586)221-4100

24  goran@michiganjustice.com

25       Appearing on behalf of the Deponent.
```

**Page 3**

```
1   ALSO PRESENT:

2

3   BRANDON HEITMANN, Defendant

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
1                    TABLE OF CONTENTS

2

3   HANK BELL                              PAGE

4

5

6   Examination                            7
7   By Mr. Bigelman
8   Examination                            33
9   By Mr. Phillips
10  Re-Examination                         53
11  By Mr. Bigelman

12

13

14                    EXHIBITS

15

16  EXHIBIT                                PAGE
17  (Exhibits attached to transcript.)

18

19  DEPOSITION EXHIBIT A                   10
    12:10 p.m.
20  Subpoena
    DEPOSITION EXHIBIT B                   11
21  12:10 p.m.
    Builder's license information
22  DEPOSITION EXHIBIT C                   14
    12:15 p.m.
23  Exigent Landscaping L.L.C. estimate
    DEPOSITION EXHIBIT D                   16
24  12:19 p.m.
    Information on Brandon Heitmann and his
25  residential builder's license
    DEPOSITION EXHIBIT E                   17
```

**Page 5**

```
1   12:21 p.m.
    City of Dearborn swimming pool permit
2   application
    DEPOSITION EXHIBIT F                   19
3   Two-page exhibit with e-mails
    DEPOSITION EXHIBIT G                   22
4   12:29 p.m.
    Certificate of liability insurance
5   DEPOSITION EXHIBIT H                   24
    12:32 p.m.
6   E-mails between Mr. Bell and Exigent
    Landscaping
7   DEPOSITION EXHIBIT I                   25
    12:33 p.m.
8   Revised Document Application
    DEPOSITION EXHIBIT J                   26
9   12:36 p.m.
    Revised Document Application
10  DEPOSITION EXHIBIT L                   28
    12:39 p.m.
11  E-mails with Amanda
    DEPOSITION EXHIBIT M                   29
12  12:41 p.m.
    City of Dearborn form for concrete
13  flatwork and porch application
    DEPOSITION EXHIBIT N                   30
14  12:43 p.m.
    Certificate of license in the City of
15  Dearborn
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

1 Remote deposition
2 Wednesday, May 7, 2025
3 About 12:00 p.m.
4     COURT REPORTER: My name is Susannah
5 Gorman, a Michigan State notary public and certified
6 shorthand reporter, and this deposition is being held
7 via videoconferencing equipment. The witness and
8 reporter are not in the same room. The witness will
9 be sworn in remotely pursuant to agreement of all
10 parties. The parties stipulate that the testimony is
11 being given as if the witness was sworn in person.
12     Do you solemnly swear that the testimony
13 you are about to give will be the truth, the whole
14 truth, and nothing but the truth?
15     THE WITNESS: Yes.
16     HANK BELL,
17 having first been duly sworn, was examined and
18 testified on his oath as follows:
19     MR. BIGELMAN: Good afternoon, Mr. Bell.
20     THE WITNESS: Good morning.
21     MR. BIGELMAN: My name's Jeff Bigelman. I
22 represent Mohamed Saad in an adversary proceeding in
23 the bankruptcy court against Brandon Heitmann,
24 Adversary Proceeding No. 24-04375-MAR. Have you ever
25 given a deposition before?

**Page 7**

1     THE WITNESS: Yes.
2     MR. BIGELMAN: So you know the process. I
3 ask the questions; you provide answers. We have a
4 court reporter. We want to make a clean record, so if
5 there's anything that's unclear, ask me to repeat it.
6 I'm happy to do so. And we'll get going. I hope not
7 to take too much of your time today.
8     THE WITNESS: Thank you.
9     EXAMINATION
10 BY MR. BIGELMAN:
11 Q. What's your address, Mr. Bell?
12 A. 6184 Oakridge Drive, Washington, Michigan 48094.
13 Q. And how old are you?
14 A. Seventy-one.
15 Q. Are you married?
16 A. Yes, sir.
17 Q. Do you have any degrees, certifications, licenses past
18   high school?
19 A. I took an IOSHA class.
20 Q. My understanding is you have a residential builder's
21   license. Is that right?
22 A. That's correct.
23 Q. And how long have you had that?
24 A. 1980.
25 Q. It's my understanding you own a company by the name of

**Page 8**

1   Construction Contractors LLC. Is that right?
2 A. That's correct.
3 Q. Are you still working?
4 A. I haven't done a job since September of 2023.
5 Q. What kind of work did you do in the construction
6   industry?
7 A. Just Construction Contractors.
8 Q. So basically a general contractor?
9 A. I'm sorry, say that again.
10 Q. A general contractor?
11 A. Construction Contractors are more of a management
12   company. I didn't have any employees. I ran it by
13   myself.
14 Q. I understand. Did you act as a general contractor?
15 A. Yes.
16 Q. Okay. Did you do residential work, commercial work?
17   What kind of work did you do?
18 A. For the last five years it was all residential. I
19   built custom family homes, single-family homes.
20 Q. I believe you just said you had no employees. Is that
21   right?
22 A. No employees.
23 Q. And has it been that way for the past five years?
24 A. Yes, since -- really, since 2014.
25 Q. And what areas did you work in? All over Michigan, or

**Page 9**

1   did you keep to it one specific area?
2 A. Yeah, just the tri-county area, for the most part.
3 Q. How do you know Brandon Heitmann?
4 A. Brandon Heitmann is -- my brother's wife's sister's
5   husband is a Heitmann, Mike Heitmann. His brother is
6   Ron Heitmann, and that is Brandon's dad. I -- so I
7   came across Brandon at some of my brother's family
8   outings throughout the years.
9 Q. Let's do that one more time so I can chart it out.
10   Your brother's wife --
11 A. My brother's wife's sister, her husband is a Heitmann,
12   Mike Heitmann. Mike Heitmann's brother is Ron
13   Heitmann, who is Brandon's dad.
14 Q. So you're not exactly related to him?
15 A. I'm sorry?
16 Q. You're not exactly related to him?
17 A. I'm not related to him at all.
18 Q. Okay. And how long have you known him?
19 A. I couldn't tell you the exact amount of time that I
20   have known him, but I've known him since he was a
21   little kid. I've known of him since he was a little
22   kid -- let's put it that way -- because he showed up
23   at my brother's, you know, Christmas or Easter or
24   whatever.
25 Q. Did he ever work for you or for Construction

1   Contractors LLC?
2   **A. Did Brandon?**
3   Q. Yeah.
4   **A. Yes, he did.**
5   Q. When did he do that?
6   **A. '21 and probably '20. He did some work at my home.**
7   Q. So he was doing work for you as a contractor or as one
8   of your employees?
9   **A. No, he -- as a contractor. He did some landscaping at**
10  **my home. He replaced some asphalt paving that was**
11  **deteriorating, and then in 2021, I was building a home**
12  **in 25 and Romeo Plank area, and he -- his company**
13  **poured the basement floor and the garage floor and the**
14  **driveway.**
15  Q. I'm sharing my screen with you. Can you see the
16  subpoena on the screen?
17  **A. Yeah. Is that what you had sent me?**
18  Q. That's right.
19  **A. Yes.**
20  Q. This is marked as Exhibit A, and in response to the
21  subpoena, you produced some documents through your
22  attorney; correct?
23          MARKED BY THE REPORTER:
24          DEPOSITION EXHIBIT A
25          12:10 p.m.

1   **A. That's correct.**
2   Q. And we're here today based on the subpoena; correct?
3   **A. Correct.**
4   Q. I'm sharing my screen again with you. Can you see it?
5   **A. Yes.**
6   Q. This is marked as Exhibit B. This is information
7   regarding your residential builder's license; correct?
8          MARKED BY THE REPORTER:
9          DEPOSITION EXHIBIT B
10         12:10 p.m.
11  **A. Yes.**
12         MR. ANTOVSKI: Jeff, I'm sorry, can you
13  zoom in on that just a little bit?
14         MR. BIGELMAN: Sure. I'm trying figure out
15  how we'll do it.
16         MR. ANTOVSKI: Can you see that okay?
17  **THE WITNESS: Yeah. It depends on what he**
18  **wants to ask about.**
19         MR. BIGELMAN: I put it back on the screen
20  blown up. Is that better?
21  **THE WITNESS: Yeah, I can read that.**
22  BY MR. BIGELMAN:
23  Q. Okay. Is that your builder's license number,
24  2102207012?
25  **A. Sounds right. I don't have the exact number with me,**

1   but that sounds right.
2   Q. Okay. And you are registered to your company,
3   Construction Contractors LLC; correct?
4   **A. Yes.**
5   Q. Have you ever been to the address 921 Crescent Drive,
6   Dearborn, Michigan?
7   **A. No, sir.**
8   Q. Have you ever met Mohamed Saad?
9   **A. No, sir.**
10  Q. Did you ever authorize Brandon Heitmann to use your
11  residential builder's license when he was unlicensed?
12  **A. No, sir.**
13  Q. Was that a "no"?
14  **A. No, sir.**
15  Q. Okay. Are there instances that you're aware of where
16  Brandon Heitmann used your residential builder's
17  license without your permission or consent?
18  **A. Could you say that again? I'm sorry.**
19  Q. Sure. Are you aware of any instances where Brandon
20  Heitmann used your residential builder's license
21  without your consent?
22  **A. Yes.**
23  Q. What are those instances?
24  **A. There was two other jobs that he used my license**
25  **information to obtain building permits in -- why can't**

1   I think of that township? Macomb Township.
2   Q. How did you become aware of those two jobs?
3   **A. I was sued by the homeowners.**
4   Q. Are those lawsuits still pending, or have they been
5   wrapped up?
6   **A. I have been let out of two, and one is still pending.**
7   Q. Do you know name of those two jobs or --
8   **A. One person's name was Boyd. One was Carter. I can't**
9   **think of the -- I can't think of the other gentleman.**
10  **There was three instances. I'm sorry. I thought two.**
11         MR. BIGELMAN: Okay. I'm going to ask your
12  attorney, Goran.
13         If you could provide me the complaints in
14  those lawsuits, I would appreciate that.
15         MR. ANTOVSKI: Yeah, absolutely.
16         MR. BIGELMAN: Thank you.
17         MR. ANTOVSKI: The last one is Hebeka,
18  H-e-b-e-k-a. Not to answer on his behalf, but just to
19  be transparent.
20  BY MR. BIGELMAN:
21  Q. Is that right, Mr. Bell; Hebeka is the other one?
22  **A. Yes, yes, and I've been dismissed from Carter and**
23  **Hebeka.**
24  Q. Do you know why you were dismissed from those cases?
25  **A. You would have to defer to my attorney. I don't know**



1 the exact lingo you guys use. You know what I mean?
2 I just know that I was out.
3 Q. I understand. I'm going to share my screen again with
4 you, Exhibit C. Can you see that, Mr. Bell?
5     MARKED BY THE REPORTER:
6     DEPOSITION EXHIBIT C
7     12:15 p.m.
8 A. Yes, sir.
9 Q. This document has Exigent Landscaping L.L.C.'s logo in
10 the upper left-hand corner. Do you see that?
11 A. Yes, sir.
12 Q. And it's titled "Estimate" with a date of June 27,
13 2022. Do you see that?
14 A. Yes, sir.
15 Q. And then it purports to be an estimate for "OJ and
16 Mohamed, 921 Crescent Drive, Dearborn, Michigan." Do
17 you see that?
18 A. Yes.
19 Q. Have you ever seen this document before?
20 A. No, I haven't.
21 Q. Did you have any conversations with Brandon Heitmann
22 around June 27, 2022, regarding 921 Crescent Drive?
23 A. No, I didn't.
24 Q. Turning to page 8 of this PDF, 8 of 13, can you see
25 there are signatures there all dated June 27, 2022?

1 Correct?
2 A. Correct.
3 Q. Going back to the first page at the bottom, do you see
4 where it says "License No. 802082183"? Do you see
5 that?
6 A. Yes, sir.
7 Q. That's not your license number, is it?
8 A. No, it is not.
9 Q. Looking at page 9 of Exhibit C -- and, again, you have
10 the Exigent Landscaping LLC logo in the upper
11 left-hand corner. Do you see that?
12 A. Yes.
13 Q. Then instead of "Estimate," it's titled "CO1." Do you
14 see that?
15 A. Yes.
16 Q. With a date of August 5, 2022; correct?
17 A. Yes.
18 Q. And, again, it's for OJ and Mohamed, 921 Crescent
19 Drive; correct?
20 A. Yes.
21 Q. And highlighted, it acknowledges a down payment of
22 $50,000; correct?
23 A. Yes.
24 Q. So as of August 5, 2022, were you aware of this job or
25 Mr. Mohamed Saad?

1 A. No.
2 Q. And as of this date, August 5, 2022, did you give
3 Mr. Heitmann authority to use your residential
4 builder's license?
5 A. No.
6 Q. Did Mr. Heitmann ever talk to you about you performing
7 any work on this job?
8 A. No.
9 Q. I'm sharing my screen again with you. This is
10 Exhibit D. This is information on Brandon Heitmann
11 and his residential builder's license. Do you see
12 that?
13     MARKED BY THE REPORTER:
14     DEPOSITION EXHIBIT D
15     12:19 p.m.
16 A. Yes, sir.
17 Q. His license number appears to be 242300197. Do you
18 see that?
19 A. Yes.
20 Q. Can you see when I highlight the document, or no?
21 A. Yeah. It says, "3-28-23 license issue date."
22 Q. Right. So it appears his license was issued March 28,
23 2023; correct?
24 A. Yes.
25 Q. That would be almost nine months after June 27, 2022;

1 correct?
2 A. Yes.
3 Q. And it appears that the license had been suspended; is
4 that right?
5 A. That's what it says, yes.
6 Q. Were you aware that his license was suspended? Did
7 you have any knowledge about that?
8 A. No.
9 Q. Sharing my screen again with you. This is Exhibit E.
10 It's a document for the City of Dearborn swimming pool
11 permit application. Do you see that?
12     MARKED BY THE REPORTER:
13     DEPOSITION EXHIBIT E
14     12:21 p.m.
15 A. Yes.
16 Q. Date submitted, August 31, '22, upper right-hand
17 corner. Do you see that?
18 A. Yes.
19 Q. And you see where it says "Contractor information"?
20 Where it says "Print name," it says, "Construction
21 Contractors." Do you see that?
22 A. Yes.
23 Q. Then there's a signature that looks like "Hank Bell."
24 Do you see that?
25 A. Yes.

1 Q.  Is that your signature?

2 A.  **No.  I always sign it "Henry."**

3 Q.  Is that your handwriting, or is --

4 A.  **No, sir.**

5 Q.  Let me just finish.  Is it your handwriting where it

6    says "Print name," where it says "Address," where it

7    says "State or city registration number, telephone

8    number, expiration date"?  Is any of that your

9    handwriting?

10 A.  **No, sir, that's not my phone number.**

11 Q.  The phone number's listed as 586-489-6680.  Do you

12    know whose number that is?

13 A.  **I have no idea.**

14 Q.  Okay.  And the License No. 2102207012, that's your

15    residential builder's license; correct?

16 A.  **Yeah.  That's the number that we had -- that you had**

17    **showed me before, I believe.**

18 Q.  Did you give anybody authority to use your name or

19    your company's name or your builder's license for this

20    project?

21 A.  **No.**

22 Q.  Did you give anyone authority to sign your name?

23 A.  **I'm sorry, could you say that again.**

24 Q.  Did you give anybody authority to sign your name?

25 A.  **No, sir.**

1 Q.  Turning to the next page, page 2 of Exhibit E has

2    "Applicant Information."  Do you see that section?

3 A.  **Yes.**

4 Q.  It's written "Amanda Pisarski."  Do you see that?

5 A.  **Yes, sir.**

6 Q.  Do you know who that is?

7 A.  **I believe that's Brandon's wife or former wife.  I'm**

8    **not sure which.**

9 Q.  Did you ever give her authority to use your

10    residential builder's license?

11 A.  **No.**

12 Q.  Do you see where it says "Signature of applicant"?

13 A.  **Yes.**

14 Q.  Is that your signature?

15 A.  **No, sir.**

16 Q.  Showing you what's being marked as Exhibit F, there's

17    a two-page exhibit with e-mails on August -- starting

18    August 31, '22, and concluding on September 1, '22,

19    between and you Brandon Heitmann.

20        MARKED BY THE REPORTER:

21        DEPOSITION EXHIBIT F

22        12:25 p.m.

23 A.  **Yes.**

24 Q.  This was a document that your attorney produced to me

25    yesterday, which I've shared with opposing counsel.

1    Can you explain the communication here with Brandon?

2 A.  **He asked me if I was licensed to do business in**

3    **Dearborn, and I told him that I hadn't renewed my**

4    **license in Dearborn for a few years, and he said,**

5    **"Well, I have a potential job."  He didn't say that I**

6    **had a job.  He said, "I have a potential job that's**

7    **coming, and I need contractors who are able to do work**

8    **in Dearborn."  And in order to do that, you have to**

9    **provide them a certificate of insurance and whatever**

10    **else they required in order to receive a license from**

11    **the City of Dearborn to do work in their town.**

12        **And I provided him a certificate of**

13    **insurance that listed, as a certificate holder, the**

14    **City of Dearborn, and they sent a license to me, and I**

15    **sent to it them, and that was it.  But there was no**

16    **discussion that I was involved in any job or what the**

17    **job -- excuse me -- what the job was or what my role**

18    **in that project may be.**

19 Q.  So the first e-mail here, in the e-mail -- the e-mail

20    is Exigent Landscaping, and it says Brandon Heitmann

21    to you, August 31, 2022, and then it has Amanda

22    Heitmann in the signature block at the bottom.  Do you

23    see that?

24 A.  **Yes.**

25 Q.  When did you have a conversation with Brandon or

1    Amanda regarding the -- the certificate with the City

2    of Dearborn or license with the City of Dearborn?

3 A.  **I can't give you an exact date.  I don't remember**

4    **that, but I -- I -- this may be the date.  It says,**

5    **"The city of Dearborn is requesting to be added to**

6    **your liability insurance as a certificate holder."**

7    **That may have been my first experience with the City**

8    **of Dearborn at this time, but if it's other than that,**

9    **I can't tell you.**

10 Q.  Okay.  Do you recall when we were looking at the

11    contract, the first day the signed estimate was

12    June 27, 2022.  Do you recall that?

13 A.  **Yes.**

14 Q.  Did you have any conversations about this license with

15    the City of Dearborn back then?

16 A.  **No.**

17 Q.  The second document we looked at, if you remember, it

18    was titled "CO1"?  I presume that means

19    Change Order 1?

20 A.  **I assume so, yes.**

21 Q.  That's dated August 5, 2022, almost three, four weeks

22    before this e-mail.  Did you have conversations back

23    then with Brandon or Amanda Heitmann about --

24 A.  **No, no.**

25 Q.  When they asked you about a builder's license, was

1  there any discussions about 921 Crescent Drive?
2  A.  No.
3  Q.  Was there any discussions about a specific project or
4     just a potential project?
5  A.  It was nothing specific at all.  It was just that he
6     may -- the way it was put to me, he may have a job
7     coming up in Dearborn and am I licensed to do business
8     in Dearborn.  That's the way it was brought to me.
9  Q.  Showing you what's been marked as Exhibit G, are you
10     able to see that on the screen?
11           MARKED BY THE REPORTER:
12           DEPOSITION EXHIBIT G
13           12:29 p.m.
14  A.  Yes, I am.  I've seen that before.
15  Q.  Is this the certificate of liability insurance that
16     you provided to Brandon based on the discussion you
17     just testified to?
18  A.  Yes.  I think it's more about the workers' comp, but,
19     anyways. . .
20  Q.  Commercial general liability, do you see it there?
21  A.  Yes.
22  Q.  And then below where the letter B is, there's a block
23     where it says "Workers' Compensation"; right?
24  A.  Yes.
25           MR. PHILLIPS:  I don't want to interrupt,

1     but I don't know that these have been marked,
2     necessarily, and can we have these e-mailed to us so
3     if I have any questions, I can make sure I'm asking
4     from the same document?  I don't know if we've been
5     marking them with the court reporter as we've gone
6     through, so I just wanted to make sure we underwent
7     that process so we all have the same thing.
8           MR. BIGELMAN:  Yeah, Tyler.  We e-mailed
9     them to the court reporter in advance, so they have
10     them, and I'm happy to bring any of them up when you
11     cross-examine the witness after.
12           MR. PHILLIPS:  If you could e-mail them to
13     me after, I would appreciate that.  That way I can
14     just pull them up on my screen.
15           MR. BIGELMAN:  Sure.
16           MR. PHILLIPS:  Sorry, please continue.
17     Apologies.
18  BY MR. BIGELMAN:
19  Q.  Mr. Bell, at the bottom left-hand corner, "Certificate
20     holder, City of Dearborn"; right?
21  A.  Yes.
22  Q.  And there are -- consistent with your testimony,
23     there's nothing on this document that is specific to
24     921 Crescent Drive; correct?
25  A.  That's correct.

1  Q.  I'll share with you Exhibit H.  These are this
2     exhibit's only one page.  These are e-mails between
3     you and the exigentlandscaping@yahoo.com e-mail.  It
4     appears to be a discussion with you and Amanda, where
5     you provide the certificate of insurance that we just
6     looked at; correct?
7           MARKED BY THE REPORTER:
8           DEPOSITION EXHIBIT H
9           12:32 p.m.
10  A.  Yes.
11  Q.  After you provided the certificate of insurance, were
12     there any further discussions about the City of
13     Dearborn or 921 -- strike that.
14  A.  No, sir, there wasn't.
15  Q.  So after you provided this insurance, were there any
16     discussions about 921 Crescent Drive?
17  A.  No, sir.  No.
18  Q.  When's the first time you became aware of that address
19     or Mr. Mohamed Saad?
20  A.  Probably was in the last two months, month.
21  Q.  Because of our lawsuit in the bankruptcy case?
22  A.  Yes.
23  Q.  I'm sharing with you what's been marked as Exhibit I.
24     Are you able to see that clearly?
25           MARKED BY THE REPORTER:

1           DEPOSITION EXHIBIT I
2           12:33 p.m.
3  A.  Yes.
4  Q.  It is a City of Dearborn document titled "Revised
5     Documents Application."  Permit site address, 921
6     Crescent Drive.  Do you see that?
7  A.  Yes.
8  Q.  Have you ever seen this document before?
9  A.  No, I haven't.
10  Q.  Okay.  And up in the upper right-hand corner where it
11     says "For office use only," it shows the permit number
12     revision date of September 29, 2022, and original
13     application dates of August 31, 2022; correct?
14  A.  Yes.
15  Q.  Is any of the handwriting on the front page your
16     handwriting?
17  A.  No.
18  Q.  Looking at the second page of Exhibit I, Line Item 17
19     lists "Construction Contractors."  Do you see that?
20  A.  Yes.
21  Q.  Is that your handwriting?
22  A.  No.
23  Q.  Line item 23, "Name authorized representative, Brandon
24     Heitmann."  Was he an authorized representative of
25     your company?

1  A.  No, sir.
2  Q.  Were you aware that he submitted this application to
3      the City of Dearborn representing that fact?
4  A.  Absolutely not.
5  Q.  I'll share with you what we'll mark as Exhibit J.  Are
6      you able to see that, Mr. Bell?
7          MARKED BY THE REPORTER:
8          DEPOSITION EXHIBIT J
9          12:36 p.m.
10 A.  Yes, sir.
11 Q.  Again, this is a form from the City of Dearborn titled
12     "Revised Document Application."  Do you see that?
13 A.  Yes.
14 Q.  In the upper right-hand corner, where it says "For
15     office use only," it lists "Permit No. 22-5274;
16     revision date, October 24, '22; and original
17     application date; 8-31-22."  Do you see that?
18 A.  Yes.
19 Q.  Have you seen this document before?
20 A.  No.
21 Q.  Is any of the handwriting on this first page of this
22     document yours?
23 A.  No.
24 Q.  If we look at line 17 on page 2 of Exhibit J, again,
25     it lists your company name, Construction Contractors;

1      correct?
2  A.  Yes.
3  Q.  And line 23, it lists a Madison Braunz, B-r-a-u-n-z,
4      as an authorized representative.  Do you see that?
5  A.  Yeah.
6  Q.  Do you know a Madison Braunz?
7  A.  No, I don't.
8  Q.  So it's fair to say she's not an authorized
9      representative of Construction Contractors LLC;
10     correct?
11 A.  No, it's not authorized at all.
12 Q.  Okay.  And do you recognize the signature in line 26?
13 A.  Yeah.  That's not mine.
14 Q.  Okay.  And Madison Braunz had no authority to sign on
15     behalf of your company; is that right?
16 A.  I have no idea who Madison Braunz is.  Never met her.
17     Don't know anything about her.
18 Q.  And this purportedly was signed October 24 of '22.
19     Did you know any more about 921 Crescent Drive at that
20     point?
21 A.  No, I didn't, sir.
22 Q.  Showing you what's been marked as Exhibit L.  This is
23     a two-page exhibit, but there's really nothing on the
24     second page.  These are e-mails, apparently between
25     you and Amanda.  Looks like she's using the Exigent

1      Landscaping e-mail @yahoo of October 25th,
2      October 27th of 2022.  You produced this document to
3      me; correct?
4          MARKED BY THE REPORTER:
5          DEPOSITION EXHIBIT L
6          12:39 p.m.
7  A.  Yes.
8  Q.  And it appears that you attached a City of Dearborn
9      license; is that right?
10 A.  That's what it appears, yes.
11 Q.  And is Amanda Heitmann Brandon's wife?
12 A.  I believe so.  I don't know if they're married or if
13     she changed her name.  I think now she's going by
14     Amanda Pisarski.  I don't know the ins and outs of
15     that.
16 Q.  Okay.  And the e-mail on October 27th, it says,
17     "Brandon's application is submitted with LARA,"
18     L-A-R-A, "and waiting for them to process it and send
19     him dates/times for exam.  I think he should take the
20     exam sometime end of December."  Do you see that?
21 A.  Yes.
22 Q.  It goes on to say, "He has one more permit I'm pulling
23     with the City of Sterling Heights.  Then I'm all set."
24     Do you know what she's talking about here?
25 A.  I have no idea.  I just assumed that she was gonna

1      take the license that I received from the City of
2      Dearborn.  In the previous e-mail, she said she was
3      gonna deliver it, and I thought she was just telling
4      me about what she was gonna do that day.  I have no
5      idea.  It's nothing that's -- they gave me any
6      information on for Sterling Heights.
7  Q.  Do you know what she's referring to in Sterling
8      Heights?
9  A.  No, I don't.
10 Q.  Showing you what's been marked as Exhibit M, this is a
11     City of Dearborn form for concrete flatwork and porch
12     application.  Do you see that?
13         MARKED BY THE REPORTER:
14         DEPOSITION EXHIBIT M
15         12:41 p.m.
16 A.  Yes.
17 Q.  In the upper right-hand corner, "For office use only,"
18     it says "Date submitted, 10-27-2022."  Do you see
19     that?
20 A.  Yep.
21 Q.  "Application No. 22-5274."  Do you see that?
22 A.  Yes.
23 Q.  And, again, where it lists "contractor" in Line
24     Item 4, it lists "Construction Contractors LLC," your
25     company; correct?

1  A. Yes.

2  Q. Have you ever seen this document before?

3  A. No, sir.

4  Q. Just to be clear on this document, site address,

5     Item 1, 921 Crescent Drive; correct?

6  A. That's what it says.

7  Q. Did you contract on this for 921 Crescent Drive to do

8     flatwork or a porch application?

9  A. I was not contacted by Exigent or Brandon about doing

10    anything on 921 Crescent Drive.

11 Q. Showing you what's been marked as Exhibit N, this is a

12    certificate of license in the City of Dearborn; is

13    that right?

14        MARKED BY THE REPORTER:

15        DEPOSITION EXHIBIT N

16        12:43 p.m.

17 A. Yes.

18 Q. And this is for your company, Construction Contractors

19    LLC; is that right?

20 A. Yes.

21 Q. What does this license allow your company to do?

22 A. Say that again.

23 Q. What's the purpose for this license with the City of

24    Dearborn?

25 A. I don't know their -- what the city of Dearborn

Page 31

1     mandated when they said that everybody who works in

2     the city of Dearborn has to be licensed with them.

3     This has been that way for a very long time.  Don't

4     know the reason why, but every time you go to work in

5     the city of Dearborn, you have to get a license as

6     this, pay for it, and then you're considered a

7     contractor -- eligible contractor to do business in

8     Dearborn.

9  Q. In the upper left-hand corner of this document, this

10    license is dated October 17, 2022; correct?

11 A. That's correct.

12 Q. And if we go to the upper right-hand corner, the

13    license is set to expire December 31, 2022; correct?

14 A. Yeah.  They want you to do one every year.

15 Q. Do you know if your license was ever renewed in 2023?

16 A. I don't know that.

17 Q. This is a license to operate in the city of Dearborn,

18    not specific to any one property but the entire city;

19    is that right?

20 A. That's correct, yeah.

21 Q. If Brandon or Amanda Heitmann were to make a statement

22    that you authorized them to use your residential

23    builder's license for this project, would that be a

24    false statement?

25 A. That's correct.  Yeah, I did not authorize anyone to

Page 32

1     use my information.

2  Q. On the three other jobs that we spoke about, the Boyd,

3     the Carter, and the Hebeka job, how did you learn that

4     Brandon Heitmann was using your residential builder's

5     license?

6  A. It was after the job was over with when they sued me,

7     and that's when I found out that he had used my

8     information on those jobs as well.

9  Q. So basically a similar situation to what we have here;

10    is that right?

11 A. That's correct, sir.

12 Q. Okay.

13        MR. BIGELMAN:  Mr. Bell, I appreciate your

14    time, your attorney's time.  I don't have any further

15    questions, subject to any questions I might have after

16    Mr. Tyler Phillips has the right to ask you questions.

17    Okay?

18        MR. PHILLIPS:  I would like to take a brief

19    break and get those documents e-mailed over to me

20    before I go into my line of questioning, Jeff.  If you

21    have someone send those over, and then we can come

22    back in 15 minutes.

23        MR. BIGELMAN:  You need 15 minutes?

24        MR. PHILLIPS:  I don't know how long you

25    need to need to get them to me.  You have Exhibits A

Page 33

1     though N here, which you didn't share

2     contemporaneously, which you e-mailed to the court

3     reporter ahead of time and I can only see on the

4     screen.  So I'm entitled to look at them, determine if

5     I have questions based on the exhibits you're

6     honoring; so, yeah, 15 minutes seems reasonable.

7        MR. BIGELMAN:  Most of the documents we

8     have are documents that you produced.

9        MR. PHILLIPS:  I'm aware of that, but I'm

10    entitled to see the documents you asked questions on.

11    I would like to look at them in an e-mail and organize

12    my thoughts based on your documents you produced as

13    exhibits today, and then I will ask questions.  I

14    think 15 minutes is reasonable.

15        MR. BIGELMAN:  We'll reconvene at 1:00

16    o'clock.

17        MR. PHILLIPS:  Thank you.

18        (Off the record at 12:49 p.m.)

19        (Back on the record at 12:59 p.m.)

20        EXAMINATION

21 BY MR. PHILLIPS:

22 Q. Mr. Bell, my name is Tyler Phillips.  We have spoken

23    before.  I'm Mr. Heitmann's attorney.  I have a few

24    questions to ask you.  First off, you're aware today

25    that you're giving testimony under oath; correct?

1  A.  Yes.
2  Q.  And you're aware that not giving truthful testimony
3      can subject you to penalties of perjury; correct?
4  A.  Yes.
5  Q.  We're gonna pull up what I believe was Exhibit F.
6      Okay.  We'll walk through this.  Can you see
7      Exhibit F, Mr. Bell?
8  A.  Yes, yes.
9  Q.  And can you identify the date and time -- well, first
10     of all, what is Exhibit F?
11 A.  It's an e-mail from Amanda to me.
12 Q.  And it's an e-mail chain; correct?
13 A.  I guess that's what you call it, yes.
14 Q.  So the first e-mail is August 31, 2022, at 11:33;
15     correct?
16 A.  Right.
17 Q.  The e-mail following that is September 1, 2022, at
18     7:43; correct?
19 A.  Yes.
20 Q.  And there's a third e-mail, September 1, 2022, at
21     7:57; correct?
22 A.  Yes.
23 Q.  And it appears to be another e-mail, September 1,
24     2022, at 7:57; correct?
25 A.  Yes.

Page 35

1  Q.  And then there's a last e-mail.  It says "Quoted text
2      hidden," but it's by you, September 1, 2022, 7:44
3      a.m.; right?
4  A.  Okay.
5  Q.  Is that correct?
6  A.  Yes, that's what it says.
7  Q.  Okay.  So I'm going to read the first e-mail.  Let me
8      know if I have misread it.  First, it's from Brandon
9      Heitmann to Hank Bell; correct?
10 A.  Yes.
11 Q.  You understood this to be Amanda because the signature
12     block said Amanda Heitmann?
13 A.  Yes.
14 Q.  Is that accurate?
15 A.  Yes.
16 Q.  "Hi, Hank.  It's Amanda with Exigent.  Hope you're
17     doing well.  The City of Dearborn is requesting to be
18     added on your liability insurance as a certificate
19     holder as," quote, "The City of Dearborn, 16901
20     Michigan Avenue, Dearborn, Michigan 48126," unquote.
21     They said "NOT," N-O-T, all caps, "as additional
22     insured.  I guess a lot of insurance companies make
23     the mistake of being added as an additional insured,
24     and they said it's not the same thing.  It has to be a
25     certificate holder.  Once that is done, if you could

Page 37

1  e-mail it here, and I will drop it off with the
2  certificate.  Thanks, Hank.  Please let me know if you
3  have any questions.  Have a blessed day," and then
4  signature block.  Did I read that right?
5  A.  Correct.  Yes.
6  Q.  Okay.  Was this the first e-mail that you were -- let
7      me rephrase the question.  Had you had any
8      communications prior to this August 31st e-mail with
9      the Heitmanns or anyone at Exigent regarding adding
10     the City of Dearborn as a certificate holder on your
11     liability insurance?
12 A.  As it pertains to insurance, yes.
13 Q.  And what were those conversations?
14 A.  I -- what I believe, what I remember is that I have to
15     be licensed in the city of Dearborn.
16 Q.  Why do you have to be licensed in the city of
17     Dearborn?
18 A.  Well, there may be a job or potentially part of a job
19     that Brandon was getting involved with that he may
20     want to use me, or he may not.
21 Q.  And what was your understanding of the scope of work
22     that Brandon may or may not want to use you for?
23 A.  It was never -- he never gave me any information as
24     far as scope, job, what it was, anything like that.
25 Q.  What was the extent of your conversations with respect

Page 37

1  to this alleged potential job?
2  A.  The alleged potential -- excuse me -- job?
3  Q.  Yeah.
4  A.  There was none.  It was just there was a potential job
5      that he was working on in Dearborn, and he wanted to
6      make sure his team was able to do work in Dearborn.
7  Q.  Well, what part of the team were you going to be?
8  A.  I don't know.  He didn't divulge that.
9  Q.  You didn't ask?
10 A.  No.
11 Q.  You didn't ask what type of scope of work you would be
12     doing?
13 A.  No.
14 Q.  Isn't it typical to figure out what type of work
15     you're gonna do before you do it?
16 A.  Well, you don't do that verbally.
17 Q.  You didn't want a proposal before sending your
18     insurance information?
19 A.  This was for a licensing issue, not a jobsite issue.
20 Q.  What do you mean it's for a licensing issue?
21 A.  It's for the license in the city of Dearborn.
22 Q.  Well, why does it matter if you have a license in the
23     city of Dearborn if you're not performing work there?
24 A.  There's the potential for me doing work in Dearborn.
25     In order for me to be in the running to do that, I

1    would have to be licensed by them.
2  Q.  What type of work did you expect, if any, to be doing
3    for Mr. Heitmann?
4  A.  I don't know.  He didn't lay it out.  He didn't give
5    me a scope of work.  He didn't give me any drawings.
6    He had never given me anything.
7  Q.  He didn't give you anything yet you continued and
8    decided to put the city of Dearborn on your insurance
9    despite the fact of not receiving a proposal for scope
10    of work?
11  A.  Correct.
12  Q.  Is that what you typically do?
13  A.  Say it again.
14  Q.  Would you typically do that without having -- being
15    under contract?
16  A.  I had the ability to do other jobs in Dearborn myself,
17    and in order to do that, I would have to be licensed.
18    It wasn't a bad thing.
19  Q.  Respectfully, sir, that wasn't my question.  My
20    question was if that was your typical practice.
21  A.  Well, I've done it under -- I don't understand the
22    question.
23  Q.  Would you typically add someone to your policy if you
24    hadn't been under contract for the work already?  Was
25    that or was that not your typical practice?

1  A.  This is not an additional insured.  This is a
2    certificate holder.  I send out insurance certificates
3    to almost everyone that I do business with.  This is
4    not uncommon.  Everybody who does business with me
5    wants an insurance certificate.  It's the same thing.
6  Q.  Well, a certificate of insurance or insurance
7    declaration simply identifies the coverages you keep;
8    right?
9  A.  Exactly.  Right.  That's all that is.
10  Q.  But there's a difference between adding someone as a
11    named insured or an additional insured onto your
12    insurance policy versus providing them a certificate
13    of insurance which identifies the policies you have;
14    correct?
15  A.  Well, if you read the e-mail, they want "to be added
16    on your liability insurance as a certificate holder,
17    not as an additional insured," and whatever the rest
18    of that says, "insurance companies make a mistake of
19    adding as additional insured, and they said it's not
20    the same thing.  It has to be a certificate holder,"
21    I don't know the ins and outs of that.  I'm not an
22    insurance guy.
23  Q.  Okay.  I appreciate your response, but if you answer
24    my question specifically, we'll move through this
25    faster.  It's different to simply give someone a

1    certificate of insurance than to add them as a named
2    or additional insured; correct?
3  A.  I don't know that.  It's much different than an
4    additional insured, but everybody that I send an
5    insurance certificate to, whether it be an automotive
6    company, a private company, a -- anybody, they are a
7    certificate holder of the insurance, period.  I don't
8    know anything beyond that.  I don't know what that
9    means.  I don't know where we're going with this, but
10    I don't have the answer to that.  I don't know how to
11    do that -- answer your technical question.
12  Q.  So the answer is you don't know, then?
13  A.  Correct.
14  Q.  Okay.  Let's move down to September 1, 2022.  You
15    indicate, "Hi, Brandon.  I need the job name and
16    address as well."  Did I read that correctly?
17  A.  Yes.
18  Q.  Why did you need the job name and address as well?
19  A.  That's what my insurance company called and said they
20    needed.
21  Q.  And they needed that information in order to do what?
22  A.  Apparently, they thought they needed to provide the
23    job name, and then that is subsequent to Amanda's
24    e-mail that said, "No, it's just City of Dearborn.
25    This is the address they need it for."

1  Q.  I'm not sure I understand your answer.  So you said
2    you needed that -- let me -- if I'm wrong, please
3    correct me.  If I understand your testimony correctly,
4    you indicated that your insurance agent indicated they
5    needed the job name and address; correct?
6  A.  Yes.
7  Q.  And that's why you were inquiring as to what the job
8    name and address was; correct?
9  A.  That's correct.
10  Q.  Okay.  Was there any other reason you would have been
11    inquiring into the job name and address?
12  A.  No.
13  Q.  Okay.  Then on September 1, 2022, at 7:57, the Exigent
14    Landscaping e-mail address e-mailed to Mohamed Saad,
15    912 Crescent Drive, Dearborn, Michigan 48126; correct?
16  A.  Correct.
17  Q.  So as of September 1, 2022, 7:57, you were aware of a
18    potential project for Mr. Saad at 921 Crescent Drive,
19    Dearborn, Michigan 48126; right?
20  A.  Yeah.  I didn't -- that was the address that Brandon
21    gave me, and it wasn't the information that my
22    insurance company required, and that was that.  I
23    didn't pursue what that was with Brandon because --
24  Q.  Yeah.  I'm asking a very simple question, sir.  As of
25    September 1, 2022, at 7:57, you were aware of a

1    potential project for Mohamed Saad at 921 Crescent
2    Drive, Dearborn, Michigan 48126; right?
3  **A.  I didn't put it together that way, but the information**
4  **was given to me, yes.**
5  Q.  Well, you asked for the project name and address;
6    right?
7  **A.  Right.**
8  Q.  And then he replied with it?
9  **A.  Yes.**
10  Q.  In fact, he replied with it on the same day within
11    20 minutes; right?
12  **A.  Yeah, I guess it was 20 minutes.**
13  Q.  Just trying to find out what exhibit number this is,
14    so just give me one moment.  Going to what's been
15    previously marked as Exhibit H.  Mr. Bell, can you see
16    Exhibit H?
17  **A.  Yes.**
18  Q.  What is Exhibit H?
19  **A.  It's an e-mail.**
20  Q.  It's e-mail from whom?
21  **A.  From me.**
22  Q.  To whom?
23  **A.  Brandon.**
24  Q.  Okay.  There's an attachment; correct?
25  **A.  Yes.**

1  Q.  And what's the attachment?
2  **A.  The certificate of insurance that was requested for**
3  **the City of Dearborn.**
4  Q.  Okay.  And is it fair to characterize the first e-mail
5    of this chain as a transmittal from you to Amanda or
6    Brandon, as the case may be, of that certificate of
7    insurance?
8  **A.  Yes.**
9  Q.  So you transmitted the certificate of insurance on
10    September 3, 2022?
11  **A.  Yes.**
12  Q.  This, I believe, was Exhibit L.  Mr. Bell, can you
13    please identify what Exhibit L is.
14  **A.  It's an e-mail from Brandon to me.**
15  Q.  Okay.  I might have pulled up the wrong exhibit.  One
16    moment.  I think I have the wrong exhibit.  Let me
17    pull up the other one on the screen.  Yep, I had the
18    wrong exhibit.  My mistake.  Let's try this again.
19    Mr. Bell, now that I have the actual exhibit on the
20    screen, can you please identify what Exhibit L is for
21    the record.
22  **A.  It's an e-mail from me to Brandon.**
23  Q.  And what's the date of this e-mail?
24  **A.  October 25, 2022.**
25      (The court reporter has technical

1    difficulties at 1:14 p.m.)
2      (Off the record at 1:14 p.m.)
3      (Back on the record at 1:30 p.m.)
4      MR. PHILLIPS:  Just so we have a clear
5    record, there was an outage with the software for the
6    court reporter.  There was questions asked to
7    Mr. Bell, approximately 10 or 15 minutes during that
8    time.  We will be re-asking some of these questions in
9    order to ensure we get them on the record.
10  BY MR. PHILLIPS:
11  Q.  So let's go back to Exhibit H, and we'll put that one
12    back on the screen.  Mr. Bell, what is Exhibit H?
13  **A.  It's an e-mail from me to Brandon.**
14  Q.  And there was an attachment to this e-mail?
15  **A.  Correct.**
16  Q.  And what is that attachment?
17  **A.  It's the certificate of insurance to the City of**
18  **Dearborn.**
19  Q.  Okay.  And that's on September -- the date of this
20    e-mail is September 3, 2022?
21  **A.  Yes.**
22  Q.  And so you transmitted the certificate of insurance
23    related to the City of Dearborn to Exigent on
24    September 3, 2022; correct?
25  **A.  Yes.**

1  Q.  I don't think we actually lost too much time.  That's
2    good.  Let's go back to where we were, which was
3    Exhibit L.  I'm going to go back to be Exhibit L.
4    Okay.  Mr. Bell, Exhibit L is an e-mail from you to
5    Exigent, October 25, 2022; correct?
6  **A.  Yes.**
7  Q.  And there is a response in this Exhibit L on
8    October 27, 2022, from Exigent to you?
9  **A.  Yes.**
10  Q.  Okay.  Let's go to the first portion.  It says, "Hi,
11    Brandon.  Attached please find the above.  Don't know
12    if you paid it or they want you to.  How's the
13    builder's license coming along?"  And that's an e-mail
14    from you; correct?
15  **A.  Yes.**
16  Q.  And I read that correctly.  Yes?
17  **A.  Yes.**
18  Q.  Okay.  When you say, "Don't know if you paid it or
19    they want you to," who is "they"?
20  **A.  City of Dearborn.**
21  Q.  Why were you asking if he paid it if it's your license
22    to do work in the city of Dearborn?
23  **A.  I didn't make the application.  He did, so if I**
24  **started getting involved in it, they're gonna go, "Who**
25  **the hell are you?"  I didn't make the application.  I**

1   didn't have conversations with them. "I have no idea
2   what they told you or what they expected from you."
3   That's why I said, "I don't know if you paid it or
4   they want you to," because I wasn't involved in the
5   submittal of the application for the license in
6   Dearborn.
7   Q.  Well, you were involved because you gave him the
8   certificate of insurance; right?
9   A.  Yeah.  That was the extent of it.
10  Q.  And then you knew he was going to be submitting so you
11  would get a license to do work in the city of
12  Dearborn, then; right?
13  A.  I didn't make the submittal.  He did.
14  Q.  But you knew he was going to do it; right?
15  A.  Yeah.
16  Q.  I'm sorry, that answer wasn't clear.
17  A.  Yes.
18  Q.  Okay.  So it wasn't a surprise to you when on or about
19  October 17, 2022, you received a license to do work in
20  the city of Dearborn?
21  A.  No, it wasn't a surprise.
22  Q.  So you were involved in the process of getting the
23  license in the city of Dearborn?
24  A.  To complete the application, I sent out the
25  certificate of insurance.  If that is what you mean by

1   being involved, then, yes, I was.
2   Q.  And you were aware Mr. Heitmann was doing it on your
3   behalf?
4   A.  Yes.
5   Q.  Okay.  Go to October 27th -- and just to be clear,
6   October 25, 2022, this is approximately two months
7   from September 1, 2022 -- right? -- just shy?
8   A.  Yeah.  Yes.
9   Q.  So two days later on October 7 [sic], 2022, you get a
10  response from the Exigent e-mail, and it says, "Hey,
11  Hank.  It's Amanda here.  Thank you for sending this.
12  We did already pay it.  Brandon's application is
13  submitted with LARA.  I'm waiting for them to process
14  it and send him dates/times for exam.  I think he
15  should be able to take the exam sometime in December.
16  He only has one more permit I'm pulling out with the
17  City of Sterling Heights.  Then we are all set,"
18  smiley face.  "Thanks, Hank.  Have a blessed day."
19  Did I read that right?
20  A.  Yes.
21  Q.  Okay.  Let's go back up to here.  On the October 25th
22  e-mail, you inquired, "How's the builder's license
23  coming along?"  Why?
24  A.  I knew that he was going for his builder's license.  I
25  didn't know if he had already received it, he was

1   going to receive it.  I didn't know where he was on
2   that front.
3   Q.  So you knew at this point Mr. Heitmann didn't have his
4   builder's license, at least at that point; right?
5   A.  I wasn't aware of it.  I didn't know if he did or he
6   didn't.
7   Q.  Well, you said he was going for it, so if he's going
8   for it, he doesn't have it; right?
9   A.  Maybe I phrased that wrong.  I said, "How's the
10  builder's license coming along?"  What I meant by
11  doing that is has Brandon got his builder's license
12  yet?  Is he going to take the test?  I hadn't heard
13  from Brandon in quite a long time, didn't know where
14  he was in that process, was just curious about that.
15      And the other thing was -- is -- was he
16  using somebody else to pull his permits.  I didn't
17  know that at that time, just wanted to kind of test
18  the waters and see if he had his license yet.
19  Q.  Okay.  So this September 1, 2022, communication that
20  we talked about, prior to that communication in the
21  prior year, how many times had you communicated with
22  Mr. Heitmann?
23  A.  I don't know the answer to that.
24  Q.  Is it more or less than a hundred?
25  A.  Way less than a hundred.

1   Q.  Okay.  But you had communicated to him within that
2   prior year?
3   A.  Of 2022?
4   Q.  Yes.  We'll call it calendar year 2022.  So from
5   January 1st to September 2022, you had communicated
6   with Mr. Heitmann prior to receiving that
7   correspondence?
8   A.  Yes.  Yep.
9   Q.  Okay.  And you knew Mr. Heitmann was performing work;
10  correct?
11  A.  I didn't know what he was doing.
12  Q.  You knew Mr. Heitmann was engaging in a pool business;
13  correct?
14  A.  No.
15  Q.  Go back to this exhibit.  The e-mail here says, "He
16  only has one more permit I'm pulling with the City of
17  Sterling Heights.  Then we are all set."  What did you
18  understand that to mean at the time you received this
19  e-mail?
20  A.  I didn't even give it a second thought.  I don't know
21  if she was telling me what she had to do that day,
22  have they -- were they with someone else they were
23  pulling the permit with?  Did the owner sign the
24  application for building permits?  'Cause owners can
25  sign as the contractor on all building permits.

**Page 50**

1    Didn't know what that was.  Didn't care what that was.
2    I was busy.  I just ignored it.
3  Q.  Let's go back to that.  So how long did you operate as
4    a general contractor?
5  A.  Say it again.
6  Q.  How long did you operate as a general contractor?
7  A.  A long time.
8  Q.  Just give me an approximate.
9  A.  Construction Contractors was formed in 2014.
10  Q.  Okay.  So you had at least ten years of experience as
11    a general contractor?
12  A.  Yes, sir.
13  Q.  Okay.  And so you're familiar with the permitting
14    process?
15  A.  Yes, sir.
16  Q.  And in your experience in the permitting process, you
17    don't necessarily need to be a licensed builder to
18    pull the permits because an owner can pull the
19    permits; right?
20  A.  Correct.
21  Q.  Okay.  And, in fact, sometimes contractors will charge
22    an additional expense for assisting the owner in
23    pulling permits; correct?
24  A.  I don't know about that.  I never did that.
25  Q.  Okay.  You received an e-mail about, in your words, a

**Page 51**

1    potential project in September 1, 2022.  You received
2    a license nearly two months later.  In that time
3    period, did you inquire in any way, shape, or form
4    about the status of that potential project?
5  A.  No, I did not.
6  Q.  You didn't chase the lead in any way?
7  A.  No.  I was busy.
8  Q.  You didn't send an e-mail?
9  A.  No, sir.
10  Q.  You didn't send a text?
11  A.  No, sir.
12  Q.  You didn't ask him for a contract?
13  A.  No, sir.
14  Q.  You didn't ask him for a scope of work?
15  A.  No, sir.
16  Q.  During the potential project at all, did you ask if
17    you were gonna be building a hospital or working on a
18    house?
19  A.  No, sir.
20  Q.  So you had zero intellectual curiosity as to the scope
21    of the potential job towards you?
22  A.  I was up to my neck in alligators on my own project,
23    and I didn't have any concern of what Exigent or
24    Brandon was doing.
25  Q.  Did you tell him, "I don't have time to take any job.

**Page 52**

1    I'm not interested"?
2  A.  Didn't even think to have that conversation.
3    Contractors don't do that, just off the cuff calling
4    some other guy that they know does business, say,
5    "Listen, don't call me if you got a job 'cause I'm
6    busy.  See you," and hang the phone up.  That doesn't
7    happen.
8  Q.  That's not what I asked.  I asked did you ever tell
9    him you weren't interested in the job?
10  A.  No, I didn't.  I never told him I was interested or
11    not interested.  It just wasn't on my radar.
12  Q.  You said that the City of Dearborn likes you to renew
13    the license on an annualized basis.  Is that
14    consistent with your prior testimony?
15  A.  Yes.
16  Q.  Have you ever renewed it?
17  A.  Excuse me?
18  Q.  Have you renewed your license to do business in the
19    city of Dearborn?
20  A.  I don't have any work right now.  I wouldn't redo it
21    unless I had a job in Dearborn right now.  Why waste
22    the money?
23  Q.  Mr. Bell, I'm not asking you why.  I'm asking you if
24    you have.
25  A.  No, I haven't.

**Page 53**

1        MR. PHILLIPS:  Okay.  Nothing further from
2    me.
3        MR. ANTOVSKI:  Jeff, you're still on mute.
4        MR. BIGELMAN:  I have a few questions to
5    follow up with.
6            RE-EXAMINATION
7  BY MR. BIGELMAN:
8  Q.  Let's go back to Exhibit F.  Before we do that,
9    Mr. Bell, do you have a pen and paper in front of you?
10  A.  No.  I can get one, though.
11  Q.  Okay.  I'm gonna ask you to write down some dates as
12    we look at documents.  Okay?
13  A.  Okay.
14  Q.  Can you see Exhibit F, this e-mail of August -- this
15    e-mail chain of August 31st, September 1st, and
16    September 1st?
17  A.  Okay.
18  Q.  And Mr. Phillips discussed this exhibit with you, and
19    if we look at page -- the bottom of page 1, where you
20    ask -- you ask, on September 1, 2022, "Hi, Brandon.  I
21    need the job name and address as well"; correct?
22  A.  Yes.
23  Q.  Then at the bottom of page 1 leading to the top of
24    page 2, he or his wife responds with a company e-mail,
25    "Mohamed Saad, September 21st" -- or, I'm sorry --

Page 54

1    "921 Crescent Drive, Dearborn, Michigan 48126";
2    correct?
3  A.  Correct.
4  Q.  So is it fair to say that's the first date you became
5    familiar with Mr. Saad or the Crescent Drive address?
6  A.  Yes.
7  Q.  Okay.  So I want you to write that down, September 1,
8    2022.  Okay?
9  A.  Okay.
10  Q.  I'm pulling up Exhibit C.  We looked at this very
11    early in the examination, and this is an estimate
12    that's dated June 27, 2022, from Exigent Landscaping
13    LLC to OJ and Mohamed, 921 Crescent Drive.  Do you see
14    that?
15  A.  Yes.
16  Q.  So as of this date, June 27, 2022, you were unaware of
17    this contract.  You were unaware of Mohamed Saad.  You
18    were unaware of 921 Crescent Drive; correct?
19  A.  That's correct, sir.
20  Q.  Okay.  This is -- we looked before, page 8 of
21    Exhibit C.  They signed it -- everybody signed it on
22    June 27th, '22 -- Mohamed Saad; Avery Petri, on behalf
23    of Exigent, as a salesman; and Brandon, on behalf of
24    manager of Exigent; right?
25  A.  That's correct, sir.

Page 55

1  Q.  And then if we go to August 5th or page 9 of
2    Exhibit C, this document, CO1, which we take to mean
3    Change Order 1, dated August 5, 2022; correct?
4  A.  Yes, sir.
5  Q.  And here this acknowledges a receipt of $50,000;
6    correct?
7  A.  Yes.
8  Q.  And, as we know, you didn't become aware of anything
9    regarding a Mohamed Saad or 921 Crescent Drive until
10    September 1, 2022, almost a month later; correct?
11  A.  That's correct, sir.
12  Q.  So is it fair to say that you had no idea that this
13    contract was in place, that Brandon received money or
14    that what appears to be a change order was negotiated
15    prior to you even knowing this man's property, the
16    man's name, or the address?
17  A.  That's correct.
18  Q.  Let's look at Exhibit E.  Did it change for you on
19    your screen?
20  A.  Yes, sir.
21  Q.  Okay.  So that is the swimming pool permit
22    application, and in the top right-hand corner, it says
23    "Date submitted, August 31, 2022"; correct?
24  A.  Yes, sir.
25  Q.  And if you remember the date that we wrote down from

Page 56

1    your e-mail exchange with Mr. and Mrs. Heitmann, that
2    wasn't until a day later; correct?
3  A.  Yes.
4  Q.  And this swimming pool permit application lists your
5    name as -- or lists your company's name as the
6    contractor; correct?
7  A.  Yes, sir.
8  Q.  And you already testified that that's not your
9    signature; correct?
10  A.  That's correct.  That's not my signature.
11  Q.  You sign your name Henry Bell; correct?
12  A.  Yes, yes.
13  Q.  If we go to the second page of Exhibit E, the
14    signature of the applicant, which appears to be Amanda
15    Pisarski, was notarized August 25th, 2022; correct?
16  A.  That's correct.
17  Q.  And that's also before the e-mail exchange of
18    September 1, 2022; correct?
19  A.  Yes, sir.
20  Q.  So you were unaware of Mr. Saad, a pool project, his
21    address when they submitted this application; correct?
22  A.  That's correct.  I had no idea.
23  Q.  And just to be clear -- I know I asked it before.  I
24    just want to ask it again -- you never visited the
25    property; correct?

Page 57

1  A.  No, sir.
2  Q.  Never met Mr. Saad; correct?
3  A.  No, sir.
4  Q.  Were you paid any money by Exigent Landscaping or
5    Brandon Heitmann?
6  A.  No.
7         MR. BIGELMAN:  I don't have any further
8    questions.  Thank you.
9         MR. ANTOVSKI:  Thank you.
10         MR. PHILLIPS:  Nothing for me on follow-up.
11         MR. BIGELMAN:  We'll be ordering a copy of
12    the transcript, please.
13         MR. PHILLIPS:  I would like to know if it's
14    possible to get your information, or I can give you my
15    information so you can e-mail me cost.
16         MR. ANTOVSKI:  I'll do the estimate as
17    well.
18         (The deposition was concluded at 1:52 p.m.)
19
20
21
22
23
24
25

```
 1                 CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN )
 3                     ) SS
 4   COUNTY OF OAKLAND )
 5
 6              I, Susanne Ellen Gorman, a Notary Public in
 7         and for the above county and state, do hereby certify
 8         that the above deposition was taken before me via
 9         virtual technology; that the witness was by me first
10         duly sworn to testify to the truth and nothing but the
11         truth; that the foregoing questions asked and answers
12         made by the witness were duly recorded by me
13         stenographically and reduced to computer
14         transcription; that this is a true, full, and correct
15         transcript of my stenographic notes so taken; and that
16         I am not related to, nor of counsel to either party,
17         nor interested in the event of this cause.
18
19
20
21         Susanne Ellen Gorman, CSR-9271, RPR
22         Notary Public,
23         Oakland County, Michigan.
24
25   My commission expires:  September 14, 2029
```

**$**

**$50,000** 15:22 55:5

**1**

**1** 19:18 21:19 30:5 34:17,20,23
35:2 40:14 41:13,17,25 47:7
48:19 51:1 53:19,20,23 54:7
55:3,10 56:18

**10** 44:7

**10-27-2022** 29:18

**11:33** 34:14

**12:00** 6:3

**12:10** 10:25 11:10

**12:15** 14:7

**12:19** 16:15

**12:21** 17:14

**12:25** 19:22

**12:29** 22:13

**12:32** 24:9

**12:33** 25:2

**12:36** 26:9

**12:39** 28:6

**12:41** 29:15

**12:43** 30:16

**12:49** 33:18

**12:59** 33:19

**13** 14:24

**15** 32:22,23 33:6,14 44:7

**16901** 35:19

**17** 25:18 26:24 31:10 46:19

**1980** 7:24

**1:00** 33:15

**1:14** 44:1,2

**1:30** 44:3

**1:52** 57:18

**1st** 49:5 53:15,16

**2**

**2** 19:1 26:24 53:24

**20** 10:6 42:11,12

**2014** 8:24 50:9

**2021** 10:11

**2022** 14:13,22,25 15:16,24 16:2,
25 20:21 21:12,21 25:12,13 28:2
31:10,13 34:14,17,20,24 35:2
40:14 41:13,17,25 43:10,24
44:20,24 45:5,8 46:19 47:6,7,9
48:19 49:3,4,5 51:1 53:20 54:8,
12,16 55:3,10,23 56:15,18

**2023** 8:4 16:23 31:15

**2025** 6:2

**21** 10:6

**2102207012** 11:24 18:14

**21st** 53:25

**22** 17:16 19:18 26:16 27:18 54:22

**22-5274** 26:15 29:21

**23** 25:23 27:3

**24** 26:16 27:18

**24-04375-MAR** 6:24

**242300197** 16:17

**25** 10:12 43:24 45:5 47:6

**25th** 28:1 47:21 56:15

**26** 27:12

**27** 14:12,22,25 16:25 21:12 45:8
54:12,16

**27th** 28:2,16 47:5 54:22

**28** 16:22

**29** 25:12

**3**

**3** 43:10 44:20,24

**3-28-23** 16:21

**31** 17:16 19:18 20:21 25:13 31:13
34:14 55:23

**31st** 36:8 53:15

**4**

**4** 29:24

**48094** 7:12

**48126** 35:20 41:15,19 42:2 54:1

**5**

**5** 15:16,24 16:2 21:21 55:3

**586-489-6680** 18:11

**5th** 55:1

**6**

**6184** 7:12

**7**

**7** 6:2 47:9

**7:43** 34:18

**7:44** 35:2

**7:57** 34:21,24 41:13,17,25

**8**

**8** 14:24 54:20

**8-31-22** 26:17

**802082183** 15:4

**9**

**9** 15:9 55:1

**912** 41:15

**921** 12:5 14:16,22 15:18 22:1 23:24 24:13,16 25:5 27:19 30:5, 7,10 41:18 42:1 54:1,13,18 55:9

---

@

**@yahoo** 28:1

---

A

**a.m.** 35:3

**ability** 38:16

**absolutely** 13:15 26:4

**accurate** 35:14

**acknowledges** 15:21 55:5

**act** 8:14

**actual** 43:19

**add** 38:23 40:1

**added** 21:5 35:18,23 39:15

**adding** 36:9 39:10,19

**additional** 35:21,23 39:1,11,17, 19 40:2,4 50:22

**address** 7:11 12:5 18:6 24:18 25:5 30:4 40:16,18,25 41:5,8,11, 14,20 42:5 53:21 54:5 55:16 56:21

**advance** 23:9

**adversary** 6:22,24

**afternoon** 6:19

**agent** 41:4

**agreement** 6:9

**ahead** 33:3

**alleged** 37:1,2

**alligators** 51:22

**Amanda** 19:4 20:21 21:1,23 24:4 27:25 28:11,14 31:21 34:11 35:11,12,16 43:5 47:11 56:14

**Amanda's** 40:23

**amount** 9:19

**annualized** 52:13

**answers** 7:3

**ANTOVSKI** 11:12,16 13:15,17 53:3 57:9,16

**Apologies** 23:17

**apparently** 27:24 40:22

**appears** 16:17,22 17:3 24:4 28:8, 10 34:23 55:14 56:14

**applicant** 19:2,12 56:14

**application** 17:11 25:5,13 26:2, 12,17 28:17 29:12,21 30:8 45:23,25 46:5,24 47:12 49:24 55:22 56:4,21

**approximate** 50:8

**approximately** 44:7 47:6

**area** 9:1,2 10:12

**areas** 8:25

**asphalt** 10:10

**assisting** 50:22

**assume** 21:20

**assumed** 28:25

**attached** 28:8 45:11

**attachment** 42:24 43:1 44:14,16

**attorney** 10:22 13:12,25 19:24 33:23

**attorney's** 32:14

**August** 15:16,24 16:2 17:16 19:17,18 20:21 21:21 25:13 34:14 36:8 53:14,15 55:1,3,23 56:15

**authority** 16:3 18:18,22,24 19:9 27:14

**authorize** 12:10 31:25

**authorized** 25:23,24 27:4,8,11 31:22

**automotive** 40:5

**Avenue** 35:20

**Avery** 54:22

**aware** 12:15,19 13:2 15:24 17:6 24:18 26:2 33:9,24 34:2 41:17, 25 47:2 48:5 55:8

---

B

**B-R-A-U-N-Z** 27:3

**back** 11:19 15:3 21:15,22 32:22 33:19 44:3,11,12 45:2,3 47:21 49:15 50:3 53:8

**bad** 38:18

**bankruptcy** 6:23 24:21

**based** 11:2 22:16 33:5,12

**basement** 10:13

**basically** 8:8 32:9

**basis** 52:13

**behalf** 13:18 27:15 47:3 54:22,23

**Bell** 6:16,19 7:11 13:21 14:4 17:23 23:19 26:6 32:13 33:22 34:7 35:9 42:15 43:12,19 44:7, 12 45:4 52:23 53:9 56:11

**Bigelman** 6:19,21 7:2,10 11:14, 19,22 13:11,16,20 23:8,15,18 32:13,23 33:7,15 53:4,7 57:7,11

**bit** 11:13

**blessed** 36:3 47:18

**block** 20:22 22:22 35:12 36:4

**blown** 11:20

**bottom** 15:3 20:22 23:19 53:19, 23

**Boyd** 13:8 32:2

**Brandon** 6:23 9:3,4,7 10:2 12:10, 16,19 14:21 16:10 19:19 20:1, 20,25 21:23 22:16 25:23 30:9 31:21 32:4 35:8 36:19,22 40:15 41:20,23 42:23 43:6,14,22 44:13 45:11 48:11,13 51:24 53:20

---

54:23 55:13 57:5

**Brandon's** 9:6,13 19:7 28:11,17 47:12

**Braunz** 27:3,6,14,16

**break** 32:19

**bring** 23:10

**brother** 9:5,12

**brother's** 9:4,7,10,11,23

**brought** 22:8

**builder** 50:17

**builder's** 7:20 11:7,23 12:11,16, 20 16:4,11 18:15,19 19:10 21:25 31:23 32:4 45:13 47:22,24 48:4, 10,11

**building** 10:11 12:25 49:24,25 51:17

**built** 8:19

**business** 20:2 22:7 31:7 39:3,4 49:12 52:4,18

**busy** 50:2 51:7 52:6

———————

**C**

**calendar** 49:4

**call** 34:13 49:4 52:5

**called** 40:19

**calling** 52:3

**caps** 35:21

**care** 50:1

**Carter** 13:8,22 32:3

**case** 24:21 43:6

**cases** 13:24

**certificate** 20:9,12,13 21:1,6 22:15 23:19 24:5,11 30:12 35:18,25 36:2,10 39:2,5,6,12,16, 20 40:1,5,7 43:2,6,9 44:17,22 46:8,25

**certificates** 39:2

**certifications** 7:17

**certified** 6:5

**chain** 34:12 43:5 53:15

**change** 21:19 55:3,14,18

**changed** 28:13

**characterize** 43:4

**charge** 50:21

**chart** 9:9

**chase** 51:6

**Christmas** 9:23

**city** 17:10 18:7 20:11,14 21:1,2,5, 7,15 23:20 24:12 25:4 26:3,11 28:8,23 29:1,11 30:12,23,25 31:2,5,17,18 35:17,19 36:10,15, 16 37:21,23 38:8 40:24 43:3 44:17,23 45:20,22 46:11,20,23 47:17 49:16 52:12,19

**class** 7:19

**clean** 7:4

**clear** 30:4 44:4 46:16 47:5 56:23

**CO1** 15:13 21:18 55:2

**commercial** 8:16 22:20

**communicated** 48:21 49:1,5

**communication** 20:1 48:19,20

**communications** 36:8

**comp** 22:18

**companies** 35:22 39:18

**company** 7:25 8:12 10:12 12:2 25:25 26:25 27:15 29:25 30:18, 21 40:6,19 41:22 53:24

**company's** 18:19 56:5

**Compensation** 22:23

**complaints** 13:13

**complete** 46:24

**concern** 51:23

**concluded** 57:18

**concluding** 19:18

**concrete** 29:11

**consent** 12:17,21

**considered** 31:6

**consistent** 23:22 52:14

**construction** 8:1,5,7,11 9:25 12:3 17:20 25:19 26:25 27:9 29:24 30:18 50:9

**contacted** 30:9

**contemporaneously** 33:2

**continue** 23:16

**continued** 38:7

**contract** 21:11 30:7 38:15,24 51:12 54:17 55:13

**contractor** 8:8,10,14 10:7,9 17:19 29:23 31:7 49:25 50:4,6, 11 56:6

**contractors** 8:1,7,11 10:1 12:3 17:21 20:7 25:19 26:25 27:9 29:24 30:18 50:9,21 52:3

**conversation** 20:25 52:2

**conversations** 14:21 21:14,22 36:13,25 46:1

**copy** 57:11

**corner** 14:10 15:11 17:17 23:19 25:10 26:14 29:17 31:9,12 55:22

**correct** 7:22 8:2 10:22 11:1,2,3,7 12:3 15:1,2,16,19,22 16:23 17:1 18:15 23:24,25 24:6 25:13 27:1, 10 28:3 29:25 30:5 31:10,11,13, 20,25 32:11 33:25 34:3,12,15, 18,21,24 35:5,9 36:5 38:11 39:14 40:2,13 41:3,5,8,9,15,16 42:24 44:15,24 45:5,14 49:10,13 50:20,23 53:21 54:2,3,18,19,25 55:3,6,10,11,17,23 56:2,6,9,10, 11,15,16,18,21,22,25 57:2

**correctly** 40:16 41:3 45:16

**correspondence** 49:7

**cost** 57:15

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

counsel 19:25

court 6:4,23 7:4 23:5,9 33:2 43:25 44:6

coverages 39:7

Crescent 12:5 14:16,22 15:18 22:1 23:24 24:16 25:6 27:19 30:5,7,10 41:15,18 42:1 54:1,5, 13,18 55:9

cross-examine 23:11

cuff 52:3

curiosity 51:20

curious 48:14

custom 8:19

---

**D**

---

dad 9:6,13

date 14:12 15:16 16:2,21 17:16 18:8 21:3,4 25:12 26:16,17 29:18 34:9 43:23 44:19 54:4,16 55:23,25

dated 14:25 21:21 31:10 54:12 55:3

dates 25:13 53:11

dates/times 28:19 47:14

day 21:11 29:4 36:3 42:10 47:18 49:21 56:2

days 47:9

Dearborn 12:6 14:16 17:10 20:3, 4,8,11,14 21:2,5,8,15 22:7,8 23:20 24:13 25:4 26:3,11 28:8 29:2,11 30:12,24,25 31:2,5,8,17 35:17,19,20 36:10,15,17 37:5,6, 21,23,24 38:8,16 40:24 41:15,19 42:2 43:3 44:18,23 45:20,22 46:6,12,20,23 52:12,19,21 54:1

December 28:20 31:13 47:15

decided 38:8

declaration 39:7

defer 13:25

degrees 7:17

deliver 29:3

depends 11:17

deposition 6:1,6,25 10:24 11:9 14:6 16:14 17:13 19:21 22:12 24:8 25:1 26:8 28:5 29:14 30:15 57:18

deteriorating 10:11

determine 33:4

difference 39:10

difficulties 44:1

discussed 53:18

discussion 20:16 22:16 24:4

discussions 22:1,3 24:12,16

dismissed 13:22,24

divulge 37:8

document 14:9,19 16:20 17:10 19:24 21:17 23:4,23 25:4,8 26:12,19,22 28:2 30:2,4 31:9 55:2

documents 10:21 25:5 32:19 33:7,8,10,12 53:12

drawings 38:5

Drive 7:12 12:5 14:16,22 15:19 22:1 23:24 24:16 25:6 27:19 30:5,7,10 41:15,18 42:2 54:1,5, 13,18 55:9

driveway 10:14

drop 36:1

duly 6:17

---

**E**

---

e-mail 20:19 21:22 23:12 24:3 28:1,16 29:2 33:11 34:11,12,14, 17,20,23 35:1,7 36:1,6,8 39:15 40:24 41:14 42:19,20 43:4,14, 22,23 44:13,14,20 45:4,13 47:10,22 49:15,19 50:25 51:8 53:14,15,24 56:1,17 57:15

e-mailed 23:2,8 32:19 33:2 41:14

e-mails 19:17 24:2 27:24

early 54:11

Easter 9:23

eligible 31:7

employees 8:12,20,22 10:8

end 28:20

engaging 49:12

ensure 44:9

entire 31:18

entitled 33:4,10

equipment 6:7

estimate 14:12,15 15:13 21:11 54:11 57:16

exact 9:19 11:25 14:1 21:3

exam 28:19,20 47:14,15

examination 7:9 33:20 54:11

examined 6:17

exchange 56:1,17

excuse 20:17 37:2 52:17

exhibit 10:20,24 11:6,9 14:4,6 15:9 16:10,14 17:9,13 19:1,16, 17,21 22:9,12 24:1,8,23 25:1,18 26:5,8,24 27:22,23 28:5 29:10, 14 30:11,15 34:5,7,10 42:13,15, 16,18 43:12,13,15,16,18,19,20 44:11,12 45:3,4,7 49:15 53:8,14, 18 54:10,21 55:2,18 56:13

exhibit's 24:2

exhibits 32:25 33:5,13

Exigent 14:9 15:10 20:20 27:25 30:9 35:16 36:9 41:13 44:23 45:5,8 47:10 51:23 54:12,23,24 57:4

exigentlandscaping@yahoo. com 24:3

expect 38:2

expected 46:2

expense 50:22

experience 21:7 50:10,16

expiration 18:8

expire 31:13

explain 20:1

extent 36:25 46:9

---

**F**

face 47:18

fact 26:3 38:9 42:10 50:21

fair 27:8 43:4 54:4 55:12

false 31:24

familiar 50:13 54:5

family 8:19 9:7

faster 39:25

figure 11:14 37:14

find 42:13 45:11

finish 18:5

flatwork 29:11 30:8

floor 10:13

follow 53:5

follow-up 57:10

form 26:11 29:11 51:3

formed 50:9

found 32:7

front 25:15 48:2 53:9

---

**G**

garage 10:13

gave 29:5 36:23 41:21 46:7

general 8:8,10,14 22:20 50:4,6,
11

gentleman 13:9

give 6:13 16:2 18:18,22,24 19:9
21:3 38:4,5,7 39:25 42:14 49:20

50:8 57:14

giving 33:25 34:2

good 6:19,20 45:2

Goran 13:12

Gorman 6:5

guess 34:13 35:22 42:12

guy 39:22 52:4

guys 14:1

---

**H**

H-E-B-E-K-A 13:18

handwriting 18:3,5,9 25:15,16,
21 26:21

hang 52:6

Hank 6:16 17:23 35:9,16 36:2
47:11,18

happen 52:7

happy 7:6 23:10

heard 48:12

Hebeka 13:17,21,23 32:3

Heights 28:23 29:6,8 47:17 49:17

Heitmann 6:23 9:3,4,5,6,11,12,
13 12:10,16,20 14:21 16:3,6,10
19:19 20:20,22 21:23 25:24
28:11 31:21 32:4 35:9,12 38:3
47:2 48:3,22 49:6,9,12 56:1 57:5

Heitmann's 9:12 33:23

Heitmanns 36:9

held 6:6

hell 45:25

Henry 18:2 56:11

Hey 47:10

hidden 35:2

high 7:18

highlight 16:20

highlighted 15:21

---

holder 20:13 21:6 23:20 35:19,25
36:10 39:2,16,20 40:7

home 10:6,10,11

homeowners 13:3

homes 8:19

honoring 33:6

hope 7:6 35:16

hospital 51:17

house 51:18

How's 45:12 47:22 48:9

hundred 48:24,25

husband 9:5,11

---

**I**

idea 18:13 27:16 28:25 29:5 46:1
55:12 56:22

identifies 39:7,13

identify 34:9 43:13,20

industry 8:6

information 11:6 12:25 16:10
17:19 19:2 29:6 32:1,8 36:23
37:18 40:21 41:21 42:3 57:14,15

inquire 51:3

inquired 47:22

inquiring 41:7,11

ins 28:14 39:21

instances 12:15,19,23 13:10

insurance 20:9,13 21:6 22:15
24:5,11,15 35:18,22 36:11,12
37:18 38:8 39:2,5,6,12,13,16,18,
22 40:1,5,7,19 41:4,22 43:2,7,9
44:17,22 46:8,25

insured 35:22,23 39:1,11,17,19
40:2,4

intellectual 51:20

interested 52:1,9,10,11

interrupt 22:25

involved 20:16 36:19 45:24 46:4, 7,22 47:1

IOSHA 7:19

issue 16:21 37:19,20

issued 16:22

item 25:18,23 29:24 30:5

**J**

January 49:5

Jeff 6:21 11:12 32:20 53:3

job 8:4 15:24 16:7 20:5,6,16,17 22:6 32:3,6 36:18,24 37:1,2,4 40:15,18,23 41:5,7,11 51:21,25 52:5,9,21 53:21

jobs 12:24 13:2,7 32:2,8 38:16

jobsite 37:19

June 14:12,22,25 16:25 21:12 54:12,16,22

**K**

kid 9:21,22

kind 8:5,17 48:17

knew 46:10,14 47:24 48:3 49:9, 12

knowing 55:15

knowledge 17:7

**L**

L-A-R-A 28:18

L.l.c.'s 14:9

landscaping 10:9 14:9 15:10 20:20 28:1 41:14 54:12 57:4

LARA 28:17 47:13

lawsuit 24:21

lawsuits 13:4,14

lay 38:4

lead 51:6

leading 53:23

learn 32:3

left-hand 14:10 15:11 23:19 31:9

letter 22:22

liability 21:6 22:15,20 35:18 36:11 39:16

license 7:21 11:7,23 12:11,17,20, 24 15:4,7 16:4,11,17,21,22 17:3, 6 18:14,15,19 19:10 20:4,10,14 21:2,14,25 28:9 29:1 30:12,21, 23 31:5,10,13,15,17,23 32:5 37:21,22 45:13,21 46:5,11,19,23 47:22,24 48:4,10,11,18 51:2 52:13,18

licensed 20:2 22:7 31:2 36:15,16 38:1,17 50:17

licenses 7:17

licensing 37:19,20

likes 52:12

lingo 14:1

listed 18:11 20:13

Listen 52:5

lists 25:19 26:15,25 27:3 29:23, 24 56:4,5

LLC 8:1 10:1 12:3 15:10 27:9 29:24 30:19 54:13

logo 14:9 15:10

long 7:23 9:18 31:3 32:24 48:13 50:3,6,7

looked 21:17 24:6 54:10,20

lost 45:1

lot 35:22

**M**

Macomb 13:1

Madison 27:3,6,14,16

make 7:4 23:3,6 31:21 35:22 37:6

39:18 45:23,25 46:13

man's 55:15,16

management 8:11

manager 54:24

mandated 31:1

March 16:22

mark 26:5

marked 10:20,23 11:6,8 14:5 16:13 17:12 19:16,20 22:9,11 23:1 24:7,23,25 26:7 27:22 28:4 29:10,13 30:11,14 42:15

marking 23:5

married 7:15 28:12

matter 37:22

means 21:18 40:9

meant 48:10

met 12:8 27:16 57:2

Michigan 6:5 7:12 8:25 12:6 14:16 35:20 41:15,19 42:2 54:1

Mike 9:5,12

mine 27:13

minutes 32:22,23 33:6,14 42:11, 12 44:7

misread 35:8

mistake 35:23 39:18 43:18

Mohamed 6:22 12:8 14:16 15:18, 25 24:19 41:14 42:1 53:25 54:13,17,22 55:9

moment 42:14 43:16

money 52:22 55:13 57:4

month 24:20 55:10

months 16:25 24:20 47:6 51:2

morning 6:20

move 39:24 40:14

mute 53:3

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

## N

**N-O-T** 35:21

**name's** 6:21

**named** 39:11 40:1

**necessarily** 23:2 50:17

**neck** 51:22

**needed** 40:20,21,22 41:2,5

**negotiated** 55:14

**notarized** 56:15

**notary** 6:5

**number** 11:23,25 15:7 16:17
18:7,8,10,12,16 25:11 42:13

**number's** 18:11

## O

**Oakridge** 7:12

**oath** 6:18 33:25

**obtain** 12:25

**October** 26:16 27:18 28:1,2,16
31:10 43:24 45:5,8 46:19 47:5,6,
9,21

**office** 25:11 26:15 29:17

**OJ** 14:15 15:18 54:13

**operate** 31:17 50:3,6

**opposing** 19:25

**order** 20:8,10 21:19 37:25 38:17
40:21 44:9 55:3,14

**ordering** 57:11

**organize** 33:11

**original** 25:12 26:16

**outage** 44:5

**outings** 9:8

**outs** 28:14 39:21

**owner** 49:23 50:18,22

**owners** 49:24

## P

**p.m.** 6:3 10:25 11:10 14:7 16:15
17:14 19:22 22:13 24:9 25:2
26:9 28:6 29:15 30:16 33:18,19
44:1,2,3 57:18

**paid** 45:12,18,21 46:3 57:4

**paper** 53:9

**part** 9:2 36:18 37:7

**parties** 6:10

**past** 7:17 8:23

**paving** 10:10

**pay** 31:6 47:12

**payment** 15:21

**PDF** 14:24

**pen** 53:9

**penalties** 34:3

**pending** 13:4,6

**performing** 16:6 37:23 49:9

**period** 40:7 51:3

**perjury** 34:3

**permission** 12:17

**permit** 17:11 25:5,11 26:15 28:22
47:16 49:16,23 55:21 56:4

**permits** 12:25 48:16 49:24,25
50:18,19,23

**permitting** 50:13,16

**person** 6:11

**person's** 13:8

**pertains** 36:12

**Petri** 54:22

**Phillips** 22:25 23:12,16 32:16,18,
24 33:9,17,21,22 44:4,10 53:1,
18 57:10,13

**phone** 18:10,11 52:6

**phrased** 48:9

**Pisarski** 19:4 28:14 56:15

**place** 55:13

**Plank** 10:12

**point** 27:20 48:3,4

**policies** 39:13

**policy** 38:23 39:12

**pool** 17:10 49:12 55:21 56:4,20

**porch** 29:11 30:8

**portion** 45:10

**potential** 20:5,6 22:4 37:1,2,4,24
41:18 42:1 51:1,4,16,21

**potentially** 36:18

**poured** 10:13

**practice** 38:20,25

**presume** 21:18

**previous** 29:2

**previously** 42:15

**Print** 17:20 18:6

**prior** 36:8 48:20,21 49:2,6 52:14
55:15

**private** 40:6

**proceeding** 6:22,24

**process** 7:2 23:7 28:18 46:22
47:13 48:14 50:14,16

**produced** 10:21 19:24 28:2 33:8,
12

**project** 18:20 20:18 22:3,4 31:23
41:18 42:1,5 51:1,4,16,22 56:20

**property** 31:18 55:15 56:25

**proposal** 37:17 38:9

**provide** 7:3 13:13 20:9 24:5
40:22

**provided** 20:12 22:16 24:11,15

**providing** 39:12

**public** 6:5

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

pull 23:14 34:5 43:17 48:16 50:18

pulled 43:15

pulling 28:22 47:16 49:16,23 50:23 54:10

purportedly 27:18

purports 14:15

purpose 30:23

pursuant 6:9

pursue 41:23

put 9:22 11:19 22:6 38:8 42:3 44:11

## Q

question 36:7 38:19,20,22 39:24 40:11 41:24

questioning 32:20

questions 7:3 23:3 32:15,16 33:5,10,13,24 36:3 44:6,8 53:4 57:8

quote 35:19

Quoted 35:1

## R

radar 52:11

ran 8:12

re-asking 44:8

RE-EXAMINATION 53:6

read 11:21 35:7 36:4 39:15 40:16 45:16 47:19

reason 31:4 41:10

reasonable 33:6,14

recall 21:10,12

receipt 55:5

receive 20:10 48:1

received 29:1 46:19 47:25 49:18 50:25 51:1 55:13

receiving 38:9 49:6

recognize 27:12

reconvene 33:15

record 7:4 33:18,19 43:21 44:2,3, 5,9

redo 52:20

referring 29:7

registered 12:2

registration 18:7

related 9:14,16,17 44:23

remember 21:3,17 36:14 55:25

Remote 6:1

remotely 6:9

renew 52:12

renewed 20:3 31:15 52:16,18

repeat 7:5

rephrase 36:7

replaced 10:10

replied 42:8,10

reporter 6:4,6,8 7:4 10:23 11:8 14:5 16:13 17:12 19:20 22:11 23:5,9 24:7,25 26:7 28:4 29:13 30:14 33:3 43:25 44:6

represent 6:22

representative 25:23,24 27:4,9

representing 26:3

requested 43:2

requesting 21:5 35:17

required 20:10 41:22

residential 7:20 8:16,18 11:7 12:11,16,20 16:3,11 18:15 19:10 31:22 32:4

respect 36:25

Respectfully 38:19

responds 53:24

response 10:20 39:23 45:7 47:10

rest 39:17

Revised 25:4 26:12

revision 25:12 26:16

right-hand 17:16 25:10 26:14 29:17 31:12 55:22

role 20:17

Romeo 10:12

Ron 9:6,12

room 6:8

running 37:25

## S

Saad 6:22 12:8 15:25 24:19 41:14,18 42:1 53:25 54:5,17,22 55:9 56:20 57:2

salesman 54:23

school 7:18

scope 36:21,24 37:11 38:5,9 51:14,20

screen 10:15,16 11:4,19 14:3 16:9 17:9 22:10 23:14 33:4 43:17,20 44:12 55:19

section 19:2

send 28:18 32:21 39:2 40:4 47:14 51:8,10

sending 37:17 47:11

September 8:4 19:18 25:12 34:17,20,23 35:2 40:14 41:13, 17,25 43:10 44:19,20,24 47:7 48:19 49:5 51:1 53:15,16,20,25 54:7 55:10 56:18

set 28:23 31:13 47:17 49:17

Seventy-one 7:14

shape 51:3

share 14:3 24:1 26:5 33:1

shared 19:25

sharing 10:15 11:4 16:9 17:9 24:23

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

shorthand 6:6

showed 9:22 18:17

Showing 19:16 22:9 27:22 29:10 30:11

shows 25:11

shy 47:7

sic 47:9

sign 18:2,22,24 27:14 49:23,25 56:11

signature 17:23 18:1 19:12,14 20:22 27:12 35:11 36:4 56:9,10, 14

signatures 14:25

signed 21:11 27:18 54:21

similar 32:9

simple 41:24

simply 39:7,25

single-family 8:19

sir 7:16 12:7,9,12,14 14:8,11,14 15:6 16:16 18:4,10,25 19:5,15 24:14,17 26:1,10 27:21 30:3 32:11 38:19 41:24 50:12,15 51:9,11,13,15,19 54:19,25 55:4, 11,20,24 56:7,19 57:1,3

sister 9:11

sister's 9:4

site 25:5 30:4

situation 32:9

smiley 47:18

software 44:5

solemnly 6:12

sounds 11:25 12:1

specific 9:1 22:3,5 23:23 31:18

specifically 39:24

spoke 32:2

spoken 33:22

started 45:24

starting 19:17

State 6:5 18:7

statement 31:21,24

status 51:4

Sterling 28:23 29:6,7 47:17 49:17

stipulate 6:10

strike 24:13

subject 32:15 34:3

submittal 46:5,13

submitted 17:16 26:2 28:17 29:18 47:13 55:23 56:21

submitting 46:10

subpoena 10:16,21 11:2

subsequent 40:23

sued 13:3 32:6

surprise 46:18,21

Susannah 6:4

suspended 17:3,6

swear 6:12

swimming 17:10 55:21 56:4

sworn 6:9,11,17

---

**T**

talk 16:6

talked 48:20

talking 28:24

team 37:6,7

technical 40:11 43:25

telephone 18:7

telling 29:3 49:21

ten 50:10

test 48:12,17

testified 6:18 22:17 56:8

testimony 6:10,12 23:22 33:25

34:2 41:3 52:14

text 35:1 51:10

thing 23:7 35:24 38:18 39:5,20 48:15

thought 13:10 29:3 40:22 49:20

thoughts 33:12

time 7:7 9:9,19 21:8 24:18 31:3,4 32:14 33:3 34:9 44:8 45:1 48:13, 17 49:18 50:7 51:2,25

times 48:21

titled 14:12 15:13 21:18 25:4 26:11

today 7:7 11:2 33:13,24

told 20:3 46:2 52:10

top 53:23 55:22

town 20:11

township 13:1

transcript 57:12

transmittal 43:5

transmitted 43:9 44:22

transparent 13:19

tri-county 9:2

truth 6:13,14

truthful 34:2

Turning 14:24 19:1

two-page 19:17 27:23

Tyler 23:8 32:16 33:22

type 37:11,14 38:2

typical 37:14 38:20,25

typically 38:12,14,23

---

**U**

unaware 54:16,17,18 56:20

unclear 7:5

uncommon 39:4

**understand** 8:14 14:3 38:21
41:1,3 49:18

**understanding** 7:20,25 36:21

**understood** 35:11

**underwent** 23:6

**unlicensed** 12:11

**unquote** 35:20

**upper** 14:10 15:10 17:16 25:10
26:14 29:17 31:9,12

---

**V**

**verbally** 37:16

**versus** 39:12

**videoconferencing** 6:7

**visited** 56:24

---

**W**

**waiting** 28:18 47:13

**walk** 34:6

**wanted** 23:6 37:5 48:17

**Washington** 7:12

**waste** 52:21

**waters** 48:18

**Wednesday** 6:2

**weeks** 21:21

**When's** 24:18

**wife** 9:10 19:7 28:11 53:24

**wife's** 9:4,11

**words** 50:25

**work** 8:5,16,17,25 9:25 10:6,7
16:7 20:7,11 31:4 36:21 37:6,11,
14,23,24 38:2,5,10,24 45:22
46:11,19 49:9 51:14 52:20

**workers'** 22:18,23

**working** 8:3 37:5 51:17

**works** 31:1

**wrapped** 13:5

**write** 53:11 54:7

**written** 19:4

**wrong** 41:2 43:15,16,18 48:9

**wrote** 55:25

---

**Y**

**year** 31:14 48:21 49:2,4

**years** 8:18,23 9:8 20:4 50:10

**yesterday** 19:25

---

**Z**

**zoom** 11:13



# EXHIBIT E

**City of Dearborn**
**PERMIT & PLAN REVIEW OFFICE**
16901 Michigan, Suite 7, Dearborn, MI 48126
(313) 943-2442

(245)

| | |
|---|---|
| Date Submitted | 8.31.22 |
| Application No. | 22.4379 |
| Clerk | KM |

R-20N 9/15

# SWIMMING POOL PERMIT APPLICATION

## SITE ADDRESS
921 Crescent Dr.

## DESCRIPTION OF PROPOSED WORK

☐ Above-Ground Pool   ☒ In-Ground Pool

(varies see plans)

| WIDTH | LENGTH | DEPTH | WALL HEIGHT | WALL CONSTRUCTION | FLOOR CONSTRUCTION |
|---|---|---|---|---|---|
| | | | | 12" thick concrete | 8" thick concrete |

## CONSTRUCTION VALUE
$ 551,545

## CONTRACTOR INFORMATION (or Home Owner)
PRINT NAME Construction Contractors   SIGNITURE Hann Bell

ADDRESS 6184 Oakridge Dr.   TELEPHONE NO. 586-489-6680

STATE LICENSE OR CITY REGISTRATION NO. 2102207012   EXPIRATION DATE 05/31/23

WORKER'S DISABILITY COMPENSATION INSURANCE CARRIER (OR REASON FOR EXEMPTION)
Accident Fund

EMPLOYER IDENTIFICATION NUMBER (OR REASON FOR EXEMPTION)
46-5101900

MESC EMPLOYER NUMBER (OR REASON FOR EXEMPTION)
no employees

## PROPERTY OWNER INFORMATION/AFFIDAVIT

I do hereby certify that I am the owner of the property herein described and that I have given the applicant herein named permission to perform the work described in this application:

NAME  Rana Saad

ADDRESS  921 Crescent Dr.
Dearborn, MI 48124   PHONE NUMBER  313-815-6342

SIGNATURE OF PROPERTY OWNER  Rana Saad

**(continued)**

## APPLICANT INFORMATION/AFFIDAVIT (If not the contractor)

Application is hereby made for a permit to perform work described in this application and the accompanying drawings, which are a part of this application. The acceptance of the permit shall constitute an agreement to abide by all codes and ordinances enforced by the City of Dearborn.

NAME  Amanda Pisarski

ADDRESS  55949 Lancewood Dr.  Shelby Twp. MI 48316

E-MAIL ADDRESS  bheitmann12@yahoo.com

PHONE NUMBER  586-383-8308

FAX NUMBER  N/A

DEPT OF COMMERCE - STATE OF MICHIGAN
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF MACOMB
MY COMMISSION EXPIRES 3/29/2023
Acting in the County of MACOMB

> Section 23a of the state construction code act of 1972, 1972 PA 230, MCL 125.1523a, prohibits a person from conspiring to circumvent the licensing requirements of this state relating to persons who are to perform work in a residential building or a residential structure. Violators of section 23a are subjected to civil fines.

SIGNATURE OF APPLICANT

Subscribed and sworn to before me this  25  day of  August , 2022

Notary Public, ~~Wayne~~ Macomb County, Michigan

My commission expires  March 29, 2023

*\*\*NOTE: Permit Applications and related construction documents are valid for 180 days. Pursuant to the State of Michigan Building Code, if a permit is not issued within 180 days after the date of submittal, the proposed work shall be deemed to have been abandoned. Permit applications and related documents will be void and destroyed.*

---

## FOR OFFICE USE ONLY

- [ ] 3 Sets of Site Plan or Mortgage Survey
- [ ] 3 Sets of Drawings
- [ ] Signed Contract
- [ ] Neighborhood Association / Historical District Review
- [ ] Property Owner Verified
- [ ] Contractor Registration Verified

**Parcel ID Number** _____

**Staff Initials** _____

**Plan Reviewer** _____

**Date Approved/Denied** _____

| | |
|---|---|
| Plan Fee | $ 15 |
| Processing Fee | $ 42 |
| Permit Fee | $_____ |
| **PAY THIS AMOUNT** | $_____ |

# EXHIBIT F

1          UNITED STATES BANKRUPTCY COURT

2           EASTERN DISTRICT OF MICHIGAN

3                SOUTHERN DIVISION

4

5   In re:                    Chapter 13

6   BRANDON HEITMANN,            Case No. 24-41956-MAR

7        Debtor.              Hon. Mark A. Randon

8   _____/

9   MOHAMED SAAD,

10       Plaintiff,            Adv. Pro. No. 24-04375-mar

11  vs.                      Hon. Mark A. Randon

12  BRANDON HEITMANN,

13       Defendant.

14  _____/

15

16

17           The Video Deposition of AMANDA PISARSKI,

18           Taken via Hanson Remote,

19           Commencing at 9:30 a.m.,

20           Tuesday, July 22, 2025,

21           Before Susannah Gorman, CSR-9271, RPR.

22

23

24

25

Page 2

1  APPEARANCES:

2

3  JEFFREY H. BIGELMAN, ESQ. (P61755)

4  Osipov Bigelman, P.C.

5  20700 Civic Center Drive, Suite 420

6  Southfield, Michigan 48076-4140

7  (248)663-1800

8  jhb@osbig.com

9      Appearing on behalf of the Plaintiff.

10

11  TYLER PATRICK PHILLIPS, ESQ. (P78280)

12  Kotz Sangster Wysocki P.C.

13  400 Renaissance Center, Suite 3400

14  Detroit, Michigan 48243-1618

15  (313)259-8782

16  tphillips@kotzsangster.com

17      Appearing on behalf of the Defendant.

18

19  ALSO PRESENT:

20  Neal Rogers, Legal Videographer

21  Brandon Heitmann, Defendant

22

23

24

25

Page 3

1                    TABLE OF CONTENTS

2

3  AMANDA PISARSKI                        PAGE

4

5

6  Examination                              6

7  By Mr. Bigelman

8

9

10                    EXHIBITS

11

12  EXHIBIT                                PAGE

13  (Exhibits attached to transcript.)

14

15  DEPOSITION EXHIBIT C                     15
   9:53 a.m.

16  Swimming Pool Permit Application
   DEPOSITION EXHIBIT T                     17

17  9:56 a.m.
   Lawsuit complaint for the Boyds

18  DEPOSITION EXHIBIT AA                    18
   9:58 a.m.

19  Business Resilient Outdoor Living

20

21

22

23

24

25

Page 4

1  Remote deposition
2  Tuesday, July 22, 2025
3  About 9:30 a.m.
4      THE VIDEOGRAPHER:  We are on the record.
5  This is the video-recorded deposition of Amanda
6  Pisarski being taken remotely via Zoom.  Today is July
7  22, 2025, and the time is 9:32 a.m.  Would the
8  attorneys please identify themselves and the court
9  reporter please swear in the witness.
10      MR. BIGELMAN:  Jeffrey Bigelman on behalf
11  of Plaintiff.
12      MR. PHILLIPS:  Tyler Phillips, P78280, on
13  behalf of Defendant.
14      THE COURT REPORTER:  Good morning,
15  everybody.  My name is Susannah Gorman, a Michigan
16  State notary public and certified shorthand reporter,
17  and this deposition is being held via
18  videoconferencing equipment.  The witness and reporter
19  are not in the same room.  The witness will be sworn
20  in remotely pursuant to agreement of all parties.  The
21  parties stipulate that the testimony is being given as
22  if the witness was sworn in person.
23      Do you solemnly swear that the testimony
24  you are about to give will be the truth, the whole
25  truth, and nothing but the truth?

Page 5

1      THE WITNESS:  Yes.
2          AMANDA PISARSKI,
3  having first been duly sworn, was examined and
4  testified on her oath as follows:
5      MR. BIGELMAN:  We're here today for your
6  duly noticed deposition and your husband's adversary
7  proceeding.  My client Mohamed Saad brought a
8  complaint against him.  Have you ever given a
9  deposition before?
10      THE WITNESS:  No.
11      MR. BIGELMAN:  Okay.  It's fairly simple.
12  As you see, we have a court reporter.  I'm going to
13  ask you questions.  We're making a record of it, so we
14  want to make a clear record.  If you don't understand
15  me or you would like me to restate it, I'm happy to do
16  so because, as I stated, we want a clear record.
17  Okay?  I will presume that any answers you give me are
18  responsive to my questions.  Okay?
19      At certain points during the examination,
20  your attorney may make objections.  You're still
21  required to answer.  He's just making an objection for
22  the record.  Okay?
23      THE WITNESS: Okay.
24      MR. BIGELMAN:  Is there anything that would
25  impair your memory, such as a health issue, a

1  prescription drug issue, street drug issue, alcohol?
2  Anything that would impair your memory as we're here
3  today?
4  **THE WITNESS:  No.**
5  EXAMINATION
6  BY MR. BIGELMAN:
7  Q.  Have you ever been convicted of a crime?
8  **A.  No.**
9  Q.  Okay.  Is it okay if I call you Amanda?
10 **A.  Yeah.**
11 Q.  Okay.  Where do you live, Amanda?
12 **A.  I live in Washington Township.**
13 Q.  And how long have you lived there?
14 **A.  Since July of 2023, I think.  I can't remember the**
15 **year exactly.**
16 Q.  You're married to Brandon Heitmann?
17 **A.  Yes.**
18 Q.  And how long have you been married?
19 **A.  Since December 30th of 2021.**
20 Q.  And before we got started, I believe you stated your
21 legal name is your maiden name, Pisarski?
22 **A.  Yeah.  Just never changed it, yeah.**
23 Q.  Okay.  Do you have any education past high school?
24 **A.  Yes.**
25 Q.  What would that be?

Page 7

1  **A.  A bachelor's degree.**
2  Q.  From where?
3  **A.  Michigan State University.**
4  Q.  When did you receive that degree?
5  **A.  2018.**
6  Q.  Any degrees past your bachelor's degree?
7  **A.  No.**
8  Q.  Any certifications, licenses, anything like that?
9  **A.  Residential builder's license.**
10 Q.  When did you obtain that?
11 **A.  It was earlier this year, maybe in January.**
12 Q.  January of 2025?
13 **A.  I think so.  Either January -- maybe February.**
14 **Something like that, yeah.**
15 Q.  Was that tied to any type of business?
16 **A.  My business.**
17 Q.  What's your business called?
18 **A.  Resilient Outdoor Living.**
19 Q.  What kind of business is this?
20 **A.  Mainly landscaping at the moment.  We also do pool**
21 **cleanings.**
22 Q.  Do you have an assumed name?
23 **A.  What do you mean?**
24 Q.  Does it go by any other name?
25 **A.  Oh, the company?  No.**

1  Q.  Do you guys build pools?
2  **A.  Not at the moment, no.**
3  Q.  And who are your employees?
4  **A.  We have -- really, we only have one employee right**
5  **now, other than myself and my husband.**
6  Q.  Who is the third employee?
7  **A.  His name is D.J.**
8  Q.  What's D.J.'s last name?
9  **A.  Wolf.**
10 Q.  Did D.J. Wolf work at Exigent Landscaping?
11 **A.  No.**
12 Q.  Did you work at Exigent Landscaping?
13 **A.  I did.**
14 Q.  And what was your role there?
15 **A.  At what point in time?**
16 Q.  When did you start working there?
17 **A.  I think 2019.  Maybe May of 2019, something like that.**
18 Q.  Didn't you have a title in 2019?
19 **A.  In 2019, I guess my title was designer.  I was the**
20 **landscape designer of the company.**
21 Q.  At any point in time, did that title change?
22 **A.  Yeah, it did.  Yeah.**
23 Q.  And when did it change?
24 **A.  I don't know when, but at one point I know my title**
25 **changed to process improvement analyst, maybe sometime**

Page 9

1  **in 2021 maybe.  I -- I really -- I don't know.**
2  Q.  What would your job duties be?
3  **A.  Basically trying to make the sales process more**
4  **efficient.**
5  Q.  In what manner?
6  **A.  Because -- well, just, like, make it more efficient.**
7  **Like, our sales process was long, so I was just trying**
8  **to make it more efficient for the team members.**
9  Q.  Did you acquire any further (indiscernible)?
10    (The court reporter needs counsel to repeat
11    his question.)
12    Did you acquire any additional titles while
13 working at Exigent Landscaping?
14 **A.  Not that I can recall.**
15 Q.  Did you have any check writing authority at Exigent?
16 **A.  Yes.**
17 Q.  Did you, in fact, write checks, make the deposits,
18 make withdrawals?
19 **A.  Sometimes.**
20 Q.  Did you also apply for permits on behalf of the
21 company?
22 **A.  What does that mean?**
23 Q.  Did you assist in the process of applying for permits?
24    MR. PHILLIPS:  Jeff, she's gonna invoke the
25 Fifth for anything regarding permits.

1    MR. BIGELMAN: Well, if she's gonna, that's
2 something she needs to state, not you.
3    MR. PHILLIPS: But I'm going to advise you
4 to invoke your Fifth Amendment right.
5    **THE WITNESS: I will invoke my Fifth**
6    **Amendment.**
7 BY MR. BIGELMAN:
8 Q. What address did Exigent Landscaping operate out of?
9 **A. At what point in time?**
10 Q. Well, you started in 2019. What address did it
11 operate out of then?
12 **A. In 2019, I believe it operated out of Brandon's**
13    **parents' home.**
14 Q. What's that address?
15 **A. 14450 Bournemuth Drive, Shelby Township, Michigan.**
16 Q. Did that change at some point? Did it operate
17 somewhere else after that?
18 **A. Yes.**
19 Q. Where?
20 **A. Another office in Shelby Township. I couldn't tell**
21    **you the address, though. I don't remember.**
22 Q. Did it operate out of your home once you bought your
23 home in --
24 **A. Oh, no, no.**
25 Q. -- 2022? Where else did it operate out of?

1 **A. So after his parents' house, like I said, it was an**
2    **office in Shelby Township, and then we also kept our**
3    **equipment at a different yard in Shelby Township, but**
4    **then at some point we got, like, a yard and office**
5    **combined, and that was also in Shelby Township.**
6 Q. What was the address of the yard, slash, office?
7 **A. I don't recall. I don't know off the top of my head.**
8 Q. Where does Resilient Outdoor Living operate out of?
9 **A. Warehouse.**
10 Q. What's the address of that?
11 **A. 60749 Forest Creek Drive, Washington Township,**
12    **Michigan.**
13 Q. What's the phone number for Resilient Outdoor Living?
14 **A. Right now, I believe on our website we have it as**
15    **586-802-9690, but we're in the process of switching it**
16    **over to a different number.**
17 Q. What was the phone number that Exigent Landscaping
18 used?
19 **A. I -- I don't know. I know for a long time it did use**
20    **a number that was 586-383-8308. I don't know for -- I**
21    **know it was the majority of the time, but other than**
22    **that, I don't know.**
23 Q. Did you go from working at Exigent Landscaping to
24 opening Resilient Outdoor Living?
25 **A. Yes.**

1 Q. That would have happened right after Exigent filed
2 bankruptcy; is that right?
3 **A. A little bit after, yep, like a couple months after.**
4 Q. And are you the sole owner of Resilient Outdoor
5 Living?
6 **A. Yes.**
7 Q. And what capital did you use to start up Resilient
8 Outdoor Living?
9    MR. PHILLIPS: I'll let some rope on here,
10 but this isn't a creditor's exam. You don't have a
11 judgment. You're not trying to pierce the corporate
12 veil right now. This is about the proofs on whether
13 or not you guys have damages and for fact witness to
14 this case; so I'm going to ask that you move on
15 because you're taking a creditor's exam. So I'm
16 giving some rope, but this is not a creditor's exam.
17 You don't have a piercing action right now.
18    MR. BIGELMAN: Very well.
19    Amanda, answer the question, please.
20    MR. PHILLIPS: I'm going to direct you not
21 to answer.
22    If you want to bring it up with the judge,
23 go ahead, Jeff.
24    MR. BIGELMAN: Can you repeat the question
25 that I asked.

1    (The court reporter read back the previous
2 question at 9:47 a.m.)
3    **THE WITNESS: By the advice of my legal, I**
4    **will not answer that.**
5 BY MR. BIGELMAN:
6 Q. What money were you paid at Exigent Landscaping?
7 **A. What time period?**
8 Q. Well, in the last year you were there, were you on
9 salary.
10 **A. In the last year, yes, I was on salary.**
11 Q. What was your salary?
12 **A. I believe it changed. Just a guess. I believe in the**
13    **first half, we were somewhere -- or I was paid**
14    **somewhere around a hundred thousand, but at some point**
15    **we did have to make reductions to people's pay, and my**
16    **pay went down to around 80,000, if I remember**
17    **correctly.**
18 Q. Were you responsible for payroll at Exigent?
19 **A. At what time period?**
20 Q. Before it shut down.
21 **A. What was that?**
22 Q. Before it shut down.
23 **A. Before it shut down, I think maybe for the last three**
24    **months or so. Last few months, I -- I believe I was**
25    **the one running the payroll, yes.**

1  Q.  What was your husband's salary at that time?
2  **A.  At what time?**
3  Q.  Before the company closed.
4  **A.  I have no idea.**
5  Q.  Are you the 100 percent owner of Resilient Outdoor
6     Living?
7  **A.  Yes.**
8  Q.  Is that a "yes"?
9  **A.  Yes.**
10  Q.  Did you have any ownership interest in Exigent
11     Landscaping, LLC?
12  **A.  No.**
13        MR. BIGELMAN:  Can you guys see what I have
14     put on the screen here?
15  BY MR. BIGELMAN:
16  Q.  Can you see the screen, Amanda?
17  **A.  (Nonverbal response.)**
18  Q.  Can you see the screen, Amanda?
19  **A.  Yes.**
20  Q.  Amanda, can you hear me?
21  **A.  Yep.**
22        MR. PHILLIPS:  Yeah.  She's answered, Jeff.
23     We can see it.  I don't know if you can't hear us.
24        MR. BIGELMAN:  Yeah, I couldn't hear her
25     response.

1        **THE WITNESS:  Sorry.  Yeah, I said, "Yes."**
2  BY MR. BIGELMAN:
3  Q.  All right.  Do you see the document titled "Swimming
4     Pool Permit Application"?
5  **A.  Yes.**
6  Q.  The right-hand corner is dated 8-31-22.  Do you see
7     that?
8  **A.  Yes.**
9  Q.  Whose handwriting is on this document?
10        MR. PHILLIPS:  Amanda, I'm going to advise
11     you to invoke your Fifth Amendment right.
12        **THE WITNESS:  I will invoke my Fifth**
13     **Amendment right.**
14  BY MR. BIGELMAN:
15  Q.  For record purposes, this is marked as Exhibit C.  Do
16     you see the second page?  It says your name on here.
17        MARKED BY THE REPORTER:
18        DEPOSITION EXHIBIT C
19        9:53 a.m.
20  **A.  Yeah.**
21  Q.  Did you write that?
22        MR. PHILLIPS:  I advise --
23        **THE WITNESS:  I invoke my Fifth Amendment**
24     **right.**
25

1  BY MR. BIGELMAN:
2  Q.  Do you see below and to the right of your name it says
3     "bheitmann12@yahoo.com"?  Do you see that?
4  **A.  I see that.**
5  Q.  Did you write that?
6  **A.  I will invoke my Fifth Amendment right.**
7  Q.  Did you ever sign Hank Bell's name on any applications
8     or permits?
9  **A.  I will invoke my Fifth Amendment right.**
10  Q.  Were you an employee or an agent of Construction
11     Contractors?
12  **A.  I will invoke my Fifth Amendment right.**
13  Q.  Were you responsible for purchasing materials for
14     Exigent Contracting?
15  **A.  (Inaudible.)**
16  Q.  I didn't hear your answer.
17  **A.  No.**
18  Q.  Have you ever been sued personally?
19  **A.  Yes.**
20  Q.  By who?
21  **A.  I believe only in one lawsuit, but I would have to ask**
22     **my counsel 'cause I'm not too sure.**
23  Q.  Who was the plaintiff in that lawsuit?
24  **A.  Alex and Rebecca Boyd.**
25  Q.  Showing you what's been marked as Exhibit T.  Is this

1     the lawsuit you were talking about?
2        MARKED BY THE REPORTER:
3        DEPOSITION EXHIBIT T
4        9:56 a.m.
5  **A.  Yes.**
6        MR. PHILLIPS:  Sorry, Jeff.  Was that T as
7     in, like, Tyler?
8        MR. BIGELMAN:  Exactly.
9        MR. PHILLIPS:  Thank you.
10  BY MR. BIGELMAN:
11  Q.  Has this lawsuit been resolved as to you?
12  **A.  I would have to advise to my legal.  I --**
13        MR. PHILLIPS:  Jeff, I don't want to answer
14     for her.  So technically, yes, it's been resolved
15     insofar as we've been dismissed; no insofar as we're
16     going to private arbitration.
17  BY MR. BIGELMAN:
18  Q.  Showing you what's been marked Exhibit AA, licensing
19     information for Resilient Outdoor Living.  License
20     issue date, July 19, 2024.  License status, 2405
21     suspension.  Do you see that?  Do you see that,
22     Amanda?  Can you move the speaker closer to you?  Has
23     your license been suspended?
24        MARKED BY THE REPORTER:
25        DEPOSITION EXHIBIT AA

1    9:58 a.m.
2  A.  Can you repeat that.  It was breaking up.
3  Q.  Okay.  We're looking at a document marked Exhibit AA.
4      It says "Business: Resilient Outdoor Living."  Do you
5      see that?
6  A.  Yes.
7  Q.  It says "License No. 262400589."  Do you see that?  I
8      need you to say "yes" or "no."  You can't shake your
9      head.
10        MR. PHILLIPS:  She's been saying "yes,"
11     Jeff.  I don't know if you're picking it up.  She's
12     giving verbal answers.
13        THE COURT REPORTER:  I can't hear them
14     either.
15        MR. BIGELMAN:  Yeah.  You need to speak
16     louder.
17        THE WITNESS:  Okay.
18 BY MR. BIGELMAN:
19 Q.  Do you see "License issue date, July 19, 2024"?
20 A.  Yes.
21 Q.  Do you see "License status, Section 2405 suspension"?
22     Do you see that?
23 A.  Yes.
24 Q.  And I believe you testified earlier that you didn't
25     get your builder's license until January 2025.  Is

1      that right?
2  A.  Yeah.
3  Q.  Whose license was being used for Resilient Outdoor
4      Living that was suspended?
5         MR. PHILLIPS:  Foundation.
6         Go ahead, if you know.
7         THE WITNESS:  Before that, it was my
8      husband's, Brandon.
9  BY MR. BIGELMAN:
10 Q.  Okay.  So Resilient Outdoor Living was using Brandon's
11     license before it was suspended; is that right?
12 A.  Yes, yes.
13 Q.  Has Resilient Outdoor Living ever used anyone's
14     builder's license aside from yours and your husband's?
15 A.  No.
16 Q.  (Inaudible) against your builder's license?
17 A.  What was that?
18 Q.  Has anyone filed a complaint against your builder's
19     license?
20 A.  Not that I'm aware of.
21 Q.  Do you draw a salary from Resilient Outdoor Living?
22        MR. PHILLIPS:  Can you please repeat the
23     question.
24 BY MR. BIGELMAN:
25 Q.  Do you draw a salary from Resilient Outdoor Living?

1  A.  Do I draw a salary?
2  Q.  Correct.
3  A.  I pay myself when I can.
4  Q.  Does your husband take a salary or commission from
5      Resilient Outdoor Living?
6  A.  Same thing, I pay him when I can.
7  Q.  What about D.J. Wolf?
8  A.  He is paid hourly.
9  Q.  What does he do?
10 A.  Laborer.
11 Q.  What assets did Exigent Landscaping use to operate?
12        MR. PHILLIPS:  Form.
13        Go ahead.
14        THE WITNESS:  I have no idea.
15 BY MR. BIGELMAN:
16 Q.  Did it have computers?
17 A.  Yeah.
18 Q.  How many computers did it have?
19 A.  I have no idea.
20 Q.  Did it have machinery and equipment?
21 A.  Yeah.
22 Q.  What else did it have?  Did it have hand tools?
23 A.  I think so.
24 Q.  Are any of those items being used for Resilient
25     Outdoor Living?

1  A.  None of the stuff that was owned by Exigent is being
2      used because I think it was all taken.
3  Q.  What does Resilient Outdoor Living use to operate?
4         MR. PHILLIPS:  Mandy, you can go ahead and
5      answer.
6         But, Jeff, this has nothing to do with
7      underlying proofs, yet again.
8         Go ahead and answer, Amanda, but this is
9      getting ridiculous.
10        THE WITNESS:  We use one truck that --
11     myself and Brandon are cosigned on that, like,
12     personally, and then we also use a Dingo that I
13     believe Brandon purchased personally, and same thing;
14     there's a trailer or two trailers we use that Brandon
15     also, I believe, purchased personally.  But other than
16     that, yeah, I don't know.  That's it.  We use my
17     car -- my personal car, too.
18 BY MR. BIGELMAN:
19 Q.  This is Resilient Outdoor Living; correct?
20 A.  Yes.
21 Q.  In the middle of the screen it says "Resilient Outdoor
22     Living, professional hardscaping, landscaping, pool
23     building experts in Michigan."  Do you see that?
24 A.  Yes.
25 Q.  I believe you testified before that this company had

Page 22

1   not built any pools.  Is that still your answer?
2  A.  Yeah.  Yep, we have not built any yet.
3  Q.  In the upper left-hand corner it has a cross.  Do you
4      see that?
5  A.  Yes.
6  Q.  I believe Exigent Landscaping had the same type of
7      cross in its logo.  Correct?
8  A.  It did.
9          MR. PHILLIPS:  Jeff, move on.
10         I mean, quit answering questions on this.
11         You haven't asked her anything about the
12     underlying issue, maybe with the exception of the
13     permits.  This isn't a creditor's exam.  Exigent isn't
14     a party to this case.  Resilient isn't a party to this
15     case.  Amanda isn't a party to this case.  Move on.
16     Go ahead and ask the next question.
17         I may have to advise you not to answer.
18         Please go ahead.
19 BY MR. BIGELMAN:
20 Q.  Who is Hank Bell to you?
21 A.  He's nobody to me.
22 Q.  Are you related to him?  Is your husband related to
23     him?
24 A.  No.
25 Q.  Do you know him?

Page 23

1  A.  Mm-hmm.  Yes, I know him.
2  Q.  Has he done work for your company, Resilient Outdoor
3      Living?
4  A.  No.
5          MR. BIGELMAN:  I don't have any further
6      questions for this witness.
7          MR. PHILLIPS:  Thank you.  No questions.
8          THE VIDEOGRAPHER:  Okay.  This concludes
9      today's testimony.  We are off the record at
10     10:08 a.m.
11         (The deposition was concluded at 10:08 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 24

1              CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                    ) SS
4  COUNTY OF OAKLAND )
5
6          I, Susanne Ellen Gorman, a Notary Public in
7      and for the above county and state, do hereby certify
8      that the above deposition was taken before me via
9      virtual technology; that the witness was by me first
10     duly sworn to testify to the truth and nothing but the
11     truth; that the foregoing questions asked and answers
12     made by the witness were duly recorded by me
13     stenographically and reduced to computer
14     transcription; that this is a true, full, and correct
15     transcript of my stenographic notes so taken; and that
16     I am not related to, nor of counsel to either party,
17     nor interested in the event of this cause.
18
19
20
21     Susanne Ellen Gorman, CSR-9271, RPR
22     Notary Public,
23     Oakland County, Michigan.
24
25 My commission expires:  September 14, 2029

**1**

**100** 14:5
**10:08** 23:10,11
**14450** 10:15
**19** 17:20 18:19

**2**

**2018** 7:5
**2019** 8:17,18,19 10:10,12
**2021** 6:19 9:1
**2022** 10:25
**2023** 6:14
**2024** 17:20 18:19
**2025** 4:2,7 7:12 18:25
**22** 4:2,7
**2405** 17:20 18:21
**262400589** 18:7

**3**

**30th** 6:19

**5**

**586-383-8308** 11:20
**586-802-9690** 11:15

**6**

**60749** 11:11

**8**

**8-31-22** 15:6
**80,000** 13:16

**9**

**9:30** 4:3
**9:32** 4:7
**9:47** 13:2
**9:53** 15:19
**9:56** 17:4
**9:58** 18:1

**A**

**a.m.** 4:3,7 13:2 15:19 17:4 18:1 23:10,11
**AA** 17:18,25 18:3
**acquire** 9:9,12
**action** 12:17
**additional** 9:12
**address** 10:8,10,14,21 11:6,10
**adversary** 5:6
**advice** 13:3
**advise** 10:3 15:10,22 17:12 22:17
**agent** 16:10
**agreement** 4:20
**ahead** 12:23 19:6 20:13 21:4,8 22:16,18
**alcohol** 6:1
**Alex** 16:24
**Amanda** 4:5 5:2 6:9,11 12:19 14:16,18,20 15:10 17:22 21:8 22:15
**Amendment** 10:4,6 15:11,13,23 16:6,9,12
**analyst** 8:25
**answering** 22:10
**answers** 5:17 18:12
**anyone's** 19:13
**Application** 15:4

**applications** 16:7
**apply** 9:20
**applying** 9:23
**arbitration** 17:16
**assets** 20:11
**assist** 9:23
**assumed** 7:22
**attorney** 5:20
**attorneys** 4:8
**authority** 9:15
**aware** 19:20

**B**

**bachelor's** 7:1,6
**back** 13:1
**bankruptcy** 12:2
**Basically** 9:3
**behalf** 4:10,13 9:20
**Bell** 22:20
**Bell's** 16:7
**bheitmann12@yahoo.com** 16:3
**Bigelman** 4:10 5:5,11,24 6:6 10:1,7 12:18,24 13:5 14:13,15, 24 15:2,14 16:1 17:8,10,17 18:15,18 19:9,24 20:15 21:18 22:19 23:5
**bit** 12:3
**bought** 10:22
**Bournemuth** 10:15
**Boyd** 16:24
**Brandon** 6:16 19:8 21:11,13,14
**Brandon's** 10:12 19:10
**breaking** 18:2
**bring** 12:22
**brought** 5:7

**build** 8:1

**builder's** 7:9 18:25 19:14,16,18

**building** 21:23

**built** 22:1,2

**business** 7:15,16,17,19 18:4

---
**C**
---

**call** 6:9

**called** 7:17

**capital** 12:7

**car** 21:17

**case** 12:14 22:14,15

**certifications** 7:8

**certified** 4:16

**change** 8:21,23 10:16

**changed** 6:22 8:25 13:12

**check** 9:15

**checks** 9:17

**cleanings** 7:21

**clear** 5:14,16

**client** 5:7

**closed** 14:3

**closer** 17:22

**combined** 11:5

**commission** 20:4

**company** 7:25 8:20 9:21 14:3 21:25 23:2

**complaint** 5:8 19:18

**computers** 20:16,18

**concluded** 23:11

**concludes** 23:8

**Construction** 16:10

**Contracting** 16:14

**Contractors** 16:11

**convicted** 6:7

**corner** 15:6 22:3

**corporate** 12:11

**correct** 20:2 21:19 22:7

**correctly** 13:17

**cosigned** 21:11

**counsel** 9:10 16:22

**couple** 12:3

**court** 4:8,14 5:12 9:10 13:1 18:13

**creditor's** 12:10,15,16 22:13

**Creek** 11:11

**crime** 6:7

**cross** 22:3,7

---
**D**
---

**D.J.** 8:7,10 20:7

**D.j.'s** 8:8

**damages** 12:13

**date** 17:20 18:19

**dated** 15:6

**December** 6:19

**Defendant** 4:13

**degree** 7:1,4,6

**degrees** 7:6

**deposition** 4:1,5,17 5:6,9 15:18 17:3,25 23:11

**deposits** 9:17

**designer** 8:19,20

**Dingo** 21:12

**direct** 12:20

**dismissed** 17:15

**document** 15:3,9 18:3

**draw** 19:21,25 20:1

**Drive** 10:15 11:11

**drug** 6:1

**duly** 5:3,6

**duties** 9:2

---
**E**
---

**earlier** 7:11 18:24

**education** 6:23

**efficient** 9:4,6,8

**employee** 8:4,6 16:10

**employees** 8:3

**equipment** 4:18 11:3 20:20

**exam** 12:10,15,16 22:13

**examination** 5:19 6:5

**examined** 5:3

**exception** 22:12

**Exhibit** 15:15,18 16:25 17:3,18, 25 18:3

**Exigent** 8:10,12 9:13,15 10:8 11:17,23 12:1 13:6,18 14:10 16:14 20:11 21:1 22:6,13

**experts** 21:23

---
**F**
---

**fact** 9:17 12:13

**fairly** 5:11

**February** 7:13

**filed** 12:1 19:18

**Forest** 11:11

**Form** 20:12

**Foundation** 19:5

---
**G**
---

**give** 4:24 5:17

**giving** 12:16 18:12

**Good** 4:14

Gorman  4:15

guess  8:19 13:12

guys  8:1 12:13 14:13

---

## H

half  13:13

hand  20:22

handwriting  15:9

Hank  16:7 22:20

happened  12:1

happy  5:15

hardscaping  21:22

head  11:7 18:9

health  5:25

hear  14:20,23,24 16:16 18:13

Heitmann  6:16

held  4:17

high  6:23

home  10:13,22,23

hourly  20:8

house  11:1

hundred  13:14

husband  8:5 20:4 22:22

husband's  5:6 14:1 19:8,14

---

## I

idea  14:4 20:14,19

identify  4:8

impair  5:25 6:2

improvement  8:25

Inaudible  16:15 19:16

indiscernible  9:9

information  17:19

interest  14:10

---

invoke  9:24 10:4,5 15:11,12,23
16:6,9,12

issue  5:25 6:1 17:20 18:19 22:12

items  20:24

---

## J

January  7:11,12,13 18:25

Jeff  9:24 12:23 14:22 17:6,13
18:11 21:6 22:9

Jeffrey  4:10

job  9:2

judge  12:22

judgment  12:11

July  4:2,6 6:14 17:20 18:19

---

## K

kind  7:19

---

## L

Laborer  20:10

landscape  8:20

landscaping  7:20 8:10,12 9:13
10:8 11:17,23 13:6 14:11 20:11
21:22 22:6

lawsuit  16:21,23 17:1,11

left-hand  22:3

legal  6:21 13:3 17:12

license  7:9 17:19,20,23 18:7,19,
21,25 19:3,11,14,16,19

licenses  7:8

licensing  17:18

live  6:11,12

lived  6:13

Living  7:18 11:8,13,24 12:5,8
14:6 17:19 18:4 19:4,10,13,21,
25 20:5,25 21:3,19,22 23:3

---

LLC  14:11

logo  22:7

long  6:13,18 9:7 11:19

louder  18:16

---

## M

machinery  20:20

maiden  6:21

majority  11:21

make  5:14,20 9:3,6,8,17,18 13:15

making  5:13,21

Mandy  21:4

manner  9:5

marked  15:15,17 16:25 17:2,18,
24 18:3

married  6:16,18

materials  16:13

members  9:8

memory  5:25 6:2

Michigan  4:15 7:3 10:15 11:12
21:23

middle  21:21

Mm-hmm  23:1

Mohamed  5:7

moment  7:20 8:2

money  13:6

months  12:3 13:24

morning  4:14

move  12:14 17:22 22:9,15

---

## N

nonverbal  14:17

notary  4:16

noticed  5:6

number  11:13,16,17,20

---

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

## O

**oath** 5:4

**objection** 5:21

**objections** 5:20

**obtain** 7:10

**office** 10:20 11:2,4,6

**opening** 11:24

**operate** 10:8,11,16,22,25 11:8
20:11 21:3

**operated** 10:12

**Outdoor** 7:18 11:8,13,24 12:4,8
14:5 17:19 18:4 19:3,10,13,21,
25 20:5,25 21:3,19,21 23:2

**owned** 21:1

**owner** 12:4 14:5

**ownership** 14:10

## P

**P78280** 4:12

**paid** 13:6,13 20:8

**parents'** 10:13 11:1

**parties** 4:20,21

**party** 22:14,15

**past** 6:23 7:6

**pay** 13:15,16 20:3,6

**payroll** 13:18,25

**people's** 13:15

**percent** 14:5

**period** 13:7,19

**Permit** 15:4

**permits** 9:20,23,25 16:8 22:13

**person** 4:22

**personal** 21:17

**personally** 16:18 21:12,13,15

**Phillips** 4:12 9:24 10:3 12:9,20
14:22 15:10,22 17:6,9,13 18:10
19:5,22 20:12 21:4 22:9 23:7

**phone** 11:13,17

**picking** 18:11

**pierce** 12:11

**piercing** 12:17

**Pisarski** 4:6 5:2 6:21

**plaintiff** 4:11 16:23

**point** 8:15,21,24 10:9,16 11:4
13:14

**points** 5:19

**pool** 7:20 15:4 21:22

**pools** 8:1 22:1

**prescription** 6:1

**presume** 5:17

**previous** 13:1

**private** 17:16

**proceeding** 5:7

**process** 8:25 9:3,7,23 11:15

**professional** 21:22

**proofs** 12:12 21:7

**public** 4:16

**purchased** 21:13,15

**purchasing** 16:13

**purposes** 15:15

**pursuant** 4:20

**put** 14:14

## Q

**question** 9:11 12:19,24 13:2
19:23 22:16

**questions** 5:13,18 22:10 23:6,7

**quit** 22:10

## R

**read** 13:1

**Rebecca** 16:24

**recall** 9:14 11:7

**receive** 7:4

**record** 4:4 5:13,14,16,22 15:15
23:9

**reductions** 13:15

**related** 22:22

**remember** 6:14 10:21 13:16

**Remote** 4:1

**remotely** 4:6,20

**repeat** 9:10 12:24 18:2 19:22

**reporter** 4:9,14,16,18 5:12 9:10
13:1 15:17 17:2,24 18:13

**required** 5:21

**Residential** 7:9

**Resilient** 7:18 11:8,13,24 12:4,7
14:5 17:19 18:4 19:3,10,13,21,
25 20:5,24 21:3,19,21 22:14
23:2

**resolved** 17:11,14

**response** 14:17,25

**responsible** 13:18 16:13

**responsive** 5:18

**restate** 5:15

**ridiculous** 21:9

**right-hand** 15:6

**role** 8:14

**room** 4:19

**rope** 12:9,16

**running** 13:25

## S

**Saad** 5:7

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**salary** 13:9,10,11 14:1 19:21,25 20:1,4

**sales** 9:3,7

**school** 6:23

**screen** 14:14,16,18 21:21

**Section** 18:21

**shake** 18:8

**Shelby** 10:15,20 11:2,3,5

**shorthand** 4:16

**Showing** 16:25 17:18

**shut** 13:20,22,23

**sign** 16:7

**simple** 5:11

**slash** 11:6

**sole** 12:4

**solemnly** 4:23

**speak** 18:15

**speaker** 17:22

**start** 8:16 12:7

**started** 6:20 10:10

**state** 4:16 7:3 10:2

**stated** 5:16 6:20

**status** 17:20 18:21

**stipulate** 4:21

**street** 6:1

**stuff** 21:1

**sued** 16:18

**Susannah** 4:15

**suspended** 17:23 19:4,11

**suspension** 17:21 18:21

**swear** 4:9,23

**Swimming** 15:3

**switching** 11:15

**sworn** 4:19,22 5:3

## T

**taking** 12:15

**talking** 17:1

**team** 9:8

**technically** 17:14

**testified** 5:4 18:24 21:25

**testimony** 4:21,23 23:9

**thing** 20:6 21:13

**thousand** 13:14

**tied** 7:15

**time** 4:7 8:15,21 10:9 11:19,21 13:7,19 14:1,2

**title** 8:18,19,21,24

**titled** 15:3

**titles** 9:12

**today** 4:6 5:5 6:3

**today's** 23:9

**tools** 20:22

**top** 11:7

**Township** 6:12 10:15,20 11:2,3, 5,11

**trailer** 21:14

**trailers** 21:14

**truck** 21:10

**truth** 4:24,25

**Tuesday** 4:2

**Tyler** 4:12 17:7

**type** 7:15 22:6

## U

**underlying** 21:7 22:12

**understand** 5:14

**University** 7:3

**upper** 22:3

## V

**veil** 12:12

**verbal** 18:12

**video-recorded** 4:5

**videoconferencing** 4:18

## W

**Warehouse** 11:9

**Washington** 6:12 11:11

**website** 11:14

**withdrawals** 9:18

**Wolf** 8:9,10 20:7

**work** 8:10,12 23:2

**working** 8:16 9:13 11:23

**write** 9:17 15:21 16:5

**writing** 9:15

## Y

**yard** 11:3,4,6

**year** 6:15 7:11 13:8,10

## Z

**Zoom** 4:6



# EXHIBIT G



**CITY OF DEARBORN**
**Permit & Plan Review Office**
16901 Michigan, Ste. 6, Dearborn, MI 48126   (313) 943-2442

FOR OFFICE USE ONLY
PERMIT NO.
22-4379
REVISION DATE
9-29-22
ORIGINAL APPLICATION DATE
8-31-22

*WPM*   *(2)45*

## REVISED DOCUMENTS APPLICATION

**1. PERMIT SITE ADDRESS**   921 Crescent Dr          **ZIP CODE**

Plan review documents will be reviewed as quickly as possible for code & ordinance requirements.

**2. REQUIREMENTS**

☑ **All noted deficiencies have been corrected on the revised documents.**

☑ **Revisions must be clouded on the revised documents.  Refer to denial letter for required documentation.**

☑ **FOUR (4) COMPLETE SETS of plans** including the revised documents shall be submitted for all <u>commercial</u> projects and <u>new residential single-family homes</u>.

☑ <u>Three (3) sets</u> of revised documents shall be submitted for <u>all other residential projects</u>.

- Revised Documents Application shall be submitted whenever additional information or revised documents have been requested, or if any changes are proposed in the project
- Applicant of the original documents must be the same applicant of the revised documents.
- If the applicant is different, the property owner shall submit a Change of Contractor Form.
- Residential Plan review fees for revised documents shall be $5 per page with a minimum fee of $25.
- A Neighborhood Association Review may be required based on revisions made.
- Commercial Plan revision fees: 1st revision per Plan Reviewers letter of requirements....... $40
- Commercial Plan revision fees: 2nd revision ..... $180 Minimum. Applicant design changes..... $180 Minimum
- Revised permits will incur additional fees

**3. REVISIONS REQUESTED BY:**
☐ Inspector _____ (name)
☑ Plan Reviewer *Maddern* (name)
☐ Developer/Owner

**4. CHANGE IN CONSTRUCTION VALUE, if any**
☐ Increase
$ _____   ☐ Decrease

**5.** ☐ Revised plans are being submitted **prior** to permit issuance.
☐ Revised plans are being submitted **after** permit issuance.
☐ Revised plans are being submitted after **Appeals Board** decision.

**6. BOARD OF APPEALS:** If a variance has been granted pertaining to the work proposed, provide appeal number:
_____ and **attach copy of Zoning Board approved plans.**

**7. LIST DESCRIPTION OF REVISIONS:**

engineering plans to come next week
Coverage is now under 40% - see attached
site plan attached

**FOR OFFICE USE ONLY**

CONTINUED ON REVERSE SIDE

**PROPERTY OWNER INFORMATION/AFFIDAVIT – AUTHORIZING CHANGE IN SCOPE OF WORK**
(must be completed ONLY if scope of work is changing)

8.
(PRINT PERMIT SITE ADDRESS) *921 Crescent Dr 48124*

| 9. PROPERTY OWNER NAME (PRINT) | 10. If Business Name, print authorized agent's name |
|---|---|
| ███████████████ | |
| 11. PROPERTY OWNER'S HOME ADDRESS ████████████ | 12. CITY/STATE/ZIP ██████████ |
| 13. PHONE NUMBER ████████ | 14. EMAIL ADDRESS (optional) |

| 15. SIGNATURE OF PROPERTY OWNER/AUTHORIZED AGENT FOR CHANGE IS SCOPE OF WORK | 16. DATE |
|---|---|
| *(signature)* | *9/29/22* |

**NOTARIZED CONTRACTOR-APPLICANT INFORMATION/AFFIDAVIT**

| 17. COMPANY NAME *Construction Contractors* | 18. DEARBORN REGISTRATION NUMBER |
|---|---|
| 19. COMPANY ADDRESS *5157 Van Dyke Sth* | 20. COMPANY PHONE NUMBER *586-802-9690* |
| 21. CITY/STATE/ZIP *Shelby twp MI 48315* | 22. COMPANY EMAIL ADDRESS or FAX NO. *crescent-landscaph@yahoo.com* |
| 23. NAME - AUTHORIZED REPRESENTATIVE (PRINT) *Brandon Hamann* | 24. DATE OF BIRTH | 25. DRIVER'S LICENSE OR STATE ID NUMBER |

I affirm that the information provided in this application and the accompanying drawings which are a part of this application, is accurate. Application is hereby made for a permit to perform the work described in this application and the accompanying drawings which are a part of this application. The acceptance of the permit shall constitute an agreement to abide by all codes and ordinances adopted and enacted by the City of Dearborn. All contractor registration information on file with the City Clerk's Office must be current.
**Section 23a of the state construction code act of 1972, 1972 PA 230, MCL 125.1523a, prohibits a person from conspiring to circumvent the licensing requirements of this state relating to persons who are to perform work in a residential building or a residential structure. Violators of section 23a are subjected to civil fines.**

| 26. SIGNATURE OF COMPANY AUTHORIZED REPRESENTATIVE ██████████ | 27. DATE *9/29/2020* |
|---|---|

28. NOTARIZATION:
Subscribed and sworn to before me this _____ day of _____, _____

_____
(signature) Notary Public, _____ County, Michigan.

My commission expires _____
(Notary printed name)

**FOR OFFICE USE ONLY**
PLAN INTAKE CHECKLIST:
1. Application is **legible and complete** with owner's signature & a reachable phone number ☐YES ☐NO
2. Three (3)/four (4) copies of site plan and other plans are legible, complete with dimensions ☐YES ☐NO
3. Neighborhood Association/Historical District Review sign off. ☐YES ☐NO

| | | RESIDENTIAL | |
|---|---|---|---|
| ☑APPROVED | ☑ 1ST REVISION ☐ 2ND REVISION | NUMBER OF SHEETS _____ X $5 *(minimum $25)* | $ |
| ☐APPROVED AS NOTED | ☐ APPLICANT DESIGN REVISION | | |
| ☐DENIED | Additional Comments: | COMMERCIAL REVISED PERMIT FEE | $ |
| *(signature)* Plan reviewer *10/13/22* Date | | | |
| | | PAY THIS AMOUNT | $ |

# EXHIBIT H



**CITY OF DEARBORN**
**Permit & Plan Review Office**
16901 Michigan, Ste. 6, Dearborn, MI 48126   (313) 943-2442

22-5274

FOR OFFICE USE ONLY
PERMIT NO. ~~scribbled~~
REVISION DATE
10·24·22
ORIGINAL APPLICATION DATE
8·31·22

## REVISED DOCUMENTS APPLICATION

**1. PERMIT SITE ADDRESS**
921 Crescent Drive City of Dearborn Mt   **ZIP CODE** 48124

Plan review documents will be reviewed as quickly as possible for code & ordinance requirements.

**2. REQUIREMENTS**

☑ **All noted deficiencies have been corrected on the revised documents.**

☑ **Revisions must be clouded on the revised documents. Refer to denial letter for required documentation.**

☑ <u>FOUR (4)</u> **COMPLETE SETS of plans** including the revised documents shall be submitted for all <u>commercial</u> projects and <u>new residential single-family homes</u>.

☑ <u>Three (3) sets</u> of revised documents shall be submitted for <u>all other residential projects</u>.

- Revised Documents Application shall be submitted whenever additional information or revised documents have been requested, or if any changes are proposed in the project
- Applicant of the original documents must be the same applicant of the revised documents.
- If the applicant is different, the property owner shall submit a Change of Contractor Form.
- Residential Plan review fees for revised documents shall be $5 per page with a minimum fee of $25.
- A Neighborhood Association Review may be required based on revisions made.
- Commercial Plan revision fees: 1st revision per Plan Reviewers letter of requirements....... $40
- Commercial Plan revision fees: 2nd revision ..... $180 Minimum. Applicant design changes..... $180 Minimum
- Revised permits will incur additional fees

**3. REVISIONS REQUESTED BY:**
☐ Inspector _____ (name)
☑ Plan Reviewer _____ (name)
☐ Developer/Owner

**4. CHANGE IN CONSTRUCTION VALUE, if any**
☐ Increase
$ _____ ☐ Decrease

**5.** ☑ Revised plans are being submitted **prior** to permit issuance.
☑ Revised plans are being submitted **after** permit issuance.
☐ Revised plans are being submitted after **Appeals Board** decision.

**6. BOARD OF APPEALS:** If a variance has been granted pertaining to the work proposed, provide appeal number:

_____ and **attach copy of Zoning Board approved plans.**

**7. LIST DESCRIPTION OF REVISIONS:**

This revision is for a grotto that is attached to the pool weve already submitted the plans for the pool itself.

_____

_____

**FOR OFFICE USE ONLY**

Submit as separate permit per SPK & JRG-SC

**CONTINUED ON REVERSE SIDE**

PROPERTY OWNER INFORMATION/AFFIDAVIT – AUTHORIZING CHANGE IN SCOPE OF WORK
(must be completed ONLY if scope of work is changing)

8.
(PRINT PERMIT SITE ADDRESS) 921 Crescent Drive City of Dearborn MI 48124

9. PROPERTY OWNER NAME (PRINT)
Moe Saad

10. If Business Name, print authorized agent's name

11. PROPERTY OWNER'S HOME ADDRESS
971 Crescent Dr

12. CITY/STATE/ZIP
City of Dearborn MI 48124

13. PHONE NUMBER
586-755-8671

14. EMAIL ADDRESS (optional)

15. SIGNATURE OF PROPERTY OWNER/AUTHORIZED AGENT FOR CHANGE IS SCOPE OF WORK

16. DATE

---

NOTARIZED CONTRACTOR-APPLICANT INFORMATION/AFFIDAVIT

17. COMPANY NAME
Construction Contractors

18. DEARBORN REGISTRATION NUMBER
22-DD136219

19. COMPANY ADDRESS
6764 Oakridge Dr

20. COMPANY PHONE NUMBER
586-489-6680

21. CITY/ STATE/ ZIP
Washington Township MI 48094

22. COMPANY EMAIL ADDRESS or FAX NO.
exigent kirelsepmy@

23. NAME - AUTHORIZED REPRESENTATIVE (PRINT)
Madison Brownz

24. DATE OF BIRTH

25. DRIVER'S LICENSE OR STATE ID NUMBER
Yule Con

I affirm that the information provided in this application and the accompanying drawings which are a part of this application, is accurate. Application is hereby made for a permit to perform the work described in this application and the accompanying drawings which are a part of this application. The acceptance of the permit shall constitute an agreement to abide by all codes and ordinances adopted and enacted by the City of Dearborn. All contractor registration information on file with the City Clerk's Office must be current.
**Section 23a of the state construction code act of 1972, 1972 PA 230, MCL 125.1523a, prohibits a person from conspiring to circumvent the licensing requirements of this state relating to persons who are to perform work in a residential building or a residential structure. Violators of section 23a are subjected to civil fines.**

26. SIGNATURE OF COMPANY-AUTHORIZED REPRESENTATIVE

27. DATE
10/24/22

28. NOTARIZATION:
Subscribed and sworn to before me this _____ day of _____, _____

_____
(signature) Notary Public, _____County, Michigan.

My commission expires _____
_____
(Notary printed name)

---

FOR OFFICE USE ONLY
PLAN INTAKE CHECKLIST:
1. Application is **legible and complete** with owner's signature & a reachable phone number ☐YES ☐NO
2. Three (3)/four (4) copies of site plan and other plans are legible, complete with dimensions ☐YES ☐NO
3. Neighborhood Association/Historical District Review sign off.   ☐YES ☐NO

| | | RESIDENTIAL NUMBER OF SHEETS _____ X $5 (minimum $25) | $ |
|---|---|---|---|
| ☐APPROVED | ☐ 1ST REVISION ☐ 2ND REVISION | | |
| ☐APPROVED AS NOTED | ☐ APPLICANT DESIGN REVISION | | |
| ☐DENIED | Additional Comments: | COMMERCIAL REVISED PERMIT FEE | $ |
| Plan reviewer | | | |
| Date | | | |
| | | PAY THIS AMOUNT | $ |

# EXHIBIT I

**Anthony Miller**

| | |
|---|---|
| **From:** | Justin Booth <justin@coastaldetroit.com> |
| **Sent:** | Wednesday, November 8, 2023 2:28 PM |
| **To:** | Anthony Miller; Rfawaz529@yahoo.com |
| **Subject:** | Exigent Pool Issues - 921 Crescent Dr. |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello all,

I will detail out my findings on the pool that Exigent partially installed at the Saad Residence at 921 Crescent Drive in Dearborn. I've attached photos and videos that go along with my bulleted list of issues below. If you have any further questions please let me know.

As an overview, this job was done completely unprofessionally and had a lot of items that were installed not only improperly, but completely unsafe. There were plenty of items that were not up to building codes and items that wouldn't have functioned correctly in the intended manner. The only thing that was done close to correctly was the shotcrete shell installation, but the design and functionality is not conducive to the homeowner's intended use with young kids playing in this pool.

What was "installed":
 - Shotcrete pool shell
 - Tile and coping on pool
 - Underground plumbing and electrical lines, ran back to equipment pad
 - Ledgerock grotto over spa

Issues with what was "installed" and improper / unacceptable construction:

1. Grotto Footing: The grotto's footing appears to be inadequately sized, potentially compromising the structural integrity and safety of the feature.
2. Ledge Rock Grotto: The engineering of the ledge rock grotto has raised concerns about its safety and stability, and it is imperative that the current grotto be removed and a new structure built to ensure it meets all safety standards.
3. Pool Design: The absence of a shallow area in the pool represents a significant oversight, as this poses a safety hazard and restricts the functionality of the pool.
4. Lazy River Channel: The narrowness of the lazy river channel prevents safe and enjoyable use with inflatable tubes.
5. Plumbing and Pump System: The plumbing lines and pump system have not been correctly designed for the lazy river and pool. The undersized pumps risk inadequate circulation and filtration.
6. Pool Steps: The pool steps are undersized and present safety concerns. They should be replaced to ensure safety and functionality.
7. Spa Spill-Over: The spa spill-over has been built too low, hindering its ability to function correctly. It is imperative that the spill-over is raised to ensure proper water flow.
8. Tan Ledge in Lazy River: The tan ledge in the middle of the lazy river is too deep to function as intended. This issue necessitates adjustment to meet the desired functionality.
9. Bubblers with Lights: The bubblers in the tan ledge were meant to have lights, but the conduits were incorrectly installed, preventing the installation of lights. This needs to be corrected for the desired aesthetics and safety.
10. Undersized Plumbing: The undersized plumbing throughout the project is a critical concern that must be addressed to ensure the efficiency and reliability of the entire system.

11. Pool Surrounding Elements: Everything outside of the pool shell needs to be replaced to rectify the issues identified and to create a safe and aesthetically pleasing environment.

12. Spa Lighting: No lights were installed inside the spa, and they will need to be cut in to meet safety and aesthetic standards.

13. Tan Shelf Spill-Over: The spill-over for the tan shelf was also installed too low, affecting water flow and potentially creating cleaning issues. It is imperative to raise it to the correct level.

14. Electrical Conduits: Electrical conduits on the entire project were not installed to code standards. A comprehensive review and update are essential to ensure safety and compliance.

15. Underground Inspections: All underground plumbing and electrical work was buried without city inspections in Dearborn, and no bonding wire was installed, creating potential safety hazards and code violations.

16. Lack of Oversight: A general lack of oversight throughout the project has contributed to these issues, and it is imperative that a rigorous review process is put in place

In summary, the Saad Residence Pool project falls significantly short of meeting the client's wants and needs as per the original design and engineering specifications.

We are committed to working closely with you to address these concerns and ensure that the Saad Residence Pool project reaches its full potential in terms of safety, functionality, and aesthetics.

**Cheers,**

📄 Saad original conditions 1.JPG

📄 Saad original conditions 2.JPG

📄 Saad original conditions 3.JPG

📄 Saad original conditions 4.JPG

📄 Saad original plumbing : electrical exposed 1.JPG

📄 Saad original plumbing : electrical exposed 2.JPG

📄 Saad original plumbing : electrical exposed 3.JPG

📄 Saad original plumbing : electrical exposed 4.JPG

📄 Saad plumbing removed : new trenches dug.JPG

Justin Booth

*Coastal*

*248-470-0439*
*www.coastaldetroit.com*

# EXHIBIT J



**Coastal**

25005 Trans X Road • Novi, MI 48375 • Phone: 248-470-0439

Rana & Moe Saad
921 Crescent Drive
Dearborn, MI 48124

Job Address:
921 Crescent Dr.
Dearborn, MI 48124

**Print Date:** 9-21-2023

## Proposal for Saad Pool

Thank you for considering Coastal Pools.

Justin Booth
Coastal Pools

## Preliminary Construction

| Items | Description |
|---|---|
| Permits Allowance | $2,000 Allowance. |
| Equipment & Mobilization | Excavator, Skid Steer, Fuel, etc. |

## Preliminary Construction Total: $4,800.00

---

## Site Work / Demo

| Items | Description |
|---|---|
| Excavation Labor | Excavation for plumbing |
| Demo Existing Ledge Rock "grotto" | Includes machines needed to take apart existing ledge rock and keep stack materials on site for future use. |
| Backfill Labor | |

## Site Work / Demo Total: $29,545.00

---

## Plumbing

| Items | Description |
|---|---|
| 1.5" Hard Pipe | |
| 2" Hard Pipe | |
| 2" Tees | |
| 2" 90s | |
| 3" Schedule 40 PVC | |
| 3" Schedule 40 90 degree Elbow | |
| 3" Schedule 40 Tees | |
| 4" Schedule 40 PVC | |
| 4" Schedule 40 90 degree Elbow | |
| 4" Schedule 40 Tees | |
| No Lube Valves | 12/CS 2"-2.5" 3-PORT PVC DIVERTER VALVE |
| Air Blower | Air Supply of the Future<br>2HP 240V Silencer Air Blower |
| Waterfall Weirs | 1 - Waterfall weir for bridge |

| Items | Description |
|---|---|
| 3HP Pump | Pentair<br>3HP 230V INTELLIFLO VSF VARIABLE SPEED & FLOW PUMP<br>1 for pool and spa circulation, 1 grotto slide, 1 bubblers / deck jets, |
| 5HP Pump | 5HP 208-230/277/460V 1PH/ 3PH WHISPERFLOXF SS PUMP<br>2 pumps lazy river, |
| Pentair Clean & Clear Plus 520 | Pentair: 160332<br>Cartridge filter 90k gallon 10 hour turnover |
| Pentair MasterTemp 400HD Heater | Pentair: 460805<br>Upgraded internals to CU-NI |
| Plumbing Labor | Plumbing & equipment installation |
| Natural Gas Subcontractor | $5,000 allowance - gas ran to pool equipment from house to back corner of property |
| Deck Jets | Standard deck jet shooters |

## Plumbing Total: $69,329.74

## Electrical

| Items | Description |
|---|---|
| Conduit 1" | |
| Lighting | 15W 12V Globrite Color LED<br>8 pool lights<br>1 spa<br>1 grotto<br>2 bubblers |
| 1" 90s | Unit |
| Transformers | 300W Transformer |
| Automation | Pentair<br>INTELLICENTER I8PS POOL/SPA CONTROL W/ SCG |
| Electrical Subcontractor | $18,000 allowance.<br>100 amp service ran to pool equipment. Pool equipment hooked into automation panel. Low-voltage ran to automation panel. |

## Electrical Total: $38,189.86

## Pebble

| Items | Description |
|---|---|
| Pebble Sheen | Pebble for pool shell, shelf, steps, spa shell, spa bench, spa steps |
| Pool Salt | 40# PROS PICK QUICK DISSOLVE PLUS POOL SALT |

## Pebble Total: $26,592.56

## Additional

| Items | Description |
|---|---|
| DOLPHIN M400 IG ROBOTIC CLNR W/ WI-FI & CADDY | |
| Maintenance Kit | |

**Additional Total:** $1,922.13

## Grotto

| Items | Description |
|---|---|
| Grotto / Slide Installation | Custom Shotcrete Grotto (as shown in rough sketch) |
| Shotcrete Bridge | Custom shotcrete bridge w/ wood plank style floor and railing. The radius will have an appropriate height at the apex to insure that customers have ample room for their tubing experience. |

**Grotto Total:** $148,500.00

**Total Price:  $318,879.29**

- Warranties:
    - 3 year pool equipment (Labor)
    - Products per manufacturer
    - 2 year pebble finish (Labor and Material)
- Materials selected, trades, etc. are subject to customer material allowances.
- Any underground lines not marked by MISS Dig are not the responsibility of Coastal for replacement.
- Any underground irrigation is not the responsibility of Coastal for replacement.
- In the event that permits are not able to be obtained, Coastal will retain $5,000 of the deposit to bill against shop drawings and time into permit drawings.
- In the event of unstable earth, water infiltration, etc., remediation is not included and will need to be accounted for before continuing work. This could include:
- Extra stone,Extra framing and steel, de-watering system, Drain tile, etc.
- Coastal reserves the right to substitute the pool equipment to an equal manufacturer based on availability.
- **Driveway protection is not included. If the driveway is the only point of access, Coastal will not be held responsible for any cracks or damage from machines and/or trucks throughout the project.**
- **Remediation of lawn, sprinklers, landscaping etc. that is in the way of pool construction or access for pool construction is not included and Coastal will not be held responsible for any damage that may occur during construction.**
- **Pool water not included. Water can be trucked in for $800 per truck, or the homeowner can coordinate directly.**
- **No winter cover included. Winter cover can be quoted out after the job is completed.**
- **Quote assumes main drains and rough plumbing / electrical are sufficient and no work will be needed inside the pool shell.**

- **Quote includes 23'x45' of artificial turf with fall pad for playground area in backyard.**
- **Change Orders Payments:**
  - For CO's $10,000.00 or less, payment is due upon signing of the change order.
  - For CO's greater than $10,000.00, 50% is due upon signing of the change order and 50% is due upon completion of the change order portion of the project.
- **Payment Terms:**
  - **20% payment due at signing**
  - **Remaining draw to be paid at completion points. Draw schedule to be signed off and agreed upon prior to job start.**

I confirm that my action here represents my electronic signature and is binding.

| | |
|---|---|
| **Signature:** | |
| **Date:** | **Sep 21, 2023, 2:32 PM** |
| **Approved by:** | **Rana & Moe Saad** |
| **Comments:** | **Rana Saad** |



# Change Order

| Client Info | Rana & Moe Saad | Job Info | 921 Crescent Dr. |
|---|---|---|---|
| | 921 Crescent Drive | | Dearborn, MI 48124 |
| | Dearborn, MI 48124 | | |

| Change Order IDs |
|---|
| 0001, 0002, 0003, 0005, 0006, 0007, 0008, 0010 |

## Saad Pool

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0001 | Created: | Oct 31, 2023 | $3,845.29 |
| | Approved: | Jan 12, 2024 | |

| Description |
|---|
| Add Spa Lights |
| 2- Light Niches |
| 2- Micro Brite Lights |
| 100' of conduit |
| 10' pvc |
| concrete |
| 30 man hours (8 hours x 2 guys x 2 days) |

| Status | Signature | Date |
|---|---|---|
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:37 PM |

| Approval Comments |
|---|
| I confirm that my action here represents my electronic signature and is binding. |

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0002 | Created: | Oct 31, 2023 | $33,412.22 |
| | Approved: | Jan 12, 2024 | |

| Description |
| --- |

Lazy river system
Material Only*
Credit Back one 3 hp vs pump at
Credit Back one 5 hp pump at
Lazy River Pump System
Saw Cut 3 15" square holes through Shell
Plumbing 12" pressure pipe 140' lnft
Fittings 6-90's ,5-45's, 1-Tee

Plumbing Labor -
Dig out Prep - 64 Man Hours
Plumb 12" Lines - 60 Man Hours

| Status | Signature | Date |
| --- | --- | --- |
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:37 PM |

| Approval Comments |
| --- |

I confirm that my action here represents my electronic signature and is binding.

| CO ID | Created / Approved Date | | Price |
| --- | --- | --- | --- |
| 0003 | Created: | Oct 31, 2023 | $7,291.78 |
| | Approved: | Jan 12, 2024 | |

| Description |
| --- |

Grotto footing
Additional Concrete Footings for Grotto

| Status | Signature | Date |
| --- | --- | --- |
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:36 PM |

| Approval Comments |
|---|
| |

I confirm that my action here represents my electronic signature and is binding.

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0005 | Created: | Oct 31, 2023 | $3,160.00 |
| | Approved: | Jan 12, 2024 | |

| Description |
|---|
| Raise Spa spill<br>Cut existing spa beam and strip tile on spillway. Add new tile at correct height and widen spillover. Tile to match pool NPT Fusion mosaic pattern pinwheel gray quartz. |

| Status | Signature | Date |
|---|---|---|
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:36 PM |

| Approval Comments |
|---|
| |

I confirm that my action here represents my electronic signature and is binding.

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0006 | Created: | Nov 15, 2023 | $6,510.00 |
| | Approved: | Jan 12, 2024 | |

| Description |
|---|
| Demo Plumbing / Electrical<br>Excavation and Removal of electrical conduit and underground piping previous builder did not get undergroud approved by city no way to use old underground.<br>Labor<br>Excavation - 90 Man Hours<br>Removal of underground pipe - 32 Man Hours |

| Status | Signature | Date |
|---|---|---|
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:36 PM |

| Approval Comments |
|---|
| |

I confirm that my action here represents my electronic signature and is binding.

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0007 | Created: | Nov 15, 2023 | $800.00 |
| | Approved: | Jan 12, 2024 | |

| Description |
|---|
| Sealing Piping<br>Cut & Pack piping not being used<br>2 Plumbers @ 6 hrs each =12 man hours<br>hydraulic cement |

| Status | Signature | Date |
|---|---|---|
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:35 PM |

| Approval Comments |
|---|
| |

I confirm that my action here represents my electronic signature and is binding.

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0008 | Created: | Dec 12, 2023 | $4,675.00 |
| | Approved: | Jan 12, 2024 | |

| Description |
|---|
| Re-install underground plumbing and electrical<br>Plumbing crew 5 days labor reinstall conduits and PVC plumbing that was assumed to be good at time of signing contract (per Coastal contract notes and discussion with home builder and clients). |

| Status | Signature | Date |
|---|---|---|
| Approved by: Rana & Moe Saad | | Jan 12, 2024, 6:35 PM |

| Approval Comments |
|---|
| |

I confirm that my action here represents my electronic signature and is binding.

| CO ID | Created / Approved Date | | Price |
|---|---|---|---|
| 0010 | Created:<br>Approved(M): | Dec 13, 2023<br>Nov 18, 2024 | $1,500.00 |

| Description |
|---|
| Over Allowance Gas |

| Status | Signature | Date |
|---|---|---|
| Approved by Builder | | Nov 18, 2024, 2:37 PM |

| Approval Comments |
|---|
| |

TOTAL AMOUNT OF CHANGE ORDER:     $61,194.29



**Client**  Rana & Moe Saad
921 Crescent Drive, Dearborn, MI 48124
**Job Address**  921 Crescent Dr., Dearborn, MI 48124

### CONTRACT PRICE SUBTOTAL: $318,879.29

## Approved Change Orders

| Title | Date | Price |
|---|---|---|
| Re-install underground plumbing and electrical | Jan 12, 2024 | $4,675.00 |
| Sealing Piping | Jan 12, 2024 | $800.00 |
| Demo Plumbing / Electrical | Jan 12, 2024 | $6,510.00 |
| Raise Spa spill | Jan 12, 2024 | $3,160.00 |
| Grotto footing | Jan 12, 2024 | $7,291.78 |
| Lazy river system | Jan 12, 2024 | $33,412.22 |
| Add Spa Lights | Jan 12, 2024 | $3,845.29 |
| Over Allowance Gas | Nov 18, 2024 | $1,500.00 |

### Approved Change Orders Subtotal: $61,194.29

## Payments Received

| Title | Date | Amount |
|---|---|---|
| Job Deposit (20%) | Sep 26, 2023 | $63,775.00 |
| Grotto Demo | Oct 13, 2023 | $30,000.00 |
| Underground Conduits / Plumbing | Dec 22, 2023 | $40,000.00 |
| C/O #2 Lazy River System 50% | Jan 16, 2024 | $16,706.11 |
| C/O # 7 Sealing Piping | Jan 26, 2024 | $800.00 |
| Equipment Draw 1 | Jun 4, 2024 | $30,000.00 |
| Equipment Draw 2 | Jun 12, 2024 | $30,000.00 |
| Change Orders Draw | Jun 5, 2024 | $52,188.18 |
| Grotto Rough Structure | Aug 26, 2024 | $60,000.00 |
| Grotto Complete (50%) | Oct 28, 2024 | $15,000.00 |

| Title | Date | Amount |
|---|---|---|
| Final Remaining | Nov 27, 2024 | $41,604.29 |

**Payments Received Subtotal:**     $380,073.58

## Job Price Summary

**Contract Price Subtotal:**    $318,879.29

**Approved Selection Difference Subtotal:**    $0.00

**Approved Change Order Subtotal:**    $61,194.29

### Job Running Total:    $380,073.58

**Less Payments Received:**    $380,073.58

### Remaining Balance:    $0.00

# EXHIBIT K

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN THE MATTER OF:

BRANDON HEITMANN

                                        Chapter 7
                                        Case No. 24−41956−mar
                                        Hon. Mark Randon

          Debtor(s)

_____/

MOHAMED SAAD,

     Plaintiff,

v

BRANDON HEITMANN                                         Adv. Pro. No. 24-04375-mar

      Defendant.

_____/

## DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGTORIES

## INTERROGATORIES

**INTERROGATORY NO. 1:** Identify the amount of money that you or your company received from the Plaintiff.

**ANSWER: With respect to the project at issue in this litigation, Brandon Heitmann did not receive money from the Plaintiff in his individual capacity. Exigent received a down payment of $50,000 on 7/1/2022; received a partial payment for progress payment 1 in amount of $100,000 on 8/18/2022; credited Plaintiff for a $26,348.00 direct payment made to a subcontractor for progress payment 1 on or about 12/14/2022; received the remainder of progress payment 1; progress payment 2; and part of progress payment 3 in the amount of $100,000 on 12/30/2022; credited Plaintiff for a direct payment made to Stone**

1

Co in the amount of $5,506.72 on 04/23/2023, 2023; received the remainder of progress payment 3 and part of progress payment 4 in amount of $100,000 on 5/4/2023; and credited Plaintiff for direct payments to the water slide supplier on in the amounts of $5,718.87 and $7,628.87 on 08/1/2023 and 08/15/2023.

**INTERROGATORY NO. 2:** Identify the disposition of all money you or your company received from the Plaintiff.

**ANSWER: Plaintiff objects to this interrogatory, as it is vague and overbroad. The question essentially asks Heitmann to perform a complete accounting from recollection alone.**

**Subject to this objection, Heitmann has produced receipts in his possession at Bates 369-383; 470; 473; 477; 496-509 as well as employee time records at Bates 522. Subject to this objection, Heitmann is aware of monies paid to Henry Rodriguez; J.P. Pools Ferguson Plumbing, Grace Transport, Home Depot, Upper Canada Stone, SCP Pool Corp; Classic Pools and Rock Bottom Stone. Exigent also paid a sales commission of 2.5% of project cost to Avery Petri. The business records pertaining to these payments; however, are with Exigent and Heitmann no longer has access to them. By way of further answer, Heitmann's personal knowledge is limited as the parties primarily responsible for purchasing materials and tracking project costs were Exigent's project managers, Kody Grandchamp and Cory Maxwell along with Exigent's CFO, Dan Othlof.**

**INTERROGATORY NO. 3:** Identify all laborers, materialmen, suppliers, and/or contractors who worked on the contract and the amount that they were paid 921 Crescent Drive, Dearborn, MI 48126. Please identify any of these people that were unpaid.

2

**ANSWER: Plaintiff objects to this interrogatory, as it is vague and overbroad. The question essentially asks Heitmann to perform a complete accounting from recollection alone.**

**Subject to this objection, parties named and documents identified in response to Interrogatory 2 contain this information. Moreover, Heitmann believes no subcontractors were unpaid when due and when appropriate funds were received from Plaintiff.**

**Finally, by way of further answer, Heitmann's personal knowledge is limited as the parties primarily responsible for purchasing materials and tracking project costs were Exigent's project managers, Kody Grandchamp and Cory Maxwell along with Exigent's CFO, Dan Othlof.**

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.      Produce each and every document that Defendant identified or referred to in answering Plaintiff's Second Set of Interrogatories.

**ANSWER: See Nextpoint link produced on 4/30/2025.**

2.      Provide a sworn statement in the form prescribed by MCL 570.1110 in regard to 921 Crescent Drive, Dearborn, MI 48126.

**ANSWER: Heitmann objects to this document request as it is vague insofar as it request "a" sworn statement, and does not specify "what" sworn statement Plaintiff would like produced. To the extent Plaintiff is requesting Heitmann create a sworn statement reflecting the status of the project as the date of Exigent's termination, Heitmann objects because: (1) it is the corporation, Exigent, not Heitmann who would create such a document; and (2) FRCP 34 does not require a defnendant to creat a document which does not exist, but merely produce documents in his possession.**

3.      Provide documentation of the disposition of all funds you or your company received from the Plaintiff.

**ANSWER:  Please see response to Interrogatory 2.**

3

4.     Provide documentation for all employees or contractors that you or your company hired to work at 921 Crescent Drive, Dearborn, MI 48126.

**ANSWER: Please see Nextpoint link produced on 4/30/2025**

## <u>VERIFICATION</u>

I AFFIRM UNDER THE PENALTIES OF PERJURY THAT I HAVE ANSWERED THE ABOVE INTERROGATORIES TRUTHFULLY AND TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

/s/*Brandon Heitmann*
Brandon Heitmann, Defendant

As to objections stated herein:

Respectfully Submitted,

**KOTZ SANGSTER WYSOCKI P.C.**

By:  */s/ Tyler P. Phillips*
       Tyler P. Phillips (P78280)
Attorneys for Defendant Heitmann
400 Renaissance Ctr. Ste. 3400
Detroit, MI 48243
313-259-8300
Dated: May 1, 2025          tphillips@kotzsangster.com

4

# EXHIBIT L

STATE OF MICHIGAN

IN THE SIXTEENTH JUDICIAL CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH HEBEKA and
ANGELA HEBEKA,

        Plaintiffs,

        Case No. 2023-002332-CZ
        Hon. James M. Biernat, Jr.

v.

EXIGENT LANDSCAPING LLC
d/b/a EXIGENT DESIGN AND BUILD
(a Michigan limited liability company),
CONSTRUCTION CONTRACTORS LLC
(a Michigan limited liability company),
HANK BELL (an individual),
BRANDON HEITMANN (an individual),
and AMANDA M. PISARSKI (an individual),

        Defendants.

---

JACOB AARON KAHN (P85936)
Law Office of Anthony Wayne Kahn
Attorneys for Plaintiffs
33110 Grand River Avenue
Farmington, MI 48336
P: (248) 442-2322
F: (248) 442-2644
jacob@kahnlawmi.com

---

## FIRST AMENDED VERIFIED COMPLAINT

        JOSEPH HEBEKA and ANGELA HEBEKA ("Plaintiffs"), by and through their

attorneys, the Law Office of Anthony Wayne Kahn, for their First Amended Verified Complaint

against EXIGENT LANDSCAPING LLC d/b/a EXIGENT DESIGN AND BUILD ("Exigent"),

CONSTRUCTION CONTRACTORS LLC ("CC LLC"), HANK BELL ("Bell"), BRANDON

Document received by the MI Macomb 16th Circuit Court.

HEITMANN ("Heitmann") and AMANDA M. PISARSKI ("Pisarski"), collectively "Defendants" now plead as follows.

## JURISDICTION AND VENUE

1.     That this Verified Complaint is amended as of right as Defendants have not yet been served with Plaintiffs' original complaint.

2.     That the events giving rise to this litigation took place within the County of Macomb, State of Michigan.

3.     That Heitmann resides in the County of Macomb, State of Michigan.

4.     That Pisarski resides in the County of Macomb, State of Michigan.

5.     That Bell resides in the County of Macomb, State of Michigan.

6.     That Exigent is a Michigan limited liability company conducting business in the County of Macomb, State of Michigan.

7.     That CC LLC is a Michigan limited liability company conducting business in the County of Macomb, State of Michigan.

8.     That the amount in controversy is in excess of $25,000.00.

9.     That jurisdiction and venue are proper in this Court based on the Defendants' residence and the amount in controversy.

## GENERAL ALLEGATIONS

10.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

11.     That this case has been administratively closed as to Exigent, only, as it is in an active Chapter 11 bankruptcy case.

12.     That on August 26, 2022, Plaintiffs entered into a certain Contract for pool

2

Document received by the MI Macomb 16th Circuit Court.

construction with Exigent Landscaping, LLC, ("Exigent") for the construction of a pool at their residential home in Shelby Township, MI.[1] Exhibit 1, Contract, incorporated throughout by reference.

13.    That the Contract lists a "license number" of 802082183, which is not a license number at all.

14.    That Michigan law requires an individual or entity to be licensed as a residential builder when engaging in swimming pool installation or alteration.

15.    That Exigent fraudulently held itself out as a licensed contractor.

16.    That Heitmann fraudulently held himself out as a licensed contractor.

17.    That Pisarski advanced the commission of fraud by Exigent and Heitmann against Plaintiffs by misleading Plaintiffs to further believe that Exigent and Heitmann were licensed contractors.

18.    That on or about December 15, 2022, Plaintiffs received a blank pool alarm affidavit (the "Original Affidavit"). Plaintiffs were informed that the Affidavit would be completed using Exigent's licensure information. Exhibit 2, Original Affidavit, incorporated throughout by reference.

19.    That subsequent to Plaintiffs signing the Affidavit, Pisarski fraudulently altered it to show CC LLC and Bell as the permit applicants. Exhibit 3, Altered Affidavit, incorporated throughout by reference.

20.    That Pisarski is or was an employee of Exigent responsible for the permitting process, as indicated by her message to Plaintiffs. Exhibit 4, Facebook Messages, incorporated throughout by reference.

---

[1] Exigent Landscaping LLC was originally named as a party to this action. It subsequently filed for Chapter 11 Bankruptcy and as such this case has been administratively closed as to Exigent, only.

3

Document received by the MI Macomb 16th Circuit Court.

21.    ==That on information and belief, Plaintiffs state that Defendants submitted to the Charter Township of Shelby's Building Department (the "Building Department") a fraudulent Application for Building Permit using the information of Defendants Bell and CC LLC. Exhibit 5, Application for Building Permit, incorporated throughout by reference.==

22.    That on information and belief, Plaintiffs state that Bell and CC LLC were aware of Pisarski's usage of their information, and had no intention of being involved with the construction at Plaintiff's home.

23.    That on January 23, 2023, February 7, 2023, March 10, 2023, and May 8, 2023 the Building Department disapproved applications for permits for Plaintiffs' pool. Exhibit 6, Disapproval Notices, incorporated throughout by reference.

24.    That Heitmann induced Plaintiffs to sign a contract with Exigent by providing them an unrealistic timeline for completion of their project. Exhibit 1, Contract, Page 4.

25.    That on November 3, 2022, Heitmann indicated to Plaintiffs that their permitting had been approved, in an effort to induce Plaintiffs to pay Heitmann/Exigent additional funds. Exhibit 7, Approval Text, incorporated throughout by reference.

26.    That Heitmann and Pisarski represented to Plaintiffs on multiple occasions that their project was approved, when in fact it was not, in a successful effort to induce Plaintiffs to pay over additional funds to Heitmann/Exigent.

27.    That in total, Plaintiffs paid to Heitmann/Exigent the sum of $60,000.00 in two tranches of $20,000.00, and $40,000.00, respectively, based entirely on fraudulent misrepresentations made by Defendants.

28.    That to date, no work has been completed toward Plaintiffs' pool, nor have any

4

22

2

2

2

2

2

2

2

2

2

2

2

2

legitimate permits been issued.

29.     That Heitmann has comingled the funds of Exigent with his own money, including the funds provided by Plaintiffs.

30.     That Pisarski has been a beneficiary of the comingling of Heitmann's comingling of Plaintiffs' funds with those of Exigent, in the form of personal auto-loan payments, and on information and belief, other personal benefits.

## PIERCING THE CORPORATE VEIL

31.     That while "piercing the corporate veil" is not recognized as an independent cause of action for which a Plaintiff may obtain damages against individual members of a corporate entity within the State of Michigan, it is a necessary determination to be made by a Court in assigning liability to individual actors of a corporation under certain causes of action, as later-alleged in this Verified Complaint.

32.     That Exigent was a mere instrumentality of Heitmann.

33.     That the corporate entity (LLC) of Exigent was used by Heitmann to commit a great number of frauds and wrongs against a startling number of injured parties, including the instant Plaintiffs.

34.     That Plaintiffs suffered an unjust loss as a result of Heitmann's abuse of Exigent's corporate form.

35.     Specifically, Heitmann used Exigent to commingle funds, to pay directly the personal expenses of himself and Pisarski (not in the form of lawful benefits or compensation), and to otherwise mislead consumers such as Plaintiffs as to Heitmann's qualification, licensure, and ability to complete projects for which he received funds from Plaintiffs and other similarly situated injured parties.

5

Document received by the MI Macomb 16th Circuit Court.

36.     That the funds received by Exigent/Heitmann were routinely used by Heitmann and Pisarski for their own personal use, rather than being held in trust for completion of customer projects as required by law and contract, or rather than being used to pay employees and other creditors of Exigent.

37.     That as further evidence of Exigent's status as a mere instrumentality of Heitmann, this Court should consider that Heitmann maintained another misleading enterprise "Heitmann Academy" as an arm of Exigent, LLC, for which Heitmann directly drew compensation through Exigent.

### COUNT I – VOIDING THE CONTRACT

38.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

39.     That a contract to which a party was induced by fraud is void as a matter of law and public policy.

40.     That Plaintiffs' contract with Defendant was induced by fraud, based on fraud, and contains a number of fraudulent statements, not least of which is the purported "license number" of Defendant.

41.     That MCL 339.601(1) prohibits a person from falsely holding himself out as a licensed contractor.

WHEREFORE, Plaintiffs request that this Court enter an order voiding the Contract between themselves and Defendant, EXIGENT LANDSCAPING LLC d/b/a EXIGENT DESIGN AND BUILD.

### COUNT II – FRAUDULENT INDUCEMENT – HEITMANN, PISARSKI

42.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

43.     That Heitmann represented to Plaintiffs that their project would be started in April

6

Document received by the MI Macomb 16th Circuit Court.

or May of 2023, and completed within nine to ten weeks. Exhibit 1, Contract, Page 4.

44.     That Defendants Heitmann and Pisarski repeatedly represented to Plaintiffs that permits and a variance had been approved for their project, in order to induce additional progress payments by Plaintiffs to Exigent/Heitmann.

45.     That said representations by Heitmann and Pisarski were false.

46.     That Heitmann and Pisarski knew said representations were false, or made said representations recklessly without knowledge of the truth thereof.

47.     That said representations were made with the intent that Plaintiffs would act upon them by providing $60,000.00 to Heitmann/Exigent.

48.     That Plaintiffs did act accordingly by providing $60,000.00 to Heitmann/Exigent, by which the Plaintiffs have been damaged.

49.     That Plaintiffs' reliance upon Heitmann and Pisarski's representations was reasonable.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants, BRANDON HEITMANN and AMANDA PISARSKI, jointly and severally, in the amount of SIXTY-THOUSAND DOLLARS ($60,000.00) plus court costs, statutory interest, and statutory attorney fees.

## COUNT III – CIVIL CONSPIRACY – ALL DEFENDANTS

50.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

51.     That Defendants engaged in a concerted action to misrepresent to Plaintiff that they were alternately: i. Licensed, qualified, and able to complete the construction project described in the contract between Plaintiffs and Exigent; ii. Lawfully obtaining permits/variances for approval of the project; iii. Intending to complete Plaintiffs' project, and iv. Applying

7

Document received by the MI Macomb 16th Circuit Court.

Plaintiffs' funds toward their project.

52.     Defendants, by way of said concerted action to mislead Plaintiffs, obtained $60,000.00 from Plaintiffs, for which Plaintiffs received no commensurate value, and moreover, for which Plaintiffs were never actually going to receive any commensurate value, based on the concerted malfeasance of Defendants.

53.     The concerted action alleged in Count II of Plaintiffs' Verified Complaint involved two or more persons.

54.     That concerted action alleged in Count II of Plaintiffs' Verified Complaint was done to accomplish an unlawful purpose, or alternatively, a lawful purpose by unlawful means.

55.     That Defendants' purpose in conducting such concerted action was to wrongfully obtain from Plaintiffs the sum of $60,000.00, which was achieved, and by which Plaintiffs have now been damaged.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants, CONSTRUCTION CONTRACTORS LLC, HANK BELL, BRANDON HEITMANN, and AMANDA M. PISARSKI, jointly and severally, in the amount of SIXTY THOUSAND DOLLARS ($60,000.00), plus any exemplary damages or attorney fees this Court sees fit, in addition to statutory interest and court costs.

### COUNT IV – SILENT FRAUD – ALL DEFENDANTS

56.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

57.     That Defendants alternately defrauded or allowed Plaintiffs to be defrauded out of the sum of $60,000.00 based on misrepresentations to Plaintiff, including by omission, as to the status of the timeframe for completion of their project, and as to the status of various permitting and variance actions necessary to the commencement of their project.

8

Document received by the MI Macomb 16th Circuit Court.

58.     That Defendants had a legal duty to disclose to Plaintiffs the falseness of the representations made to Plaintiffs.

59.     That specifically, Bell and CC LLC had a legal duty to disclose to Plaintiffs the fraud that occurred regarding the submission of their information on various applications for permits/variances for Plaintiffs' project, and regarding the fact that Bell and CC LLC were not going to work on or oversee Plaintiffs' project.

60.     That Defendants failed to disclose in order to induce reliance by the Plaintiff.

61.     That Defendants' failure to disclose was misleading because of the Defendants' actions.

62.     That Defendants knew failing to disclose would be misleading to Plaintiffs.

63.     That Plaintiffs relied on Defendants' failure to disclose, and as a result, were damaged in the amount of $60,000.00.

64.     That all Defendants knew or should have known of the falsehood of the relevant facts which they failed to disclose to Plaintiffs as alleged above.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants, CONSTRUCTION CONTRACTORS LLC, HANK BELL, BRANDON HEITMANN, and AMANDA M. PISARSKI, jointly and severally, in the amount of SIXTY THOUSAND DOLLARS ($60,000.00), plus any exemplary damages or attorney fees this Court sees fit, in addition to statutory interest and court costs.

## COUNT V – VIOLATION OF THE MICHIGAN
## BUILDERS' TRUST FUND ACT ("MBTFA") – HEITMANN

65.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

66.     That Defendant Exigent received funds from owners (Plaintiffs) as payment to be used toward the construction of Plaintiffs' pool.

9

bar

Document received by the MI Macomb 16th Circuit Court.

67.     That in receiving said funds, Exigent constituted a Trustee within the meaning of MCL 570.151 *et seq.* (the MBTFA)

68.     That as a Trustee under the MBTFA, Exigent was required to pay Plaintiff for the building materials furnished to it.

69.     That as owner of Exigent, Heitmann was a fiduciary of the trust created by Exigent's receipt of Plaintiff's funds earmarked and intended for use on their construction project.

70.     That Heitmann breached his duty to Plaintiffs by misappropriating said funds.

71.     That Plaintiffs have been damaged in the amount of $60,000.00 as a result of Heitmann's misappropriation of their funds.

WHEREFORE, Plaintiffs request that this Court enter a Judgment against Defendant, BRANDON HEITMANN, in his individual capacity, in the amount of SIXTY THOUSAND DOLLARS ($60,000.00), plus court costs, statutory interest, and statutory attorney fees.

### COUNT VI – COMMON LAW CONVERSION – HEITMANN AND PISARSKI

72.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

73.     That Heitmann and Pisarski wrongfully obtained from Plaintiffs the sum of $60,000.00 by way of fraud.

74.     That Heitmann and Pisarski's wrongful obtaining of Plaintiffs' funds constituted an unlawful exercise of dominion or control over Plaintiffs' property (the funds).

75.     That Plaintiffs were damaged accordingly, in the amount of $60,000.00.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants, BRANDON HEITMANN and AMANDA PISARSKI, jointly and severally,

Document received by the MI Macomb 16th Circuit Court.

in the amount of SIXTY-THOUSAND DOLLARS ($60,000.00) plus court costs, statutory

interest, and statutory attorney fees.

## COUNT VII – STATUTORY CONVERSION
### (MCL 600.2919a) – HEITMANN AND PISARSKI

76.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

77.     That Defendants Heitmann and Pisarski obtained by fraud, in what constituted a

wrongful exercise of dominion or control over Plaintiff's property, the sum of $60,000.00 from

Plaintiffs.

78.     That said funds were to be applied toward Plaintiff's construction project.

79.     That rather than using Plaintiffs' funds for their intended purpose, and rather than

obtaining them by honest and lawful means, Heitmann and Pisarski caused Exigent to disgorge

said funds to them in their individual capacities.

80.     That said funds were then converted to Heitmann and Pisarski's own usage for

their own individual purposes.

81.     That MCL 600.2919a provides that a person damages as a result of the statutory

conversion of another is entitled to treble damages plus a reasonable attorney's fee.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and

against Defendants, BRANDON HEITMANN and AMANDA PISARSKI, in the amount of

ONE HUNDRED EIGHTY THOUSAND DOLLARS ($180,000.00), plus court costs, statutory

interest, and reasonable attorney fees.

## COUNT VIII – VIOLATION OF MICHIGAN'S LIMITED
### LIABILITY COMPANY ACT – HEITMANN AND PISARSKI

82.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

83.     That Michigan's Limited Liability Company Act (MCL 450.4307(1)(a) *et seq.*)

11

Document received by the MI Macomb 16th Circuit Court.

provides that distribution shall not be made if said distribution would render the LLC unable to pay its debts as they become due.

84.     That in the course of operating Exigent, Heitmann and Pisarski made distributions to themselves as insiders which rendered the LLC unable to pay its debts as they became due.

85.     That Plaintiffs became creditors of Exigent upon its failure to comply with the material terms of its Contract with Plaintiff.

86.     That members of an LLC that assent to or participate in improper distributions in violation of MCL 450.4307 may be held personally liable per MCL 450.4308.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants, BRANDON HEITMANN and AMANDA PISARSKI, in the amount of ONE HUNDRED EIGHTY THOUSAND DOLLARS ($180,000.00), plus court costs, statutory interest, and reasonable attorney fees.

## COUNT IX –VIOLATION OF MICHIGAN'S UNIFORM VOIDABLE TRANSACTIONS ACT ("UVTA") – BRANDON HEITMANN

87.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

88.     That on information and belief, Plaintiffs state that Heitmann caused to be sold certain equipment belonging to Exigent shortly in advance of Exigent's filing for Chapter 11 bankruptcy.

89.     That on information and belief, said "fire sales" were not made for reasonably equivalent value of the property sold.

90.     That said sales were made with actual intent to hinder, delay, or defraud creditors, including the instant Plaintiffs.

91.     That Exigent, in this capacity, functioned as a mere instrumentality of Heitmann, and as such, he can and should be held personally liable to Plaintiffs.

12

Document received by the MI Macomb 16th Circuit Court.

92.     That Michigan's Uniform Voidable Transactions Act, MCL 566.34 *et seq.* ("UVTA") provides that a transfer made by a debtor is voidable as to a creditor, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor, and that in determining intent, a court should look to whether the transfer was to an insider.

93.     That Plaintiffs have been damaged as a result of Exigent and Heitmann's conduct as set forth in Count VIII of this Verified Complaint.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendant, BRANDON HEITMANN, in an amount in excess of $25,000.00, plus court costs, statutory interest, and statutory attorney fees.

## COUNT X – VIOLATION OF MICHIGAN'S CIVIL RICO STATUTE (MCL 750.159i *et seq.*) – HEITMANN AND PISARSKI

94.     That Plaintiffs reallege all previous allegations of this Verified Complaint.

95.     That at all times relevant as alleged under this Verified Complaint, Defendants Heitmann and Pisarski were personally employed by or associated with an enterprise which they knew to be engaged in a pattern of racketeering activity.

96.     That specifically, said racketeering activity included, but was in no way limited to, the use of mailing, wire communications, and phone communications to perpetrate further acts of fraud by making erroneous representations therethrough, such as (but not limited to): i. Representing that Exigent and Heitmann were licensed contractors, ii. Representing that Exigent and Heitmann were competent to perform construction jobs for which Plaintiffs and other similarly situated parties paid and contracted, iii. Representing that certain permitting actions, variances, and other milestones had been achieved or granted when they had not, iv. Representing that customers' funds would be held for and applied to construction projects when they were in fact converted to the use of Exigent, Heitmann, and/or Pisarski, v. Representing that

13

repairs to faulty work would be made by Exigent or its agents, and vi. Representing that Exigent was in privity of contract with various subcontractors, laborers, and materialmen for the performance of various customers' projects, when in fact, it was not.

97.    That specifically, said racketeering activity also included extorting customers for additional funds, benefits, and insulation from litigation, by entering customers' property, commencing with substandard and unworkmanlike performance (such as improperly digging, improper laying of rebar, improper application of shotcrete, failure to erect mandatory safety fences, damaging property, and by other such means), and then by informing said customers that failure to allow Exigent to continue "working" on their property or to continue making "progress payments" to Exigent would result in the forfeiture of huge sums of down payments (not consistent with industry standards), and subsequent litigation by Exigent against said customers for expectation damages and other damages.

98.    That as a result of the conduct described in this Verified Complaint and specifically in Count IX, the instant Plaintiffs have been damaged in the amount of $60,000.00, plus their attorney fees so wrongfully incurred, plus additional damages they will incur to remediate any steps taken by Exigent.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants, BRANDON HEITMANN and AMANDA PISARSKI, jointly and severally, in an amount in excess of $25,000.00.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury of all causes of action set forth herein.


[SIGNATURES TO FOLLOW]

14

Document received by the MI Macomb 16th Circuit Court.

Respectfully submitted,

Dated: 10/2 , 2023

By: _____
Jacob Aaron Kahn (P85936)
Attorney for Plaintiffs

_____

*I declare the foregoing factual allegations to be true to the best of my knowledge, information, and belief.*

Dated: 9/29/23

By: _____
Joseph Hebeka, Plaintiff

Dated: 9/29/23

By: _____
Angela Hebeka, Plaintiff

*Joseph & Angela Hebeka*
Subscribed and sworn to before me

This 29 day of September 2023

*Sheri L. Kelchner*
Notary Public, Wayne County, MI
My commission expires: May 23, 2025

SHERI L. KELCHNER
Notary Public, State of Michigan
County of Wayne
My Commission Expires May. 23, 2025
Acting in the County of Wayne

15

# EXHIBIT M

In the Matter of

BRANDON LEWIS HEITMANN          Complaint No. 2300623
Residential Builder, Individual
License No. 24-23-00197

- and -

EXIGENT LANDSCAPING, LLC,          Complaint No. 2200622
Residential Builder, Company
License No. 26-23-00279
_____/

STATE OF MICHIGAN   )
COUNTY OF INGHAM   )

On the date below I sent a copy of: <u>Formal Complaint</u> dated April 9, 2024,
<u>Respondents' Notice of Opportunity to Show Compliance</u>, and <u>Compliance
Conference Election Form</u> to:

Brandon Lewis Heitmann          Exigent Landscaping, LLC
                                Resident Agent, Brandon Heitmann

c/o:
Tyler P. Phillips, Esq.
Kotz Sangster
tphillips@kotzsangster.com
By:   (✓)  Electronic Mail

With copy to:
Felicia Badger
Administrative Manager
Residential Builders Section
Bureau of Construction Codes
Department of Licensing & Regulatory Affairs

I declare that the statements above are true to the best of my information, knowledge,
and belief.
Mail date: April 9, 2024          */s/ Christine S. Zinn*_____
                                 Christine S. Zinn
                                 Legal Assistant

LF: 2023-0382725-B/Heitmann, Brandon, 2300623 (Res Bldr)/PS - Formal Complaint – 2024-04-09

In the Matter of

BRANDON LEWIS HEITMANN             Complaint No. 2300623
Residential Builder, Individual
License No. 24-23-00197

and

EXIGENT LANDSCAPING, LLC,          Complaint No. 2200622
Residential Builder, Company
License No. 26-23-00279
_____/

## FORMAL COMPLAINT

Assistant Attorney General Jennifer Fitzgerald, on behalf of the Department

of Licensing and Regulatory Affairs, Bureau of Construction Codes (Complainant),

files this formal complaint against Brandon Lewis Heitmann and Exigent

Landscaping, LLC (referred to individually by name or collectively as

"Respondents"), alleging upon information and belief as follows:

1.     The Board of Residential Builders and Maintenance and Alteration

Contractors is an administrative agency established under Article 24 of the

Occupational Code ("Code"), MCL 339.101 *et seq.*

2.     After receiving a complaint against Respondent, the Bureau

investigated the allegations of the complaint pursuant to section 502 of the Code.

3. Section 601(1) of the Code subjects a person to sanction for engaging or attempting to engage in the practice of an occupation regulated under the Code or for using a title designated in the Code unless the person possesses a license or registration issued by the department for the occupation.

4. Section 604(b) of the Code subjects a person to sanction for practicing fraud, deceit, or dishonesty in practicing an occupation.

5. Section 604(d) of the Code subjects a person to sanction for demonstrating a lack of good moral character, which is defined in MCL 338.41 to mean "the propensity on the part of the person to serve the public in the licensed area in a fair, honest, and open manner."

6. Section 604(h) of the Code subjects a person to sanction for violating any other provision of this act or a rule promulgated under this act for which a penalty is not otherwise prescribed.

7. Section 604(l) of the Code subjects a person to sanction for aiding or abetting another person in the unlicensed practice of an occupation.

8. Section 2411(2)(e) of the Code subjects a licensee or applicant to sanction for a willful violation of the building laws of this state or of a political subdivision of this state.

9. Section 2411(2)(j) of the Code subjects a licensee to sanction for aiding or abetting an unlicensed person to evade Article 24 of the Code, or knowingly combining or conspiring with, or acting as agent, partner, or associate for an unlicensed person.

10.     Section 2411(2)(m) of the Code subjects a licensee to sanction for workmanship not meeting the standards of the Michigan Residential Code (MRC) as promulgated under the Stille-DeRossett-Hale Single State Construction Code Act, MCL 125.1501, *et seq*.

11.     Section 2404a of the Code requires a licensee, as part of a contract, to include information relating to his individual license and to any license issued to that person as a qualifying officer of another entity.

12.     Section 10 of the Stille-DeRossett-Hale Single State Construction Act requires a residential builder or maintenance and alteration contractor who applies for a building permit on behalf of a homeowner to be duly licensed and to include the license number and expiration date of the contractor, builder, or maintenance and alteration contractor who will perform the work in the permit application.

13.     Mich Admin Code, R 338.1551(5) requires all construction, renovations, alterations, or repairs to comply with the Michigan construction code.

14.     Section 514 of the Code authorizes the Board to assess penalties against licensees based on an administrative law hearings examiner's hearing report.

<u>FACTUAL ALLEGATIONS</u>

15.     Respondents are licensed residential builders pursuant to the Code. Respondent Heitmann became licensed by the Department on March 28, 2023. Respondent Exigent became licensed by the Department on April 27, 2023.  Neither respondent has ever had a maintenance and alteration contractor license issued by the Department.

3

16.     Respondent Heitmann is the qualifying officer for Exigent Landscaping and is responsible for its compliance with the Occupational Code.

17.     On September 30, 2021, before they were licensed by the Department, Respondents entered into a construction contract with the owners (Homeowners) of a home on Chaucer Court in Macomb, Michigan.

18.     Under Article 24 of the Code, Respondents were required to be licensed by the Department as residential builders or maintenance and alteration contractors to perform the work in their contract with the Homeowners.

19.     The contract with the Homeowners included a "license number" of 802082183 that does not correspond to residential builder or maintenance and alteration contractor license numbers issued by the Department, was signed on behalf of Exigent by an unlicensed salesperson and does not contain information regarding a qualifying officer.

20.     To obtain a building permit for the construction, Respondents, or someone on their behalf, submitted a permit application to Macomb County which stated that another company, which was duly licensed as a residential builder under the Occupational Code, was the contractor for the Homeowners' project

21.     The application, which was dated October 6, 2021, included the other company's name, license number, and expiration date in the spots for "contractor/applicant name," "builder's license number," and "expiration date." However, the contact email address was for someone at "exigentdesignbuild.com" and the contact phone number was the same number Respondents used on their contract with the Homeowners.

22.    Despite what was stated on the permit application, the other company was not the contractor for the project.  Neither it nor its qualified officer performed construction on the project, and they did not have a contract with the Homeowners.

23.    The building permit was issued to the other company, Construction Contractors, LLC, on October 28, 2021.

24.    Despite not being licensed as required by the Code, Respondents received payments from the Homeowners and performed the construction on the Chaucer Court home.

25.    A Macomb Township building inspector inspected the construction and found the following deficiencies in violation of Section 305 of the 2015 International Swimming Pool and Spa Code, which is applicable to Michigan via the MRC:

    a.    Failure to maintain a 48" approved pool barrier in rear yard

    b.    Lack of self-closing, self-latching gate that swing out from the pool.

## COUNT I

26.    Respondents' conduct constitutes engaging or attempting to engage in the practice of an occupation regulated under this act or for using a title designated in this act without possessing a license issued by the department for the occupation, in violation of section 601(1) of the Code.

## COUNT II

27.    Respondents' conduct constitutes fraud, deceit, or dishonesty in practicing an occupation, in violation of section 604(b) of the Code.

## COUNT III

28.    Respondents' conduct constitutes a lack of good moral character, in violation of section 604(d) of the Code.

## COUNT IV

29.    Respondents' conduct constitutes aiding and abetting another person in the unlicensed practice of an occupation, in violation of section 604(l) of the Code.

## COUNT V

30.    Respondents' conduct is contrary to Section 10 of the Stille-DeRossett-Hale Single State Construction Act and constitutes a willful violation of the building laws of this state or of a political subdivision of this state, in violation of section 2411(2)(e) of the Code.

## COUNT VI

31.    Respondents' conduct constitutes aiding or abetting an unlicensed person to evade Article 24 of the Code, or knowingly combining or conspiring with, or acting as agent, partner, or associate for an unlicensed person, in violation of Section 2411(2)(j) of the Code.

## COUNT VII

32.    Respondents' conduct constitutes workmanship not meeting the standards of the Michigan Residential Code as promulgated under the Stille-DeRossett-Hale Single State Construction Code Act Section, in violation of section 2411(2)(j) of the Code.

## COUNT VIII

33.    Respondents' conduct constitutes failing to include license information in a contract as required by section 2404a of the Code, in violation of section 604(h) of the Code.

## COUNT IX

34.    Respondents' conduct constitutes construction, renovations, alterations, or repairs that fail to comply with the Michigan construction code, contrary to R 1551(5), and in violation of section 604(h) of the Code.

WHEREFORE, Complainant, Department of Licensing and Regulatory Affairs, hereby commences proceedings pursuant to the Administrative Procedures Act of 1969, MCL 24.201 *et seq.* and the Occupational Code to determine whether disciplinary action should be taken by the Department of Licensing and Regulatory Affairs, pursuant to the Occupational Code, for the reasons set forth herein.

Any written response shall be submitted by regular mail to the Department of Licensing and Regulatory Affairs, Bureau of Construction Codes, P.O. Box 30254, Lansing, MI 48909 or by email to LARA-BCC-RBS-Compliance@michigan.gov, with a copy mailed to the undersigned assistant attorney general.

Respectfully submitted,

 */s/ Jennifer Fitzgerald*
Jennifer Fitzgerald (P60109)
Assistant Attorney General
Licensing & Regulation Division
P.O. Box 30758
Lansing, MI 48909
Telephone: (517) 335-7569
Dated: April 9, 2024               Facsimile: (517) 241-1997

LF: 2023-0382725-B/Heitmann, Brandon, 2300623 (Res Bldr)/Formal Complaint – 2024-04-09

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
BUREAU OF CONSTRUCTION CODES
BOARD OF RESIDENTIAL BUILDERS AND MAINTENANCE AND
ALTERATION CONTRACTORS

In the Matter of

BRANDON LEWIS HEITMANN                    Complaint No. 2300623
Residential Builder, Individual
License No. 24-23-00197

and

EXIGENT LANDSCAPING, LLC,                 Complaint No. 2200622
Residential Builder, Company
License No. 26-23-00279
_____/

## NOTICE OF OPPORTUNITY TO SHOW COMPLIANCE

You have been served with a formal complaint alleging that you violated the

Occupational Code, MCL 339.101 *et seq.*

If you admit to the alleged violations or are found responsible for violations

after an administrative hearing, you are subject to penalties provided for in the

Code and as determined by a final order.  The final order and associated

disciplinary records are subject to disclosure and publication to the public in accord

with Section 11 of the Freedom of Information Act, MCL 15.231 *et seq.*  Publication

will include posting the disciplinary record on the Department's website and/or

other reporting formats.

If this license requires a qualifying officer pursuant to Mich Admin Code, R 338.1526 and the formal complaint leads to suspension or revocation, any license issued to any other organization with the same qualifying officer is subject to suspension, and any license issued to the qualifying officer in an individual capacity is subject to suspension or revocation.

Pursuant to section 508(1) of the Occupational Code, you may choose one of the following options:

(a)     Meet with a Department representative to negotiate a settlement
(b)     Demonstrate compliance prior to holding a contested case hearing
(c)     Proceed to a contested case hearing

If you choose option (a) or (b), a compliance conference will be scheduled; you will be notified of the date, time, and location.  You have the right to have an attorney represent you in this conference at your own expense.  The primary purpose of the conference is to afford you an opportunity to discuss the formal complaint in an attempt to resolve the matter.  If settlement is reached at the conference, a stipulation will be prepared for your signature.  The signed stipulation will be submitted to the Board for acceptance or rejection; you will be notified of the Board's decision.  If a settlement is not reached at the conference, the matter will proceed to a contested case hearing.

If you choose option (c), the matter will be scheduled for a contested case hearing before an administrative law judge.  You have the right to have an attorney represent you at the hearing at your own expense.  Following the hearing, the administrative law judge will issue a hearing report containing findings of fact and conclusions of law.  The hearing report will be forwarded to the Board for review and issuance of a final order.

You have 15 calendar days after receipt of this notice to return the enclosed compliance conference election form indicating your selection in accordance with the instructions on the form.  If you fail to return the form within 15 calendar days, the matter will be forwarded for a contested case hearing.

LF: 2023-0382725-B/Heitmann, Brandon, 2300623 (Res Bldr)/Notice of Opp to Show Compliance – 2024-04-09

# COMPLIANCE CONFERENCE ELECTION FORM

## Complaint No. 2300623 & 2200622

Pursuant to section 508(1) of the Michigan Occupational Code, MCL 339.101 *et seq.*, I wish to:

_____ Meet with a Department representative to negotiate a settlement[1]

_____ Demonstrate compliance prior to holding a contested case hearing

_____ Proceed to a contested case hearing

Comments regarding scheduling preferences for a compliance conference:

_____

_____

_____

| | |
|---|---|
| Printed Name | Phone Number |
| | E-mail Address |
| Signature (required) | Date |

This form must be signed by the licensee if an individual or sole proprietorship, or by the qualifying officer of the licensee if a business entity.

**If you do not complete and return this form within 15 calendar days, this matter will proceed to a contested case hearing.**

Return the completed form to:

Department of Attorney A General
ATTN: **Jennifer Fitzgerald**
Licensing and Regulation Division
P.O. Box 30758
Lansing, MI 48909
Fax: (517) 241-1997
Email: Fitzgeraldj@mihigan.gov & zinnc@michigan.gov

LF: 2023-0382725-B/Heitmann, Brandon, 2300623 (Res Bldr)/Compliance Conference Election – 2024-04-09

# EXHIBIT N

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
BUREAU OF CONSTRUCTION CODES
BOARD OF RESIDENTIAL BUILDERS AND MAINTENANCE AND
ALTERATION CONTRACTORS

In the Matter of

BRANDON LEWIS HEITMANN                    Complaint No. 2300623
Residential Builder, Individual
License No. 24-23-00197

and

EXIGENT LANDSCAPING, LLC,                 Complaint No. 2300622
Residential Builder, Company
License No. 26-23-00279

_____ / CONSENT ORDER AND STIPULATION

CONSENT ORDER

A formal complaint was filed with the Board of Residential Builders and

Maintenance and Alteration Contractors on March 26, 2024, charging

Brandon Lewis Heitmann and Exigent Landscaping, LLC with having violated

sections 601(1), 604(b), 604(d), 604(l), 2411(2)(e), 2411(2)(j), 2411(2)(m),[1] 2404a, and

604(h) of the Occupational Code, MCL 339.101 *et seq*, and Mich Admin Code, R

338.1551(5).

The parties have stipulated that the Board may enter this consent order.

The Board has reviewed the stipulation contained in this document and agrees that

the public interest is best served by resolution of the outstanding complaint.

Therefore, the Board finds that the allegations of fact contained in the formal

_____

[1] The legal citation in Count VII of the formal complaint is corrected to 2411(2)(m), rather than
2411(2)(j).

complaint are true and that Respondents have violated sections 601(1), 604(d), 604(l), 2411(2)(e), 2411(2)(j), 2411(2)(m), 2404a, and 604(h) of the Occupational Code, MCL 339.101 *et seq*, and Mich Admin Code, R 338.1551(5).

Accordingly, for these violations, IT IS ORDERED:

Respondents' licenses are SUSPENDED for a minimum period of six months. The licenses shall be automatically reinstated upon completion of the suspension period, provided Respondents have complied with the terms of this consent order.

If either Respondent's license remains suspended for more than three years, that Respondent will be required to petition for reinstatement of the license in accordance with section 411(5) of the Occupational Code. Under this provision, the applicant must file an application on a form provided by the Department, pay the application processing fee, and file a petition to the Department and the Board stating reasons for reinstatement and including evidence that the person can and is likely to serve the public in the regulated activity with competence and in conformance with all other requirements prescribed by law, rule, or an order of the Department or Board.

Respondents are FINED $3,500.00, joint and severally, to be paid by check, money order, or cashier's check made payable to the State of Michigan (with complaint numbers 2300623 and 2300622 clearly indicated on the check or money order) and shall be payable within 90 days of the effective date of this order. The

2

timely payment of the fine shall be Respondents' responsibility.  The fine shall be mailed to:  Department of Licensing and Regulatory Affairs, Bureau of Construction Codes, Compliance Division, P.O. Box 30255, Lansing, Michigan 48909.

Count II of the complaint, alleging a violation of section 604(b) of the Occupational Code, is DISMISSED.

Respondents shall direct all communications, except fines, required by the terms of this order to: LARA-BCC-RBS-Compliance@michigan.gov.

Respondents shall be responsible for all costs and expenses incurred in complying with the terms and conditions of this consent order.

Respondents shall be responsible for the timely compliance with the terms of this consent order, including the timely filing of any documentation.  Failure to comply within the time limitations provided will constitute a violation of this order.

If Respondents violate any term or condition set forth in this order, they will be in violation of section 604(k) of the Occupational Code.

This order shall be effective 30 days from the date signed by the Chairperson or the Chairperson's designee, as set forth below.

Signed on _____

                                 MICHIGAN BOARD OF RESIDENTIAL
                                 BUILDERS AND MAINTENANCE AND
                                 ALTERATION CONTRACTORS

                                 By_____
                                    Chairperson

## STIPULATION

The parties stipulate as follows:

1.     Respondents do not contest the allegations of fact and law in the complaint.  Respondents understand that, by pleading no contest, they do not admit the truth of the allegations but agree that the Board may treat the allegations as true for resolution of the formal complaint and may enter an order treating the allegations as true.

2.     The Director of the Bureau of Construction Codes, or his designee, must approve this consent order and stipulation before it is submitted to the Board for final approval.

3.     Respondents understand and intend that, by signing this stipulation, they are waiving the right under the Occupational Code, rules promulgated under the Occupational Code, and the Administrative Procedures Act, MCL 24.201 *et seq.*, to require the Department to prove the charges set forth in the complaint by presentation of evidence and legal authority, and to present a defense to the charges.  Should the Board reject the proposed consent order, the parties reserve the right to proceed to hearing.

4.     This matter is a public record required to be published and made available to the public pursuant to section 11(1)(a) of the Michigan Freedom of Information Act, MCL 15.231 *et seq.*

4

5.     The Board may enter the above consent order.  An attorney from the Licensing and Regulation Division may discuss this matter with the Board in order to recommend acceptance of this resolution.

6.     The parties considered the following factors in reaching this agreement:

A.     Both Respondents have obtained residential builder licenses since the construction of the pool in question.

B.     This consent order does not contemplate restitution because Respondents have filed for bankruptcy.

By signing this stipulation, the parties confirm that they have read, understand, and agree with the terms of the consent order.

AGREED TO BY:

_____
Jennifer Fitzgerald (P60109)
Assistant Attorney General
Attorney for Complainant
Dated: _____

AGREED TO BY:

_____
Brandon Lewis Heitmann
Exigent Landscaping, LLC
Respondents
Dated: 6/13/2024

_____
Tyler Phillips (P78280)
Yousef M. Farraj (P79760)
Attorneys for Respondents
Dated: 6/14/2024

Bureau of Construction Codes
Approved by:

_____
Andrew Brisbo, Director

_____
Date

LF: 2023-0382720-B/Exigent Landscaping LLC, 2300622 - 2023-0382725-B/Heitmann, Brandon, 2300623 (Res Bldr)/Consent Order and Stipulation – 2024-06-06

5

# EXHIBIT O

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
BUREAU OF CONSTRUCTION CODES
BOARD OF RESIDENTIAL BUILDERS AND MAINTENANCE AND
ALTERATION CONTRACTORS

In the Matter of

BRANDON LEWIS HEITMANN                    Complaint No. 2300616
Residential Builder, Individual
License No. 24-23-00197

and

EXIGENT LANDSCAPING, LLC                  Complaint No. 2300759
Residential Builder, Company
License No. 26-23-00279
_____ /  CONSENT ORDER AND STIPULATION

CONSENT ORDER

A formal complaint was filed with the Board of Residential Builders and

Maintenance and Alteration Contractors on March 26, 2024, charging

Brandon Lewis Heitmann and Exigent Landscaping, LLC with having violated

sections 601(1), 604(b), 604(d), 604(l), 2411(2)(e), 2411(2)(j), 2404a, and 604(h) of the

Occupational Code, MCL 339.101 *et seq.*

The parties have stipulated that the Board may enter this consent order.

The Board has reviewed the stipulation contained in this document and agrees that

the public interest is best served by resolution of the outstanding complaint.

Therefore, the Board finds that the allegations of fact contained in the formal

complaint are true and that Respondents have violated sections 601(1), 604(d),

604(l), 2411(2)(e), 2411(2)(j), 2404a, and 604(h) of the Occupational Code.

Accordingly, for these violations, IT IS ORDERED:

Respondents' licenses are SUSPENDED for a minimum period of six months. The licenses shall be automatically reinstated upon completion of the suspension period, provided Respondents have complied with the terms of this consent order.

If either Respondent's license remains suspended for more than three years, that Respondent will be required to petition for reinstatement of the license in accordance with section 411(5) of the Occupational Code. Under this provision, the applicant must file an application on a form provided by the Department, pay the application processing fee, and file a petition to the Department and the Board stating reasons for reinstatement and including evidence that the person can and is likely to serve the public in the regulated activity with competence and in conformance with all other requirements prescribed by law, rule, or an order of the Department or Board.

Respondents are FINED $3,500.00, joint and severally, to be paid by check, money order, or cashier's check made payable to the State of Michigan (with complaint numbers 2300616 and 2300759 clearly indicated on the check or money order) and shall be payable within 90 days of the effective date of this order. The timely payment of the fine shall be Respondents' responsibility. The fine shall be mailed to: Department of Licensing and Regulatory Affairs, Bureau of Construction Codes, Compliance Division, P.O. Box 30255, Lansing, Michigan 48909.

Count II of the complaint, alleging a violation of section 604(b) of the Occupational Code, is DISMISSED.

Respondents shall direct all communications, except fines, required by the terms of this order to: LARA-BCC-RBS-Compliance@michigan.gov.

Respondents shall be responsible for all costs and expenses incurred in complying with the terms and conditions of this consent order.

Respondents shall be responsible for the timely compliance with the terms of this consent order, including the timely filing of any documentation. Failure to comply within the time limitations provided will constitute a violation of this order.

If Respondents violate any term or condition set forth in this order, they will be in violation of section 604(k) of the Occupational Code.

This order shall be effective 30 days from the date signed by the Chairperson or the Chairperson's designee, as set forth below.

Signed on _____

                                 MICHIGAN BOARD OF RESIDENTIAL
                                 BUILDERS AND MAINTENANCE AND
                                 ALTERATION CONTRACTORS

                                 By_____
                                      Chairperson

## STIPULATION

The parties stipulate as follows:

1.    Respondents do not contest the allegations of fact and law in the complaint. Respondents understand that, by pleading no contest, they do not admit the truth of the allegations but agree that the Board may treat the

3

allegations as true for resolution of the formal complaint and may enter an order treating the allegations as true.

2. The Director of the Bureau of Construction Codes, or his designee, must approve this consent order and stipulation before it is submitted to the Board for final approval.

3. Respondents understand and intend that, by signing this stipulation, they are waiving the right under the Occupational Code, rules promulgated under the Occupational Code, and the Administrative Procedures Act, MCL 24.201 *et seq.*, to require the Department to prove the charges set forth in the complaint by presentation of evidence and legal authority, and to present a defense to the charges. Should the Board reject the proposed consent order, the parties reserve the right to proceed to hearing.

4. This matter is a public record required to be published and made available to the public pursuant to section 11(1)(a) of the Michigan Freedom of Information Act, MCL 15.231 *et seq.*

5. The Board may enter the above consent order. An attorney from the Licensing and Regulation Division may discuss this matter with the Board in order to recommend acceptance of this resolution.

6. The parties considered the following factors in reaching this agreement:

> A. Both Respondents have obtained residential builder licenses since the construction of the pool in question.

4

B.   This consent order does not contemplate restitution because Respondents have filed for bankruptcy.

By signing this stipulation, the parties confirm that they have read, understand, and agree with the terms of the consent order.

AGREED TO BY:

_____
Jennifer Fitzgerald (P60109)
Assistant Attorney General
Attorney for Complainant
Dated: _____

AGREED TO BY:

_____
Brandon Lewis Heitmann
Exigent Landscaping, LLC
Respondents
Dated: 6/13/2024

_____
Tyler Phillips (P78280)
Yousef M. Farraj (P79760)
Attorneys for Respondents
Dated: 6/14/2024

Bureau of Construction Codes
Approved by:

_____
Andrew Brisbo, Director

_____
Date

LF: 2023-0382706-B/Exigent Landscaping LLC, 2200759 - 2023-0382708-B/Heitmann, Brandon, 2300616 (Res Bldr)/Consent Order and Stipulation – 2024-06-06

5

# EXHIBIT P

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

ALEX BOYD and REBECCA BOYD,
Husband and Wife

Case No. 23-003864-CZ
Hon. KATHRYN A. VIVIANO

     Plaintiff,

v

BRANDON HEITMANN, an Individual,
AMANDA PISARSKI, also known as
AMANDA HEITMANN, an Individual,
KODY GRANDCHAMP, an Individual,
HENRY GIRARD BELL, also known as
HANK BELL, an Individual,
CONSTRUCTION CONTRACTORS, LLC,
a Michigan Limited Liability Company, and
EXPLORE INDUSTRIES USA, INC.,
A Tennessee Corporation, doing business as
IMAGINE POOLS

     Defendant

---

LAW OFFICES OF JOHN F. HARRINGTON
BY: John F. Harrington (P40443)
Attorney for Plaintiff
30500 Van Dyke Avenue, Suite 200
Warren, MI 48093
(586) 751-3610
attysharrington@comcast.net

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

### COMPLAINT

There is no other pending or resolved civil action
arising out of the transaction or occurrence alleged
in the Complaint.

     /s/ John F. Harrington
     John F. Harrington (P40443)

1

NOW COMES the Plaintiffs, ALEX BOYD and REBECCA BOYD, Husband and Wife, by and through their attorneys, the LAW OFFICES OF JOHN F. HARRINGTON, by way of Complaint, hereby states as follows:

1. That, Plaintiffs, Alex Boyd and Rebecca Boyd, are Husband and Wife, residing in the Township of Macomb, County of Macomb, State of Michigan.

2. That, Defendant, Brandon Heitmann, is an Individual, conducting business in the Township of Shelby, County of Macomb, State of Michigan.

3. That, Defendant, Amanda Pisarski, also known as Amanda Heitmann, is an Individual, conducting business in the Township of Shelby, County of Macomb, State of Michigan.

4. That, Defendant, Kody Grandchamp, is an Individual, residing in the City of Livonia, County of Wayne, State of Michigan.

5. That, Defendant, Henry Girard Bell, also known as Hank Bell, is an Individual, conducting business in the Township of Washington, County of Macomb, State of Michigan.

6. That, Defendant, Construction Contractors, LLC., is a Michigan Limited Liability Company, in good standing, with its principle place of business in the Township of Washington, County of Macomb, State of Michigan.

7. That, Defendant, Explore Industries USA, Inc., is a Tennessee Corporation, in good standing, conducting business in the County of Macomb, State of Michigan, although not authorized to do so.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

2

8. That, this cause of action concerns events that occurred in the Township of Macomb, County of Macomb, State of Michigan, thus venue is proper before this Honorable Court.

9. That, the amount in controversy is in excess of $25,000.00, thus jurisdiction is proper before this Honorable Court.

## FACTUAL AVERMENTS

10. That, Alex Boyd and Rebecca Boyd, are Husband and Wife, (hereinafter "Boyds"), who own real property at 50639 Cheltenham Drive, in the Township of Macomb, County of Macomb, State of Michigan.

11. That, on or about May 14, 2021, the Boyds entered in a contract with Exigent Landscaping, LLC, for the design and construction of an in-ground swimming pool at their home.

12. That, the Boyds either met or communicated with, Defendants Heitmann, Pisarski, and Grandchamp. in their capacity as representatives of Exigent Landscaping, LLC, during the solicitation of the Boyds and ultimate execution of the contract, at which time said Defendants repeatedly stated that Exigent Landscaping, LLC was a licensed residential contractor.

13. That, in addition, said Defendants represented to the Boyds and Carter that Exigent Landscaping, LLC, was an authorized dealer of Imagine Pools.

14. That, in fact, Exigent Landscaping was an authorized dealer of Imagine Pools, as so authorized by the manufacturer, Defendant Explore Industries USA, Inc.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

3

15. That, Plaintiffs relied upon the fact that Exigent Landscaping, LLC, was an authorized dealer of Imagine Pools by Defendant Explore Industries USA, Inc., to ultimately enter in to a contract with Exigent Landscaping, LLC.

16. That, the May 14, 2021, contract even states, at the bottom of each page, "License #802082183", inferring that Exigent Landscaping, LLC, was a licensed residential contractor. (See Exhibit A)

17. That, in fact, Exigent Landscaping, LLC, was never a licensed residential contractor at any time during its relationship with the Boyds.

18. That, the Boyds paid the substantial portion of their respective contract price to Exigent Landscaping, LLC.

19. That, after execution of the contracts with the Boyds, Defendants Heirmann, Pisarski, and Grandchamp, knowingly and falsely represented to Macomb Township Building Officials that the Plaintiffs executed contracts with Defendant Construction Contractors, LLC, and Henry Girard Bell, (hereinafter "Bell").

20. That, based on said false representations, Macomb Township Building Officials approved permits for the construction of in-ground swimming pools at the Boyds' residence.

21. That, for the Boyds, Exigent Landscaping, LLC, and the Defendants failed to timely or properly construct a swimming pool, necessitating removal of their respective pools.

22. That, the Boyds have suffered damages well in excess of $25,000.00.

23. That, the Boyds have previously commenced arbitration proceedings against Exigent Landscaping, LLC, yet said proceedings have been stayed as Exigent Landscaping,

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

4

LLC, has filed for Chapter 11 Bankruptcy in the United Sates Bankruptcy Court for the Eastern District of Michigan.

## COUNT I

## FRAUDULENT MISPREPRESENTATION OF THE BOYDS BY
## DEFENDANTS HEITMANN, PISARSKI, and GRANDCHAMP

24. Plaintiffs hereby restate and reiterate allegations contained in paragraph 1 through 23 as if fully restated herein.

25. That, Defendants Heitmann, Pisarski, and Grandchamp, before, during, and after execution of the Exigent Landscaping, LLC, contract on May 14,2021, repeatedly advised the Boyds that Exigent Landscaping, LLC, was a licensed residential builder, and otherwise fully qualified and capable of building a swimming pool as agreed upon.

26. That, in fact, Exigent landscaping, LLC, was not a licensed residential builder nor was it qualified or capable of building a swimming pool.

27. That, said representations by Defendants Heitmann, Pisarski, and Grandchamp, were false and said Defendants knew they were false, or made them recklessly without regard of the truth.

28. That, said Defendants made these representations with the intent that the Boyds would act upon it, and the Boyds did, in fact, rely upon these false representations, by tendering to Exigent Landscaping, LLC, the vast majority of the $130,00.00 contract price.

29. That, the swimming pool installed by Exigent Landscaping, LLC, was not completed in a timely manner, but also constructed so defectively, that it mandates removal.

30. That, the Boyds never would have entered into a contract with Exigent Landscaping had they known that the company was not a licensed residential contractor, if

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

5

it were not for the intentional misrepresentaitons of Defendants Heitmann, Pisarski, and Grandchamp.

31. That, as such, the Boyds have suffered damages in an amount in excess of $25,000.00.

WHEREFORE, Plaintiffs Alex Boyd and Rebecca Boyd, hereby prays this Honorable Court enter a Judgment in their favor and against the Defendants, Brandon Heitmann, Amanda Pisarski, aka Amanda Heitmann, and Kody Grandchamp, jointly and severally, in an amount in excess of $25,000.00, plus costs, interest and reasonable attorney fees.

## COUNT II

## FRAUDULENT MISPRESENTAITON OF BOYDS BY HENRY GIRARD

## BELL and CONSTRUCTIUON CONTRACORS, LLC

32. Plaintiffs hereby restate and reiterate allegations contained in paragraphs 1 through 31 as if fully restated herein.

33. That, on or about October 12, 2021, and on numerous occasions thereafter, Defendants Bell and Construction Contractors, LLC, applied for and obtained building permits from Macomb Township Building Officials for the construction of an in-ground swimming pool at the Boyds' residence.

34. That, said Defendant falsely represented to Macomb Township that they were the contractors for the project, utilizing their respective residential builders' license number and expiration date.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

6

35. That, despite what said Defendants stated on the permit application, neither Defendant Bell nor Defendant Construction Contractors were involved in the project and neither had entered into a contract with the Boyds.

36. That, Defendants Bell and Construction Contractors intended for the Macomb Township Building Officials, and, in turn, the Boyds, to rely upon such misrepresentations., which the Township and the Boyds relied upon to their detriment.

37. That, as a result, the Boyds have suffered damages in an amount in excess of $25,000.00.

WHEREFORE, Plaintiffs Alex Boyd and Rebecca Boyd, hereby prays this Honorable Court enter a Judgment in their favor and against the Defendants, Henry Girard Bell, aka Hank Bell, and Construction Contractors, LLC, jointly and severally, in an amount in excess of $25,000.00, plus costs, interest and reasonable attorney fees.

## COUNT III

## SILENT FRAUD BY ALL DEFENDANTS

38. Plaintiffs hereby restate and reiterate allegations contained in paragraphs 1 through 37 as if fully restated herein.

39. That, all the Defendants had a duty to disclose to the Boyds that Exigent Landscaping, LLC, was not a licensed residential contractor, and that, instead, that they were using the licensure status of third parties, to fraudulently obtain Township approval for construction of a pool and the Boyds' residence.

40. That, the Defendants failure to disclose was misleading to the Boyds.

41. That, the Defendants knew that not disclosing would be misleading.

42. That, the Boyds relied on the Defendants failure to disclose.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

7

43. That, as a result, the Boyds suffered damages in an amount in excess of $25,000.00.

WHEREFORE, Plaintiffs Alex Boyd and Rebecca Boyd, hereby prays this Honorable Court enter a Judgment in their favor and against the Defendants, Brandon Heitmann, Amanda Pisarski, aka Amanda Heitmann, Kody Grandchamp, Henry Girard Bell, aka Hank Bell, and Construction Contractors, LLC, jointly and severally, in an amount in excess of $25,000.00, plus costs, interest and reasonable attorney fees.

## COUNT IV

## CIVIL CONSPIRACY BY ALL DEFENDANTS

44. Plaintiffs hereby restate and reiterate allegations contained in paragraphs 1 through 43 as if fully restated herein.

45. That, all the Defendants engaged in a concerted effort to defraud and otherwise make misrepresentation to the Boyds by falsely stating the Exigent landscaping, LLC was at all times a licensed residential builder, qualified and capable of competently completing construction of a swimming pool.

46. That, in addition, all the Defendant engaged in a concerted effort to misrepresent to Macomb Township Building Officials, and, in turn, the Boyds, that a licensed residential builder was constructing a swimming pool at the Boyds' residence.

47. That such concerted actions involved more two or more persons, and was done so to accomplish an unlawful purpose, or alternatively, a lawful purpose by unlawful means.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

8

48. That, the Defendants purpose was to obtain monies from the Boyds in exchange for untimely constructing a defective swimming pool and to not fulfill the Boyds expectations or Exigent Landscaping's contractual obligations.

49. That, as a result, the Boyds suffered damages in an amount in excess of $25,000.00.

WHEREFORE, Plaintiffs Alex Boyd and Rebecca Boyd, hereby prays this Honorable Court enter a Judgment in their favor and against the Defendants, Brandon Heitmann, Amanda Pisarski, aka Amanda Heitmann, Kody Grandchamp, Henry Girard Bell, aka Hank Bell, and Construction Contractors, LLC, jointly and severally, in an amount in excess of $25,000.00, plus costs, interest and reasonable attorney fees.

## COUNT V

## NEGLIGENCE OF EXPLORE INDUSTRIES USA, INC.

50. That, Plaintiffs hereby restate and reiterate their allegations contained in paragraphs 1 through 49 as if fully restated herein.

51. That, Defendant Explore Industries USA, Inc., doing business as Imagine Pools, designated Exigent Landscaping, LLC, as an authorized dealer of Imagine Pools, for sale and installation in the State of Michigan, even though Exigent Landscaping was not a licensed residential builder.

52. That, in order to install an in-ground swimming pool at a residential home in the State of Michigan, the installer must be a licensed residential contractor.

53. That, Defendant Explore Industries USA, Inc, had a duty to the consuming public, when designating an authorized dealer of Imagine Pools in the State of Michigan to select only a licensed residential builder.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

9

54. That, the Plaintiffs relied upon Defendant Explore Industries USA, Inc., designation of Exigent Landscaping as an authorized dealer of Imagine Pools when entering into an agreement with Exigent Landscaping, LLC.

55. That, as such, Defendant Explore Industries USA, Inc., breached its duty owed to the Plaintiffs.

56. That, because of Defendant Explore Industries USA, Inc., breach of its duty, the Boyds each suffered damages in an amount in excess of $25,000.00.

57. That, if not for the Defendant's breach plaintiffs would not have suffered any damages.

WHEREFORE, Plaintiffs Alex Boyd and Rebecca Boyd, hereby prays this Honorable Court enter a Judgment in their favor and against the Defendant Explore Industries USA, Inc., doing business as Imagine Pools, in an amount in excess of $25,000.00, plus costs, interest and reasonable attorney fees.

## COUNT VI

## NEGLIGENT MISREPRESNTATION BY EXPLORE INDUSTRIES USA, INC.

58. That, Plaintiffs hereby restate and reiterate their allegations contained in paragraphs 1 through 57 as if fully restated herein.

59. That, Defendant Explore Industries USA, Inc., doing business as Imagine Pools, made a material representation that Exigent Landscaping, LLC, was an authorized dealer and installer of Imagine Pools in the State of Michigan.

60. That, Exigent Landscaping, LLC, could not qualify to be an installer of in-ground swimming pools in the State of Michigan as it was not a licensed residential builder.

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

10

61. That, Defendant Explore Industries USA, Inc., designation that Exigent Landscaping, LLC, was an authorized dealer and installer of Image Pools, was a false representation, as Exigent Landscaping, LLC, could not act in such a capacity in the State of Michigan.

62. That, Defendant Explore Industries USA, Inc., negligently made said representation, breaching a duty owed to the Plaintiffs.

63. That, as a result, the Boyds have suffered damages in an amount in excess of $25,000.00.

WHEREFORE, Plaintiffs Alex Boyd and Rebecca Boyd, hereby prays this Honorable Court enter a Judgment in their favor and against the Defendant Explore Industries USA, Inc., doing business as Imagine Pools, in an amount in excess of $25,000.00, plus costs, interest and reasonable attorney fees.

LAW OFFICES OF JOHN F. HARRINGTON

BY:     /s/ John F. Harrington
**JOHN F. HARRINGTON (P40443)**
**Attorney for Plaintiff**
**30500 Van Dyke Avenue, Suite 200**
**Warren, MI 48093**
**(586) 751-3610**
**attysharrington@comcast.net**

Law Offices of
JOHN F. HARRINGTON
30500 Van Dyke Avenue
Suite 200
Warren, Michigan 48093
(586) 751-3610
(586) 751-3612 (Fax)

**Dated: November 9, 2023**

11



**Landscaping Estimate**

Date: 05-08-21

Rebecca and Alex Boyd
50639 Cheltenham Dr.
Macomb Twp., MI 48044
(586) 601-4648

Dear Rebecca,

Thank you for the opportunity to submit the following quotation. We would love to get this project on our schedule. Listed below is a complete breakdown of the scope of work.

**Scope of Work**

## Preparation - $1,500

- Remove existing patio
- Haul away and dispose of all materials
- Switch gate position of gate on south side of house



*Illusion by Imagine Pools*

## Fiberglass Swimming Pool - $88,203

- **Pool in picture above is the pool we quoted other features in picture not included unless specified below.**
- Imagine Pool, Illusion 35
    - Size: 35x15.5', depth 4'4" to 6'6"
- Includes 2 skimmers, 2 main drains, and return fittings - $31,900
- Delivery of pool, crane operator - $9,000
- Installation, dig hole, remove all dirt - $8,500
- Pea Gravel backfill and underpool for drainage
    - 120 tons = $5,800
- Concrete flatwork including pad for equipment tie rebar into pool structure for under brick pavers
- Coping: Cantilever coping approx. 105 linear ft.= $2,415
- Area of white concrete for pool equipment pad= $800

License #: 802082183
Phone: (586) 383-8308

- Permits and plans for city for pool= $2,500
- *Extra ~$1,500 if survey needed for city, not included in total price*

### Plumbing - $6,988

- Plumbing equipment pad also skimmer, return and main drains - $6,500
- 200 feet of 2" flex line= $488



*Illusion Shell by Imagine Pools*

### Electrical/Gas $7,000

- Run electrical and wire in all pool equipment, pass all inspections, pull permits. $4,500
- Trench conduit for electrician 18 " deep trenched $500
- Trench as line 18"for boiler $500
- Licensed plumber come in run gas line pass depth test/air test $1,500

### Pool Equipment/Accessories - $13,300

- Cartridge filter= $950
- 1.5 HP Variable speed pump= $1,200
- (3) LED lights= $850 x 3= $2,550
- Intellibrite controller for lights= $350
- Heater 200k BTU - $2,500
- Salt Chlorine system $2,200
- 
- Automation system - $2,500
- Automation setup so every feature is controlled from cell phone app - $500
- Mesh cover with anchors, material + install
- Pool Vacuum

### Concrete - $17,612.50

- Frame for concrete slabs
- Install base rock and compact
- Install rebar/wire
- Pour concrete into the mold
- Screed the top of the concrete
- Float concrete surface to compact
- Make control joints every 5 to 6 feet with groover

License #: 802082183
Phone: (586) 383-8308

- Slope will be away from home

- Type of concrete:
  - Dyed concrete

AB

Dimensions: *Stain & seal existing walkway - KY*

1. Pool deck: Level with grade, retaining wall installed in back and on sides to handle slope
   a. Approx. 1,325 sq. ft. x $11.50= $15,237.50
   b. Retaining wall to support slope: Approx. 65 phase ft. x $25= $1,625
   c. Steps: Approx. 30 phase ft. x $25= $750

## Fence - $4,900

- Price below includes material, delivery, and labor to install fence and installing pins into concrete
- Water Warden pool fence safety system
  - Need 10 sections
- Plus 1 Water Warden gate

## Finishing Touches - $1,500

- Re-sod backyard and fix/reroute all sprinkler lines
- Clean up property of all trash, blow away all unwanted debris, sweep/wash debris of patio/walkway(s)

**This proposal Includes a mesh cover with anchors and installation, and includes a Robot Vacuum (usually additional $7,500 for both, only additional $4,259.50 with this deal)

Includes power wash/seal front walkway apprx 80 sq foot

→ **Total Investment before discount - $117,425**

→ **-$3,975 Discount with $55,000 down upon signing**
→ **Total Investment after Discount - $113,450**

_____

Homeowner's Initials Acknowledging Total Investment+Progress Payment Schedule

## PROGRESS PAYMENTS*

- Down payment to book spot in line - $55,000
- Progress payment: 1-2 weeks before work is started on site - $25,000
- Progress payment: Pool is delivered - $20,000
- Progress payment: Concrete is delivered - $7,000
- Final payment upon completion - $6,450 + *any additional add-ons added on after initial contract signing*

*Note that if for any progress payment homeowner chooses to pay with a credit card, there will be an additional 3% convenience fee added to amount.**

**The 3% fee is an additional fee and does not count towards the rest of the progress payments.

## Terms & Conditions of this quote, as well as any change order thereafter-

License #: 802082183
Phone: (586) 383-8308

These terms & conditions protect Exigent Landscaping, LLC as well as the homeowner if any issues should arise.

Please review carefully.

## General Contract Terms:

1. Exigent's employees stand behind all their work, if any problems with install come up, contact us.
2. Add-ons/extras must be paid upon completion or immediately.
3. Both parties are entitled to a filled out copy of agreement, signed by homeowner and contractor.
4. By signing, homeowner agrees to everything stated in contract.
5. If there is a change order, a revision will be sent through email.
6. Before work is started on property, Exigent will call Miss Dig to mark utilities. Please do not disturb these markings as they are important to us to know where these utilities are at time of project. If any sprinkler lines are damaged by Exigent we will fix it and homeowner will not incur cost. We are not liable for any other damaged utility lines, including but not limited, to cable, gas, water, etc.
7. If an item is not stated in this contract, it is NOT included. Nothing in designs are included if they are not listed on here, ex. Outdoor furniture, coping on steps, etc. Designs only provide homeowner with a vision, they are never 100% exact.
8. All prices in any contract provided by Exigent are only good for 30 days from the date listed in the top right corner of front page of quotes. After 30 days, prices may rise due to changes in gas prices, material prices rising, etc.
9. Return check fee= $40
10. For any interior work, Exigent asks homeowner to please remove all valuables from room and cover any furniture with plastic/tarps as dust/debris may collect during work.
11. If an item/service listed in this contract can no longer be performed/purchased by Exigent once job is started for whatever reason, Exigent is no longer liable to perform/purchase item/service and homeowner will be notified and fully refunded for that item/service. Ex. if type of paver(s) get discontinued, etc.
12. Exigent is not responsible for pets that get loose. Exigent is also not responsible if they hit an invisible fence line. This must be marked out by homeowner before Exigent initiates work.
13. Exigent will clean up job sites end of day as best as possible, however, homeowner's property/surrounding area(s) will not be cleaned up 100% until Exigent is completely finished with the job.
14. If another contractor/company is ever present during the course of Exigent's working period, Exigent can not be held liable for any damage that occurs to the homeowner's property.
15. If a permit/architect plan payment is not listed above, but becomes needed at any point during project, a charge will incur a minimum of $150 to a maximum of $3,000 depending on size of project.
16. In pool quotes, water is not included in the quote. We will fill pool with homeowner's water. Covers are also not included unless stated otherwise in pool section of quote.
17. Exigent is not responsible for soil baring capacity. We strongly encourage homeowner to hire a geo technical engineer before Exigent starts work.
18. If city/HOA/engineer/etc. ever requires extra work/material needed to be done to scope of work that is not listed in the contract above, Exigent is not responsible for the extra fees.
19. We are not responsible for patio drainage.
20. If there is a high water table on homeowner's property, Exigent is not responsible for pumping fees.
21. If final payment, including payment of all change orders, is not received on the day of completion, payment is subject to late fees. If payment is not received after 30 days, Exigent is subject to place a lien on homeowner's property. If at any point during the project a progress payment is not paid, Exigent reserves the right to commence work until payment is received.
22. We are not responsible for HOA approval.
23. Down payments are non-refundable.
24. Agreeing to a price or add-on via text message or email omits the need for a signature for that particular item/change order.
25. I will allow Exigent Landscaping to use pictures of my property for marketing purposes indefinitely. The pictures will only be taken on the property while work is being done to show the progress of the job and the

License #: 802082183
Phone: (586) 383-8308

only pictures taken after work is completed will be taken when Exigent/Brandon has permission to enter property.

26. Once contract is signed, homeowner agrees to make no changes to contract that will lower the contract signing price by 20% or more.
27. Unknown conditions are not Exigent's responsibility.
28. All claims and disputes arising under or relating to this Contract are to be settled by binding arbitration in the state of Michigan or another location mutually agreeable to the parties. An award of arbitration may be confirmed in a court of competent jurisdiction.

## Materials:

1. Materials cannot be changed once purchased by Exigent. Location of patio, ledgerock, limestone, etc. cannot be changed once base has begun to be dug by Exigent. If homeowner no longer wants material that was already purchased, homeowner is responsible for return fee.
2. If more material is needed for any scope of work, sqft or cost per item will be re-measured and multiplied by amount charged.
3. Any leftover materials/tools are property of Exigent. In many cases we have to purchase full pallets of brick, or an even tonnage of limestone from our supplier, but the homeowner is only paying for what is listed on quote/invoice.
4. All concrete types (white, stamped, and aggregate) are mixed on site before being poured by our concrete company. Color will almost never be exact as color promised, however 90% of time concrete will be <u>very</u> similar. Exigent is not responsible if color is not exact. Patio/walkway/etc. will be installed as is. If color is not to homeowner's standards, Exigent is not responsible to rip out patio/walkway/etc. or pay for new concrete load.
5. Plant sizes and/or species may have to be substituted upon availability.
6. If homeowner purchases any material, we are not responsible for the trash/debris associated with that material. As well as if homeowner has other contractor(s) on site, we are not responsible for their trash/debris.

## Warranties:

1. Exigent is not responsible for any weeds after install. Weedblock/landscape fabric is not a guarantee.
2. It is homeowner's responsibility to maintain all aspects of landscaping after install. A professional company should be hired afterwards to maintain all living items such as trees, shrubs, etc. as well as any maintenance needed/desired for hardscape.
3. Exigent is not responsible for damage to existing concrete driveways/sidewalks/walkways on homeowner's property. Exigent's machines are made to not crack cement, however, if the cement does crack that means the base was never installed properly and Exigent cannot be held responsible.
4. Exigent warranties white concrete/exposed aggregate/stamped concrete for 1 month after install.
5. Exigent provides a 3-year limited warranty on brick paver labor. If a brick paver itself cracks or is damaged, all manufacturers have a lifetime warranty and Exigent will just charge a $95 service fee for labor to come out to replace it. The warranty covers settling and paver shifting. Warranty does not cover self-inflicted damage, salt damage, or causes by natural disaster(s).
6. Some paver blocks may tend to chip. Exigent is not responsible for any chips in block. Unfortunately, we have no control over the pallet choice at our supplier. However, we will do our best to hide chips in block.
7. Exigent does not manufacture its brick pavers, therefore, if paver(s) produce efflofloresence Exigent will not be held liable and they will not compensate homeowners for new pavers nor will they re-install new ones without charging for additional labor and materials. However, Exigent will help homeowner coordinate with Pavers' Manufacturer to see what the Manufacturer can do for homeowner.

License #: 802082183
Phone: (586) 383-8308

8. Exigent provides a 1 year warranty on all composite decks. The warranty covers only issues with labor that arise, this warranty does not cover physical damage to deck, damage to wood, or damage caused by natural disasters or self-inflicted damage.

9. In-lite lights come with a 3-year limited warranty. Exigent warranties their labor in installing them for 1 year. Warranty doesn't cover physical damage, self-inflicted damage, damage caused by natural disasters, or water damage.

10. There are no warranties on plants/shrubs/trees/flowers.

11. There is no warranty on re-planted/transplanted plants/shrubs/trees/flowers.

12. There are no warranties on sod/seed and straw.

13. Exigent is not responsible for any rotting wood after install.

14. Exigent is not liable for any damage caused to any scope of work due to natural disasters.

15. Warranties on all products bought from suppliers, other than pavers and paver block, such as outdoor fridges, outdoor/indoor fireplaces, outdoor sinks, etc. all follow original manufacturers' warranties. Exigent does not provide any extra warranty on these products.

16. Any and all invoices not paid in full will result in no warranty on work completed by Exigent.

**Homeowner's Signature (as well as initial on investment amount):**

Name ___Alex Boyd_____ Date: 05-14-21

Signature _____

**Exigent's Salesman's Signature:**

Name ___Kody Grandehamp___ Date: 5-14-21

Signature _____

# EXHIBIT Q

IN RE:

**BRANDON HEITMANN**

**Case No. 24-41956-mar**
**Chapter 13**
**Hon. Mark A. Randon**

    **Debtor**

_____/

**DANIEL CATER**

**Adversary Proceeding**
**Case No.**

    **Plaintiff**

**v.**

**BRANDON HEITMANN**

    **Defendant/Debtor**

_____/

**LAW OFFICES OF JOHN F. HARRINGTON**
**BY: John F. Harrington (P40443)**
**Attorney for Plaintiff**
**30500 Van Dyke Ave., Ste. 200**
**Warren, MI 48093**
**(586) 751-3610**
**attysharrington@comcast.net**

**Robert N. Bassel (P48420)**
**Attorney for Debtor Heitmann**
**P.O. Box T**
**Clinton, MI 49236-0000**
**(248) 677-1234**
**bbassel@gmail.com**

_____/

## COMPLAINT TO DENY DISCHARGE

    NOW COMES the Plaintiff, Daniel Carter, by and through the Law Offices of John F.

Harrington, and by way of Complaint to Deny Discharge, hereby states as follows:

    1. That, Plaintiff, Daniel Carter, is an individual residing in the Township of Macomb,

County of Macomb, State of Michigan, as well is a Creditor in the Chapter 13 Bankruptcy

Proceeding of Defendant, Brandon Heitmann.

2.   That, Defendant, Brandon Heitmann, is an individual residing in the Township of Washington, County of Macomb, State of Michigan, as well as the Debtor in the underlying Bankruptcy case.

## JURISDICTION AND VENUE

3.   That, Plaintiff brings this cause of action pursuant to 11 USC Sec. 523(a)(2)(A); 11 USC Sec. 523(a)(2)(b); 11 USC Sec. 523(a)(4), and 11USC Sec. 523(a)(6), seeking to determine that Defendant's debt to the Plaintiff is non-dischargeable under the aforementioned federal statutes.

4.   That, this Honorable Court has jurisdiction over this Adversary Proceeding pursuant to 28 USC Sec. 1334, as well as pursuant to 28 USC Sec. 157.

5.   That, venue lies in the Eastern District of Michigan,  pursuant to 28 USC Sec. 1408(1) and 28 USC Sec. 1409(a).

## STATEMENT OF FACTS

6.   That, Plaintiff is the owner of real property at 22162 Chaucer Court, in Macomb Township, Michigan.

7.   That, on or about September 30, 2021, Plaintiff entered into a contract with Exigent Landscaping, LLC, though its agent and sole member, Defendant Brandon Heitmann, for the design and construction of an in-ground swimming pool at Plaintiff's residence. (See Exhibit A)

8.   That, during this time frame, representations were made to Plaintiff by the Defendant that both himself and Exigent landscaping, LLC, were licensed residential builders.

9.   That, the September 30, 2021 contract even states at the bottom of each page "License #802082183", inferring that Exigent Landscaping, LLC, was a licensed residential builder.

10.   That, in fact, neither Defendant or Exigent Landscaping, LLC, were licensed residential contractors during its relationship with Plaintiff.

–2–

11. That, after execution of the contract and during the permit application process, unbeknownst to Plaintiff, the Defendant knowingly and falsely represented to Macomb Township Building Officials that Plaintiff contracted with licensed residential builders Construction Contractors, LLC, and Henry Girard Bell.

12. That, based on said false representations, Macomb Township Building Officials approved permits for the construction of an in-ground swimming pool at Plaintiff's residence.

13. That, Plaintiff paid the substantial portion of the contract price to exigent Landscaping, LLC.

14. That, Defendant and his business, Exigent Landscaping, LLC, failed to properly construct a swimming pool, necessitating removal of the pool and otherwise causing substantial monetary damages to be suffered by the Plaintiff.

## COUNT I

### DETERMINATION THAT DEBT IS NON-DISCHARGEABLE PURSAUNT TO USC SEC. 523(a)(2) and (b), 11 USC SEC. 523(a)(4), and 11 USC SEC. 523(a)(6), FOR BREACH OF CONTRACT

15. That, Plaintiff hereby restates and reiterates the allegations contained in paragraphs 1 through 14 as if fully restated herein.

16. That, as set forth in the Statement of Facts, Defendant, as sole member of Exigent Landscaping, LLC, owed a fiduciary duty to Plaintiffs, including but not limited to, duty of fair and honest dealings.

17. That, however, Defendant violated said fiduciary duty by falsely representing to Plaintiff and others that he and his business were licensed residential builders, and otherwise competent to install an in-ground swimming pool.

18. That, Plaintiff provided and otherwise fulfilled all of his conditions, covenants, and promises required to meet all obligations due and owing to the Defendant and his business, yet

–3–

Defendant engaged in multiple breaches of said obligations due and owing to the Plaintiff, causing monetary damages to the Plaintiff.

19. That, as such, Plaintiff's are entitled to have Defendant's debt to the Plaintiff determined to be non-dischargeable, pursuant to 11 USC Sec. 523(a)(2)(A); 11 USC Sec. 523(a)(2)(B); 11 USC Sec. 523(a)(4); and 11 USC Sec. 523(a)(6).

WHEREFORE. Plaintiff, Daniel Carter, hereby prays this Honorable Court enters an Order finding that Defendant, Brandon Heitmann, is not entitled to discharge debts due and owing to Plaintiff.

## COUNT II

### DETERMINATION THAT DEBT IS NON-DISCHARGEABLE PURSUANT TO 11 USC SEC. 523(a)(4) and 523(a)(6)

20. That, Plaintiff hereby restates and reiterates his allegations in paragraphs 1 through 19 as if fully restated herein.

21. That, as set forth in the Statement of Facts, the Defendant deliberately and falsely represented to Plaintiff that both himself and his company, Exigent Landscaping, LLC,, that their were licensed residential builders and otherwise a competent contract capable of installing an in-ground swimming pool.

22. That, Defendant's representations were made with the intent to induce Plaintiff to enter into a contract with Exigent Landscaping, LLC.

23. That, Defendant's representations were, in fact, false, made with the intent to deceive Plaintiff.

24. That, Plaintiff was unaware of the Defendant's false representations and relied to his detriment on these misrepresentations.

25. That, based on Defendant's intentional misrepresentations to Plaintiff, the debt owed

–4–

to him by the Defendant must be determined nondischargeable pursuant to 11 USC Sec. 523(a)(4) and 11 USC Sec. 523(a)(6).

WHEREFORE. Plaintiff, Daniel Carter, hereby prays this Honorable Court enters an Order finding that Defendant, Brandon Heitmann, is not entitled to discharge debts due and owing to Plaintiff.

LAW OFFICES OF JOHN F. HARRINGTON

Date: September 5, 2024

By: /s/ John F. Harrington
John F. Harrington (P40443)
Attorney for Plaintiffs,
30500 Van Dyke Avenue, Suite 200
Warren, Michigan 48093
(586) 751-3610 phone/(586) 751-3612 fax
attysharrington@comcast.net

# EXHIBIT A



Landscaping Estimate

Date: 09-24-2021

Dan Carter
22162 Chaucer Ct.
Macomb, MI

Dear Dan,

Thank you for the opportunity to submit the following quotation. We would love to get this project on our schedule. Listed below is a complete breakdown of the scope of work.

**Scope of work**



*Illusion by Imagine Pools*

**Fiberglass Swimming Pool - $80,250**

- Pool in picture above is the pool we quoted other features in picture not included unless specified below.
- Imagine Pool, Illusion 35
  - Pool Size: 15'6" x 35', depth 4'4" to 6'6"
- Pool: Includes 2 skimmers, 2 main drains, and return fittings - $23,650
- Installation, dig hole, remove all dirt, delivery of pool - $13,000
- Cracked Cobble backfill and underpool for drainage
  - 120 tons = $5,800
- Cantilever edge = 115 linear ft. - $3,000
- Permits and plans for city for pool= $5,000

License #: 802082183
Phone: (586) 383-8308



*Illusion Shell by Imagine*

Electrical - $5,500
- Run electrical and wire in all pool equipment, pass all inspections, pull permits
- Trench conduit for electrician 18 " deep trenched
- Trench as line 18"for boiler
- Licensed plumber come in run gas line pass depth test/air test

Pool Equipment/Accessories - $15,150 (listed below)
- Clean and clear cartridge filter= $2,000
- 2.7 HP Superflow VST pump= $2,900
- Heater 300K BTU - $3,900
- (3) LED ColorBright lights
  - 3 x $1,000= $3,000

Optional Equipment (included in total):
- **Salt Chlorine system** - $2,500
- Intellibrite controller for lights= $850

Pool Plumbing - $9,150 (listed below)
- Plumbing equipment pad - $8,500
- 200 feet of 2" flex line= $650

Concrete - $16,800
- Frame for concrete slabs
- Install base rock and compact
- Install rebar/wire

License #: 802082183
Phone: (586) 383-8308

- Pour concrete into the mold
- Screed the top of the concrete
- Float concrete surface to compact
- Make control joints every 5 to 6 feet with groover
- Slope will be away from home

- Type of concrete:
    - Stained grey concrete
    - Diamond cuts

Dimensions:

1. Adding onto existing deck
    a. Approx. 1,800 sq. ft. = $16,800
    b. Included in the 1800 sq is side steps out of concrete on side of the house

## Plantings - $11,967

- Excavate for plants that have been approved by homeowner
- Install all plants
- Excavate 1.5X height and 2X width of plant
- Each plant will be installed with fresh topsoil and native soil to ensure proper growth
    - Topsoil: Approx. 15 yds. x $95= $1,425
- Location of plants are specified in plan

- Plants to be installed:

- (4) Boxwood Hedge 12": 4 x $81 = $324
- (27) Maidenhar Grass 6": 27 x $24 = $648
- (5) Crimson King 1 1/2 #25: 5 x $381 = $1,905
- (6) Drift Rose 8": 6 x $84 = $504
- (1) River Birch 8': 1 x $489 = $489
- (24) Green Giant #5 Arborvitae: 24 x $165 = $3,960
- (3) Norway Spruce: 3 x $570 = $1,710
- (18) Coneflowers 6": 18 x $30 = $540
- (1) Ornamental Crab 1 1/4 #15: 1 x $270 = $270
- (4) Dwarf Hydrangea 6": 4 x $24 = $96
- (4) Perennial Geranium 6": 4 x $24 = $96

## Steppers - $4,000

- Preparing and installing (9) 3'x3' steppers

## Sod/sprinklers $10,990

- 50 yards of topsoil included
- Shrub zones included
- 7 zones installed

## Finishing Touches - $960
- Bury downspouts around entire home 4 downspouts

## Mesh cover with anchors $3,000

License #: 802082183
Phone: (586) 383-8308

## Free gas firepit made out of brick pavers

## Aluminum fence $4,900
- Approx 220 linear foot x $22 linear foot
- 36 gate with magnalatch

## 2 Led bubblers included
## Trench approx 15 linear foot 18" deep (homeowner to run plumbing)
## Includes mulch around plants
## Includes pool water

→ **END of the Month special pricing Total Investment $130,000**



**Homeowner's Initials Acknowledging Total Investment+Progress Payment Schedule**

PROGRESS PAYMENTS*

- 25% down payment to book spot in line + Progress payment: 2-4 weeks before work is started on site =$35,000
- Progress payment: Pool shell arrives - $35,000
- Progress payment: Pool system running $15,000
- Progress payment: Concrete complete - $16,000
- Progress payment: Plants installed - $10,000
- Progress payment sod and sprinklers completed $10,000
- Final payment upon completion - $9,000 + *any additional add-ons added on after initial contract signing*

*Note that if for any progress payment homeowner chooses to pay with a credit card, there will be an additional 3% convenience fee added to amount.**

**The 3% fee is an additional fee and does not count towards the rest of the progress payments.

Estimated Start Date:
- *Contingent on: Weather, Certain Material Availability, and Building Permit Issuance*

## Terms & Conditions of this quote, as well as any change order thereafter-

These terms & conditions protect Exigent Landscaping, LLC as well as the homeowner if any issues should arise.

Please review carefully.

## General Contract Terms:

1. Exigent's employees stand behind all their work, if any problems with install come up, contact us.
2. Add-ons/extras must be paid upon completion or immediately.
3. Both parties are entitled to a filled out copy of agreement, signed by homeowner and contractor.
4. By signing, homeowner agrees to everything stated in contract.
5. If there is a change order, a revision will be sent through email.

License #: 802082183
Phone: (586) 383-8308

DocuSign Envelope ID: 720AD78D-2E87-4D5F-B29C-62DA6958743E

6. Before work is started on property, Exigent will call Miss Dig to mark utilities. Please do not disturb these markings as they are important to us to know where these utilities are at time of project. If any sprinkler lines are damaged by Exigent we will fix it and homeowner will not incur cost. We are not liable for any other damaged utility lines, including but not limited, to cable, gas, water, etc.
7. If an item is not stated in this contract, it is NOT included. Nothing in designs are included if they are not listed on here, ex. Outdoor furniture, coping on steps, etc. Designs only provide homeowner with a vision, they are never 100% exact.
8. All prices in any contract provided by Exigent are only good for 30 days from the date listed in the top right corner of front page of quotes. After 30 days, prices may rise due to changes in gas prices, material prices rising, etc.
9. Return check fee= $40
10. For any interior work, Exigent asks homeowner to please remove all valuables from room and cover any furniture with plastic/tarps as dust/debris may collect during work.
11. If an item/service listed in this contract can no longer be performed/purchased by Exigent once job is started for whatever reason, Exigent is no longer liable to perform/purchase item/service and homeowner will be notified and fully refunded for that item/service. Ex. if type of paver(s) get discontinued. etc.
12. Exigent is not responsible for pets that get loose. Exigent is also not responsible if they hit an invisible fence line. This must be marked out by homeowner before Exigent initiates work.
13. Exigent will clean up job sites end of day as best as possible, however, homeowner's property/surrounding area(s) will not be cleaned up 100% until Exigent is completely finished with the job.
14. If another contractor/company is ever present during the course of Exigent's working period. Exigent can not be held liable for any damage that occurs to the homeowner's property.
15. If a permit/architect plan payment is not listed above, but becomes needed at any point during project, a charge will incur a minimum of $150 to a maximum of $3,000 depending on size of project.
16. In pool quotes, water is not included in the quote unless otherwise stated. We will fill pool with homeowner's water if water delivery is not stated. Covers are also not included unless stated otherwise in pool section of quote.
17. Exigent is not responsible for soil boring capacity. We strongly encourage homeowner to hire a geo technical engineer before Exigent starts work.
18. If city/HOA/engineer/etc. ever requires extra work/material needed to be done to scope of work that is not listed in the contract above, Exigent is not responsible for the extra fees.
19. We are not responsible for existing patio or cement drainage not installed by Exigent.
20. If there is a high water table on homeowner's property, Exigent is not responsible for pumping fees.
21. If final payment, including payment of all change orders, is not received on the day of completion, payment is subject to late fees. If payment is not received after 30 days, Exigent is subject to place a lien on homeowner's property. If at any point during the project a progress payment is not paid, Exigent reserves the right to commence work until payment is received.
22. We are not responsible for HOA approval.
23. Up to 40% of the down payment may not be refundable due to costs already incurred on Exigent's part depending when contact/project is terminated by homeowner.
24. Agreeing to a price or add-on via text message or email omits the need for a signature for that particular item/change order.
25. I will allow Exigent Landscaping to use pictures of my property for marketing purposes indefinitely. The pictures will only be taken on the property while work is being done to show the progress of the job and the only pictures taken after work is completed will be taken when Exigent/Brandon has permission to enter property.
26. We do not remove large trees. Please ensure if we will be installing a patio/pool/etc. where a tree is currently present, it is removed (roots and all) before our arrival. If roots remain we may charge fee to remove/haul away.
27. Once contract is signed, homeowner agrees to make no changes to contract that will lower the contract signing price by 20% or more.
28. Unknown conditions are not Exigent's responsibility.

License #: 802082183
Phone: (586) 383-8308

DocuSign Envelope ID: 720AD78D-2E87-4D5F-B29C-62DA6958743E

29. All claims and disputes arising under or relating to this Contract are to be settled by binding arbitration in the state of Michigan or another location mutually agreeable to the parties. An award of arbitration may be confirmed in a court of competent jurisdiction.

## Materials:

1. Materials cannot be changed once purchased by Exigent. Location of patio, ledgerock, limestone, etc. cannot be changed once base has begun to be dug by Exigent. If homeowner no longer wants material that was already purchased, homeowner is responsible for return fee.
2. If more material is needed for any scope of work, sqft or cost per item will be re-measured and multiplied by amount charged.
3. Any leftover materials/tools are property of Exigent. In many cases we have to purchase full pallets of brick, or an even tonnage of limestone from our supplier, but the homeowner is only paying for what is listed on quote/invoice.
4. All concrete types (white, stamped, and aggregate) are mixed on site before being poured by our concrete company. Color will almost never be exact as color promised, however 90% of time concrete will be very similar. Exigent is not responsible if color is not exact. Patio/walkway/etc. will be installed as is. If color is not to homeowner's standards, Exigent is not responsible to rip out patio/walkway/etc. or pay for new concrete load.
5. Plant sizes and/or species may have to be substituted upon availability.
6. If homeowner purchases any material, we are not responsible for the trash/debris associated with that material. As well as if homeowner has other contractor(s) on site, we are not responsible for their trash/debris.

## Warranties:

1. Exigent is not responsible for any weeds after install. Weedblock/landscape fabric is not a guarantee.
2. It is homeowner's responsibility to maintain all aspects of landscaping after install. A professional company should be hired afterwards to maintain all living items such as trees, shrubs, etc. as well as any maintenance needed/desired for hardscape.
3. Exigent is not responsible for damage to existing concrete driveways/sidewalks/walkways on homeowner's property. Exigent's machines are made to not crack cement, however, if the cement does crack that means the base was never installed properly and Exigent cannot be held responsible.
4. Exigent warranties white concrete/exposed aggregate/stamped concrete for 1 month after install.
5. Exigent provides a 3-year limited warranty on brick paver labor. If a brick paver itself cracks or is damaged, all manufacturers have a lifetime warranty and Exigent will just charge a $95 service fee for labor to come out to replace it. The warranty covers settling and paver shifting. Warranty does not cover self-inflicted damage, salt damage, or causes by natural disaster(s). Warranty does not include polymeric sand between pavers, this is a product that requires maintenance and cannot fall under our warranty.
6. Some paver blocks may tend to chip. Exigent is not responsible for any chips in block. Unfortunately, we have no control over the pallet choice at our supplier. However, we will do our best to hide chips in block.
7. Exigent does not manufacture its brick pavers, therefore, if paver(s) produce effloflioresence Exigent will not be held liable and they will not compensate homeowners for new pavers nor will they re-install new ones without charging for additional labor and materials. However, Exigent will help homeowner coordinate with Pavers' Manufacturer to see what the Manufacturer can do for homeowner.
8. Exigent provides a 1 year warranty on all composite decks. The warranty covers only issues with labor that arise, this warranty does not cover physical damage to deck, damage to wood, or damage caused by natural disasters or self-inflicted damage.
9. In-lite lights come with a 3-year limited warranty. Exigent warranties their labor in installing them for 1 year. Warranty doesn't cover physical damage, self-inflicted damage, damage caused by natural disasters, or water damage.
10. There are no warranties on plants/shrubs/trees/flowers.
11. There is no warranty on re-planted/transplanted plants/shrubs/trees/flowers.

License #: 802082183
Phone: (586) 383-8308

12. There are no warranties on sod/seed and straw.
13. Exigent is not responsible for any rotting wood after install.
14. Exigent is not liable for any damage caused to any scope of work due to natural disasters.
15. Warranties on all products bought from suppliers, other than pavers and paver block, such as outdoor fridges, outdoor/indoor fireplaces, outdoor sinks, etc. all follow original manufacturers' warranties. Exigent does not provide any extra warranty on these products.
16. Any and all invoices not paid in full will result in no warranty on work completed by Exigent.

**Homeowner's Signature (as well as initial on investment amount):**

Name _____ Dan Carter _____ Date: 9/30/2021

Signature _____

**Exigent's Salesman's Signature:**

Name _____ Brandon Heitmann _____ Date: 9/30/2021

Signature _____

License #: 802082183
Phone: (586) 383-8308

# EXHIBIT R

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

BRANDON HEITMANN,

      Debtor.

_____/

RATNESH MEHRA,

    Plaintiff,

v.

BRANDON HEITMANN,

    Defendant.

_____/

Chapter 7
Case No. 24-41956-MAR
Hon. Mark A. Randon

Adv. Pro. No.

## **<u>COMPLAINT</u>**

Ratnesh Mehra, Plaintiff ("Plaintiff"), by his attorneys OSIPOV
BIGELMAN, P.C., states for his Complaint as follows:

### **Jurisdiction**

1.    This is an adversary proceeding in bankruptcy brought by Plaintiff
pursuant to Bankruptcy Rule 7001(4).

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §
157(b)(1) and (b)(2)(I) and 28 U.S.C. § 1334.

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I).

## Parties

4.      Plaintiff Ratnesh Mehra ("Plaintiff") is an individual and owns real property located at 232 Forest Ave, Royal Oak, Michigan ("Property").

5.      Defendant Brandon Heitmann ("Heitmann") is an individual residing at 60749 Forest Creek, Washington Township, Michigan 48094.

6.      At all times relevant to this Complaint, Heitmann was the resident agent, president, authorized agent, and the sole and managing member of Exigent Landscaping, LLC[1] ("Exigent").

## Factual Statement

7.      On or about August 7, 2023, Exigent filed a voluntary Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Eastern District of Michigan, commencing Case No. 23-46912-tjt.  The case was assigned to Judge Thomas J. Tucker.  On or about February 12, 2024, Judge Tucker converted Exigent's Chapter 11 bankruptcy case to Chapter 7.

8.      On or about February 29, 2024, Heitmann filed a voluntary Chapter 13 petition in the U.S. Bankruptcy Court for the Eastern District of Michigan, commencing Case No. 24-41956-mar.

9.      On or about February 25, 2025, Heitmann converted his case to Chapter 7 of the Bankruptcy Code.

---

[1] Heitman and Exigent Landscaping, LLC may be collectively referred to herein as "Contractor".

10.     Heitmann and Exigent were engaged in the residential building and construction industry.  In particular, Heitmann and Exigent held themselves out to the world as contractors who were licensed and competent to build and install custom swimming pools.

11.     A residential builder's license is required to engage in such work in Michigan, pursuant to M.C.L. § 339.2401, *et. seq.*

12.     On or about May 14, 2020, Plaintiff entered into a contract ("Contract") with Exigent for the construction of a custom swimming pool at the Property.  **Exhibit A**.

13.     The initial Contract price was $308,395.70 which increased to $466,255.70 through Change Orders #1-10.  **Exhibit E**.

### No Builder's License

14.     The Contract provided that Exigent would obtain permits for scope of work outlined in the Contract.

15.     Michigan law requires contractors to include their residential builder's license information as a part of their contracts.  M.C.L. § 339.2404a.

16.     At the time the parties signed the Contract, neither Heitmann nor Exigent held a residential builders license.

17.     Nevertheless, at the bottom of each page of the Contract and each change order a representation is made that their license number was

"802082183."

18.    The number "802082183" is not a license number of any kind ("Phony License Number").

19.    At the time he signed the Contract, Heitmann knew that the Phony License Number did not refer to a Michigan Residential Builder's License or any other license number.

20.    Heitmann's inclusion of the Phony License Number on the Contract was intended to, and did, deceive Plaintiff into believing that Heitmann and/or Exigent held a Michigan Residential Builder's License.

21.    Heitmann and Exigent also misrepresented to Plaintiff that they possessed the requisite skill and experience to satisfactorily perform under the Contract.

22.    Plaintiff relied upon Heitmann's misrepresentations.

23.    Plaintiff suffered damages as a result of his reliance on Heitmann's misrepresentations.

24.    As the Contractor did not have a residential builders license it had no ability to legally apply for a building permit in its own name.

25.    Despite this, the Contractor invoiced the Plaintiff for permits and represented in the Contract numerous times in the Contract it had the ability and would pull the required building permits.

26.     Contractor used Henry Bell/Construction Contractors, Residential Builder's License to obtain three permits for this project.

27.     The work done by Contractor was <u>never approved</u> by the City of Royal Oak.

28.     None of the three building permits that the Defendant obtained by fraudulently using Henry Bell/Construction Contractors, residential builder's license were finaled (approved); two expired and one was cancelled.  **Exhibit B, C,** and **D**.

29.     Upon information and belief, Henry Bell/Construction Contractors did not authorize the Contractor to utilize his residential builder's license to apply for building permits.

30.     Plaintiff suffered damages as a result of his reliance on Heitmann's misrepresentations.

31.     Heitmann and Exigent failed to properly perform the work as required by the Contract.

32.     Contractor was not licensed to do the work that they contracted for with the Plaintiff.

33.     Contractor was not competent to do the work that they contracted for with the Plaintiff.

34.     In August 2023, an assessment was done of the work of the Contractor. **Exhibit F**.

35.    Additionally, the work done by Contractor was done in a sloppy and

unworkmanlike manner, including, but not limited to:

A.    The swimming pool had a series of several serious leaks, causing it to be repeatedly emptied, "repaired," and refilled. In addition to the constant disruption of the re-digging in and around Creditors' backyard for more than three years, this also caused Creditors to incur water bills in excess of $10,000.00;

B.    Tiles in the swimming pool routinely fell off. Eventually, Contractor admitted that he used an improper tile for a pool in Michigan's climate. The plaster and tiles were also poorly set and grouted. When the Contractor finally installed replacement tiles (more than three years later), the new tiles were, again, poorly installed and grouted, with several coming loose. The poor grouting and plaster work caused materials to "fall out" and get into the water pump and filter, damaging them;

C.    The pool skimmers and water pump were improperly installed and routinely failed to function (often running extremely loudly, shaking, and overheating), causing any water in the pool to stagnate and cause algae;

D.    The mechanical pool cover was improperly installed and did not close completely because it was not installed properly and eventually collapsed;

E.    The hot tub was improperly designed and never functioned properly, constantly leaking;

F.    The retaining wall failed, causing damage to a neighbor's lawn (who threatened the Plaintiff with litigation);

G.  A large section of the "heated" driveway never functioned;

H.  Several sprinklers did not function, resulting in patches of dead lawn;

I.  Other sprinklers leaked, causing flooding (killing Plaintiff's trees) and significantly increased water bills;

J.  The driveway lighting failed to function – with some lights smoking and presenting a fire hazard; and

K.  The "automatic" driveway gate routinely malfunctioned, often trapping Plaintiff in their home.

36.  Heitmann was responsible for the operation and management of Exigent, including but not limited to the payment of invoices, collection of accounts receivable, accounts payable, and allocation of trust funds.

37.  Heitmann had sole control and authority over Exigent's bank account and was the sole person with check-signing authority for Exigent

38.  Upon information and belief, Heitmann fraudulently failed to use Plaintiff's payments to pay all subcontractors and suppliers associated with the Contract.

39.  Upon information and belief, instead of using the funds that Plaintiff paid to honor the Contract, Heitmann and Exigent embezzled or converted some or all of Plaintiff's funds.

40.     Upon information and belief, by using Plaintiff's funds for purposes other than to complete the Contract, Heitmann and Exigent violated the Michigan Building Contract Fund Act, MCL §570.151 *et. seq.* (the "MBCFA") which, pursuant to MCL §570.153, is evidence of intent to defraud.

41.     Because of Heitmann's fraudulent misrepresentations, Plaintiff was required to pay substantial funds, in order to remediate Contractor's incompetent work and complete the project.

42.     The additional cost required to remediate Contractor's improper work and complete the contracted job properly is at least $421,670.00. **Exhibit G**.

## Count 1

## <u>Section 523(a)(2)</u>

43.     Plaintiff restates all prior paragraphs of this Complaint as though fully set forth herein.

44.     11 U.S.C. § 523(a)(2) excepts from discharge any debt obtained by false pretenses, a false representation, actual fraud, or intentional use of a materially false statement, with the intent to deceive, on which the creditor relied.

45.     Heitmann and Exigent falsely represented to Plaintiff (a) that he and/or Exigent were licensed to perform the work required by the Contract (including the Phony License Number on the bottom of each page of the Contract and change orders), (b) that they were able to pull the requisite building permits, and

(c) that Heitmann and Exigent possessed the requisite skill and experience to satisfactorily perform under the Contract.

46.    Heitmann and Exigent knew these misrepresentations were false when made.

47.    Heitmann and Exigent made these misrepresentations with the intent to deceive Plaintiff and to induce Plaintiff to sign the Contract, the change orders, and to make payment pursuant thereto.

48.    Plaintiff relied on the misrepresentations.

49.    Plaintiff suffered damages as a result of his reliance on the misrepresentations.

50.    M.C.L. § 570.153 provides,

**Building contract fund; evidence of fraudulent detention or use.**

The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud.

51.    Alternatively, and upon information and belief, Heitmann also misappropriated funds subject to the Michigan Building Contract Fund Act, MCL §570.151 et. seq. (the "MBCFA") which, pursuant to MCL §570.153, which constitutes additional evidence of their intent to defraud Plaintiff.

52.    Accordingly, Plaintiff's damages arise from Heitmann's "false pretenses, a false representation, actual fraud, or intentional use of a materially false statement, with the intent to deceive, on which the creditor relied."

WHEREFORE, Plaintiff respectfully requests that this honorable Court enter judgment in his favor in the amount not less than $421,670.00, plus costs, interest, and attorney's fees, and determine that such judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2).

## Count 2

## Section 523(a)(4)

53.    Plaintiff restates all prior paragraphs of this Complaint as though fully set forth herein.

54.    11 U.S.C. § 523(a)(4) excepts from discharge any debt arising from fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

55.    The funds Plaintiff paid to Exigent constituted "trust funds" under the MBCFA.

56.    Upon information and belief, Heitmann misappropriated funds paid by Plaintiff.

57.    Heitmann misappropriation of trust funds constitutes "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." *See Patel v. Shamrock Floorcovering Servs. (In re Patel)*, 565 F.3d 963 (6th Cir. 2009).

WHEREFORE, Plaintiff respectfully requests that this honorable Court enter judgment in his favor in the amount not less than $421,670.00, plus costs, interest, and attorney's fees, and determine that such judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

## Count 3

### Section 523(a)(6)

58.     Plaintiff incorporates all prior paragraphs by reference.

59.     Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt for willful and malicious injury by the debtor to another entity or to the property of another entity.

60.   A willful injury is one "where the debtor 'desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it.'" Ewers v. Cottingham (In re Cottingham), 473 B.R. 703, 709 (B.A.P. 6th Cir.2012) (quoting Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir.1999).

61.   "Malicious injury means an injury caused in 'conscious disregard of one's duties or without just cause or excuse.'" Cottingham, 473 B.R. at 709 (quoting Wheeler v. Laudani, 783 F.20 610, 615 (6th Cir. 1986)).

62. As a result of Defendant's actions described herein, the Defendant's liability to the Plaintiff in an amount not less than $421,670.00 should be exempted from discharge.

WHEREFORE, Plaintiff respectfully requests that this honorable Court enter judgment in his favor in the amount not less than $421,670.00, plus costs, interest, and attorney's fees, and determine that such judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

Dated:                                        Respectfully Submitted,

                                              **OSIPOV BIGELMAN, P.C.**

                                              /s/     Jeffrey H. Bigelman
                                              JEFFREY H. BIGELMAN (P61755)
                                              ANTHONY J. MILLER (P71505)
                                              Attorneys for Plaintiff
                                              20700 Civic Center Drive, Ste. 420
                                              Southfield, MI 48076
                                               (248) 663-1800
                                              jhb@osbig.com / am@osbig.com

# Exhibit A



Date: 05-14-2020

Ratnesh
232 Forest Ave.
Royal Oak, MI 48067
Building Permit:

Dear Ratnesh,

Thank you for the opportunity to submit the following quotation. We would love to get this project on our schedule. Listed below is a complete breakdown of the scope of work.

**Scope of Work**

**Unknown Variables as of May 14th**

- Automatic gate for driveway - should have quote by early to mid-week next week

**Pavers - $40,797.50**

- Excavate 8 inches
- Fill with 4-6 inches of base rock
- Border of paver will be installed in concrete
- Sleeves will be installed under pavers for ease of access in the future for irrigation or lighting
- Compact base rock using plate compactor
- Spread and screed 2 inches of paver sand over the compacted base
- Align the paver rows using stakes and a string
- Lay the pavers outward starting in a corner maintain a consistent joint width between each paver
- Tap and level the pavers in place
- Fill the joints with polymeric sand to hold the pavers in place
- Sweep away any excess sand from the paver surface
- Apply a fine water mist to the filled joints
- If more pavers are added SQFT will be measured and multiplied by amount charged below:

- Type of paver to be installed:
  - For pool area/patio: Beacon Hill Smooth or Flagstone by Unilock
  - For front walkway: Town Hall by Unilock

License #: 802082183

Phone: (586) 383-8308

Dimensions:

1.  Patio/Pool Area: *As pictured in plan*
    a.  Approx. 1,906.5 sq. ft. x $15= $28,597.50
2.  Front curved walkway: *As pictured in plan*. Curved design, approx. 4' wide, installed herringbone style
    a.  Approx. 215 sq. ft. x $28= $6,020
3.  Driveway ribbons: Approx. 2' wide on both sides of driveway
    a.  Approx. 210 sq. ft. x $28= $5,880
    b.  Additional base for driveway= $300

## Seating wall and Steps  - $7,200

- Excavate and remove soil
- Base will be 6" thick
- Sand will be installed for leveling
- Finishing cap will be placed on top and secured with adhesive - *only where listed*
- Paver block to be installed: U-Cara Pitched or Smooth by Unilock with Ledgestone Coping by Unilock

1.  Seating wall by fire pit: L-shaped, 10x10' and 2' tall
    a.  40 phase ft. x $80= $3,200
2.  Front door steps
    a.  Approx. 20 phase ft. x $80= $1,600
3.  Back patio door steps with wingwall
    a.  Approx. 30 phase ft. x $80= $2,400

## Exposed Aggregate for Driveway- $11,700

- Frame for concrete slabs
- Install base rock and compact
- Install rebar/wire
- Pour concrete into the mold
- Screed the top of the concrete
- Float concrete surface to compact
- Make control joints every 5 to 6 feet with groover
- Slope will be away from home

- Type of concrete:
    o  Exposed aggregate (not including driveway brick paver ribbons on side, those are in paver section above)
    o  *White concrete - will be approx. $2,600 cheaper*
    o  *Brick pavers will be about $7,800 more*

License #: 802082183

Phone: (586) 383-8308

Dimensions:

- Exposed: Approx. 1,300 sq. ft. x $9= $11,700

## Auto Pool Cover - $15,000

- Automatic Pool Cover for pool
- Push button
- Strong enough to walk on top
- Rail track system plumbed into brick

## Pool and Hot Tub- $111,638

- Gunite rebar 20x40 shell also spa 10x10 spa infinity edge two sides spilling into the pool - $48,000
- Sun Shelf and steps - $4,000
- Plaster pebble tec finish - $17,500
- Tile around spa and around pool water line 200 linear - $12,000
- Coping brussels brick paver 120 x $20 - $2,400
- Permits and engineering/plans for city for pool= $2,500
- Rebar minimum spacing 12"-18" Floor thickness 6"-8" walls minimum 8"-10" per engineer plans



- Run electrical and wire in all pool equipment, pass all inspections, pull permits  -$5,000
- Trench conduit for electrician 18 " deep trenched - $500
- Trench as line 18"for boiler - $500
- Licensed plumber come in run gas line pass depth test/air test - $1,500

License #: 802082183

Phone: (586) 383-8308

- Pool Equipment/Accessories - $10,750 (listed below)
- Clean and clear cartridge filter= $898
- The EasyClean D.E. Inground Filter makes it even easier to enjoy the added water clarity that only D.E. media can deliver. This simple, trouble-free and highly effect filter features a fiberglass-reinforced, chemical-resistant, polypropylene tank with no-tool servicing for easier cleaning.
- Integrated Continuous High Flow™ Internal Air Relief *
- Lock ring with spring-loaded safety latches
- High Flow Manual Air Relief Valve
- 1-in. drain and wash out
- Single-piece base and body design
- Unionized connections
- Note: Actual system flow will depend on plumbing size and other system components.
- Note: Pentair Aquatic Systems does not recommend flow rates above 150 GPM.
- *Integrated Continuous High Flow Internal Air Relief is operational only when there is unobstructed flow in the circulating system.
- Note: Operating limits—Maximum continuous operating pressure of 50 psi. Pool/spa (bather) applications, maximum operating water temperature (internal filter) 104° F (40° C).
- 1.5 HP Superflow VST pump= $990
- 3 hp vst pump for jets - $1,000
- Maintenance pump to run daily with filter/heater.
- The Superior Replacement Pool Pump with TradeGrade Designation
- The SuperFlo VST Variable Speed Pool Pump features sophisticated technology in a simple to operate pump. Designed for pool owners who are practical and like to save, the SuperFlo VST pump has a dependable and robust Totally Enclosed Fan Cooled motor and can adapt to 115V to 230V and 50hz or 60hz power with no special wiring or switching.
- Improved mechanical seal for long, dependable performance
- Superior drop-in replacement for the Hayward® Super Pump® and existing Pentair SuperFlo pumps
- Ideal for new and standard pool pump replacement for pools requiring up to a 1.5 HP pump
- Simple, easy-to-use digital control keypad with three programmable speeds, override capability and a real-time, 24-hour clock



  - (1) LED ColorBright lights
  - 2 x $487= $974
- Choose from 5 predetermined fixed colors (blue, green, magenta, white and red) or 7 popular preprogrammed "color shows"

License #: 802082183

Phone: (586) 383-8308

- Consumes up to 50% less energy than competitors' lights
- Pool lens can be rotated to 180° to provide wide beam pattern (standard) or narrow beam pattern
- Designed to work with IntelliTouch® and EasyTouch® Control Systems



- Intellibrite controller for lights= $269
- Heater 200k BTU pentair heater - $1,989



- All the Efficiency, Convenience and Reliability You Want in a Gas-fired Pool Heater
- As easy to use as your home-heating system, the MasterTemp pool heater has user-friendly indicator lights that make system operation and monitoring a snap. The compact design and quiet operation won't intrude on your swimming and poolside enjoyment.
- Best-in-class energy efficiency*
- Manual gas shutoff when service is required
- Eco-friendly MasterTemp is certified for low NOx emission and outperforms industry standards
- Rotating digital display allows for easy viewing
- Tough, rustproof exterior handles the heat and weathers the element.
- **Salt Chlorine system -** $1,489
- A Salt Chlorine Generator that Turns Salt into Water-purifying Chlorine
- IntelliChlor uses common table salt to produce all the chlorine a pool needs, safely, effectively and automatically. It provides the same sanitation performance as harsh chlorine additives without the drawbacks. There's no need to buy, handle and store chemicals.
- Full diagnostic capabilities, including cell-life tracking that communicates remaining hours of cell life in real-time
- Push-button operation and easy-to-view displays enable fast checking of salt levels, cell cleanliness, sanitizer output and water flow
- Automatic shut-off feature protects the unit and prolongs cell life under low-water-temperature conditions

License #: 802082183

Phone: (586) 383-8308

- On-time cycling prevents calcium and scale buildup to maximize cell life
- Communicates with IntelliTouch®, EasyTouch® and SunTouch® Automation Systems



- Automation system - $2,500
- Automation setup so every feature is controlled from cell phone app - $500
- The IntelliCenter Control System for Pool and Spa is the latest automation innovation from Pentair. Easily and intuitively manage the features of your pool and/or spa from anywhere in the world with IntelliCenter's remote access and built-in connectivity for the ultimate in convenient control.
- Provides real-time email alerts
- Easy to use, intuitive user interface on touchscreen interfaces with multiple controller options
- Optional indoor control panel and wireless remote
- Controls spa jets, lights and light shows, blower, water features remotely
- Interfaces with iOS®, Android® mobile devices, Apple Watch®, Amazon Echo® and Google Home® smart speaker, enabling owners to check their pools status remotely



- 3 step economy ladder installed - $389
- Stair Rail Installed $239

Plumbing - $6,988 (listed below)

- Plumbing equipment pad also skimmer, return and main drains - $6,500
- 200 feet of 2" flex line= $488
- 12 jets in spa with good pressure

License #: 802082183

Phone: (586) 383-8308

- Pressure test all plumbing before gunite

## Limestone - $13,125

- Excavate area
- Install base 4-6 in.
- Measure out each piece of limestone
- Plan out where to place each rock after measurements
- Compact base every 4 in.
- Install rock
- Our natural limestone comes from our exclusive quarry in Canada

Approx. dimensions: 38.5 ft out from left side of front entrance, 32' back, then 17' to left side of house. Approx. tallest height= 1-1.5'

- 35 tons x $375= $13,125

## Outdoor Kitchen* - $23,975

- *Price doesn't include granite for countertops
- All costs below include shipping/delivery charge
- Paver block will be used to build kitchen - $11,475
- Grill (American Outdoor Grill, T-series, 36", stainless steel) - $2,500
- Fridge (Fire Magic, Outdoor Rated, DR, 23.9"W x 33.75"H, **right hinge**) - $4,250
- Sink and faucet set (Fire Magic, Outdoor Rated, 15x15", stainless steel, cold water faucet)- $650
- Double access doors (21" H x 30" W, stainless steel, for storage underneath grill + sink) - $550 x 2 (two sets of doors) = $1,100
- Licensed plumber/electrician to run gas lines/electric to the following items as well as pull all necessary permits and pass all necessary inspections; to grill ($1,000), electrical to fridge ($2,000), water to sink ($1,000)= $4,000
- Type of block used: U-Cara Pitched or Smooth by Unilock (same material as seating wall, fire pit and steps)
- *Countertops will not be installed by Exigent. We do not install granite, however, we can manage the process for the install and homeowner is then responsible for payment to granite company.
  - Will need to order about _____ sq. ft. of granite., with cuts around sink and grill, and with overhang on bar stool side

- Dimensions for paver block for kitchen: (L-shaped, Approx. 3' tall, 3' in depth, and 7.5x12.5')
  - Approx. 153 phase ft. x $75= $11,475 (listed above)

## Gas Fire Pit - $4,230

- Paver block will be used to build gas fire pit - $2,025
- 4' burner placed in center with drop-in pan - $950
- Fire pit glass rock (any color) - $255
- Run gas line to fire burner by licensed plumber, pulling all necessary permits and passing all necessary inspections - $1,000
- Type of block used: U-Cara Smooth or Pitched by Unilock (same as steps, kitchen, and seating wall)

License #: 802082183

Phone: (586) 383-8308

- Dimensions for paver block for fire pit: (Approx. 1.5' tall, 3x6')
  - Approx. 27 phase ft. x $75= $2,025 (listed above)

**Planting - $12,132.50**

- Excavate for plants that have been approved by homeowner
- Install all plants
- Excavate 1.5X height and 2X width of plant
- Each plant will be installed with fresh topsoil and native soil to ensure proper growth
  - Topsoil: Approx. 13 yds. x $65= $845
- *Location of plants are specified in plan*

- (40) 5' Degroot Spire Arborvitae: 40 x $165= $6,600
- (39) 12" Green Velvet Boxwood: 39 x $62.50= $2,437.50
- (6) #2 Cypress Golden Mop: 6 x $40= $240
- (8) #3 Incrediball Hydrangea: 8 x $65= $520
- (4) #3 Pinky Winky Hydrangea: 4 x $65= $260
- (5) #3 Double Knockout Pink Rosewood: 5 x $40= $200
- (2) 2" trunk Fastigiata European Hornbeam Tree: 2 x $515= $1,030

**Decorative Stone - $4,231.70**

- Grading and compaction to receive stone
- Landscape fabric will be stapled underneath stone
- Install stone 2-3 inches thick to prevent weeds

Stone Details - Black Ice Medium from our supplier Rocks n Roots - Enough to cover approx. 1,515 sq. ft. + 640 sq. ft for fenced in units area= 2,155 sq. ft. total

- Material Cost: 22 tons x $112.35= $2,471.70
- Labor and delivery: 22 tons x $80= $1,760
  - Total= $4,231.70

**Sprinkler System and Drip Irrigation - $2,400**

- Sprinkler system for front and back yard
- Will need approx. 2 zones in back and 3 in front
  - 5 zones x $380= $1,900
- Connect to controller and timer
- Each plant will have a drip emitter - $500

License #: 802082183

Phone: (586) 383-8308

Page 9

## Lighting - $7,795

- Assemble lights
- Attach transformer to home with photocell, auto on/off - $850
- Place lights in correct location specified on plan
- Run 12-2 cable to each fixture starting at transformer
- Splice each fixture into main cable, will leave 3' of excess wire to allow for adjustment
- Mount each fixture
- Make sure all wires are buried properly
- Connect cable to transformer box
- Adjust position of lighting

Type of lights to be installed:

- (36) Hyve 22 RVS lights by In-Lite: (Circle lights drilled into brick pavers) 10 around pool, 2 by seating wall, 3 by outdoor kitchen, 2 by back patio steps, 8 in front walkway, 11 on driveway ribbons)
  - Material+delivery: 36 x $55= $1,980
  - Labor to install: 36 x $100= $3,600
    - Total= $5,580
- (7) Scope lights by In-Lite: (Spotlights in front inside landscape beds) 3 in right landscape bed, 4 in limestone bed on left)
  - Material+delivery: 7 x $105= $735
  - Labor to install: 7 x $90= $630
    - Total= $1,365

## Artificial Turf - $15,906

- Demolition
- Excavate 4 inches
- Grade and compact to receive gravel
- Add 3-4 inches of base rock
- Rake and compact
- Middle of base will be 1' higher to ensure good drainage and authenticity
- Compact gravel
- Install synthetic turf
- Nail turf in place and seam together if needed.
- Cut turf to fit the landscape
- Add silica sand and use powerbrush push sand into grass blades
- Level out any low spots
- Clean up and dispose of all materials

Dimensions: 15x37' in back by pool, 23x33.5' by driveway
- 555 sq. ft. x $12= $6,660
- 770.5 sq. ft. x $12= $9,246

License #: 802082183

Phone: (586) 383-8308

**Artificial Living Wall - $1,565**

- Installed on one fence panel facing dining room area
- Using Fire Retardant, UV Rated, Outdoor Artificial Boxwood Foliage
- Material is approx. 1 inch thick
- Boxwood mat
  - Material and shipping cost: $275
  - Labor to install and adhere to fence: $350
    - Total= $625
- (2) 9.5' UV Rated, Outdoor Artificial Flowering Bougainvillea Vines, cut and placed in multiple areas on fence panel for some color
  - Choose from 5 colors: fuschia, peach, lavender, red, white/cream, or purple
    - Material and shipping cost: $70 x 2= $140
    - Labor to install and adhere to boxwood mat wall: $200
      - Total= $340

Artificial wall material cost only $600

 

**Sod - $3,500**

- Topsoil will be installed as base
  - Topsoil: Approx. 30 yds. x $55= $1,650
- New, fresh rolls of sod will be installed
- Sod will be laid out as specified in diagram/homeowner specs

Sod Details: For front yard
  - Approx. 3,700 sq. ft. for front yard only
    - 3,700 x $0.50= $1,850

License #: 802082183

Phone: (586) 383-8308

**Idea builders subcontracting overhead - ~~$20,000~~ $10,000**

Idea builders are taking all payments from Ratnesh and cutting Exigent a check immediately for all progress payments. Exigent Is taking over all exterior work.

**Vinyl Fence - $19,800**

- 328 linear ft white vinyl fence with lattice design on top (similar to picture below)
- Pour footings 42" minimum, per code
- 2 6' gates



photo courtesy of - Paramount Fence - www.paramountfenceco.com

*Upgrade to Jewelscapes glass finish for the pool for paying 150K up front*

**Porch - ~~$7,400~~ $3,000 Porch to be determined**

- Build porch out of brick pavers and paver block
- ~~Dimensions: 275 sq ft for pavers = $4,400~~
- Porch wall: Approx. 60 ft. long total and 1' tall= $3,000
- Retaining wall around porch built using U-Cara paver block, same block as fire pit and outdoor kitchen
- Porch floor built using same brick pavers as around pool

License #: 802082183

Phone: (586) 383-8308



2 more panels of artificial turf, material cost only $400

→ Total Investment - $322,795.70 (minus $2,500 credit= $320,295.70) (minus changes made after initial signing= $308,395.70)

Homeowner's Initials Acknowledging Total Investment+Progress Payment Schedule

*Note that if for any progress payment homeowner chooses to pay with a credit card, there will be an additional 3% convenience fee added to amount.**

**The 3% fee is an additional fee and does not count towards the rest of the progress payments.

Terms & Conditions of this quote, as well as any change order thereafter-

These terms & conditions protect Exigent Landscaping, LLC as well as the homeowner if any issues should arise. Please review carefully.

General Contract Terms:

1. Exigent's employees stand behind all their work, if any problems with install come up, contact us.
2. Add-ons/extras must be paid upon completion or immediately.

License #: 802082183

Phone: (586) 383-8308

3. Both parties are entitled to a filled out copy of agreement, signed by homeowner and contractor.
4. By signing, homeowner agrees to everything stated in contract.
5. If there is a change order, a revision will be sent through email.
6. Before work is started on property, Exigent will call Miss Dig to mark utilities. Please do not disturb these markings as they are important to us to know where these utilities are at time of project. If any sprinkler lines are damaged by Exigent we will fix it and homeowner will not incur cost. We are not liable for any other damaged utility lines, including but not limited, to cable, gas, water, etc.
7. If an item is not stated in this contract, it is NOT included. Nothing in designs are included if they are not listed on here, ex. Outdoor furniture, coping on steps, etc. Designs only provide homeowner with a vision, they are never 100% exact.
8. All prices in any contract provided by Exigent are only good for 30 days from the date listed in the top right corner of front page of quotes. After 30 days, prices may rise due to changes in gas prices, material prices rising, etc.
9. If an item/service listed in this contract can no longer be performed/purchased by Exigent once job is started for whatever reason, Exigent is no longer liable to perform/purchase item/service and homeowner will be notified and fully refunded for that item/service. Ex. if type of paver(s) get discontinued, etc.
10. Exigent is not responsible for pets that get loose. Exigent is also not responsible if they hit an invisible fence line. This must be marked out by homeowner before Exigent initiates work.
11. Exigent will clean up job sites end of day as best as possible, however, homeowner's property/surrounding area(s) will not be cleaned up 100% until Exigent is completely finished with the job.
12. If another contractor/company is ever present during the course of Exigent's working period, Exigent can not be held liable for any damage that occurs to the homeowner's property.
13. If a permit/architect plan payment is not listed above, but becomes needed at any point during project, a charge will incur a minimum of $150 to a maximum of $3,000 depending on size of project.
14. If final payment, including payment of all change orders, is not received on the day of completion, payment is subject to late fees. If payment is not received after 30 days, Exigent is subject to place a lien on homeowner's property. If at any point during the project a progress payment is not paid, Exigent reserves the right to commence work until payment is received.
15. Down payments are non-refundable.
16. Once contract is signed, homeowner agrees to make no changes to contract that will lower the contract signing price by 20% or more.
17. Unknown conditions are not Exigent's responsibility.
18. All claims and disputes arising under or relating to this Contract are to be settled by binding arbitration in the state of Michigan or another location mutually agreeable to the parties. An award of arbitration may be confirmed in a court of competent jurisdiction.

**Materials:**

1. Materials cannot be changed once purchased by Exigent. Location of patio, ledgerock, limestone, etc. cannot be changed once base has begun to be dug by Exigent.
2. If more material is needed for any scope of work, sqft or cost per item will be re-measured and multiplied by amount charged.
3. Any leftover materials/tools are property of Exigent. In many cases we have to purchase full pallets of brick, or an even tonnage of limestone from our supplier, but the homeowner is only paying for what is listed on quote/invoice.
4. All concrete types (white, stamped, and aggregate) are mixed on site before being poured by our concrete company. Color will almost never be exact as color promised, however 90% of time concrete will be very similar. Exigent is not responsible if color is not exact. Patio/walkway/etc. will be installed as is. If color is not

License #: 802082183

Phone: (586) 383-8308

to homeowner's standards, Exigent is not responsible to rip out patio/walkway/etc. or pay for new concrete load.

5. If homeowner purchases any material, we are not responsible for the trash/debris associated with that material. As well as if homeowner has other contractor(s) on site, we are not responsible for their trash/debris.

## Warranties:

1. Exigent is not responsible for any weeds after install. Weedblock/landscape fabric is not a guarantee.
2. It is homeowner's responsibility to maintain all aspects of landscaping after install. A professional company should be hired afterwards to maintain all living items such as trees, shrubs, etc. as well as any maintenance needed/desired for hardscape.
3. Exigent is not responsible for damage to existing concrete driveways/sidewalks/walkways on homeowner's property. Exigent's machines are made to not crack cement, however, if the cement does crack that means the base was never installed properly and Exigent cannot be held responsible.
4. Exigent warranties concrete for 1 month after install.
5. Exigent provides a 3-year limited warranty on brick paver labor. If a brick paver itself cracks or is damaged, all manufacturers have a lifetime warranty and Exigent will just charge a $95 service fee for labor to come out to replace it. The warranty covers settling and paver shifting. Warranty does not cover self-inflicted damage, salt damage, or causes by natural disaster(s).
6. Some paver blocks may tend to chip. Exigent is not responsible for any chips in block. Unfortunately, we have no control over the pallet choice at our supplier. However, we will do our best to hide chips in block.
7. Exigent does not manufacture its brick pavers, therefore, if paver(s) produce efflofloresence this is not Exigent's fault and they will not compensate homeowners for new pavers nor will they re-install new ones without charging for additional labor. However, Exigent will help homeowner coordinate with Pavers' Manufacturer to see what the Manufacturer can do for homeowner.
8. Exigent provides a 1 year warranty on all composite decks. The warranty covers only issues with labor that arise, this warranty does not cover physical damage to deck, damage to wood, or damage caused by natural disasters or self-inflicted damage.
9. In-lite lights come with a 3-year limited warranty. Exigent warranties their labor in installing them for 1 year. Warranty doesn't cover physical damage, self-inflicted damage, damage caused by natural disasters, or water damage.
10. There are no warranties on plants/shrubs/trees/flowers.
11. There is no warranty on re-planted/transplanted plants/shrubs/trees/flowers.
12. There are no warranties on sod/seed and straw.
13. Exigent is not responsible for any rotting wood after install.
14. Exigent is not liable for any damage caused to any scope of work due to natural disasters.
15. Warranties on all products bought from suppliers, other than pavers and paver block, such as outdoor fridges, outdoor/indoor fireplaces, outdoor sinks, etc. all follow original manufacturers' warranties. Exigent does not provide any extra warranty on these products.
16. Any and all invoices not paid in full will result in no warranty on work completed by Exigent.

**Homeowner's Signature (as well as initial on investment amount):**

License #: 802082183

Phone: (586) 383-8308

Page 15

Name _____Date:

Signature _____


**Exigent's Salesman's Signature:**

Name _____ Date:

Signature _____

License #: 802082183
Phone: (586) 383-8308